# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLAINTIFFS JEANNE and NICOLAS STATHAKOS, individually and on behalf of all others similarly situated,<br><br>                      Plaintiffs,<br>  v.<br><br>COLUMBIA SPORTSWEAR COMPANY; COLUMBIA SPORTSWEAR USA CORP,<br><br>                      Defendants. | **Case No. 4:15-cv-04543-YGR**<br><br>**EXPERT REPORT OF ARTHUR OLSEN** |

_____

My Assignment

      1.      Based on my extensive experience in the information technology ("IT") field and my prior work as a data management expert in other cases, I have been retained by Plaintiffs to review and analyze detailed sales transaction data produced by Defendants Columbia Sportswear Company and Columbia Sportswear USA Corporation ("Defendants" or "Columbia") in connection with the above-captioned action, and to testify at deposition and trial if necessary. I have personal knowledge of the following except where so stated, and could and would competently testify thereto.

      2.      My initial assignment was to provide my opinions regarding whether Columbia has gathered and retained sufficient historical sales data in order to allow me to perform certain calculations under a variety of assumptions, for all potential class members, under the theories of restitution and damages being advanced by Plaintiffs.

1

3. As detailed throughout the rest of this report, based on my experience and the information and data that I have reviewed, I conclude that Columbia has maintained, and can provide access to, the data necessary to perform the requested calculations on a classwide basis.

4. Having determined that sufficient data exists as to a subset of seven of the products at issue in this case, I was also asked to perform the calculations necessary to arrive at values pursuant to three models of restitution and/or damages.

5. As detailed below, I calculated actual values for the following measures of restitution and/or damages based on detailed sales data available for the seven outlet-exclusive products Plaintiffs purchased. The three measures can be described as follows:

    a. Full refund;

    b. Promised percentage discount; and

    c. Disgorgement of profit.

6. My calculations, which were limited to the seven outlet-exclusive products the Plaintiffs purchased, are as follows:

    a. Full refund: $649,357.37

    b. Promised percentage discount: $194,342.45

    c. Disgorgement of profit: $366,180.72

Summary of My Qualifications

7. I am the principal of Cassis Technology, LLC, an IT consulting firm, and have nearly 20 years of professional experience in the IT field, specializing in the areas of data analysis, database development, database administration, and database support. My qualifications and background are set forth in my consultant profile ("Profile") attached hereto as **Exhibit A**.

8. Prior to starting my own firm, I worked as a database engineer for Microsoft Corporation ("Microsoft"). For my first assignment at Microsoft, I was the primary database engineer on a team tasked with integrating and scaling an online billing system obtained by Microsoft as part of a corporate acquisition. When this project was completed, the system could handle fifty thousand concurrent connections, and ten million users in total. From there, I participated in the design, implementation, and support of an extensive data warehousing solution for Microsoft's licensing division, which processed monthly transactions in excess of two billion dollars. I was awarded Microsoft's award for operational excellence in connection my database-related work at the company.

9. I also worked for Hewlett-Packard Company ("Hewlett-Packard") as a database engineer. Among other responsibilities at Hewlett-Packard, I served as the primary database administrator for both Oracle and SQL Server systems that supported the three primary manufacturing divisions within Hewlett-Packard (laptops, desktops, and servers), and also served as the lead analyst in charge of compiling, analyzing, and processing data from the various internal database systems throughout Hewlett-Packard for use in litigation support.

10. In addition to my work for Microsoft and Hewlett-Packard, I have provided database services to a number of other large corporations, including Cisco Systems, Inc. My responsibilities in that regard have included integrating various internal database systems for financial reporting services. I have also managed the development of data integration solutions for small to mid-size companies, and developed a solution for integrating an automated process for the calculation of inventory reserves with Oracle Financials.

11. I also have experience working on several litigation consulting projects. A list of the cases in which I have offered testimony during the past four years is attached hereto as **Exhibit B**.

12. For example, I previously provided trial testimony and was qualified as an expert witness in a consumer lawsuit against Wells Fargo relating to its overdraft practices and fees, which ultimately resulted in a judgment of over $200 million against Wells Fargo. *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010) ("*Gutierrez*"). In its Order awarding restitution to the class members, the court found that I had done a "professional and careful job" in connection with this work:

> This order finds that plaintiffs' expert Arthur Olsen has convincingly shown that it is entirely practical to re-run the computerized data in storage for each class members' account and determine how many overdrafts were added by the high-to-low practice for debit-card transactions during the class period. Indeed, he has already done so, using various alternate posting sequences. This has been done by him on an account-by-account, day-by-day, and transaction-by-transaction basis, using the bank's own real-world data. Court orders were needed to provide him access to this data, but-after much work and time-this order finds that Expert Olsen has done a professional and careful job in laying out the impacts of various alternative posting protocols. This work has not only demonstrated the enormous impact of the high-to-low scheme, but it has demonstrated that it is possible, in considering relief and restitution, to add back to depositors' specific accounts the amounts that were wrongfully taken by Wells Fargo, using posting protocols that this order finds would have tracked the ordinary and reasonable expectations of depositors.

