# Exhibit 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEANNE and NICHOLAS STATHAKOS,           )
individually and on behalf of all         )
others similarly situated,                )
                                          )
                    Plaintiffs,           )
                                          )
         vs.                              ) Case No.
                                          ) 4:15-cv-04543-YGR
COLUMBIA SPORTSWEAR COMPANY;              )
COLUMBIA SPORTSWEAR USA                    )
CORPORATION,                              )
                                          )
                    Defendants.           )
_____ )


        VIDEOTAPED DEPOSITION OF NICHOLAS STATHAKOS,

taken at Four Embarcadero Center, 17th Floor, San

Francisco, California on November 3, 2016, at 9:39

a.m., before Jay W. Harbidge, Certified Shorthand

Reporter in and for the State of California.

NICHOLAS STATHAKOS

November 03, 2016

```
 1    a social worker.
 2         Q.      Are you still employed today?
 3         A.      I am.  I'm a social work supervisor with
 4    Adult Protective Services, City and County of San
 5    Francisco.
 6         Q.      Have you ever worked at a clothing store?
 7         A.      Never.
 8         Q.      Have you worked at any other retail
 9    establishment?
10         A.      Never.
11                 Can I pour my juice real fast?
12         Q.      Of course.
13         A.      Thank you.
14         Q.      I'm going to quickly ask ten questions.
15                 All set?
16         A.      All set.
17         Q.      Have you ever met Hassan Zavareei?
18                 MS. SAGAFI:  Zavareei.
19                 MR. RAMSEY:  I'm going to get that right one
20    day.
21    BY MR. RAMSEY:
22         Q.      Hassan Zavareei?
23         A.      No, I have never met him.
24         Q.      Have you spoken on the phone with him?
25         A.      No, I have not.
```

NICHOLAS STATHAKOS

1    Q.    Have you ever met Jeffrey Kaliel?

2    A.    No, I have not.

3    Q.    Have you spoken on the phone with him?

4    A.    No.

5    Q.    Have you met Jeffrey Ostrow?

6    A.    No.

7    Q.    Have you spoken on the phone with him?

8    A.    No.

9    Q.    Other than Kristen or Marty, have you spoken

10   to any other person who is counsel for you in this

11   action?

12   A.    No.

13   Q.    Do you remember the first time that you spoke

14   to Kristen or Marty?

15   A.    I believe that is when I met them earlier

16   this year.

17   Q.    Prior to filing -- do you know when this

18   complaint was filed in this action?

19   A.    I want to say it was last year sometime,

20   October, November.  I don't know the exact date.

21   Q.    Prior to the filing of the complaint -- it

22   was October last year --

23   A.    Okay.

24   Q.    -- did you speak to any counsel?

25   A.    I did not speak to any counsel then.

NICHOLAS STATHAKOS

```
 1      Q.      Did you speak to anyone about this action?
 2      A.      I did.
 3      Q.      Who did you speak to?
 4      A.      There was a person from the law office that
 5   had contacted me and interviewed me, and I believe
 6   Sidney was her name.  She was a paralegal.
 7      Q.      Do you remember when that was?
 8      A.      I would imagine it was a few months before
 9   the action was filed.  I don't have a -- I can't think
10   of a specific date offhand.  Last year.
11      Q.      So a couple of months prior to October?
12      A.      I would imagine so.
13      Q.      Do you know if it was May of 2015?
14      A.      I can't say for sure.
15      Q.      Okay.  When is your birthday?
16      A.      My birthday is February 20th, 1963.
17      Q.      Do you have an anniversary?
18      A.      I do have an anniversary.
19      Q.      What date is that?
20      A.      June 24th.
21      Q.      Do you happen to remember if, when you spoke
22   to Sidney, the paralegal, it was before or after your
23   anniversary?
24      A.      Sorry, I don't --
25      Q.      That's fine.  Sometimes dates like that will
```

```
1    jog people's memories.
2         A.     Yes, I appreciate that.
3         Q.     Other than that conversation with Sidney, the
4    paralegal, did you have any other conversations with
5    anyone prior to the filing of this action about this
6    case?
7         A.     No.
8         Q.     Did you provide any documents to anyone prior
9    to the filing of this action?
10        A.     The only thing I provided is what was asked
11   of me.  And that was it.
12        Q.     But no documents?
13        A.     No.  I provided some -- I believe some photos
14   is what I provided.
15        Q.     Okay.  How was it that you got in touch with
16   Sidney, the paralegal?
17        A.     She got in touch with me.
18        Q.     How did that happen?
19        A.     I filled out this survey online, and then I
20   guess sometime later -- I don't remember how, what the
21   space was between the two -- I got a call from her.  And
22   that was it.
23        Q.     Where did you see the survey?
24        A.     Online.
25        Q.     Was it emailed to you?
```

NICHOLAS STATHAKOS

```
 1      A.      That's the part that I'm a little unclear on.
 2  I've been kind of racking my brains on this.  I don't
 3  remember if it was a pop-up; I don't remember if it was
 4  an aside to something like one of those things you look
 5  at a page and it's on the, you know, left-hand side.
 6  It's like questions.  So that's the part that I'm a
 7  little unclear on, where exactly I filled this out at.
 8      Q.      Do you remember -- so I think you're saying
 9  it may have been an advertisement or something on the
10  side?
11      A.      Yes, yes.
12      Q.      Or it may have been a pop-up?
13      A.      Yes.
14      Q.      Do you know what website you were looking at
15  when you saw it?
16      A.      I don't.
17      Q.      Do you remember if it was a website or like a
18  message board?
19      A.      I don't necessarily go on any message boards,
20  so I don't know if it was, again, a website.  I can tell
21  you it was not an email.  I don't think I was emailed on
22  it.
23      Q.      Okay.  Once you filled out the survey, did
24  you receive a confirmation of any sort, perhaps an
25  email?
```

1    A.    No, not that I can remember.

2    Q.    Okay.  Do you have a copy of the survey?

3    A.    No.  It was online.

4    Q.    Do you remember what questions were asked?

5    A.    What I remember that caught my attention is

6    something like, "Have you shopped at --" I remember that

7    kind of in the question, and then I remember this list

8    of --

9    Q.    Stores?

10   A.    Stores, yes.  And I guess what caught my eye

11   was one of those was Columbia.

12   Q.    And why did Columbia catch your eye?

13   A.    Because I shop there a lot.

14   Q.    Had you shopped at any of the other stores on

15   the survey?

