# Exhibit 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JEANNE AND NICOLAS STATHAKOS,        )
et al.,                              )
                                     )
            Plaintiffs,              )
                                     )
vs.                                  ) Case No. 4:15-cv-
                                     )          04543-YGR
COLUMBIA SPORTSWEAR COMPANY;         )
COLUMBIA SPORTSWEAR USA              )
CORPORATION,                         )
                                     )
            Defendants.              )
_____)




DEPOSITION OF GABRIELE GOLDAPER

VOLUME I

Los Angeles, California

Tuesday, December 20, 2016




Reported by:  Susan Van Booven
              CSR No. 3956

1    prices?

2        A    I don't remember using -- I was not involved,

3    ever, with setting -- putting a price on the tickets for

4    any MSRP pricing.  Only wholesale.

5        Q    In the products that you looked at to render

6    your opinion in this case, did you look at the end

7    consumer price listed on any price tags?

8        A    I looked at a lot of garments and I'm sure that

9    I've glanced at some of the prices.

10       Q    Did those prices play any role in your

11   opinions?

12       A    When I wrote the opinions?  No.

13       Q    And it's fair to say that you were not asked to

14   render an opinion on what an MSRP price should be for

15   any of the products that you looked at?

16       A    That's correct, I was not asked.

17       Q    Were you asked to render any sort of opinion on

18   what price Columbia would be able to obtain from an end

19   consumer for any of the items that you looked at?

20       A    I was not asked.

21       Q    And when you were comparing inline and outlet

22   products, also fair to say that you were not asked to

23   render an opinion on whether Columbia could have

24   obtained from the end consumer a different price for one

25   of the items versus the other?

1    A    That's correct.

2    Q    And is it fair to say that you would also not

3    be qualified to do that?

4    A    That's correct.

5    Q    Okay.  If I could have you look at what's been

6    marked as, I believe it's Exhibit B to your report,

7    which is Exhibit 74, and also Exhibit 78, which was the

8    sampling of cases that you've testified in.  Let me grab

9    them so I'm looking at the same things.

10        Starting with Exhibit B to your report, which I

11   think is Exhibit 74, I just want to make sure that this

12   is a complete listing of your experience as an expert

13   witness in the last four years.

14   A    There's one case that I did since I mailed this

15   in to counsel, and that's because it was done last week.

16   It's not on the list.  So just the one that I was

17   deposed on last week.

18   Q    What was that case?

19   A    That was Kiini versus Victoria's Secret.

20   Q    And who were you serving as an expert for in

21   that case?

22   A    Victoria's Secret.

23   Q    And what was the general subject matter of

24   that -- the opinion in that case?

25   A    That Victoria's Secret did not copy the

```
 1       Q    If you could flip through these and tell me
 2   which cases that you remember involved comparing one
 3   company's product to another company's product.
 4       A    Okay, so we're -- you want me to find a case
 5   where I said, "These two are not similar"; is that what
 6   you want?
 7       Q    Or perhaps that they are similar.
 8       A    Or where --
 9       Q    Where you're taking two products and comparing
10   them, or contrasting them, any cases where you've done
11   that.
12       A    Okay.  Number 33, Royal Printex versus
13   Unicolors.
14       Q    Okay.  Any others?  I'll come back and ask
15   about those.  Just trying to get the full list for now.
16       A    In Cameron Industries versus B.I.Y.A.Y.C.D.A.
17       Q    Number 39?
18       A    Yes.
19            Tell me again.  You want cases where I showed
20   either similarity or lack of similarity; is that what
21   you want?  Then, Olem Shoes.
22       Q    Which number --
23       A    57.
24       Q    -- is it?
25       A    57.
```

1      A      That's correct.

2      Q      But you're not rendering an opinion at all
3   about whether a consumer, a typical Columbia consumer,
4   for example, would be able to also spot those
5   differences?

6      A      I'm not rendering an opinion on that.

7      Q      Okay.  And you aren't even qualified to render
8   that type of opinion, right?

9      A      That's why I'm not rendering an opinion on
10   that.

11      Q      That's fine.  All right.  Flipping to 39,
12   Cameron Industries versus B.I.Y.A.Y.C.D.A.?

13      A      B.I.Y.A.Y.C.D.A.

14      Q      B.I.Y.A.Y.C.D.A.; that seems easier.  Tell me,
15   if you can, the issue in that case?

16      A      It was similar; it was also a print.  It was
17   more of a geometric print.  But I was able to trace the
18   fabric to the China fabric market, because the company
19   produced everything in China; therefore, didn't buy
20   domestic goods, only bought -- and so I was able to show
21   that they were not infringing because they hadn't bought
22   domestic goods.

23      Q      So in that case were you comparing and
24   contrasting the two prints, or just focused on showing
25   that the defendant's print was sourced from the Chinese

1  place and everybody uses it.  It's part of the

2  vocabulary of designers.

