# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JEANNE AND NICHOLAS STATHAKOS, )
Individually and on Behalf of )
All Others Similarly Situated, )
                               )
                Plaintiffs,    )
vs.                            )  Case No. 4:15-cv-
                               )           04543YGR
COLUMBIA SPORTSWEAR COMPANY;   )
COLUMBIA SPORTSWEAR USA        )
CORPORATION,                   )
                Defendants.    )
_____ )


VIDEOTAPED DEPOSITION OF

LARRY D. COMPEAU, Ph.D.

Potsdam, New York

Friday, January 13, 2017


Reported by:  Kristin Ashley Hicks, RPR

1               MS. GOLD:  Object to the form.

2        A    Well, from a layperson's point of view, a

3        Class Action is typically initiated on behalf

4        of a group of consumers that are alleged to

5        have been harmed in some way seeking some form

6        of damages or redress.  The Government

7        prosecution in the Overstock case, the only one

8        I've done deposition work or testified for, is

9        the Government trying to enforce the laws and

10       regulations in this case on a seller.  And

11       again, to seek damages to try to discourage

12       that type of behavior from other sellers and

13       from that seller in the future.

14  BY MR. CARDON:

15       Q    You just said damages there with respect

16       to the Government claim.

17            Do you mean penalties?

18       A    Penalties, yeah.  Again, I'm not a lawyer,

19       so forgive me.

20       Q    Okay.  So when you say you're not a

21       lawyer, you're not qualified to testify as to

22       what the legal standard is for a violation of a

23       law?

24               MS. GOLD:  Object to the form.

25       A    What do you mean?  What do you mean by

1          that?  I'm not sure.

2     BY MR. CARDON:

3          Q    Well, do you think you're qualified to

4     testify to whether a law has been broken or

5     not, a law has been violated?

6          A    I am qualified as an expert in my area to

7     testify as to whether or not the processes and

8     tactics used would go against the specific

9     areas of law that I am familiar with.  But

10    outside of that, no.

11         Q    So you, as an expert, are qualified to

12    testify as to whether certain pricing practices

13    are deceptive within the legal meaning of the

14    word deceptive?

15                   MS. GOLD:  Object to the form.

16         A    I, as an expert, can testify as to whether

17    certain pricing practices are deceptive based

18    on the research that has been done.  Whether

19    that measures to a legal definition, it's up to

20    attorneys and the Courts.

21    BY MR. CARDON:

22         Q    Okay.  Are you aware of what the standard

23    for deception in a false advertising case is?

24                   MS. GOLD:  Object to the form.

25         A    I do not know the legal definition.

```
1        that you had read that in this article?

2        A    No, I'm sorry, it didn't.

3        Q    Okay.  If you'll look up above in the

4        second paragraph of that same page, there is a

5        quote that is attributed to you, "the list

6        price has become a meaningless piece of

7        information".  Did you make that statement?

8        A    I did.

9        Q    Did you make that statement to Mr.

10       Streitfeld?

11       A    To the best of my recollection, yes.

12       Q    If you could turn back one page to two of

13       five.

14                  MR. CARDON:  Actually, let's

15              withdraw that.

16  BY MR. CARDON:

17       Q    Let's move on to Overstock.

18            So you testified at trial?

19       A    Yes, I did.

20       Q    You said the case is now on appeal?

21       A    Yes, that's my understanding.

22       Q    What did you charge in that case on an

23       hourly basis?

24       A    I believe when I first started that case

25       my rate was -- I think my rate was 900, but for
```

```
 1    -- in that particular instance I charged 450.
 2    Q    Why was that?
 3    A    Number one, it was public litigation.
 4    They had a limited budget, and I believed in
 5    the contribution I could make in the case.
 6    Q    The next case is the Jos. A. Bank case.
 7    A    Yes.
 8    Q    Where was that pending?
 9    A    I don't recall.
10    Q    Do you know what the status of that case
11    is?
12    A    No, I don't know the exact status.
13    Q    Do you know whether it has been dismissed?
14    A    I don't know what the legal -- I know I'm
15    not working on it anymore, but I don't know how
16    it was finally resolved.
17    Q    Okay.  Have you heard anything about the
18    Plaintiffs in that case not being forthright
19    with the Court?
20              MS. GOLD:  Object to the form.
21    A    The only thing I can recall seeing is on
22    Law 360, you get the e-mails, but I don't
23    subscribe because it's too expensive.  And I
24    remember seeing something about -- something to
25    that effect.  And so the case was either being
```

BY MR. CARDON:

Q    My question is you have written in your articles, in your scholarly pieces that the list price is, in many situations, not believed by the consumer?

MS. GOLD:  Object to the form, asked and answered.

A    I don't believe I've ever stated specifically that conclusion.  What I have stated is that consumers -- as the reference price gets more and more exaggerated, consumers believe it less and less.  I do not believe I've ever stated emphatically that consumers simply do not believe the reference price based on the research.  Now, there may have been a specific context in which I might have mentioned or said that a reference price might not be believable, but that does not mean that it still doesn't affect the consumer's responses.  That's what the research shows at least, and I can only rely on that.

BY MR. CARDON:

Q    So you conducted some research with respect to certain -- certain words that are used, right?

```
 1        A    Yes.

 2        Q    You know the research I'm talking about?

 3                  MS. GOLD:  Object to the form.

 4   BY MR. CARDON:

 5        Q    You understand what I'm asking, don't you?

 6                  MS. GOLD:  Object to the form.

 7        A    If I have conducted -- if I have conducted

 8   research examining what we call the semantic

 9   cues or semantic phrases --

10   BY MR. CARDON:

11        Q    Sure.

12        A    -- associated with reference prices?

13        Q    Sure.

14        A    Yes.

15        Q    Okay.  And those semantic cues you studied

16   were MSLP?  That was one of them?

17        A    That's one of them.

18        Q    And that stands for manufacturer suggested

19   list price?

20        A    Correct.

21        Q    Why did you use MSLP instead of MSRP?

22        A    Take a look at the date.  That's what was

23   more in favor at the time.

24        Q    Okay.

25        A    So if you look at the article, you'll see
```

1    that where we got these semantic cues from was

2    through a survey of newspapers, brochures, ads,

3    and so that's how we collected them and saw

4    which ones were being used.

