# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--------------------------------------------------------

JEANNE and NICOLAS STATHAKOS,     )

et al.,                           )

                Plaintiffs,     )

      vs.                        )   Civil Action No.

COLUMBIA SPORTSWEAR COMPANY;      )   4:15-cv-04543-YGR

COLUMBIA SPORTSWEAR USA           )

CORPORATION,                      )

              Defendants.     )

--------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

ARTHUR OLSEN

--------------------------------------------------------

9:27 a.m.

January 6, 2017

600 University Street, Suite 320

Seattle, Washington

Lauren G. Harty, RPR, CCR #2674

Court Reporter

ARTHUR OLSEN

January 06, 2017

```
 1    the question.  You know -- yeah, I'm going to say no.
 2    I mean, in terms of like a Daubert motion or something
 3    like that --
 4         Q.    Correct.
 5         A.    -- the answer's no.
 6         Q.    Okay.
 7               Are you saying that you maybe offered
 8    opinions that just weren't used?
 9         A.    Yes.
10         Q.    Okay.
11               But you've never had a court say, "That
12    guy's no good as an expert," or, "That opinion has to
13    be excluded."
14         A.    That is correct.
15         Q.    You mentioned earlier that you have never
16    been involved in setting the price of a piece of
17    clothing.  Have you ever been involved or had any
18    experience determining the value of a piece of
19    clothing?
20         A.    No.
21         Q.    And that's just not something you would be
22    qualified to do, right?
23               MS. SAGAFI:  Objection; vague as to value.
24    It calls for a legal conclusion.
25         A.    Right.
```

1      Q.    (By Mr. Ramsey)   And you wouldn't similarly

2    be qualified to render an opinion on what a clothing

3    company should offer its products for, what price.

4         A.    I would say no.   I'm not qualified to offer

5    that.

6         Q.    In this case in your report you looked I

7    believe at seven products; is that right?

8         A.    Yes.

9         Q.    And you weren't asked and are not rendering

10   an opinion on what price Columbia could or should have

11   sold those products at; is that correct?

12        A.    Yes.

13        Q.    Okay.

14              And you're also not rendering any type of

15   opinion about the value of those seven products.

16        A.    Correct.

17        Q.    Have you ever testified as an expert in a

18   case where the allegation was that a company selling a

19   product made a false advertisement or false

20   representation about the product?

21        A.    Well, that -- I hesitate because -- so

22   product is kind of vague, right?  So even in the

23   banking cases I think some of the allegation were that

24   the banks were misleading about the products that they

25   were selling, so --

ARTHUR OLSEN

January 06, 2017

```
 1      Q.    Sure.

 2            Let me --

 3      A.    Okay.

 4      Q.    -- be a little more specific.

 5            Have you ever testified in a case where the

 6      allegation was made that a company that sells a

 7      tangible product that a consumer would buy, an article

 8      of clothing, a piece of food, maybe a piece of

 9      software, where an allegation was made that there was

10      a false representation about that piece of software,

11      article of clothing, food item?

12      A.    I don't believe so, and if I did, then my

13      testimony wouldn't have been about that specifically,

14      so I might have -- not have known, but I don't believe

15      so.

16      Q.    Okay.

17            Have you ever rendered an opinion in any

18      case that a company was able to charge a price premium

19      on a particular product, whatever it is?

20      A.    No.

21      Q.    Are you familiar with that phrase, price

22      premium, at all?

23      A.    I would assume that would be the profit

24      margin or --

25      Q.    Okay.  That's fine.
```

ARTHUR OLSEN

January 06, 2017

1          And, again, so just to confirm, in this case

2     you were not asked to render an opinion about any type

3     of price premium that Columbia was or was not able to

4     charge on the seven items you looked at.

5          A.     Correct.

6          Q.     Okay.

7                 Okay.  So we've covered some things that you

8     didn't do.  Can you just describe for me what you view

9     your assignment as in this case.

