# EXHIBIT 6

## Items Purchased by Plaintiffs from Columbia Sportswear Outlet Stores

For cells containing no information, Plaintiffs are have been unable to identify information responsive to Columbia's corresponding Requests for Production following a diligent search to date. Plaintiffs will supplement and update their responses herein if and when responsive documents or information are identified.

| No. | Item Description | Identifying Numbers | Purchase Method | Date of Purchase | Amt. Paid |
|---|---|---|---|---|---|
| 1 | Men's Jacket, XXXL | XT6093; 1559593; 0PSXDGB000263 | | | |
| 2 | Men's Shirt, XXXXL | AX1020; 1442154; XKSDD3R800677 | | | |
| 3 | Men's Shirt, XXXL | AX7585 | | | |
| 4 | Men's Shirt, XXXL | FS7272; 1276382; RGSRD7LK00475 | | | |
| 5 | Men's Montrail Enduro-soles | GU 2061-011; 1275051 | ■ | Feb. 14, 2016 | $3.99 |
| 6 | Women's Omnigrip Shoes | BL4432-030; 1545761030 | | | |
| 7 | Women's Omnigrip Shoes | BL4434-384; 1542881334 | ■ | June 11, 2015 | $34.99 |
| 8 | Men's PFG Techlite Shoes | BM4445-941; 1546281941 | | | $34.98 |
| 9 | Men's Andrew Leather Shoes, Wide, Size 13 | BI2445-010 | | | |
| 10 | Men's Rocky Pine Leather Shoes, Size 14 | BM2299-229 | | | |
| 11 | Men's Shirt, XXXXL | AX7572; RN69724; CA05367 | | | |
| 12 | Men's Shorts, Size 44 | 0108 XM 4433; RN69724; CA05367 | | | |
| 13 | Men's Pants, XXL | 0108 TM8290; RN69724; CA05367 | | | |
| 14 | Men's Pants, XXL | SP04 EM8166 I/32; RN69724; CA05367 | | | |
| 15 | Men's Shorts, Size 44 | 0108 AM4444; RN69724; CA05367 | | | |
| 16 | Men's Polo, XL | 109 XM6185; RN69724; CA05367 | | | |
| 17 | Men's Fleece Pullover, XXL | 205 XM 6535; RN69724; CA05367 | | | |
| 18 | Women's Shirt, L | XL7123; 1565151; 0PSMDBK000709 | | | |
| 19 | Women's Jersey Dress, L | XL5077; 166002L; VHSKDHLH05545 | ■ | Feb. 14, 2016 | $11.98 |
| 20 | Women's Blouse, L | AL7918; 1537701; 5XS9D0X900753 | ■ | July 26, 2015 | $11.98 |
| 21 | Women's Dress, L | 210 AL 5065; RN69724; CA05367 | | | |
| 22 | Women's Shorts, Size 8 | XL4712; 163577100; XQSRDVK804460 | | | |
| 23 | Women's Shorts, Size 8 | XL4712; 163577100; XQSRDVK801831 | ■ | July 26, 2015 | $8.98 |

STATHAKOS000001

STATHAKOS000002

| No. | Item | Identifier | | Date | Price |
|---|---|---|---|---|---|
| 24 | Women's Blouse, L | XL6629; 1564931; XQSKDTX802892 | | | |
| 25 | Men's Pants, XXL | SP05 EM8166; RN69724; CA05367 | | | |
| 26 | Women's Blouse, M | XL6981; 1677821; 5X4SD24903768 | ▮ | Feb. 14, 2016 | $7.98 |
| 27 | Men's Windbreaker, XXXL | 210 RS2134; RN69724; CA05367 | | | |
| 28 | Men's Shirt, XXXXL | AX7242; 1429433; W1S2DXFR00942 | | | |
| 29 | Men's Shirt, XXXXXL | AS7441; 1441325; 2NS7DRXJ00548 | | | |
| 30 | Men's Shirt, XXXXXL | AS7441; 1441325; 2NSXDVRJ00685 | | | |
| 31 | Men's Socks, 4-pack, Crew Mi-Chausettes | | | | |
| 32 | Men's Polo, XXXL | AS6696; 1492164; 5SWV20WT00008 | | | |
| 33 | Men's Polo, XXL | 108 FM6017; RN69724; CA05367 | | | |
| 34 | Women's Coat, M | 211 WL4045; RN69724; CA05367 | | | |
| 35 | Men's Jacket, XXL | XO5035; 1684441; N206DMVZ03283 | ▮ | Feb. 14, 2016 | $47.94 |
| 36 | Women's Coat, M | XL5012; 1586361; 5XS0DDB908828 | ▮ | Feb. 14, 2016 | $39.98 |
| 37 | Camouflage Backpack | 210 UU 9023; RN69724; CA05367 | | | |
| 38 | Women's Fleece Pullover, M | XL6624; 1564881; XQSPDF13813648 | | | |
| 39 | Women's Long johns, M | RN63093; CA05994 | | | |
| 40 | Men's Undershirt, M | RN63091; CA05994 | | | |
| 41 | Women's Polo, L | XL6923; 1646671; 9NRJV13205165 | | | |
| 42 | Women's Blouse, L | XL6629; 1564931; XQSBDVXB00596 | | | |
| 43 | Men's Pullover, XXL | 0109 XM 6033; RN69724; CA05367 | | | |
| 44 | Men's Boorad Hiking Shoes, Size 14 | BM3132-228 | | | |
| 45 | Men's Pants, Size 44 | 106 TM8252; RN69724; CA05367 | | | |
| 46 | Men's Fleece Jacket, XXL | 205 SM7479; RN69724; CA05367 | | | |
| 47 | Men's Woven Pullover, XL | XM6997; 1620641; 1CSDDQXV02650 | | | |
| 48 | Men's Knit Sweater, L | 207 AM2534; RN69724; CA05367 | | | |
| 49 | Men's Shirt, L | 207 AM7736; RN69724; CA05367 | | | |
| 50 | Women's T-shirt, L | XL1961; 1637321; 0YS2DGB601044 | ▮ | July 26, 2015 | $8.34 |
| 51 | Men's Shirt, XL | XM7022; 1564361; 16S1D9R609199 | | | |
| 52 | Men's Rain Jacket, L | F05 SVM2023; RN69724; CA05367 | | | |
| 53 | Men's Pants, Size 44 | 109 XM8486; RN69724; CA05367 | | | |

# EXHIBIT 7

```
*******************************************
        Columbia Sportswear Company
        Gilroy Outlet
        8555 San Ysidro
        Gilroy            CA  95020
               408-337-3233
*******************************************
QTY    ITEM        PRICE            TOTAL
---    ----        -----            -----

 1    1497269     $27.99          $27.99
     1559593 MTVILLAGET/44L/TXT/NODIM
        Original Price    $39.98
        Coupon: 5000037940

Coupon Savings  5000037940        $-11.99

                    Sub Total     $27.99
                    Tax            $2.45

                    Total         $30.44
     Reward Certificate            $5.00
        Q6SKL2WG3XPF

            MasterCard            $25.44
            Acct# 4647


You Saved:          $11.99

 95020  95020                      $2.45
        $27.99 @ 8.7500            $2.45

Thanks for shopping with us, Jeanne
As a Greater Rewards member you earned
points for this purchase. Please visit
Columbia.com/GreaterRewards to view your
points activity.

Sales Associate:9162   chris
```

```
Irregular Merchandise Not Guaranteed
Returns within 30 days with receipt
Void if: Washed, Worn,   Altered/Misused
Sorry no price adjustments
Thank you for shopping with us.
```

```
Trx 6682 Str 404   02      5/30/15   12:54
h2wn
H.
k4ELWDACJXAAAPO
-d-i

      Columbia Sportswear Company
      Gilroy Outlet

CARD TYPE: MasterCard
   ACCT #: 4647
AUTH CODE: 507601

                $25.44

                NO SLIP
    Signature................................
              STATHAKOS           /JE

    I AGREE TO PAY ABOVE TOTAL AMOUNT
    ACCORDING TO CARD ISSUER AGREEMENT.

Trx 6682  Str 404   02   5/30/15   12:54
<027>d<010> <027>-i
```

# EXHIBIT 8

| | Date | Store# | Register# | Transaction# | Store Name | Uni | Total $ | UPC | Product name | Item price paid by customer | Regular price | Signature capture |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 404-160214-2-3145 | 2/14/2016 | 404 | 2 | 3145 | Gilroy Outlet | 5 | $111.87 | 619120110164 | ENDUROSOLE/011/13/NODIM | $ 3.99 | $ 4.99 | YES |
| | | | | | | | | 888664611325 | MORNINGLIG/100/M/NODIM | $ 39.98 | $ 49.97 | |
| | | | | | | | | 888665515943 | HOPEWELLBA/032/M/NODIM | $ 7.98 | $ 9.97 | |
| | | | | | | | | 888664851967 | WILDFLOWER/684/L/NODIM | $ 11.98 | $ 14.98 | |
| | | | | | | | | 888665699926 | CASCADETRA/429/XXL/NODIM | $ 47.94 | $ 79.90 | |
| 446-151122-3-5738 | 11/22/2015 | 446 | 3 | 5738 | Vacaville Premium Outlets | 4 | $70.61 | 888458890189 | GREATBARLO/013/XL/DONOT | $ 23.95 | $ 29.94 | NO |
| | | | | | | | | 887921908826 | KESTRELRID/010/XL/NODIM | $ 23.94 | $ 39.90 | |
| | | | | | | | | 888665481774 | COOLCAMPER/565/XL/NODIM | $ 11.95 | $ 14.94 | |
| | | | | | | | | 887921485389 | WTRAVERSEW/011/O/S/NODIM | $ 10.77 | $ 17.95 | |
| 446-150726-1-6673 | 7/26/2015 | 446 | 1 | 6673 | Vacaville Premium Outlets | 6 | $53.84 | 888664642848 | SUNSETHILL/100/8/4 | $ 8.98 | $ 11.22 | YES |
| | | | | | | | | 23616327002 | MOISTURECO/160/O/S/NODIM | $ 8.98 | $ 11.23 | |
| | | | | | | | | 23616327576 | MERINOTRAV/010/O/S/NODIM | $ 8.38 | $ 10.48 | |
| | | | | | | | | 23616313104 | TRAILRUNNI/030/O/S/NODIM | $ 7.18 | $ 8.98 | |
| | | | | | | | | 887253461068 | SUNSHINEBO/419/L/NODIM | $ 11.98 | $ 14.97 | |
| | | | | | | | | 888664452423 | OUTDOORENT/676/L/NODIM | $ 8.34 | $ 10.43 | |
| 420-150708-2-4711 | 7/8/2015 | 420 | 2 | 4711 | Tejon Outlet | 4 | $53.95 | 888664639718 | PEDALFLATS/010/L/NODIM | $ 8.39 | $ 14.98 | NO |
| | | | | | | | | 888664642602 | SUNSETHILL/160/8/4 | $ 11.98 | $ 14.97 | |
| | | | | | | | | 887921036567 | SILVERRIDG/353/4X/NODIM | $ 16.79 | $ 29.98 | |
| | | | | | | | | 887921036802 | SILVERRIDG/683/4X/NODIM | $ 16.79 | $ 29.98 | |
| 447-150611-1-9958 | 6/11/2015 | 447 | 1 | 9958 | Las Vegas Premium Outlets | 1 | $22.46 | 888664472681 | AGENTCHILL/160/O/S/NODIM | $ 22.46 | $ 22.46 | < floor limit |
| 447-150611-1-9950 | 6/11/2015 | 447 | 1 | 9950 | Las Vegas Premium Outlets | 1 | $34.99 | 887921738317 | SUNVENTBOA/334/6/NODIM | $ 34.99 | $ 34.99 | < floor limit |
| 404-150530-2-6682 | 5/30/2015 | 404 | 2 | 6682 | Gilroy Outlet | 1 | $27.99 | 887921909755 | MTVILLAGET/441/3XT/NODIM | $ 27.99 | $ 39.98 | < floor limit |
| 446-150509-2-5698 | 5/9/2015 | 446 | 2 | 5698 | Vacaville Premium Outlets | 3 | $34.38 | 886535681149 | OUTBACKLSS/678/4X/NODIM | $ 11.88 | $ 11.88 | NO |
| | | | | | | | | 23616332464 | NOSHOWFLAT/022/O/S/NODIM | $ 15.00 | $ 15.00 | |
| | | | | | | | | 23616331535 | PFGREALDRY/010/O/S/NODIM | $ 7.50 | $ 15.00 | |
| 420-141124-2-3620 | 11/24/2014 | 420 | 2 | 3620 | Tejon Outlet | 2 | $38.48 | 887253378045 | ENDLESSTRA/419/XL/4 | $ 13.99 | $ 13.99 | NO |
| | | | | | | | | 692832354910 | NORTHWAYEX/366/4X/NODIM | $ 24.49 | $ 24.49 | |
| 404-141108-2-9394 | 11/8/2014 | 404 | 2 | 9394 | Gilroy Outlet | 4 | $51.47 | 887921520387 | ARCTICAIRF/402/M/NODIM | $ 19.99 | $ 19.99 | YES |
| | | | | | | | | 887921456662 | COOLCAMPER/711/L/NODIM | $ - | $ 10.49 | |
| | | | | | | | | 887921291362 | COOLCAMPER/600/L/NODIM | $ 10.49 | $ 10.49 | |
| | | | | | | | | 887921737839 | SUNVENTBAL/030/5/NODIM | $ 20.99 | $ 20.99 | |
| 447-140615-2-2737 | 6/15/2014 | 447 | 2 | 2737 | Las Vegas Premium Outlets | 1 | $13.99 | 887921301016 | KESTRELRID/463/L/NODIM | $ 13.99 | $ 13.99 | < floor limit |
| 450-131127-1-7891 | 11/27/2013 | 450 | 1 | 7891 | Cabazon Outlets | 1 | $22.43 | 887253562642 | CSHORTSKOR/900/O/S/NODIM | $ 22.43 | $ 22.43 | N/A |
| 446-130902-2-2811 | 9/2/2013 | 446 | 2 | 2811 | Vacaville Premium Outlets | 1 | $19.95 | 887253562680 | CSWEATERWM/900/O/S/NODIM | $ 19.95 | $ 19.95 | N/A |
| 447-130829-1-2114 | 8/29/2013 | 447 | 1 | 2114 | Las Vegas Premium Outlets | 2 | $79.14 | 887253562369 | CTECHSHELL/900/O/S/NODIM | $ 53.95 | $ 59.95 | N/A |
| | | | | | | | | 824648139065 | STANDUPPAN/931/XL/NODIM | $ 25.19 | $ 27.99 | |
| 446-130213-2-8908 | 2/13/2013 | 446 | 2 | 8908 | Vacaville Premium Outlets | 3 | $51.36 | 885491958081 | HEAT/419/XXL/NODIM | $ 22.04 | $ 24.49 | N/A |
| | | | | | | | | 885491947108 | KLMTHRGIIH/935/XXL/NODIM | $ 11.33 | $ 12.59 | |
| | | | | | | | | 886108484917 | VAPORRIDGE/456/4X/NODIM | $ 17.99 | $ 19.99 | |
| 446-120901-3-9533 | 9/1/2012 | 446 | 3 | 9533 | Vacaville Premium Outlets | 2 | $54.94 | 032985518093 | SNTRYSNKRC/010/14/NODIM | $ 9.99 | $ 9.99 | N/A |
| | | | | | | | | 786636891525 | OWNOTIANWO/900/O/S/NODIM | $ 44.95 | $ 44.95 | |
| 446-120505-2-8924 | 5/5/2012 | 446 | 2 | 8924 | Vacaville Premium Outlets | 2 | $15.98 | 885491567948 | RAVENOUSTA/037/XL/NODIM | $ 7.99 | $ 7.99 | N/A |
| | | | | | | | | 885491567917 | RAVENOUSTA/010/XL/NODIM | $ 7.99 | $ 7.99 | |
| 446-120304-2-5072 | 3/4/2012 | 446 | 2 | 5072 | Vacaville Premium Outlets | 2 | $54.80 | 824646165769 | BUGABOOFLE/610/L/NODIM | $ 18.89 | $ 20.99 | N/A |
| | | | | | | | | 824646124797 | DEPARTURED/083/L/NODIM | $ 35.91 | $ 39.90 | |
| 446-111230-1-2530 | 12/30/2011 | 446 | 1 | 2530 | Vacaville Premium Outlets | 1 | $28.34 | 786636624567 | ICEICEJACK/010/L/NODIM | $ 28.34 | $ 31.49 | N/A |
| 446-110903-3-2265 | 9/3/2011 | 446 | 3 | 2265 | Vacaville Premium Outlets | 2 | $53.90 | 885491738553 | DUNMOREHIL/251/14/NODIM | $ 31.41 | $ 34.90 | N/A |
| | | | | | | | | 709713063264 | ANDREW/010/13/NODIM | $ 22.49 | $ 24.99 | |
| 483-110618-2-4514 | 6/18/2011 | 483 | 2 | 4514 | Prime Outlets in Grove City | 1 | $19.99 | 885491088016 | HANNACRKFL/332/M/NODIM | $ 19.99 | $ 19.99 | N/A |
| 446-110306-2-8650 | 3/6/2011 | 446 | 2 | 8650 | Vacaville Premium Outlets | 4 | $102.42 | 786636627889 | DOUBLEWHAM/221/3X/NODIM | $ 31.49 | $ 31.49 | N/A |
| | | | | | | | | 410000971079 | CRATERMTNC/023/XXL/NODIM | $ 14.95 | $ 14.95 | |