*Id.* at 1139.

13. In addition to my work in the *Gutierrez* case, I was retained by plaintiffs as a consultant and expert in the massive multi-district litigation *In re: Checking Account Overdraft Litigation*, MDL No. 2036 ("Overdraft MDL"). In connection with my work in the Overdraft MDL, I have analyzed historical transaction data from over thirty of the largest banks in the United

4

States, including but not limited to: Bank of America, BancorpSouth, Capital One, Comerica, Compass, Great Western, JPMorgan Chase, PNC, RBS Citizens, TD Bank, Union Bank, and US Bank. The purpose of each analysis was to determine the feasibility of using bank data to: (a) identify which customers were harmed as a result of each bank's particular posting practices; and (b) calculate the amount of harm (*i.e.*, additional overdraft fees) each such customer incurred as a result of such practices. In each of these cases, I was able to successfully perform these tasks.

14.  The data produced in these banking cases varied considerably from case to case. For instance, in one case, the bank produced over 20 million individual monthly statements in PDF format. In another case, the bank produced massive database extracts from a data warehouse. But the most common format in which data was produced was flat Unicode text files containing data in report format. Regardless of the format, it was not uncommon for a data production from a single bank to include hundreds of billions of records and reach sizes in the tens of terabytes, especially for the largest banks.

Evaluation of Data Available in this Case

15.  In connection with my work on the present action, I have reviewed the following documents:

  a. The deposition transcript of Columbia's James Robert Bui, with exhibits. Among other things, Mr. Bui's testimony concerned ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Transcript of Deposition of James Robert Bui, Sept. 28, 2016 ("Bui Depo"), at 23:12-17.

  b. Sample sales data pulled from Columbia's "Aspect" system, (Bates number Columbia 01054). This Excel spreadsheet contains ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

5

███████████████████████████████████████████████

███████████████████████████████████████. Specifically, the seven sample products included in the data, as identified by "JDE Style Number" and "Material Style Number", are as follows: (1) XM6093 / 1637371; (2) XL4712 / 1635771; (3) XO5035 / 1684441; (4) XL6923 / 1646671; (5) XL5077 / 1660021; (6) XL5012 / 1586361; and (7) XL6981 / 1677821.

c. MSRP to outlet price costing matrix, (Bates number Columbia 00183). This PDF contains a ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ I use the terms "MSRP" and "outlet price" accordingly in this report.

d. Product-level pricing data for outlet-exclusive items, (Bates numbers Columbia 00189 and Columbia 01055). These Excel spreadsheets contain, among other things, ██████████████████████████████████████ in the spreadsheet with the Bates number Columbia 01054.

e. Product level costing data, (Bates numbers Columbia 01271 and Columbia 01272). These spreadsheets contain the ████████████████████████████████ ███████████████████ as in the spreadsheet with the Bates number Columbia 01054.

f. Production document Bates stamped STATHAKO000071, which depicts the price tag for outlet-exclusive item XL6981 / 1677821.

6

16. As noted below, I was able to perform a variety of calculations based on various assumptions using the sample data produced by Columbia. Accordingly, it is my opinion that I could perform, at a minimum, the same calculations on a full data set covering all sales transactions of the relevant products for all California customers if and when such a data set is made available to me.

Analysis of Sample Data in this Case

17. For the purposes of performing calculations on the sample data produced in this case, I was asked to utilize the following three models of monetary relief: (1) full purchase price; (2) promised percentage discount; and (3) disgorgement of profit, where profit is calculated as full purchase price less full landed cost. The analysis consisted of the following steps:

   a. The sample sales data from the spreadsheet Bates numbered Columbia 01054 was loaded into a Microsoft SQL Server database. All records were loaded, but any voided items were subsequently excluded. This includes voided transactions ▉ ▉ as well as voided line items ▉ *See* Bui Depo, at 28:15-29:9 ▉ ▉ and at 29:21-30:1 ▉ ▉ and at 53:17-54:4 ▉

   b. For the full purchase price model, the purchase price of each remaining individual line item was summed in order to arrive at a total for the entire sample data set. Specifically, for the remaining individual line items in the data, I summed the values ▉. Based on the testimony of Mr. Bui, ▉ ▉ Bui Depo, at