16   A.    I don't remember what they were, but the main

17   one was Columbia that stuck out for me.

18   Q.    Other than the question about what stores you

19   may or may not have shopped at, did the survey ask any

20   other questions?

21   A.    I think there were.  Maybe there was two or

22   three questions.  I don't remember what the others were.

23   I do remember, "Have you shopped at these stores," and

24   you had to check off.  And that's -- what came after

25   that I don't exactly remember.  Maybe there was two

1    questions or three questions.  It was not a long thing;

2    it was kind of a short questionnaire.

3       Q.    Okay.  Do you remember your understanding at

4    the time of why you were being asked to fill out the

5    survey?

6       A.    Offhand I don't remember how the question was

7    posed, so I can't tell you exactly.

8       Q.    Did you believe at the time that you were

9    being asked questions so that you could potentially

10   serve as a plaintiff in a lawsuit?

11      A.    I just don't remember how it was posed, the

12   questions, so I wasn't clear.

13      Q.    So I'm not asking how the questions were

14   posed, but whether independent of the questions or

15   perhaps how they were phrased, whether you understood by

16   filling out the survey that you may end up serving as a

17   plaintiff in a lawsuit against Columbia.

18             MS. SAGAFI:  Objection, asked and answered.

19             THE WITNESS:  I just don't remember that.

20   BY MR. RAMSEY:

21      Q.    When Sidney, the paralegal, contacted you,

22   did you know before she perhaps explained what she was

23   calling about what she was calling about?

24      A.    No.

25      Q.    Was there anything in the survey that you

NICHOLAS STATHAKOS

```
1    remember indicating that either Columbia or any of the
2    stores listed were engaging in some sort of conduct that
3    was deceptive or unlawful?
4         A.    I don't remember how it was phrased.  I just
5    do not.  I know that's how I came in contact, but the
6    substance of it, I'm a little foggy on it.
7         Q.    Do you know if you have an agreement between
8    yourself and your counsel for their representation of
9    you in this case?
10        A.    I do.
11        Q.    Did you sign it?
12        A.    I did.
13        Q.    Do you remember when you signed it?
14        A.    Well, I don't remember the exact dates.  I
15   believe I met Kristen and Marty around February or March
16   and spoke with Sidney sometime before the suit was
17   filed, so somewhere in between that time.
18        Q.    Was the conversation with Sidney on the
19   phone?
20        A.    Yes.
21        Q.    Did you ever meet with Sidney?
22        A.    Never.
23        Q.    So between the phone call with Sidney and the
24   time you met with Kristen and Marty earlier this year,
25   did you meet with anyone in person regarding this case?
```

```
 1      A.      No.
 2      Q.      Did you speak to anyone on the phone between
 3  those two time periods regarding this case?
 4      A.      Yes.
 5      Q.      Who did you speak with?
 6      A.      Sidney.
 7      Q.      I'm sorry.  So was there more than one call
 8  with Sidney.
 9      A.      Yes, there were a couple of calls.
10      Q.      I see.  How many calls were there with
11  Sidney?
12      A.      I don't remember.
13      Q.      More than five?
14      A.      I couldn't remember.
15      Q.      But definitely more than one?
16      A.      Yes.
17      Q.      Do you remember how far apart the first one
18  and the second one was?
19      A.      No.
20      Q.      Do you remember if you signed the engagement
21  letter prior to the filing of the action?
22      A.      I don't remember.
23      Q.      Was it before or after the first phone call
24  with Sidney?
25      A.      I would imagine it was after.
```

NICHOLAS STATHAKOS

November 03, 2016

```
 1      Q.     What did Sidney ask you on that first phone
 2  call?
 3             MS. SAGAFI:  Objection, calls for a
 4  privilege.  I'll instruct the witness not to answer.  No
 5  way.
 6  BY MR. RAMSEY:
 7      Q.     What did you tell Sidney on the first phone
 8  call?
 9             MS. SAGAFI:  Same objections.  Don't answer
10  that.
11  BY MR. RAMSEY:
12      Q.     When you spoke with Sidney that first time,
13  did you understand that she was representing you?
14      A.     The first time she was not representing me;
15  she was representing her law firm.
16      Q.     When you spoke with Sidney that first time,
17  did you understand that anyone at her law firm was
18  representing you?
19      A.     No.
20      Q.     Well, I'll ask it again.  Do you remember
21  what Sidney -- or what did Sidney tell you in that first
22  phone call?
23             MS. SAGAFI:  Objection, calls for privileged
24  information.  Do not answer.
25  BY MR. RAMSEY:
```

NICHOLAS STATHAKOS

```
 1      Q.      What did you tell Sidney on that first phone
 2  call?
 3              MS. SAGAFI:   Same objection.  Do not answer.
 4  BY MR. RAMSEY:
 5      Q.      Have you paid any money or legal fees to any
 6  counsel in this case?
 7      A.      I have not.
 8      Q.      Have you paid any costs associated with this
 9  case?
10      A.      No.
11      Q.      What is your understanding of the claim that
12  you are asserting in this case against Columbia?
13      A.      The claim is that basically Columbia used
14  deceptive pricing in its outlet stores and sold items
15  that were not necessarily sold in their retail stores.
16      Q.      What is your understanding of what you're
17  contending is deceptive about Columbia's -- excuse me --
18  pricing at its outlet stores?
19              MS. SAGAFI:   Objection, calls for a legal
20  conclusion.
21  BY MR. RAMSEY:
22      Q.      You can answer.
23      A.      Sorry.
24      Q.      That's fine.
25      A.      I'm contending that the items that were sold
```

NICHOLAS STATHAKOS

November 03, 2016

```
 1    item?
 2        A.      No.  How could I know that?  That is -- when
 3    I see a price -- when I see a price tag attached to an
 4    item, that is what I believe it is, nothing more,
 5    nothing less.
 6        Q.      And so I think you said before that you
 7    understand now that some of the items at Columbia's
 8    outlet were not previously sold for the higher price on
 9    the price tag; is that right?
10        A.      That's correct.
11        Q.      When did you first come that understanding?
12        A.      Probably around the time the suit was filed.
13        Q.      How about in relation to the first phone call
14    with Sidney; was it at that moment in time that you came
15    to that understanding?
16                MS. SAGAFI:  Objection to the extent that the
17    answer would require you to divulge the substance of any
18    conversation, Nick, that you've had with anyone from any
19    of the law firms.
20    BY MR. RAMSEY:
21        Q.      Are you able to answer the question?
22                MS. SAGAFI:  I don't remember what the
23    question was.
24                MR. RAMSEY:  Sure.
25    BY MR. RAMSEY:
```

1    purchased from Sierra Trading Post, do you remember

2    whether they were all online or all in the store or some

3    combination?