3      Q     And the Unicolor case, this is the floral print

4  case?

5      A     That's a floral print.

6      Q     Was the thrust of that opinion that the two

7  prints were different, or was there some other aspect of

8  the opinion, then?

9      A     Well, you always have more than one opinion.

10 One of them was that the prints were not the same.  In

11 comparing the two side by side, one could clearly see

12 the differences that I pointed out.

13     Q     But was that the thrust of that opinion?

14     A     That was the biggest thrust, yes, because

15 that -- I remember showing, visually, the two prints,

16 holding them up on the witness stand.

17     Q     In that case, the floral print case, were --

18 did you find modest differences between the two prints?

19     A     I don't remember whether I said they were

20 modest or major, but I found differences.

21     Q     Do you remember if you even used the word

22 "modest" or "major," or some other word?

23     A     I probably used other words.

24     Q     In your experience in rendering opinions, it

25 sounds like you've only really compared products or

1    prints on a few instances.  On any of those cases, did

2    you describe the differences as either modest or major?

3         MS. SAGAFI:  Objection; misstates testimony,

4    assumes facts not in evidence, calls for speculation.

5         Go ahead.

6         THE WITNESS:  Yeah, I already said I hadn't --

7    I don't remember what words I used.  That Unicolor case

8    is a long time ago.  I also -- you used the word

9    "product."  I don't compare product; I compare only the

10   print.

11   BY MR. RAMSEY:

12   Q    Have you ever rendered an opinion that two

13   prints or two products, either one, is materially

14   different?

15   A    I can never testify on product because nobody

16   owns the right to a design.  Product is a silhouette, is

17   a design.  You can't get rights to that.  We haven't

18   passed any laws protecting designers, so you don't talk

19   about the product in terms of protecting the product.

20        Protect the print in copyright.  Okay.  And I

21   have talked about comparing prints as not being similar

22   or being similar.  I don't recall the words that I've

23   used.

24   Q    So in this case, is it fair to say that you're

25   comparing two products?

```
 1      A     In this case, I'm comparing garments, yes, but
 2   from a different point of view than we do in copyright
 3   or trademark.  There is no protection against the
 4   product that you're putting the print on.  This is not
 5   trademark or copyright.
 6      Q     Is it better for you for me to use the word
 7   "garment" or "product" when referring to --
 8      A     Oh, "garment."
 9      Q     Okay, "garment."  All right.  So in this case,
10   you were comparing two garments?
11      A     Yes.
12      Q     Have you ever compared two garments before in
13   any of the expert work that you've done?
14            MS. SAGAFI:  Objection; vague and ambiguous,
15   incomplete hypothetical.
16            THE WITNESS:  Have I ever compared garments;
17   that's what you're asking me?  The answer is I don't
18   recall specifically comparing garments, no.
19   BY MR. RAMSEY:
20      Q     You recall comparing prints --
21      A     Yes.
22      Q     -- but not garments?
23      A     Correct.
24      Q     Do you recall comparing anything other than a
25   print or a garment?
```

```
 1    identical, modestly different, materially different,
 2    majorly different?
 3        A    I didn't have to do that because it was my
 4    opinion that the color wasn't the issue; it was the
 5    placement of the color that became a source identifier.
 6        Q    Did you render an opinion, then, that the
 7    placement of the colors on each shoe was identical,
 8    materially identical, similar, modestly different?  What
 9    was your opinion in that regard?
10        A    I didn't use any of those words.
11        Q    What words did you use?
12        A    That Yves St. Laurent, on using the same color
13    red on his insole, was hurting and/or infringing and/or
14    diluting the Louis Vuitton brand.
15        Q    So then you weren't rendering any opinions at
16    all that one shoe or the shoe's use of the color at a
17    particular location was similar or dissimilar to the
18    other shoe's use?  That wasn't part of your opinion at
19    all?
20        A    No.
21        Q    Have you ever rendered an opinion similar to
22    the ones you've rendered in this case, where you are
23    comparing two garments --
24             MS. SAGAFI:  Objection; asked and answered,
25    vague, ambiguous.
```

1    BY MR. RAMSEY:

2        Q    -- and saying that they're either similar or

3    dissimilar?

4        A    Have I ever rendered an opinion before about

5    this kind of a subject, about garments being similar or

6    not similar?

7        Q    Correct.

8        A    And the answer is no, this was my first time.

9        Q    You used, in your opinion, the words "modest"

10   and "material," I believe.  Are those words -- where do

11   those words come from?

12       A    Me.

13       Q    Have you ever heard the word -- the words

14   "modest" or "material" used to describe differences

15   between two garments?

16       A    Yes, there are modest differences or material

17   differences, yes.