5        Q    Okay.  And then you also used -- the other

6    semantic cue you studied was "Compare At"?

7        A    Correct.

8        Q    And then what was the third one?

9        A    Regular price.

10       Q    Regular, that's right.  And with respect

11   to "Compare At", over 30 percent of the

12   subjects indicated to you that they thought

13   that that was a fictitious price that was made

14   up by the retailer?

15       A    Right.

16                    MS. GOLD:  Object to the form.

17       A    Right.  Correct.

18   BY MR. CARDON:

19       Q    Now, has your work ever been -- has your

20   testimony -- and when I say testimony, I

21   include declarations, so not just live

22   testimony, ever been utilized in Class

23   certification proceedings?

24       A    I don't know.

25       Q    Okay.  So you don't know about whether it

1    was utilized in that fashion in the Dell case?

2    A    No, I don't.

3    Q    And you said you did not provide a

4    declaration in the Dell case?

5    A    Overstock case.

6    Q    Okay.  In the Overstock -- So you did

7    provide a declaration in the Dell case?

8    A    Yes.

9    Q    And you don't know whether it was used in

10   Class certification or not?

11   A    I do not.

12   Q    You don't know if a Class was ever

13   certified in that case?

14   A    I do not.

15   Q    And the Overstock case there was no Class

16   certification because it was a Government

17   enforcement action, right?

18   A    To the best of my knowledge, yes.

19   Q    And the Jos. A. Bank case never got to

20   that stage?

21   A    To the best of my knowledge, yes.

22   Q    Have you ever been to a Columbia outlet

23   store?

24   A    I have not.

25   Q    Have you ever interviewed a shopper from a

```
 1   Columbia outlet store?
 2   A    I have not.
 3   Q    Did you consider doing so in connection
 4   with this assignment?
 5   A    No.  I mean, full disclosure, it might
 6   have come up in my mind maybe, but I never
 7   thought to act on it or --
 8   Q    So you actually thought in your mind about
 9   possibly talking to Columbia shoppers to get a
10   sense of what -- how they felt about their
11   experience with respect to the pricing at the
12   Columbia outlet stores?
13   A    No, I never thought of that specifically.
14   Q    You have written previously about the
15   importance of empirical data and surveys with
16   respect to determining whether a practice is
17   deceptive or not.  Isn't that correct?
18             MS. GOLD:  Object to the form.
19   A    I have.
20             MR. CARDON:  Can we mark the
21        next in order?
22             (Compeau Exhibit 2, was received
23        and marked for identification; exhibit
24        given to reporter and appended to
25        transcript.)
```

```
 1        would have to say well, then the subjects were
 2        somehow systematically assigned to one group or
 3        the other.
 4            So what we do is over a number of studies
 5        we maybe test cameras, we maybe test jackets,
 6        we maybe test women, we maybe test college
 7        students, so on and so forth, and then
 8        collectively and through the use of
 9        meta-analysis we can draw conclusions about the
10        general population of consumers.
11   BY MR. CARDON:
12        Q    And that's what I'm getting at is you're
13        talking in the scholarly context about the
14        general population of consumers, right?
15        A    Yes.  Yes.
16        Q    So if I wanted to find out what a
17        particular population, not the general
18        population, but for example, if I wanted to
19        study outlet mall customers, I would focus on
20        people who shopped at outlet malls, not people
21        who'd never been to an outlet mall.  Is that a
22        fair statement?
23                    MS. GOLD:  Object to the form.
24        A    Actually, no, and I'll tell you why.
25
```

1    BY MR. CARDON:

2        Q    Okay.  Wait, wait, don't --

3             Let me just get that.  You said, when I

4        asked you if I wanted to study people -- if I

5        wanted to study outlet mall behavior, I should

6        not be studying people who go to outlet malls?

7                    MS. GOLD:  Object to the form,

8             mischaracterizes testimony.

9        A    What I'm saying is it's more complex than

10       that.  In fact, you could study just

11       outlet-going consumers and get a biased

12       response because of the particular day you went

13       to the outlet to study them.

14            So what we have to do is we have to be

15       extremely careful in how we design our samples.

16       And then specifically you would have to ask

17       yourself, first of all, is there any reason to

18       believe that outlet customers are different

19       than other customers?

20            Is there any reason to believe that outlet

21       customers don't shop anywhere else, and

22       therefore, they're somehow different in some

23       way and so they defy the generalizations of the

24       body of the research?

25

1    BY MR. CARDON:

2         Q    Have you done any research as to whether

3    outlet customers behave differently or have

4    different expectations at outlets than they do

5    at non-outlet locations?

6                   MS. GOLD:   Object to the form.

7         A    No.

8    BY MR. CARDON:

9         Q    So if I wanted to understand what you had

10   for breakfast this morning -- Is it safe to say

11   you had something for breakfast this morning?

12                  MS. GOLD:   Object to the form.

13        A    Actually, it's probably not.  But it

14   applies this morning, so go ahead.

15   BY MR. CARDON:

16        Q    Okay.  So good.  So if I wanted to

17   understand what you had for breakfast this

18   morning, do you think it would be more accurate

19   for me to ask you what you had for breakfast

20   this morning or to conduct a survey of 200

21   people to see what they had for breakfast this

22   morning and think that the most -- that the

23   result that got the highest response is likely

24   what you had for breakfast?  Which do you think

25   would be a better way of figuring out what you

1     A     Well, the FTC guide has used the word

2     majority.

3     Q     We'll get back to that.

4     A     Okay.

5     Q     You said the -- Which guide specifically

6     do you think used the word majority?