10         A.     My assignment was to look at the testimony

11    and the data and do some calculations.  Generally I

12    think that my assignment is the same in all these

13    cases.  It's to look at data and answer specific

14    questions and then point out any limitations that

15    might be in the data in terms of getting to those

16    questions -- answers.

17                So in this case I was asked to look at data

18    for seven products, to do some calculations and verify

19    that some calculations could be done on the data, and

20    then to verify that I could do the same types of

21    calculations if and when the -- all the product -- the

22    data for all the products is produced.

23         Q.     Okay.

24                Let's go back to your report.  If you flip

25    to the main portion of the report and go to just

ARTHUR OLSEN

January 06, 2017

```
1    paragraph two on the first page --

2        A.    Yes.

3        Q.    -- and if you read it, it says on the third

4    line, and "...allow" -- "...in order to allow me to

5    perform certain calculations," and then, "under a

6    variety of assumptions..."

7              Do you see that?

8        A.    Yes.

9        Q.    What were those assumptions?

10       A.    We'll probably get into the detail of those,

11   but like specific -- for example, the -- there are

12   three damages models, and those aren't my damages

13   models.  Those were provided to me and I was asked to

14   perform those calculations, so I would consider those

15   assumptions that were given to me.

16       Q.    I think you've sort of answered the question

17   that I was going to ask, but -- so were you involved

18   in any way creating any of those damages models?

19       A.    Only so far as to understand what the -- the

20   questions were, what the -- what -- the damage model,

21   what the end goal was, and then to talk about how that

22   could be accomplished with the data.  So there might

23   have been some questions that needed to be answered

24   about the data and how it was used in that context,

25   but -- so I would be involved in that way, but in
```

1    terms of, you know, where did the damage model

2    originate, who came up with it, that wasn't me.

3         Q.    So, for example, we'll get into the details,

4    but one of them was the full refund I believe it was

5    called model?

6         A.    Yes.

7         Q.    It's not you -- you're not rendering an

8    opinion that a full refund model is an appropriate

9    measure of damages.

10        A.    Correct.

11        Q.    You're merely running a calculation.

12        A.    Yes.

13        Q.    Okay.

14              And is the same true for each of the other

15   two calculations, the promised percentage discount and

16   disgorgement of profit?

17        A.    Yes.

18        Q.    You're just running those calculations?

19        A.    Yes.

20        Q.    You're -- you weren't involved -- or you're

21   not rendering a -- rendering an opinion that either

22   one is an appropriate measure of damages in this case.

23        A.    Correct.

24        Q.    If I asked you to render an opinion about

25   what an appropriate model for damages would be in this

ARTHUR OLSEN

```
1    case, do you -- would you be qualified to do that?
2         A.    I don't think so.  I wouldn't be
3    comfortable --
4         Q.    You're just comfortable --
5         A.    -- doing that.
6         Q.    Given the model, you can calculate the
7    numbers.
8         A.    Yes.
9         Q.    In doing your analysis and running your
10   report -- or creating your report was there any
11   opinion that you were specifically asked to exclude,
12   like, "Don't render an opinion on this"?
13        A.    No.
14        Q.    Was your assignment limited in any way?
15        A.    I -- I hesitate because -- I guess it's kind
16   of limited because there's specific questions that are
17   asked, can I perform these calculations.  So it's
18   limited in that I wasn't asked to do anything else,
19   but I wasn't told don't do something that I asked to
20   do.
21        Q.    So, for example, there was never an
22   instruction that, "Please do A, B, and C, but don't do
23   D"?
24        A.    No.  There was just a, "Please do A, B, and
25   C."
```