| | | | | | | | UPC | Item | | Price | | Amount | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 786636827371 | THEHELSINK/514/XL/NODIM | $ | | 27.99 | $ | 27.99 | |
| | | | | | | | 786636619532 | RIDGERUNPA/232/XL/NODIM | $ | | 27.99 | $ | 27.99 | |
| 467-101121-2-5169 | 11/21/2010 | 467 | 2 | 5169 | Tanger Outlet Center in Park City | 2 | $77.39 | 883834268354 | SIERRASUMM/010/10/NODIM | $ | | 59.90 | $ | 59.90 | N/A |
| | | | | | | | 692832752464 | OCANTOPEAK/365/5/NODIM | $ | | 17.49 | $ | 17.49 | |
| 430-100923-2-1140 | 9/23/2010 | 430 | 2 | 1140 | Historic Old Sellwood | 16 | $191.34 | 8949216605 | SUNGDDSIIS/010/L/NODIM | $ | | 9.09 | $ | 9.09 | N/A |
| | | | | | | | 786636163370 | HIGHROADTE/486/M/NODIM | $ | | 10.49 | $ | 10.49 | |
| | | | | | | | 786636606983 | TENDERTRAI/010/16/10 | $ | | 12.59 | $ | 12.59 | |
| | | | | | | | 786636574275 | SOLVISTATA/499/M/NODIM | $ | | 8.39 | $ | 8.39 | |
| | | | | | | | 883834891248 | LILYSNWGLM/100/XL/R | $ | | 19.59 | $ | 19.59 | |
| | | | | | | | 824646009766 | HALFTRACK/356/O/S/NODIM | $ | | 22.48 | $ | 22.48 | |
| | | | | | | | 786559324964 | CONTINUUMM/010/XL/NODIM | $ | | 27.93 | $ | 27.93 | |
| | | | | | | | 619120101247 | MAKA/066/5/NODIM | $ | | 13.99 | $ | 13.99 | |
| | | | | | | | 786559325510 | ADVANCELIG/010/XL/R | $ | | 20.93 | $ | 20.93 | |
| | | | | | | | 824646710365 | SLIDERCKBR/319/36/11 | $ | | 6.98 | $ | 6.98 | |
| | | | | | | | 883834680118 | PROYFLSPRT/218/XXL/9 | $ | | 6.98 | $ | 6.98 | |
| | | | | | | | 53455991669 | EARLCOVEII/038/XL/NODIM | $ | | 5.98 | $ | 5.98 | |
| | | | | | | | 53455019967 | CASCADIANS/390/L/NODIM | $ | | 5.98 | $ | 5.98 | |
| | | | | | | | 692832374543 | BONEHEADII/105/O/S/NODIM | $ | | 7.48 | $ | 7.48 | |
| | | | | | | | 786636853219 | COLUMBIAHE/015/O/S/NODIM | $ | | 4.98 | $ | 4.98 | |
| | | | | | | | 53455015761 | STEEPANDDE/588/L/NODIM | $ | | 7.48 | $ | 7.48 | |
| 446-100701-2-243 | 7/1/2010 | 446 | 2 | 243 | Vacaville Premium Outlets | 7 | $80.75 | 709713077582 | PFGSAILFSH/714/XXL/NODIM | $ | | 7.92 | $ | 9.90 | N/A |
| | | | | | | | 824646430225 | ITLLCOSTYA/425/3X/NODIM | $ | | 9.90 | $ | 9.90 | |
| | | | | | | | 883834632315 | TRYSONCREE/425/14/6 | $ | | 13.99 | $ | 13.99 | |
| | | | | | | | 786636421036 | BULLRNIICR/213/38/12 | $ | | 14.95 | $ | 14.95 | |
| | | | | | | | 410000644720 | COLIBEXIIP/425/3X/NODIM | $ | | 9.95 | $ | 9.95 | |
| | | | | | | | 824646710570 | SLIDERCKBR/319/38/11 | $ | | 14.95 | $ | 14.95 | |
| | | | | | | | 709713700374 | EXSPLSNTPL/048/XL/NODIM | $ | | 9.09 | $ | 9.09 | |

# EXHIBIT 9

SEDGWICK LLP
STEPHANIE A. SHERIDAN, State Bar No. 135910
stephanie.sheridan@sedgwicklaw.com
ANTHONY J. ANSCOMBE, State Bar No. 135883
anthony.anscombe@sedgwicklaw.com
MEEGAN B. BROOKS, State Bar No. 298570
meegan.brooks@sedgwicklaw.com
333 Bush Street, 30th Floor
San Francisco, CA 94104-2834
Telephone:  415.781.7900/Facsimile:  415.781.2635

Attorneys for Defendant
DSW INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELANIE BARBER, MICHAEL YANG, and DEBORAH BAUMEL, individually and on behalf of all others similarly situated,<br><br>          PLAINTIFFS,<br><br>   v.<br><br>DSW INC., an Ohio corporation, and DOES 1 through 100 inclusive,<br><br>          DEFENDANT. | Case No. 8:15-cv-02024-JGB-SP<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(1) and 12(b)(6)**<br><br>Judge:  Hon. Jesus G. Bernal<br><br>Date:    June 13, 2016<br>Time:    9:00 a.m.<br>Ctrm:   1 - Riverside |

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on June 13, 2016 at 9:00 a.m. or as soon thereafter as the matter may be heard in Courtroom 1 of the above-entitled Court, at 3470 Twelfth Street, Riverside, California 92501, Defendant DSW Inc. ("DSW" or "Defendant") will and hereby does move for an order to dismiss the Second Amended Complaint (SAC) filed by Plaintiffs Melanie Barber, Michael Yang, and Deborah Baumel ("Plaintiffs") pursuant to Rules 8, 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure. As set forth in the attached declaration of Stephanie Sheridan, this motion is made following a Local Rule 7-3 conference with Plaintiffs' counsel on May 9, 2016.

This case should be dismissed without leave to amend. Plaintiffs Barber and Yang reiterate the insufficient allegations of their last Complaint, and still fail to allege facts demonstrating that the "Compare At" prices for their items were not, in fact, accurate MSRPs actually charged by other retailers. Plaintiff Baumel, meanwhile, appears to have made her purchases because she wanted to become a Plaintiff, and not because DSW's "Compare At" pricing fooled her. Video surveillance footage of her visit to DSW on March 23, 2016 demonstrates that she was on a mission to collect and record evidence, and not on an innocent shopping expedition.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities in Support of the Motion, the Declaration of Stephanie Sheridan in Support of the Motion, the Declaration of Kim Chacon, the Declaration of Tom Zimmerman, and the Request for Judicial Notice filed concurrently herewith, as well as all other matters that may be judicially noticed or adduced at the hearing of this matter.

/ / /

/ / /

/ / /

DATED: May 16, 2016     SEDGWICK LLP

By: /s/ *Stephanie Sheridan*
        Stephanie A. Sheridan
        Anthony J. Anscombe
        Meegan B. Brooks
        Attorneys for Defendant
        DSW INC.

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

II.   PLAINTIFFS' ALLEGATIONS ........................................................................ 2

    A.    Plaintiffs Barber and Yang Rely on the Same
         Conclusory Allegations ........................................................................ 2

    B.    Barber and Yang's "New" Allegations Do Nothing to Support
         Their Claims ......................................................................................... 3

    C.    Plaintiff Baumel's Allegations ............................................................ 4

III.  PLAINTIFF BAUMEL LACKS STANDING ................................................. 7

    A.    Rule 12(b)(1) Requires Dismissal Where the Pleadings
         or Evidence Demonstrate That the Court Lacks Subject
         Matter Jurisdiction .............................................................................. 7

    B.    Extrinsic Evidence and the Allegations of the SAC Demonstrate
         That Baumel Lacks Standing ............................................................... 8

IV.   PLAINTIFFS FAIL TO STATE ANY CLAIM FOR
      DECEPTIVE PRICING ................................................................................... 9

    A.    Applicable Standard for 12(b)(6) Motions ......................................... 10

    B.    The SAC Fails to Allege Any Facts Demonstrating that DSW's
         Pricing Is Deceptive .......................................................................... 11

         1.    Barber and Yang Fail to Plead Facts Demonstrating That
              the Compare at Prices for Their Items Were Not
              Real Prices ............................................................................ 11

         2.    Barber and Yang's New Allegations Do Not Save
              Their Claims ......................................................................... 13

    C.    A Reasonable Consumer Would Not Interpret "Compare At"
         to Mean "Former Price" as Plaintiffs Apparently Contend ................ 15

    D.    California's "Former Price" Law Is Inapplicable Because DSW
         Has Never Made a "Former Price" Representation ............................. 16

Sedgwick LLP

1       E.     Plaintiffs Fail to State Any Claim for Unjust Enrichment ................... 17

2       F.     Plaintiffs' Other Claims Also Fail ....................................................... 18

3

4  V.     THE COURT SHOULD DENY PLAINTIFFS LEAVE TO FURTHER AMEND THEIR COMPLAINT ...................................................... 19

5  VI.    CONCLUSION ........................................................................................ 20

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

83227781v3                 ii.                Case No. 8:15-cv-02024-JGB-SP

NOTICE OF MOTION AND MOTION TO DISMISS SAC PURSUANT TO 12(b)(1) and 12(b)(6)

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>CASES</u>

*Ashcroft v. Iqbal*
129 S. Ct. 1937 (2009) ...................................................................................10

*Astiana v. Hain Celestial Grp., Inc.*
783 F.3d 753 (9th Cir. 2015)..........................................................................17

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) .......................................................................................10

*Branca v. Nordstrom*
2015 WL 1841231 (*please provide court and date info.*) ...........................12

*Cafasso ex. rel. United States v. Gen. Dynamics C4 Sys., Inc.*
637 F.3d 1047 (9th Cir. 2011).........................................................................11

*Citizens United v. Fed. Election Comm'n*
558 U.S. 310 (2010) .........................................................................................8

*Clapper v. Amnesty Int'l USA*
133 S. Ct. 1138 (2013) .....................................................................................8

*Comwest, Inc. v. Am. Operator Servs., Inc.*
765 F. Supp. 1467 (C.D. Cal. 1991)................................................................11

*Diamond v. Charles*
476 U.S. 54 (1986) ...........................................................................................8

*Freeman v. Time, Inc.*
68 F.3d 285 (9th Cir. 1995).............................................................................15

*Hill v. Roll Intern. Corp.*
195 Cal. App. 4th 1295 (2011).........................................................................9

*In re iPhone 4s Consumer Litig.*
2016 WL 758346 (9th Cir. Feb. 25, 2016).....................................................11

*In re Tobacco II Cases*
46 Cal. 4th 298 (2009)......................................................................................9