7

49:21-50:14.  Of note is the fact that in many cases, ███████████████ ███████████████ as in the case of returns or exchanges.  Regardless, these negative values were included in the total to ensure that the final results included all sales, net of returns and exchanges.  For instance, if a customer purchased an item and then subsequently returned the item for a refund, the two transactions would offset each other and would therefore have no effect on the final results.  The total purchase price amount for the seven sample products under this model totaled $649,357.37.

c. For the promised percentage discount model, a promised percentage discount was calculated for each of the seven sample products identified above by comparing the outlet price to the MSRP price.  This calculation consisted of the following steps, and totaled $194,342.45 for the seven sample products:

   i. I first determined the MSRP price for each item, by season, by looking up the product in the spreadsheets with the Bates numbers Columbia 00189 and Columbia 01055.  Specifically, the spreadsheets consisted of ███████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████.

ii. The MSRP price was found to be consistent across all seasons for each product. For example, ███████████████████████████████████ ███████████████████████████████████████. This is noteworthy because in some cases, the season data was incomplete and so an MSRP could not be determined for a given product for a particular season. For instance, ███████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████. In order to account for this, whenever a product was missing from a particular season tab, the MSRP from the other season(s) for that product was used.

iii. Once the MSRP was determined for each product, I attempted to determine the outlet price by comparing each MSRP to the table in the PDF with the Bates number Columbia 00183. However, the values in this table did not always appear to be supported by the sales data. Mr. Bui testified that ███ ███████████████████████████████████████ ████████████████████. Bui Depo, at 46:3-6. ██████████ ███████████████████████████████████████ ███ As a result, for any given product in the sales data, ██████████ ███████████████████████████████████████ ████████████████████████████ For example, ██████████ ███████████████████████████████████████ ███████████████████████

9

██████████████████████████████████████████
████████████████████████████████. Instead, ██
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████

iv. Based on the above analysis, I concluded that the PDF with the Bates number Columbia 00183 is not a reliable source for determining outlet price once the MSRP for a given product is known. Instead, I determined the outlet price for each product by ██████████████████████████ ████████████████████████

v. In one instance, ██████████████████████████████
██████████████████████████████████████████
██████████████████ As a result, I determined the MSRP by referring to STATHAKOS000071, which is a photo of a price tag for product XL6981 / 1677821. An MSRP of $40.00 is clearly visible on the price tag.

vi. Once the MSRP and outlet price was determined for each product, a promised percentage discount was calculated by dividing the difference between the MSRP and the outlet price by the MSRP price. That discount was then applied to the actual purchase price to calculate an amount for each individual transaction. The sum of the discount amount for each transaction was then tallied to arrive at a total for this measure. By way of example, if a product had a $100 MSRP and an outlet price of $80, then the promised percentage discount would be 20%. Assuming an actual purchase price of

$80, a 20% discount from that price would equal $16, so the monetary value associated with that transaction would be $16. Assuming a later transaction for the same item where the actual purchase price for the same item was only $60, I would apply the 20% discount to that $60 purchase price to arrive at a discount value of $12 for that transaction. Likewise, if the actual purchase price was $40, I would apply a 20% discount to arrive at a value of $8 for that transaction.

vii. Using the methodology described directly above, I determined the following MSRP and outlet price values for the seven products, as follows:



d. For the full purchase price less full landed cost model, the total landed cost for each product was subtracted from the actual purchase price for each line item. As noted above, I obtained the actual purchase price for each individual sale of the seven products in the sample from ▬▬▬▬▬▬▬▬▬▬ I obtained the total landed cost for each of the seven products in the sample set ▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬ If the total landed cost for a particular transaction was greater than the

purchase price, I used a value of $0 for that transaction. After I calculated a value for each transaction, I tallied the results to arrive at a total dollar value. Using the methodology described in this paragraph, the resulting total for the seven sample products was $366,180.72.

Conclusions

18. Based on my experience and the information and data that I have reviewed, including but not limited to the deposition testimony of Mr. Bui and the Columbia sales data and documents found at Bates Numbers 1054, 1055, 1083, 1089, 1271 and 1272, I believe that Columbia has maintained, and could provide me access to, the historical sales data necessary to perform classwide damage/restitution calculations in this case.

19. My opinions in this declaration are based upon my extensive experience in the information technology field and my prior work as a data management expert in other cases. I reserve the right to supplement or modify my opinions detailed in this report to the extent that new information is made available through discovery or other means.

The foregoing statements are made under penalty of perjury and are true and correct to the best of my knowledge and belief.

Dated: November 16, 2016

Arthur Olsen