4        A.    I couldn't tell you the ratio.

5        Q.    Okay.  But you've purchased some from Sierra

6    Trading Post online?

7        A.    Yes.

8        Q.    And some from the Sierra Trading Post --

9        A.    Yes.

10       Q.    -- store?  Okay.  Just let me finish the

11   question before you answer it, even though I know you

12   know what I'm going to ask.

13             Have you ever been to a Columbia outlet store

14   and not purchased something?

15       A.    Yes.

16       Q.    Would you say that of your trips to a

17   Columbia outlet store you more often end up purchasing

18   something or more often end up not purchasing something?

19       A.    I couldn't tell you the ratio of that.  I

20   don't know.

21       Q.    Okay.  Have you ever been to a Columbia

22   outlet store without your wife?

23       A.    No.

24       Q.    Why do you shop at Columbia outlet stores?

25       A.    First of all, I respect the label, as I do

1  certain labels in clothing.  I'm kind of embarrassed to

2  say this, but with me I have a little bit of a girth, so

3  the fit is pretty good.  I can find clothes that fit me

4  well.  And I kind of respect the quality of it.  And

5  they have -- I guess up until this point I felt that

6  their discounts were pretty great.

7      Q.    Is there any other brand or company, clothing

8  company that you would consider to be similar to

9  Columbia?

10     A.    I would say North Face is pretty similar.

11     Q.    Have you shopped at North Face before?

12     A.    I have.

13     Q.    How about a North Face outlet?

14     A.    Yes.

15     Q.    Do you remember what their price tags look

16  like?

17     A.    Offhand, no, because I have not been there in

18  at least the past year, so...

19     Q.    Would you say that you shop more often at a

20  Columbia outlet than a North Face outlet?

21     A.    Probably.

22     Q.    Do you consider each to have -- Columbia and

23  North Face to have products that are of similar quality?

24          MS. SAGAFI:  Objection, calls for a legal

25  conclusion, calls for speculation.

NICHOLAS STATHAKOS

November 03, 2016

```
 1      A.      No.
 2      Q.      Have you ever shopped at TJ Maxx?
 3      A.      I think I have.
 4      Q.      How about Marshall's?
 5      A.      Yes.
 6      Q.      How about Nordstrom Rack?
 7      A.      Yes.
 8      Q.      Of those stores, Nordstrom Rack, TJ Maxx,
 9   Marshall's and Ross, would you say you've shopped at
10   those stores more or less than Columbia outlet?
11      A.      I have no idea.  I don't know that ratio.
12      Q.      Do you ever shop -- I know you mentioned
13   Sierra Trading Post online, but is shopping online
14   something you do regularly?
15      A.      Not regularly.
16      Q.      Do you do most of your clothes shopping out
17   of brick and mortar stores?
18      A.      Usually.
19      Q.      When you're shopping online, what is it
20   you're looking for typically?
21      A.      It might be something very specific that I
22   can't find, or it may be something that, using Sierra
23   Trading Post as an example, I may get an additional
24   savings perk that kind of gets me to go and browse.
25      Q.      So you may get a coupon or something?
```

NICHOLAS STATHAKOS

```
 1     A.    Yes, an online coupon.
 2        Q.    Do you receive coupons or other similar
 3  promotional opportunities from Columbia?
 4     A.    Myself personally, no.
 5        Q.    Does your wife?
 6     A.    Yes.
 7        Q.    When we were talking earlier about what
 8  factors go into why you may -- I take that back.
 9              If you're looking at a particular item of
10  clothing -- let's say at Columbia, a Columbia outlet --
11  what factors go into your decision to buy that item?
12     A.    Well, myself personally, again, size and fit
13  is important.  So it's first of all finding the -- an
14  item of clothing that fits me appropriately and well,
15  and then how it's priced, how much of a discount I'm
16  getting.
17        Q.    So with price, you said how it's priced and
18  how much of a discount.  Do you view that as the same
19  thing or two things?
20     A.    I'm sorry?
21        Q.    Let me try that again.  So there's the price
22  at which you're going to buy it --
23     A.    Right.
24        Q.    -- at the end of the day.  Is that price,
25  irrespective of any discount you may or may not be
```

NICHOLAS STATHAKOS

November 03, 2016

```
 1    you were receiving?
 2              MS. SAGAFI:   Objection, calls for
 3    speculation.
 4              THE WITNESS:  A time where the price would be
 5    more important to me than the discount?
 6    BY MR. RAMSEY:
 7       Q.    Yes.
 8       A.    The discount is what usually helps me make my
 9    decision.
10       Q.    Okay.  When you're at a Columbia outlet
11    store, is there a minimum percentage discount that
12    you're looking for before buying an item?
13       A.    I would say offhand at least 25 percent on
14    the rack.
15       Q.    When you say "on the rack," what does that
16    mean?
17       A.    What it's being sold -- what it's -- you
18    know, the outlet price without any further discounts.
19    And then I know there are further discounts on top of
20    that, so...
21       Q.    Always?  Are there always further discounts
22    on top of that?
23              MS. SAGAFI:  Objection, calls for
24    speculation.
25              THE WITNESS:  I don't know in general for the
```

NICHOLAS STATHAKOS

November 03, 2016

1    store.  For me, there usually is.

2    BY MR. RAMSEY:

3        Q.      Okay.  Let's go back to that last shopping

4    trip at Columbia outlet --

5        A.      Uh-huh.

6        Q.      -- which you said it was before your trip

7    January or February of 2016.

8        A.      Uh-huh.

9        Q.      Do you remember what you bought during that

10   trip to Columbia?

11       A.      Off the top of my head, I think there was two

12   jackets -- one for myself, one for my wife.

13       Q.      Do you remember -- can you picture in your

14   head the jacket that you bought that day?

15       A.      Yes.

16       Q.      Is it something you wear on a regular basis?

17       A.      When it's cold.

18       Q.      Do you remember the last time you wore it?

19       A.      Well, it was before I turned it over to

20   legal -- to my attorneys here, and it was sitting in a

21   bag in my garage, so, you know, whenever that date was,

22   it was before that.

23       Q.      Okay.  Do you remember what you paid for that

24   jacket?