18       Q    Are there any other types of differences?

19       A    When comparing garments, modest -- in this

20   case, modest and material differences applied, and so I

21   used them.

22       Q    So in your opinion, there's only modest

23   differences or material differences?

24            MS. SAGAFI:  Objection; misstates the

25   testimony.

```
 1              THE WITNESS:  That's not what I said.  What I
 2    said was that the differences of these garments, where
 3    applicable, were either moderate differences or major
 4    differences.
 5    BY MR. RAMSEY:
 6        Q    And how did you decide whether a difference was
 7    modest or material?
 8        A    I decided that based on the actual differences.
 9    If one was a jacket and the other one was a vest, to me,
10    that's not moderate; that's material.  Okay.  And it was
11    based on what the differences actually were as to how I
12    would assign the word "moderate" or "material."
13        Q    Is there a list somewhere that I could consult
14    that would describe for me differences between garments
15    that are modest?
16             MS. SAGAFI:  Objection; vague and ambiguous.
17             THE WITNESS:  If you would like to go to my
18    report, I do believe that in my -- when I describe my
19    methodology, that I tell you how I assigned these.  Just
20    have to find it, but it's in here.  And, you know, you
21    can read it in the report.
22    BY MR. RAMSEY:
23        Q    Sure.  So we can flip to your report real
24    quick.  That's Exhibit 72.  And I think what you are
25    looking at is page 6, paragraph 18, 19?
```

1     A     Yes.

2     Q     Okay.  What's in paragraphs 18 and 19, is that

3     a methodology that you created?

4     A     It's an accepted practice in our industry in

5     terms of comparing or trying to find the differences

6     between two garments.  The same thing with quality

7     issues, they're either minor -- they're either moderate

8     or major.  And so we use those terms to describe

9     differences.

10    Q     Is that -- those words, "moderate" or "major,"

11    or "material," I think is actually what you used --

12    A     Right.

13    Q     -- in the report, are those terms that have

14    been developed in research?

15          MS. SAGAFI:  Objection; calls for speculation.

16          THE WITNESS:  I can't answer that because I

17    don't know the background.  I can only tell you that the

18    apparel industry has its own idioms and idiomatic

19    wording, and those would be -- I would put them in that

20    category.

21    BY MR. RAMSEY:

22    Q     Okay.  But in using these words as you have in

23    this case, you haven't consulted any literature?

24    A     No, I have not.

25    Q     Consulted any research of any type?

1     **A**   **No.**

2     Q   It's just purely your experience in the

3   industry?

4     **A**   **Yeah.  I would say, after 45-plus -- almost 48**

5   **years of working with garments, it is based on my**

6   **experience and, kind of, the accepted practices, what I**

7   **hear other people in the apparel industry -- when we**

8   **talk, using similar terms.**

9     Q   So are those accepted practices, as you've

10  described them, listed somewhere?  Could I go grab them

11  off the Internet?

12    **A**   **There's very little that's listed in the**

13  **apparel industry when it comes to standard practices.**

14  **It's been a development.  So I'm not -- I do not believe**

15  **that there's anyplace you could find them listed.**

16    Q   Okay.  Or generically described as opposed to

17  listed; is there anyplace I could find that?

18    **A**   **If it is, I'm not aware.**

19    Q   Are there any other individuals that you

20  believe would have the requisite experience or expertise

21  that would be able to identify the same -- or, excuse

22  me -- the differences that you've identified in your

23  report?

24    **A**   **I couldn't answer that.**

25    Q   Not a single person that you think could do

1    that?

2        A     I can't answer that.  I don't know everybody

3    that works in the garment industry and/or what they can

4    do.

5        Q     Do you know anyone that you believe could do

6    that?

7              MS. SAGAFI:  Asked and answered.

8              THE WITNESS:  At the moment, I can't come up.

9    BY MR. RAMSEY:

10       Q     Okay.  So if I'm looking for an expert to do

11   the same thing you did, you couldn't list me a name?

12             MS. SAGAFI:  Objection; argumentative, asked

13   and answered.

14             THE WITNESS:  You're correct.

15   BY MR. RAMSEY:

16       Q     If I found an expert, let's call him John Doe,

17   that I asked to do the same analysis, is it fair to say

18   that he might have different opinions about what is a

19   modest or material difference?

20             MS. SAGAFI:  Objection; calls for speculation.

21             THE WITNESS:  I have to know his background and

22   his involvement in the apparel industry; specifically,

23   production, garments.  Without knowing that, I couldn't

24   answer your question.

25   BY MR. RAMSEY:

1      A      Right.

2      Q      And those words or terms are used often in the

3  apparel industry?

4      A      Right, they're generic to the garment industry.

5  I mean, someone not in the garment industry would not

6  use.

7      Q      Sure.  But these are terms that, in your

8  experience, are used on a day-to-day basis?