7     A     I think it was FTC, but it --

8     Q     Which guide though?  The FTC issues many

9     guides.

10    A     Oh, the FTC guidelines on use of reference

11    prices.  I don't know if they call them -- they

12    have several categories, former prices and so

13    forth.

14    Q     And you think the word majority was used?

15    A     I -- Yeah, that's my recollection.

16    Q     Okay.  So I want you to assume that the

17    regular price, the 150-dollar price for that

18    black sweater was adequately established, okay?

19               MS. GOLD:  Object to the form.

20    A     Okay.

21    BY MR. CARDON:

22    Q     And it sold for that price up until March,

23    when the weather started to get warm.  Now the

24    weather is warm, people aren't buying as many

25    sweaters.  It's been on the shelves for a

1        while.  I'm going to reduce that price to $50.

2        Is it appropriate in that circumstance for me

3        to show the former price of $150 and the

4        current price of 50?

5                    MS. GOLD:  Object to the form.

6        A    I'm very hesitant to deal with these kinds

7        of hypotheticals, but what I will say to try to

8        answer your question as best I can given what

9        you have provided in that hypothetical and that

10       the former price does represent a price at

11       which a significant quantity was sold and a

12       price at which they offered the product a

13       significant period of time, hopefully maybe

14       even majority period of the time, then to show

15       that price in my judgment would mean that the

16       reference price has veracity and is valid.

17  BY MR. CARDON:

18       Q    Okay.  Now, in addition to the black

19       sweaters, I have blue sweaters, and they came

20       in late, but they're identical to the black

21       sweater.  It's a Navy blue sweater, and even

22       the color is just, you know -- for someone

23       who's a little color blind like me, I might not

24       even be able to tell the difference, but it's

25       different.  It's a blue sweater and the other

1        is a black sweater.  Is it okay for me to mark

2        that one down, too, and show that that blue

3        sweater is 50 and with the original price there

4        being 150?  It's the same sweater, just a

5        different color.

6                        MS. GOLD:  Object to the form.

7        A     It may be.  It may not be.

8              In my judgment, I would again have to look

9        at how long was it offered at that reference

10       price and how many units were sold at that

11       reference price.

12   BY MR. CARDON:

13       Q     Oh, no.  You mistake the question.

14       A     Okay.

15       Q     I'm asking you for the blue sweater that's

16       identical to the black sweater.  Can I rely

17       upon the sales and the time that the black

18       sweater was being offered --

19                        MS. GOLD:  Object to the form.

20       Q     -- or is it so narrow that I have to show

21       that the blue sweater was sold for a particular

22       period of time and sold a particular number of

23       units?

24       A     You have to show the blue sweater.

25       Q     Okay.  So you do not believe -- Now, okay,

1       so if I have the black sweater in a small, a

2       medium and a large, and I have sold the -- a

3       lot of units of the large because it's

4       wintertime and people ate a lot at Christmas,

5       and I haven't sold any units of the small and

6       they're all still sitting there, and I've got a

7       few units of black and a bunch of units of the

8       small left, can I show on the small the

9       markdown and show the previous price?

10                      MS. GOLD:  Object to the form.

11      A       Are you saying the prices were all the

12      same regardless of size to begin with?

13  BY MR. CARDON:

14      Q       Yep.

15      A       And they were all displayed in the same

16      manner on the same table side by side?

17      Q       It's just, right, I got multiple sizes.  I

18      can't -- every time I shop, I go somewhere and

19      it's got the same item in multiple sizes.

20      A       Okay.  And overall, did the retailer sell

21      these sweaters at that price for a significant

22      period of time and a significant --

23      Q       I've asked you to assume that, but I asked

24      you --

25      A       You asked me about large.

 1      Q     Nobody was buying the smalls.  I didn't

 2      have a lot of small people that walked into the

 3      store.  Nobody was buying the smalls.

 4                  MS. GOLD:  What's the question

 5            that's pending?

 6                  MR. CARDON:  I think the witness

 7            knows.

 8                  MS. GOLD:  Do you understand

 9            what the question is that's pending at

10            this point?

11                  DR. COMPEAU:  Yes, I do.

12                  MS. GOLD:  Okay.

13      A     Your scenario started out specifically to

14      the large.  And so you said a significant

15      majority of the large sweaters sold at that

16      reference price --

17      Q     Yep.

18      A     -- and was offered at that reference price

19      for a significant period of time.  I'm simply

20      saying I can't answer your question unless

21      you're willing to make the same assumption

22      about all the sweaters during the same time

23      period at the same reference price.

24   BY MR. CARDON:

25      Q     No.  What I'm telling you is that I

1        couldn't sell any small sweaters because

2        everybody was big that came into my store.

3        A    I understand that.  What I'm asking you is

4        did the sale of the large sweaters represent a

5        significant quantity, not just in terms of

6        large sweaters, but all of the sweaters?  Let

7        me try to explain.

8        Q    So I understand -- let's say --

9        A    Okay.

10       Q    -- I've got -- this is awfully -- this is

11       a lot of thinking, would you agree, for a store

12       manager to have to go through when they're

13       trying to mark down products for sale?

14                   MS. GOLD:  Object to the form.

15       A    I have no idea what store managers think,

16       and I don't even want to try to speculate.