ARTHUR OLSEN

```
 1    so I'm going do that as well, click, "Okay."
 2              And then for your first calculation, which
 3    is full refund, just to -- making sure I understand
 4    this, you went to column O, which is item ext price?
 5         A.    Yes.
 6         Q.    And you effectively summed the total.
 7         A.    Yes.
 8         Q.    Okay.
 9              And if do I that in Excel, I get
10    $649,357.37, which is I believe the same number you
11    have in 17.b.
12         A.    Yes.
13         Q.    Okay.
14              So this model is a customer brings the good
15    back, gets what they paid.
16         A.    Yeah.  I don't know about the bringing it
17    back and get what they paid, but it's the -- the
18    amount paid for the -- the items that were not voided,
19    yes.
20         Q.    So you're not rendering an opinion at all on
21    whether if a customer wants the -- to follow this
22    model they would have to return the good.
23         A.    I'm not.
24         Q.    Okay.
25              I wanted to go to column H, and if you click
```

ARTHUR OLSEN

1    the little -- this is the -- the column is labeled

2    transaction, tran -- T-R-A-N-S underscore C-D.  And if

3    you click the little arrow there, you'll see that the

4    values included in that column either start with E or

5    S.  Do you see that?

6        A.    Yes.

7        Q.    Were you asked to exclude the transactions

8    that start with E?

9        A.    No.

10       Q.    Do you know why not?

11       A.    No.

12       Q.    Do you know what the transactions starting

13   with E refer to?

14       A.    I believe that those were employee

15   purchases.

16       Q.    If -- I'm going to now remove the Es from

17   this, so leaving only the SO1, SO3, SO4, and S11 in

18   the columns.  I'm going to click, "Okay."

19           Okay.  Now if I sum the total in column O,

20   the item ext price, I get $642,608.60.  Do you get the

21   same number?

22       A.    It looks like it, yes.

23       Q.    Okay.

24           And that's less than the number calculated

25   in 17.b., which was $649,357.37, correct?

ARTHUR OLSEN

January 06, 2017

```
 1        A.     Yes.
 2        Q.     Not by a lot but by some.
 3        A.     Yes.
 4        Q.     Would you agree that if you removed the
 5    transactions with -- where the code started with E,
 6    that that would decrease each of your other
 7    calculations?
 8        A.     Yes.
 9        Q.     And that's because you're effectively just
10    removing some transactions from the picture.
11        A.     Yes.
12        Q.     Okay.
13               Rather than going through some of the odd
14    numbers with the pricing, I'm going to just do a
15    sample to make sure that I have each of your models
16    correct, I understand how they're run.
17        A.     Okay.
18        Q.     So I'm going to do it with an MSRP price --
19    I think you actually did this in your report, too, but
20    I want to follow along.  If there's an item sold with
21    an MSRP price of $100 and an outlet price of $80, if
22    the person purchased that product for $80 let's say,
23    the outlet price, under the full refund model how much
24    would they get back?
25        A.     I'm not sure how much they would get back,
```

ARTHUR OLSEN

January 06, 2017

```
1                    C E R T I F I C A T E

2    STATE OF WASHINGTON      )
                              )  ss.
3    COUNTY OF KING           )

4         I, the undersigned Washington Certified Court

5    Reporter, hereby certify that the foregoing deposition

6    upon oral examination of ARTHUR OLSEN was taken before

7    me on January 6, 2017, and transcribed under my

8    direction;

9         That the witness was duly sworn by me pursuant

10   to RCW 5.28.010 to testify truthfully; that the

11   transcript of the deposition is a full, true, and

12   correct transcript to the best of my ability; that I

13   am neither attorney for nor a relative or employee of

14   any of the parties to the action or any attorney or

15   counsel employed by the parties hereto, nor am I

16   financially interested in its outcome;

17        I further certify that in accordance with

18   CR 30(e), the witness was given the opportunity to

19   examine, read, and sign the deposition within 30 days

20   upon its completion and submission, unless waiver of

21   signature was indicated in the record.

22        IN WITNESS WHEREOF, I have hereunto set my hand

23   this 13th day of January, 2017.

24

25                         LAUREN G. HARTY, CCR #2674
```