*In re Worlds of Wonder Securities Litig.*
694 F. Supp. 1427 (N.D. Cal. 1988) .........................................................11, 14

*Jacobo v. Ross*
No. 2:15-cv-4701 (C.D. Cal. Feb. 23, 2016)..................................................12

*Kane v. Chobani, Inc.*
2013 WL 5289253 (N.D. Cal. Sept. 19, 2013) ................................................8

*Kazovsky v. Metrocities Mortgage, LLC*
2012 WL 177333 (C.D. Cal. Jan. 23, 2012) ...................................................17

*Kearns v. Ford Motor Company*
  567 F.3d 1120 (9th Cir. 2009) ..................................................................... 10

*Kim v. Carter's Inc.*
  598 F.3d 362 (7th Cir. 2010) ........................................................................ 18

*Kwikset Corp. v. Superior Court*
  51 Cal. 4th 310 (2011) .................................................................................... 9

*Lacano Investments, LLC v. Balash*
  765 F.3d 1068 (9th Cir. 2014) ....................................................................... 7

*Lavie v. Procter & Gamble Co.*
  105 Cal. App. 4th 496 (2003) ....................................................................... 15

*Leadsinger, Inc. v. BMG Music Publ'g*
  512 F.3d 522 (9th Cir.2008) .......................................................................... 19

*Lujan v. Defenders of Wildlife*
  504 U.S. 555 (1992) ........................................................................................ 7

*Mahfood v. QVC, Inc.*
  2007 WL 9363986 (C.D. Cal. Feb. 7, 2007) ............................................... 12

*Marques v. Fed. Home Loan Mortgage Corp.*
  2013 WL 1932920 (S.D. Cal. May 8, 2013) ................................................ 17

*McConnell v. Fed. Election Comm'n*
  540 U.S. 93 (2003) .......................................................................................... 8

*McHenry v. Renne*
  84 F.3d 1172 (9th Cir. 1996) ........................................................................ 19

*Mehta v. Wells Fargo Bank, N.A.*
  737 F. Supp. 2d 1185 (S.D. Cal. 2010) ....................................................... 19

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*
  540 F.3d 1049 (9th Cir. 2008) ...................................................................... 19

*O'Donnell v. Bank of America Nat. Ass'n.*
  504 Fed. Appx. 566 (9th Cir. 2013) ............................................................. 19

*Odom v. Microsoft Corp.*
  486 F.3d 541 (9th Cir. 2007) ........................................................................ 10

*Peterson v. Cellco Partnership*
  164 Cal. App. 4th 1583 (2008) ..................................................................... 17

*Phillips v. Apple Inc.*
  2016 WL 1579693 (N.D. Cal. Apr. 19, 2016) .............................................. 8

*Rubenstein v. Neiman Marcus Grp. LLC*
  2015 WL 1841254 (C.D. Cal. Mar. 2, 2015) ............................................... 12

83227781v3                                          iv.                            Case No. 8:15-cv-02024-JGB-SP

NOTICE OF MOTION AND MOTION TO DISMISS SAC PURSUANT TO 12(b)(1) AND 12(b)(6)

*Savage v. Glendale Union High School, Dist. No. 205, Maricopa County*
    343 F.3d 1036 (9th Cir. 2003) ........................................................... 8

*Scripps Clinic v. Superior Court*
    108 Cal. App. 4th 917 (Cal. Ct. App. 2003) ..................................... 18

*Shaulis v. Nordstrom Inc.*
    120 F. Supp. 3d 40 (D. Mass. 2015) ................................................. 18

*Sperling v. DSW Inc.*
    2016 WL 354319 (C.D. Cal. Jan. 28, 2016) ....................... 12, 14, 19

*Sperling v. Stein Mart, Inc. et al.*
    No. 5:15-cv-1411 (C.D. Cal. Jan. 26, 2016) ..................................... 13

*Stone v. Conrad Preby's*
    2013 WL 139939 (S.D. Cal. Jan. 10, 2013) ..................................... 19

*Warren v. Fox Family Worldwide, Inc.*
    328 F. 3d 1136 (9th Cir. 2003) ............................................................ 7

*Zucco Partners, LLC v. Digimarc Corp.*
    552 F.3d 981 (9th Cir. 2009) ............................................................ 19

## **STATUTES**

16 C.F.R. § 251.1(f) ................................................................................... 16

30 Op. Atty. Gen. 127 (1957) ................................................................... 16

Bus. & Prof. Code § 17200, *et seq.* ........................................................... 9

Bus. & Prof. Code § 17500, *et seq.* ....................................................... 9, 18

Bus. & Prof. Code § 17501 ............................................................... 16, 17

Cal. Civ. Code § 3515 ................................................................................. 8

Cal. Civ. Code § 3516 ................................................................................. 8

Cal. Civil Code § 1750 *et seq.* ................................................................... 10

Fed. R. Civ. P. 12(b)(1) ............................................................................... 7

Fed. R. Civ. P. 12(b)(6) ............................................................................. 10

Fed. R. Civ. P. 9 ......................................................................................... 14

Fed. R. Civ. P. 9(b) ............................................................... 10, 11, 12, 17

## **OTHER AUTHORITIES**

http://www.investopedia.com/terms/m/manufacturers-suggested-retail-price-
    msrp.asp ........................................................................................... 15

### **MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs' Second Amended Complaint ("SAC") does nothing to remedy the deficiencies that this Court found in the FAC.  The SAC's only new allegations relate either to items Plaintiffs ***did not purchase***, or items that they ***intentionally purchased for the sake of this lawsuit***.  Plaintiffs do not plausibly allege that they were deceived by anything DSW has said or done, and their claims must be dismissed.

As to Barber and Yang, this Court ruled on April 4, 2016 that their claims in the FAC "regarding the inaccuracy of the products' comparative reference prices are conclusory and lack any factual support." (Dkt. 27, at *7.)  The SAC does not allege ***a single new fact*** concerning the items they purchased.  Instead, Barber and Yang repeat their "conclusory allegations that [DSW's] comparative reference prices for its products do not reflect the manufacturer's suggested retail price or former prices offered by DSW." (*Id*.)  The SAC does raise some new allegations about items currently on sale at DSW, *but which these Plaintiffs never bought*:  the Waylon Oxford, Eppie Wedge, and Ronnie Flat.  (SAC ¶¶ 19-22.)  The SAC does not explain why these three items are relevant to the different items purchased by Barber and Yang almost a year earlier.  The SAC's new allegations do not establish that "*the products purchased by Plaintiffs*…were exclusively sold at [DSW's] stores" or that "*the products purchased by Plaintiffs* were sold by 'off-retail' stores at prices different from those on [DSW's] 'Compare At' labels." (Dkt. 27, at *7, emphasis added.)

Deborah Baumel, meanwhile, was never deceived by DSW's "Compare At" pricing.  The circumstances of her purchases, and surveillance video of her visit to DSW, demonstrate that she made her purchases for the express purpose of becoming a class representative.  Ms. Baumel, who had not shopped at DSW in almost two years, visited a DSW store a mere two days after DSW filed its last Reply brief,

Sedgwick LLP

1   which pointed out a fatal flaw in Plaintiff Barber and Yang's claims:  while they

2   make a big deal out of the fact that DSW sells some private label items, neither

3   Barber nor Yang purchased such items and could not base their claims on this

4   premise.

5        Ms. Baumel cured this problem two days after DSW's Reply exposed it.  She

6   claims to have bought *only* private label items.  But surveillance footage

7   demonstrates that Baumel was not shopping for shoes:  she was shopping for a

8   lawsuit.  Video footage shows Baumel at the checkout counter taking pictures of an

9   in-store policy and the signature capture display (which showed information about

10  her purchase), and pulling her receipt from the bottom of her shopping bag to

11  closely scrutinize it, presumably confirming that it contained the same "You Saved"

12  language depicted at paragraph 27 of the SAC.  Baumel's March 23, 2016 purchase

13  was not an innocent purchase, but one calculated to lead to secondary gain.  This

14  case should be dismissed, once and for all, without leave to amend.

15  **II.    PLAINTIFFS' ALLEGATIONS**

16      **A.    Plaintiffs Barber and Yang Rely on the Same
                Conclusory Allegations**
17

18       As in the FAC, Plaintiff Barber alleges that "in or around July 2015," she

19  purchased a pair of Guess sandals from DSW's store in Orange, California, and that

20  the shoes had a "Compare At" price of $59.00 and a list price of $34.94; the SAC

21  does not specify how much she actually paid.  (SAC ¶ 56.)  Plaintiff Yang alleges

22  that on June 26, 2015, at DSW's Costa Mesa, California store, he paid $32.41 for a

23  pair of Penguin shoes that had a "Compare At" price of $125 and a list price of

24  $69.95.  (SAC ¶¶ 27, 59.)

25       Barber and Yang claim that at the time of their purchase, they understood

26  "Compare At" to mean a manufacturer's suggested retail price (MSRP).  (SAC ¶¶ 4,

27  25.)  Plaintiffs do not allege that the "Compare At" prices on their shoes were not in

28  fact "suggested" by the "manufacturer."  Instead, Plaintiffs claim that DSW's

1  "Compare At" prices are deceptive because they do not accurately reflect "a price at
2  which the products were formerly sold." (See, e.g. SAC ¶ 39.) Plaintiffs plead no
3  facts to show that other retailers did not sell these exact items for the "Compare At"
4  price, nor have they pled any facts to show that the manufacturer did not, in fact,
5  suggest the retail prices for the items they bought.

6      Yang and Barber purport to bring this case on behalf of an "Outlet Exclusive
7  Class," defined as "All California residents who…purchased an Outlet Exclusive
8  Product from a DSW Outlet in California." (SAC ¶ 68.) They define "Outlet
9  Exclusive Products" to mean products "manufactured to be sold exclusively at DSW
10  and/or DSW and other discount retail stores." (SAC ¶ 15.) That is, products
11  "manufactured at DSW's direction," "marketed and sold by DSW or by other outlet
12  stores," and never sold at their "Compare At" prices. (SAC ¶ 17.) They claim that
13  their Guess sandals and Penguin shoes fall within this definition (SAC ¶¶ 57, 60),
14  but they have not pled any facts to support this conclusion.

15      Specifically, Plaintiffs do not plead any facts to support their claims that the
16  "Compare At" prices for the items they purchased were not, in June and July 2015,
17  prices that were actually charged by other retailers at the time of their purchases.
18  While acknowledging that other retailers may have sold these items, they have not
19  identified the prices at which other retailers offered these items, much less that those
20  other retailers sold them for prices below the MSRP/"Compare At" price.

21  **B.    Barber and Yang's "New" Allegations Do Nothing to Support
22         Their Claims**

23      The SAC has added allegations about three specific pairs of shoes that Barber
24  and Yang did not purchase: the Waylon Oxford, Eppie Wedge, and Ronnie Flat.
25  (SAC ¶¶ 19-22.) Based on nothing more than a "simple Google search," conducted
26  more than ten months after Barber and Yang's purchases, the SAC concludes that

27
28

---

83227781v3                                3.                    Case No. 8:15-cv-02024-JGB-SP

NOTICE OF MOTION AND MOTION TO DISMISS SAC PURSUANT TO 12(b)(1) and 12(b)(6)

1  each of these three shoes is an "Outlet Exclusive Product."[1]  (*Id.*)  Plaintiffs do not

2  explain how, even if true, these facts demonstrate anything about their own

3  purchases.

4      Plaintiffs allege that DSW's website now states that a "Compare At" price

5  may be an MSRP, or alternatively, may reflect the price of a "similar" item sold

6  elsewhere—but Plaintiffs have pled no facts to demonstrate that the "Compare At"

7  prices on the Waylon Oxford, Eppie Wedge, and Ronnie Flat do not meet this

8  definition, or why it matters to their purchases.  Plaintiffs do not offer any details

9  about their "simple Google search," and do not claim to have looked for any of these

10  shoes in a single brick-and-mortar store.

11      **C.    Plaintiff Baumel's Allegations**

12      The SAC adds a new Plaintiff, Deborah Baumel, who purchased three items

13  from DSW's Westminster[2], California store on March 23, 2016, just two days after

14  DSW filed its Reply brief supporting its motion to dismiss the FAC.  (SAC ¶ 44.)

15  In that Reply brief, DSW's main argument, in a section titled "**PLAINTIFFS FAIL**

16  **TO STATE ANY CLAIM CONCERNING THE PRODUCTS THEY**

17  **ACTUALLY PURCHASED**," was that Barber and Yang could not state a claim

18  concerning allegedly exclusive items, because "[t]hey do not allege that Ms.

19  Barber's (brand name) *Guess* sandals or Mr. Yang's (brand name) *Penguin* shoes

20  and belt were sold exclusively at DSW."  (Dkt. 24, at 7.)

21      Two days later, Baumel purchased three items whose brands she claims are

22  sold exclusively at DSW:  Kelly & Katie sandals, Audrey Brooke dress shoes, and

23  One Wink earrings.  Baumel alleges that she paid $49.95 for her Audrey Brooke

---

[1] The SAC admits that the Waylon Oxford is sold by several other retailers, contradicting the contention that the shoes were "*manufactured at DSW's direction*."  (SAC ¶ 44.)  The SAC does not identify other Penguin shoes sold exclusively by DSW.

[2] Westminster is only about ten miles away from the stores where Barber and Yang bought their items.

Sedgwick LLP

83227781v3                                    4.                    Case No. 8:15-cv-02024-JGB-SP
NOTICE OF MOTION AND MOTION TO DISMISS SAC PURSUANT TO 12(b)(1) and 12(b)(6)

shoes, and that they had a "Compare At" price of $90. (SAC ¶ 30.) She does not allege how much she paid for her other two items. Baumel purports to bring claims on behalf of a "DSW Exclusive Products Class," defined as "All California residents who…purchased a DSW Exclusive Product from a DSW Outlet in California." (SAC ¶ 69.)

Video footage of Baumel's visit, attached to the Declaration of Tom Zimmerman, exposes that Baumel was on a mission to become a plaintiff when she went to DSW's store on March 23, 2016. While the cashier was ringing up her purchase, Baumel wandered to the adjacent check-out station to photograph an internal store policy that had been inadvertently knocked over by another customer. (Zimmerman Decl., Exhibit A, at 18:35:52.)