25       A.      I don't.

NICHOLAS STATHAKOS

```
 1    day that the jacket you bought had previously sold for
 2    the higher price on the price tag --
 3         A.    Uh-huh.
 4         Q.    -- is that right?
 5         A.    That's right.
 6         Q.    But you also knew on that day or understood
 7    that some of the products at the Columbia outlet had not
 8    sold for the higher price on the price tag.
 9         A.    Right.
10         Q.    Okay.  So why did you assume that this
11    particular jacket had sold for the higher price on the
12    price tag at retail?
13         A.    To be quite honest, I don't know which
14    products would have or have not sold in the store for a
15    higher price for a lower price.  I found something that
16    fit me well.  I found something that I was -- with the
17    discounts seemed like a value, and I bought it, and that
18    it did its job, kept me warm.
19         Q.    If I told you today that that jacket had not
20    actually been sold for the higher price on the price
21    tag, would you still have purchased the jacket that day?
22              MS. SAGAFI:  Objection, calls for
23    speculation.
24              THE WITNESS:  I don't know.
25    BY MR. RAMSEY:
```

1    outlet, would you be able to tell me which one was the

2    outlet item?

3        A.    No.

4        Q.    I'm going to hand you -- let's keep those

5    out -- what was marked yesterday as Exhibit 61.  It's an

6    article of clothing.  I'll represent to you that it's

7    the same article of clothing that's depicted in Exhibit

8    53.

9        A.    Okay.

10       Q.    And I'm also going to hand you what was

11   marked yesterday as Exhibit 62, which I'll represent to

12   you is the same article of clothing that's depicted in

13   Exhibit 54.

14            So go ahead and look them over, do whatever

15   you want to do with them.  You can probably guess what

16   I'm going to ask you, so...

17            MS. SAGAFI:  You can spread them out if you

18   want to.

19            THE WITNESS:  Okay.

20   BY MR. RAMSEY:

21       Q.    Okay.  Are you able to -- or are there any

22   differences between the jackets that you're able to

23   point out by looking at them?  And if so, please tell me

24   what they are.

25       A.    The color is a difference, both outside and

NICHOLAS STATHAKOS

November 03, 2016

```
 1        A.      I would have no idea about that.
 2        Q.      Okay.  Do you think the two fabrics are
 3    comparable?
 4                 MS. SAGAFI:  Objection, calls for speculation
 5    and an expert opinion and a legal conclusion.
 6                 THE WITNESS:  I don't know.
 7    BY MR. RAMSEY:
 8        Q.      Would you consider the fabrics on each jacket
 9    to have the same quality?
10                 MS. SAGAFI:  Objection, calls for
11    speculation, an expert opinion and a legal conclusion.
12                 THE WITNESS:  I couldn't tell you.
13    BY MR. RAMSEY:
14        Q.      More broadly, each jacket, would you consider
15    each jacket as a whole to have the same quality?
16                 MS. SAGAFI:  Objection, calls for
17    speculation, an expert opinion and a legal conclusion.
18                 THE WITNESS:  I couldn't tell.
19    BY MR. RAMSEY:
20        Q.      Would you pay more for one jacket than the
21    other?
22                 MS. SAGAFI:  Objection, calls for
23    speculation.
24                 THE WITNESS:  I couldn't tell you that
25    either.
```

NICHOLAS STATHAKOS

November 03, 2016

```
 1    BY MR. RAMSEY:
 2        Q.     What would you want to know in order to
 3    figure out whether you'd pay more for one than the
 4    other?
 5        A.     To pay more for one than the other?  I don't
 6    know what I would need to know to pay more for one over
 7    the other.  I --
 8        Q.     Is there one -- sorry, go ahead.
 9        A.     I guess I would have to see the features or
10    the price tags on both and know that that is what it is.
11        Q.     Okay.  Would you consider the two jackets as
12    a whole to be comparable?
13               MS. SAGAFI:  Objection, calls for
14    speculation, an expert opinion and a legal conclusion.
15               THE WITNESS:  Only that they are two hooded
16    jackets.
17    BY MR. RAMSEY:
18        Q.     Would you consider them to be similar?
19               MS. SAGAFI:  Same objections.
20               THE WITNESS:  Only that they are two hooded
21    jackets.
22    BY MR. RAMSEY:
23        Q.     If I told you that one of those jackets was
24    sold at a Columbia outlet retail store, an REI or
25    someplace other than an outlet, and the other jacket was
```

NICHOLAS STATHAKOS

November 03, 2016

```
 1    sold only at the outlet, would you be able to tell me
 2    which one is the version of the jacket that is sold at
 3    the outlet?
 4        A.       No.
 5        Q.       Actually, let's lay them out again.
 6                 Are you left- or right-handed?
 7        A.       I'm right-handed.
 8        Q.       Okay.  So we'll go with the jacket on your
 9    right, which is Exhibit 62.  If this was the one that
10    was sold at a retail store, Columbia retail store, not
11    sold at the outlet, and it sold for a hundred dollars,
12    would you buy it?
13                 MS. SAGAFI:  Objection, calls for
14    speculation.
15                 THE WITNESS:  I don't know.
16    BY MR. RAMSEY:
17        Q.       Okay.  Switching to the other jacket -- it's
18    Exhibit 61 -- in this case in our example, then, this
19    jacket would be sold only at the outlet.  I would ask
20    for you to picture a price tag where the higher price on
21    the tag is a hundred dollars and the lower price is $70.
22                 Would you buy this jacket at the outlet for
23    $70?
24                 MS. SAGAFI:  Objection, calls for
25    speculation.
```

```
 1   calls for a legal conclusion.
 2             THE WITNESS:  I don't know what that is.  But
 3   as a consumer, I think I am entitled to more transparent
 4   pricing, that I know that this in fact has been sold or
 5   not sold in a store, in fact that is the retail price or
 6   it's not the retail price or like it's a second or a
 7   return or whatever that is so that I can make an honest
 8   and right decision whether to buy this or not, whether
 9   it's a deal for me or it's not a deal.
10   BY MR. RAMSEY:
11       Q.    Do you think you should receive money from
12   Columbia?
13             MS. SAGAFI:  Objection, asked and answered,
14   calls for speculation, calls for an expert opinion,
15   calls for a legal conclusion.
16             THE WITNESS:  That part I don't know.  That's
17   between you and Kristen the figure that out.  That's not
18   my realm.
19   BY MR. RAMSEY:
20       Q.    Okay.  We're done with these for now.  Well,
21   not for now.  I think we're done with them.  Sorry, one
22   moment.
23             I'll show you what was marked yesterday as
24   Exhibits 64 and Exhibit 63.
25       A.    Okay.
```

NICHOLAS STATHAKOS

November 03, 2016

1      Q.      Okay.   And looking at these, would you

2   consider them to be similar?