9      A      Yes.

10      Q      And I think you said that it was generally

11  accepted that certain changes would be considered

12  moderate and certain changes would be considered major?

13      A      Yes.

14      Q      And then maybe -- I think in your report you

15  reference that maybe an accumulation of moderate changes

16  might make a difference major?

17      A      Correct.

18      Q      All right.  Is there a standard amount of

19  moderate changes that might result in a garment being

20  materially different from another garment?

21      A      Is there a standard that -- say it again so --

22      Q      So you said, I think, in your report, that,

23  say, an accumulation of different moderate changes might

24  result in a product being materially different even if

25  any particular change wasn't material itself; is that --

1      A      Correct.

2      Q      -- fair?  Okay.  Is there a standard in the

3    industry where, you know, five modest changes equals a

4    material change or 10 modest changes equals a material

5    change?  Anything like that?

6      A      No.  If we go -- use quality as an example,

7    because it's an easy one to relate to, we have certain

8    standards that say these are moderate and these are

9    major.  Okay.  What we don't have is if you have three

10   of these, they become major, or if you have four of

11   these, they become major.

12           Well, the same thing is true here.  It's -- a

13   lot has to do with the person who's examining the

14   garments and their determination.  They may feel that

15   because it's got certain functional items that make it

16   different, that those three combined really make it a

17   material difference.

18           So sometimes it's up to the person who's

19   examining them, based again on their experience of that

20   particular difference.

21     Q      All right.  So whether a particular person

22   might consider something a modest or material change may

23   depend on their own opinion?

24     A      Their own production background.  The key is

25   production background.  And you gotta remember, I've

1       produced just about every kind of garment, either

2       because of the companies I worked for or I owned my own

3       company or as a consultant.

4               So I've been involved in production all over

5       the world:  Mexico, China, India, Honduras, El Salvador.

6       I mean -- and so I've got a vast compendium of

7       experience in production.

8       Q    Have you ever produced a ski jacket?

9       A    No.

10      Q    Have you ever produced any of the types of

11      products you looked at in this case?

12      A    No, I have not done outdoor.  But the

13      particular items that I looked at, like pockets and

14      zippers and stitches and arms, it doesn't matter if it's

15      a ski jacket or it's a T-shirt or -- it doesn't matter

16      on the type of garment.

17              The process or the procedure for producing

18      an -- an arm or a collar, the procedure of the

19      production process is the same for a ski jacket as it is

20      for a woman's blouse, so to speak.  I mean --

21      Q    Okay.  So whether differences are moderate or

22      material are concepts, words used in the industry?

23      A    Yes.

24      Q    Okay.  They're generally accepted --

25      correct? --

```
 1        A    Yes.

 2        Q    -- in your opinion?  And yet you're the only

 3   person who could render the opinion in this case?

 4             MS. SAGAFI:  Objection; misstates the

 5   testimony, argumentative.

 6             THE WITNESS:  I don't think I said I'm the only

 7   person.  I merely said that I didn't know -- couldn't

 8   give you a name of someone else.  That doesn't mean that

 9   out in the universe there aren't other people who could

10   do it.

11   BY MR. RAMSEY:

12        Q    How many years have you been in the fashion

13   industry, apparel industry?

14        A    About 48.

15        Q    And in all that time, you've met probably

16   hundreds of people, right?

17        A    Yes.

18        Q    And of all those people, you're not aware of

19   any one of them who would be qualified, in your opinion,

20   to render an opinion in this case along the lines that

21   you rendered?

22             MS. SAGAFI:  Objection; misstates the

23   testimony; asked and answered, argumentative.

24             THE WITNESS:  First of all, you used the word

25   "in this case."  I don't know of people who have done
```

1    expert witness work.  Okay.

2         I know a lot of production managers, but I'm

3    not in a position to vouch for their work.  A lot of

4    them are very good at production, but would not be able

5    to do expert witness work.

6    BY MR. RAMSEY:

7    Q    Setting aside whether they'd be able to do

8    expert witness work, do you think these individuals in

9    production would be able to spot the same differences

10   that you spotted in this case?

11   A    They're strictly production people?

12   Q    Correct.

13   A    They would be able to spot -- some of them

14   would be able to.

15   Q    And would they also refer to the changes as

16   moderate or material?

17   A    That, I couldn't answer.  They might, but I

18   couldn't answer for sure.

19   Q    Is there anything else they might refer to the

20   changes as, differences as?

21   A    Instead of material, they might have said

22   "major."

23   Q    Okay.  You mentioned earlier, when talking, I

24   think, about a sleeve, that a sleeve on a ski jacket and

25   a sleeve on a blouse are effectively the same as far as

1    product that you looked at provides a better value,

2    however defined, as another product that you looked at?