17   BY MR. CARDON:

18       Q    Okay. well, let's go through it then.  So

19       you can't answer it based on what I've given

20       you so far.  So let me just tell you, of the --

21       there were 100 sweaters total, let's say there

22       were 99 sweaters total, 33 of each size.  I

23       sold 50 -- I sold 30 of the large sweaters, ten

24       of the mediums and two smalls.  Let's make it

25       even easier, I sold zero smalls.  So I've got

```
 1        93 sweaters and I've -- 99 sweaters and I've
 2        sold 43, zero of them were smalls.
 3        A    And all of the sweaters had a reference
 4        price of $150 to begin with, the various sizes?
 5        Q    All of the sweaters had a tagged price of
 6        150.  It wasn't a reference price at that time.
 7        That was the tag price.
 8        A    Right, right.
 9                      MS. GOLD:  What's the question?
10                      MR. CARDON:  The witness
11              understands.  If the witness has a
12              question about what the question is --
13                      MS. GOLD:  There's no question
14              pending.
15                      MR. CARDON:  There is.
16                      MS. GOLD:  What's the question?
17                      Do you understand what the exact
18              question is that's pending?
19        A    I would like to have it asked if you don't
20        mind --
21   BY MR. CARDON:
22        Q    Okay.
23        A    -- just to make sure I don't understand
24        incorrectly --
25        Q    Under that --
```

```
1        A    -- or don't answer your question.

2        Q    Under that scenario, is it fine for me to

3    put the new price of $50 on the sticker and not

4    cover up the old price of $150 for the smalls?

5                    MS. GOLD:  Object to the form as

6            to "fine."

7        A    So what I'm trying to get at here, and

8    apparently I'm not doing a very good job is

9    that in that scenario you would have to have

10    sold all sizes, you know, clumped them

11    together.  And if you sold a significant

12    quantity, regardless of size, and offered it at

13    that 150-dollar reference price, or price, and

14    offered it all sizes at that price for a

15    significant period of time, then it would be,

16    in my mind, legitimate to use that reference

17    price again regardless of the size because

18    you're looking at this sweater as being a unit

19    regardless of size.

20 BY MR. CARDON:

21        Q    Got it.  So it's a unit if it's different

22    sizes, but it's not a unit if they're different

23    colors?

24        A    And let me explain my reasoning on that.

25    So in my mind, the size does not change the
```

1      basic bundle of benefits that a consumer gets,

2      but color does.  So in one scenario you could

3      have black sweaters that are extremely popular

4      and sell well at your initial price, the

5      reference price, but blue sweaters could be

6      very unpopular, not worth the reference price.

7      And then to use that reference price suggests

8      to consumers that they really are worth $150

9      but you didn't sell any at $150.

10         Q    So you think reference prices can be

11    beneficial to consumers?

12                   MS. GOLD:   Object to the form.

13         A    If they are valid and true, yes.

14    BY MR. CARDON:

15         Q    Do you think the consumer would want to

16    understand that the black sweater -- let me

17    just rephrase it, that the other colors of the

18    blue sweater have been -- let me phrase it

19    differently.

20         I'm just having a different time --

21    difficult time with the concept that you're

22    parsing things on a color basis.  So your view

23    is for it to be an accurate reference price, it

24    has to be the exact same item with the possible

25    difference being size?

```
 1   time.
 2   Q    So when you say that it's contextual as to
 3   how long the selling price should be, you're
 4   telling me that the life of a product from, you
 5   know, inception through being on the clearance
 6   rack is -- is, let's call it nine weeks, the
 7   period at which it should be at the original
 8   price before it goes to a reference price would
 9   be shorter than a product that might have a
10   six-month life cycle?
11   A    Possibly.  Possibly.  In my mind, whether
12   the guidelines or regulations allow for that,
13   I'm not sure.
14   Q    Right, and that's not your area of
15   expertise, telling us what the regulations say?
16   A    No.
17   Q    Okay.
18   A    Other than how it relates specifically to
19   my research.
20   Q    How does -- Well, let me ask you that.  So
21   you think -- you are -- What does that last
22   piece mean, other than as it relates
23   specifically to my research?
24   A    Well, I publish research that incorporated
25   reviews of regulations and what they mean, and
```

1          offered advice to retailers, sellers on how

2          they can avoid deceiving consumers through the

3          use of reference prices.  So I'm interpreting

4          those regulations, interpreting those guides

5          and providing advice, managerial prescription,

6          prescriptions to sellers.

7          Q    Got it.  But you would not expect a judge

8          to rely upon you to tell them what the legal

9          standard is?

10         A    No.

11         Q    Okay.  How --

12         A    I would expect a judge to rely on me to

13         determine whether a practice would be deceptive

14         in my view.

15         Q    So you believe that a judge should rely

16         upon you to determine whether a practice falls

17         above or below a legal standard?

18                   MS. GOLD:  Object to the form.

19         A    Not a legal standard.  Simply a standard

20         that's borne out in the research.

21    BY MR. CARDON:

22         Q    Okay.  And that standard may be different

23         from what the operative legal standard is in

24         any particular jurisdiction at any particular

25         time?

1        A    That is possible, yes.

2        Q    Okay.  Tell me, what are the FTC

3        guidelines.  Are they -- are they law?

4                    MS. GOLD:  Object to the form,

5              seeks legal conclusion.

6        A    My understanding is that they are simply

7        guidelines that convey to sellers that the FTC

8        -- if sellers don't abide by them, the FTC can

9        pursue action against them for violating these

10       guides.

11  BY MR. CARDON:

12       Q    You say "violating."  That suggests that

13       they are, in fact, a hard and fast rule.

14            You either are complying or not complying.

15       Is that right?

16       A    That's up to the FTC to decide.

17       Q    Okay. but I'm asking what your

18       understanding is of it.

19                    MS. GOLD:  Object to the form.

20       A    My understanding is that the FTC makes a

21       determination as to whether or not a firm is

22       following the guidelines close enough.  And if

23       the FTC decides that they're not following the

24       guidelines as they should be, then subsequently

25       makes a determination whether or not they

1    for some companies it can be extremely

2    important.   For other companies there may not

3    be much brand respect or brand equity there at

4    all.

5    Q    Do you have an opinion one way or another

6    where Columbia fits into that?

7    A    I guess not.   I've never been in an outlet

8    store.

9    Q    You've been in a Columbia regular store?

10   A    No.

11   Q    Have you -- before being retained for this

12   action, did you ever look at the Columbia web

13   site?