After the cashier rang up her shoes, Plaintiff dug her receipt from her shopping bag (*Id.*, at 18:39:49), and studied it closely for a full fourteen seconds. (*Id.*, at 18:39:51-18:40:06.) When the cashier rang up Baumel's earrings in a separate transaction, Baumel took a second photo—this time, of the POS Signature Capture screen that listed her "Compare At" price. (*Id.*, at 18:40:18.)

Sedgwick LLP



Surveillance footage also appears to show Baumel taking photographs and/or videos of merchandise in the dress sandals section, along with their pricing displays, after she had already selected and set down the items she would buy. (Zimmerman Decl., Exhibit B, 18:48:49.) Another video shows Plaintiff looking for something in the sandals section after completing her purchase. (Zimmerman Decl., Exhibit C.)

Baumel alleges that she understood "Compare At" to mean a manufacturer's suggested retail price. (SAC ¶ 25.) She does not allege any basis for this understanding, other than DSW's definition of "Compare At," which says:

> "Our COMPARE AT price typically refers to the manufacturer's suggested retail price (MSRP), *but when an MSRP is not available, the COMPARE AT price is our estimate of other retailers' ticketed prices for the same or similar items*."

(SAC ¶ 6, emphasis in SAC.) The SAC summarizes this definition as meaning that "Compare At" prices may be "estimates of prices for non-identical goods." (SAC ¶ 6, internal quotation marks omitted.) Not only was this definition posted online at the time of Baumel's purchase, (*see* Dkt. 22, at 2, n. 1), it was also posted at the point-of-sale. (See Declaration of Kim Chacon, ¶7.) Baumel does not allege that she failed to notice this posted policy, as she was closely scrutinizing the POS in order to photograph other notices and to gather evidence for this suit.

Sedgwick LLP

1   The circumstances of Baumel's purchase two days after DSW's Reply brief,

2   combined with her choice of *only* private label items and her videotaped efforts to

3   collect and record evidence <u>while shopping</u>, dispel any suggestion that she bought

4   these shoes because she was duped as to what "Compare At" meant. Rather, they

5   compel a conclusion that she bought the shoes in order to become a class action

6   plaintiff.

7   Baumel's motivations are further confirmed by another simple fact.

8   She wants a refund of the money she paid (SAC, Prayer for Relief, B), but she did

9   not need to file a law suit to get her money back. Even today, Baumel could ***still***

10  return each item for a full refund, pursuant to DSW's generous return policy.

11  (*See* Chacon Declaration, ¶ 8, Ex. A.) Only someone looking for a lawsuit and an

12  incentive award would forego this fast and easy remedy, and instead bring claims in

13  federal court for punitive damages, actual damages, disgorgement of profits,

14  restitution, and injunctive relief.

15  **III.   PLAINTIFF BAUMEL LACKS STANDING**

16         **A.     Rule 12(b)(1) Requires Dismissal Where the Pleadings or Evidence

17                 Demonstrate That the Court Lacks Subject Matter Jurisdiction**

18  Article III of the United States Constitution dictates that jurisdiction of the

19  federal courts extends only to actual cases or controversies. To satisfy the

20  Article III standing requirements, a plaintiff must allege: (1) that she has suffered

21  injury in fact; (2) a causal connection between the injury and the conduct

22  complained of; and (3) the likelihood that the injury will be redressed by a favorable

23  decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "The

24  plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing

25  these elements." *Spokeo v. Robins*, Case No. 13-1339, 578 U.S. __, slip op. at *6

26  (May 16, 2016). When determining whether a plaintiff has established standing, the

27  court need not accept legal conclusions in a complaint as true, even if "cast in the

28  form of factual allegations." *Lacano Investments, LLC* v. *Balash*, 765 F.3d 1068,

1071 (9th Cir. 2014). Where the face of the complaint does not demonstrate a basis

for standing, the Court should dismiss the action. *Warren v. Fox Family Worldwide,*

*Inc.*, 328 F. 3d 1136, 1139-40 (9th Cir. 2003). Rule 12(b)(1) also allows a

defendant to raise a factual attack on standing, using evidence that demonstrates the

plaintiff's lack of subject matter jurisdiction. *Savage v. Glendale Union High*

*School, Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003).

### B. Extrinsic Evidence and the Allegations of the SAC Demonstrate That Baumel Lacks Standing

Baumel lacks standing to bring this suit because she made her purchase for

the sole purpose of joining this lawsuit, not because she was confused about what

"Compare At" meant.

It is well-established that a plaintiff may not create federal standing for

herself through a "self-inflicted injury," which breaks the causal connection between

the plaintiff and the defendant. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93,

228 (2003) overruled on other grounds by *Citizens United v. Fed. Election Comm'n*,

558 U.S. 310 (2010) (plaintiffs lacked standing to challenge election reform law

because injury stemmed from plaintiffs' "personal choice" rather than from the

statute); *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1151 (2013) (a plaintiff

"cannot manufacture standing merely by inflicting harm on [himself]. . . .");

*Diamond v. Charles*, 476 U.S. 54, 69-70 (1986) (party's liability for attorney's fees

was a consequence of his own decision to intervene in the case, "cannot fairly be

traced" to the law challenged, and cannot confer Article III standing). Where a

plaintiff claims to have been injured by deceptive misrepresentations or omissions,

actual reliance on those alleged misrepresentations is required to show causation.

*See, e.g., Phillips v. Apple Inc.*, No. 15-CV-04879-LHK, 2016 WL 1579693, at *7

(N.D. Cal. Apr. 19, 2016) (actual reliance required for Article III standing

for UCL and CLRA claims); *Kane v. Chobani, Inc.*, No. 12-CV-02425-LHK, 2013

WL 5289253, at *5-*6 (N.D. Cal. Sept. 19, 2013) (same). *Accord* Cal. Civ. Code

Sedgwick LLP

§ 3515 ("He who consents to an act is not wronged by it"); § 3516 ("Acquiescence in error takes away the right of objecting to it.").

Similarly, to have standing to bring a claim under the UCL, FAL and CLRA, a plaintiff "must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009); *see also Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 317 (2011) (a plaintiff must "*truthfully allege* they were deceived by a product's label into spending money to purchase the product…") (emphasis added). The standard applicable to California's consumer protection laws is that of the reasonable consumer "acting reasonably in the circumstances-not just any consumer" and surely not an "overly suspicious" consumer looking to buy a lawsuit. *See Hill v. Roll Intern. Corp.*, 195 Cal. App. 4th 1295, 1304 (2011).

Although Plaintiff asserts that she bought her shoes and earrings "[i]n reliance on Defendant's false and deceptive advertising, marketing and pricing schemes" and "was damaged as a result thereof," (SAC ¶ 44; *see also* ¶ 62), DSW's surveillance footage tells another tale. Plaintiff went into the store on March 23, 2016 for the express purpose to buy only items sold exclusively by DSW, in direct response to DSW's argument that Barber and Yang did not buy such items. Plaintiff Baumel's claims must be dismissed.

## IV. PLAINTIFFS FAIL TO STATE ANY CLAIM FOR DECEPTIVE PRICING

Plaintiffs' SAC purports to state six causes of action. The first three causes of action, styled as claims under the California's Unfair Competition Law ("UCL"), Business & Professions Code § 17200, *et seq.*, allege that DSW employed "Unfair," "Fraudulent," and "Unlawful" business practices by offering discounts that are "false, misleading and/or deceptive." (SAC ¶¶ 79, 86, 95.) The fourth cause of action, styled as a claim under California's False Advertising Law ("FAL"),

1  Business & Professions Code § 17500, *et seq.*, claims that DSW offered allegedly

2  inflated discounts "with the intent to induce members of the public to purchase

3  products." (SAC ¶ 105.)  The fifth cause of action, styled as a claim under the

4  Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq.*,

5  claims that DSW made false representations about the extent of its "price

6  reductions." (SAC ¶ 109.)  Finally, Plaintiffs' sixth cause of action is styled as a

7  claim for unjust enrichment under California law.  (SAC ¶ 120.)

8  Although each of Plaintiffs' claims are rooted in the allegation that DSW's

9  "Compare At" pricing is "deceptive and misleading" (SAC ¶ 1), Plaintiffs fail to

10  allege facts showing that reasonable consumers would interpret DSW's "Compare

11  At" pricing in the way Plaintiffs allege, or that the "Compare At" prices on the items

12  they purchased were false.  These deficiencies are fatal to each of Plaintiffs' legal

13  theories, as set forth below.

14  ### A.  Applicable Standard for 12(b)(6) Motions

15  To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a complaint must

16  contain sufficient factual matter, accepted as true, to "state a claim to relief that is

17  plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (citing

18  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility only

19  exists where the plaintiff pleads enough factual content to allow the court to draw

20  the reasonable inference that the defendant is liable for the misconduct alleged.

21  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "A plaintiff's obligation

22  to provide the grounds of his entitle[ment] to relief requires more than labels and

23  conclusions, and a formulaic recitation of the elements of a cause of action will not

24  do." *Twombly*, 550 U.S. at 554.

25  A plaintiff alleging fraudulent conduct must further satisfy Rule 9(b)'s

26  heightened pleading standard, which requires the plaintiff to plead the circumstances

27  constituting fraud with particularly.  *Kearns v. Ford Motor Company*, 567 F.3d

28  1120, 1126 (9th Cir. 2009).  Rule 9(b) requires that a plaintiff's pleading include

Sedgwick LLP

1  "the time, place and specific content of the false representations…." *Odom v.*

2  *Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). To satisfy Rule 9(b), it is not

3  enough for the plaintiff to simply claim that that a representation is false—she must

4  "explain what is false or misleading about the statement made and ***why it is false***."

5  *In re iPhone 4s Consumer Litig.*, No. 14-15487, 2016 WL 758346, at *1 (9th Cir.

6  Feb. 25, 2016) (quoting *Cafasso ex. rel. United States v. Gen. Dynamics C4 Sys.,*

7  *Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)) (emphasis added). In addition, "[i]t is

8  well settled that fraud '[a]llegations based on 'information and belief' do not satisfy

9  the particularity requirement of Rule 9(b) unless the complaint sets forth the facts on

10  which the belief is founded.'" *Comwest, Inc. v. Am. Operator Servs., Inc.*, 765 F.

11  Supp. 1467, 1471 (C.D. Cal. 1991) (citing *In re Worlds of Wonder Securities Litig.*,

12  694 F. Supp. 1427, 1432–33 (N.D. Cal. 1988)).

> **B.** **The SAC Fails to Allege Any Facts Demonstrating that DSW's Pricing Is Deceptive**
>
> **1.** **Barber and Yang Fail to Plead Facts Demonstrating That the Compare at Prices for Their Items Were Not Real Prices**

17  This Court previously dismissed Barber's and Yang's claims for failing to

18  allege facts supporting their claim that the items they purchased were never sold for

19  their "Compare At" prices. (Dkt. 27, at *7.) Despite the Court's clear guidance,

20  the SAC does not do not allege *any* additional facts concerning their claim to have

21  been deceived. Instead, Barber and Yang rely on *the same* conclusory allegations

22  that this court has already found to be deficient. For example:

> Plaintiffs reasonably believed they were getting a terrific bargain on their purchases. In reality, they were not getting a bargain at all. (SAC ¶ 39; *see also* FAC ¶ 19.)
>
> Retailers like DSW create the illusion of traditional outlet and warehouse discounts and bargains by offering the made-for-outlet goods at prices reduced from fabricated, arbitrary, and false "Compare At" prices. (SAC ¶ 52; FAC ¶ 31.)

Sedgwick LLP

> [T]he inflated "Compare At" and corresponding selling price was nothing more than a false, misleading and deceptive illusion of a discount. (SAC ¶ 82; FAC ¶ 59.)
>
> DSW deceived consumers into believing that it was offering value, discounts or bargains at DSW stores from the prevailing market value, real suggested price or worth of the products sold that did not, in fact, exist. (SAC ¶ 90; FAC ¶ 60.)

As this Court has explained, these claims "are conclusory and lack any factual support." (Dkt. 27, at *7-8.)

Nothing in the SAC supports Plaintiffs' claims that the Guess and Penguin shoes that they purchased in June and July of 2015 were not sold for their "Compare At" price elsewhere. Plaintiffs do not, for example, identify a single retailer selling the items for less than DSW's "Compare At" price or the amount Plaintiffs actually paid. Indeed, Plaintiffs do not even claim to have looked at a single other retailer to see whether they were selling the same shoes. Plaintiffs' allegations about other stores' practices based upon "information and belief," without more, is insufficient to state a claim.

California federal courts have repeatedly granted motions to dismiss under these circumstances. *See Branca v. Nordstrom*, 2015 WL 1841231, at *8 (S.D. Cal. Mar. 20, 2015) ("Although Plaintiff acknowledges that Rule 9(b) applies to his claims, he merely alleges that the 'Compare At' prices are [fictitious]. The Court finds that these conclusory allegations are insufficient under Rule 9(b)."); *Jacobo v. Ross*, No. 2:15-cv-4701 (C.D. Cal. Feb. 23, 2016) (granting motion to dismiss pricing claims because "It is insufficient under Rule 9(b) to simply assert on 'information and belief' that 'the prevailing retail prices for the items [Plaintiffs purchased] were materially lower than the 'Compare At' prices advertised by Defendant.' Plaintiffs must conduct a reasonable investigation into their claims…") (RJN, Exhibit A); *see also Sperling v. DSW Inc.*, Case No. 15-cv-1366JGBSPX,

2016 WL 354319, at *6 (C.D. Cal. Jan. 28, 2016), on appeal; *Rubenstein v. Neiman Marcus Grp. LLC*, 2015 WL 1841254 (C.D. Cal. Mar. 2, 2015), on appeal; *Mahfood v. QVC, Inc.*, 2007 WL 9363986 at *4 (C.D. Cal. Feb. 7, 2007); *Sperling v. Stein Mart, Inc. et al.*, No. 5:15-cv-1411 (C.D. Cal. Jan. 26, 2016) (RJN, Exhibit B).