3              MS. SAGAFI:   Objection, calls for

4   speculation, an expert opinion and a legal conclusion.

5              THE WITNESS:   They are two belted shorts of

6   different colors, cargo shorts, I guess.   That's all I

7   can say.

8   BY MR. RAMSEY:

9      Q.      Would you consider them to be similar?

10             MS. SAGAFI:   Objection, asked and answered.

11             THE WITNESS:   To the extent that they are two

12   pairs of belted cargo shorts, that's the similarity.

13   BY MR. RAMSEY:

14     Q.      Would you consider these shorts to be

15   comparable?

16             MS. SAGAFI:   Objection, calls for an expert

17   opinion, calls for a legal conclusion.

18             THE VIDEOGRAPHER:   Could you move your

19   microphone to the lapel of your jacket?   Thank you.

20             THE WITNESS:   Two different shorts, different

21   colors, different lengths, different styling is the only

22   similarity or comparison I can see.

23   BY MR. RAMSEY:

24     Q.      Would you consider one or the other to be

25   worth more?

NICHOLAS STATHAKOS

1            MS. SAGAFI:  Objection, calls for
2    speculation, calls for an expert opinion.
3            THE WITNESS:  I have no idea which one that
4    would be.
5    BY MR. RAMSEY:
6       Q.    If I told you that one was sold at a Columbia
7    retail store or REI, somewhere other than an outlet, and
8    one was only sold at the outlet, would you be able to
9    tell me which one was the outlet item?
10      A.    No.
11      Q.    Okay.  We can take those aside.  I'm done
12   with those.  Yes, you can hand them back to me.
13           I'm going to hand you what was marked
14   yesterday as Exhibit 65, and I'm also going to hand you
15   what was marked yesterday as Exhibit 66.
16      A.    Okay.
17      Q.    Feel free to look them over.  I'm going to
18   ask you whether you consider them to have the same
19   quality.
20           MS. SAGAFI:  And I'll object that that calls
21   for speculation and an expert opinion.
22           THE WITNESS:  I don't know.
23   BY MR. RAMSEY:
24      Q.    Would you consider them to have the same
25   value?

NICHOLAS STATHAKOS

November 03, 2016

```
 1                MS. SAGAFI:  Objection, calls for speculation
 2    and an expert opinion and a legal conclusion.
 3                THE WITNESS:  I couldn't tell you if they
 4    have the same value or not.  I don't know.
 5    BY MR. RAMSEY:
 6       Q.      How about in your opinion?
 7                MS. SAGAFI:  Same objections.
 8                THE WITNESS:  Well, I see two hooded jackets
 9    styled differently.  I don't know other than what I see
10    in front of me.
11    BY MR. RAMSEY:
12       Q.      Let's just assume that you had a need for a
13    jacket and both of these fit you perfectly.  Is there
14    one that you would buy over the other?
15                MS. SAGAFI:  Objection, vague and ambiguous,
16    calls for speculation.
17                THE WITNESS:  I don't know.  I couldn't tell
18    you.
19    BY MR. RAMSEY:
20       Q.      There's not one that you like better?
21       A.      Not necessarily.
22       Q.      Do you like the colors better on one?
23                MS. SAGAFI:  Objection, relevance.
24                THE WITNESS:  Well, I like all colors, but I
25    don't know.  They're just -- to me, they are -- other
```

NICHOLAS STATHAKOS

November 03, 2016

1  than they are two hooded jackets, they're also very

2  different just from what I see.  So --

3  BY MR. RAMSEY:

4      Q.    What are the major differences?

5      A.     Well, there's color, there's styling,

6  there's -- styling, there's weight, there's lining that

7  I can see.

8            So again, other than they are two hooded

9  jackets, there's nothing -- they're very different.  The

10  similarity is they're hooded jackets.

11      Q.    Would you be willing to pay more for one than

12  the other?

13            MS. SAGAFI:  Objection, calls for

14  speculation.

15            THE WITNESS:  I don't know.

16  BY MR. RAMSEY:

17      Q.    Okay.  If they were both sold at the outlet

18  and both of them had a higher price on the price tag of

19  $150 and on both of them the lower price on the price

20  tag was $75, would you feel that you were getting a

21  better deal if you bought one over the other?

22            MS. SAGAFI:  Objection, vague and ambiguous

23  calls for speculation.

24            THE WITNESS:  Looking at them, I couldn't

25  say.

```
 1   BY MR. RAMSEY:

 2       Q.     What else would you need to look at in order

 3   to say?

 4       A.     I would love to know, I guess, the features

 5   of it.  I guess I would like to know that in fact these

 6   are jackets that sold in retail, they were -- what

 7   quality is it?  Is it first quality?  Is it second

 8   quality?  Is it a return?  I don't know.  There's a lot

 9   of factors that go into my decision.  So I don't know.

10   I mean, it would just --

11       Q.     Okay.  Going back to the jacket you bought in

12   February of this year --

13       A.     Uh-huh.

14       Q.     -- do you have it in your head?

15       A.     Uh-huh.

16       Q.     Can you tell me what features it had?

17       A.     What drew me to the jacket first of all was

18   the fit.  It fit well.  It was one of those -- we wanted

19   a jacket that was light and packable but yet provided

20   warmth for cold weather.  It wasn't heavy.  Most of our

21   winter coats are a little on the heavier side.  We

22   didn't want to travel with that.  And in that respect it

23   provided it.

24       Q.     That jacket, the February jacket that we're

25   talking about --
```

NICHOLAS STATHAKOS

1   North Face.  In this case I'm going to Columbia.  And I

2   go by I trust the brand and that's what I go by.  I

3   mean, I -- I don't know what all the different fabrics

4   are.  I assume that I'm buying something of quality and

5   I trust that.  It's like -- I don't know -- if I go buy

6   a Mercedes.  This is something of a less quality, and I

7   trust the brand.  And if it tells me this is a coat that

8   will keep me dry or will keep me warm up to a certain

9   degree or will provide me snow protection or rain

10  protection or it's waterproof, I trust that.  I do

11  not -- I don't know what else to do with it.

12      Q.      Have you ever bought something at a Columbia

13  outlet and ended up being disappointed by the article

14  that you bought?

15      A.      No.  Nothing has fallen apart at the seams

16  for me.