3        A    Is it fair to say that -- I think -- can you

4    repeat it?  Read it back to me.

5            (Record read as follows:

6            "Q  Is it fair to say, then, that none of

7            your opinions in this case have to do with

8            whether one product that you looked at

9            provides a better value, however defined,

10           as another product that you looked at?")

11           THE WITNESS:  That's correct.

12           Thank you.

13           DEPOSITION OFFICER:  You're welcome.

14    BY MR. RAMSEY:

15        Q    Okay.  Let's turn to your report, which is

16    Exhibit 72, I believe.

17        A    Yes.

18        Q    I want to go to Section IV, which is on page 3.

19    This is the Materials Considered portion.

20        A    Sure.

21        Q    Sorry, one moment.  I'll tell you, last night,

22    that I received an email from counsel that there were a

23    few items that were not listed in the report that you

24    reviewed, so -- not a big deal --

25        A    Okay.

```
 1      Q     Yes.  Sorry, those are still getting copied.
 2            Okay.  All I really wanted to ask is, if you
 3     flip through Exhibit 70 -- you don't have to -- these
 4     are all outlet items, and Exhibit 71 are the inline
 5     items?
 6      A     Okay.
 7      Q     Are there more items in Exhibits 70 and 71 than
 8     are the subject of your report?
 9      A     Correct.
10      Q     And I'm wondering why you didn't look at every
11     item.
12      A     Well, my schedule is one that I don't wish on
13     anybody.  And that being said, my time was limited.  So
14     when I was called to do this particular case, I -- I had
15     agreed to do it only if I could do X number of styles as
16     opposed to the entire collection.
17      Q     Okay.
18      A     And that's how I didn't do all of them.
19      Q     Sure.  Did you select which ones you reviewed
20     versus didn't review?
21      A     No, I did not select.
22      Q     How -- who selected those?
23      A     Well, certainly the ones that the plaintiff had
24     purchased, they were in the group.  And then counsel
25     supplied me with some others that they were able to
```

1    locate.

2        Q    They supplied you with actual garments,

3    correct?

4        A    Not in every case, no.  And if you go to the

5    exhibit to the -- the attachments of my report, you will

6    find where I had the actual physical garment and where I

7    did not have it.  So I didn't have the physical garment

8    in every case.

9        Q    I understand.  But -- so I'll represent to you

10   your report has 35 products, it discusses 35 products.

11       A    Yes.

12       Q    And I think you said that in each of the

13   35 cases -- or in some of the cases you have garments,

14   actual garments, and some you do not?

15       A    That's correct.

16       Q    When you did not have a garment, what were you

17   looking at?

18       A    Then I was looking at what we call the tech

19   pack and the CADs, and I was looking at -- which is part

20   of my exhibits to the report, copy of which you have.

21       Q    Sure.

22       A    So I was looking at those sheets.

23       Q    All right.  And do you know why certain of the

24   garments were selected for you to look at versus others

25   not?

```
 1        A     I do not know.

 2        Q     Do you know if there was a method used to

 3   select which ones you would look at versus not?

 4        A     I think you have to ask counsel.

 5        Q     Okay.  But you don't know?

 6        A     I have no idea.

 7        Q     You weren't involved in that process at all?

 8        A     No.

 9        Q     Did you, nonetheless, look at anything other

10   than the ones that are the subject of your report?

11        A     No, only that which is the subject of my

12   report.

13        Q     And then just ignore the rest, correct?

14        A     That's it.

15        Q     Okay.

16        A     I just -- whatever I had, I looked at, and that

17   was it.

18        Q     I just wanted to confirm that.

19              Okay.  We can set 70 and 71 aside.

20              (Mr. Cardon entered the deposition room.)

21              MS. SAGAFI:  Let's just put on the record that

22   Craig Cardon has joined us.

23   BY MR. RAMSEY:

24        Q     I also saw in your report, paragraph -- well,

25   in Section IV, where you're talking about materials that
```

1    you considered -- it's paragraph 12a -- you looked at

2    costing data for the garments that you considered?

3        A    Yes.

4        Q    Okay.   Why did you do that?

5        A    I wanted to get a feel for their land-of-duty

6    prices.   It was more for information.

7        Q    The cost doesn't factor into any of your

8    opinions, though, correct?

9        A    That's correct.

10       Q    You also have, in paragraph 10, that you

11   visited numerous corporate websites of apparel

12   retailers, as general background into overall trends in

13   the retail apparel marketplace in this season.   Can you

14   tell me what websites you reviewed?

15       A    Well, I reviewed other websites that also sell

16   outdoor products, like REI and North Face, Patagonia.

17   And I did that merely to give me the -- the ambience,

18   the whole environment of that category of clothing.   It

19   was for information for me.