14   A    No.

15   Q    Have you subsequently looked at the

16   Columbia web site?

17   A    Briefly.   Very briefly.

18   Q    Have you ever owned an article of Columbia

19   clothing?

20   A    Not that I can recall.

21   Q    Do you recall ever seeing an advertisement

22   for Columbia, separate from your retention in

23   this matter?

24   A    No, I don't.

25   Q    Okay.   So you have very little interaction

1    with Columbia Sportswear other than your

2    retention in this specific matter?

3    A    I do recall one instance I do believe I

4    got a Columbia sweater as a Christmas gift one

5    year from one of my kids, but that's the only

6    thing I recall.

7    Q    So you think you might have gotten a

8    Columbia sweater one year?

9    A    Might have.

10   Q    Roughly how --

11   A    Could have been another brand, but I think

12   it was Columbia.

13   Q    Okay.  So fair to say that would not

14   change the conclusion that you've had very

15   limited interaction with the Columbia brand

16   outside of this engagement?

17   A    Correct.

18   Q    So who is -- and I don't know if it's

19   doctor, professor, Mr., Grewal?

20   A    Doctor and Professor Grewal.

21   Q    Grewal, who is he, or she?

22   A    He is a professor at Babson College.

23   Q    Where is that located?

24   A    Boston.

25   Q    And what is your relationship with Dr.

1    A      Finally, if the reference price is

2    exaggerated and even if the consumer infers

3    product quality based on the sale price, the

4    legal definition of deception has been met.

5    Q      What do you mean by that?

6    A      Again, we're drawing upon the integration

7    of the FTC guides with the empirical research

8    that has been done to develop a conceptual

9    model.  And so we're, again, articulating

10   another path in that conceptual model.

11   Q      And the next sentence?

12   A      However, the FTC or State Attorney

13   General's Office may decide that the

14   misrepresentation is not material and not

15   prosecute the advertiser.

16   Q      So that concept is that there may be

17   misrepresentations that don't rise to the level

18   of Governmental action being necessary, and

19   that's at the discretion of the Government.  Is

20   that right?  That's what you're saying there?

21   A      That's what I'm saying.

22   Q      And what determines whether it's material

23   or not?

24                MS. GOLD:  Object to the form.

25   A      Beyond the scope of what I do.

```
 1   BY MR. CARDON:
 2        Q    So you're saying it is not material.  You
 3        don't have an opinion one way or another how to
 4        determine whether a misrepresentation in this
 5        context is material?
 6        A    It's --
 7                  MS. GOLD:  Object to the form.
 8        A    It's so contextually dependent, all the
 9        variables that go in.  That's why the Court
10        cases --
11   BY MR. CARDON:
12        Q    And it wouldn't be contextually dependent
13        just upon the store?  You'd have to know
14        contextually about the individual who's
15        responding to that stimulus?
16                  MS. GOLD:  Object to --
17   BY MR. CARDON:
18        Q    Have they gone comparative shopping?
19        Do they look at prices?
20        Have they simply walked in with a gift
21        card and they have $25 to spend and are looking
22        to fill up that gift card?
23        Isn't that all part of the context that
24        would need to be determined to ascertain
25        materiality?
```

```
1                       MS. GOLD:  Object to the form.
2          A    I don't know what the Court uses,
3          honestly.  I don't know what factors the Court
4          would deem important in that scenario.
5    BY MR. CARDON:
6          Q    Okay.  But you would think so, right?  If
7          you were trying to decide whether a -- some
8          deception or some -- some misinformation was
9          material, you'd want to know more than just the
10         bare fact that there was misinformation?
11         A    I have never, nor do I try to make the
12         legal judgment of materiality.  It's just not
13         what I -- I'm supposed to do.
14         Q    Okay.  So that's beyond the scope of any
15         opinion you have here?
16         A    Correct.
17         Q    Okay.  But let me ask you, the concept of
18         materiality on some level goes to whether there
19         is actually deception.  Isn't that right?  So
20         if there is a price, a reference price, and I
21         never look at the reference price, then with
22         respect to me it is so immaterial that I
23         haven't even been deceived because I didn't
24         even look at it?  Would you conceptually agree
25         with that?
```

1    A    No.

2    Q    Okay. why have I been deceived about

3    something I didn't look at?

4    A    Several reasons. Number one, you're

5    asking me, again, to refer to and opine on

6    materiality which I cannot do. It's a legal --

7    as far as I'm concerned, that's a legal

8    construct and it's determined by the Court.

9    You then go ahead and position materiality on

10   an individual basis where one consumer doesn't

11   look at the reference price, so it's not

12   material. And to me that -- we don't look at

13   that as materiality because, again,

14   materiality's a legal word.

15         What we would do is we would look at how

16   the consumers respond to that price

17   information. To date there is no research to

18   support the notion that consumers are -- do not

19   respond in some way to a reference price

20   scenario. Even when they don't believe it, it

21   still has a positive impact on their

22   perceptions of the value of the deal, their

23   willingness to purchase and a negative impact

24   on their willingness to continue to search.

25   Q    And it also can have a negative impact on

1   them, as well, right?  Because if they don't
2   believe it and they think they're being
3   deceived, you've written that that can have a
4   negative impact on them?
5   A    A negative impact in the sense of the
6   brand, but the research -- and again, you have
7   to look closely at the dates.  That was a
8   proposition, a hypothetical proposition in one
9   paper quite a while ago.  Since then we have a
10  whole body of research, including that
11  meta-analysis, that shows that when -- that
12  even when consumers cast doubt and don't
13  believe the reference price, even when it's
14  wildly exaggerated, it still has a positive
15  impact on their perceptions of the value of the
16  deal, their willingness to purchase, and a
17  negative impact on their willingness to
18  continue to search.
19  Q    What does that mean by a positive impact?
20  A    A positive impact, it's statistical, means
21  that there is a positive response.  So the
22  higher the reference price, the more they're
23  going to value the deal, the more likely they
24  are to purchase.
25  Q    So it increases the likelihood of -- based

1    on that factor, the pricing factor?  Increases

2    the likelihood of a purchase based upon the

3    pricing factor?