## 2. Barber and Yang's New Allegations Do Not Save Their Claims

Plaintiffs' new allegations about the Waylon Oxford, Eppie Wedge, and Ronnie Flat—***shoes they did not purchase***—are irrelevant to whether the prices on items Barber and Yang *actually purchased* were false.

The SAC describes these shoes as "examples" supporting their claim that "Outlet Exclusive Products were never sold or intended to be sold at the 'Compare At' prices." (SAC ¶ 18.) Aside from the fact that these shoes happen to have the same "well-known brand names" as the shoes purchased by Barber and Yang[3] almost ten months ago (SAC ¶ 15), the SAC demonstrates nothing as to why these shoes are relevant to Plaintiffs' claims. Plaintiffs do not claim, for example, that *all* Penguin and Guess items sold by DSW are "Outlet Exclusive Products."

Plaintiffs' argument seems to be that these shoes are "Outlet Exclusive Products" and that, *ipso facto*, the shoes they did purchase must also be "Outlet Exclusive Products." This argument fails for several reasons.

First, Plaintiffs' allegations about the Waylon Oxford, Eppie Wedge, and Ronnie Flat do not support a finding that the pricing for *those* shoes is inaccurate. Plaintiffs do not purport to have looked for these shoes in a single brick-and-mortar store. Instead, Plaintiffs base their claims about these shoes on a "simple Google search." (SAC ¶¶ 19-22.) They do not allege the date they conducted this search,

---

[3] Notably, the SAC does not identify a single pair of Penguin shoes that actually fits within Plaintiffs' definition of "Outlet Exclusive Products—because it cannot. The SAC recognizes that the Penguin Waylon Oxford is sold by several other retailers, directly contradicting their contention that the shoes were "*manufactured at DSW's direction*." (SAC ¶ 44.)

1  what search terms they used, which Google pages they looked at ("All,"

2  "Shopping," etc.), or how many results they viewed.

3  In a very similar case, this Court has previously found that "vague" references

4  to Google searches are insufficient to satisfy Rule 9's heightened standard.

5  *Sperling v. DSW Inc.*, 2016 WL 354319, at *7. Here, Plaintiffs' claims are

6  significantly weaker than those in *Sperling*, where the plaintiff at least claimed to

7  have investigated the shoes *she actually bought*. Nevertheless, the Court in *Sperling*

8  still found the plaintiff's claims to be insufficient:

> The only new allegations presented in SAC are Plaintiff's
> **vague** claims that she has independently investigated the
> prices for the [shoes she bought] and [a second pair of shoes
> she did not allege buying]... [T]he SAC provides **no details
> at all** regarding Plaintiff's efforts to investigate the price of
> the [shoes she bought]. In short, Plaintiff's **conclusory
> allegations** regarding her efforts to investigate the prices of
> the shoes **do not make clear that Defendants' comparative
> reference prices were deceptive and did not reflect market
> prices at the time they were listed**.

*Id.*, emphasis added; *see also In re Worlds of Wonder Sec. Litig.*, 694 F. Supp. 1427,

1433 (N.D. Cal. 1988) (statement that information and belief regarding fraud was

based upon investigation made by plaintiffs by and through their attorneys did not

sufficiently state facts upon which belief was founded). Like in *Sperling*, Plaintiffs'

new, "vague" and "conclusory" allegations about shoes they did not purchase are

insufficient to save their claims.

Second, the SAC admits that Plaintiffs did not investigate the pricing of these

other shoes anywhere near the time that Barber and Yang made *their* purchases,

which are the subject of this suit. The pricing for shoes "today" (SAC ¶¶ 19-22) is

irrelevant to the pricing for *different* shoes ten months ago, *especially* when

Plaintiffs allege that DSW updated the definition of "Compare At" in the interim,

which is both posted online and posted at the point of sale in every store. (SAC

¶ 6.)

Sedgwick LLP

## C.     A Reasonable Consumer Would Not Interpret "Compare At" to Mean "Former Price" as Plaintiffs Apparently Contend

Plaintiffs' claims also fail because a reasonable consumer would not be deceived by DSW's "Compare At" pricing. As the California Court of Appeals has explained:

> "'Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the phrase indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."

*Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003). Dismissal is appropriate where a Court can conclude as a matter of law that members of the public are not likely to be deceived by an advertisement. *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995).

On the one hand, Plaintiffs claim that reasonable consumers understand "Compare At" prices to reflect "authentic MSRPs." (SAC ¶ 25.)

"MSRP" is generally defined as:

> A manufacturer's suggested retail price (MSRP) is the amount of money for which the company that produces a product recommends that it be sold in stores. ***MSRP does not necessarily correspond to the price retailers actually use*** or to the price customers are willing to pay.

*See* http://www.investopedia.com/terms/m/manufacturers-suggested-retail-price-msrp.asp (emphasis added).

Despite the self-explanatory meaning of MSRP—a price "suggested" by the "manufacturer"—Plaintiffs *also* claim that reasonable consumers understand MSRP to mean a price *actually used* by DSW or other retailers. As in the FAC, however, Plaintiffs do not identify **any** representation by DSW that would cause reasonable consumers to interpret "Compare At" or "MSRP" this way. In effect, Plaintiffs

Sedgwick LLP

argue that a manufacturer cannot set an MSRP until *after* other retailers have actually sold the item at that price.[4]  This argument defies both logic and the plain meaning of MSRP.

### D. California's "Former Price" Law Is Inapplicable Because DSW Has Never Made a "Former Price" Representation

Plaintiffs claim that DSW has violated California's "former price" law, Bus. & Prof. Code § 17501, which provides:  "No price shall be advertised as a *former price* of any advertised thing, unless the alleged former price was the prevailing market price [defined to mean "the worth or value" of the item] within three months next immediately preceding the publication of the advertisement…" (Emphasis added; *see also* SAC ¶¶ 32, 98, 101.)  This law is inapplicable here because the SAC does not point to any representation by DSW concerning former prices.

Moreover, Plaintiffs misinterpret § 17501 to mean both that the *identical* item must have been sold at its "former price" in the preceding three months, and that the former price must have been the "prevailing market price" during that period.  (SAC ¶ 32.)  Under Plaintiffs' strained interpretation of the statute, retailers would not be able to ever offer an item on sale if it did not sell well, or even to offer introductory promotions (something permitted by the FTC, 16 C.F.R. § 251.1(f)).  This was not, and could not have been, what the legislature intended.

The only logical reading of the statute is the one endorsed by the California Attorney General:  that a retailer may advertise a former price as long as a *comparable* item sold at that price.  The Attorney General has explained that in the context of § 17501, "[t]he phrase 'prevailing market price' means the predominating

---

[4] Plaintiffs cite to no authority—nor do they specifically allege—that reasonable consumers understand MSRP to mean that the retailer advertising the MSRP previously sold the item for that price.  Indeed, requiring DSW itself to offer each item at its MSRP would transform the price from a *suggested* price to a *required* one.

1  price that may be obtained for merchandise <u>similar</u> to the article in question on the
2  open market and within the community where the article is sold."  30 Op. Atty. Gen.
3  127 (1957) (RJN, Exhibit D).  The Attorney General's reading of the statute is
4  reinforced by the statute itself, which defines "prevailing market price" to merely
5  mean the product's "worth or value."  Bus. & Prof. Code § 17501.  Plaintiffs do not
6  allege a basis on which to conclude that DSW's "Compare At" prices do not reflect
7  prices used by other retailers on comparable items (that is, "comparable value
8  comparisons.").

9  **E.    Plaintiffs Fail to State Any Claim for Unjust Enrichment**

10  In addition to bringing claims under California's consumer protection laws,
11  Plaintiffs purport to bring a claim for unjust enrichment.  (SAC ¶ 120.)  But in
12  California, "there is not a standalone cause of action for 'unjust enrichment,' which
13  is synonymous with 'restitution.'"  *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d
14  753, 762 (9th Cir. 2015) (citations omitted).  Although a court *may* construe an
15  unjust enrichment claim as a quasi-contract claim for restitution, such a claim must
16  be pled with specificity—a "broad-strokes, formulaic recitation of the elements of a
17  claim for quasi contract—to the extent one even exists—will not do."  *Kazovsky v.*
18  *Metrocities Mortgage, LLC*, Case No.  11-cv-06079-ODW FMOX, 2012 WL
19  177333, at *4 (C.D. Cal. Jan. 23, 2012); *see also Marques v. Fed. Home Loan*
20  *Mortgage Corp.*, No. 12-cv-1873-IEG MDD, 2013 WL 1932920, at *5 (S.D. Cal.
21  May 8, 2013) (unjust enrichment claims that "sound in fraud" must satisfy Rule
22  9(b)'s specificity requirement).

23  Here, as with the FAC, the SAC's unjust enrichment claim fails because the
24  SAC "does not contain sufficient factual allegations indicating the products
25  purchased by Plaintiffs from Defendant's stores had deceptive comparative
26  reference prices."  Dkt. 27, at *8 (citing *Peterson v. Cellco Partnership*, 164 Cal.
27  App. 4th 1583, 1595 (4th Dist. 2008) (rejecting plaintiffs' unjust enrichment claim
28  because it was predicated on the same allegations as their other meritless claims)).

Sedgwick LLP

For each item that Plaintiffs purchased, DSW listed a price, Plaintiffs decided the item was worth that price, and Plaintiffs gave that amount of money in exchange for the item. Plaintiffs do not allege that the listed "Compare At" prices were inaccurate, that the items they bought are worth any less than what they paid, or that it would be otherwise unjust for DSW to retain that amount. Plaintiffs therefore fail to state any claim for unjust enrichment.

For the same reason, another court recently dismissed the plaintiff's unjust enrichment claim in a similar case involving deceptive pricing claims:

> The complaint alleges that plaintiff purchased the cardigan for the current price listed on the price tag. It does not allege that she did not receive the sweater or that she paid more than the sweater is worth—in other words, it does not allege that Nordstrom retained a benefit that would be inequitable without payment for its value. The conclusory allegation that Nordstrom "has been unjustly enriched" is not enough to state a claim for unjust enrichment.

*Shaulis v. Nordstrom Inc.*, 120 F. Supp. 3d 40, 55-56 (D. Mass. 2015). *See also Kim v. Carter's Inc.*, 598 F.3d 362, 365-66 (7th Cir. 2010) ("The plaintiffs agreed to pay a certain price for [the defendant's] clothing, which they do not allege was defective or worth less than what they actually paid. Nor have the plaintiffs alleged that, but for Carter's deception, they could have shopped around and obtained a better price in the marketplace…the plaintiffs in this case got the benefit of their bargain and suffered no actual pecuniary harm."); *Waldron, et al., v. Jos. A. Bank Clothiers, Inc.*, 2:12-cv-02060-DMC-JAD, at *8 (D. N.J. Jan. 28, 2013) (RJN, Exhibit C).

## F. Plaintiffs' Other Claims Also Fail

Plaintiffs cannot state a claim for false advertising, unfairness, or unlawfulness, because each of these claims relies on Plaintiffs' underlying claim that DSW did something deceptive. Plaintiffs do not state a claim for false advertising because they provide no basis to infer that DSW could have known or should have known of any false statement allegedly made to Plaintiffs. Cal. Bus. &

Sedgwick LLP

1 Prof. Code § 17500. Similarly, Plaintiffs' UCL "unfairness" claims should be

2 dismissed because Plaintiffs have not alleged any conduct by DSW that "offends an

3 established public policy or ... is immoral, unethical, oppressive, unscrupulous or

4 substantially injurious to consumers." *Scripps Clinic v. Superior Court*, 108 Cal.

5 App. 4th 917, 939 (4th Dist. 2003).

6        Finally, Plaintiffs fail to state a claim for unlawfulness, because they do not

7 allege facts sufficient to show a violation of some underlying law. Plaintiffs may

8 not "use California law to engineer" a cause of action under the FTCA. *See*

9 *O'Donnell v. Bank of America Nat. Ass'n.*, 504 Fed. Appx. 566, 568 (9th Cir. 2013)

10 ("The district court rightly dismissed the unfair competition claim premised on Bank

11 of America's alleged violation of the Federal Trade Commission Act. The federal

12 statute doesn't create a private right action, and plaintiffs cannot use California law

13 to engineer one."); *Sperling v. DSW Inc.*, 2016 WL 354319, at *2 n. 3 ("Plaintiff

14 cannot assert a cause of action for this violation through his claims under the

15 California Unfair Competition Law."). An "unlawfulness" claim "stands and falls

16 with the viability of [the] other claims," *Mehta v. Wells Fargo Bank, N.A.*, 737 F.

17 Supp. 2d 1185, 1206 (S.D. Cal. 2010), so this claim must too be dismissed.

18 **V. THE COURT SHOULD DENY PLAINTIFFS LEAVE TO FURTHER AMEND THEIR COMPLAINT**

19

20        In "the Ninth Circuit ... plaintiffs do not enjoy unlimited opportunities to

21 amend their complaints." *Stone v. Conrad Preby's*, 2013 WL 139939, at *2

22 (S.D. Cal. Jan. 10, 2013) (citing *McHenry v. Renne*, 84 F.3d 1172, 1174 (9th Cir.

23 1996)). A district court may in its discretion deny leave to amend "due to undue

24 delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

25 deficiencies by amendments previously allowed, undue prejudice to the opposing

26 party by virtue of allowance of the amendment, [and] futility of amendment."

27 *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir.2008) (internal

28 citation and quotation marks omitted). "The district court's discretion to deny leave

1   to amend is particularly broad where plaintiff has previously amended the

2   complaint." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1072

3   (9th Cir. 2008); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981,

4   1007 (9th Cir. 2009) ("[W]here the plaintiff has previously been granted leave to

5   amend and has subsequently failed to add the requisite particularity to its claims,

6   '[t]he district court's discretion to deny leave to amend is particularly broad.'")

7        Plaintiffs Barber and Yang allege no new facts of any consequence, and

8   demonstrate their inability to show that the "Compare At" price on their purchases

9   were false or deceptive.  Baumel should not be allowed leave to amend because her

10  claims are clearly manufactured, and no amendment can change that.  Allowing

11  Plaintiffs the opportunity to further amend would be futile.

12  **VI.   CONCLUSION**

13       For the foregoing reasons, DSW respectfully requests that the Court grant its

14  motion to dismiss the SAC, without leave to amend.