17      Q.      So I've been asking you to compare the

18  qualities of these two items.  Would you consider each

19  of them, separate and apart from whether they are equal

20  quality, to both be quality articles?

21              MS. SAGAFI:  Objection, calls for

22  speculation, asked and answered.

23              THE WITNESS:  They are both Columbia and to

24  the extent of that, that's all I can say about them.

25  They're -- I've trusted the brand.

```
 1    BY MR. RAMSEY:
 2         Q.      Okay.  One more pair that we'll look at.
 3    I'll take these from you.
 4                 MS. SAGAFI:  And then let's break once you
 5    get through these.
 6                 MR. RAMSEY:  That's fine.
 7                 MS. SAGAFI:  I'm going to hand you what was
 8    marked yesterday as Exhibit 67, and I will also hand you
 9    what was marked yesterday as Exhibit 68.
10                 THE WITNESS:  Oh, how cute.  Okay.
11    BY MR. RAMSEY:
12         Q.      Would you consider -- I'm not asking you to
13    compare, but would you consider both of these articles
14    to be of a good quality?
15                 MS. SAGAFI:  Objection, calls for speculation
16    and an expert opinion.
17                 THE WITNESS:  I don't know to what I'm
18    comparing it to.  They are Columbia.  I have trusted the
19    brand.  And if it has the Columbia name on it, I felt
20    that it was, I guess, a good quality item.
21    BY MR. RAMSEY:
22         Q.      Okay.  Would you consider these two items to
23    be comparable?
24                 MS. SAGAFI:  Objection, calls for
25    speculation, an expert opinion and a legal conclusion.
```

NICHOLAS STATHAKOS

```
 1              THE WITNESS:  To the extent that they are two
 2    fleece -- zip-top fleeces, or whatever they're called,
 3    fleece jackets, yes.
 4    BY MR. RAMSEY:
 5       Q.      Is there one that you would be willing to pay
 6    more for than the other?
 7              MS. SAGAFI:  Objection, calls for
 8    speculation.
 9              THE WITNESS:  I couldn't tell you.
10              MR. RAMSEY:  Okay.  I think we're done.
11    We'll go for a break.
12              THE VIDEOGRAPHER:  Going off the record, the
13    time is 11:49 a.m.
14                         *  *  *
15                      (LUNCHEON RECESS)
16                         *  *  *
17
18
19
20
21
22
23
24
25
```

NICHOLAS STATHAKOS

```
 1    AFTERNOON SESSION                              12:45 P.M.

 2

 3              THE VIDEOGRAPHER:  Back on the record, the

 4    time is 12:45 p.m.

 5

 6                    EXAMINATION (RESUMED)

 7    BY MR. RAMSEY:

 8        Q.      Welcome back.  I realized I forget to ask a

 9    question.  I'm happy to put those actual articles of

10    clothing back in front of you, but when we were looking

11    at Exhibits 61 and 62, 63 and 64, 65 and 66, 67 and

12    68 -- for the record I'm referring to the actual

13    articles of clothing -- if you'll remember, there were

14    essentially four sets of two clothing; is that fair?

15    There were two jackets, two pairs of shorts, another set

16    of jackets and two children's fleeces; is that correct?

17        A.      Uh-huh.

18        Q.      Do you remember those?

19        A.      Yes.

20        Q.      I'm happy to get the items back in front of

21    you.  My question for each of them is going to be, if I

22    told you with respect to each pair of items that one was

23    an item that was sold only at a Columbia retail store or

24    REI and was not sold at an outlet and one was sold at an

25    outlet whether you would be able to tell me which of the
```

NICHOLAS STATHAKOS

1   pair was the outlet -- the item that was sold at the

2   outlet, do you think you could do that for any of the

3   pairs of items?

4       A.      I think you asked that.

5       Q.      I did for like two of them.

6       A.      And I couldn't tell the difference between

7   which is sold at the retail and which sold at the

8   outlet.  I couldn't tell for any of them.

9       Q.      For any of the pairs?

10      A.      No.

11      Q.      Okay, great.  That takes care of that.

12              (Exhibit 70 and Exhibit 71 marked)

13  BY MR. RAMSEY:

14      Q.      I have had marked --

15              THE VIDEOGRAPHER:  70 and 71.

16  BY MR. RAMSEY:

17      Q.      Oh, the sevens look like a Z.  And I think I

18  gave you a copy.

19              The only question I'm going to ask is whether

20  you've seen these before.

21      A.      No.

22      Q.      Okay, that's it, then.  That was easy.

23      A.      You want them back?

24      Q.      Yes.  I'll stick them in this pile.  Thank

25  you.

NICHOLAS STATHAKOS

```
1        Q.     And just to orient you to the document or the
2   stack, the first three pages are a chart -- or actually,
3   the first four pages.
4        A.     Here's the jacket in question that I bought.
5        Q.     Okay.  We'll circle back to that.
6        A.     Okay.
7        Q.     So the first three -- four pages are a chart
8   of sorts.
9        A.     Okay.
10       Q.     And it lists the various items.
11       A.     All righty.
12       Q.     And in some cases it lists the date and
13  method of purchase and the price paid for the item.  Do
14  you see that?
15       A.     Yes.
16       Q.     I am going to start, if you could flip to
17  item number 1, the photograph of it, which is on page
18  STATHAKOS5 --
19       A.     Okay.
20       Q.     -- you should see a gray jacket.
21       A.     Right.
22       Q.     Are we on the same -- okay, good, we're on
23  the right page.
24              Do you recognize this jacket?
25       A.     I believe I do, yes.
```

NICHOLAS STATHAKOS

1      Q.      Is it something that you wear?

2      A.      I don't think it's my jacket.  It might be

3   either my son's or wife's.

4      Q.      Do you remember buying it?

5      A.      I mean, I remember all these articles of

6   clothing, but when I got them, I couldn't tell you.

7      Q.      No, that's fine.

8      A.      I can tell you that we bought it, I guess,

9   but that's about --

10     Q.      But you can't remember the day, for

11  example --

12     A.      No, no.

13     Q.      -- at the store, you buying it -- maybe not

14  the date but the experience; is that right?

15     A.      Yes.

16     Q.      Okay.  Do you know if the item depicted in

17  Columbia Outlet Item No. 1 was an item that was -- I

18  take that back.

19             Do you remember the price you paid for the

20  item that is depicted in Columbia Outlet Item No. 1?

21     A.      Not at all.

22     Q.      Do you remember the higher price on the price

23  tag?