20       Q    Did any of that information that you obtained

21   from the websites factor into the opinions you

22   rendered --

23       A    No.

24       Q    -- in your report?

25       A    No.

```
 1   for speculation.
 2              THE WITNESS:  You'll have to repeat the
 3   question.  I don't think I can answer it, but repeat the
 4   question just in case I can.
 5              MR. RAMSEY:  Sure.
 6              Can you just read it back.
 7              (Record read as follows:
 8              "Q  In that case where they're using not
 9              excess fabric, the same fabric -- or
10              closeout, as you used the term, would you
11              agree that the customer at the outlet
12              purchasing the outlet item is receiving an
13              item that has the same value as the inline
14              item?")
15              MS. SAGAFI:  Same objection.
16              THE WITNESS:  I couldn't answer that.  I'd have
17   to see the garment just because I couldn't -- I can't
18   answer that.
19   BY MR. RAMSEY:
20       Q    Can you answer that as to any of the garments
21   you reviewed in this case?
22       A    Answer what about those garments?
23       Q    That question.
24       A    Well --
25       Q    Can you render an opinion at all as to whether
```

1    the -- of the garments you've looked at, whether the

2    outlet item provides the same value as the inline item

3    that you were comparing and contrasting it to?

4        A    I was never asked to do that.

5        Q    And you wouldn't be able to, correct?

6        A    It's -- it's not my area.

7        Q    Not your expertise?

8        A    In determining the value of the garment, since

9    we have already agreed that "value" is a term that we

10   haven't agreed to, I would say no.

11       Q    But you would also be unable to render an

12   opinion about what price Columbia might be able to

13   obtain from an end retail customer for either item,

14   correct?

15       A    That's correct.

16           MS. SAGAFI:  Objection; asked and answered.

17           That's fine.

18           THE WITNESS:  It is; I wouldn't comment on the

19   price.

20   BY MR. RAMSEY:

21       Q    We were talking earlier about the Speedo's

22   outlets and items sold there.  Was it ever a concern at

23   Speedo, if you remember, that they shouldn't sell the

24   products at the outlet that are also sold inline because

25   it would frustrate, irritate their wholesale accounts

1      A      No.  I do state that in my report.

2      Q      Yeah.

3      A      Yeah.

4      Q      Okay.  Turning to your report, if we flip to

5      page 6, paragraph 17 sets forth your assignment in this

6      case.  Do you see that?

7      A      Number 17, I do, yes.

8      Q      Is that an accurate description of what you

9      were asked to do?

10     A      That's exactly what I was asked to do.

11     Q      And you weren't asked to do anything beyond

12     that, correct?

13     A      No.

14     Q      So then in -- it's actually back in 13, there's

15     a summary of your opinion on page 5.  And just

16     throughout the report, you, I think it's fair to say,

17     are either categorizing the differences as material --

18     major material or modest?

19     A      Yes.

20     Q      Were you ever asked to determine whether a pair

21     of products were comparable?

22     A      Whether they were comparable to each other?  I

23     was --

24     Q      Yes.

25     A      -- specifically not asked that.

```
 1      Q      Were you told to not render an opinion about
 2   that?
 3      A      I was not specifically asked to -- I was not
 4   told not to do that, or --
 5      Q      Okay.
 6      A      -- no reference to that.
 7      Q      Were you asked to render an opinion one way or
 8   the other about whether a pair of items were similar?
 9      A      Specifically if they were similar or not?  I
10   was asked to do exactly what it says in No. 13, and I
11   was limited to answering that.
12      Q      So you describe, in paragraph 18 and 19, some
13   general categories, I guess, of what may be either a
14   major material difference or a modest difference.  Do
15   you see that?
16      A      Yes, I do.
17      Q      We'll get into some specific products in a
18   moment.  But as a general matter, if there is a material
19   difference between one garment and another garment, does
20   that, in your opinion, necessarily make the garments not
21   comparable?
22      A      If they're not similar, they're not -- they're
23   not comparable; is that what you're asking me?
24      Q      Yeah.  They're not comparable if ...?  What
25   would you say?
```

1      Q      So, just for the record, the zippers were on
2    the inline version, and the snaps were on the outlet
3    version.  Viewing those alone, that difference, is that,
4    standing alone, a material difference or a modest
5    difference?
6      A      No, you know, when you come up with a material
7    difference, it's not -- remember, I said that it's not
8    one particular thing; it's the combination.  Okay.  But
9    if you -- forcing me to say so, then I would say yes.
10            These are nice.  You know, these are blind
11   zippers because you can't see the zipper.  And these are
12   totally different pockets; they're totally different
13   constructed.  This is, you know, sewn -- attached on the
14   top.
15     Q      The outlet version has a pocket that's attached
16   on the top of the garment?
17     A      And these --
18     Q      The inline version has pockets inside?
19     A      -- inside.  Okay.  That's a material
20   difference.  But when I make garment material, as
21   opposed to moderate, for this exercise I took everything
22   into consideration.  So if they had one thing that was
23   material and everything else was so minor.  Okay.
24            This, to me, is a material difference, both in
25   the way it was sewn and in the way it was constructed.