4    A    I want to be very specific about the

5    relationships because I don't want to

6    mischaracterize the research.  What the

7    research shows is as the sales price is held

8    constant and the reference price increases,

9    even to points where consumers say we don't --

10   you know, subjects say they don't believe that

11   price --

12   Q    Yep.

13   A    -- it still has a positive impact on

14   causing those same subjects to increase their

15   perceptions of the value of the deal and to

16   increase their willingness to purchase.

17   Q    Understood.  And this is not research you

18   conducted.  This is an analysis you conducted

19   of other's research?

20   A    Correct.

21   Q    Okay.

22   A    Which is far more rigorous.

23   Q    There's probably a whole different body of

24   expert that could opine on that.

25   A    I doubt it.  If you look at the medical

1    Q    Well, the consumers that you're opining on
2    in your report, your declaration.
3    A    I have not been presented with any
4    empirical evidence to show what factors those
5    consumers are.  The only assumption I can make
6    is that these consumers -- I know of no
7    evidence to show that these consumers are
8    substantially or wildly different than other
9    consumers.  And so we know in general some of
10   the factors that consumers use.  I don't know
11   why those wouldn't apply to these consumers.
12   Q    Okay.  So you know of no evidence that
13   would show that these consumers, the Columbia
14   consumers are different than the overall body
15   of consumers?
16   A    Correct.  And that the -- the assumption
17   that they probably don't shop solely at
18   Columbia outlets, they probably do grocery
19   shopping and even clothes shopping at other
20   places, would suggest that, as well.
21   Q    Okay.  So other than the fact that they
22   probably do other shopping, when they're
23   shopping at Columbia, do you have any basis to
24   believe that their considerations are the same
25   as those considerations as the much wider body

1    of consumers shopping anywhere?

2    A    Yes, because again, the nature of

3    scientific research and scientific process is

4    to select different samples for studies, to

5    select different product categories, to select

6    different contextual variables.  And while no

7    single study alone could speak to Columbia

8    shoppers, a whole body of thousands of studies

9    looking at consumers, unless there's some

10   compelling research evidence to suggest that

11   somehow Columbia shoppers, consumers are wildly

12   different than all of the various samples.  And

13   I'm sure some of those samples have included

14   people who shop at Columbia outlet stores, but

15   that's how -- I mean, we don't have to test

16   whether gravity applies to you.  We know that.

17   We've tested it on so many different contexts

18   and different variables and so forth, that

19   unless you can show some compelling reason why

20   you're different from everybody else, then, you

21   know, it probably applies to you, as well.

22   Q    Okay.  So your assumption is that absent

23   someone telling you that outlet shoppers for

24   technical sporting equipment, sporting goods

25   are different from the general body of

1        consumers in the United States, you will assume

2        they are the same?

3                    MS. GOLD:   Object to the form.

4        A     What I'm saying is that there is no --

5    BY MR. CARDON:

6        Q     I'm going to --

7        A     -- evidence.

8        Q     -- ask you -- That's a yes or no question.

9        I understand that you have lots of opinions,

10       but this is a yes or no question.

11                   MS. GOLD:   Object to the form.

12                   You can answer as you were answering.

13       A     You're asking me specifically, and what

14       I'm trying to tell you is that it's not my

15       decision.   What I'm saying is this is how

16       science works.   And that when you want to

17       generalize to a population, you have to have

18       some theoretical notion of why that population

19       would be different in some way.   And if you

20       have that theoretical notion, then you can test

21       it.   But as I said previously, right now we

22       have thousands and thousands of studies that

23       look at consumer shopping for all different

24       kinds of goods, technical, non-technical, older

25       consumers, younger consumers, large consumers,

1      small consumers, and we know that overall there

2      are some generalizations we can draw about

3      consumers regardless of what they're shopping

4      for or what they are.

5  BY MR. CARDON:

6      Q    Have you conducted any investigation as to

7      whether the consumers at a Columbia outlet

8      store in California have different priorities

9      or different concerns than the mass body of

10     consumers that you refer to in your studies?

11     A    No.

12     Q    Do you believe that a consumer at a Louis

13     Vuitton store would have the same purchasing

14     criteria and factors in mind in making a

15     decision as a consumer at a Walmart?

16     A    They very well could be.

17     Q    Okay.  Are they likely to?

18     A    I'm going to say they're probably quite

19     likely to use the same criteria, but possibly

20     different standards for those criteria.

21     Q    So weighing those criteria differently?

22     A    Either weighing them or the actual range

23     of acceptable -- acceptability for those

24     criteria.

25     Q    Okay.  You said a few minutes ago when I

```
1          price, even if it is not believed to be
2          accurate, increases the likelihood or the
3          weighing of one of those factors?
4                        MS. GOLD:  Object to the form.
5          A    No.  No, I didn't say that.  So let me be
6          clear.
7     BY MR. CARDON:
8          Q    Okay.  So you have those list of factors
9          you just gave me, and you've said that even if
10         the reference price isn't believed, it has an
11         impact on the consumer's perception of value.
12         So if you've got a scale, let's say, or, you
13         know, I think of an LED sort of readout with,
14         on the bottom, each of those factors and then
15         sort of a bar graph like that and it rises, for
16         the value, perception of value bar, that would
17         be raised based upon that reference price even
18         if the consumer doesn't believe it?
19         A    The mere presence of the reference price,
20         even if the consumer discounts it because they
21         find it to some degree unbelievable, will still
22         increase their perception of value.
23         Q    Got it.  And the overall decision to make
24         a purchase or not make a purchase though is
25         based upon a number of different factors of
```

1          which that is one?