15

16  DATED:  May 16, 2016          SEDGWICK LLP

17                     By: /s/ *Stephanie Sheridan*

18                        Stephanie A. Sheridan

19                        Anthony J. Anscombe

20                        Meegan B. Brooks
                      Attorneys for Defendant
                      DSW INC.

21

22

23

24

25

26

27

28

Sedgwick LLP

**EXHIBIT 10**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  | CASE NUMBER |
|---|---|
| Plaintiff(s), | |
| v. | |
| Defendant(s). | **NOTICE OF DISMISSAL PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 41(a) or (c)** |

PLEASE TAKE NOTICE: (*Check one*)

☐ This action is dismissed by the Plaintiff(s) in its entirety.

☐ The Counterclaim brought by Claimant(s) _____ is dismissed by Claimant(s) in its entirety.

☐ The Cross-Claim brought by Claimants(s) _____ is dismissed by the Claimant(s) in its entirety.

☐ The Third-party Claim brought by Claimant(s) _____ is dismissed by the Claimant(s) in its entirety.

☐ **ONLY** Defendant(s) _____

_____
is/are dismissed from (*check one*) ☐ Complaint, ☐ Counterclaim, ☐ Cross-claim, ☐ Third-Party Claim brought by _____ .

The dismissal is made pursuant to F.R.Civ.P. 41(a) or (c).

_____          _____
*Date*                                              *Signature of Attorney/Party*

*NOTE:  **F.R.Civ.P. 41(a):** This notice may be filed at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs.*

*        **F.R.Civ.P. 41(c):** Counterclaims, cross-claims & third-party claims may be dismissed before service of a responsive pleading or prior to the beginning of trial.*

# EXHIBIT 11

## DECLARATION OF KARMA CHRISTINE HUGHES

I, KARMA CHRISTINE HUGHES declare as follows:

1.    I am a private investigator and an Associate of Montano & Associates International Investigations.  My California license number is PI13710.  I have 27 years of experience as a Licensed Private Investigator and an additional 14 years of experience as a Paralegal.  I have personal knowledge of the matters described below, and if called as a witness, I could and would testify competently.

2.    On October 22, 2016 I spoke with Donovan Farwell in his apartment building located at 11136 Chandler Boulevard, North Hollywood, California.  Mr. Farwell told me he has been living there since the fall of 2015.  When I asked Mr. Farwell how he became the lead plaintiff in *Farwell v. Levi Strauss & Co.*, San Francisco Sup. Ct. No. CGC-14-541316, he said he met Wayne Kreger, formerly counsel for plaintiffs in that action, through Mr. Kreger's girlfriend.  He then said that Mr. Kreger's girlfriend asked him to go to the Levi's store and make purchases so he could serve as the lead plaintiff.  Mr. Farwell called agreeing to Mr. Kreger's request a "momentary lapse in judgment."  After the suit was filed, Mr. Farwell reconsidered and decided he was no longer interested in pursuing the case.

3.    Mr. Farwell indicated that Mr. Kreger and Mr. Kreger's girlfriend and the girlfriend's friend tried to reach him by phone and text.  Mr. Farwell responded once to communicate his desire to be removed from the case.  Mr. Farwell sent this communication roughly one and a half to two years before we spoke (i.e. late 2014 to early 2015).  Mr. Farwell told me that he did not respond to further calls and text messages from Mr. Kreger or Mr. Kreger's girlfriend or the girlfriend's friend.  He did not indicate that Mr. Kreger or any other plaintiffs' counsel attempted to contact him by any other means.  Mr. Farwell said he had not been in rehab.

4.    I wrote down fastidious notes immediately after my conversation with Mr. Farwell and used those notes to prepare this declaration, which was complete within two weeks of my meeting with Mr. Farwell.  Because the case he started against Levi Strauss & Co. was settling, I did not finalize this declaration by executing it at that time.  I am doing so now, but other than this

1   paragraph I have not made any changes to or additions to what I wrote shortly after meeting Mr.

2   Farwell.

3       I declare under penalty of perjury under the laws of the State of California that the

4   foregoing is true and correct.

5       Executed January 23, 2017, at Los Angeles, California.

6

7   KARMA CHRISTINE HUGHES

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RAMSEY DECLARATION IN SUPPORT OF JOINT "ONE SHOT" SUBMISSIONS RE
            DISCOVERY DISPUTE RE REQUESTS FOR PRODUCTION TO FARWELL

**EXHIBIT 12**

1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

10

| DAVID M. LUCAS, et al., | CASE NO. 14cv1631-LAB (JLB) |
|---|---|

11

Plaintiffs,    **ORDER RE: SANCTIONS**

vs.

12

JOS. A. BANK CLOTHIERS, INC.,

13

Defendant.

14
15
16

     David Lucas sued Joseph A. Bank for allegedly inflating suit prices before offering supposed "buy one, get one free" sales. Hassan Zavareei of Tycko & Zavareei and Stuart

17

Scott of Spangenberg Shibley & Liber represented David M. Lucas in this putative class

18

action. Without rehearsing the entire procedural history of the case, suffice it to say that the

allegations against Joseph A. Bank fell apart when it became clear to all that Lucas, who had

19

been designated lead plaintiff, had lied about ever buying suits from Joseph A. Bank.

20

Plaintiffs eventually moved to dismiss the case with prejudice, and Joseph A. Bank filed a

21
22

motion to sanction Lucas and his attorneys for not dismissing the case sooner.

23

     The Court agrees that Lucas's attorneys should have been more diligent and

24

skeptical of Lucas's story much earlier in the litigation. But they didn't act recklessly. And

25

the Court won't stain their reputations for dishonest acts committed by their client . With that

said, the Court recognizes that significant time, effort, and money was spent by everyone

26

involved because Lucas attempted to perpetrate a fraud on Joseph A. Bank, this Court, and

27

the public. The Court has determined that Lucas's conduct is sanctionable.

28

# I. Background

## A.   Lucas becomes the class representative.

Lucas learned of the proposed lawsuit against Joseph A. Bank through an online advertisement.  He responded to the ad and eventually spoke with an employee at the Spangenberg law firm.  The conversation was memorialized in a May 2014 memo.  Lucas told a firm representative with whom he first spoke that he remembered buying three suits for about $1,000.  He went on to relate that the suits "incurred wear" "within a year."  When the Spangenberg associate asked Lucas if he'd be interested in serving as a class representative in a contemplated class action suit against Joseph A. Bank, he enthusiastically responded "YES!" (Ex. A, Tab 1.)

About a month later, Lucas sent Spangenberg an email containing a different account.  He now claimed that he had purchased a total of 12 suits from Joseph A. Bank—three suits on four separate occasions.  Spangenberg asked for proof, and Lucas emailed them back a document that he described as "the bank statements for the four purchases made with my debit card."  What Lucas provided looked like an online banking print-out that had been redacted with black marker.  The document showed four debit transactions at Joseph A. Bank occurring in December 2012, June 2013, December 2013, and a fourth transaction with the date redacted.  (Ex. A, Tab 2.)

A Spangenberg paralegal followed up with Lucas asking him for the date of the redacted purchase.  Lucas told her it was July 1, 2012.  The paralegal annotated the alleged bank statement with that date and attempted to otherwise "clean[] up the document" by removing the black marker redactions.  Attorney Scott later produced this cleaned-up document to Joseph A. Bank in July 2015, but didn't provide the original that Lucas had sent until August 2016.  (Ex. A, Tab 34.)

Scott testified that in his opinion, Lucas seemed like a good fit to be a class representative. Lucas held a Master's degree in accounting, worked for Qualcomm, and was married to a service member in the U.S. Navy.  Scott had no reason to suspect that Lucas was lying about buying suits.  Scott and Zavareei decided to move forward with Lucas as

their class representative.  They filed the lawsuit in July 2014.

**B.    Problems with Lucas's story emerge.**

The parties litigated the action over the next year.  In January 2016, Joseph A. Bank deposed Lucas.  Lucas testified that he purchased the first three suits in July 2012 from a Joseph A. Bank store in San Diego.  He said the suits frayed after he wore them once or twice.  Rather than return them to Joseph A. Bank, he donated them to Goodwill.  Yet, he testified that a few months later he bought three more suits from Joseph A. Bank.  When these suits also frayed after a single wearing, he donated them too.  He testified that the next summer (2013), he bought three more suits from Joseph A. Bank.  And a few months later, he bought the final three suits.  According to Lucas, all of the suits frayed after he wore them once or twice.  He testified that he didn't complain or return the suits because returning things made him anxious.  He maintained that he purchased all of the suits with his Navy Federal Credit Union debit card.  (Dkt. 151-1, Ex. B.)

On May 24, 2016, pursuant to a subpoena, Navy Federal Credit Union produced Lucas's original bank statements.  The records established that Lucas had made no purchases from any Joseph A. Bank store.  Faced with the glaring inconsistency between Lucas's testimony and what the records revealed, plaintiffs' counsel told Joseph A. Bank's lawyers that they were "conferring with Mr. Lucas to figure this out," and surmised that Lucas may have "misremembered the debit card he used."  (Ex. A, Tab 16.)

A week later, Daniel Frech, a Spangenberg attorney who had most of the communication with Lucas, alerted Scott and Zavareei to another issue: If the prices Lucas supplied on his alleged bank statement were correct, then he was taxed at 8.75%, which "should mean that he bought [the suits] in the Bay area."  (Ex. A, Tab 21.)  Frech emailed Lucas: "The tax rate looks like it was 8.75%, which suggest[s] that it was in San Francisco or Santa Clara county.  Maybe Marin.  Not a lot of places around San Diego have a sales tax rate that high."  (Ex. A, Tab 20.)

**C.    The parties file summary judgment motions.**

On June 22, 2016, Lucas and Joseph A. Bank filed motions for summary judgment.

(Dkt. 103 and 106.) Joseph A. Bank argued that Lucas wasn't entitled to restitution, and also maintained that his story was so implausible that no reasonable juror could believe it. Joseph A. Bank identified five problems with Lucas's story: (i) His claim to have purchased twelve-suits didn't make sense; (ii) his Navy Federal records showed no suit purchases; (iii) the Navy Federal records showed that Lucas made purchases in Virginia at the same times in 2012 that he claimed he bought suits in San Diego; (iv) Lucas said he had alterations performed at the stores, but the prices on the statement Lucas produced didn't reflect those additional costs; and (v) the suit prices on the statement Lucas produced reflected an 8.75% sales tax, yet no Joseph A. Bank store in San Diego had a tax rate that high in 2012 or 2013. (Dkt. 106-1.)

Zavareei testified that when he read Joseph A. Bank's summary judgment motion "alarm bells went off." A few days later, Tycko attorneys spoke with Lucas by telephone and although they "still kind of believe[d]" Lucas, stated they didn't feel comfortable going forward with him as class representative. (Ex. A, Tab 28.) Plaintiffs' counsel withdrew their motion for summary judgment, asked for a continuance on Joseph A. Bank's pending summary judgment motion, and moved to substitute a new class representative "to protect the putative class" and because of the "vagaries around the specifics of [Lucas's] purchases." (Dkt. 108-1.) Discovery was closed by then, and the Court denied the request. (Dkt. 113.)

Three days later, plaintiffs' counsel moved to voluntarily dismiss their claims with prejudice and to withdraw from representing Lucas owing to ethical concerns. (Dkt. 116, 117.) At this point, Joseph A. Bank moved for sanctions against Lucas and his attorneys. (Dkt. 132.) They also obtained an order from the magistrate judge compelling plaintiffs' counsel to produce their communications with Lucas. (Dkt. 147.) The Court granted the motion to withdraw and ordered Lucas to: (i) answer some key questions about the alleged bank statement; and (ii) appear at a hearing on October 18, 2016. (Dkt. 123, 128, 150.)

**D.    The sanctions hearing.**

A few days before the hearing, Lucas sent the Court an email explaining that the bank statement he produced had been "faxed" to him. He didn't offer any information about when,

where, how, or from whom he obtained this document.  He also tried to blame his former counsel for any misunderstanding that may have arisen.

The Court held the hearing on October 18, 2016.  Lucas appeared telephonically from Japan, and advised the Court that he was proceeding without an attorney.  The Court placed Lucas under oath and attorneys from both sides, as well as the Court, questioned him. Lucas maintained that the bank statement he provided was legitimate and that his twelve-suit story was true.  He admitted that he must have mistakenly purchased the 2012 suits in Virginia, but insisted that he bought the suits in 2013 in California.

While questioning Lucas, Zavareei submitted into evidence an email that he sent to Lucas on July 12, 2016.  The letter stated: "We have been doing research on how to proceed based on our conclusion that you have not been honest with us and have been dishonest in your deposition.  Despite our numerous calls and requests for clarification, you have not been able to provide any sort of explanation for the facts that indicate you were being untruthful."  (Ex. 1.)

Joseph A. Bank called attorneys Scott and Zavareei as witnesses.  Scott testified that after May 24, when he became aware of the real Navy Federal records, lawyers with his firm spoke with Lucas and emailed him 13 times.  Zavareei said he didn't realize how serious the problem was until he read Joseph A. Bank's summary judgment motion.  Both Scott and Zavareei admitted they knew about the tax rate issue before the summary judgment motion. Zavareei also acknowledged that he didn't read Lucas's deposition until months after it was taken.

## II.  Standard of Review

### A.   Burden of proof.

The Ninth Circuit hasn't addressed the standard of proof for sanctions.  *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010).  But most courts that have considered the issue apply the clear and convincing evidence standard. *See, e.g.*, *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995). The clear and convincing standard is a way to protect against "the consequences of grave

14cv1631

decisions too lightly reached." *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1252 n.5 (9th Cir. 1997). Sanctioning an attorney is a grave decision with serious consequences for his or her reputation. A sanctions motion alone is an accusation with the power to stigmatize. For these reasons, the Court finds that when a lawyer's good name and professional honor are on the line, the party moving for sanctions must provide clear and convincing evidence.