24     A.      No.

25     Q.      Okay, that's fine.  I assumed that, but just

NICHOLAS STATHAKOS

November 03, 2016

1   getting it out there.

2       A.      I wish my memory was that good.

3       Q.      Don't we all.

4               Okay.  Do you know whether the item depicted

5   in Columbia Outlet Item No. 1 was an item that was

6   previously sold at a Columbia outlet retail

7   establishment, REI or someplace other than the outlet?

8       A.      I assumed it was.  I don't know if it was or

9   if it wasn't.

10      Q.      Okay.  But when you bought it, you believe --

11  you believed that at that time you thought it was?

12      A.      Yes.

13      Q.      Okay.  If I told you that this item was not

14  in fact ever sold at a Columbia outlet retail store, REI

15  or someplace other than the outlet and was only ever

16  sold at the outlet, do you believe you would have still

17  purchased the item?

18              MS. SAGAFI:  Objection, calls for

19  speculation.

20              THE WITNESS:  To be quite honest, if I had

21  all the facts, I don't know.

22  BY MR. RAMSEY:

23      Q.      What would all the facts be?

24      A.      That I would know that in fact this was --

25  whether this item was in fact sold at a retail store and

```
 1    that tag was.  Okay?  I am asking you whether -- you
 2    still don't know those things -- whether knowing now
 3    that this was never sold anywhere but the outlet,
 4    whether you would have still purchased it for whatever
 5    price you paid that day?
 6              MS. SAGAFI:  Objection, asked and answered,
 7    calls for speculation.
 8              THE WITNESS:  I'm not sure.
 9    BY MR. RAMSEY:
10        Q.    Okay.  Would you want to see the price tag
11    also?
12        A.    You can show it to me, but right now, I mean,
13    I don't know what the factors were the day I bought it.
14    I don't know what my budget was.  I don't know what I
15    needed that day.  I mean, there's different factors.
16        Q.    So you may have still bought it; you may not
17    have still bought it?
18        A.    Right.  I don't know.
19        Q.    Okay.  Let's go next to item number --
20    Columbia Item No. 35, which is on page STATHAKOS39.
21    This is the jacket I believe you purchased in February.
22        A.    Okay.
23        Q.    Okay.  And if I could get you to hold this
24    page, I'm going to have you flip to another page.
25        A.    Okay.
```

NICHOLAS STATHAKOS

1      Q.      Flip to page STATHAKOS77.  You should see a

2    photograph of a Columbia price tag.

3      A.      Okay.

4      Q.      Okay.  I'm going to represent to you that

5    this is the price tag that is associated with item

6    number 35.

7      A.      Okay.

8      Q.      Okay.  If you could, hold both of those pages

9    for a moment.

10      A.      All righty.

11      Q.      If you go back to the chart at the very

12    beginning --

13      A.      All righty.

14      Q.      -- and you go to item 35 which is on the

15    second page and you scroll all the way to the right,

16    you'll see that the actual price out the door paid that

17    day was $47.94.

18      A.      Okay.

19      Q.      Okay.  And we'll keep all those pages for

20    now.  Do you know, looking at item 35, that jacket --

21      A.      Uh-huh.

22      Q.      -- whether that jacket was ever sold anywhere

23    other than a Columbia outlet?

24      A.      I don't know.  I went by this tag, which is a

25    regular Columbia tag, and it had a retail price on there

NICHOLAS STATHAKOS

1   and that made me assume that it was sold at a retail

2   store.

3       Q.      At which price did you believe it sold at the

4   retail store?

5       A.      $120.

6       Q.      And is that because it's the higher price

7   listed on the tag?

8       A.      Yes.  That's the original sticker -- or the

9   original price that's printed on this -- on the tag, on

10  the Columbia tag that's attached to the jacket.

11          MR. RAMSEY:  Just for the record, this is

12  STATHAKOS77 that we're looking at.

13          THE WITNESS:  This -- the $79.90 is what they

14  put at the outlets.

15  BY MR. RAMSEY:

16      Q.      And then you'll remember that day you didn't

17  pay the 120; you didn't pay the 79.90 --

18      A.      Right.

19      Q.      -- but instead paid 47.94.

20      A.      That's correct.

21      Q.      Do you know how that would have happened?

22      A.      The store had a sale, number one; number two,

23  I got an additional discount at the register.

24      Q.      Okay.  So taking a look at the jacket in

25  Columbia item 35, if I told you that this item was never

NICHOLAS STATHAKOS

1   sold in a Columbia retail store, was never sold at an

2   REI or anyplace other than the outlet, it was only ever

3   sold at the outlet, and if I also told you that it was

4   never sold at $120, which is the higher price listed on

5   the price tag, would you have still purchased the jacket

6   back in February for the $47.94 that you paid?

7           MS. SAGAFI:  Objection, calls for

8   speculation.

9           THE WITNESS:  I don't know because now you

10  are putting in the question everything I believed that

11  helped me make a decision.  I based it on this item

12  being sold at a retail store for$120.  So you're telling

13  me that that's not correct.  I don't know what my

14  decision would be.  I don't know how much I would need

15  that jacket.  I don't know how much of a deal this is.

16  I don't know what -- it's throwing into question a lot

17  of factors for me.

18  BY MR. RAMSEY:

19      Q.    So you don't know whether you'd buy it or

20  not?

21      A.    No.

22      Q.    Okay.  Similar question:  What if I told you

23  that the jacket depicted in item number 35 was

24  previously sold at the Columbia outlet for $79.90, which

25  is the lower price depicted on the price tag on

NICHOLAS STATHAKOS

1   pretty sure that she sees the same thing I see when we

2   go to the outlet together.

3   BY MR. RAMSEY:

4        Q.    Okay.  That's just one example.  Keeping your

5   hand on this page, item 19, can you also flip to page

6   STATHAKOS73 where you will find a picture of a price

7   tag.

8        A.    Okay.

9        Q.    Where the higher price says 60, there's a

10  lower price that says $39.90, and then a sticker of

11  sorts --

12       A.    Yes.

13       Q.    -- that has 24.98.

14       A.    Yes.

15       Q.    If you could, keep your hands on these pages.

16  And if you would flip back to the chart at the

17  beginning, you'll see that for item 19 on the first page

18  the price paid out the door was $11.98.  Do you see

19  that?

20       A.    Okay, yes.

21       Q.    Okay.

22       A.    That's this (indicating)?

23       Q.    Yes, correct.

24       A.    Okay.

25       Q.    So the price tag that we looked at was also

1    the price tag for this pink garment.