1    this is sewn, attached to this. It's not one piece.

2    This -- this, too, this is attached right here, but it's

3    a much cleaner look. Okay.

4            Now, the other differences that I saw. Look at

5    how this sleeve is inset. You don't see any stitching;

6    it's beautifully done. It's on the inside. This is

7    also beautifully done, by the way. I don't think it's

8    not beautifully done, but it's very different. There's

9    your top stitching.

10   Q    So, just to be clear. So the inline version

11   has stitches on the sleeve that you --

12   A    You can't see them.

13   Q    -- can't see, and the outlet version has

14   stitches attaching the sleeve that you can see?

15   A    And -- okay. Yeah, this is a much cleaner

16   version, and that's because all of it is sewn inside and

17   then turned around, you know, and you don't see it.

18   Okay. This is not done the same way. This one, in the

19   sleeve, has an extra piece. This one does not.

20   Q    So the inline version has an extra piece on the

21   sleeve, and the outlet version does not.

22   A    The collar on this inline, if we look closely,

23   is, once again, sewn and attached totally different.

24   Here again, this is sewn from the inside so you don't

25   see the stitches. This is sewn from the outside.

1     Q    Go ahead.  I just want to make sure you get a

2  chance to review paragraph 22 to make sure that there

3  isn't anything else you want to point out.

4     A    And yeah, they're different -- finishing at the

5  bottom of both garments is different.  As you can see

6  here, the bottom of this, it's folded over and it's sewn

7  very nicely.  This is also sewn very nicely, but it's a

8  different finish, different stitches.

9         Okay.  I got -- I got it.

10    Q    Okay.

11    A    So I took all of those elements and said it was

12  materially different.

13    Q    Okay.  Just to circle back to a concept

14  earlier.  Are there any examples on either of these of a

15  yoke?

16    A    A yoke.  I don't think so.  No.  No.  It would

17  have been nice if it had neck facing here.  But it

18  doesn't.  No, there's no example of a yoke that I could

19  find.

20    Q    Okay.  Actually, my next question was going to

21  be is there an example of neck facing that --

22    A    No.

23    Q    On either jacket?  Just for my own --

24    A    That's okay.

25    Q    -- understanding, I'm looking at the inline

1   was a tighter-fitting jacket, that may be why they had

2   it.

3       Q    The two different fabric percentages, would

4   they provide a different functionality at all, other

5   than the fit?

6       A    It's a slight functionality difference because

7   fit is, you know, what -- if something makes it fit

8   better or less better, it's a functional item.  By

9   itself, it's a moderate, but combined with everything

10  else, we're looking at major lack of similarity, okay,

11  or major differences.

12      Q    Looping back to what we talked about earlier

13  but now we have a sample in front of us, you're

14  commenting on the differences between the garments, but

15  not the value or price at which Columbia could sell the

16  two garments, correct?

17      A    That is correct.

18      Q    And you couldn't tell me that because they used

19  one type of stitch on the inline and one type of stitch

20  on the outlet, that they would garner a different price

21  at the store?

22      A    I would not be able to tell you that.

23      Q    I think you'll notice, on both, there is a

24  round hang tag.  And I believe both say "Water

25  Resistant"?

1     A   Yes.

2     Q   Do you know whether both are equally water

3  resistant?

4     A   I don't know that.

5     Q   Okay.  And you didn't test for that, for

6  instance?

7     A   No, I did not.

8     Q   In any of the garments that you've looked at

9  where it indicated that it was water resistant, wind

10  resistant or heat resistant, did you check those

11  qualities of the garments?

12    A   No.

13       MS. SAGAFI:  Objection; vague and ambiguous.

14  Just -- I don't object to that question, but I just

15  don't think you phrased it well.

16       MR. RAMSEY:  Okay.

17     Q   So where the inline version and the outlet

18  version both said that they were wind resistant, you

19  didn't compare how well either resisted the wind,

20  correct?

21    A   That's correct.

22     Q   Okay.  And where either said that they were

23  waterproof or water resistant, you didn't compare the

24  relative ability of the jackets to dispel water?

25    A   That's correct.

1    Q    And the same would be true for heat resistant?

2  So if they both said they were heat resistant, you

3  didn't judge whether one was better at resisting heat

4  versus the other?

5    A    That's correct.

6    Q    And you weren't asked to do that?

7    A    No, that's correct as well.

8    Q    Let's do another sample.  This one is going to

9  be -- sorry, one moment.