2      A    Correct.

3      Q    So you're not saying there is a causation

4          effect, that because there is a reference price

5          that impacts this perception of value;

6          therefore, consumers always buy the product?

7                    MS. GOLD:  Object to the form.

8      A    The way you have stated it specifically in

9          that way, it is correct.  You are correct.

10   BY MR. CARDON:

11     Q    Okay.  And I'm not trying to play games

12         here.  It's just one of those factors that you

13         described, and it makes that factor tend

14         towards purchase?

15                   MS. GOLD:  Object to the form.

16     A    Correct.  As I've stated, that the mere

17         presence of a reference price -- and it's

18         causal, the mere presence of a reference price

19         causes consumers to increase their perceptions

20         of value, and therefore, increase their

21         likelihood of purchase.  The higher that

22         reference price is relative to the selling

23         price may even increase more the perception of

24         value and increases more their likelihood of

25         purchase.

```
 1                        THE VIDEOGRAPHER:   Time is 11:51
 2              [sic].   This is DVD three.   We are on the
 3              record.
 4                   * * * * * * * *
 5
 6         A F T E R N O O N    S E S S I O N
 7
 8                   * * * * * * * *
 9
10              LARRY D. COMPEAU, Ph.D.,
11            having been previously sworn,
12           returned from the luncheon recess
13                and testified as follows:
14    BY MR. CARDON:
15         Q    Okay.  Dr. Compeau, do you have any
16         opinion as to the difference, if any, in
17         quality between the Columbia InLine and SMU
18         products?
19         A    No.
20         Q    Have you been asked to come up with an
21         opinion on that?
22         A    No.
23         Q    Did you in any way investigate whether
24         there was a difference in quality?
25         A    No.  Counsel, you know, did mention to me
```

1    that they have investigated that and had

2    someone investigate that, but that's all the

3    knowledge I have other than to say that their

4    conclusion was that they thought there -- they

5    had evidence that there were differences in

6    quality.

7    Q    Okay.  So Counsel told you that they had

8    conclusions that there is a difference in

9    quality between the InLine and the SMU

10   products?

11   A    That's my recollection, yes.

12   Q    Did they tell you in any way what the

13   basis for that conclusion was?

14   A    No.

15   Q    Okay.  Did you inquire about that at all?

16   A    No.

17   Q    How would -- Would you feel that you would

18   have the capability of ascertaining a

19   difference in quality between two Columbia

20   products?

21   A    You mean in terms of rendering an expert

22   opinion?

23   Q    Well, first in terms of rendering an

24   expert opinion, yeah.

25   A    No.

1    there may have been a conference paper or a

2    paper that might have been published later, but

3    off the top of my head right now I don't recall

4    any.

5    Q    Okay.   There are no semantic cues on the

6    Columbia tags, right?

7    A    Correct.

8    Q    Okay.  Does your 2004 study relating to

9    semantic cues address expressly the situation

10   where there is no semantic cue?

11   A    No, but other studies have.

12   Q    Okay.  Other studies that you've

13   conducted?

14   A    No, other studies in the body of

15   literature.  And again, I'm -- my expertise

16   doesn't -- isn't driven solely by my research,

17   but the body of research that I'm familiar

18   with, intimately involved in, have been

19   reviewing, reviewing that research for

20   journals, for publications of the like.

21   Q    So which studies -- well, let me just ask

22   you, did you rely upon those studies in forming

23   your opinions here?

24   A    Not specifically, no.

25   Q    Okay.

```
 1    A     There again, general body of knowledge.
 2    Q     Okay.  Have you ever opined -- Well, let
 3  me ask, have you ever performed any consumer
 4  testing relating to reference prices without a
 5  semantic cue?
 6    A     No, but others have.
 7    Q     Okay. my question was --
 8    A     No.
 9    Q     And again, my time, so I get my questions
10  answered.
11    A     Yep.
12    Q     The answer's no, right?
13    A     Not me personally, no.
14    Q     Okay.  Others have and you have not
15  expressly relied upon those other studies in
16  your opinions here?
17    A     And let me be clear about that.  So some
18  of the studies I have cited in my opinion may
19  have relied on those studies.  I don't know off
20  the top of my head, but the research is
21  progressive, right.  And so every subsequent
22  piece of research relies on the previous
23  research that's been conducted and so on and so
24  forth.  That's how we build the body of
25  knowledge.
```

1      Q    Right.  Each step of the way we get more

2      attenuated from the actual consumer response?

3                        MS. GOLD:  Object to the form.

4  BY MR. CARDON:

5      Q    Isn't that true?

6      A    No, I disagree with that.

7      Q    It's the old game of telephone, right,

8      where you tell the person next to you something

9      and we see how -- how similar it is to the

10     first statement when it comes back around the

11     room?

12     A    Not at all.

13     Q    Okay.  That doesn't happen in academia?

14     A    No, not when you're doing research like

15     that.  It actually helps you construct and

16     execute the research to be more specific.

17     Q    Can you tell me the studies that did

18     expressly study the effect of not -- reference

19     prices that did not include semantic cues?

20     A    Off the top of my head, I cannot cite

21     them, but they would tend to be the very early

22     studies, like Fry and McDougall, where they

23     were looking at the presence versus absence of

24     a reference price and estimating those effects.

25     And then later we went on to then start looking

1    at semantic cues and using different semantic

2    cues and looking at different values of the

3    discounts and so forth.  So it started out very

4    basic, how do consumers respond when there is a

5    reference price and when there isn't a

6    reference price, then we started getting more

7    sophisticated as the literature developed.

8    Q     So Fry and McDougall is the 1974 study?

9    A     That's a very early study.  So it may very

10   well be one of the early ones.  I'm not saying

11   specifically that, but I'm saying in that time

12   period, the early '70s, early '80s, in that

13   time period is where I recollect studies were

14   done that primarily looked at the presence of a

15   reference price.  And if you look in our

16   meta-analysis, you'll see that we classified

17   the articles as whether or not they manipulated

18   the amount of the reference price, selling

19   price and discount or whether it was mere

20   presence or absence.