**B. Section 1927 sanctions.**

Under section 1927, "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The law of the Ninth Circuit isn't quite clear if "recklessness suffices for § 1927 sanctions," *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001), or if sanctions under "section 1927 must be supported by a finding of subjective bad faith." *Blixseth v. Yellowstone Mountain Club*, *LLC*, 796 F.3d 1004, 1007 (9th Cir. 2015) (bad faith includes when an attorney "recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent"). The Court need not resolve the issue because even under the lesser standard of recklessness, there is not clear and convincing evidence that Lucas's former attorneys acted recklessly.

**C. Inherent power sanctions.**

The Court may also sanction parties or counsel under its' inherent powers when they act in bad faith. *Fink*, 239 F.3d at 994. Here, the Court finds by clear and convincing evidence that Lucas acted in bad faith, and also that he acted intentionally and willfully.

### III. Findings of Fact

**A. Lucas's counsel didn't act recklessly.**

Recklessness is "a departure from ordinary standards of care that disregards a known or obvious risk of material misrepresentation." *In re Girardi*, 611 F.3d 1027, 1038 n.4 (9th Cir. 2010). Attorneys Scott and Zavareei testified that they weren't aware of Lucas's obvious lack of credibility until they read Joseph A. Bank's motion for summary judgment. The Court

14cv1631

credits their testimony, and finds that they acted promptly and reasonably after that point. Within three weeks of determining that Lucas lacked credibility, they moved to substitute a new class representative. When the Court denied that motion, they moved to dismiss Lucas's claims with prejudice, and withdraw from representing him.

### 1. Counsel filed suit in good faith and didn't alter the statement to deceive.

Having considered all of the evidence, the Court finds that plaintiff's counsel initially had no reason to suspect that Lucas – a professional accountant with advanced degrees, a job at Qualcomm, and a wife serving in the U.S. Navy – was lying to them about buying suits. This finding is buttressed by evidence that Lucas produced a phony document to his lawyers to corroborate his account of the purchases. Lucas's counsel were entitled to rely on his representations and the corroborating record he produced.

Although counsel weren't reckless, the Court believes that they should have done more to vet Lucas before selecting him as their class representative. For example, it was sloppy not to nail down Lucas's complete story early on. Basic questions about where Lucas bought the suits and what he did with them should have been asked long before Joseph A. Bank deposed him a year after the case was filed. Plaintiffs' counsel were also somewhat careless in ignoring Lucas's changing story (*e.g.*, first three suits, then twelve), even though they didn't disregard an obvious risk that their client was deceiving them before filing suit.

Joseph A. Bank argues alternatively that counsel should be sanctioned for altering the bank statement and failing to disclose the changes. At the hearing, Scott acknowledged that was a mistake. And it was. But the changes to the phony record were cosmetic, not substantive. The paralegal supplied a missing date by typing it into the document in a noticeably different font. The Court agrees that counsel should have notified Joseph A. Bank about the alteration, but the conduct is not cause for sanctions.

### 2. Counsel acted carelessly, but not recklessly, after Lucas's deposition.

Lucas told a far-fetched story at his deposition. The Court finds that former counsel acted negligently, but not recklessly, in failing to follow-up with their client immediately after his deposition. That's especially true for attorney Zavareei, who admitted that he was

14cv1631

embarrassed that he may not have read the deposition testimony until as late as June 2016. Because an attorney is entitled to rely on his client's sworn testimony, as outlandish as the twelve-suit story sounded, plaintiffs' counsel still had no hard evidence that their client was lying to them and that he had forged the corroborating bank statement until the true and correct bank records were obtained.

But the revelation of the official Navy Federal records four months later should have alerted plaintiffs' counsel that Lucas's account was either mistaken or false. The Court finds it troubling that former counsel filed their summary judgment motion on June 22, 2016—a month after discovering the problems with the bank records that were the linchpin for Lucas's standing.

The Court acknowledges that the missing purchases, standing alone, didn't necessarily mean that Lucas was lying or that he created a false document. The more likely explanation was that he misremembered which account he used. And that's what plaintiffs' counsel initially thought. Frech wrote Scott and Zavareei: "Meaning, unless Lucas is a pathological liar with a penchant for forgery, that he misremembered which account he used to purchase the suits. Or something else is amiss." (Ex. A, Tab 12.)

But Lucas's counsel had also discovered other problems. For example, Frech emailed Lucas on May 31, 2016, that the 8.75% tax rate didn't look right. A month later, counsel told the Court in their substitution motion that, "Plaintiff did not know prior to the filing of" Joseph A. Bank's summary judgment motion on June 22, 2016, "that JAB has no stores in metropolitan San Diego with an 8.75% sales tax rate." (Dkt. 108-1.)

At the hearing, Scott admitted he was aware of the tax issue by June 1, 2016, but said he didn't know exactly where the Joseph A. Bank stores in San Diego County were located during the relevant time frame. He acknowledged on cross examination that he should have taken the time to research the store locations but didn't. Zavareei testified that he probably had some knowledge about the tax issue. Plaintiffs' counsel knew that the City of La Mesa had an 8.75% tax rate during the relevant time, but acknowledged that they didn't follow up to find out if Joseph A. Bank had a store in La Mesa in 2012 or 2013.

14cv1631

These weren't great explanations—particularly after Frech emailed lawyers at Tycko and Spangenberg on June 28 relating, "I looked again just now and can't find any plausible 8.75% taxing jurisdictions in which Lucas could have bought all four of his suits." (Ex. A, Tab 28.)  But what that email does suggest is that when counsel filed their substitution motion two days later – claiming they didn't know about the tax problem before June 22 – they made the motion in good faith.  Briefs often pass through many word processors.  Based on the internal email, and Zavareei and Scott's credible testimony at the hearing, the Court finds the tax rate problem was something that got missed rather than something that was intentionally concealed to mislead.  Still, Lucas's counsel should have alerted the Court to the problems with the bank statement.

The Court credits Zavareei and Scott's testimony, which is supported by confidential internal emails, that tends to establish the lawyers didn't appreciate how serious the problems with Lucas's account were until Joseph A. Bank pointed them out.  Lucas's counsel didn't act recklessly.

**B.  Lucas should be sanctioned $40,000.**

In contrast to his counsel, the Court finds that Lucas did act recklessly and with the intent to deceive by making up a story that he had purchased suits from Joseph A. Bank, and creating a phony document purporting to prove the purchases that he never made.  He compounded these deceitful actions by lying under oath at deposition and during the sanctions hearing before this Court.  Lucas defrauded Joseph A. Bank, his own counsel, and the Court from the inception of this lawsuit.

**1.  Lucas wasn't credible.**

The Court finds Lucas's account of the background facts to be incredible.  First, his story that he successively purchased defective suits doesn't ring true.  The chances of one suit falling apart after a single wearing is slim; to have it happen eleven more times is fantastic.  Lucas's story also doesn't match the account he provided during his initial intake conversation, namely, that he bought three suits that incurred wear after a *year*.  Ask yourself, after buying three suits from a store and determining they were poorly made, would

anyone return to the same clothing store three more times and spend thousands of dollars to purchase nine more disintegrating suits? At the hearing, Lucas testified that he couldn't recall where he bought these suits in San Diego. He couldn't remember, in particular, if he purchased the suits at the same location all four times, if it was in a shopping center, or if the store was located somewhere along his commuting route between Escondido and his job in San Diego at Qualcomm. The Court finds that Lucas's testimony was false. He didn't buy suits at any Joseph A. Bank store in San Diego at any time.

Lucas also couldn't answer basic questions about the alleged bank statement. For example, he couldn't explain why the prices reflected an 8.75% tax rate, or why his record didn't reflect the alteration costs he said he incurred. At the hearing, he testified that he couldn't recall how he obtained the bank statement. Yet, in the email he sent the Court just three days before the hearing, he stated that someone had "faxed" it to him. He also said other things that weren't true. For example, he testified that when he emailed the alleged bank statement to his attorneys, he included a cover page identifying the financial institution it was from. The lawyers denied that, and the Court finds that Lucas's testimony that he identified the name of the bank isn't true. (*See* Ex. 3.)

Nor did Lucas provide any credible explanation for his failure to figure out where the alleged bank statement came from. The Court questioned Lucas – an experienced accountant – about whether he had taken the basic step of ordering a credit report to identify all possible financial institutions where he may have had accounts. He initially said no, then yes, before finally settling on a story that he discovered three extra cards (Amazon, Best Buy, and Synchronicity). He said that although he tried to obtain records of those accounts, the companies wouldn't produce them for reasons amounting to the dog-ate-my-homework. Lucas's answers at the hearing were hesitant and punctuated with deep sighs. Like his former counsel, the Court concludes his account is dishonest.

The Court finds that the likely motivation for Lucas's false account was money. As the intake memorandum reveals, Lucas seemed extremely interested in becoming a class representative ("YES!") in the lawsuit against Joseph A. Bank. To assure his selection, he

14cv1631

multiplied the number of suits he allegedly purchased, saying initially that he bought three suits for $1,000, then changing the story to claim that he bought twelve suits for $5,000. At one point, he even suggested that he had purchased more than twelve suits – using a credit card that he was "unable to get credit card statements for" because he no longer had access to "that credit card account." (Ex. A, Tab. 2.) Lucas must have assumed that claiming he purchased more suits meant he would receive more money if he prevailed in the lawsuit.

The Court finds by clear and convincing evidence that Lucas acted in bad faith by intentionally deceiving his lawyers and – initially – opposing counsel about the suit purchases. He also acted in bad faith and with the intent to deceive when he created a fake bank record, and lied under oath at his deposition and during the sanctions hearing. The effect of his deceitful conduct was to sabotage two years of expensive litigation to the detriment of all involved.

**2. Sanctioning Lucas $40,000 is appropriate.**

Faced with the kind of litigation misconduct established here, a court is duty bound to take action to redress it, and to try to deter future misconduct. To do nothing, or to simply dismiss a case under aggravated circumstances like these, creates a risk that courts will be viewed by unscrupulous litigants as an organ for committing fraud. With that said, the Court is also aware that when it exercises its "inherent sanctioning power" it must do so in a way that "tailor[s] the sanction to the particular wrong." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 56 (1991). "Hence, a court can properly consider plaintiff's ability to pay monetary sanctions as one factor in assessing sanctions. It cannot, however, decline to impose any sanction, where a violation has arguably occurred, simply because plaintiff is proceeding *pro se*." *Warren v. Guelker*, 29 F.3d 1386, 1390 (9th Cir. 1994).

At the hearing, Lucas testified that he didn't know his net worth. He said he earned income from a home he owned in Virginia, and that he had about $25,000 equity in the house. He also testified that he owns a car and he has about $30,000 in savings. Based on this accounting, incomplete as it may be, the Court finds that Lucas can afford a monetary sanction of $40,000. That's a fraction of what Joseph A. Bank spent, but it's an amount that

is proportionate to what Lucas can pay and to the reprehensibleness of his conduct.

## IV. Conclusion

Ben Franklin said it takes many good deeds to acquire a good reputation and only one bad deed to lose it. That's especially true in the legal profession. The Court is reluctant to sanction attorneys who were intentionally deceived by their client—although, as recounted here, that doesn't absolve them completely. As experienced class action litigators, counsel should have more thoroughly vetted Lucas's account, and should have promptly investigated his changing stories. But ultimately, the Court finds there isn't clear and convincing evidence that the attorneys multiplied the proceedings "unreasonably and vexatiously." In other words, plaintiffs' counsel didn't act in bad faith or recklessly by failing to dismiss the case sooner. Lawyers must give their clients the benefit of the doubt and act circumspectly before abandoning them or their cases. That's especially true in situations like this one, where the interests of a putative class were also at stake.

David Lucas caused Joseph A. Bank to needlessly expend a substantial amount of money. He's done a disservice to many other citizens who faithfully and with good intentions turn to the Court to help them reliably and honestly resolve their disputes. His conduct is sanctionable. The Court orders Lucas to pay Joseph A. Bank $40,000.

**IT IS SO ORDERED**.

DATED: November 15, 2016

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

14cv1631

**EXHIBIT 13**



Create an Account | Sign in    ftgi

English

## TOP CLASS ACTIONS
Connecting Consumers to Settlements, Lawsuits and Attorneys

| News | Settlements | Investigations | Attorneys | About | START A CLASS ACTION |

# Calif. Factory Outlet Store Fake Sale Class Action Lawsuit Investigation

By Top Class Actions
August 11, 2015

**Add to Favorites**



If you purchased clothing from a discount retailer or factory outlet store in California in the last two years, you may be the victim of a false advertising scheme. Some of the retailers being investigated in the potential false advertising class action lawsuit include:

- Barney's New York Outlet
- Bloomingdales Outlet
- Colombia Outlet
- DSW Designer Shoe Warehouse
- Levi's Outlet

## Join a Free California Factory Outlet Store Class Action Lawsuit Investigation

If you qualify, an attorney will contact you to discuss the details of your potential case at no charge to you.

**First Name** *

**Last Name** *

**Street Address** *

STATHAKOS000164

Theory Outlet
- Other California outlet stores

Advertising that merchandise is on sale using a fictitious "original" or "MSRP" price is against the law. If you purchased clothing at a California outlet store or other type of discount retailer, you may have a legal claim. Fill out the form on this page now for a free review of your case.

## Overview of Fake Sale Lawsuits

A new class action lawsuit investigation has been launched into the pricing practices of factory outlet or "company" stores in California, which may be using deceptive advertising practices to lure customers in with fake markdowns.

At the center of the class action lawsuit investigation is the allegation that some California outlet stores and discount retail stores are misleading consumers into purchasing merchandise based on false representations that the items have been marked down from a fictitious "original," "regular," or "MSRP" price. These so-called "original" prices are often fake prices at which items were never actually offered for sale.

The class action lawsuit investigation has even revealed that some factory outlet stores are selling clothing that's intentionally manufactured as a lower-quality version of the brand-name clothing sold in regular retail stores, further perpetuating the alleged false advertising scheme.

Advertising that merchandise is on sale using a fictitious "original" or "MSRP" price is against the law. The U.S. Court of Appeals for the Ninth Circuit ruled last year that it is illegal in California to falsely advertise that a product is on sale when the alleged "original price" was not the prevailing market price during the three months immediately preceding the publication of the advertisement.