2            Okay.  Flipping to the price tag briefly, do

3    you know whether either you or your wife -- I take that

4    back.  If I told you that the item depicted in Columbia

5    Outlet No. 19 on STATHAKOS23 had been sold only ever at

6    the outlet, had never been sold anywhere at a Columbia

7    outlet retail store, REI or elsewhere, had also never

8    sold for $60, which is this higher price on the price

9    tag on Stathakos page 73, would you or your wife, if you

10   know, have purchased this item for the $11.98 paid?

11           MS. SAGAFI:  Objection, vague and ambiguous,

12   incomplete hypothetical, calls for speculation.

13           THE WITNESS:  I don't know about -- I can

14   just speak for myself, and what I can say is that you're

15   putting into question what's on this tag.  I made my

16   decision based on every piece of clothing that I either

17   picked for myself, I picked with my wife based on the

18   total facts here.  I didn't base it on that, hey, it was

19   just -- it wasn't 60 -- well, it was $39.90; it wasn't

20   $24.98.  I see $60.  I made the assumption that that is

21   what this item sold at a retail store.  I didn't know

22   that this did not sell at a retail store.  I did not

23   know that this did not sell at Columbia but sold at REI

24   or sold at Sierra Trading or at the outlets only.  I

25   don't know.  I just know that that is the price that a

1    company that my wife and I trust put on there and that's

2    what we went by.

3    BY MR. RAMSEY:

4        Q.    Okay.  So if you notice from page 1 the date

5    of purchase for item 19 was February 14, 2016.

6        A.    Uh-huh.

7        Q.    That was earlier this year.

8        A.    Right.

9        Q.    And it was also after the time that you came

10   to understand that at least some items at the Columbia

11   outlet were not sold for -- or had not ever been sold at

12   the higher price on the tag, correct?

13       A.    Correct.

14       Q.    Okay.  So knowing that, do you believe it was

15   reasonable in February 2016 to look at the tag on page

16   STATHAKOS73 and still believe that this item had

17   previously sold at a Columbia outlet retail

18   establishment, REI or somewhere other than the outlet

19   for $60?

20            MS. SAGAFI:  Objection, calls for an expert

21   opinion and a legal conclusion.

22            THE WITNESS:  I don't know, to be quite

23   honest.  To that point and even to now I don't know

24   what's been proven or what has not.  This is just

25   allegations that were made, and there was no reason for

NICHOLAS STATHAKOS

```
 1    us to really think otherwise.  I mean, it was a good
 2    bargain, 11.98, whatever it was.
 3    BY MR. RAMSEY:
 4        Q.     Okay.  But you don't know, sitting here,
 5    whether you would have still paid the 11.98 to purchase
 6    this item had you known at the time that it had never
 7    sold for $60?
 8        A.     I don't know.
 9        Q.     More broadly, do you believe that you would
10    have been involved in that situation -- in that decision
11    given that this item was for your wife?
12        A.     I think more my involvement would be, "How do
13    you like it?"
14        Q.     "It looks nice," or whatever?
15        A.     Yes.
16        Q.     Okay.  Just give me one moment.  We are done
17    with that one.
18        A.     You want this back?
19        Q.     I'm done with it.  You're welcome to look at
20    it if you want.  Just give me a second.
21               Do you know anyone other than your wife or
22    children who has shopped at a Columbia outlet store?
23        A.     No.
24               MS. SAGAFI:  Objection, calls for
25    speculation.
```

```
 1      Q.      And you had said or we had talked about you

 2   speaking to the paralegal prior to signing the

 3   engagement letter but that you didn't remember how long

 4   before; is that right?

 5      A.      I'm sorry, say it again.  Signed an

 6   engagement letter prior to signing the --

 7      Q.      Okay.  Let me put it this way:  On the first

 8   day you spoke to Sidney, was that the day you signed the

 9   engagement letter?

10      A.      It was not the day, no.

11      Q.      So you spoke to Sidney prior to signing the

12   engagement letter?

13      A.      Yes.

14      Q.      But you the just don't know how long prior?

15      A.      No.

16      Q.      In that first conversation with Sidney, did

17   she ask you to sign an engagement letter?

18              MS. SAGAFI:  Objection to the extent that it

19   calls for the witness to divulge the substance of

20   communications with a member of the counsel team.

21              Don't answer that question.

22              MR. RAMSEY:  How is that a confidential

23   communication?

24              MS. SAGAFI:  Any communication with a member

25   of the law firm or the law firm's staff that takes place
```

NICHOLAS STATHAKOS

November 03, 2016

```
 1    in reasonable anticipation of litigation --
 2              MR. RAMSEY:  He previously told me that when
 3    he spoke to Sidney, he had no idea if he was going to be
 4    in litigation.  He filled out a form online, nothing --
 5    no part of it which indicated that it had anything to do
 6    with the litigation.
 7              MS. SAGAFI:  The instruction not to answer
 8    stands.
 9    BY MR. RAMSEY:
10       Q.    When you spoke to Sidney that day, did she
11    tell you that she or her law firm represented you?
12              MS. SAGAFI:  Objection, privileged.
13              Don't answer.
14              MR. RAMSEY:  Okay.  I'm done subject to
15    reserving my rights on this issue and asking you
16    questions about this.
17              Where he was instructed, if I could get those
18    marked, that would be great.
19              I have no further questions.
20              MS. SAGAFI:  I don't have any questions.
21              THE VIDEOGRAPHER:  This concludes today's
22    videotaped deposition of Nicholas Stathakos.  We are off
23    the record at 1:16 p.m.  Thank you.
24              (Deposition concluded at 1:17 p.m.)
25
```

NICHOLAS STATHAKOS

November 03, 2016

```
 1              C E R T I F I C A T I O N

 2

 3              I, JAY W. HARBIDGE, a Shorthand Reporter

 4    within and for the State of California, do hereby

 5    certify:

 6              That, NICHOLAS STATHAKOS, the witness whose

 7    examination is hereinbefore set forth, was first duly

 8    sworn by me and that this transcript of said testimony

 9    is a true record of the testimony given by said witness.

10              I further certify that I am not related to

11    any of the parties to this action by blood or marriage,

12    and that I am in no way interested in the outcome of

13    this matter.

14

15              IN WITNESS WHEREOF, I have hereunto set my

16    hand November 7, 2016.

17

18

19

20

21              _____

22              JAY W. HARBIDGE, CSR.

23

24

25
```