10          MS. SAGAFI:  We've been going about an hour.

11  Let's take a break while you set up the next one.

12          MR. RAMSEY:  Perfect; let's do that.

13          MS. SAGAFI:  Okay.

14          (Recess.)

15  BY MR. RAMSEY:

16    Q    So we're going to move to our next example,

17  which is paragraph 37 of your report.

18    A    Okay.

19    Q    I'm going to put on your left what I believe

20  is -- yes -- the outlet style, with style number

21  starting with XM.  And then on your right will be --

22    A    This is outlet?

23          MS. SAGAFI:  This is outlet.

24  BY MR. RAMSEY:

25    Q    -- will be the inline, which is style number

1    BY MR. RAMSEY:

2        Q    So on the inline version, at the top of the

3    zipper --

4        A    Right.

5        Q    -- there's a little piece of fabric that covers

6    the zipper?

7        A    Thank you.  That's the other part; that's in

8    addition to this part.  This part should, nevertheless,

9    be here to protect you from feeling this against your

10   skin.  But this part is at the chin; this will avoid

11   that you feel it at the chin.  It doesn't exist here.

12          And it's -- this part here in No. 37, it says

13   the model for the outlet store has an exposed zipper and

14   does not have a chest pocket -- the exposed zipper at

15   the chin.  It doesn't have the chin protection.  Okay.

16       Q    And so based on these differences, why did you

17   determine that these are moderate differences as opposed

18   to material?

19       A    These are moderate because, basically, I felt

20   that it -- they were not really material differences.

21   You know, it still had the waist at the same -- I mean,

22   it still had the pockets.

23          It still had zippered pockets, it just had them

24   in different -- at a slightly -- angle, but it still had

25   the pockets.  And it still had the overall feel of the

1    garment.  And although some of these are very

2    valuable -- this is really important, the fact that the

3    Velcro can adjust the sleeve and that this was with

4    elastic -- I still didn't feel that they were material.

5    I felt that this could get away as moderate.

6              And, you know, the same thing I said.  The

7    color of the zipper, I don't think that that's that

8    critical to make it material, but it is moderate.  It

9    makes it dissimilar; it makes it different.

10    Q    Are there features on the outlet jacket that

11   you believe are preferable to any of the corresponding

12   features on the inline jacket?

13             MS. SAGAFI:  Objection; calls for speculation,

14   a lay opinion, and exceeds the scope.

15             THE WITNESS:  To answer that question, I'd have

16   to go back and examine each and every one of the outlet

17   ones.

18   BY MR. RAMSEY:

19    Q    No, I'm sorry, just of the two that are in

20   front of us.  Is there anything on this outlet jacket

21   that is, in your opinion or view, more preferable than

22   the inline jacket?

23             MS. SAGAFI:  Are you asking for her personal

24   opinion or her expert opinion?

25             MR. RAMSEY:  I'm asking for her opinion.

1      DEPOSITION OFFICER'S CERTIFICATE

2          (Civ. Proc. S 2025.520 (e))

3    STATE OF CALIFORNIA        )
                                ) ss.
4    COUNTY OF LOS ANGELES      )

5

6          I, Susan Van Booven, hereby certify:

7          I am a duly qualified Certified Shorthand

8    Reporter, in the State of California, holder of

9    Certificate No. 3956 issued by the Court Reporters

10   Board of California and which is in full force and

11   effect. (Bus. & Prof. S 8016)

12         I am not financially interested in this

13   action and am not a relative or employee of any

14   attorney of the parties, or of any of the parties.

15   (Civ. Proc. S 2025.320(a))

16         I am authorized to administer oaths or

17   affirmations pursuant to California Code of Civil

18   Procedure Section 2093(b), and prior to being

19   examined, the deponent was first placed under oath

20   or affirmation by me.  (Civ. Proc. S 2025.320,

21   2025.540(a))

22         I am the deposition officer that

23   stenographically recorded the testimony in the

24   foregoing deposition, and the foregoing transcript

25   is a true record of the testimony given.  (Civ.

1    Proc. S 2025.540(a))

2           I have not, and shall not, offer or provide

3    any services or products to any party's attorney or

4    third party who is financing all or part of the

5    action without first offering same to all parties or

6    their attorneys attending the deposition and making

7    same available at the same time to all parties or

8    their attorneys.  (Civ. Proc. S 2025.320(b))

9           I shall not provide any service or product

10   consisting of the deposition officer's notations or

11   comments regarding the demeanor of any witness,

12   attorney, or party present at the deposition to any

13   party or any party's attorney or third party who is

14   financing all or part of the action, nor shall I

15   collect any personal identifying information about

16   the witness as a service or product to be provided

17   to any party or third party who is financing all or

18   part of the action.

19

20

21   Dated January 3, 2017

22

23

24   _____
     Susan Van Booven, CSR No. 3956
25