21   Q     Which meta-analysis is this?

22   A     1998.  There's only one.

23   Q     The 1998 is your meta-analysis?

24   A     Correct.

25   Q     Now, do you have this one in front of you?

```
 1      measured.
 2           So it's pretty hard to say that there
 3      isn't a cause and effect between use of
 4      advertised reference prices, or reference
 5      prices in general, and consumer subsequent
 6      decision processes when there is a significant
 7      statistical significance in that.  So maybe if
 8      you could ask me a different way.
 9  BY MR. CARDON:
10      Q    Yeah.  I guess what I'm getting at,
11      because you're speaking only in the aggregate
12      and I'm trying to figure out how this applies
13      to an actual human being.  And I get to the
14      question of does your opinion say that but for
15      the use of the reference price, any particular
16      person would not have bought that item?
17                 MS. GOLD:  Object to the form,
18            asked and answered.
19      A    And again, if -- and I'm trying to
20      understand.  If you're asking me is 100 percent
21      of the choice process driven solely by the
22      presence of a reference price; no.
23  BY MR. CARDON:
24      Q    Number three, you say Columbia knows that
25      its outlet consumers are motivated by the
```

1    Q    Because that's not within your area of

2    expertise or research?

3    **A    Correct.  Correct.**

4    Q    Okay.  Number six, Columbia's reference

5    pricing scheme is deceptive to consumers and

6    induces consumers into purchasing Columbia

7    outlet exclusive products that, absent the

8    deceptive, I think that's a typo, they

9    otherwise would not have bought?

10    **A    I caught that typo afterwards, too.**

11    Q    Okay.

12    **A    Should be deception.**

13    Q    So you're saying that every consumer who

14    purchased a Columbia outlet product, an SMU

15    product with a reference price, would not have

16    bought it but for the deception?

17    **A    Could you read that again?**

18    Q    Yes.

19    **A    I don't have it in front of me.**

20    Q    This surprised me a little bit, I'll tell

21    you.  It seemed to go much farther than any of

22    your research has gone.  Columbia's reference

23    pricing scheme is deceptive to consumers and

24    induces consumers into purchasing Columbia

25    outlet exclusive products that, absent the

1     deceptive, they otherwise would not have

2     bought?  I read this and it directly says that

3     the reference pricing causes consumers to make

4     a purchase that they wouldn't have otherwise

5     bought.  And I'm asking you if that -- if your

6     testimony or your opinion is that that's for

7     each and every consumer, each and every SMU

8     product?

9                    MS. GOLD:  Object to the form.

10    A     What I was trying to convey there is the

11    fact that the items being sold at the outlet

12    store have a reference price or is using a

13    reference price at which those particular items

14    have never been sold at previously will induce

15    consumers to make purchases that they might not

16    otherwise have made.

17          Your question, you want me to answer it?

18    So your question is would that apply to each

19    and every single consumer.

20          My answer would be some consumers more

21    than others.  Some consumers may feel they were

22    just duped, didn't get the discount they were

23    supposed to get.  Other consumers may feel

24    absolutely, if I would have known this, I

25    wouldn't have bought it because I could have

1          got a similar item down the road at T.J. Maxx

2          for less.

3     BY MR. CARDON:

4          Q     And other consumers would have gone

5          forward with their purchase?

6          A     Well, they all went forward with their

7          purchase because they didn't know they were

8          being deceived.

9          Q     Well, but your opinion here assumes that.

10          You say absent the deception?

11          A     Right.

12          Q     So I'm saying others, absent -- absent the

13          deception, or knowing of the deception, would

14          still go forward with their purchase?

15                    MS. GOLD:  Object to the form.

16     BY MR. CARDON:

17          Q     Is what you're saying is that if Columbia

18          -- that the reference pricing was the cause of

19          every single purchase of outlet exclusive

20          product?

21                    MS. GOLD:  Object to the form.

22          A     If that's your interpretation, that was

23          not my intent.

24     BY MR. CARDON:

25          Q     Okay.

1    A    My intent was to say that but for the

2    deception, many of the consumers would not have

3    purchased and other consumers will have feel --

4    felt that they were deceived and harmed in some

5    way.

6    Q    Can you quantify many?

7    A    I could only go back to the research and

8    show that the effects have been strong and

9    robust.  To a specific percentage to carry from

10   the research over to Columbia customers I think

11   is beyond the scope of what I've done and would

12   need to be teased out.

13   Q    And that would go to that consumer

14   materiality perception that we said is not

15   something that you had undertaken?

16                   MS. GOLD:  Object to the form,

17        mischaracterizes testimony.

18   A    No.  I'm -- I'm not dealing with

19   materiality in a legal sense.  And what I'm

20   talking about here is I feel that this

21   particular form of deception that Columbia

22   engaged in was widespread form of deception

23   that caused consumers to make purchases and be

24   harmed in some way as a result of it.

25

```
 1   BY MR. CARDON:
 2        Q    How would I find out which consumer would
 3        have made a purchase and which one would not
 4        have?
 5                    MS. GOLD:  Object to the form.
 6        A    Well, that's really not what I was asked
 7        to do.
 8   BY MR. CARDON:
 9        Q    Okay.  So you don't know the answer to
10        that?  That's not your area?
11                    MS. GOLD:  Object to the form.
12        A    I didn't say I don't know an answer.  I'm
13        saying that I don't feel qualified to make --
14        to give you an answer at this state given the
15        information that you've given me and that I
16        have.
17   BY MR. CARDON:
18        Q    Okay.  So that is not one of your
19        opinions, that there is a method by which you
20        could determine which consumers would have made
21        a purchase and which consumers would not have
22        made a purchase?
23        A    Correct.
24        Q    Okay.  And you used the term impact a lot
25        to describe the effect of reference prices.
```