California is already known for its plaintiff-friendly consumer protection laws, but the Ninth Circuit's decision will make it even harder for companies to ditch a "fake price markdown" class action lawsuit.

See if you qualify to join this FREE class action lawsuit investigation by filling out the form on this page now.

---

Apt. #

City *

State *

Alabama

Zip Code *

Phone *

Email *

**Did you purchase a clothing item at a California factory outlet store that was advertised as being reduced from an original, MSRP or other former price? ***

- Yes
- No

**Select the factory outlet store(s) in California where you made a purchase: ***

- Barney's New York Outlet
- Bloomingdales Outlet
- Colombia Outlet
- DSW Designer Shoe Warehouse
- Levi's Outlet

STATHAKOS000165

- Theory Outlet
- Other (list in the Additional Comments section below)

**Do you still have a receipt, price tag, or other proof of purchase?** *

- Yes
- No

**Approximately how long ago did you make the purchase?** *

- Less than 1 year
- 1-2 years
- 2-4 years
- 4+ years

**¿Necesita un orador español?**

- Yes

- No

**Additional comments:**

**I understand and agree that submitting this form does not create an attorney-client relationship and that the information I submit is not confidential or privileged and may be shared.** *

- Yes

STATHAKOS000166



The choice of a lawyer is an important decision and should not be based solely on advertisements.

E-mail any problems with this form to questions@TopClassActions.com

Counsel responsible for this advertisement include Jeffrey Kaliel at:

Tycko & Zavareei LLP

PAID ATTORNEY ADVERTISEMENT: THIS WEB PAGE IS AN ADVERTISEMENT AND THE PARTICIPATING ATTORNEY(S) ARE INCLUDED BECAUSE THEY PAY AN ADVERTISING FEE. It is not a lawyer referral service or prepaid legal services plan. Top Class Actions is not a law firm. Top Class Actions does not endorse or recommend any lawyer or law firm who participates in the network, nor does it analyze a person's legal situation when determining which participating lawyers receive a person's inquiry. It does not make any representation and has not made any judgment as to the qualifications, expertise or credentials of any participating lawyer. No representation is made that the quality of the legal services to be performed is greater than the quality of legal services performed by other lawyers. The information contained herein is not legal advice. Any information you submit to Top Class Actions does not create an attorney-client relationship and may not be protected by attorney-client privilege. Do not use the form to submit confidential, time-sensitive, or privileged information. All photos are of models and do not depict clients. All case evaluations are performed by participating attorneys.

« Previous Post

Next Post »

View all: Class Action Lawsuit and Settlement News, Consumer Products, LAWSUIT INVESTIGATIONS:

STATHAKOS000167

# EXHIBIT 14

*Jeanne and Nicholas Stathakos vs. Columbia Sportswear Company*, Case No. 4:15-cv-04543 (YGR)

**Privilege Log in Response to Defendants' Interrogatory No. 13**

| Date | Medium | From | To | Subject |
|------|--------|------|-----|---------|
| Aug. 18, 2015 | Email | Nicolas Stathakos | Sydney Teng, Jeffrey Kaliel | Intake survey. |
| Sept. 1, 2015 | Telephone | Sydney Teng | Nicolas Stathakos | Investigation contact. |
| Sept. 1, 2015 | Email | Sydney Teng | Nicolas Stathakos | Investigation contact. |
| Sept. 2, 2015 | Email | Nicolas Stathakos | Sydney Teng | Information regarding Columbia purchase history. |
| Sept. 2, 2015 | Email | Nicolas Stathakos | Sydney Teng | Information regarding Columbia purchase history. |
| Sept. 2, 2015 | Email | Sydney Teng | Nicolas Stathakos | Questions regarding Columbia purchase history. |
| Sept. 2, 2015 | Email | Nicolas Stathakos | Sydney Teng | Information regarding Columbia purchase history. |
| Sept. 2, 2015 | Email | Sydney Teng | Nicolas Stathakos | Confirmation of receipt of prior emails. |
| Sept. 2, 2015 | Email | Jeanne Stathakos | Sydney Teng; Nicolas Stathakos | Information regarding Columbia purchase history. |
| Sept. 2, 2015 | Email | Sydney Teng | Jeanne Stathakos; Nicolas Stathakos | Confirmation of receipt of prior emails. |
| Sept. 8, 2015 | Email | Sydney Teng | Jeanne Stathakos; Nicolas Stathakos | Scheduling telephone call. |
| Sept. 9, 2015 | Email | Jeanne Stathakos | Sydney Teng; Nicolas Stathakos | Scheduling telephone call. |
| Sept. 9, 2015 | Telephone | Sydney Teng | Jeanne Stathakos; Nicolas Stathakos | Representation agreement, class representative duties. |
| Sept. 11, 2015 | Email | Sydney Teng | Jeanne Stathakos; Nicolas Stathakos | Representation agreement. |

| Sept. 11, 2015 | Email | Jeanne Stathakos | Sydney Teng; Nicolas Stathakos | Representation agreement. |
|---|---|---|---|---|
| Sept. 11, 2015 | Email | Sydney Teng | Jeanne Stathakos; Nicolas Stathakos | Representation agreement. |
| Sept. 11, 2015 | Email | Jeanne Stathakos | Sydney Teng; Nicolas Stathakos | Representation agreement. |
| Sept. 15, 2015 | Email | Jeanne Stathakos | Sydney Teng; Nicolas Stathakos | Representation agreement. |
| Sept. 15, 2015 | Email | Sydney Teng | Jeanne Stathakos; Nicolas Stathakos | Representation agreement, complaint. |
| Sept. 28, 2015 | Email | Sydney Teng | Jeanne Stathakos; Nicolas Stathakos | Complaint. |
| Sept. 28, 2015 | Email | Jeanne Stathakos | Sydney Teng; Nicolas Stathakos | Complaint. |
| Sept. 28, 2015 | Email | Sydney Teng | Jeanne Stathakos; Nicolas Stathakos | Confirmation of receipt of prior emails. |
| Oct. 1, 2015 | Email | Sydney Teng | Jeanne Stathakos; Nicolas Stathakos | Complaint. |
| Oct. 1, 2015 | Email | Jeanne Stathakos | Sydney Teng; Nicolas Stathakos | Complaint. |

**EXHIBIT 15**

We are not unmindful of the audit procedure required of county superintendents of schools by Education Code section 5010. However, this procedure does not, in our opinion, derogate from the power of county grand juries to investigate the official conduct of all county officers.

We therefore are of the view that a grand jury may examine the records of the county superintendent of schools pertaining to the county school services fund.

------

· Opinion No. 57-126—September 24, 1957

**SUBJECT:** FURNITURE AND BEDDING — Inspection bureau for, may not arbitrarily establish "prevailing market price" for purposes of determining whether advertising is misleading, but may arrive at such figure, which is the predominating price that can be obtained in the same market for comparable merchandise at the time of sale, by investigation of such local market.

**Requested by:** SENATOR, 40th DISTRICT.

**Opinion by:** EDMUND G. BROWN, Attorney General.

Carl W. Wynkoop, Deputy.

Honorable Fred H. Kraft, Senator from San Diego County, has asked this office for an interpretation of the phrase "prevailing market price" as used in section 17501 of the Business and Professions Code, prohibiting the dissemination of untrue or misleading advertising as applied to the sale of furniture and bedding. The inquiry also asks whether the Bureau of Furniture and Bedding Inspection may determine a prevailing market price and enforce it.

· Our conclusions may be summarized as follows:

The phrase "prevailing market price" contained in section 17501 of the Business and Professions Code means the predominating price that may be obtained for merchandise similar to the article in question on the open market and within the community where the article is sold. As such, the prevailing market price is determined *wholly* and *exclusively* by the conditions of the market at the time and place of sale. It therefore follows that the Bureau of Furniture and Bedding Inspection has no authority under section 17501 to fix or determine *ab initio* the "prevailing market price."

Though the Bureau may not arbitrarily *establish* a "prevailing market price" for furniture, they may *arrive* at such a figure based on their investigation of the local furniture market. The Bureau may then utilize this figure to guide merchants in their advertising or to discipline false advertisers.

## ANALYSIS

(All section references are to the Business and Professions Code unless otherwise noted.)

Case 4:15-cv-04543-YGR   Document 75-11   Filed 01/31/17   Page 66 of 67

Section 19210 provides that a violation of sections 17500-17502 of the same code may be a basis for the suspension of a license to engage in the sale of furniture and bedding. Section 17500, as applied to furniture and bedding, prohibits the making of untrue or misleading statements in advertising items of furniture and bedding for sale. With respect to this prohibition, section 17501 provides that "the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published." The purpose of sections 17500 and 17501 is to insure the truth and candor of advertisements which describe or characterize merchandise as possessing a certain worth or value. Its purpose is not to regulate actual sales price. A merchant may advertise or sell his goods, so far as this statute is concerned, for what he will, so long as he makes no untruthful or misleading representations as to value or former price.

The phrase "prevailing market price" in section 17501 has been upheld as not being void for uncertainty by the appellate division in the unreported case of *People* v. *Dorn* (1950, CR-A 2642 (L.A. Sup. Ct. App. Div.). The court saw no more uncertainty in this phrase than in the phrase "market price" as used as a measure of damages in civil suits under sections 1784 and 1787 of the Civil Code and sections 3317, 3353 and 3354 of the Civil Code. We therefore turn to the legion of civil cases which have defined such terms as "market price," "market value" and "market worth" for the definition of the phrase.

The case of *Continental Rubber Works* v. *Bernson,* 91 Cal. App. 636, 638, in considering a suit for the value of goods sold, accepted the following definition: "Bouvier in his Law Dictionary defines the term 'value' when referring to property as 'the price which it will command in the market' and 'market value' as 'a price established by public sales, or sales in the way of ordinary business, as merchandise,' and the 'price at which such articles are sold and purchased.'" This case has been approved by *Wade* v. *Rathbun,* 23 Cal. App. 2d 758, 760, and *Valentin* v. *Valentin,* 93 Cal. App. 2d 588, 592. This office in considering this question of the meaning of "market value" and "market price" has reached substantially the same definition (Cal. Ops. Atty. Gen. No. 5674).

Again, in *Lund* v. *Lachman,* 29 Cal. App. 31, 34, the court was presented with this phrase and defined it as follows: "Obviously, the market value of a commodity is the highest price in the market where it is offered for sale which those having means and inclination to buy are willing to pay for it; and it is equally obvious, we think, that market values are created and controlled by the condition of the market with reference to supply and demand rather than by the particular or peculiar selling ability of the seller." The same thought was expressed, though in different terms, by the court in *Conlin* v. *Southern Pacific R.R. Co.,* 40 Cal. App. 743, 745.

From these cases we can logically reason to the conclusion that the Bureau of Furniture and Bedding Inspection cannot set the market price. By definition, the market price must evolve of itself from market conditions of supply and

Case 4:15-cv-04543-YGR   Document 75-11   Filed 01/31/17   Page 67 of 67

02 of the same
e sale of furni-
lding, prohibits
ns of furniture
17501 provides
; market price,
at the time of
lvertisement is
the truth and
e as possessing
price. A mer-
:rned, for what
ons as to value

>een upheld as
:ported case of
: court saw no
" as used as a
the Civil Code
re turn to the
>rice," "market

\pp. 636, 638,
ing definition:
ng to property
ue' as 'a price
; merchandise,'
case has been
*in* v. *Valentin,*
f the meaning
ame definition

was presented
llue of a com-
e which those
l it is equally
by the condi-
n by the par-
vas expressed,
*R. R. Co.,* 40

it the Bureau
By definition,
f supply and

demand unaffected by any extrinsic influence. Therefore, the Bureau cannot set
the market price or it ceases to be the market price and becomes the Bureau price.
For sake of completeness the term "prevailing" in the phrase does not alter the
concept essentially. "Prevailing" is defined by Webster's New International Dic-
tionary Unabridged, 2d Ed. as "most frequent" or "predominant." Thus, it is not
any price on the market that the statute refers to, for, of course, there is often
more than one price for the same goods appearing simultaneously on the market,
but the most common one. The statute applies to both the wholesale and retail
market in the same way.

The application of these two statutes, section 17501 and section 17500,
occurs in the so-called "comparative advertising" field, of which there are two basic
variations. To better explain these, two types of hypothetical situations will be
assumed. A furniture dealer advertises a mattress as "worth $100" but that he will
sell it for $50. Hence, the adjective "comparative", for the dealer is comparing
worth with selling price as an inducement to the purchaser. Unless the mattress
is actually worth $100, which under section 17501 means that similar mattresses
are selling for $100 in the open local market, the advertisement is false and
deceptive and the dealer is guilty of a violation. The same furniture dealer runs
another advertisement which offers a couch which he claims was formerly selling
for $100 but is now selling for $50. Unless the price which he advertises as the
former price actually coincides with the "prevailing market price" of the couch
within the next preceding three months, or if before that, unless the dealer states
the time that such former price actually did prevail, the advertisement is again
false and deceptive, and the vendor is within the prohibitions of section 17500.

Contrasting the first type of advertisement with the second type, we see that
though the first type makes a representation as to value or worth and the second
type makes a representation as to former price, they both must coincide with the
same standard, the "prevailing market price," which means the actual selling price
of the article on the open market.

The position and duties of the Bureau of Furniture and Bedding Inspection
in relation to these false advertising statutes which are incorporated into the Furni-
ture and Bedding Act by section 19210, require a brief discussion. The Bureau,
of course, is charged with the duty of enforcing the laws applicable to their
licensees. As to these particular statutes the Bureau may ascertain the "prevailing
market price" either from investigation of the market or consultation with experts
in the field. This information can be used either as a guide to merchants who seek
to advertise fairly or as evidence in a disciplinary action against an accused
licensee. In the same manner, the Bureau can determine former selling price of
merchandise by investigation of past markets with the same ends in view. The key
fact which must be remembered is that the Bureau is not *fixing* or *establishing*
the "prevailing market price" *ab initio* by these proceedings. They are merely
examining the market as it exists by itself and making observations. They are not
doing anything creative in the field of pricing by setting their own prices out.
Therefore, the above mentioned practices are wholly within the powers and rights,
indeed the duties, of the Bureau of Furniture and Bedding Inspection.