# EXHIBIT 16

## Colorado versus May Department Stores

The State of Colorado's litigation against May's pricing policies has progressed to the Colorado Supreme Court. The next section provides a brief overview of the case and the associated legal actions.

In October 1982, the May Department Stores signed an Assurance of Discontinuance to satisfy a complaint filed by the State of Colorado alleging certain deceptive advertising and selling practices. A similar complaint was again filed by the Colorado Attorney General in June 1989 indicating that the May Department Stores, through its comparison price advertising practices, violated the Colorado Consumer Protection Act (especially Sections 6-1-105(1) (i), (1), and (u)). The Colorado Consumer Protection Act (CCPA) includes the following section on deceptive trade practices:

> 6-1-105. Deceptive Trade Practices. (1) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation he:
>
> (i) Advertises goods, services, or property with intent not to sell them as advertised;
>
> (ii) Makes false and misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reduction; and
>
> (iii) Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale of such failure to disclose such information was intended to induce the consumer to enter into a transaction.

Allegedly, the advertisements stated that their merchandise was being offered "on sale" (i.e., at a reduced or discounted sale price) for a limited duration only. In fact, the state alleges that "selling or sale" prices were the prices at which most of the merchandise was regularly sold. Thus, these reference prices were simply inflated to provide the illusion of a deal, and few transactions were ever made at these advertised "regular" prices. Furthermore, the limited nature of the sale implied by the advertisements was promoted to create a false sense of urgency. In reality, according to the state, the merchandise was offered more often at the "sale" price than at the "regular" price.

To understand whether consumers in general were being deceived or misled by May's advertised deals, the State of Colorado hired a marketing expert to conduct a study examining whether such comparative price advertisements affected consumer perceptions and behavioral intentions (Urbany 1990). The study was conducted in Denver and involved mall intercept interviews of 400 consumers. These consumers were given a May Department Store ad (name removed) and asked questions pertaining to perceptions of value and purchase intentions. Four advertisements were used—two for a vacuum cleaner and two for a frying pan. For each product, one ad contained both the reference price and the sale price and the other contained only the sale price (e.g., the vacuum cleaner was either advertised at "Reg. $269.99, Sale $189.99" or advertised at "Sale $189.99").

The results of the study suggested that the presence of an advertised reference price increased respondents' perceptions of value and their purchase intentions, consistent with past research (e.g., Della Bitta, Monroe, and McGinnis

1981; Urbany, Bearden, and Weilbaker 1988; see review by Compeau and Grewal 1990). Respondents inferred that the regular price in the advertisement was the price at which the product was offered when the product was not on sale. Finally, they believed that at least 25% of products sold (in the last 90 days) were at the regular price.

These results provide evidence that consumers in general believe that the regular price is a bona fide price at which the advertised item is sold for the majority of the time and that a substantial number of sales are made at this regular price. On the basis of these beliefs, consumers use these advertised reference prices to form their perceptions of savings (or the value of the deal), consistent with the conceptualizations of Thaler (1985), Monroe and Chapman (1987), and Urbany, Bearden, and Wielbaker (1988).

May also presented evidence in the form of the results of two surveys conducted for them by a market research firm, Leo Shapiro and Associates, Inc. The results of a random sample of 500 Denver households surveyed by telephone were interpreted by the researchers to suggest that items on sale and drastically reduced at May are still believed to be priced higher than other area retailers and that the advertising is not misleading or deceptive (e.g., 70% of the respondents indicated that they did not believe that an item on sale at May would be priced lower than at any of the other stores in his or her area that sell the same things). The results of a second survey were interpreted to indicate that consumers' understanding of the label "Original" and May's use of "Original" were consistent.

In considering the case, the District Court determined that the FTC Guides should apply because the CCPA (C.R.S. p.6-1-101 et seq.) specifically excludes from its provisions conduct in compliance with the rules, orders, or statutes administered by a federal agency. Moreover, the Colorado Attorney General had previously advised May to follow the FTC Guides.

In June 1990, the district judge concluded that May's comparative price advertising policies and practices did not comply with the FTC Guides (16 CFR p. 233.1, et seq. 1989) and enjoined the May Department Stores from marking up merchandise for the purpose of establishing a comparison price in its advertisements and promotions (unless it provided consumers with a full disclosure of its method of promotional markup) and from using the words *regular price* unless it disclosed its definition to the consuming public. The definition used by May was (*Colorado v. May Department Stores Co.* 1990, p. 64,381):

> A regular price is established by offering the merchandise at that price initially for ten consecutive days and, after the initial ten-day offering period, the merchandise will be at the regular price for at least twenty-eight out of every ninety days. The ten-day offering period is included in the twenty-eight days.

Furthermore, May was required to stop falsely advertising sales of limited duration to create a sense of urgency. Consumers had to be informed that a given sale was to be one of several such sales that were planned. Finally, the Court levied an $8000 fine against May, based on a $2000 fine for each of the consumer "victims" who testified in the trial.

The FTC Guides stipulate that a former price must be bona fide, which means that the article must have been pre-

COMPEAU000008

viously offered to the public on a regular basis for a reasonably substantial period of time at that former price. It is further stipulated that a former price is not necessarily fictitious merely because no sales are made at the former price, but advertisers are warned that this would be an unlikely situation and that they should take great care to ensure that the article was openly and actively offered for sale at the former price for a reasonably substantial period of time, during the recent, regular course of business, honestly and in good faith.

In July 1990, the State of Colorado filed an appeal (*Colorado v. May Department Stores Co.* 1990). A large part of the appeal pertained to the fact that, even though the District Court had found that the price-comparison advertising was deceptive, it had allowed the practice to continue if a disclaimer was provided; moreover, the state sought a more substantial fine to reflect potential harm from the practice and to deter future occurrences.

The Court of Appeals found that the injunctive relief ordered by the District Court was not adequate to protect consumers from such misleading comparison price advertising practices. The Court of Appeals found that the disclaimer remedy was inadequate and May was enjoined from using such deceptive practices (i.e., creating fictitious reference prices). The Court of Appeals also indicated that if disclaimers are used, they must be prominent, understandable, and reviewed by the courts. Finally, the Court of Appeals ruled that Section 6-1-112(1) required a civil penalty for every transaction (e.g., the number of days a misleading advertisement was run times the number of different media in which the advertisement appeared) as well as a penalty for every consumer affected by the misleading advertisement. Thus, the case was remanded to the trial court to reexamine the penalty imposed on the basis of the following guides (p. 810):

1. The good or bad faith of the defendant,
2. The injury to the public,
3. The defendant's ability to pay, and
4. the desire to eliminate the benefits derived by violations of the CCPA.

May appealed the Court of Appeals decision to the Colorado Supreme Court. In November 1993, the Colorado Supreme Court affirmed the Appeals court decision and rejected the trial court's decision to require May to use only a small-print disclaimer defining *regular price* in conjunction with such price advertising and ruled that May D&F's (now Foley's) false price advertising must cease (*May Department Stores Co. v. Colorado* 1993). However, the Court decided that the Court of Appeals should not have ordered an injunctive remedy and that the Court of Appeals should have remanded the matter to the trial court. The Colorado Supreme Court ruled that the penalties needed to be recalculated on the basis of the Consumer Protection Act and thus returned "this case to the court of appeals with directions to remand to the trial court for further review of the civil penalty award consistent with this opinion" (p. 977).

This Supreme Court-level decision indicates that a hard stance is being taken against deceptive price advertising and should serve as a wake-up call for major retailers to take careful examination of their pricing practices. The courts ap-

pear to have "turned the corner" and will no longer dispense simple warnings as remedies. Full cessation of any deceptive practices combined with stiff penalties are viewed as better deterrents against future violations. This case also illustrates the complexity retailers face in attempting to comply with statutes, guides, rules, or orders of different levels of government. Notwithstanding, it is the advertiser's responsibility to know and understand all applicable guides.

### North Carolina versus The J.C. Penney Company

In December 1989, the State of North Carolina filed a law suit against the J.C. Penney Co. for violations of Chapters 66 and 75 of the North Carolina Statutes stemming from certain alleged deceptive price advertising (*North Carolina v. J.C. Penney* 1992). The State objected to five different business practices that it judged as not meeting these statutes.

1. The State alleged that Penney systematically inflated its prices of gold and diamond jewelry. Furthermore, these prices were alleged to be inflated, on average, every two weeks so that they could then advertise reduced from price inflated figures (i.e., setting an inflated reference price to compare the reduced sale price).

2. The State alleged that Penney advertised large discounts on its jewelry without having first substantiated that these claims were not deceptive.

3. The State alleged that Penney advertised "sale" prices with claims such as "50% off," although the sale prices were the same prices that they charged before the "sale."

4. The State alleged that these special prices were in effect and planned to be in effect well beyond that limited time period. Thus, these bargains were not for the limited time period as advertised.

5. The State indicated that even after Penney was notified that these practices were deceptive, this form of advertising was continued.

The state requested Penney to provide sales data pertaining to the jewelry items in these various promotions for the six months preceding each ad for all their North Carolina stores (approximately 40–50 stores). Penney indicated that providing such a vast magnitude of data would be very difficult; thus, both sides agreed to view data from one Penney store and only for the items depicted in the advertisements. The 1988 pricing schedules used by Penney for gold and diamond jewelry are provided in Tables 1 and 2 respectively. Certain summary data pertaining to the sales of these jewelry items for the one store follow:

- 192 total sales, 11.46% at regular price and 88.54% at sale price (in terms of the number of transactions);
- 95.39% of the sales dollars were for items purchased at the sale price;
- No sales for diamond jewelry were made at the regular price, and 16 sales for diamond jewelry were made at the sale price (the total dollar sales were $7249);
- No sales for 14-karat gold chains were made at the regular price, and 67 sales for 14-karat gold chains were made at the sale price (total dollar sales were $7333);
- 15 sales for 14-karat gold earring were made at the regular price (dollar volume of $538), and 61 sales for 14-karat gold earrings were made at the sale price (the total dollar sales were $1152); and

COMPEAU000009

**Table 1.      J.C. Penney 1988 Price Schedule for Gold Jewelry**

|  | No. of Days | Holiday "Sale" Periods |
|---|---|---|
| "Regular" Price: Jan 1–Jan 30 | 30 | Valentine's Day 2/11 |
| "Sale" Price: Jan 31–Feb 20 | 21 | Washington's B' Day 2/15 |
| "Regular" Price: Feb 21–Feb 27 | 7 | |
| "Sale" Price: Feb 28–Mar 5 | 7 | |
| "Regular" Price: Mar 6–Apr 8 | 34 | |
| "Sale" Price: Apr 9 | 1 | |
| "Regular" Price: Apr 10–Apr 16 | 7 | Mother's Day 5/8 |
| "Sale" Price: Apr 17–May 14 | 28 | |
| "Regular" Price: May 15–May 28 | 14 | Memorial 5/30 |
| "Sale" Price: May 29–Jun 4 | 7 | |
| "Regular" Price: Jun 5–Jun 11 | 7 | Father's Day 6/19 |
| "Sale" Price: Jun 12–Jul 4 | 23 | Independence Day 7/4 |
| "Regular" Price: Jul 5–Jul 16 | 12 | |
| "Sale" Price: Jul 17–Jul 22 | 7 | |
| "Regular" Price: Jul 24–Aug 20 | 28 | |
| "Sale" Price: Aug 21–Sept 5 | 16 | Labor Day 8/5 |
| "Regular" Price: Sept 6–Sept 17 | 12 | |
| "Sale" Price: Sept 18–Oct 1 | 14 | |
| "Regular" Price: Oct 2–Oct 15 | 14 | |
| "Sale" Price: Oct 16–Oct 22 | 7 | |
| "Regular" Price: Oct 23–Oct 29 | 7 | Halloween 10/31 |
| "Sale" Price: Oct 30–Nov 5 | 7 | |
| "Regular" Price: Nov 6–Nov 12 | 7 | Thanksgiving, Christmas |
| "Sale" Price: Nov 13–Dec 31 | 49 | After-Christmas |

Note: The regular price was offered for a total of 179 days with an average duration of 14.92 days and the longest duration being 34 days. The sale price was offered for a total of 187 days with an average duration of 15.59 days and the longest duration being 49 days.

**Table 2.      J.C. Penney 1988 Price Schedule for Diamond Jewelry**

|  | No. of Days | Holiday "Sale" Periods |
|---|---|---|
| "Regular" Price: Jan 1–Feb 6 | 37 | Valentine's Day 2/11 |
| "Sale" Price: Feb 7–Feb 20 | 14 | Washington's B' Day 2/15 |
| "Regular" Price: Feb 21–Feb 27 | 7 | |
| "Sale" Price: Feb 28–Mar 5 | 7 | |
| "Regular" Price: Mar 6–Apr 2 | 28 | |
| "Sale" Price: Apr 3–Apr 9 | 7 | |
| "Regular" Price: Apr 10–Apr 16 | 7 | Mother's Day 5/8 |
| "Sale" Price: Apr 17–May 14 | 28 | |
| "Regular" Price: May 15–May 21 | 7 | |
| "Sale" Price: May 22–Jun 4 | 14 | Memorial 5/30 |
| "Regular" Price: Jun 5–Jun 18 | 14 | Father's Day 6/19 |
| "Sale" Price: Jun 19–Jul 2 | 14 | |
| "Regular" Price: Jul 3–Jul 16 | 14 | |
| "Sale" Price: Jul 17–Aug 6 | 21 | |
| "Regular" Price: Aug 7–Aug 20 | 14 | Labor Day 8/5 |
| "Sale" Price: Aug 21–Sept 3 | 14 | |
| "Regular" Price: Sept 7–Sept 10 | 7 | |
| "Sale" Price: Sept 11–Sept 24 | 14 | |
| "Regular" Price: Sept 25–Oct 1 | 7 | |
| "Sale" Price: Oct 2–Oct 8 | 7 | |
| "Regular" Price: Oct 9–Oct 29 | 21 | Halloween 10/30 |
| "Sale" Price: Oct 30–Nov 5 | 7 | |
| "Regular" Price: Nov 6–Nov 19 | 14 | Thanksgiving, Christmas |
| "Sale" Price: Nov 20–Dec 31 | 42 | After-Christmas |

Note: The regular price was offered for a total of 117 days with an average duration of 14.75 days and the longest duration being 37 days. The sale price was offered for a total of 189 days with an average duration of 15.75 days and the longest duration being 42 days.

COMPEAU000010

**Legal Developments**

•7 sales for 14-karat gold charms were made at the regular price (dollar volume of $249), and 26 sales for 14-karat gold charms were made at the sale price (the total dollar sales were $563).

The State believed that Penney had a preplanned pricing schedule to inflate the jewelry prices so that it could offer discounted sale prices. Furthermore, the State believed that Penney did not substantiate these discount claims as being truthful and not deceptive because it had not made substantial sales at the higher regular price and did not expect to make sales at these higher regular prices. Furthermore, in certain cases the sale prices depicted in advertisements for Penney's "50% Off Month's End Clearance Sale" were not reduced from prices preceding the sale. Penney also explicitly or implicitly advertised that these sale prices were available for a limited time period, thereby conveying a sense of urgency for consumers to avail themselves of these sales. However, as evidenced by the pricing schedule, these sale prices were planned and available in most instances well beyond the specified time. Finally, Penney continued with their pricing practices.

Penney denied that it had violated any laws and indicated that it offered highly competitive prices. It must be noted that N.C.G.S. 75-1-1 (a) simply states that "unfair methods of competition in or affecting commerce, and unfair or deceptive acts of practice in or affecting commerce, are declared unlawful" (Chapter 75, p. 5). Because these laws were deemed vague, Judge Stephens, in making his decision, relied heavily on the FTC's "Guides Against Deceptive Pricing." Specifically, much of the decision was based on Section 233.1 (a), pertaining to "Former Price Comparisons" which states:

> One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

The key questions that the court attempted to address were, "When is a regular price inflated and when is it bona fide?" and "What is a reasonably substantial period of time to offer an item at a regular price in order to legitimately advertise a discount?" (p. 5).

Penney presented evidence of a statistical sampling analysis performed by Ernst & Young on Penney's national sales revenue receipts. A random sample of cash register tapes for 800 national store days (approximately) between the year January 29, 1989 to January 27, 1990 was used to document two indicators of bona fide "regular prices." First, the results indicated that 25% or more of national fine jewelry sales were made at regular prices. Second, the pricing schedule provided support that the period that Penney offered merchandise at the regular price was over 50% of the year. The court used these two indicators to conclude that (1) substan-

tial sales had been made at the regular price and (2) the regular price was offered for a reasonable period of time. Thus, the court applied two tests to determine the validity of former (regular) prices. Not only must the former price be in effect for a reasonable period of time, but substantial sales must also be made at this former price. What is a "reasonable" period of time and how much is "substantial"? In this instance, the court decided that 50% of the time at the former price is reasonable, and 25% of total sales at the former price is substantial. However, these interpretations of "reasonable time period" and "substantial sales" do vary across states. For example, in Massachusetts, the regulations establish a minimum of 55% of the time as reasonable and 30% of the sales as substantial (see Code of Massachusetts Regulations, 940 CMR 6.00 Retail Advertising Regulations, effective May 1, 1990).

In this case, the court also deemed that the analysis presented using the national basis was likely to be more reliable than that presented by the State, which was based on data from only one store of the 40–50 North Carolina stores and for only a fraction of the 9000 fine jewelry items offered on sale. For this reason, the judge dismissed the action against Penney.

## Implications and Further Research Avenues

Examining the various recent legal actions pertaining to deceptive pricing suggests that states are taking a firm stance against perceived deceptive pricing practices. On the basis of these cases, the following suggestions could be made to the retailer:

- Offer the regular price for at least 50% of the time;
- Make a minimum of 25% of all sales at the regular price;
- Adopt the Better Business Bureau's Code as a minimum compliance standard (see Table 3 for a summary); and
- Follow specific state statutes and regulations where they exist.

The FTC guides do not explicitly specify what constitutes a "substantial period of time" in evidence of a bona fide price. To address this issue, individual states have been specifying what constitutes a "substantial period of time." For example, Connecticut and Wisconsin specify at least 28 days over the last 90 days, whereas Minnesota specifies 30 days preceding the comparison (see Grewal, Grewal, and Compeau 1993; Ortmeyer 1991). In addition, certain states have also started to specify the percentage of total sales that must be made at the reference price to establish it as a bona fide one (e.g., Massachusetts: 30%, Missouri: 10%; see Ortmeyer 1991). Therefore, retailers must be aware of such standards for the states in which they conduct business before they advertise comparative price offers.

As is evident from the May case, following these guidelines may not be sufficient. There seems to be a simple test, though, that appears to reduce the potential for deception in price advertising. Namely, retailers should ask themselves whether customers might become agitated if full disclosure was made regarding their price advertising tactics. Would customers feel deceived? Better yet, ask the customers. As retailers strive for customer loyalty, it seems prudent to test certain pricing strategies through consumer research to avoid potential deception and alienation.

COMPEAU000011

**Table 3.** **The Better Business Bureau's Code of Advertising for Comparative Price Advertisements Using Former Price Comparisons[a]**

•The advertiser must demonstrate that the former price is a bona fide or genuine price, that is, a price from which a reduction represents a genuine savings for the customer.

•A former price is bona fide when "reasonably substantial sales" are made at or above that price in the recent regular course of business. Alternatively, if few or no sales were made at that former price, the bona fides of a former price may be established only if the advertiser openly and actively offered the merchandise honestly and in "good faith" for a "reasonably substantial period of time" in the recent regular course of business.

•If the former price was the price in effect immediately prior to the savings claim, the use of labels such as "Regularly," "Usually," "Formerly," "Was," and "Originally" is appropriate. If the former price was not in effect immediately prior to the reduction, the advertiser must disclose this fact and the time during which the former price was last applicable, clearly and conspicuously by indicating intermediate markdowns were taken.

•Reasonably substantial sales can be substantiated by selecting the appropriate time period (e.g., season, year) and geographical trade area (e.g., national, regional).

•The offers of products at the former price for at least a majority of time during the relevant selling period presumptively meets the "substantial period of time" criterion.

•To establish that a former price is not fictitious merely because substantial sales were not made at that price, advertisers may rely on several factors:

—Whether the advertiser had a reasonable expectation of selling the product at the former price, based on demonstrated facts such as prior experience and the proportion of time at or above the former price;

—Whether the former price was realistic, that is, whether it fell within the range of bona fide selling prices for similar products in the market area;

—The extent to which sales of the product were made at the former price, even if not substantial, taking into account the nature of the merchandise;

—Whether the former price is based on a markup that does not significantly exceed the advertiser's usual and customary retail markup for similar merchandise;

—Whether the product was openly and actively offered in the recent regular course of business, such as devoting reasonable display space, maintaining reasonable inventory, or advertising the product at the former price.

[a]Adapted from "Code of Advertising: Comparative Price Advertising." Arlington, VA: Council of Better Business Bureaus, Inc. 1989.

Certain implications can be drawn from these court cases for the state Attorneys General. States must conduct customer surveys to establish that consumers are indeed making purchases due to falsely represented information. One key aspect emerging from these recently litigated cases is the growing use of empirical evidence for adjudication. In the case of the *State of Maryland v. The Hecht Co.* (1985), the State used expert witness Professor Kent B. Monroe, who introduced findings from past consumer research as evidence. As mentioned previously, The Hecht Co. decided to settle the case and sign an assurance of discontinuance. Similarly, in the May case, the State of Colorado relied on experimentally based empirical evidence as evidence of deception (see Urbany 1990). In the Penney case, however, one of the stipulated facts was, "The plaintiff presented no consumer survey or study showing that consumers in general are deceived or misled by Penney's discount advertisements" (p. 15). Thus, these three cases highlight the increasing need for empirical evidence to demonstrate deception or the lack thereof, consistent with the FTC's increased reliance on survey evidence (Brandt and Preston 1977; Richards 1990).

Given the growing court activity regarding deceptive pricing practices, several avenues for further research seem to be imperative. These cases stress that at the core of understanding deception is understanding how consumers interpret these comparative price advertisements. Do they believe these advertised reference prices? If they do not, deception may be difficult to demonstrate. Furthermore, research by Urbany (1990) and Grewal and Compeau (1992b) illustrate that understanding consumer interpretations of these price deals is critical; there is a need for clearer consumer-based definitions of commonly used price claims (Compeau and Grewal 1994). Such research would help the FTC, the state legislatures, and the Better Business Bureau develop and disseminate clearer definitions for these price terms to both retailers and the consuming public. For example, what do the labels "Regular Price," "Original Price," and "Former Price" mean to consumers? If advertisers and consumers share meanings for these price labels, then the opportunity for deception is reduced. The point is, there may be general agreement across consumers as to the definitions for these labels, and it would seem prudent to know these definitions before great effort is expended on developing legal definitions and educating consumers about them.

Further research should identify factors that may interact with these advertised reference prices and as a consequence increase the potential for deception. For example, the context of where the consumer is when he or she views the ad may be critical (Marmorstein, Sharma, and Grewal 1994). A consumer who is viewing an ad in a store may react very differently than a consumer who views the ad at home. The consumer who is in the store may purchase the product due to a false sense of saving and inability to verify the reference price claim, whereas a consumer at home may be able to examine other price advertisements and call other stores. Other factors, such as the way the message is framed in an ad (positively framed versus negatively framed) and the spokesperson credibility, can also affect the effectiveness of a comparative price claim (Grewal, Gotlieb, and Marmorstein 1994). Researchers also should examine the effects of these contextual factors (both situational and ad related) and other individual-specific factors, such as involvement and knowledge (Lichtenstein, Bloch, and Black 1988; Rao and Monroe 1989).

But for now, the conclusion that marketers, retailers, and their advisors should draw from the *May* and *Penney* cases is that deceptive price advertising is coming under increasing scrutiny as the proliferation of comparative price advertisements continues. It appears that the courts acknowledge considerable harm to consumers when comparative prices are

COMPEAU000012

deemed deceptive. Although the test(s) for deception used by the courts appears to vary, retailers should acknowledge that from a consumer researcher's perspective, the ultimate test is whether the customer finds the practice deceptive.

# References

Blair, Edward A. and E. Laird Landon, Jr. (1981), "The Effects of Reference Prices in Retail Advertisements," *Journal of Marketing,* 45 (Spring), 61–6 9.

Brandt, Michael T. and Ivan L. Preston (1977), "The Federal Trade Commission's Use of Evidence to Determine Deception," *Journal of Marketing,* 41 (January), 54–62.

Della Bitta, Albert J., Kent B. Monroe, and John M. McGinnis (1981), "Consumer Perceptions of Comparative Price Advertisements," *Journal of Marketing Research,* 18 (November), 416–27.

*Colorado v. May Department Stores Co.* (1990), 1990-2 Trade Cas. (CCH) Par. 69,163 (Colo. Dist. Ct.).

———— (1992), 849 P.2d 802 (Colo. App. Ct.).

Compeau, Larry D. and Dhruv Grewal (1990), "Comparative Price Advertising: A Methodological Review and Critique," in *AMA Educators' Proceedings,* Chicago: American Marketing Association, 56.

———— and ———— (1994), "Adding Value by Effectively Communicating Price Deals: Does It Matter How You Phrase It?" *Pricing Strategy and Practice: An International Journal,* 2 (Summer), forthcoming.

Grewal, Dhruv and Larry D. Compeau (1992a), "Comparative Price Advertising: Informative or Deceptive," *Journal of Public Policy and Marketing,* 11 (Spring), 52–62.

———— and ———— (1992b), "Interpretations of Semantic Phrases in Comparative Price Advertisements: Some Preliminary Evidence on a Public Policy Issue," in *Advances in Consumer Research,* L. McAlister and M.L. Rothschild, eds. Provo, UT: Association for Consumer Research, 479–80.

————, Jerry Gotlieb, and Howard Marmorstein (1994), "The Moderating Effects of Message Framing and Source Credibility on the Price-Perceived Risk Relationship," *Journal of Consumer Research,* June, 145–53.

———— and Diana S. Grewal (1991), "Pricing Responsibility: The Retailer or the State?," *Journal of the Academy of Marketing Science,* 19 (Summer), 276–77.

————, ————, and Larry D. Compeau (1993), "States' Crackdown on Deceptive Price Advertising: Retail and Public Policy Implications," *Pricing Strategy and Practice: An International Journal,* 1 (2), 33–40.

Komensky, Alan M. and Mark D. Wegener (1991), "When Is a Sale Not a Sale: State Regulation of Price Comparison Advertising," *Antitrust,* 5 (Summer), 28–33.

Lichtenstein, Donald R., Peter H. Bloch, and William C. Black (1988), "Correlates of Price Acceptability," *Journal of Consumer Research,* 15 (September), 243–52.

Liefeld, John and Louise A. Heslop (1985), "Reference Prices and Deception in Newspaper Advertising," *Journal of Consumer Research,* 11 (March), 868–76.

Marmorstein, Howard, Arun Sharma, and Dhruv Grewal (1994), "Communicating Price Information to Consumers through Semantic Cues: The Effects of Situation and Discount Size," working paper, University of Miami.

*Maryland v. The Hecht Co.* (1985), No. 11256, (Maryland Circuit Court, Montgomery County, filed December 4, 1985).

*May Department Stores Co. v. Colorado* (1993), 863 P.2d 967 (Colo. S. Ct.).

Monroe, Kent B. and Joseph D. Chapman (1987), "Framing Effects on Buyers Subjective Product Evaluations," in *Advances in Consumer Research,* Vol. 14, Melanie Wallendorf and Paul Anderson, eds. Provo, UT: Association for Consumer Research, 193–97.

*New York v. Sears, Roebuck & Co.* (1989), No. 13709, (New York State Supreme Court, Erie County, filed Dec. 20, 1989).

*North Carolina v. J.C. Penny Co., Inc.* (1992), No. 89 CVS 11819 (Sup. Ct. Division, N.C., July 20, 1992).

Ortmeyer, Gwen (1991), "Retail Promotional Pricing: When is a Sale Really a Sale? (A)," Case #9-591-111. Cambridge, MA: Harvard Business School.

Rao, Akshay R. and Kent B. Monroe (1988), "The Moderating Effect of Prior Knowledge on Cue Utilization in Product Evaluation," *Journal of Consumer Research,* 15 (September), 253–64.

Richards, Jef I. (1990), *Deceptive Advertising: Behavioral Study of a Legal Concept.* Hillsdale, NJ: Lawrence Erlbaum Associates.

Sewall, Murphy A. and Michael H. Goldstein (1979), "The Comparative Price Advertising Controversy: Consumer Perceptions of Catalog Showroom Reference Prices," *Journal of Marketing,* 43 (Summer), 85–92.

Thaler, Richard (1985), "Mental Accounting and Consumer Choice," *Marketing Science,* 4 (Summer), 199–214.

Urbany, Joel E. (1990), "Comparative Price Advertising Effects in the Denver Market," unpublished report, University of South Carolina.

————, William O. Bearden, and Dan C. Weilbaker (1988), "The Effect of Plausible and Exaggerated Reference Prices on Consumer Perceptions and Price Search," *Journal of Consumer Research,* 15 (June), 95–110.

COMPEAU000013

AN INTERNATIONAL JOURNAL

# Adding Value by Communicating Price Deals Effectively

## Does It Matter How You Phrase It?

### Larry D. Compeau and Dhruv Grewal

How many times do consumers encounter prices advertised as "regular price", "sale price", "original price", "manufacturer's suggested list price", "special", and "compare at"? Moreover, does it matter whether the final sale price includes a rebate or consists solely of a discount? Consumers are blitzed with price promotions which claim to offer them a deal, to save them money. Given this widespread use of price advertising, one would think that consumers must be somewhat inoculated against any significant effects from such ads. However, continued widespread use of price advertisements and 20 years of research suggest consumers' strong desire to get a "deal" is a prerequisite to being a good shopper and is fuel for the price promotion fire (Barnes, 1975; Berkowitz and Walton, 1980; Blair and Landon, 1981; Compeau and Grewal, 1994; Della Bitta et al., 1981; Grewal and Compeau, 1992; Urbany et al., 1988). Thus, a great deal of research has examined variations in different aspects of these comparative price advertisements in an effort to understand consumers' responses (see Compeau and Grewal, 1994 for a review).

Nonetheless, this myriad of prices must seem at least a little confusing to the average consumer. What does the advertiser mean by a "regular price" and how does it differ from an "original price", if it differs at all? Do these different labels tell consumers something different about these prices? Do consumers respond differently to these labels? These issues are important to the manager who must decide how best to communicate a particular price offer to consumers. The manager wants to communicate effectively to the consumer the value of the deal; that is, the added value due to the lower selling price. If phrased incorrectly, the consumer may undervalue the price reduction and not respond to the offer, or the consumer may overvalue the price reduction and feel deceived, resulting in negative attitudes toward the advertiser. Either way, the manager stands to lose.

In this article, we examine the phrasing of price offers. First we focus on the use of semantic phrases (e.g. regular price, sale price, manufacturers' list price, special), then turn our attention to other forms of phrasing such as the use of coupons, rebates and price bundling. Throughout the discussions, managerial prescriptions are proffered.

Pricing Strategy & Practice, Vol. 2 No. 2, 1994, pp. 28-36
© MCB University Press, 0968-4905

COMPEAU000015

VOLUME 2 NUMBER 2
1994

## Semantic Phrases

A semantic phrase, or cue, is the verbal label used to attach meaning to the prices presented in the advertisement. For example, an advertiser can simply label a price as a "sale price", suggesting the product would normally sell at a higher price. Some semantic phrases are used primarily to explain the reference price (e.g. regular price, manufacturer's suggested list price, compare at, valued at); other semantic phrases are used primarily to label the offering price (e.g. sale price, special). Thus, the research on semantic phrases (or semantic cues) is reviewed with the goal of extracting managerially relevant implications to act as a guide in price promotion. We begin by examining the conceptual foundation of semantic phrases followed by a detailed review of the substantive results of the literature. Managerial implications which emerge from this review are also presented.

## A Conceptualization of the Semantic Phrase

The semantic phrase has been conceptualized as the "promotional phrase" (Barnes, 1975) or more specifically as specific words or phrases which provide additional meaning to actual and comparison price stimuli (Berkowitz and Walton, 1980). Generally, such phrases as regular price, sale price, compare at, MSLP are considered examples of semantic phrases (see Table I for a more complete list). While it is known that consumers respond differently to different semantic phrases (Della Bitta *et al.*, 1981), why these variations occur has had little attention.

Typically, the objective of an advertiser using a semantic phrase in a comparative price advertisement is to provide additional information about the prices for consumers to use in making judgments about the value of the deal. From the advertiser's perspective, this additional information should enhance consumers' perceptions of value associated with the offer. For example, an advertiser

| Reference price semantic phrases | Combined forms | Selling price semantic phrases |
|---|---|---|
| Regular price | Percent off (e.g. 25 percent off) | Sale |
| Regularly | Fraction off (e.g. ½ off) | Sale price |
| Original price | Dollar amount off (e.g. $5.00 off) | On sale |
| Originally | | Mark(ed) down |
| Manufacturer's suggested list price | | Our price |
| Compare at | | Our everyday low price |
| Compare elsewhere | | Special |
| Seen elsewhere for | | On special |
| Usually | | Giveaway price |
| Total value | | Now only |
| Was | | |

*Note*:
This list of semantic phrases was developed through a review of the literature and a review of advertisements from newspapers and circulars from three large eastern cities and several smaller towns over a three-month period in 1993.

Due to length considerations, we separated the phrases used to label the higher advertised reference price from the phrases used to label the lower actual selling price. Advertisers used almost every conceivable combination of reference price/selling price semantic phrases (e.g. regular price $99.95/sale price $79.95 or manufacturer's suggested list price $795.00, our price $645.00)

**Table I.**
**A Compilation of Semantic Phrases**

COMPEAU000016

PRICING STRATEGY & PRACTICE:
AN INTERNATIONAL JOURNAL

could simply present the selling price for an item in an advertisement. Alternatively, the advertiser could label the selling price in some manner to suggest savings to the consumer. The phrase "sale price" is often used for this purpose. Finally, the advertiser could also include a price as a point of comparison for this selling price (an advertised or external reference price) such as "regular price". Thus, an advertisement with a "compare at/our price" semantic phrase, provides more information than an advertisement with "our price" only, and may enhance the perceived value of the deal (Barnes, 1975). Using semantic phrases to label prices in comparative price advertisements (e.g. "Sale $9.99" versus just "$9.99"), the advertiser can affect consumers' perceptions of value and their purchase behavior (Oglesby, 1984; Varadarajan, 1986). Presumably, the consumer is more informed and, hence, makes a more accurate judgment of the price offer.

Some studies treat the semantic phrase as providing different levels of information (e.g. Barnes, 1975; Della Bitta et al., 1981) while other studies interpret the semantic phrase as providing different types of information (e.g. Berkowitz and Walton, 1980). For example "regular price, sale price" and "compare at, our price" may have the same *amount* of information but differ in the *concreteness* of the information, whereas "regular price, sale price" contains more information than just "sale price".

How do semantic phrases enhance consumers' responses to price deals? To address this question we must first examine how the use of advertised reference prices or external reference prices work. Adaptation level theory suggests that buyers' behavioral responses to information phrases are influenced by their adaptation to past internal and external cues (Helson, 1964). Thus, what would be considered a warm day in April for people who live in Miami, FL is likely to be considerably warmer than for people who live in Syracuse, NY. People adapt to the range of

temperatures and make judgments based on some reference point. Consumers evaluate prices by comparing them to some standard of reference (Monroe, 1973). Often, a consumer will have been exposed to prices for a product via advertisements, prior purchases, in-store displays and price tags and word-of-mouth. Thus, the consumer develops an internal sense of the price of the product. This adaptation level to all of this price information is referred to as the internal reference price. If the buyer has an internal reference price it is anticipated that the external reference price presented in the advertisement may influence this internal reference price. That is, the external reference price will cause the internal reference price to shift toward the external reference price. If the buyer does not have an internal point of reference, the external reference price may serve as that standard of reference.

However, certain semantic phrases would seem to convey different meanings which would provide different information regarding the prices (Della Bitta et al., 1981) and, thus, might vary the influence of the external reference price on the internal reference price response to the offer. That is, *ceteris paribus*, some semantic phrases may have greater impact than others. For example, the price $99.95 may be perceived differently if it is labeled as a "regular price" versus a "manufacturer's suggested list price". The effect of this external reference price could vary as a result of the semantic phrase used to label the price. The same holds for an offering price (e.g. "special" versus "sale").

Thus, the semantic phrase is information which may enhance or reduce the impact of the price offer on consumers' responses by moderating the effect of the external reference price.

### A Review of the Research
For managers, the most relevant indicators of the impact of the price offer are consumers' perceptions of the value of the deal and their

COMPEAU000017

VOLUME 2 NUMBER 2
1994

actual purchase behavior. Since no research to date has examined the effect of semantic cues on purchase behavior (cf. Leigh and Varadarajan (1991) who looked at coupon formats) to derive managerial prescriptions from the literature, we limit our focus to research which has examined perceptions of the deal and purchase intentions.

Barnes (1975) found that some price promotional phrases elicit higher levels of perceived value and motivation to act. Three semantic phrases, "special, $11.98", "25 per cent off, $11.98" and "regular price $15.98/sale price $11.98", were conceived by Barnes to represent three levels of information content: low, medium and high respectively. Thus, he concluded that greater information content leads to greater believability, higher perceptions of value and more motivation to act. However, it is not clear that the last two semantic phrases actually differ in information content since the missing information in each case can be imputed by the consumer. Another interpretation is that different information was provided, not necessarily more information; i.e. the second cue (25 percent off, $11.98) never explicitly states the regular price and the third cue (regular price $15.98/sale price $11.98) never explicitly states the relative size of the discount. Thus, subjects may view some information (e.g. the size of the discount) to be more important than other information (e.g. the regular price). If information is not provided consumers may not make the necessary effort to calculate the missing information, thus lowering their evaluations of the deal. Of course, the degree of difficulty would seem to have some influence. In the present instance, it would seem more difficult to calculate the regular price ($15.98) given that the sale price is 25 percent off the regular price and is set at $11.98 compared with calculating the discount ($4.00 or 25 percent) given the regular price $15.98 and the sale price $11.98. Thus, consumers may prefer information which reduces the amount of work, or the "mental cost" associated with

evaluating the offer (Shugan, 1980). This need to reduce the mental cost may suggest that advertisers should provide as complete information as possible regarding any price offer.

Berkowitz and Walton (1980) suggest that consumers may indeed be unwilling to calculate missing information in a comparative price advertisement. For a camera, the "percent off" semantic phrase was evaluated more negatively by subjects than other phrases which contained an explicit reference price (i.e. "regular", "total value", and "compare at"), suggesting that the missing information, i.e. the reference price, was not calculated. Thus, again, managers are advised to provide at least the reference price, the selling price, and some indication of savings, either the dollar amount saved or a percentage saving.

Similarly, Mobley *et al.* (1988) found that tensile price claims (claims which are ambiguous, e.g. "save up to 50 percent" is ambiguous since the consumer does not know exactly how much will be saved), decreased perceived value of the deal compared to more specific price claims (e.g. "save 50 percent"). Moreover, consumers substantially discounted the advertised price reductions when stated ambiguously. Thus, not only should the advertiser provide as much information as possible, but the information provided must be concrete – specific and useful.

Thus, one might speculate about the use of certain semantic phrases such as "special" and "'compare at" based on these findings. Both of these semantic phrases can be vague or specific depending on whether the advertiser provides additional information. For example, based on these results, the semantic phrase "compare at Store X" should be more effective than just "compare at" since it not only provides more information, but the information provided is more specific and useful.

In one of the most comprehensive investigations to date, Della Bitta *et al.* (1981)

COMPEAU000018

PRICING STRATEGY & PRACTICE:
AN INTERNATIONAL JOURNAL

examined eight different semantic phrases and their effects on three dependent measures including perceived value of the offer. The semantic phrases, however, were distinguished more by their differences in the level of information than simple phrasing differences. For example, some phrases provided both the regular price and the offering price while other phrases presented the regular price, offering price and percentage off. Although there was a significant effect for the different semantic phrases on perceived value, the only significant differences occurred between presenting the regular price and the dollar amount off and the sale price only condition. These results suggest that the difference may be due to the mere presence of a reference price as opposed to any phrasing associated with the semantic phrase. These results are consistent with many other studies which have observed a significant effect when an external reference price is included in the advertisement (Barnes, 1975; Berkowitz and Walton, 1980; Biswas and Blair, 1991; Blair and Landon, 1981; Fry and McDougall, 1974; Keiser and Krum, 1976; Urbany et al., 1988). Thus, it seems that managers should consider always including an external reference price in any price offer. A question remains, however, regarding what semantic phrase should be used to label this advertised reference price.

In general, subjects have estimated higher ordinary prices for products when presented with a reference price labeled "regular price," as opposed to a reference price labeled "manufacturer's suggested list price" (Liefield and Heslop, 1985). Although not enough information was presented to assess whether these differences are significant, the differences appear to be substantial (e.g. for interior house paint the ordinary price estimates were $19.33 (MSLP) and $21.22 (regular price). One explanation for these results is that consumers attach greater validity to prices labeled as regular as opposed to MSLP. Moreover, Grewal and Compeau

(1992) advise against using MSLP to avoid deception. Thus, managers should refrain from using MSLP; at best, it is no more effective than other phrases (Della Bitta et al., 1981), and is inherently deceptive (Grewal and Compeau, 1992).

Lichtenstein et al. (1991) adopted correspondent-inference theory to guide their research efforts examining semantic phrases in terms of consistency (i.e. whether the offering price is consistent with previous offers) and distinctiveness (i.e. the level of the offering price compared with what competitors charge). Perceptions of the value of the deal, however, were largely unaffected by whether the semantic phrase was low consistency or high distinctiveness. However, when the discount was small the semantic phrase did have an effect, with distinctiveness-based phrases (e.g. compare at/our price) wielding more influence on internal reference prices (and ostensibly perceptions of the deal) compared to consistency-based phrases (e.g. regular/sale). Thus, when consumers perceive the selling price as substantially reduced, they do not appear to use the semantic phrase as important information. However, when the selling price is perceived as only marginally reduced, the semantic phrase becomes more important in the evaluation of the deal. Thus, managers should consider carefully a semantic phrase which distinguishes the deal from competitors when offering a marginal price reduction.

In sum, the research on the use of semantic cues has important implications for managers. These implications are summarized in Table II.

## Other Phrasing Techniques

The use of different semantic phrases is not the only way to alter the phrasing of a price offer. The form of the discount (e.g. lower selling price, rebate, coupon, bundling) can also affect consumers' responses to the price offer.

COMPEAU000019

- Create added value by including an appropriately labeled advertised reference price to which the consumer may compare the selling price
- Present complete information regarding the deal including the reference price, the selling price, and some quantity representing the savings, appropriately labeled. The savings should be stated preferably in dollars and percent, but at least one or the other should be presented to add value
- Avoid the use of vague phrasing such as "save up to 50 percent", which may detract from perceptions of value. The more concrete the phrasing, the more accurate the estimate of added value
- Although a combination of coupons, rebates and direct discounts may be an effective pricing strategy, direct discounts require less consumer effort and thus create more added value. Thus, general price offers should rely primarily on the direct discount form with coupons and rebates targeted to specific consumer segments
- Always attempt to minimize the amount of work or effort required for the consumer to understand *and* take advantage of the deal. That is, make the price offers easy to read and understand, in order to form an opinion about the value added. Moreover, make the deal easy for the consumer to obtain
- Refrain from using "manufacturer's suggested list price" or any other form of suggested price since consumers are skeptical of its validity, it is inherently deceptive and it does not appear to be any more effective than other less problematic phrases
- In general, focus on the overall savings in a bundled offer, but mention individual savings on each item if space allows
- Emphasize and specifically place a value on what the consumer gets for free in a gift with purchase bundled offer

**Table II.**
**A Prescriptive List of Managerial Implications**

### Coupons and Rebates

Price deals can be phrased differently based on the form of the discount. For example, thus far we have only considered the lowering of the price via a direct discounting of the selling price. However, managers can add value by lowering the price in a price deal by offering a coupon, a rebate or by product bundling. In the case of the coupon, an immediate discount still occurs, however, the consumer must cut the coupon from the print media, store it in an accessible location, retrieve for the shopping trip and present it to the cashier before it expires. Thus, while different semantic phrases may suggest different levels of mental work (cost), the use of a coupon in comparison to a direct price discount involves additional physical work as well.

Rebates are considered to involve even more mental and physical effort (Chapman, 1987; Tat *et al.*, 1988). There are also economic costs associated with the rebate. Consumers must first purchase the item and wait a considerable time for the rebate (a capital cost). The rebate coupon must also be mailed, incurring mailing costs. Finally, all of this process extracts even more time and effort compared with a coupon.

### Price Bundling

Price bundling involves the provision of two or more products which are marketed at one "special" price (Guiltinan, 1987). Often these bundles take the form of "buy one – get one free" – a gift with a purchase (e.g. a free sponge with a purchase of a mop), a purchase with a purchase (e.g. buy one at the regular price, get the second one for half price), or two or more complementary products sold at one price (e.g. a computer and printer). The primary item in the bundle is referred to as the bundle anchor, and all other products included

COMPEAU000020

PRICING STRATEGY & PRACTICE:
AN INTERNATIONAL JOURNAL

in the bundle are referred to as ancillary products.

Research presented by Yadav and Monroe (1993) suggests that marketers need to be careful whether they present the savings on each bundle item or savings across the entire bundled package. Their results suggest savings on the bundle enhance consumers' perceptions of value to a greater extent compared to similar savings on the bundle's individual items. Offering savings on the individual items, as well as the savings on the entire bundle, may help attract customers who are interested in the individual items but not necessarily interested in the whole bundle. Moreover, when presented with an excellent bundle anchor and a poor or moderate ancillary item, consumers are more likely to adjust their evaluation downward than they are likely to adjust their evaluation upward when presented with a moderate bundle anchor and an excellent ancillary item (Yadav, 1994).

An initial examination on alternative semantic price-offers used to convey a deal by purchasing a bundle of items provides an interesting and particularly relevant managerial insight. Leigh and Varadarajan (1991) found that consumers exposed to coupons for two equivalent price offers – "buy one get one free" versus "get two for the price of one" – redeemed the coupon with the former phrase more often. Thus, managers need to be aware that the semantic phrase used to convey an advertised bundled price offer merits as much careful attention as the semantic phrase chosen to advertise a single product comparative price deal. It appears that getting something for nothing is valued more if phrased to emphasize that fact.

Research on bundles which include double deals, a discounted product that is marketed with a free ancillary product (also referred to as a "gift with purchase"), suggest that offering a high value free product when the basic product is offered at a low discount may adversely affect consumers' perceptions of the image of the discounted product (Low and Lichtenstein, 1994). Specifically, these researchers exposed consumers to a discounted calculator (i.e. a regular price and a sale price) and a free ALCO backpack (a very high quality backpack). Consumers appear to perceive the deal as too good to be true, concluding there must be something wrong with the calculator which makes it necessary for the retailer to bundle it with such a high value backpack. Thus, managers must be careful not to phrase the bundled offer such that the anchor product is overshadowed by the ancillary product. Moreover, managers must be warned that inappropriate bundling is not just ineffective, it can actually hurt the image of an anchor product.

This bundling technique can be confusing to the consumer, however, and significant mental effort may be required. For example, if the manager does not provide the retail value of, say, a free item advertised in a bundled offer. the consumer must expend considerable energy to locate an accurate price estimate for this free item before he or she can evaluate the deal. Moreover, there are many questions regarding the processes consumers use to evaluate bundled offers and how they impact on perceptions of the value of the deal.

In sum, the direct discount appears to be the most effective form of phrasing to convey the value of the deal. Although coupons, rebates and bundling can be part of an overall effective price promotion strategy, the direct discount offers consumers the greatest value, since little physical and mental effort is required to achieve the price promotion benefits if presented in a complete and concrete fashion.

## Conclusions and Future Research

The phrasing of price deals is certainly far from being a science. As fuzzy as it is, however, certain conclusions can be drawn from the research. Overall, retailers should rely primarily on direct discounts presented

34

COLUMN NUMBER 2
1994

with concrete phrases which provide consumers with as much information about the price offer as possible. Price offers should avoid vague and ambiguous claims since the interpretation of such an advertisement is left to the consumer. In this instance, the consumer is likely to be skeptical and conservative and underestimate the value of the deal, or dismiss it altogether. Moreover, the consumer may simply not expend the time and effort to calculate any potential savings to make the price offer meaningful to him or her.

Coupons and rebates should be targeted tools. That is, managers should target specific market segments and set specific objectives when using either of these techniques. For example, coupons may be targeted toward simply increasing traffic in a store – to get consumers who do not normally patronize the store to go in. In this case, coupons focus on one or more products which competitors often promote. Rebates should be limited to large ticket items since the overall cost of the rebate process to the consumers can be considerable.

There are still many unresolved issues. What is the relationship between the various forms of price promotion? For example, would a $0.50 direct discount hold greater value for consumers than, say, a $1.00 rebate? Although some preliminary work has been done regarding the relationship between direct discounts and nonmonetary promotions (also referred to as "value-added" promotions) on internal reference prices, additional research is needed to identify the processes consumers use to evaluate these disparate promotional techniques. The interpretation, or the meaning which consumers assign to the various semantic phrases, is also in need of investigation. Moreover, it would be helpful to examine what meanings retailers intend to convey by using certain semantic phrases.

With regard to price bundling, how do consumers evaluate bundles with seemingly noncomparable alternatives (e.g. a free vacation with the purchase of a car)? Does the amount of information provided in a bundled offer impact on the perceptions of the deal in a manner similar to single product comparative price advertisements? Finally, although there appears to be a positive relationship between the amount of information provided in the price advertisement and consumers' perceptions of the value of the deal, there is some evidence that exaggerated advertised reference prices (i.e. believed less) still enhance perceptions of value of the deal (Urbany *et al.*, 1988). These issues need further study to examine potential moderator variables which might account for the different results.

□

## References

Barnes, J.G. (1975), "Factors Influencing Consumer Reaction to Retail Newspaper 'Sale' Advertising", *Proceedings of the American Marketing Association*, Vol. 37, pp. 471-7.

Berkowitz, E.N. and Walton, J.R. (1980), "Contextual Influences on Consumer Price Responses: An Experimental Analysis", *Journal of Marketing Research*, Vol. 17, August, pp. 349-58.

Biswas, A. and Blair, E.A. (1991), "Contextual Effects of Reference Prices in Retail Advertisements", *Journal of Marketing*, Vol. 55, July, pp. 1-12.

Blair, E.A. and Landon, Jr, E.L. (1981), "The Effects of Reference Prices in Retail Advertisements", *Journal of Marketing*, Vol. 45, Spring, pp. 61-9.

Chapman, J.D. (1987), "The Impact of Discounts On Subjective Product Evaluations", unpublished doctoral dissertation, Virginia Polytechnic Institute and State University, Blacksburg, VA.

Compeau, L.D. and Grewal, D. (1994), "Comparative Price Advertising: An Integrative Review", Working Paper, Clarkson University, Potsdam, New York, NY.

Della Bitta, A.J., Monroe, K.B., and McGinnis, J.M. (1981), "Consumer Perceptions of

COMPEAU000022

PRICING STRATEGY & PRACTICE
AN INTERNATIONAL JOURNAL

Comparative Price Advertisements", *Journal of Marketing Research*, Vol. 18, November, pp. 416-27.

Fry, J.N. and McDougall, G.H. (1974), "Consumer Appraisal of Retail Price Advertisements", *Journal of Marketing*, Vol. 38, July, pp. 64-7.

Grewal, D. and Compeau, L.D. (1992), "Comparative Price Advertising: Informative or Deceptive?", *Journal of Public Policy and Marketing*, Vol. 11, Spring, pp. 52-62.

Guiltinan, J.P. (1987), "The Price Bundling of Services: A Normative Framework", *Journal of Marketing*, Vol. 51, April, pp. 74-85.

Helson, H. (1964), *Adaptation Level Theory*, Harper and Row, New York, NY.

Keiser, S.E. and Krum, J.R. (1976), "Consumer Perceptions of Retail Advertising with Overstated Savings", *Journal of Retailing*, Vol. 52, Fall, pp. 27-37.

Leigh, J.H. and Varadarajan, P.R. (1991), "Consumers' Behavioral Responses to Alternative Coupon Price Promotions: A Field Study in a Fast Food Retailing Context", in Darden, W.R., Lusch, R.F. and Mason, J.B. (Eds), *Proceedings of the 1991 Symposium on Patronage Behavior and Retail Strategy: The Cutting Edge II*, pp. 133-45.

Lichtenstein, D.R., Burton, S. and Karson, E.J. (1991), "The Effect of Semantic Cues on Consumer Perceptions of Reference Price Ads", *Journal of Consumer Research*, Vol. 18, December, pp. 380-91.

Liefield, J. and Heslop, L. (1985), "Reference Prices and Deception in Newspaper Advertising", *Journal of Consumer Research*, Vol. 11, March, pp. 868-76.

Low, G.S. and Lichtenstein, D.R. (1994), "The Effect of Double Deals on Consumer Attitudes", *Journal of Retailing*, Vol. 4, Winter, pp. 453-66.

Mobley, M.F., Bearden, W.O. and Teel, J.E. (1988), "An Investigation of Individual Responses to Tensile Price Claims", *Journal of Consumer Research*, Vol. 15, September, pp. 273-9.

Monroe, K.B. (1973), "Buyers' Subjective Perceptions of Price", *Journal of Marketing Research*, Vol. 10, February, pp. 70-80.

Oglesby, B.D. (1984), "Price and Semantic Cues' Effect on Perceived Quality and Attitude", in Klein, D.M. and Smith, A.E. (Eds), *Marketing Comes of Age*, Southern Marketing Association, Boca Raton, FL, pp. 308-12.

Shugan, S.M. (1980), "The Cost of Thinking", *Journal of Consumer Research*, Vol. 7, September, pp. 99-111.

Tat, P., Cunningham III, W.A. and Babakus, E. (1988), "Consumer Perceptions of Rebates", *Journal of Advertising Research*, Vol. 28, August/September, pp. 45-50.

Urbany, J.E., Bearden, W.O. and Weilbaker, D.C. (1988), "The Effect of Plausible and Exaggerated Reference Prices on Consumer Perceptions and Price Search", *Journal of Consumer Research*, Vol. 14, June, pp. 95-110.

Varadarajan, P.R. (1986), "Consumers' Behavioral Responses to Coupon Price Promotions: An Empirical Inquiry", in Shimp, T.A., *et al.* (Eds) *AMA Educators' Proceedings*, Vol. 52, American Marketing Association, Chicago, IL, p. 211.

Yadav, M. (1994), "An Examination of How Buyers Evaluate Product Bundles: A Model of Anchoring and Adjustment", *Journal of Consumer Research*, (forthcoming).

Yadav, M. and Monroe, K.B. (1993), "How Buyers Perceive Savings in a Bundle Price: An Examination of a Bundle's Transaction Value", *Journal of Marketing Research*, Vol. 30, August, pp. 350-8.

Larry D. Compeau is Assistant Professor of Marketing at Clarkson University, Potsdam, New York and Dhruv Grewal is Assistant Professor of Marketing at the University of Miami, Coral Gables, Florida, USA.

COMPEAU000023



ELSEVIER

Journal of Retailing xxx (xxx, 2012) xxx–xxx

Journal of
Retailing

Editorial

# Retail Value-Based Pricing Strategies: New Times, New Technologies, New Consumers ☆

Dhruv Grewal [a,*], Anne L. Roggeveen [a], Larry D. Compeau [b], Michael Levy [a]

[a] Babson College, United States
[b] Faculty of Consumer and Organizational Studies, Clarkson University, United States

## Abstract

The global marketplace is continually shaped by changing realities, including the recent economic downturn and ever-increasing adoption of new technologies. The results of these changing realities affect every element of consumers' shopping behavior, as well as their value perceptions. This article examines how recent changes in the environment and technology have spurred changes in how consumers perceive value, as well as in how retailers communicate their value offers. Furthermore, this introductory article highlights how the 14 contributions in this special issue of the *Journal of Retailing* on pricing relate to these areas of change.
© 2011 New York University. Published by Elsevier Inc. All rights reserved.

*Keywords:* Value-based pricing models; Shopping behavior; Pricing

In the face of radical changes to the global marketplace—a worldwide recession, significant technological turbulence, and so on—consumers change not only their shopping behaviors but also their value perceptions. To respond appropriately, savvy retailers must monitor the environment to identify changes, both expected and unexpected, in the marketplace. By monitoring their environment and harnessing technological advances, retailers can (1) remain more in touch with consumer preferences, (2) take advantage of opportunities created by new consumer preferences, and (3) enhance the value they offer to consumers. These retailers are willing and able to redefine their businesses to respond to the new realities of the marketplace.

Consider in particular the effects of the economic downturn. Consumers are more price conscious and likely to cherry pick the best deals. In turn, retailers seek out ways to compete through pricing tactics and provide the deals that offer the most value to consumers. On Black Friday for example, many retailers offer radical deals on popular items to create publicity, encourage traffic into the store, and increase the sales of other items on their shelves. One Macy's customer who intended to spend $20

on a promoted microwave oven wound up spending well over $300 on a variety of other goods (Mattioli 2011).

Consumer shopping patterns also have changed as a result of the recession, such that some consumers consolidate their shopping to save on gas or shipping charges. Brick-and-mortar retailers focused intently on developing locations that encourage "one-stop shopping" and provide a plethora of categories, some of which have not traditionally appeared in the specific retail format. For example, convenience and drug stores are experimenting with fresh produce. Big box retailers such as Home Depot, Staples, and Walmart, which traditionally located in less expensive suburban locations, are opening smaller stores in urban locations. And online retailers are encouraging customers to purchase more by promising free shipping, as long as the sales reach a minimum dollar requirement. Finally, the loss of disposable income is shifting consumer preferences for retail formats, creating more opportunities for supercenters and club stores but threatening smaller retailers (Ma et al. 2011; Talukdar, Gauri, and Grewal 2010).

In addition to economic changes, the modern environment hosts technological changes in the form of explosive growth of social media and mobile web-enabled devices. These developments also influence all aspects of consumers' experiences, from how they search for goods, to how they pay for them, to how they tell others about them. Mobile phones and their related applications (apps) have made consumers more aware of price promotions, because they can check the prices of a given

---

☆ The authors appreciate support from Babson College and Clarkson University in sponsoring this initiative.
* Corresponding author. Tel.: +1 781 239 3902.
*E-mail addresses:* dgrewal@babson.edu (D. Grewal), aroggeveen@babson.edu (A.L. Roggeveen), compeau@clarkson.edu (L.D. Compeau), mlevy@babson.edu (M. Levy).

0022-4359/$ – see front matter © 2011 New York University. Published by Elsevier Inc. All rights reserved.
doi:10.1016/j.jretai.2011.12.001

COMPEAU000024

ARTICLE IN PRESS

2                              *D. Grewal et al. / Journal of Retailing xxx (xxx, 2012) xxx–xxx*

stockkeeping unit (SKU) even while they are still shopping in the store. Social networks such as Facebook also make information sharing and group buying opportunities nearly seamless. Product reviews even commonly appear on Facebook. That is, technological changes affect both the benefit side (e.g., instant access to product information, such as reviews) and the cost side (e.g., lower search costs, lower prices) of the value equation.

Social media and mobile web-enabled devices represent only some of the ways technology affects retailers. Other new technologies include the growth of digital displays in retails spaces, which draw consumers' attention to promoted items, and retailers' improving abilities to collect data to mine from the ever-growing trove of loyalty and scanner data. Technology allows retailers to gain a more refined understanding of customer reactions to pricing decisions through the use of sophisticated analytics that reflect these abundant loyalty and scanner data. Shrewd retailers thus actively manage their loyalty programs to offer more effective promotions. Some brick-and-mortar leaders in these domains include Kroger and CVS (Grewal, Levy, and Hackmann 2011). These retailers have harnessed the power of their vast loyalty programs and developed systematic analytical capabilities to develop targeted offers. Personalized offers are another way to enhance consumer value and ultimately ensure customer loyalty to the retailer.

Moreover, changes to the way retailers store, access, and process consumer data and usage patterns have prompted the development of new retail business models. Some retailers have taken the trunk show notion online to establish flash sale formats (e.g., Gilt, Rue La La). Groupon and Living Social exploit the power of social media to provide consumers with deals, contingent on sufficient other consumers purchasing, which creates an inherent incentive to spread the word throughout a social network. Other business models adopt various forms of name your own prices or bidding mechanisms. These illustrative examples are by no means a comprehensive list of the new business models that have emerged to enhance customer value and that continue to evolve as a function of the changes in consumer behavior that are driven by both economic and technological shifts.

As this discussion thus illustrates, recent changes in the environment and technology have spurred changes in both the ways consumers perceive value and the tactics retailers are using to communicate value offers. In this article, we explore both areas and highlight how the fourteen contributions in this special issue of the *Journal of Retailing* on pricing relate to these areas.

### Organizing framework and research issues

This article is organized around three major components: changes in consumer behavior, driven by environmental changes and technological changes. We focus on how the two drivers initiate different consumer perceptions of value, as well as the growth of newer forms of value-based pricing models (see Fig. 1).

In discussing each of these areas, we draw from current trends, highlight how the articles in this special issue relate, and identify opportunities for further research. The fourteen contributions in this special issue use a host of outcome measures,



Fig. 1. Organizing framework.

which reflects the richness of the research stream; moreover, they employ a wide range of methodologies and bases for their data.

### Impact of the economic environment on consumer behavior and business models

The past few years have unleashed recessionary forces in the marketplace, not only in the United States but globally. Every day, consumers face the threatening possibilities of an imploding Euro, debt crises in various countries, deficit reduction failures in Congress, a historic housing slump, high unemployment figures, seemingly unending increases in gasoline prices, and great fluctuations in the stock market. The recent economic meltdown also has led to global fluctuations of market currencies; the major currencies see widespread fluctuations on an almost weekly basis. In this special issue, Raghubir, Morwitz, and Santana (2012) examine how consumers react to prices conveyed in multiple currencies, rather than just their local currency.

These recessionary forces also have unleashed profound uncertainty among consumers, who simultaneously are experiencing declines in their overall wealth and their disposable incomes. This unrest and weak economy provoke changes in consumer shopping patterns and consumption (Ma et al. 2011), with people striving for the very best values. Value—both acquisition and transaction value—drives both search and purchase intentions (Grewal, Monroe, and Krishnan 1998).

In this special issue, Pillai and Kumar (2012) expand on the concept of value to clarify the role of value consciousness and coupon proneness on pricing tactic persuasion knowledge (PTPK)—that is, the persuasion knowledge of consumers when it comes to marketers' pricing tactics. Their research indicates that consumers who are coupon prone focus more on peripheral cues and are likely to be less accurate or confident; they also have lower levels of PTPK calibration. Those who are value conscious instead engage in more explicit quality–price trade-offs, achieve greater accuracy, are confident, and have higher levels of PTPK calibration.

To further detail the role of deals and value in an increasingly price-conscious marketplace, Zhang, Seetharaman, and Narasimhan (2012) explore the effects of price promotions on price expectations, incidence, brand choice, and quantity decisions. They test the effectiveness of two competing

COMPEAU000025

learning processes: the *deal-probability* learning process that raises expectations versus a *deal-timing* learning process that lowers them. They find more support for the deal-probability learning process, though the effects are moderated by multiple individual factors, such as family size, usage, education, employment, and purchase frequency.

Murthi and Rao (2012) also explore the effect of price promotions, though their findings suggest that "between 40 and 50% of the purchases are made by consumers using expectations of prices rather than posted prices" (p. *xx*). They also find that the effect of promotions is greater for price-aware consumers. Thus, even if a retailer offers price deals, it must effectively communicate these deals to consumers. Simply offering the deal is no longer sufficient. Retailers must encourage consumers to process the communicated prices to make sure that the consumer recognizes the value offered.

Because the economic environment is altering the uncertainty that consumers feel, it also exerts an impact on the uncertainty that retailers feel, pushing them to adapt their business models. For example, as retailers recognize the increasing price sensitivity of consumers, low-price guarantees are becoming more widespread, as a means to assure consumers that prices are low. However, as Dutta (2012) notes, the effectiveness of low-price guarantees is not universal. Instead, it depends on the consumer's confidence in the price category, as well as his or her involvement with the product category.

Although many consumers react to uncertainty in the marketplace by focusing on saving, and thus only purchase items on promotion, others choose to shop more, to make themselves feel better. Kinney, Ridgeway, and Monroe (2012) delve into the role of compulsive buying tendencies. These buyers (relative to non-compulsive shoppers) are driven by the transaction value (i.e., the pleasure of getting a deal), which makes them more knowledgeable, brand conscious, and price sensitive.

For retailers to react appropriately to consumers, they first must understand who those consumers are and what motivates them. Fortunately, modern retailers have increasing opportunities to learn about consumers and their behaviors by tracking information about their search tactics, spending, and even referral habits. Such information can be captured through multiple channels, including in-store loyalty card programs, online surveys, Facebook tracking, online search tracing, or app tracing. Retailers in possession of advanced technologies also can better mine and model this data to understand their customers' behavior. Recent research suggests that rich retail analytical models should incorporate household heterogeneity effects (Grewal et al. 2011). In this vein, Kopalle et al. (2012) explicitly demonstrate that pricing practices that ignore household heterogeneity are less profitable than are normative models that incorporate this variable.

Consumer household differences change further with the shifting economic landscape. Differences in family size, income, education, and employment result in changes to shopping and consumption behaviors, including product usage and purchase frequency. Ma, Seetharaman, and Narasimhan (2012) provide greater insight into these household shopping patterns. They explicitly examine the role of cross-category dependence as a function of the complementarities of brands within the category. Their results suggest that more than 50% of the total profit impact of a price promotion is a function of the brand-level dependence of the household.

With these research insights, multiple avenues for further research open up. The roles of assorted individual difference variables have been well examined using laboratory experiments and surveys; it would be helpful if they were explicitly incorporated into empirical shopping and consumption models. We also need more field experiments to assess the moderating roles of individual difference variables on the effectiveness of a host of price and promotion variables, ranging from guarantees to types of messages. In this sense, Raghubir, Morwitz, and Santana (2012) call for research that examines "what makes prices in one currency more salient to consumers when prices are offered in multiple currencies? . . . the colors used to present price information in different currencies, the specific price digits used, and the right/left or top/bottom positions of the prices in the two currencies could affect which one consumers' attend to and use" (p. *xx*). Does economic uncertainty further increase the salience of these prices?

As a consequence of changes in the economy, a grassroots frugality movement also has sprung up, encouraging consumers to shift their pride in new and expensive products to bragging about how little they have spent on keeping older products working (e.g., www.getrichslowly.org, www.frugalvillage.com). Additional research is needed to understand the role of individual differences that move consumers from consumption to maintenance. Would these shifts be attenuated for compulsive shoppers? Regulatory focus theory and work on promotion and prevention focus might provide a rich conceptual basis for understanding such shifts in consumption mindsets (Dutta, Biswas, and Grewal 2011).

### Impact of technology on consumer behavior and business models

The economic environment is not the only macro-level factor that defines consumer behavior and business models. Technological changes associated with social and mobile localization and personalization have resulted in vast disruptions in retailer marketing practices and consumer shopping practices. Such changes, occurring at breakneck speed, also shift some aspects of the consumer decision-making process and thereby offer opportunities for retailers and manufacturers. For example, the role of price comparisons and good deals appear more prominent as the actual act of comparing prices becomes simpler and faster through the prevalence of shopping bots and mobile applications to support the comparisons. Consumers' search processes have been streamlined and can be performed in a matter of seconds, even from the retail location. Many changes are driven by the increasing presence of the Internet in every minute corner of consumers' lives. The ubiquity of Wi-Fi and 3G networks, as well as the number of devices available to access these networks, ensures that consumers can quickly and easily access the Internet, regardless of space, time, or location. They also ensure maximal value.

COMPEAU000026

4                    *D. Grewal et al. / Journal of Retailing xxx (xxx, 2012) xxx–xxx*

Table 1
List of reviewers.

| Name | Affiliation |
| --- | --- |
| Joseph W. Alba | University of Florida |
| Mark Arnold | Saint Louis University |
| Neeraj Arora | University of Wisconsin |
| Laurence Ashworth | Queen's University |
| Barry J. Babin | Louisiana Tech University |
| William O. Bearden | University of South Carolina |
| Sharon E. Beatty | University of Alabama |
| Nada Nasr Bechwati | Bentley University |
| David Bell | University of Pennsylvania |
| Richard F. Beltramini | Wayne State University |
| Neeraj Bharadwaj | Temple University |
| Abhijit Biswas | Wayne State University |
| Jeffrey Blodgett | North Carolina A&T |
| Onur Bodur | Concordia University |
| Lisa Bolton | Penn State University |
| Michael Brady | Florida State University |
| Anne Brumbaugh | College of Charleston |
| Scot Burton | University of Arkansas |
| Margaret C. Campbell | University of Colorado |
| Jay Carlson | Union University |
| Rajesh Chandrashekaran | Fairleigh Dickinson University |
| Allan (Haipeng) Chen | Texas A&M University |
| Hai Che | University of Southern California |
| Pradeep K. Chintagunta | University of Chicago |
| S. Chan Choi | Rutgers University |
| Keith Coulter | Clark University |
| Peter Darke | York University |
| Ramarao Desiraju | University of Central Florida |
| Utpal M. Dholakia | Rice University |
| Claudiu Dimofte | San Diego State University |
| Sujay Dutta | Wayne State University |
| Sri Devi Duvvuri | State University of New York at Buffalo |
| Hooman Estelami | Fordham University |
| Scott Fay | Syracuse University |
| Judith Anne Garretson Folse | Louisiana State University |
| Dinesh Gauri | Syracuse University |
| Mary Gilly | University of California Irvine |
| Ronald Goodstein | Georgetown University |
| Eric A. Greenleaf | New York University |
| David Hardesty | University of Kentucky |
| Kelly L. Haws | Texas A&M University |
| Carrie M. Heilman | University of Virginia |
| Elizabeth C. Hirschman | Rutgers University |
| Charles Ingene | University of Mississippi |
| Shailendra Pratap Jain | University of Washington |
| Satish Jayachandran | University of South Carolina |
| Monika Kukar Kinney | University of Richmond |
| Noreen Klein | Virginia Tech |
| Praveen Kopalle | Dartmouth College |
| P.K. Kannan | University of Maryland |
| R. Krishnan | University of Miami |
| V. Kumar | Georgia State University |
| Rajesh V. Manchanda | University of Manitoba |
| Tamara Mangleburg | Florida Atlantic University |
| Kenneth C. Manning | Colorado State University |
| James G. Maxham III | University of Virginia |
| Tridib Mazumdar | Syracuse University |
| Peter McGoldrick | University of Manchester |
| Anthony Miyazaki | Florida International University |
| Kent Monroe | University of Richmond |
| Vicki G. Morwitz | New York University |
| Susan Mudambi | Temple University |
| Ronald W. Niedrich | Louisiana State University |
| Stephanie M. Noble | University of Tennessee |

Table 1 (*Continued*)

| Name | Affiliation |
| --- | --- |
| James L. Oakley | University of North Carolina at Charlotte |
| Chezy Ofir | Hebrew University of Jerusalem |
| Joseph Pancras | University of Connecticut |
| Purushottam Papatla | University of Wisconsin at Milwaukee |
| Mark Parry | University of Missouri at Kansas City |
| Ashutosh Prasad | University of Texas Dallas |
| Chris Pullig | Baylor University |
| Priya Raghubir | New York University |
| Mohammad S. Rahman | University of Calgary |
| Akshay R. Rao | University of Minnesota |
| Brian T. Ratchford | University of Texas at Dallas |
| Kristy E. Reynolds | University of Alabama |
| Nancy Ridgeway | University of Richmond |
| Robert Schindler | Rutgers University at Camden |
| Raj Sethuraman | Southern Methodist University |
| Venkatash Shankar | Texas A&M University |
| Bernd Skiera | Goethe University |
| David Sprott | Washington State University |
| Srinivasan Swaminathan | Drexel University |
| Joydeep Srivastava | University of Maryland |
| Yacheng Sun | University of Colorado |
| Rajneesh Suri | Drexel University |
| Joffre Swait | University of Alberta |
| Jill Sweeney | University of Western Australia |
| Manoj Thomas | Cornell University |
| Remi Trudel | Boston University |
| Michael Tsiros | University of Miami |
| Rajiv Vaidyanathan | University of Minnesota at Duluth |
| Rajkumar Venkatesan | University of Virginia |
| Peter C. Verhoef | University of Groningen |
| Clay M. Voorhees | Michigan State University |
| Janet Wagner | University of Maryland |
| Russell S. Winer | New York University |
| Lan Xia | Bentley University |
| Manjit S. Yadav | Texas A&M University |
| Chi Kin (Bennett) Yim | University of Hong Kong |
| Rui Zhu | University of British Columbia |

In turn, the role of price and pricing guide many new value-based pricing business models (Sorescu et al. 2011). The group buying business model (e.g., Living Social, Groupon, Google Offers) builds on the power of social media to offer localized price deals to customers, depending on a volume pricing approach. Provided a predetermined number of consumers agree to purchase the product or service during the given time period, the purchaser is guaranteed access at the offered, low, sale price. To reach that minimum number of consumers to activate the deal, users can reach out to others in their networks to introduce them to the deal. This "social" approach taps into consumers' motivations to belong and be a part of their group. New business models similarly should incorporate innate consumer motivations in their strategies.

Recent price and promotion models also include flash sale sites that emphasize value by offering fashion merchandise at low prices for a limited time, by invitation only and to a limited number of customers (e.g., Gilt, Rue La La, Amazon's My Habit, HauteLook). These online retailers tend to adopt reference price comparisons (i.e., regular versus sale price) to highlight the value of their deals. Thus, researchers and public policy makers should

D. Grewal et al. / Journal of Retailing xxx (xxx, 2012) xxx–xxx
5

explore the underlying basis of these reference prices, as well as their potential for deception (Grewal and Compeau 1992).

Technology allows retailers to enhance consumer perceptions of value by leveraging opportunities through the integration of online, social, mobile, localization, and personalization technologies. For example, Amazon provides recommendations specific to each customer's prior browsing and shopping experiences; it also offers a free app to help customers follow daily deals, recently released products, and other functions. A single consumer thus may be in contact with Amazon through e-mail notice, an alert on his or her smartphone, an app, and Facebook, all in the same day. Moreover, to enhance consumer value perceptions, many of these touches will be personalized in their appeals to the customer. One of Amazon's most recent apps, Price Check, allows consumers to check prices at physical stores. If they do so and then buy from Amazon, they receive an extra 5% off their purchases (up to $5). The excitement among users suggests the thrill of a treasure hunt. This crowdsource approach also grants prizes to shoppers who are willing to collect prices in offline stores, so Amazon can beat those prices and enhance consumer value. With this app, Amazon leverages the power of its millions of shoppers to attain up-to-the-minute pricing data.

In this special issue, several articles explore pricing-related business models, such as name your own price (NYOP) and bid elicitation tactics. Joo, Mazumdar, and Raj (2012) examine successful bidding strategies and the savings that result from using NYOP. They also empirically demonstrate that the number of bids and the bid function shape affect consumers' savings. Specifically, savings increase when consumers use a constant bid increment strategy or if their bid increments decrease with each successive bid strategy. Taking a slightly different tack, Spann et al. (2012) experimentally compare a bid elicitation interface that provides pre-specified alternative bid amounts with NYOP. They find that providing consumers with higher alternative bid amounts results in higher bids and more profits for the retailer.

Over the years, various firms have tried and failed differential pricing methods. Consumer backlash to differential pricing often arises in the form of perceptions of disrespect. Ashworth and McShane (2012) therefore suggest several strategies that can help retailers that adopt differential pricing mitigate the negative consequences.

Expiration date-based pricing (EDBP) is another new, relatively unknown phenomenon. As Theotokis, Pramatari, and Tsiros (2012) reveal, with EDBP, retailers price perishables on the basis of their shelf life. Contrary to their expectations though, EDBP only results in reduced evaluations among loyal consumers and those who perceive perishables as less risky.

One of the powers of the Internet has been to allow consumers to search for products and prices with shopping bots, such as BizRate, or the tools provided by major retailers, such as Amazon. These methods provide customers with a key benefit, namely, easier ways to sort through the myriad potential offerings (e.g., by relevance, price, rating). Suri et al. (2012) examine the effects when consumers choose to sort merchandise by price versus brand, as well as the role of motivation. Their results suggest that for motivated consumers, sorting based on

brand results in less thorough evaluations than do alternatives that follow a price sorting organization.

Beyond sorting approaches, retailers can influence consumer perceptions through their price presentations. An area of increasing research inquiry in recent decades has been the potential effects of odd versus even prices. Mace (2012) extends this field by examining the role of brand, category, and store factors in influencing the effectiveness of nine-ending prices. She find that nine-ending pricing practices increase sales for small brands (e.g., low market share, low price, new items) that represent weak categories. These effects decline as the store's use of nine-ending practices increases though. Therefore, the effectiveness of even subtle price cues (e.g., nine endings) is impressive, such that they can influence value perceptions and choice when the other cues are not highly diagnostic (i.e., smaller brands, less relevant brands).

Additional research should examine the intersection of consumer decision and choice processes, especially with the advent of new business models such as NYOP and bidding. How does the choice process change when consumers interact with new-to-the-world purchasing environments? Although Suri et al. (2012) examine moderating impacts of both motivation to process information and memory capacity (or memory load) on the effect of alternative sorting organizations on consumers' evaluations, we need more research in this domain to realize how various social and mobile applications influence consumer value perceptions.

Recent research into retail pricing also has focused on various cues, ranging from temporal framing (e.g., Bambauer-Sachse and Grewal 2011) to price-matching guarantees (Dutta 2012; Ho, Ganesan, and Oppewal 2011). The strategic and tactical applications of deals suggest the need for additional research to understand emerging Internet- and retail-related issues, such as:

- The role of social media and the source credibility associated with friends who forward or refer others to particular price promotions and retail sites.
- Effects of limited time offers.
- How a sense of exclusivity of the offer or site influences consumers' value perceptions and interest in engaging with the offer or identifying with the retail site.

## Conclusion

The genesis of this special issue involved stimulating additional research on pricing, across all dimensions and various methodologies. We are delighted that this special issue reflects our original vision. We greatly appreciate the valuable feedback and support from the reviewers, whose names are listed in Table 1. The resulting collection of articles in this special issue provides a rich overview of the role of the economy and technological advances and the changes they are inducing in consumer value perceptions and shopping behaviors. We hope these contributions and their insights spur even more research on retail pricing and evolving value-based pricing business models.

COMPEAU000028

Please cite this article in press as: Grewal, Dhruv, et al, Retail Value-Based Pricing Strategies: New Times, New Technologies, New Consumers, Journal of Retailing (xxx, 2012), doi:10.1016/j.jretai.2011.12.001

6                                    *D. Grewal et al. / Journal of Retailing xxx (xxx, 2012) xxx–xxx*

## References

Ashworth, Lawrence and Lindsay McShane (2012), "Why Do We Care What Others Pay? The Role of Other Consumers' Prices in Inferences of Seller Respect," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.10.004

Bambauer-Sachse, Silke and Dhruv Grewal (2011), "Temporal Price Reframing: When is it Beneficial?," *Journal of Retailing,* 87 (2), 156–65.

Dutta, Sujay (2012), "Vulnerability to Low Price Signals: An Experimental Study of Effectiveness of Genuine and False Signals," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.08.003

Dutta, Sujay, Abhijit Biswas and Dhruv Grewal (2011), "Regret from Post-Purchase Discovery of Lower Market Prices: Do Price Refunds Help?," *Journal of Marketing,* 75 (November), 124–38.

Grewal, Dhruv, Kusum Ailawadi, Dinesh Gauri, Kevin Hall, Praveen Kopalle and Jane Robertson (2011a), "Innovation in Pricing and Promotion Strategies," *Journal of Retailing,* 87S (1), S43–52.

Grewal, Dhruv and Larry D. Compeau (1992), "Comparative Price Advertising: Informative or Deceptive?," *Journal of Public Policy & Marketing,* 11 (Spring), 52–62.

Grewal, Dhruv, Michael Levy, and Britt Hackmann (2011), "Making Loyalty Programs Sing," working paper, Babson College.

——————————, Kent B. Monroe and R. Krishnan (1998), "The Effects of Price Comparison Advertising on Buyers' Perceptions of Acquisition Value and Transaction Value," *Journal of Marketing,* 62 (April), 46–60.

Ho, Hillbun (Dixon), Shankar Ganesan and Hermann Oppewal (2011), "The Impact of Store-Price Signals on Consumer Search and Store Evaluation," *Journal of Retailing,* 87 (2), 127–41.

Joo, Mingyu, Tridib Mazumdar and S.P. Raj (2012), "Bidding Strategies and Consumer Savings in NYOP Auctions," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.07.004

Kinney, Monika Kukar, Nancy Ridgeway and Kent Monroe (2012), "The Role of Price in the Behavior and Purchase Decisions of Compulsive Buyers," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.02.004

Kopalle, Praveen, P.K. Kannan, Lin Bao Boldt and Neeraj Arora (2012), "The Impact of Household Level Heterogeneity in Reference Price Effects on Optimal Retailer Pricing Policies," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.10.002

Ma, Yu, Kusum L. Ailawadi, Dinesh Gauri and Dhruv Grewal (2011), "An Empirical Investigation of the Impact of Gasoline Prices on Grocery Shopping Behavior," *Journal of Marketing,* 75 (March), 18–35.

Ma, Yu, P.B. Seetharaman and Chakravarthi Narasimhan (2012), "Modeling Dependencies in Brand Choice Outcomes Across Complementary Categories," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.04.003

Mace, Sandrine (2012), "The Determinants of Nine-Ending Effects: An Empirical Analysis Using Store-Level Scanner Data," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.07.002

Mattioli, Dana (2011), "Macy's Plan: Boots, Bieber," *The Wall Street Journal,* November 26–27, B1–2.

Murthi, B.P.S. and Ram C. Rao (2012), "Price Awareness and Consumers' Use of Deals in Brand Choice," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.07.001

Pillai, Kishore Gopalakrishna and V. Kumar (2012), "Differential Effects of Value Consciousness and Coupon Proneness on Consumers' Persuasion Knowledge of Pricing Tactics," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.03.002

Raghubir, Priya, Vicki Morwitz and Shelle Santana (2012), "Europoly Money: The Impact of Currency Framing on Tourists' Spending Decisions," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.11.001

Sorescu, Alina, Ruud Frambach, Jagdip Singh, Arvind Rangaswamy and Cheryl Bridges (2011), "Innovations in Retail Business Models," *Journal of Retailing,* 87S (1), S3–S16.

Spann, Martin, Gerald Haubl, Bernd Skiera and Martin Bernhardt (2012), "Bid-Elicitation Interfaces and Bidding Behavior in Retail Interactive Pricing," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.06.001

Suri, Rajneesh, Jane Zen Cai, Kent Monroe and Mrugank V. Thakor (2012), "Retailers' Merchandise Organization and Price Perceptions," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.02.005

Talukdar, Debabrata, Dinesh K. Gauri and Dhruv Grewal (2010), "An Empirical Analysis of Extreme Cherry Pickers in the Frequently Purchased Goods Market," *Journal of Retailing,* 86 (4), 336–54.

Theotokis, Aris, Katerina Pramatari and Michael Tsiros (2012), "Effects of Expiration Date-Based Pricing on Brand Image Perceptions," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.06.003

Zhang, Qin, P.B. Seetharaman and Chakravarthi Narasimhan (2012), "The Indirect Impact of Current Prices on Households' Purchase Decisions Through the Formation of Expected Future Prices," *Journal of Retailing,* 88 (1), doi:10.1016/j.jretai.2011.08.004

Case 4:15-cv-04543-YGR   Document 75-12   Filed 01/31/17   Page 23 of 80

Abhijit Biswas & Edward A. Blair

# Contextual Effects of Reference Prices in Retail Advertisements

Reference prices, which are extensively used in retail advertisements, have received considerable research attention over the last 15 years. The authors examine how reference prices in advertisements affect consumers' price beliefs and behavioral intentions in different contexts. A model of reference price effects is proposed and tested. The model facilitates explanation of anomalous findings in previous research.

REFERENCE prices are a common feature of retail advertisements. Rather than simply stating the offering price for some item, a retail advertiser often presents some comparative price information to document the saving represented by the offering. This comparative information can have many forms: "was $X, now $Y," "compare at $X," "list price $X, our price $Y," "save $X," "save X%." Whatever form it takes, the comparative information presents or implies a reference price against which the offering price can be judged.

The questions of whether reference price advertising works, when it works, and how it works have long been of interest to market researchers and policy makers. The policy interest relates to fair advertising practice; reference prices often are "puffed," and therefore may constitute deceptive advertising if effective (Blair and Landon 1981). The research interest relates partly to the policy issue, but mainly to underlying theoretical questions about how consumers process price information. As Winer (1986, p. 250) indicates (follow-

ing Rao 1984), "relatively little is yet known at the consumer level about how price information is used in making brand choice decisions."

A review of the literature on the effects of reference price advertising shows some unresolved points of theory. We note these points, offer a conceptual framework that resolves them, and provide an empirical test that supports the framework. Our conceptual framework is capable of explaining unexpected and inconsistent findings in previous research on reference prices. Also, our framework and our empirical results have managerial and public policy implications.

## Background

### Definitions

A reference price can be defined as any price in relation to which other prices are seen. Reference prices can be external or internal to memory.

External reference prices can be provided to consumers through channels such as advertising, catalog listings, and consumer price guides. Three basic external reference price formats are used in advertising: (1) comparing an advertised price with the seller's former price, (2) comparing an advertised price with the manufacturer's suggested retail price, and (3) com-

Abhijit Biswas is Assistant Professor of Marketing, College of Business Administration, Louisiana State University. Edward A. Blair is Associate Professor of Marketing, College of Business Administration, University of Houston.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000030

paring an advertised price with prices at competing stores (Della Bitta, Monroe, and McGinnis 1981; Federal Trade Commission 1986).

Internal reference prices are those stored in the consumer's memory. Various internal reference prices have been discussed in the literature, including the aspiration price, market price, and historical price (Klein and Oglethorpe 1987), the adaptation level price, lowest market price, and highest market price (Monroe 1979), and the fair price (Thaler 1985). These internal reference prices may be points or ranges of values (Gabor and Granger 1961; Monroe 1971, 1984; Sherif 1963). Internal reference prices serve as reference points for evaluating an advertised price or savings claim, and may change when the consumer receives information from an external source.

### Previous Research

Previous research on reference price advertisements by retailers has focused on the effects of external reference prices on consumers' price perceptions. Specific dependent variables in previous studies have included (1) the believability or credibility of the reference price, (2) perceptions of the store's regular selling price, (3) perceived saving (how the sale price compares with the regular price), (4) shop-around saving (how the sale price compares with the lowest price in the market), and (5) willingness to buy (see Berkowitz and Walton 1980; Blair and Landon 1981; Della Bitta, Monroe, and McGinnis 1981; Fry and McDougall 1974; Keiser and Krum 1976; Lichtenstein and Bearden 1988, 1989; Liefeld and Heslop 1985; Urbany, Bearden, and Weilbaker 1988a).

Reference price effects generally have been explained through adaptation level (Helson 1964) and assimilation-contrast (Sherif 1963; Sherif and Hovland 1964) theories. Adaptation level theory suggests that a particular stimulus is judged in relation to what one has become accustomed to. The adaptation level price, in the strictest sense defined as the geometric mean of previously observed stimuli, can be considered to be the average market price or some average of the range of prices for similar products (Emory 1970). The concept of a range of prices implies extreme (both high and low) stimulus values for a particular product category. According to Monroe (1979), three different internal prices—the adaptation level price, the lowest price, and the highest price—provide the "anchoring stimuli" that affect price judgments. The notion is that an external reference price can draw the adaptation level price in its direction, or even substitute for it.

Adaptation level theory suggests that the ability of an external reference price to move the adaptation level price depends on contextual factors. Contextual factors relevant to retail advertising include the place-

ment and size of the price claim within the ad, the semantic content of the price claim (cf. Della Bitta, Monroe, and McGinnis 1981), the familiarity of the brand to consumers (Blair and Landon 1981), and the store's price reputation (Fry and McDougall 1974), among others.

Assimilation-contrast (A-C) theory also has been used to predict the effects of advertised reference prices. In a pricing context, according to the A-C theory, consumers have latitudes of acceptance around their price beliefs. A consumer introduced to a reference price claim assimilates it if the claim is within the latitude of acceptance. Otherwise a contrast effect occurs and the claim is not believed (Monroe and Petroshius 1981).

The internal standard with which consumers compare an incoming price stimulus has also been labeled "expected or fair price" (Thaler 1985). Thaler's theory of consumer choice separates the total value of goods being considered for purchase into two components, acquisition utility and transaction utility. Transaction utility is a function of p, the actual price of the good being purchased, and p*, the consumer's internal reference price for the product. Transaction utility reflects the value or "merits of the deal" (p. 205). In this terminology, external reference prices work by moving the fair price of the product, thus enhancing the merits of the deal.

### Some Issues

Several issues have not been addressed fully in previous work on reference prices. First, all of the researchers have assumed implicitly that external reference prices *raise* perceptions of saving if they affect them at all. This assumption probably stems from the fact that reference prices are used to assert savings. But what will happen if the external reference price is *below* the internal reference? Almost certainly, the consumer will abandon his or her previous estimate as being too high. Will the external reference price therefore *reduce* perceived savings and shopping intention when compared with an advertisement without a reference price?

Another issue in understanding external reference price effects is whether assimilation and contrast occur abruptly. Urbany, Bearden, and Weilbaker (1988a) found that reference prices higher than subjects' initial estimates of the highest price in town could affect shopping behavior. Also, there is strong evidence that consumers are skeptical of reference price claims and discount them. Fry and McDougall (1974, p. 65) found "a general distrust of sales" and Blair and Landon (1981), Liefeld and Heslop (1985), and Urbany, Bearden, and Weilbaker (1988a) all found explicit discounting of ad claims. These findings suggest that acceptance or rejection of external reference prices is

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000031

not abrupt, and that increasing reference price claims may simultaneously become less believable yet more effective.

A question that has very interesting implications is which price beliefs are relevant to retail patronage. Reference pricing studies generally have used, as the chief dependent variable, "perceived saving," measured as the difference between a sale price and consumers' estimates of the store's regular price. We believe, though, that the more important belief for patronage is the consumer's belief about how a sale price compares with the lowest price in the market area (our empirical results seem to confirm this point; see footnote 5). This point is important because it forces a separation of "perceived saving" and shopping intention, a separation that generally has not been made by other authors (cf. Blair and Landon 1981; Lichtenstein and Bearden 1989; Urbany, Bearden, and Weilbaker 1988a).

Consider, for example, identical reference price advertisements from a discount store and a department store. Consumers might assign a higher perceived saving (from the store's regular price) to the department store. At the same time, consumers exposed to the discount store ad might show larger increases in shopping intention. Because the discount store is seen as having a regular price at or near the lowest price in town, a relatively small saving makes that store's sale price very attractive, whereas the department store might be viewed as high priced even with a sale. Fry and McDougall (1974) observed this phenomenon.

Also, consider a situation in which an offering price is at or below the consumer's initial estimate of the lowest price in town. This offering price should not need an external reference price to certify its merit. Urbany, Bearden, and Weilbaker (1988a) inadvertently created such a situation and, as one might expect, they found high patronage regardless of whether or not a reference price was given. The reference price in their advertisement influenced perceived saving from the store's regular price, but was not needed to influence patronage.

In addition to forcing a separation between perceived saving and shopping intention, a focus on lowest market price as a key belief requires that attention be given to the issue of inferencing. A reference price advertisement typically provides no direct information about the lowest market price. The advertisement's effect on that belief must occur through some form of inference; for example, "If I was low in my estimate of the store's regular price, I'm probably also low in my estimate of the lowest market price, so this sale price probably is a good deal." Authors in the reference price literature generally have not addressed inferencing.

## Conceptual Model and Hypotheses

Our conceptual model (Figure 1) is similar to the process described by Lichtenstein and Bearden (1989). Our additions include (1) identification of key factors that may affect the *direction* and the *amount* of change in the initial belief, (2) use of inferencing as a theoretical explanation for shifts in initial beliefs, and (3) the recognition that shop-around saving (in comparison with perceived saving) may be the more important determinant of shopping intention.

### Overall Model Description

Monroe (1984) postulates that buyers generally have a range of acceptable prices for possible purchases. People can estimate a distribution of retail prices for some item, such as the lowest market price at which the item can be purchased, the highest price, the average price, and a price for some given retailer (Helgeson and Beatty 1987; Klein and Oglethorpe 1987; Urbany, Bearden, and Weilbaker 1988a). Regardless of whether these estimates are accurate and/or based in fact, they embody the consumer's beliefs about the price of the item—for example, these estimates would indicate whether the consumer believes that the given retailer has the lowest price in town, a lower than average price but not the lowest price in town, and so on. The various beliefs may be strong or weak, depending on the consumer's knowledge about the brand, the product category, and the retailer.

A reference price advertisement directly asks the consumer to re-evaluate at least one price belief. For example, an ad with a "regular price–sale price" format asks the consumer to change his or her belief about the store's regular price, if necessary, to fit the reference price. The consumer may change this belief without completely accepting the reference claim. That is, the revised belief may reflect some discounting of the ad claim.

Apart from beliefs that change in direct response to the reference price, other aspects of the internal price distribution can change through inferencing. Inferred changes may be as simple as, "If I was high on my estimate of the store's regular price, I'm probably high on my estimate of the lowest market price." These changes may also draw upon other bases.

One type of inferencing relevant to reference prices is correlational rules, whereby inferred beliefs about one attribute are based on other attribute beliefs (Erikson, Johansson, and Chao 1984; Huber and McCann 1982; John, Scott, and Bettman 1986). An example is inferring quality on the basis of price. When a consumer is exposed to a high external reference price for an unfamiliar brand, he or she may infer that "it must be a deluxe brand." Another relevant type of inferencing is schema-based inferencing (Alba and

**Contextual Effects of Reference Prices / 3**

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000032

**FIGURE 1**
**A Model of Reference Price Effects**



Hutchinson 1987; Lichtenstein and Bearden 1988). For example, a consumer may make inferences based on the perception that an advertiser is a good instance of a category (such as a discount store). Correlational or schema-based inferences may change the entire estimated distribution of prices.

The recognition of various price beliefs and of inferencing suggests that the effect of a reference price may depend on which price it claims to provide. We focus on advertisements that claim to provide the store's "regular price" along with the offering (sale) price.

Regardless of whether a particular price belief is changed through direct information or through inferencing, the *direction* of change depends on whether the reference price is higher or lower than the consumer's initial estimate of the price. A reference price higher than the initial belief should pull beliefs upward, and a reference price below the initial belief should pull beliefs downward. The *amount* of change depends on (1) the size of discrepancy between the external reference price and the consumer's initial estimate of the price, (2) the consumer's confidence in various initial price beliefs, and (3) the meaningfulness of the reference price information.

Size of discrepancy should have an inverted-U relationship with the amount of belief change. That is, the amount of belief change should be higher for a moderate discrepancy between the external reference price and the consumer's initial estimate of the price and lower when the discrepancy is very small or very large. A small discrepancy will cause little movement in price beliefs because it asks for only a little movement. A larger discrepancy will cause larger movements in price beliefs until the discrepancy becomes large enough to trigger a contrast effect. From that point on, increasing skepticism about the external reference price should drive the effects of that price down.

Confidence in initial beliefs should relate negatively to belief change, and meaningfulness of the reference price should relate positively. Factors related to confidence in beliefs include product class familiarity, brand familiarity, shopping experience, general price consciousness, frequency of price promotions within the product category (Winer 1986), memory factors, and others. Meaningfulness of the reference price depends on variables such as the store's general price reputation (Fry and McDougall 1974), the store's typical advertising practices (Lichtenstein and Bear-

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000033

den 1988, 1989), typical advertising practices for the product class, and others.

After revising price beliefs in response to an advertisement, consumers should compare the offering price with their revised price beliefs. Consumers' willingness to shop a given retailer for a given item generally depends on their perceptions of the retailer's price in relation to the lowest available price (potential shop-around saving), and may be influenced also by the "deal" (the perceived saving from consumers' estimates of the store's regular price; Urbany, Bearden, and Weilbaker 1988b, p. 335).

### Hypotheses

In our research, we focused our theoretical framework on three experimental variables: brand, store type, and level of reference price. Brand gave us a managerially interesting variable that relates to confidence in prior beliefs, and store type gave us an interesting variable that relates to the meaningfulness of reference price information (vis à vis the lowest available price).

We tested three hypotheses about the way in which brand, store, and reference price level would mediate the effects of a reference price on subjects' price beliefs.

$H_{1a}$: Reference price advertisements for an unfamiliar brand move consumers' price estimates for that brand (lowest market price, highest price, average price, and regular price at some store) more than reference price advertisements for a familiar brand.[1]

$H_{1b}$: The difference between unfamiliar and familiar brands (in movement in price estimates) is larger when the reference price is implausible than when it is plausible.[2]

$H_2$: Reference price advertisements from a discount store move estimates of lowest market price more than reference price advertisements from a nondiscount store.

$H_3$: The effects of a plausible reference price on posterior estimates of the lowest market price differ according to the level of initial price estimates. If the reference price is higher than the initial estimate of the store's normal price, the posterior estimate of the lowest price will be higher than the initial estimate. If the reference price is lower than the initial estimate of the store's normal price, the posterior estimate of the lowest price will be lower than the initial estimate.[3]

---

[1] Brand familiarity is used in this hypothesis as a managerially interesting proxy for consumers' belief confidence. Any test of the hypothesis should contain a manipulation check on confidence.

[2] We use "implausible" where Urbany, Bearden, and Weilbaker (1988a) use the term "exaggerated" to describe a reference price that is above most subjects' estimates of the highest market price. At some point, the implausible reference price should become so outlandish as to be discounted completely. Our hypothesis presumes that implausibility is not pushed to that point.

[3] $H_3$ presumes that the advertised sale price (i.e., the offering price) is higher than the consumers' initial estimate of lowest market price. If the offering price is lower than this estimate, the estimated lowest price will decline at least to the offering price, regardless of whether the external reference price is above or below the initial estimate of the store's normal price.

$H_2$ and $H_3$ pertain to estimates of lowest market price because we regard lowest price as a key belief in store patronage decisions.

To put the effects suggested by $H_1$ through $H_3$ in the context of reference price literature, we tested related hypotheses with dependent variables that have been used in previous research: discounting, perceived saving, shop-around saving, and shopping intention.

Movements in price beliefs relate to all of these variables. For example, if reference price claims cause less change in consumers' price beliefs for familiar than for unfamiliar brands ($H_{1a}$), the suggestion is that the reference price claims are discounted more heavily for the familiar brands. With reference prices that are higher than consumers' initial price beliefs, heavier discounting means that the posterior price estimates are lower (closer to the initial beliefs). Lower estimates of the store's regular price and the lowest market price mean that (1) an advertised sale price will offer less perceived saving from the store's regular price and (2) perceived shop-around saving will be higher. Presumably, therefore, less shift in price beliefs means less shift in shopping intention. The following hypotheses were tested.

$H_4$: Plausible reference prices for unfamiliar versus familiar brands
   (a) are similarly discounted,
   (b) result in similar perceived saving from the store's regular price,
   ($c_1$) result in lower estimates of shop-around saving (if the reference price is higher than the consumer's initial estimate of the store's regular price),
   ($c_2$) result in higher estimates of shop-around saving (if the reference price is lower than the consumer's initial estimate of the store's regular price),
   ($d_1$) result in higher shopping intention (if the reference price is higher than the consumer's initial estimate of the store's regular price), and
   ($d_2$) result in lower shopping intention (if the reference price is lower than the consumer's initial estimate of the store's regular price).

$H_5$: Implausible reference prices for unfamiliar versus familiar brands
   (a) are discounted less,
   (b) result in higher perceived saving,
   (c) result in lower estimates of shop-around saving, and
   (d) result in higher shopping intention.

$H_6$: Reference price advertisements (implausible and plausible) by discount stores versus nondiscount stores
   (a) are discounted more,
   (b) result in lower perceived saving, yet
   (c) result in lower estimates of shop-around saving, and
   (d) result in higher shopping intention.

$H_{4a}$ and $H_{4b}$ follow a previous finding by Blair and Landon (1981). Theory requires only that the differences in discounting and perceived saving between familiar and unfamiliar brands be smaller for plausible (vs. implausible) reference prices.

**Contextual Effects of Reference Prices / 5**

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000034

The hypothesized effects of store type on the dependent variables ($H_6$) demonstrate that there need not be a consistent relationship between perceived saving and shop-around saving or shopping intention.

# Method

We tested our hypotheses in an experimental study. Subjects responded to advertisements for videocassette recorders (VCRs) under varied conditions of brand, store type, and level of external reference price.

## Stimulus Design

*Product selection.* We tested 15 shopping goods for use in our study. Shopping goods were preferred because most previous studies of external reference prices have used them. We selected VCRs because pretest respondents (n = 54) indicated greater price familiarity for VCRs than for other products (VCR mean = 5.2 on scale of 1 = not familiar at all to 7 = very familiar).

*Brand selection.* Two brands of VCRs, one familiar and one unfamiliar, were selected from a list of 11 brand names. The pretest subjects were asked to indicate how familiar they were with each brand name (on a 1 to 7 scale). Brand familiarity was conceptualized as subjective knowledge; Park and Lessig (1981) argue that subjective knowledge is a better predictor of decision-making strategy than other knowledge measures.

The subjects also were asked to give estimates of lowest possible price, average price, highest price in town, and prices at certain stores for each brand. To facilitate these estimates, a description of four major features common to all brands was provided.

Two brands, Emerson and Colorguard, were selected on the bases of (1) similarity in price estimates and (2) maximum difference on the familiarity scale, given the similarity in price estimates. Similarity in price estimates was emphasized so that the same reference (advertised regular) price and sale price could be used for both brands.

Though the Emerson and Colorguard pairing scored best on our criteria of similar price and dissimilar familiarity, we had a second motive for choosing the Colorguard name. One of our goals was to clarify results obtained by Blair and Landon (1981), who unexpectedly found no difference in response to reference price ads for familiar and unfamiliar brands. They used the fictitious Colorguard brand as their unfamiliar brand of television set, and we considered it desirable to use the same name. (They used Sony as their familiar brand despite a large difference in expected prices between the Colorguard and Sony brands; we used Emerson to remove this price difference while retaining most of the familiarity difference).

*Store selection.* The second variable manipulated was type of store. Pretest subjects were given a list of 18 stores and asked to indicate their expectations of each store's price for a 19-inch RCA color TV set on a scale of 1 = much lower than other stores to 7 = much higher than other stores. A "not familiar" category was provided. Wal-Mart (discount) and Foley's (department) were selected on the basis of (1) maximum difference in price perception (mean = 2.2 vs. 5.3) and (2) minimum response variance (1.0 and .77), indicating homogeneous perceptions of each store.

*Determining the reference and sale price.* The third manipulated variable was reference (regular) price. Implausible reference price was operationalized as an advertised regular price that was (1) considerably higher than the average expected highest market price for a brand and (2) higher than at least 95% of the highest price estimates for the brand. The average estimated highest prices for Emerson and Colorguard VCRs were $345 and $318, respectively. The implausible reference price was set at $599.

A plausible reference price was defined as an advertised regular price lower than the average expected highest market price for a brand. The plausible reference price was set at $299—approximately the average of the estimated normal prices at Foley's for Colorguard ($291) and Emerson ($311)—to obtain naturally two groups of subjects, one for whom the plausible reference price would be higher than their prior belief of the store's normal price and one for whom the plausible reference price would be lower. These two groups were used to test $H_3$ and $H_4$.

The sale price was set at $229, lower than the plausible external reference price and higher than the mean lowest price estimates for both brands. The second criterion is crucial in order to be able to demonstrate upward movement of the lowest price estimates after exposure to a reference price advertisement.

## Experimental Procedures

The experiment was conducted in a classroom setting. Upon arrival the subjects were given an envelope containing the experimental booklet. They were asked to give their best estimates of the (1) lowest price in town, (2) average price in town, (3) highest price in town, and (4) regular price at some store (Wal-Mart or Foley's) for an athletic shoe, a VCR (Colorguard or Emerson), and a TV set (Zenith). Each brand was described by four major features, and feature descriptions were identical within each product category.

The second section of the booklet contained three sets of advertisements and questionnaires. The advertisements were realistic and, with the exception of the manipulated variables, had the same content within each set. The subjects were asked to go through the

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000035

advertisements one at a time and respond to the corresponding questionnaires. They were permitted to refer back to an advertisement while answering questions about it.

The experimental advertisement was placed last in this section. This advertisement contained price and feature information on the experimental product (VCR) and an accompanying product (TV). The advertisement was either by Foley's or by Wal-Mart, for a Colorguard VCR or for Emerson, with a plausible reference price or an implausible reference price. The 2 × 2 × 2 design was applied between subjects (each subject saw one brand in one store with one reference price).

After viewing the experimental advertisement, the subjects responded to questions on shopping intention, price estimates, and plausibility of the reference price for both the VCR and the TV set. Finally, subjects completed a questionnaire including task inquiries, manipulation checks, and demographic questions. On average the entire experimental session lasted 30 minutes.

*Sample.* A total of 234 student subjects, mostly juniors and seniors with business majors, participated in the study.

*Dependent variables.* The dependent variables considered were (1) estimates of the advertiser's price, (2) estimates of the lowest price in town, (3) estimates of average price, (4) estimates of highest price, (5) discounting, (6) perceived saving, (7) shop-around saving, and (8) shopping intention. Price estimates were obtained both before and after exposure to the reference price advertisements by directly questioning the subjects.

Discounting, defined as the amount of reduction in the advertised regular price, was calculated by subtracting post-test estimates of the store's price from the store's advertised regular price (Blair and Landon 1981). Perceived saving was calculated by subtracting the sale price from the consumers' (post-test) estimates of the store's regular price. Shop-around saving was calculated as the difference between the sale price and the post-test estimate of the lowest price around town. Finally, shopping intention was measured directly by asking the respondents whether they would shop the advertiser for the advertised brand. The subjects were told to assume that they already had decided to purchase the advertised brand and that the store was conveniently located for them.

# Data Analyses and Results

## Task Perception

Responses to the task perception statements indicate that the subjects felt at ease with the task, took the task seriously, and performed the task in a natural manner. Also, the advertisements were perceived as real.

## Manipulation Checks

*External reference price.* The manipulation of plausible versus implausible reference price was checked in two ways. First, we examined the range of pre-exposure estimates of Foley's and Wal-Mart's regular prices for Emerson and Colorguard VCRs. The plausible external reference price ($299) was within all of these estimated price ranges, whereas the implausible external reference price ($599) was considerably outside these ranges.

In a second manipulation check, subjects were asked to express their level of agreement (1 = strongly disagree, 7 = strongly agree) with the statement, "I do *not* believe that the amount of reduction shown in the advertisement is a truthful claim." The mean agreement for subjects exposed to the implausible and plausible reference prices was 4.15 and 2.21, respectively ($F_{1,227} = 71.391$, $p < .01$).

*Brand familiarity.* The subjects reported their level of familiarity (1 = not familiar at all, 7 = very familiar) with the VCR to which they had been exposed. The mean familiarity levels for the Colorguard (unfamiliar) and the Emerson (familiar) VCRs were 2.72 and 5.32, respectively ($F_{1,227} = 147.20$, $p < .01$). The subjects also reported their confidence in their initial price estimates. The mean confidence levels for the familiar and unfamiliar brands were 4.5 and 3.2, respectively ($F_{1,229} = 33.55$, $p < .01$). A manipulation check for store type was not conducted because Wal-Mart and Foley's had been selected initially from a group of discount and nondiscount stores, respectively.

## Hypothesis Testing

Tests of the six hypotheses give good support for our theoretical framework. The results are reported in two parts. We first report results for the basic belief hypotheses ($H_{1a}$, $H_{1b}$, $H_2$, $H_3$), then summarize results for the related hypotheses ($H_4$, $H_5$, $H_6$).

*Basic hypotheses.* $H_{1a}$ states that reference price advertisements for an unfamiliar brand affect the internal price distribution more than reference price advertisements for a familiar brand. The dependent variable of interest was taken as the average of absolute differences between subjects' pre- and post-test estimates of lowest price, store price, average price, and highest price. This average represents overall movement in price beliefs—that is, the global effect of the external reference price.

An analysis of variance (modeling the three experimental variables and all possible interactions) was performed on the average absolute difference. The main

COMPEAU000036

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

effect of brand familiarity is significant at p < .10 ($F_{1,124}$ = 3.01), and a comparison of means shows proper directionality (see the first two rows of Table 1). Thus, $H_{1a}$ is supported.

$H_{1b}$ proposes an interaction between type of reference price and brand familiarity. Specifically, it states that the difference between price distribution changes for unfamiliar and familiar brands is larger when the reference price is implausible than when it is plausible. The interaction effect of these two variables on the dependent variable is significant ($F_{1,124}$ = 4.82, p < .05) and in the expected direction (see the lower four rows of Table 1). Therefore, $H_{1b}$ is supported.

$H_2$ states that reference price advertisements from a discount store, in comparison with those from a nondiscount store, move *lowest* price estimates more in the direction of the reference price. This hypothesis was tested by examining the main effect of store type on the difference between pre- and post-test estimates of the lowest market price. Store type had a significant effect on lowest price estimates ($F_{1,124}$ = 8.99, p < .01). The mean changes in lowest price estimates are $47 and $23 for the discount and nondiscount stores, respectively (see the first two rows of Table 2). Thus, $H_2$ is supported.

Incidentally, the first two rows of Table 2 show that subjects who were assigned to the two store type conditions had very similar prior estimates of the lowest available price for the advertised VCRs. All available tests of group similarity showed no prior differences among experimental cells.

$H_3$ proposes an interaction effect between the level of initial price estimates (i.e., RP > NP vs. RP <

NP) and reference price effects. Specifically, the posterior estimates of lowest available price are posited to be higher than initial estimates when the reference price is greater than the initial estimate of normal price (RP > NP), and lower than initial estimates when the reference price is less than the initial estimate of normal price (RP < NP).

This hypothesis was tested by a repeated-measures MANOVA with level of initial price estimates (RP > NP or RP < NP) as a between-subjects factor and reference price effects (pre- vs. post-test estimates of lowest available price) as a within-subjects factor. Recall that the plausible reference price was set around the estimated average normal price charged by the nondiscount store for the selected brands of VCR. Hence, data from only the "plausible reference price, nondiscount store" condition were used to test this hypothesis.

The hypothesized interaction is significant ($F_{1,40}$ = 36.15, p < .01), with means in the proper direction (see the lower two rows of Table 2). Thus, $H_3$ is also supported.[4]

*Related hypotheses.* Table 3 provides test results for the hypotheses about discounting, perceived saving, shop-around saving, and shopping intention ($H_4$–$H_6$). All are supported but $H_{4c_1}$, $H_{4d_1}$, $H_{4d_2}$, and $H_{6b}$. Results for $H_{4c_1}$ are in the proper direction but not significant; results for $H_{6b}$ are in the contrary direction and significant.

$H_{4a}$ and $H_{4b}$ propose that there are no differences in discounting and perceived saving between unfamiliar and familiar brand conditions when the reference price is plausible. As shown in the first two rows of Table 3, discounting and perceived saving are not significantly different between the two brand conditions. Thus, $H_{4a}$ and $H_{4b}$ are supported.

$H_{4c_1}$ and $H_{4d_1}$ state that shop-around saving is lower and shopping intention higher for unfamiliar brands than for familiar brands, given that subjects' initial estimates of the store's normal price are lower than the plausible reference price. However, these differences, shown in the third and fifth rows of Table 3, are not significant.

$H_{4c_2}$ and $H_{4d_2}$ pertain to the subjects whose initial price estimates are *higher* than the plausible reference price (RP < NP). For these subjects, we hypothesized that shop-around saving is higher and shopping intention lower for unfamiliar brands than for familiar brands. The shop-around saving hypothesis, $H_{4c_2}$, is supported at p < .10, but there is no significant dif-

**TABLE 1**
**Mean Overall Changes in Price Estimates for Familiar Versus Unfamiliar Brands**

| Condition | Average Absolute Difference Between Pre-Ad-Exposure and Post-Ad-Exposure Estimates of Store's Regular Price, Lowest Available Price, Average Price, and Highest Price ($) |
|---|---|
| Emerson VCR, overall | 68 |
| Colorguard VCR, overall | 86 |
| Emerson with a plausible reference price | 52 |
| Colorguard with a plausible reference price | 52 |
| Emerson with an implausible reference price | 93 |
| Colorguard with an implausible reference price | 148 |

---

[4]Because the assignment of subjects to groups for this hypothesis test is based on their initial price estimates, rather than random assignment, some portion of the results may be attributable to regression to the mean.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000037

**TABLE 2**
**Mean Estimates of Lowest Available Price Under Various Experimental Conditions**

| Condition | Mean Estimate Before Ad Exposure ($) | Mean Estimate After Ad Exposure ($) | Mean Change ($) |
|---|---|---|---|
| Ad for Wal-Mart, overall | 174 | 221 | +47 |
| Ad for Foley's, overall | 178 | 201 | +23 |
| Plausible reference ad for Foley's, subjects whose pre-exposure estimate of Foley's regular price was above the reference | 276 | 203 | −73 |
| Plausible reference ad for Foley's, subjects whose pre-exposure estimate of Foley's regular price was below the reference | 183 | 205 | +22 |

ference in shopping intention (see the fourth and sixth rows of Table 3).

$H_{5a}$ through $H_{5d}$ pertain to the implausible reference price condition. $H_{5a}$ and $H_{5b}$ state that discounting is lower and perceived saving higher for an unfamiliar than for a familiar brand. As shown in the middle section of Table 3, discounting is significantly lower and perceived saving is significantly higher for the unfamiliar brand. Hence, $H_{5a}$ and $H_{5b}$ are supported. $H_{5c}$ and $H_{5d}$ state that implausible reference prices result in lower shop-around saving and higher shopping intention for unfamiliar than for familiar brands. These two hypotheses also are confirmed. Shop-around saving is significantly lower (t = 2.76, p < .01) and shopping intention is significantly higher (t = 1.84, p < .05) for the unfamiliar brand.

$H_{6a}$ through $H_{6d}$ pertain to the effects of store type

(discount vs. nondiscount) on discounting, perceived saving, shop-around saving, and shopping intention. Reference price claims from discount stores are expected to be discounted more heavily ($H_{6a}$), produce lower estimates of perceived saving from the store's normal price ($H_{6b}$), produce lower estimates of shop-around saving ($H_{6c}$), and produce higher shopping intention ($H_{6d}$). Results in the lower part of Table 3 suggest that $H_{6a}$, $H_{6c}$, and $H_{6d}$ are supported, but $H_{6b}$ is reversed. However, these effects are subject to an interaction with reference price level.

In Figure 2 are plots of cell means for the various dependent variables under all conditions of store type and plausible versus implausible reference price. These plots reveal some interesting points. First, the effects of store type on discounting and perceived saving ($H_{6a}$, $H_{6b}$) are in the hypothesized direction only under the

**TABLE 3**
**Mean Levels of Discounting, Perceived Saving From Store's Regular Price, Shop-Around Saving, and Shopping Intention Under Various Conditions**

| | Mean ($) | Mean ($) | P-value[a] |
|---|---|---|---|
| **$H_4$: Comparing brands given a plausible external reference price** | **Emerson** | **Colorguard** | |
| Discounting | 17.05 | 8.38 | n.s. |
| Perceived saving | 52.95 | 61.62 | n.s. |
| Shop-around saving | | | |
| (RP > NP) | 24.47 | 19.91 | n.s. |
| (RP < NP) | 11.37 | 25.67 | <.10 |
| Shopping intention | | | |
| (RP > NP) | 4.82 | 4.20 | n.s. |
| (RP < NP) | 4.05 | 4.67 | n.s. |
| **$H_5$: Comparing brands given an implausible reference price** | **Emerson** | **Colorguard** | |
| Discounting | 236.88 | 156.92 | <.05 |
| Perceived saving | 133.13 | 213.08 | <.05 |
| Shop-around saving | 28.63 | −5.60 | <.01 |
| Shopping intention | 4.29 | 5.20 | <.05 |
| **$H_6$: Comparing store types** | **Wal-Mart** | **Foley's** | |
| Discounting | 99.18 | 62.48 | <.10 |
| Perceived saving | 118.51 | 83.64 | — |
| Shop-around saving | 7.98 | 27.67 | <.01 |
| Shopping intention | 5.09 | 4.09 | <.01 |

[a]n.s. = not significant.

Contextual Effects of Reference Prices / 9

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000038



**FIGURE 2**
**Effects of Store Type on Discounting, Perceived Saving, Shop-Around Saving, and Shopping Intention Under Plausible and Implausible Reference Prices**

is mediated by the size of discrepancy between the reference price and prior beliefs, by factors that influence consumers' confidence in prior beliefs (including brand familiarity), and by factors that affect the meaningfulness of the reference price information (including store type, discount vs. nondiscount).

### Explaining Some Previous Results

One purpose of our research is to explain unexpected or inconsistent findings in previous studies of reference price. Principal among these findings is the inconsistent relationship between perceived saving and shopping intention. Researchers have been able to demonstrate positive effects of reference prices on perceived saving, but more often than not they have not been able to find any effect of reference prices on shopping intention (Berkowitz and Walton 1980; Della Bitta, Monroe, and McGinnis 1981; Keiser and Krum 1976).

Other points of interest are noted in the literature. Urbany, Bearden, and Weilbaker (1988a) found that a reference price had an effect on shopping intention when the sale price was *above* consumers' previous estimates of the lowest price in town, but not when the sale price was *below* consumers' estimates of lowest price in town. Blair and Landon (1981) found no difference in discounting of reference price claims between familiar and unfamiliar brands, though they had anticipated a difference.

Our research, and its accompanying model, suggest reasons for these results. For the inconsistent relationship between perceived saving and shopping intention, our model notes that these phenomena need not relate closely. We believe that reference prices are able to increase perceived saving because consumers are inclined to give some credence to the store's claim about its normal price. However, we believe that shopping intention depends not so much on perceived saving from the store's normal price as on the difference between the sale price and the lowest market price.[5] A reference price will produce changes in shopping intention only when the change in estimated store price is linked, through inference, with a change in estimated lowest price. If consumers are very knowledgeable about a product class and a brand, so that their estimates of lowest market price are resistant to change, reference prices will tend not to change shopping intention even if they affect perceived saving from a store's regular prices.

We consider very natural the Urbany, Bearden, and

plausible reference price condition (Figure 2, A and B). When the reference price is implausible, the nondiscount store's price is discounted more than the discount store's price, so that perceived saving is higher for the discount store. Regardless of the direction of discounting and perceived saving, shop-around saving is lower and shopping intention higher for the discount store (Figure 2, C and D), confirming $H_{6c}$ and $H_{6d}$.

## Discussion and Conclusions

In general, the results support our argument that (1) consumers' price beliefs change in response to external reference prices, (2) inference leads to changes in beliefs other than those directly addressed by a reference price, (3) the direction of belief change is determined by whether the external reference price is above or below consumers' previous estimates of that price, and (4) the amount of change in price beliefs

---

[5]We correlated our measure of shopping intention with our measures of perceived saving and shop-around saving. Shop-around saving was by far the stronger predictor of intention.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000039

Weilbaker (1988a) finding that shopping intention is affected by reference price only when the sale price is above the prior estimate of the lowest market price. Reference price increases shopping intention by shifting the estimates of the lowest price toward the sale price. If the sale price itself is low enough to make consumers feel they cannot save anything by shopping around (shop-around saving equals zero), then, though the reference price may affect perceived saving, it will be irrelevant to shopping intention.

Our research reproduced Blair and Landon's (1981) finding that plausible reference prices for familiar and unfamiliar brands are similarly discounted. Plausible reference prices do not ask for much change in price beliefs, so there is not much difference between familiar and unfamiliar brands. With implausible reference prices, however, the effect that Blair and Landon expected emerges. An implausible reference price for a familiar brand is discounted more heavily to bring it closer to the (more strongly held) prior beliefs.

## Implications and Future Directions

Our study has some straightforward implications of managerial and public policy interest. The most important managerial implication stems from the finding that discount stores, in comparison with nondiscount stores, show larger increases in shopping intention when external reference prices are used. The implication is that discount stores can use reference price advertising more effectively than nondiscount stores. The most important public policy implication stems from the finding that (1) a plausible reference price may reduce shopping intention among some buyers, whereas (2) an implausible reference price, even though discounted more than a plausible reference price, can result in higher shopping intention. The implication is that retailers have an economic incentive to use inflated reference prices, and that consumers will be harmed if retailers yield to that temptation.

Two points should be noted here. First, both stores used in our study have some reputation for honest advertising. Had we used stores with a reputation for puffing their reference prices, we might have found greater discounting of the ad claims and less effect. An advertising strategy that repeatedly tries to benefit from inflated reference prices may carry the seeds of its own destruction by teaching consumers that the store cannot be trusted. In fact, Lichtenstein and Bearden (1989) suggest that regular use may blunt the effects of reference price claims *regardless* of honesty, because it reduces the distinctiveness of the claims.

Second, consumers do not see reference price claims in isolation from claims by competing stores. We suspect that most consumers have had the experience of

seeing a reference price advertisement in a newspaper, thinking the offer was a really good deal, then seeing a competing ad offering a similar or even lower price for the same item. Ads for auto dealers might be an example of this phenomenon, particularly in a large city. The benefit of a reference price claim may be short-lived under such circumstances.

These two points relate to a fundamental question about reference price advertising: To what extent do consumers protect themselves against inflated claims in real life? The implication of our findings, and those of previous research on reference prices, is that consumers are neither fully defenseless nor fully protected. They discount claims, they use general knowledge about the product, brand, and/or store, and they may shop around—all of which mitigate the effects of reference prices. Even so, consumers do seem to be affected by reference price claims, including inflated claims.

The fact that the consumers are not fully protected from reference price claims suggests the desirability of aggressively policing such claims, as some states are doing (Agins 1990). However, the fact that the consumers are not defenseless, and that reference price advertising can contain useful information, suggests that policing efforts should not take the form of a blanket ban, but rather should be directed to situations in which harm is most likely (Blair and Landon 1981).

Before arguing too strongly for any policy, we must recognize an important limitation of our research. Our study, like most of those reported in the reference price literature, is based on an experiment in which subjects (1) knew they were in a research study, (2) were not engaged in actual shopping behavior, (3) had no opportunity to compare ad claims with other information, and (4) responded immediately to the ad claims.[6] These factors do not invalidate the differences in reference price effects across store types, brands, etc. They do, however, suggest that all observed effects may be larger than in real life. This feature is common in laboratory research (cf. Hovland 1959).

Following the scientific realist view of psychological experiments, we view our study as showing *potential* effects rather than *typical* effects as observed in the real world (Manicas and Secord 1983). Research is needed that measures real-world response to reference prices, as well as the extent to which habitual puffing by a store negates that response, and the extent to which consumers triangulate information such as other stores' advertisements to judge reference price claims. We regard these issues, plus others implied by our model, as fertile research topics.

---

[6]Other factors conducive to demand effects in our study include a student sample, most without direct buying experience in the product category, and before-and-after measurements of price beliefs.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000040

# REFERENCES

Agins, Teri (1990), "As Retailers' Sales Crop Up Everywhere, Regulators Wonder If the Price Is Right," *Wall Street Journal* (February 13), B1–B6.

Alba, Joseph W. and J. Wesley Hutchinson (1987), "Dimensions of Consumer Expertise," *Journal of Consumer Research*, 13 (March), 411–54.

Berkowitz, Eric N. and John R. Walton (1980), "Contextual Influences on Consumer Price Responses: An Experimental Analysis," *Journal of Marketing Research*, 17 (August), 349–58.

Blair, Edward A. and E. Laird Landon, Jr. (1981), "The Effects of Reference Prices in Retail Advertisements," *Journal of Marketing*, 45 (Spring), 61–9.

Della Bitta, Albert J., Kent B. Monroe, and John M. McGinnis (1981), "Consumer Perceptions of Comparative Price Advertisements," *Journal of Marketing Research*, 18 (November), 416–27.

Emory, Fred E. (1970), "Some Psychological Aspects of Price," in *Pricing Strategy*, Bernard Taylor and Gordon Wills, eds. Princeton, NJ: Brandon/Systems, 98–111.

Erickson, Gary M., Johny K. Johansson, and Paul Chao (1984), "Image Variables in Multi-Attribute Product Evaluations: Country-of-Origin Effects," *Journal of Consumer Research*, 11 (September), 694–9.

Federal Trade Commission (1986), "FTC Guides Against Deceptive Pricing," *Title 16, Code of Federal Regulations*, Section 233, 26–30.

Fry, Joseph N. and Gordon H. McDougall (1974), "Consumer Appraisal of Retail Price Advertisements," *Journal of Marketing*, 38 (July), 64–7.

Gabor, Andre and C. W. J. Granger (1961), "On the Price Consciousness of Consumers," *Applied Statistics*, 10 (November), 170–80.

Helgeson, James G. and Sharon E. Beatty (1987), "Price Expectation and Price Recall Error: An Experimental Study," *Journal of Consumer Behavior*, 14 (December), 379–86.

Helson, Harry (1964), *Adaptation Level Theory*. New York: Harper & Row Publishers, Inc.

Hovland, Carl (1959), "Reconciling Conflicting Results Derived From Experimental and Survey Studies on Attitude Change," *American Psychologist*, 14, 8–17.

Huber, Joel and John McCann (1982), "The Impact of Inferential Beliefs on Product Evaluations," *Journal of Marketing Research*, 19 (August), 324–33.

John, Deborah Roedder, Carol A. Scott, and James R. Bettman (1986), "Sampling Data for Covariation Assessment: The Effects of Prior Beliefs on Search Patterns," *Journal of Consumer Research*, 13 (June), 38–47.

Keiser, Stephen E. and James R. Krum (1976), "Consumer Perceptions of Retail Advertising With Overstated Savings," *Journal of Retailing*, 52 (Fall), 27–37.

Klein, Noreen M. and Janet E. Oglethorpe (1987), "Cognitive Reference Points in Consumer Decision Making," in *Advances in Consumer Research*, Vol. 14, Melanie Wallendorf and Paul Anderson, eds. Provo, UT: Association for Consumer Research, 183–7.

Lichtenstein, Donald R. and William O. Bearden (1988), "An Investigation of Consumer Evaluations of Reference Price Discount Claims," *Journal of Business Research*, 17, 189–200.

—————— and —————— (1989), "Contextual Influences on Perceptions of Merchant-Supplied Reference Prices," *Journal of Consumer Research*, 16 (June), 55–66.

Liefeld, John and Louise A. Heslop (1985), "Reference Prices and Deception in Newspaper Advertising," *Journal of Consumer Research*, 11 (March), 868–76.

Manicas, Peter and Paul Secord (1983), "Implications for Psychology of the New Philosophy of Science," *American Psychologist*, 38, 399–413.

Monroe, Kent B. (1971), "The Information Content of Prices: A Preliminary Model for Estimating Buyer Response," *Management Science*, 17 (8), B-519–32.

—————— (1979), *Pricing: Making Profitable Decisions*. New York: McGraw-Hill Book Company.

—————— (1984), "Theoretical and Methodological Developments in Pricing," in *Advances in Consumer Research*, Vol. 11, Thomas C. Kinnear, ed. Provo, UT: Association for Consumer Research, 636–7.

—————— and Susan M. Petroshius (1981), "Buyers' Perceptions of Price: An Update of the Evidence," in *Perceptions in Consumer Behavior*, Harold H. Kassarjian and Thomas S. Robertson, eds. Glenview, IL: Scott, Foresman and Company.

Park, C. Whan and V. Parker Lessig (1981), "Familiarity and Its Impacts on Consumer Decision Biases and Heuristics," *Journal of Consumer Research*, 8 (September), 223–30.

Rao, Vithala (1984), "Pricing Research in Marketing: The State of the Art," *Journal of Business*, 57, Part 2 (January), s39–s60.

Sherif, Carolyn (1963), "Social Categorization as a Function of Latitude of Acceptance and Series Range," *Journal of Abnormal and Social Psychology*, 67 (August), 148–56.

Sherif, M. and C. E. Hovland (1964), *Social Judgement*. New Haven, CT: Yale University Press.

Thaler, Richard (1985), "Mental Accounting and Consumer Choice," *Marketing Science*, 4 (Summer), 199–214.

Urbany, Joel E., William O. Bearden, and Dan C. Weilbaker (1988a), "The Effect of Plausible and Exaggerated Reference Price on Consumer Perceptions and Price Search," *Journal of Consumer Research*, 15 (June), 95–110.

——————, ——————, and —————— (1988b), "Advertised Comparative Price Effects on Buyer Perceptions and Behavior: A Model and Empirical Test," in *Advances in Consumer Research*, Vol. 15, Michael J. Houston, ed. Provo, UT: Association for Consumer Research, 334–40.

Winer, Russell S. (1986), "A Reference Price Model of Brand Choice for Frequently Purchased Products," *Journal of Consumer Research*, 13 (September), 250–6.

**Reprint No. JM553100**

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000041

# Comparative Price Advertising: Informative or Deceptive?

Dhruv Grewal and Larry D. Compeau

*An issue currently generating considerable debate is the increasing use of the comparative price format in advertising. In this paper, reviews of comparative price advertising literature and Federal Trade Commission (FTC) guidelines are integrated to discuss whether comparative price advertisements are informative or deceptive. Recent court cases relevant to comparative price advertising are also discussed. The central focus of the paper is to articulate the state of knowledge regarding comparative price advertising and to assess its potential for being informative or deceptive using an examination of relevant literature and public policy. Recommendations regarding comparative price advertising for public policy makers, managers, and researchers are developed.*

Considerable time and money is spent designing advertisements that will appeal to consumers. One particular format, *the comparative price advertisement,* appeals to consumers' desire for bargains or deals. In comparative price advertisements, advertisers attempt to get consumers to compare a "sale price" to a suggested reference price. This may be an explicit reference price comparison (e.g., "original price/sale price" or "their price/our price"), or an implicit reference price comparison (e.g., the use of "sale price" alone suggests that the regular price is higher).

Ostensibly, advertisers give consumers more price information in a comparative price advertisement than in a noncomparative price advertisement. Comparative price advertising offers consumers a basis for comparing the relative value of the product offering by suggesting a monetary worth for the product and any potential savings. For example, the comparative price advertisement, "regular price $10.00, on sale $7.99," suggests a monetary worth of $10.00 and a savings of $2.01. To the extent that consumers do not have this information about potential savings, the comparative price advertisement is beneficial because more informed consumers are likely to make better purchase decisions.

However, comparative price advertising need not always be beneficial. The FTC has promulgated specific guidelines to determine the conditions under which a comparative price advertisement is deceptive. In general, a comparative price advertisement can be construed as deceptive if it makes any representation, commits any omission of information, or involves any practice that may materially mislead a reasonable consumer [Della Bitta et al. 1981; Ford and Cal-

fee 1986; Kinnear and Root 1988; Laczniak and Grossbart 1990; Richards 1990a].

Recently, numerous legal actions have been taken against major retailers regarding the use of comparative price advertisements [Grewal and Grewal 1991]. The State of Maryland charged that the May Department Stores employed deceptive comparative price advertising. Specifically, it was alleged that May's reference price, labeled as a regular price, was deceptive since May had not regularly sold the product at that price [Grewal and Grewal 1991]. Deception can also occur through the omission of information. Blair and Landon [1981] found that omitting a reference price in conjunction with labeling a price as a "sale price" led consumers to infer a savings. Thus, if the savings inferred were greater than the actual difference between the nonsale price and the sale price, the advertisement was deceptive.

Comparative price advertising should be distinguished from comparative advertising. In comparative advertising, the advertiser typically compares his/her product to a competitor's product (named or implied) [Hisrich 1983; Muehling and Kangun 1985; Turgeon and Barnaby 1988; Wilkie and Farris 1975; Wilson 1978]. This comparison may be an attribute-specific comparison or a global comparison. Therefore, it is tempting to conclude that comparative price advertising is a specific case of the more general comparative advertising. However, the advertiser in a comparative price advertisement compares an actual selling price to some "other" price. This "other" price may not be the price of the competitor (e.g., "manufacturer suggested list price" or a "regular price"). Only in an instance where an advertiser compares a price offer to that of a competitor could a comparative price advertisement be considered a comparative advertisement. Since this paper focuses on comparative price advertising, the general topic of comparative advertising is considered to be outside its scope.

The contributions of two streams of research—comparative price advertising and information cues—facilitate understanding the informative or deceptive nature of comparative price advertisements. An understanding of the effects of information cues on consumer decision processes is considered vitally important by the FTC [Ford and Calfee 1992].

DHRUV GREWAL is with the Department of Marketing at the University of Miami, Coral Gables, Florida. LARRY D. COMPEAU is with the Department of Marketing at Clarkson University, Potsdam, New York. Both authors contributed equally to the paper. The helpful comments of KENT B. MONROE, JERRY B. GOTLIEB, DIANA S. GREWAL, four anonymous reviewers, and the editor are greatly appreciated. DHRUV GREWAL was partly funded by a Summer Award in Business and Social Sciences at the University of Miami.

In the comparative price advertising stream, consumer researchers have examined the effects of the use of explicit reference prices in terms of their ability to deceive [Blair and Landon 1981; Liefeld and Heslop 1985; Sewall and Goldstein 1979]. The stream of information cue research has examined consumers' use of price as an information cue [Rao and Monroe 1989]. However, this research is fragmented, so to derive substantive public policy implications from these studies, a comprehensive review follows.

The next section discusses the FTC's guidelines for pricing practices. Moreover, representative court cases concerned with alleged deceptive price advertising are presented to illustrate relevant legal issues. A conceptual framework is then presented. The third section uses this conceptual framework to guide the review of the research and ties the behavioral research to legal issues. In the fourth section, recommendations for public policy makers, managers, and researchers are given. Finally, key aspects of this paper are summarized.

## Legal Policies

In order for consumer research to be relevant for public policy, researchers must be better acquainted with the law [Preston 1976; Richards 1990a]. This section discusses the FTC's relevant guidelines and a few recent court cases.

### FTC Guidelines

To prevent deceptive practices, the FTC specifies guidelines for pricing practices. Part-233 (Section 233.1- 233.5) of the Code of Federal Regulations contains guidelines against deceptive pricing. Some key points of these guidelines are reviewed briefly:

### Section 233.1: Former Price Comparisons

A common practice is to offer a product at a reduced price relative to the advertiser's own former price (e.g., original price/sale price). A bargain is genuine if:

a. the former price is the "actual bona fide" previous price;

b. for which the product "regularly sold;"

c. for a "reasonably substantial" period of time; and

d. the offer is made in the regular course of business and in good faith.

Furthermore, if the former price or reduction (amount or percentage) is not stated in the advertisement, as in one that simply states "sale," the advertiser must make sure that the reduction is not so insignificant as to be meaningless (e.g., original price $10, now being advertised as "on sale for $9.99"). It is this section that is the focus of most of the recent legal cases dealing with comparative price advertising violations.

### Section 233.2: Retail Price Comparisons; Comparable Value Comparisons

Another common practice is comparing the advertiser's selling price to a competitor's higher price; for example, "Product-x; their price $10, our price $7.50." This strategy is known as a retail price comparison. In order for the offer to be genuine, the following criteria must be met:

a. the advertised higher price must be based on facts and not fictitious and misleading; and

b. the advertised higher price must not exceed the price at which substantial sales are made in the area.

Likewise, another practice compares the advertiser's price to some higher price being charged for similar, but not identical merchandise. The guidelines for preventing deception for this practice are:

a. it must be made clear that the comparisons are being made to other merchandise;

b. the other merchandise is of like grade and quality; and

c. the advertised higher price does not exceed the price at which the merchandise is offered by representative retail outlets in the area.

### Section 233.3: Advertised Retail Prices Suggested by Manufacturers

Many times advertisers compare their sale price to a higher manufacturer's suggested list price (MSLP). This strategy has the potential for deception unless:

a. substantial sales are made in the area at the suggested retail price; and

b. the manufacturer or retailer acts honestly and in good faith in advertising the list price and not with the idea of creating a deceptive comparison.

### Section 233.4: Bargain Offers Based Upon Purchase of Other Merchandise

Advertisers regularly create bargains by offering additional merchandise with the initial purchase (e.g., "buy one-get one free"). Although this section is somewhat tangential to the central focus of the paper, such offers are implicitly comparing the sale price to a reference price. For example, prior to the holiday season a number of airlines were advertising "buy one ticket and get another one free," suggesting a 50 percent discount. Consumers are protected when advertisers adhere to the following guidelines:

a. the selling price must not be inflated;

b. the quality of the product must not be reduced;

c. the quantity of the product must not be reduced;

d. no additional conditions should be attached (other than the basic condition that the article be purchased to get the additional merchandise); and

e. all terms and conditions of the offer must be made clear.

### Section 233.5: Miscellaneous Price Comparisons

There are a number of variations in comparative price advertisements which also have the potential for deception. Retailers, for instance, should not represent a retail price as being a "wholesale" price when they are not selling at the price paid by purchasing directly from the manufacturer. Retailers should not sell imperfect merchandise as reduced (i.e., marking down "irregulars") without disclosing that it is imperfect. Retailers should not offer advance sales under conditions where they do not, in good faith, expect to increase the price at a later date. In all cases of bargain offers, the advertiser must ensure that the bargain being offered is genuine and truthful. According to the FTC, these guidelines pro-

COMPEAU000043

vide the most effective ways for advertisers to operate in the best interests of the public.

### Recent Comparative Price Cases

Recently there have been several court cases concerning the use of deceptive comparative pricing practices by major retailers, including *State of New York vs. Sears, Roebuck & Co., State of Colorado vs. May Department Stores Inc., State of Maryland vs. The Hecht Co., State of New York vs. Stigley, and New York City's Department of Consumer Affairs vs. Newmark and Lewis Inc.* [Agins 1990; Grewal and Grewal 1991; Monroe 1990]. These cases have brought attention to the potential widespread misuse of comparative price advertising.

The *State of New York vs. Sears, Roebuck & Company* is a representative case that can be used to illustrate some of the issues involved in comparative price advertising. The New York State Attorney General alleges that Sears breached a 1986 agreement to discontinue the use of misleading and deceptive sales practices, the most prominent of which were comparative price advertisements. It was charged that Sears "urged consumers into believing they were being offered bargains ... by promoting products with inflated fictitious "regular" prices." Specifically, the complaint charged that Sears used deceptive pricing in violation of several laws and the FTC's Code of Federal Regulations. In accordance with these charges, the attorney general sought redress in the form of consumer restitution, among other penalties, to compensate those customers who purchased products when they otherwise might not have because they "believed them to be bargains."

States are becoming more aggressive concerning violations of consumer protection laws, as illustrated by the *State of New York vs. Sibley, Lindsay & Curr Co.* (Sibley's). The attorney general alleged that Sibley's, from 1987 to 1989, had advertised television sets, videocassette recorders, stereos, dinnerware, furniture, and mattresses on sale at various percentages off "regular prices." These discount percentages ranged as high as 50 percent off the purported "regular prices." The attorney general alleged that the regular prices quoted were fictitious, with no actual basis for use in comparison to "sale" prices, because a number of the products had never sold at those prices and in some cases had never even been offered for sale at these "purported regular prices." This action by Sibley's violated a 1984 Assurance of Discontinuance agreement which had been accompanied by a $4,000 fine. Sibley's has entered another Assurance of Discontinuance, but the fine has been increased to $225,000. This legal action suggests a much less tolerant view of such practices. Similarly, in the case of *State of Maryland vs. The Hecht Co.*, Hecht signed an Assurance of Discontinuance agreement that was accompanied by a $500,000 fine.

In the case of *City of New York vs. Newmark & Lewis, Inc.*, the Commissioner of the Department of Consumer Affairs for the City of New York alleged that Newmark & Lewis advertised that it had lowered its prices on every product in the store, when in fact some prices had not been changed. In August 1989, Newmark & Lewis was served notice that it failed to lower the prices on fifty products in vi-

olation of the consumer protection law. Thus, by claiming that it had "lowered every price on every item even further," Newmark & Lewis was misleading consumers by using implicit price comparisons and giving the impression that exceptional deals were available. Similar cases alleging violations of the FTC's deceptive pricing guidelines (or individual state guidelines) are being looked at in other states where the primary issue is whether the reference price used in the comparative price advertisement is genuine or fictitious (for a review of the FTC, see Baer 1988; Jones 1988; Strenio 1988).

In the next section, a conceptual model is presented which guides the subsequent review of the comparative price advertising research. The model illustrates the effects of information cues on consumers' product evaluations so as to better understand how price information in a comparative price advertisement is used by consumers. This research has taken on greater importance since the FTC has shifted its reliance from its own experts to consumer testimony and surveys [Brandt and Preston 1977; Richards 1990a].

## Conceptual Model

Knowledge of the way that consumers use price as information is basic to understanding how comparative price advertising can be informative or deceptive. Therefore, a conceptual framework is provided that explains the effects of comparative price advertising on consumers' product evaluations and purchase and search behaviors. This model incorporates the substantive results of research that examines the use of price as information, namely the price-perceived quality stream of research.

Substantive results from the price-perceived quality research stream suggest that price has both an information component and a sacrifice component [Chapman 1987]. Consumers use price as a cue for two types of information. Price information identifies the monetary sacrifice the consumer has to make to acquire the product (perceptions of the amount of money that must be given up) [Chapman 1987]. Price is also used as an indicator of product quality (empirically supported by two recent meta-analyses: Monroe and Krishnan 1985; Rao and Monroe 1989). Therefore, price is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price. Consumers' use of price in a comparative price advertisement may be informative or deceptive, depending on (1) the price used by the consumer to make quality judgments (the reference price, the actual price, or both) and (2) whether the prices are bona fide.

If the reference price is truthful and consumers make product quality inferences based only on the reference price, then no deception has occurred and the comparative price advertisement has been informative. If the reference price is truthful, but the consumer bases product quality inferences on the sale price, the consumer has not been deceived; however, the lower perception of product quality could be detrimental to the advertiser because it may reduce brand equity [Sawyer and Dickson 1984]. If the reference price is exaggerated and the consumer infers product quality based on

COMPEAU000044

this reference price, then there has been deception (i.e., the consumer has been materially misled by the exaggerated reference price). Finally, if the reference price is exaggerated and even if the consumer infers product quality based on the sale price, the legal definition of deception has been met. However, the FTC or state attorney general's office may decide that the misrepresentation is not material and not prosecute the advertiser [Richards 1990a]. Thus, it is not always true that inflated reference prices will enhance consumer perceptions of value. Consumers may not believe the misrepresented reference price and therefore reject it and base their perceptions of value on the selling price. Moreover, if the reference price is judged by the consumer to be patently false, a negative reaction to the brand may further adversely reduce perceptions of value [Lichtenstein and Bearden 1986; Lichtenstein et al. 1989].

A conceptual framework is provided in Figure 1 that simplifies existing models [Dodds, Monroe, and Grewal 1991; Grewal and Monroe 1991; Monroe and Chapman 1987; Stigler 1961; Thaler 1985; Zeithaml 1988] and guides the comparative price advertising literature review. According to the model, semantic cues, that is, phrases used in an advertisement that describe a price or a price offer (e.g., MSLP, sale price, compare at) provide the consumer with information about a reference price, selling price, and potential savings. This information is used to develop perceptions of the product's quality relative to its actual cost to the consumer. For example, the semantic cue "regular price, sale price" suggests to the consumer that a product with quality comparable to the "regular price" is being offered for sale at the lower "sale price" and is therefore a better deal.

According to the model, external reference prices suggested by advertisers influence consumers' perceptions of quality [Monroe and Chapman 1987]; moreover, external reference prices can also cause internal reference prices to shift toward the advertised reference price [Lichtenstein and Bearden 1988, 1989; Urbany et al. 1988)]. An internal reference price is a price held in consumers' memory and is used for comparison with other prices [Grewal and Monroe 1991; Kamen and Toman 1970]; it may be a specific value or a range of values [Monroe 1971], including price last paid, expected price, and estimated market price [Klein and Oglethorpe 1987]. Moreover, the consumer's internal reference price may shift toward the external reference price supplied in the advertisement, regardless of its veracity [Urbany et al. 1988]. That is, even exaggerated reference prices that consumers do not believe may enhance value perceptions.

Consumers' *perceptions of value* are positively influenced by both their perceptions of quality and their internal reference price [Grewal and Monroe 1991; Thaler 1985]. Consumers' perceptions of value are influenced by the trade-off between what they get relative to what they must give up [Zeithaml 1988]. Simply put, consumers value products perceived as high quality that are available at low prices. Furthermore, the lower the selling price relative to the internal reference price, the larger the perceived value. In other words, consumers attach value to saving money.

These perceptions of value influence *purchase behavior* [Szybillo and Jacoby 1974; Zeithaml 1988] and *price search behavior* [Grewal and Monroe 1991]. Specifically, the higher the overall perception of value the greater the willingness to buy and the lower the likelihood of additional price search.

This model then articulates how consumers use price information and consequently suggests how deception occurs in comparative price advertisements. A comparative price advertisement contains information about the product's reference price, selling price, and potential savings. If the advertisement conveys an inflated reference price, it could enhance a consumer's perception of quality and his/her internal reference price. Therefore, it would enhance the consumer's perceptions of value and willingness to buy the product. Search for a better price would be likely to be reduced or terminated. The behavioral research and the conceptual model suggest that a comparative price advertisement has the opportunity to inform or deceive through its ability to influence consumers' perceptions of quality and value, internal reference prices, and hence, purchase and search behavior.

## Comparative Price Advertising Research

A comprehensive review of the literature was undertaken to identify comparative price advertising studies. This review consisted of the use of periodical indices, computerized data base searches, the "invisible college" technique (i.e., colleagues working in this research area provided references, full bibliographies, and copies of studies) [Cooper 1984], and the ancestry method (i.e., tracking material that has been cited in research that was already collected in a recursive manner). The search process identified forty-six studies, of which only twenty-eight are reviewed here, because they contained empirical results. The discussion of this research will focus on the explicit public policy implications drawn from the studies.

Although the research area suffers from a general lack of robust conceptual definitions and certain methodological flaws [Compeau and Grewal 1990], several substantive conclusions having public policy implications can be drawn from the literature (Table 1). Four key public policy implications of these studies are discussed:

- the effects of the presence of a reference price in an advertisement;
- the effects of the magnitude of discount;
- the effects of semantic cues/price promotional phrases; and
- the effects of manufacturer's suggested list price.

### Presence of Reference Price in an Advertisement

An examination of the substantive results of the research suggests that an advertisement containing a reference price and a sale price is more effective in influencing consumer perceptions of price and value than an advertisement containing only a sale price. By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product [Barnes 1975; Bearden et al. 1984; Della Bitta et al. 1981; Friedman

COMPEAU000045

**Comparative Price Advertising**

---

**Figure 1.   The Conceptual Model**



Note: This model is adapted from Monroe and Chapman [1987] and Grewal and Monroe [1991].

---

et al. 1982; Inman et al. 1990; Keiser and Krum 1976; Urbany et al. 1988; Varadarajan 1986]. Thus, if the reference price is truthful, the advertisement offers valuable price information to the consumer.

If the reference price is not truthful, a consumer may be encouraged to purchase as a result of a false sense of value. In this situation the advertisement is no longer informative but deceptive. Therefore, a selling price labeled as a "sale price" alone, while offering less information, may actually result in a more informed decision compared to a deceptive comparative price advertisement, since consumers base their perceptions of the product on the characteristics of the product itself and on the actual selling price rather than on a fictitious reference price. It must be noted that research results of Lichtenstein and Bearden [1989] indicate that, for deep discounts from an implausible reference price, there could be a potential reduction in consumers' perceptions of value. In addition, Moore and Olshavsky [1989] found that fewer subjects choose an unfamiliar brand with a deep discount relative to a moderate discount.

However, a selling price labeled as a "sale price" alone may still convey a message of savings or additional value to consumers [Blair and Landon 1981]. If consumers use the reference price provided in the advertisement to infer judgments about the product, their perceptions of the value associated with the product will be enhanced (i.e., acquisition value). However, simply labeling a price as a "sale price" also appears to convey a perception of savings and may enhance perceptions of value. Therefore, the opportunity for deception exists if the retailer provides an exaggerated reference price or simply labels a price as a "sale price" when the "sale price" is not significantly lower than the previous price, misrepresenting the value and materially misleading the consumer. This practice may result in higher perceptions of quality and value, along with a reduction in search and an increase in the likelihood of purchase.

**Magnitude of Discount Size/Savings**

The results of the empirical studies indicate that as discount size increases, consumers' perceptions of value and their willingness to buy the product increase, while their intention to search for a lower price decreases [Berkowitz and Walton 1980; Burton and Lichtenstein 1988; Chapman 1987; Della Bitta et al. 1981; Friedman et al. 1982; Fry and McDougall 1974; Lichtenstein and Bearden 1989; Lichtenstein et al. 1989; Mobley et al. 1988; Moore and Olshavsky 1989; Oglesby 1984; Raju and Hastak 1983]. The research results indicate that false or inflated reference prices mislead the consumer and reduce search as a result of these larger discount sizes [Keiser and Krum 1976; Urbany et al. 1988]. Consequently, there is an incentive for advertisers to use inflated reference prices and/or to actually reduce the selling price. The latter approach maintains an informative advertisement, while the former renders the advertisement deceptive.

**Effects of Semantic Cues or Price Promotional Phrases**

Price promotional phrases and semantic cues that provide more information (e.g., an advertisement with "regular price/sale price" provides more information than an advertisement with "sale price" only) enhance the believability and perceived value of the price-promotional offer [Barnes 1975]. Although the amount of savings in the price-promotion is the same, the use of different semantic cues or price-promotion cues (e.g., a product advertised for "$.99, 50% off regular price" versus product advertised for "$.99, 1/2 off regular price") affects consumers' perceptions of the informativeness of the advertisement and their purchase behavior [Diamond and Sanyal 1990; Oglesby 1984; Varadarajan 1986].

Objective claims, such as "save 50%," are perceived to provide greater information than subjective claims like "save up to 50%" [Mobley et al. 1988]. Objective claims

**Table 1.    Review of Comparative Price Advertising Research Results**

| Study | Research Results |
|---|---|
| Fry and McDougall (1974) | • Low acceptance of advertised reference price (RP).<br>• Magnitude of discount lowers consumers' search for the lowest price. |
| Barnes (1975) | • Increase in price promotional information (i.e., high: RP/SP and low: sale/SP)enhances believability of the price-offer.<br>• Increase in price promotional information enhances perceived value of the price-offer. |
| Keiser and Krum (1976) | • Advertisement with reference price/sales price (RP/SP) is more effective in creating impressions of price reduction than offer with just a SP.<br>• Fictitious reference price misleads consumers.<br>• Consumers do not question the truthfulness of the advertisement. |
| Sewall and Goldstein (1979) | • Few consumers misunderstand the meaning of catalog RP.<br>• Consumers oppose the prohibition of catalog RPs. |
| Berkowitz and Walton (1980) | • Discount size influences consumers' price perceptions.<br>• Semantic cues influence consumers' price perceptions.<br>• Contextual cues may warrant attention in terms of their deceptive possibility. |
| Blair and Landon (1981) | • False RPs have the capacity of deceiving, but this deception is not guaranteed.<br>• Reference prices inflate consumer perceptions of savings, but the perceived savings is less than the difference between the RP and the SP. |
| Della Bitta et al. (1981) | • Magnitude of discount enhances consumer perceptions of value.<br>• Magnitude of discount lowers consumer search intentions.<br>• Magnitude of discount enhances interest in product/brand.<br>• Semantic cues affect consumer perceptions (cues with explicit RP are better than implicit RP). |
| Ahmed and Gulas (1982) | • Large number of the respondents associated manufacturer's suggested list price (MSLP) with price charged by majority of the stores in the area.<br>• Comparison of list price to store's SP can be misleading. |
| Friedman et al. (1982) | • Magnitude of discount enhances consumers' willingness to buy the product.<br>• Advertisements with RP/SP are more effective in increasing consumers' willingness to buy than an advertisement with a SP only. |
| Raju and Hastak (1983) | • Magnitude of deal enhances consumers' purchase intentions. |
| Oglesby (1984) | • Magnitude of discount enhances consumers' price attitudes.<br>• Semantic cues affect consumers' perceptions of price information. |
| Bearden et al. (1984) | • Advertisement with RP/SP was viewed more favorably than an advertisement with SP information only. |
| Liefeld and Heslop (1985) | • MSLP is not misleading.<br>• Presence of 'sale' increases consumer suspiciousness. |
| Varadarajan (1986) | • Semantic cues affect purchase behavior.<br>• Presence of RP/SP in advertisement enhanced purchase relative to ad with SP only. |
| Chapman (1987) | • Magnitude of discount enhances consumer perceptions of value. |
| Lichtenstein and Bearden (1988) | • External RP affects consumers' internal price standards and can be misleading. |
| Mobley et al. (1988) | • Magnitude of discount enhances consumer perceptions of value.<br>• Claim type affects consumer perceptions of information value of the advertisement (objective claims have greater information value than tensile/subjective claims).<br>• The level of consumer discounting of the advertisement message depends on the claim type. |
| Burton and Lichtenstein (1988) | • Magnitude of discount affects consumer attitudes of price deals. |
| Urbany et al. (1988) | • Advertisement with a plausible RP, as compared to an advertisement without a RP, enhances subject's internal RP and the perceived value of the product.<br>• Advertisement with an implausible RP had same effect, even for skeptics, and in addition reduces search for a lower price.<br>• These perceptions may affect search and choice. |
| Lichtenstein and Bearden (1989) | • Magnitude of discount enhances perceived value of the deal when the discount is from a plausible RP.<br>• The effect of magnitude of discount on consumers' perception of value decreases when the discount is from an implausible RP. |
| Lichtenstein et al. (1989) | • Magnitude of discount enhances perceived value of the deal. |
| Moore and Olshavsky (1989) | • Deep discount amount does not increase product choice for unfamiliar brands.<br>• Magnitude of discount enhances choice (except for deep discounts). |
| Diamond & Sanyal (1990) | • Semantic cues/price promotional framing as a gain enhances choice. |
| Gotlieb (1990) | • Greater savings enhance consumer involvement. |
| Gotlieb & Fitzgerald (1990) | • The greater the MSLP, the more the consumer is willing to pay. |
| Gotlieb and Swan (1990) | • Greater savings enhance consumer involvement and motivation to process information. |
| Inman et al. (1990) | • For low need for cognition consumers: A promotional signal (not accompanied by a price cut) affects choice.<br>• For high need for cognition consumers: Promotional signals are effective only when accompanied by a price cut. |
| Gotlieb & Sarel (1991) | • When the credibility of the source is high, the established brand's price, a RP, affects the quality perceptions of the new product. |

COMPEAU000047

are precise statements, whereas subjective claims are vague. For example, "save 50%" is an objective claim because the consumers know they will save 50 percent off a supplied reference price. On the other hand, "save up to 50%" is a subjective claim, and consumers are unsure about savings. Thus, consumers are more skeptical of subjective claims and discount them to a greater extent than objective claims [Ford et al. 1990; Mobley et al. 1988]. Consequently, the way in which advertisers word their price claims influences consumers' perceptions and behavioral responses.

Different semantic labels for the reference price and the actual selling price may inform or deceive the consumer, depending on whether there is a shared interpretation of the labels for both the sellers and the consumers. If consumers and sellers interpret the semantic cues in the same way, then the potential for deception is small. However, if consumers and sellers interpret the semantic cues differently, then the potential for deception is great. For example, this can occur when a seller uses a vague word such as "special" to label an actual selling price. Consumers may interpret "special" as meaning the actual selling price is especially low for some reason and will stay at this price until all inventory has been sold. On the other hand, consumers may interpret "special" as implying a limited time offer. Thus, this impreciseness in interpreting the semantic cue allows a greater opportunity for deception. Richards [1990a, p. 30] has pointed out that, "courts have determined that if a statement in an ad lends itself to more than one interpretation by the ordinary recipient of the ad, and *one* of those interpretations is deceptive, the representation will be construed to be deceptive, *in toto.*" In addition, puffery, which is defined as claims that involve exaggeration, superlative, and hyperbole, has often been used by advertisers as a defense against allegations of deception [Honigwachs 1987], although if the claim materially misleads the consumer, it is deceptive and puffery is not a valid defense [Richards 1990b].

The informative and deceptive potential of semantic cues is directly dependent on the interpretation of consumers and sellers. The more vague the semantic cue, the greater the likelihood of differing interpretations and the chance that the meaning will not be shared. Consequently, there is a greater potential for deception. This utilization of vague semantic cues is contrary to the FTC's objective of enhancing factual comparisons.

### Effect of Manufacturer's Suggested List Price (MSLP)

The results concerning the effect of MSLP on consumers' perceptions are mixed. Liefeld and Heslop's [1985] findings indicate that the use of a MSLP is not misleading. Ahmed and Gulas [1982] found that a majority of the respondents associate the MSLP with the price charged by the majority of the stores; therefore, the MSLP may confuse consumers and lead them away from further price comparisons if it is not a price charged by the majority of stores. This latter finding is reinforced by Gotlieb and Fitzgerald [1990]—the higher the MSLP, the higher the price consumers are willing to pay—suggesting that MSLP can affect consum-

ers' internal reference prices. Whether the use of "manufacturer's suggested list price" is deceptive or informative depends on the meaning assigned to it by consumers and whether the product is actually sold at that price. If the product has rarely been sold at the MSLP, then it conveys little information and will most likely be deceptive (in accordance with Sec. 233.3). The MSLP becomes merely a wish price, an amount at which the manufacturer wishes the product would or could be sold.

## Recommendations

Based on the review of the comparative price advertising studies, recent court cases, and the FTC's guidelines for pricing, recommendations for public policy makers, managers, and researchers are developed.

### Public Policy Makers

The most obvious deceptive comparative price advertisement uses a false, or inflated, reference price to suggest a deal or bargain to the consumer. Clearly, from a public policy perspective, a reference price should be truthful. Public policy should encourage the use of reference prices that are easily verified (e.g., a competitor's price) [Committee on Consumer Policy 1979]. This would not only assist in the investigation of the veracity of the claim by authorities but might eliminate the need for such investigation, since consumers could easily verify price claims themselves.

Public policy makers should discourage the use of reference prices that are based on the seller's subjective assessment of the value of the product (FTC Section 233.3: Comparable Value Comparison). Although these reference prices may be truthful in the eyes of the advertiser, the high degree of variation in estimating a subjective assessment of worth or value leaves most estimates suspect (e.g., "valued at," or "a total value of ...," or "worth...,"). Because of differing perspectives, the value of a product is likely to vary across individuals [Zeithaml 1988]. These subjective reference prices are difficult to verify.

A less obvious deceptive comparative price advertising practice uses vague or misleading semantic phrases. For example, instead of simply labeling a bargain, "special," which is a vague description, the seller should also provide specific information on why the bargain is special (e.g., to close out inventory), the length of time the special will run, and the precise savings to the consumer. The purpose of semantic cues is to communicate information about prices to the consumer. Public policy makers should discourage the use of vague semantic cues and encourage the provision of additional information about the offer (e.g., the nature of the bargain, relevant time, and precise savings) so consumers can make more accurate assessments of the bargain.

Communication involves the sharing of meaning between the sender (the advertiser) and the receiver (the consumer). To the extent that the meaning of the semantic cue is not shared, the accuracy of the comparative price claim is reduced (i.e., the claim is vague). More specific information reduces the ambiguity of the semantic cue. One way for public policy makers to develop shared meaning is to legally define the common semantic cues used in comparative price advertisements and then educate the public as to these defi-

COMPEAU000048

nitions and enforce their appropriate use. This is similar to other labeling practices such as the terms used to label different levels of cut and fat in ground meat (e.g., ground round, ground chuck, ground beef).

The informative content of these semantic cues must be weighed against their potential for deception. Policy makers, such as states' attorneys and legal experts, as well as sellers need an awareness of available consumer research and the research methods used for evaluating whether a retail price promotion is deceptive [Armstrong et al. 1979; Gardner 1975; Russo et al. 1981; Richards 1990a]. Public policy makers must incorporate consumer research findings into the assessment of whether or not a comparative price claim is deceptive.

The research to date suggests that public policy makers should discourage the use of a MSLP [Ahmed and Gulas 1982; Gotlieb and Fitzgerald 1990]. Although the label may be legitimate in some instances, logically it appears that if the MSLP were indeed valid the product would rarely be sold at a lower price. In other words, if a majority of the stores in a given geographical area were able to sell the product at MSLP, stores would only occasionally offer the product for sale at a lower price since, ostensibly, demand would be stable at the higher MSLP. Consequently, if the product is sold at the MSLP, there is no advantage in using this semantic cue. If the product is sold a lower price on more than a few occasions, the MSLP is no longer valid. Therein lies the paradox of MSLP. The purpose of labeling a price as a MSLP is to convey a product value greater than the actual selling price; yet, if done so on more than a few occasions, the MSLP is no longer a valid estimate of the product's value.

The only instance the MSLP constitutes a valid claim is when an occasional price reduction occurs. This paradox suggests that the overall value to the consumer in sellers using MSLP is marginal at best. The paradox also suggests that it may be more accurate and less misleading if sellers simply use "regular price" instead of MSLP. Thus, it may be appropriate for public policy makers to discourage the use of MSLP.

Finally, the use of comparative price advertisements that compare a selling price to competitors' prices (e.g., their price/our price), or prices from suppliers (our cost/your price) should require identification of the competitor or supplier [Committee on Consumer Policy 1979]. In order for comparative price claims to be most effective, the claim should be easily verifiable by the consumer. The claim that a price is one charged by a competitor and then not identifying that competitor places an undue burden on the consumer to verify the truthfulness of the claim.

## Managers

Managers should be familiar with FTC regulations, since they provide guidance for the use of comparative price advertisements. From an ethical viewpoint, managers should use truthful reference prices in comparative price advertisements. This practice reduces the risk of deception and may be more effective in influencing consumer choice [Moore and Olshavsky 1989]. Comparative price advertisements can be used by retailers to suggest an external reference

price that the consumer may use in forming perceptions of acquisition value and transaction value [Lichtenstein and Bearden 1989; Urbany et al. 1988]. However, if the reference price supplied is genuine and the consumer uses the sale price to form perceptions of acquisition value or discounts or ignores the reference price to form perceptions of transaction value, the managers have not satisfied the objectives of the advertisement. Moreover, price claims should be objective rather than subjective, since objective claims are more precise and enhance the opportunity for shared meanings and, consequently, reduce the potential for deception [Ford et al. 1990; Mobley et al. 1988].

## Researchers

The current research does not address all important public policy issues. The review (Table 2) indicates that existing research has not addressed the effects of retail price comparisons and comparable value comparisons (Section 233.2) [cf., Gotlieb and Sarel 1991]. Clearly, research is needed to address how price comparisons affect consumers' perceptions of value as well as search and purchase behavior. Similarly, bargain offers based on the purchase of other merchandise (Section 233.4), e.g., "buy one get one free" offers, need to be researched. By contrast, a sufficient volume of research has been conducted on former price comparisons (Section 233.1), and a meta-analysis at this stage may be informative. In addition, it is critical that researchers incorporate the legal definitions as a guide to the operationalization of constructs and discuss the public policy implications of their findings.

Research also needs to examine the long-term impact of comparative price advertisements on consumers' perceptions and behavioral responses. Time-series data from a household panel would be helpful in addressing this area. This research could then approach issues such as whether consumers discount reference prices more for retailers that use them more often and whether a relationship exists between exposure to comparative price claims and the level of discounting that most consumers employ. Moreover, can comparative price claims be so pervasive that consumers eventually disregard the reference prices? This latter question is especially relevant because of the recent popularity of television shopping channels, where virtually every product is offered for sale with at least one, and often several, reference prices.

The meaning that consumers assign to different semantic cues needs to be further researched. How do consumers interpret the phrases "compare at," "special," or "their price/our price?" Until consumers' interpretations of these phrases are assessed, the potential for deception is open to debate. The current research suggests that consumers discount most reference price claims, regardless of their veracity [Blair and Landon 1981; Della Bitta et al. 1981; Urbany et al. 1988]. However, a question remains as to whether different semantic cues result in different levels of discounting. For example, do consumers discount "their price" claims more, less, or about the same as "compare at" claims?

The effects of advertiser credibility on consumers' perceptions of price-promotion information have only recently

Table 2.     Review of Federal Trade Commission Guidelines Studied

| Study | Former Price Comparisons Sec. 233.1 | Retail Price Comparisons Sec. 233.2 | Manufacturers Suggested List Price Sec. 233.3 | Bargain Price Offers Sec. 233.4 | Other Price Comparisons Sec. 233.5 |
|---|---|---|---|---|---|
| Fry & McDougall (1974) | X | | | | |
| Barnes (1975) | X | | | | |
| Keiser & Krum (1976) | X | | | | |
| Sewall & Goldstein (1978) | | | X | | |
| Berkowitz & Walton (1980) | X | | | | |
| Blair & Landon (1981) | X | | X | | |
| Della Bitta et al. (1981) | X | | | | |
| Ahmed & Gulas (1982) | | | X | | |
| Raju and Hastak (1983) | X | | | | |
| Friedman et al. (1982) | X | | | | |
| Oglesby (1984) | X | | | | |
| Bearden et al. (1984) | X | | | | |
| Liefeld & Heslop (1985) | X | | X | | |
| Varadarajan (1986) | X | | | X | |
| Chapman (1987) | X | | | | |
| Burton & Lichtenstein (1988) | X | | | | |
| Lichtenstein & Bearden (1988) | X | | | | |
| Mobley et al. (1988) | X | | | | |
| Urbany et al. (1988) | X | | | | |
| Lichtenstein & Bearden (1989) | X | | | | |
| Lichtenstein et al. (1989) | X | | | | |
| Moore & Olshavsky (1989) | X | | | | |
| Diamond & Sanyal (1990) | | | | | |
| Gotlieb (1990) | X | | | | |
| Gotlieb & Fitzgerald (1990) | | | X | | |
| Gotlieb & Swan (1990) | X | | | | |
| Inman et al. (1990) | X | | | | |
| Gotlieb & Sarel (1991) | | X | | | |

Note: X indicates that study examined issues involving a particular Federal Trade Commission section.

begun to be investigated [Gotlieb 1990; Gotlieb and Sarel 1991; Gotlieb and Swan 1990]. It is likely that the potential for deception grows with increasing source credibility. That is, consumers may be more likely to believe a false reference price when it is communicated by a highly credible seller. Moreover, is it possible that a retailer or manufacturer with low credibility can employ a spokesperson with high credibility, thereby communicating a credible comparative price advertisement? Research needs to further examine the roles of advertiser and source credibility.

Little is known about the effect of different media on consumer perceptions of comparative price claims. The popularity of television shopping channels raises the issue of whether the medium plays a role in the effects of comparative price claims. Whether comparative price claims are more believable in newsprint, catalogues, magazines, or on television is yet undetermined. If there are certain media where comparative price advertisements appear more believable to consumers than others, the potential for deception is enhanced. Likewise, whether comparative price claims are more believable when presented in certain formats and whether certain media enhance or detract from the believa-

bility of claims in certain formats are important research issues. Future research needs to explore these queries.

## Conclusion

This paper addressed a critical public policy question regarding the potential for comparative price advertising to be informative or deceptive. The public policy implications of twenty-eight studies examining comparative price advertising were reviewed and recommendations were presented.

In summary, policy makers need to be certain that the meanings assumed and articulated in policy and law are as congruous as possible with the ordinary consumer's interpretations. More specifically, the use of MSLP in general is of questionable value and deserves further scrutiny. Researchers need to investigate the meanings that consumers assign to various semantic cues, the long term effects of exposure to comparative price advertisements, the impact of contextual cues such as media and format, the influence of different semantic cues on levels of discounting, and the effects of source credibility. For retailers and advertisers, the research suggests that vague information presented in a comparative price advertisement may not help communicate the intended message, because such information tends to be dis-

COMPEAU000050

counted by consumers. As the use of comparative price advertising increases, the need to address the issues developed in this paper becomes more critical.

# References

Agins, Teri (1990), "Low Prices or Low Practices? Regulators Cast Wary Eye on Retailers' Many Sales," *Wall Street Journal,* (February 13), B1, B7.

Ahmed, Sadrudin A. and Gary M. Gulas (1982), "Consumers' Perception of Manufacturers' Suggested List Price," *Psychological Reports,* 50 (April), 507-518.

Armstrong, Gary M., Metin N. Gurol, and Frederick A. Russ (1979), "Detecting and Correcting Deceptive Advertising," *Journal of Consumer Research,* 6 (December), 237-246.

Baer, William J. (1988), "At the Turning Point: The Commission in 1978," *Journal of Public Policy & Marketing,* 7, 11-20.

Barnes, James G. (1975), "Factors Influencing Consumer Reaction to Retail Newspaper 'Sale' Advertising," in *Proceedings,* Edward M. Mazze, ed. Fall Educators' Conference, Chicago, Ill.: American Marketing Association, 37, 471-477.

Bearden, William O., Donald R. Lichtenstein, and Jesse E. Teel (1984), "Comparison Price, Coupon, and Brand Effects on Consumer Reactions to Retail Newspaper Advertisements," *Journal of Retailing,* 60 (Summer), 11-36.

Berkowitz, Eric N. and John R. Walton (1980), "Contextual Influences on Consumer Price Responses: An Experimental Analysis," *Journal of Marketing Research,* 17 (August), 349-358.

Blair, Edward A. and E. Laird Landon, Jr. (1981), "The Effects of Reference Prices in Retail Advertisements," *Journal of Marketing,* 45 (Spring), 61-69.

Brandt, Michael T. and Ivan L. Preston (1977), "The Federal Trade Commission's Use of Evidence to Determine Deception," *Journal of Marketing,* 41 (January), 54-62.

Burton, Scot and Donald R. Lichtenstein (1988), "The Effect of Ad Claims and Ad Context on Attitude Toward the Advertisement," *Journal of Advertising,* 17 (1), 3-11.

Chapman, Joseph D. (1987), "The Impact of Discounts on Subjective Product Evaluations," Ph.D. diss., Virginia Polytechnic Institute and State University, Blacksburg, Va.

Committee on Consumer Policy (1979), *Bargain Price Offers and Similar Practices,* Paris, France: Organization for Economic Cooperation and Development.

Compeau, Larry D. and Dhruv Grewal (1990), "Comparative Price Advertising: A Methodological Review and Critique," in *AMA Educators' Proceedings,* Chicago, Ill.: American Marketing Association, 56.

Cooper, Harris M. (1984), *The Integrative Research Review: A Systematic Approach,* Beverly Hills, Calif.: Sage Publications.

Della Bitta, Albert J., Kent B. Monroe, and John M. McGinnis (1981), "Consumer Perceptions of Comparative Price Advertisements," *Journal of Marketing Research,* 18 (November), 416-427.

Diamond, William D. and Abhijit Sanyal (1990), "The Effect of Framing on the Choice of Supermarket Coupons," in *Advances in Consumer Research,* Marvin Goldberg, Gerald Gorn, and Richard W. Pollay, eds. Provo, Utah: Association for Consumer Research, 17, 488-493.

Dodds, William B., Kent B. Monroe, and Dhruv Grewal (1991), "The Effects of Price, Brand, and Store Information on Buyers' Product Evaluations," *Journal of Marketing Research,* 28 (August), 307-319.

Ford, Gary T. and John E. Calfee (1983), "Consumer Psychology Research Needs at the Federal Trade Commission," in *Proceedings of the Division of Consumer Psychology,* James C. Anderson, ed. Anaheim, Calif.: Annual Convention of the American Psychological Association, 118-120.

_____ and _____ (1986), "Recent Developments in FTC Policy on Deception," *Journal of Marketing,* 50 (July), 82-102.

_____, Darlene B. Smith, and John L. Swasy (1990), "Consumer Skepticism of Advertising Claims: Testing Hypotheses from Economics of Information," *Journal of Consumer Research,* 16 (March), 433-441.

Friedman, Hershey H., Philip E. Weingaten, Linda W. Friedman, and Ralph Gallay (1982), "The Effects of Various Price Markdowns on Consumers' Ratings of a New Product," *Journal of the Academy of Marketing Science,* 10 (Fall), 432-437.

Fry, Joseph N. and Gordon H. McDougall (1974), "Consumer Appraisal of Retail Price Advertisements," *Journal of Marketing,* 38 (July), 64-74.

Gardner, David M. (1975), "Deception in Advertising: A Conceptual Approach," *Journal of Marketing,* 39 (January), 40-46.

Gotlieb, Jerry B. (1990) "Communicating Price-Perceived Quality Relationship," *Journal of Applied Social Psychology,* 20 (March), 404-423.

_____ and Cyndy T. Fitzgerald (1990), "An Investigation Into the Effects of Advertised Reference Prices on the Price Consumers Are Willing to Pay for the Product," *Journal of Applied Business Research,* 6 (1), 59-69.

_____ and Dan Sarel (1991), "Effect of Price Advertisement on Perceived Quality and Purchase Intentions," *Journal of Business Research,* Forthcoming.

_____ and John E. Swan (1990), "An Application of the Elaboration Likelihood Model," *Journal of the Academy of Marketing Science,* 18 (Summer), 221-228.

Grewal, Dhruv and Diana S. Grewal (1991), "Pricing Responsibility: The Retailer or the State?," *Journal of the Academy of Marketing Science,* 19 (Summer), 276-277.

_____ and Kent B. Monroe (1991), "Information Cues Internal Reference Prices and Product Evaluations: A Conceptual Framework and Synthesis of Past Research," Coral Gables, Fla.: University of Miami, Working paper.

Hisrich, Robert D. (1983), "Executive Advertisers' Views of Comparison Advertising," *Sloan Management Review,* 25 (Fall), 39-50.

Honigwachs, Joshua (1987), "Is It Safe to Call Something Safe? The Law of Puffing in Advertising," *Journal of Public Policy & Marketing,* 6, 157-170.

Inman, J. Jeffrey, Leigh McAlister, and Wayne Hoyer (1990), "Promotion Signal: Proxy for a Price Cut?" *Journal of Consumer Research,* 17 (June), 74-81.

Jones, Mary Gardner (1988), "The Federal Trade Commission in 1968: Times of Turmoil and Response," *Journal of Public Policy & Marketing,* 7, 1-10.

Kamen, Joseph and Robert Toman (1970), "Psychophysics of Prices," *Journal of Marketing Research,* 7 (February), 27-35.

COMPEAU000051

Keiser, Stephen K. and James R. Krum (1976), "Consumer Perceptions of Retail Advertising With Overstated Price Savings," *Journal of Retailing,* 52 (Fall), 27-36.

Kinnear, Thomas C. and Ann R. Root (1988), "The FTC and Deceptive Advertising in the 1980s: Are Consumers Being Adequately Protected?" *Journal of Public Policy & Marketing,* 7, 40-48.

Klein, Noreen M. and Janet E. Oglethorpe (1987), "Reference Points in Consumer Decision Making," in *Advances in Consumer Research,* Melanie Wallendorf and Paul Anderson, eds. Provo, Utah: Association for Consumer Research, 14, 183-187.

Laczniak, Russell N. and Sanford Grossbart (1990), "An Assessment of Assumptions Underlying the Reasonable Consumer Element in Deceptive Advertising Policy," *Journal of Public Policy & Marketing,* 9, 85-99.

Lichtenstein, Donald R. and William O. Bearden (1986), "Measurement and Structure of Kelley's Covariance Theory," *Journal of Consumer Research,* 13 (September), 290-296.

____ and ____ (1988), "An Investigation of Consumer Evaluations of Reference Price Discount Claims," *Journal of Business Research,* 17 (September), 189-200.

____ and ____ (1989), "Contextual Influences on Perceptions of Merchant-Supplied Reference Prices," *Journal of Consumer Research,* 16 (June), 55-66.

____, Scot Burton, and Bradley S. O'Hara (1989), "Marketplace Attributions on Consumer Evaluations of Discount Claims," *Psychology and Marketing,* 6 (Fall), 163-180.

Liefeld, John and Louise A. Heslop (1985), "Reference Prices and Deception in Newspaper Advertising," *Journal of Consumer Research,* 11 (March), 868-876.

Mobley, Mary F., William O. Bearden, and Jesse E. Teel (1988), "An Investigation of Individual Responses to Tensile Price Claims," *Journal of Consumer Research,* 15 (September), 273-279.

Monroe, Kent B. (1971), "Measuring Price Thresholds by Psychophysics and Latitudes of Acceptance," *Journal of Marketing Research,* 18 (November), 460-464.

____ *Pricing: Making Profitable Decisions,* 2d ed., New York, N.Y.: McGraw Hill Book Co.

____ and Joseph D. Chapman (1987), "Framing Effects on Buyers Subjective Product Evaluations," in *Advances in Consumer Research,* Melanie Wallendorf and Paul Anderson, eds. Provo, Utah: Association for Consumer Research, 14, 193-197.

____ and R. Krishnan (1985), "The Effect of Price On Subjective Product Evaluations," in *Perceived Quality: How Consumers View Stores and Merchandise,* Jacob Jacoby and Jerry C. Olson, eds. Lexington, Mass.: Lexington Books, 209-232.

Moore, David J. and Richard W. Olshavsky (1989), "Brand Choice and Deep Price Discounts," *Psychology and Marketing,* 6 (Fall), 181-196.

Muehling, Garrel D. and Norman Kangun (1985), "The Multi-Dimensionality of Comparative Advertising: Implications for the Federal Trade Commission," *Journal of Public Policy & Marketing,* 4, 112-128.

Oglesby, Bobbie D. (1984), "Price and Semantic Cues' Effect on Perceived Quality and Attitude," *Marketing Comes of Age,*

David M. Klein and Allen E. Smith, eds. Boca Raton, Fla.: Southern Marketing Association, 308-312.

Preston, Ivan L. (1976), "A Comment on 'Defining Misleading Advertising'" and "Deception in Advertising," *Journal of Marketing,* 40 (July), 54-60.

Raju, P.S. and Manoj Hastak (1983), "Pre-Trial Cognitive Effects of Cents-Off Coupons," *Journal of Advertising,* 12 (2), 24-33.

Richards, Jef I. (1990a), *Deceptive Advertising: Behavioral Study of a Legal Concept,* Hillsdale, N.J.: Lawrence Erlbaum Associates.

____ (1990b), "A 'New and Improved' View of Puffery," *Journal of Public Policy & Marketing,* 9, 73-84.

Russo, J. Edward, Barbara L. Metcalf, and Debra Stephens (1981), "Identifying Misleading Advertising," *Journal of Consumer Research,* 8 (September), 119-131.

Sawyer, Alan G. and Peter R. Dickson (1984), "Psychological perspectives on Consumer Response to Sales Promotions," in *Research on Sales Promotions: Collected Papers,* Katherine E. Jocz, ed. Cambridge, Mass.: Marketing Science Institute, Report No. 84-104, 1-21.

Sewall, Murphy A. and Michael H. Goldstein (1979), "The Comparative Price Advertising Controversy: Consumer Perceptions of Catalog Showroom Reference Prices," *Journal of Marketing,* 43 (Summer), 85-92.

Stigler, George J. (1961), "The Economics of Information," *Journal of Political Economy,* 69 (June), 213-25.

Strenio, Andrew J., Jr. (1988), "The FTC in 1988: Phoenix of Finis?" *Journal of Public Policy & Marketing,* 7, 21-39.

Thaler, Richard (1985), "Mental Accounting and Consumer Choice," *Marketing Science,* 4 (Summer) 199-214.

Turgeon, Normand and David J. Barnaby (1988), "Comparative Advertising: Two Decades of Practice and Research," in *Current Issues and Research in Advertising,* James H. Leigh and Claude R. Martin, Jr., eds. Ann Arbor, Mich.: The University of Michigan, 11 (1-2), 41-65.

Urbany, Joel E., William O. Bearden, and Dan C. Weilbaker (1988), "The Effect of Plausible and Exaggerated Reference Prices on Consumer Perceptions and Price Search," *Journal of Consumer Research,* 15 (June), 95-110.

Varadarajan, P. Rajan (1986), "Consumers' Behavioral Responses to Coupon Price Promotions: An Empirical Inquiry," in *AMA Educators' Proceedings,* Terence A. Shimp et al., eds. Chicago, Ill.: American Marketing Association, 52, 211.

Wilkie, William L. and Paul W. Farris (1975), "Comparison Advertising: Problems and Potential," *Journal of Marketing,* 39 (October), 7-15.

Wilson, R. Dale (1978), "Comparative Advertising: Some Current Considerations for Managerial Planning and Strategy," in *Current Issues and Research in Advertising,* James Leigh and Claude R. Martin, Jr., eds. Ann Arbor, Mich.: The University of Michigan, 5-22.

Zeithaml, Valarie A. (1988), "Consumer Perceptions of Price, Quality, and Value: A Means-End Model and Synthesis of Evidence," *Journal of Marketing,* 52 (July), 2-22.

COMPEAU000052

Case 1:15-cv-04543-YGR   Document 75-12   Filed 01/31/17   Page 46 of 80

# Comparative Price Advertising: An Integrative Review

## Larry D. Compeau and Dhruv Grewal

*After two decades of research, public policymakers, researchers, and managers still have questions regarding the use, abuse, and overall effectiveness of comparative price advertising. Using an integrative review of the literature as a basis, the authors examine the state of substantive knowledge regarding comparative price advertising effects. They use meta-analytical procedures to assess the effects of (1) presence of an advertised reference price, (2) advertised reference price levels, and (3) advertised sale price levels on consumers' internal reference price, perceived value, price offer believability, purchase likelihood, and search intentions. Evidence indicates that comparative price advertising is a powerful advertising tool, with a strong opportunity for deception, that requires careful management and monitoring.*

The use of comparative price advertising is widespread. An advertised reference price (e.g., regular price, original price, manufacturer's suggested price) suggests that consumers will save money, that they will "get a deal." Advertisers often appeal to this desire to "get a deal" by comparing the offering price (e.g., sale price) with some higher reference price (e.g., regular price), thereby making the offered price more attractive. Whether consumers actually save money depends primarily on the validity of this advertised comparative reference price.

Studies during the past 23 years have attempted to explain consumers' responses to the inclusion of comparative reference prices in advertisements. Grewal and Compeau (1992) qualitatively review 28 studies and integrate Federal Trade Commission (FTC) guidelines to assess the informativeness or deceptiveness of comparative price advertising. They conclude that there are incentives for advertisers to use inflated reference prices because the effect of these exaggerated prices is strong. They did not assess, however, the empirical studies quantitatively. Thus, the robustness of the effects of reference prices has not been established. Moreover, since their article was published, many more studies have been conducted. The increased research attention is due, in part, to theoretical developments providing testable hypotheses (Monroe and Chapman 1987; Thaler 1985; Urbany, Bearden, and Weilbaker 1988) and heightened awareness of their deceptive potential (Grewal and Compeau 1992).

Meta-analysis has been used in marketing to synthesize results of prior research, even when only a small number of studies is available, to examine certain effects (e.g., Brown

and Stayman 1992; Rao and Monroe 1989; Szymanski, Bharadwaj, and Varadarajan 1993). Biswas, Wilson, and Licata (1993) provide an important first step by conducting a meta-analytical review of the reference price literature. In the course of reviewing 26 studies, they use meta-analysis to assess the overall significance of reference price advertising from empirical results of 12 studies; however, the effect of advertised reference price on a given dependent variable (e.g., perceived value, purchase intentions) was not predicted or examined. Thus, we build on Grewal and Compeau's (1992) qualitative review and Biswas, Wilson, and Licata's (1993) integrative review and highlight how prior research results, integrated and taken together as a whole, can help policymakers and managers reduce deception.

The FTC and most states suggest that three elements must be demonstrated before an advertisement is deemed deceptive (Preston 1992). The first evidentiary burden pertains to identifying the claims the advertisement conveys to consumers. Comparative price advertisements, in general, convey an advertised reference price (ARP), which suggests that a deal is being offered. The implication is that the selling price (SP) is lower than what consumers might have paid had they shopped at some other time or store.

The second evidentiary burden discussed is the veracity of the claim. The advertisement must be shown to be false in some manner. This burden typically is handled by challenging the truthfulness of the ARP (see for example, *State of New York v. Sears, Roebuck & Co.,* New York State Supreme Court, Erie County, 13709/89; *State of Maryland v. The Hecht Co.,* Maryland Circuit Court, Montgomery County, Civil Case No. 11256; *State of Colorado v. The Mays Department Store Company,* Denver District Court, 89CV09274; *State of North Carolina v. J.C. Penny Company Inc.,* Wake County Supreme Court, North Carolina, 89 CVS 11819; see also Compeau, Grewal, and Grewal 1994; Kaufmann, Smith, and Ortemeyer 1994).

For the third evidentiary burden, the deception must be material; "that is, [the advertisement must have] the potential to affect consumers' purchasing decisions" (Preston 1992, p. 58). Therefore, even though an advertisement may be deemed untruthful (e.g., the prices advertised are fictitious), it matters little if the deception is not material, that is,

LARRY D. COMPEAU is Associate Professor of Marketing, Clarkson University. DHRUV GREWAL is Professor of Marketing, University of Miami. Both authors contributed equally, and the order of authorship is alphabetical. Larry D. Compeau was funded partly by a Clarkson School of Business Summer Research Grant. Dhruv Grewal was funded partly by a University of Miami School of Business Summer Research Grant. The authors appreciate the helpful comments of Ed Fern, Diana Grewal, R. Krishnan, Kent Monroe, Debra Scammon, and four anonymous *JPP&M* reviewers.

COMPEAU000053

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Case 4:15-cv-04543-YGR   Document 75-12   Filed 01/31/17   Page 47 of 80

if consumers are not harmed (e.g., *Kraft Inc.* 1991). If the meta-analysis demonstrates clear, convincing, and robust effects of comparative price advertising on consumers' search and purchase behavior across many conditions, including different contexts and methods, then a link to materiality is demonstrated.

In summary; in this article, we report an integrative review using meta-analysis of comparative price advertising research to (1) synthesize current substantive findings; (2) probe for any inconsistencies across the studies; (3) provide a benchmark, a single source of summary information on comparative price advertising for public policymakers, managers, and researchers; and (4) draw public policy implications. In the next section, we develop a conceptual framework.

## A Conceptual Framework

Prior studies have adopted and adapted several theories to explain and predict the effects of comparative price advertisements on a broad spectrum of consumer responses (for a description of the studies, see Appendix A). Our conceptual framework suggests that an ARP in the context of a comparative price advertisement provides a point of reference to judge the offer and sale price (Figure 1).

The Elaboration Likelihood Model (ELM; Petty and Cacioppo 1981) suggests that consumers using the central route of processing compare the ARP to an internal reference price (IRP). They then make the adjustments in their IRP that are predicted by Adaptation Level Theory (Helson 1964) and Assimilation-Contrast Theory (Sherif, Sherif, and Hovland 1961).[1] If the ARP is not too far from consumers' IRP range (i.e., in the latitude of acceptance), it will shift their range toward itself (Lichtenstein and Bearden 1989). For example, a consumer might have a category for videocassette recorders (VCRs). Attached to that category might be an IRP range of $250 to $450; if the consumer is exposed to an ARP of $200, the IRP shifts downward from $250 to $200. If the consumer encounters an ARP of $500, it shifts the range upward from $450 to $500. Both of these examples show how the ARP is assimilated into the IRP range (i.e., an *assimilation effect*).

A *contrast effect* occurs when the entire IRP range shifts in response to an ARP and produces different judgments and categories (Monroe, Grewal, and Compeau 1991; Ozanne, Brucks, and Grewal 1992). For example, a consumer might be exposed to an ARP of $800 for a VCR. It is likely that consumer will contrast the product from the category called VCRs and now form two categories, the original called Regular VCRs and the other called High-End or Professional VCRs. The range of IRPs also would shift, such that the IRP range for Regular VCRs would be lowered to $200 to $350 and that for High-End VCRs set at $600 to $1,000. Alternatively, the ARP might be ignored and would not shift the IRP.

If consumers are not motivated to process information centrally (low involvement) or do not have the knowledge to do so, peripheral processing will occur. The consumer relies

on a simple comparison between the ARP and the selling price. One implication of the ELM is that low-involvement (and most likely, low-knowledge) consumers are more susceptible to exaggerated or inflated reference price claims and the associated deception.[2]

Thaler (1985) suggests that the overall value of a price offer is contingent on two comparisons. The value of the acquisition of the product itself involves a comparison of what the consumer gets relative to what is given up (Grewal, Monroe, and Krishnan 1998). The value of the deal, or transaction value, involves a comparison of a reference price (highly involved consumers are more likely to use IRP, and less involved consumers are more likely to use the ARP) with the selling price. If the deal is judged acceptable, a purchase is made; if not, additional search will take place (Grewal, Monroe, and Krishnan 1998; Urbany, Bearden, and Weilbaker 1988).

## Conceptual Issues Pertaining to the Dependent Variables

Several conceptual issues emerge from our examination of prior research. One of the most critical is a lack of consensus regarding the conceptual definition of key dependent variables.

### Internal Reference Price

Thaler (1985) defines an IRP as an expected or "just" price. This definition is only one of many possible internal representations of reference price. An IRP also can be some average of the range of prices for similar products (Emery 1970). Furthermore, IRP can be defined conceptually as a range of expected prices (Gabor and Granger 1961; Lichtenstein, Bloch, and Black 1988; Monroe 1971; Urbany and Dickson 1991), an aspiration price, a particular market price remembered, an average price paid (Klein and Oglethorpe 1987), or an expected future price (Jacobson and Obermiller 1990). The conceptualization of IRP as a point estimate of some expected price is only one alternative representation.

Several studies have measured IRP (see Appendix A). Some employ alternative measures to capture the construct (e.g., Biswas and Blair 1991; Lichtenstein and Bearden 1989; Urbany, Bearden, and Weilbaker 1988). Urbany, Bearden, and Weilbaker (1988) consider IRP an "expected price range," indicated by subjects' perceptions of the high and low market prices. This definition is similar to Monroe's (1984) "acceptable price range." However, the expected price range might include prices that are not acceptable. More research is needed on how a reference price is represented and stored in memory. Furthermore, research must address whether the very act of measuring it influences or generates responses.

Price expectations also should integrate the consumers' knowledge regarding all relevant products and prices, including competing brands (Rajendran and Tellis 1994). The literature on price expectations suggests that an expectation is an integration of all relevant information (Grewal, Monroe, and Krishnan 1998). Consumers may have an internal reference point that consists of some other price

---

[1]The IRP, though often conceptualized as a mathematical point, can be a range of values that constantly adapts to stimuli and cues (Monroe, Grewal, and Compeau 1991).

[2]We thank an anonymous reviewer for this conceptual link.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Figure 1.    A Model of Reference Price Processing



$IRP_i$ = Old internal reference price.
$IRP_n$ = New internal reference price.

COMPEAU000055

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

(e.g., the last price paid). This IRP should hold less sway than the consumers' range of expected prices because it takes into account less information. For example, a consumer might be traveling and pay $3.00 for a small tube of toothpaste at a hotel gift shop. The consumer might have a price expectation range of, say, $1.75 to $2.50 for a large tube of toothpaste. Although the $3.00 price last paid is likely to be remembered for some time by the consumer, it is unlikely that it would be used to judge the value of future price offers.

## Perceived Value of the Offer

Monroe and Chapman (1987) suggest that the perceived value of the offer is composed of acquisition and transaction value. *Acquisition value* represents the product value and depends on the trade-off between the product's benefits and its costs (Monroe 1990; Zeithaml 1988). *Transaction value* represents the value of the deal and depends on the comparison of the reference price (external or internal) and the SP (Grewal, Monroe and Krishnan 1998).

Although some research has focused on perceived savings as an indicator of perceived value (Blair and Landon 1981), other research has employed multiple measures in the form of perceptions of worth, price acceptability, savings, and value for the money (Berkowitz and Walton 1980; Della Bitta, Monroe, and McGinnis 1981; Lichtenstein, Burton, and O'Hara 1988). Although it seems prudent to use multiple indicators, there is little theoretical support for how these indicators relate to the perceived value construct. Recently, Grewal, Monroe, and Krishnan (1998) suggested that transaction value is an antecedent of acquisition value, and acquisition value is akin to overall value. Although their operationalizations are more complex to measure than some alternatives, this conceptualization allows for finer discrimination in the overall values that different consumers attach to a comparative price advertisement.

## Believability of the Price Offer

One potential mediator of the effect of a comparative price offer is its perceived believability. Ostensibly, the more a consumer believes the price offer is truthful, the greater its effect is. Moreover, the credibility of the source (e.g., merchant, manufacturer, spokesperson) may influence the believability or truthfulness of the price promotion (Petty and Cacioppo 1981). This latter issue is complicated by the awareness that, for any given communication (advertisement), there may be more than one associated source. If a store is advertising a brand item, then both the store and the brand may be considered sources of the message. The conditions in which consumers rely on one source more than another in assessing the believability of the comparative price claim need examination.

Prior research has conceptualized believability as either global (e.g., Kamins and Marks 1988) or of the price reduction only (e.g., Lichtenstein, Burton, and Karson 1991). The research does not indicate clearly which price(s) consumers believe, the ARP, the SP, or both. Further research should examine the potential multidimensionality of the believability of the price offer; research should measure specifically

the believability of the ARP, the advertised sale price (ASP), and the price reduction (i.e., ARP − ASP).

## Purchase Intention

*Purchase intention*, or willingness to buy, has been defined as the consumer's likelihood of purchasing the product (Dodds, Monroe, and Grewal 1991). Dodds and Monroe (1985) suggest that willingness to buy is a behavioral tendency that the consumer will purchase the product. Prior research predominantly has used purchase intention (e.g., Barnes 1975; Keiser and Krum 1976) rather than actual choice (cf. Moore and Olshavsky 1989; Varadarajan 1986).

## Search Intention

*Search intention* has been defined as the consumer's intention to search for additional information before making a purchase (Della Bitta, Monroe, and McGinnis 1981). Urbany, Bearden, and Weilbaker (1988) focus on *search benefit* and define it as the improvement in value or price that the consumer believes can be obtained by searching (Stigler 1961). Ostensibly, the better the current price offer (or deal), the lower the need to continue searching, because the benefit of additional search is reduced given the lower likelihood of finding a better deal and the additional search costs. Therefore, both costs and benefits are integral components in a consumer's decision to engage in additional search. A conceptualization of search that incorporates multiple components (search costs, benefits, and intention) is needed. Consumers may search for a variety of information, in addition to just getting a better deal. Search benefits may need to be broadened to include these types of search (e.g., whether the product fits needs). Search intention alone only provides a measure of the likelihood that a consumer will continue to seek a lower price. It does not capture the reasons for this intent, including whether the search costs are too high or the benefit too small. Thus, the effects of comparative advertisements on search costs, search benefits (both price and nonprice), and overall intentions to undertake further search need assessment.

# Hypotheses

## Presence Versus Absence of Advertised External Reference Price

Prior research has examined whether the presence or absence of an ARP in an advertisement influences consumer perceptions (e.g., Blair and Landon 1981; Keiser and Krum 1976; Liefeld and Heslop 1985). A central public policy issue pertains to whether the presence of the ARP enhances the value of the offer, attenuates search process, and results in consumers spending more on the product than necessary (by not buying it at the lowest price). From a public policy perspective, these effects should be welcome, as long as the ARP is bona fide. The comparative price information helps consumers attach a value to the offer and could result in substantial savings in money, time, and effort. However, if the ARP is fictitious, then the advertisement is deceptive, potentially can be harmful to consumers, and is in need of further scrutiny.

COMPEAU000050

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

According to our framework (which builds on prior models, including Grewal and Compeau [1992], Grewal, Monroe, and Krishnan [1998], and Urbany, Bearden, and Weilbaker [1988]), the presence of a higher ARP should result in an upward shift in the IRP, which will create increased perceptions of value and purchase intentions. This higher ARP also should result in reduced believability (because it is further from both the IRP and the SP) and intent to search (because the consumer will believe that it would be difficult to do any better). We hypothesize that

> $H_1$: The mere presence of an ARP in a comparative price advertisement (a) increases consumers' IRP, (b) increases consumers' perceptions of value, (c) increases consumers' perceptions of believability, (d) increases consumers' purchase intentions, and (e) decreases consumers' search intentions.

## Advertised Reference Price Levels

Another key public policy issue is how the level of the ARP affects consumers. Results of studies that examine this issue provide evidence pertaining to the role of the ARP (and if it was inflated or fictitious) and consumer perceptions and intentions (e.g., Berkowitz and Walton 1980; Biswas 1992; Della Bitta, Monroe, and McGinnis 1981; Moore and Olshavsky 1989). If these reference prices are fictitious, it would be useful to assess the magnitude of the deception.

We predict that the higher the ARP, the higher consumers' estimates of their IRP, perceptions of value, and purchase intentions will be. However, the higher levels of ARP are likely to reduce the believability of the offer and search intention. When we compare $H_1$ with this hypothesis for varying levels of ARP ($H_2$), the predicted effect on believability for the mere presence of a reference price might seem counterintuitive. However, studies typically have compared an advertisement that simply indicates that an item is on sale with an advertisement that also presents an ARP. Thus, believability should be enhanced when some additional information about the product's regular or list price is provided, compared with cases in which only a price labeled as on sale appears ($H_1$), whereas believability should decrease as the level of the ARP is increased. Thus, we hypothesize the following:

> $H_2$: As the level of an ARP in a comparative price advertisement increases, (a) consumers' IRPs increase, (b) consumers' perceptions of value increase, (c) consumers' perceptions of believability decrease, (d) consumers' purchase intentions increase, and (e) consumers' search intentions decrease.

Note that the prediction for the effects on believability is the reverse of $H_1$. When the ARP is always present but increasing, it leads to lower believability because it moves farther from the IRP and the SP.

## Advertised Selling Price

In addition to different reactions in response to different levels of ARP, consumers also may react differently if the ARP is constant but the SP is changed. The SP will be compared with the IRP (which may have been influenced by the ARP) to judge the offer. As the SP decreases and moves farther from the ARP, consumers attach more value to the deal,

believe the offer less, increase their intent to purchase, and decrease their intent to search. However, the SP also may influence the IRP, producing a downward pressure on it as the SP is lowered.

In the presence of a higher ARP, this SP should have a smaller effect on the IRP because consumers are likely to view the ARP as the "normal" or real price (at least, that is what the advertisement suggests) and the "sale" price as unusual or abnormal, which is why it is on sale. This effect may not hold, however, if consumers are exposed constantly to the sale price and learn to disregard the ARP. Thus, in general, lower SPs should result in more favorable responses (Lichtenstein and Bearden 1989; Lichtenstein, Burton, and Karson 1991). As the SP decreases, consumers' perceptions of value and purchase intentions should increase. Alternatively, IRP, believability, and search intentions should decrease.

> $H_3$: As the level of an SP in a comparative price advertisement decreases, (a) consumers' IRPs decrease, (b) consumers' perceptions of value increase, (c) consumers' perceptions of believability decrease, (d) consumers' purchase intentions increase, and (e) consumers' search intentions decrease.

## Method

The studies used in this meta-analysis were identified by a computerized search of the Psychlit database, a manual search of periodical indices, the "invisible college" technique (i.e., colleagues working in this research area provided references, full bibliographies, and copies of studies) (Cooper 1984), and an issue-by-issue search of six journals (*Journal of Marketing, Journal of Marketing Research, Journal of Consumer Research, Journal of Public Policy & Marketing, Journal of Retailing,* and *Journal of the Academy of Marketing Science*) and two series of proceedings (American Marketing Association and Association for Consumer Research). We also performed an ancestral trace of references in a recursive manner as each article was identified. In total, 38 studies were identified for inclusion in the meta-analysis. The meta-analysis examines 15 central relationships,[3] including the effects of presence and absence of reference price and levels of reference price and SP, which resulted in 86 effect sizes, as measured by eta. Eta is a correlational index, calculated as the square root of the proportion of variance accounted for. It is analogous to a correlation coefficient (Rosenthal and Rosnow 1984). For a complete discussion on calculating and using eta as an effect size indicator, see Hedges and Olkin (1985), Hunter, Schmidt, and Jackson (1982), and Rosenthal (1984).

## Effects of Method Factors

Differences in method often are cited to explain variances in the results across studies in a given research area (Appendix B). We tested the effects of method factors on the magnitude of effect sizes across the 38 studies. Because of the large number of relationships examined across these 38 studies,

---

[3]We also examined the effects of store and brand name but do not report them here because too few studies were available to test across most cells and the theory to develop hypotheses still is developing. Clearly, there is a need for research examining these effects.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Table 1. A Quantitative Assessment of Substantive Results

| Hypothesis | N | Average Eta | 95% Confidence Interval | | File Drawer N | | |
|---|---|---|---|---|---|---|---|
| | | | Lower | Upper | .05 | .10 | .15 |
| **Presence Versus Absence of ARP** | | | | | | | |
| $H_{1a}$: PARP→IRP | 5 | .26 | .03 | .50 | 21 | 8 | 4 |
| $H_{1b}$: PARP→PV | 5 | .21 | .03 | .39 | 16 | 6 | 2 |
| $H_{1c}$: PAR→BEL | 1 | .29 | NC | NC | 5 | 2 | 1 |
| $H_{1d}$: PARP→PI | 10 | −.03 | −.01 | .08 | NC | NC | NC |
| $H_{1e}$: PARP→SI | 3 | .17 | .09 | .25 | 7 | 2 | 1 |
| **Level of ARP** | | | | | | | |
| $H_{2a}$: ARP→IRP | 7 | .29 | .14 | .44 | 43 | 17 | 8 |
| $H_{2b}$: ARP→PV | 6 | .25 | .10 | .41 | 28 | 11 | 5 |
| $H_{2c}$: ARP→BEL | 4 | .21 | −.24 | .65 | NC | NC | NC |
| $H_{2d}$: ARP→PI | 6 | .11 | .01 | .19 | 7 | 1 | NC |
| $H_{2e}$: ARP→SI | 4 | .12 | .03 | .21 | 6 | 1 | NC |
| **Level of Advertised SP** | | | | | | | |
| $H_{3a}$: SP→IRP | 6 | .25 | .12 | .37 | 24 | 9 | 4 |
| $H_{3b}$: SP→PV | 8 | .35 | .22 | .48 | 48 | 20 | 11 |
| $H_{3c}$: SP→BEL | 5 | .10 | .01 | .09 | 5 | NC | NC |
| $H_{3d}$: SP→PI | 8 | .21 | .17 | .24 | 26 | 9 | 3 |
| $H_{3e}$: SP→SI | 7 | .27 | .16 | .37 | 31 | 12 | 6 |

PARP = presence versus absence of advertised reference price,
RP = advertised reference price,
SP = advertised selling price,
IRP = internal reference price,
PV = perceived value,
BEL = perceived believability of price offer,
PI = purchase intentions,
SI = search intentions, and
NC = not calculated.

few effect sizes are available to test many of the method variances. Therefore, we performed exploratory tests on method differences when data were sufficient.

Our meta-analysis of the 38 studies for the proposed 15 relationships resulted in 86 effect sizes. Our exploratory analysis suggests that methodological factors at the overall level, such as use of manipulation checks, type of advertisement, and order of price information, did not affect the magnitude of the effect sizes.[4] Unfortunately, we could not assess the impact of other variables (e.g., type of IRP measured, design, measurement of purchase intention versus choice) because of the restrictive cell sizes.

## Results

A summary of the substantive results of the 38 empirical studies that examine comparative price advertising is provided in Table 1. Although 38 empirical studies have been conducted, certain relationships have received little attention. As we previously mentioned, the dearth of studies

examining the effects of store and brand name did not allow for complete examination. The quantitative assessment of the research results in terms of the size of the measured effects is expressed by η (Rosenthal and Rosnow 1984). Table 1 is organized according to three key independent variables: (1) the presence or absence of a comparative external reference price, (2) the level of the advertised comparative reference price, and (3) the level of the SP. The following discussion of the substantive findings therefore is organized according to these three independent variables and their effects on the five foremost dependent variables: (1) IRP, (2) perceived value of the offer or deal, (3) believability of the offer, (4) purchase intention, and (5) search intention.

Because our primary objective was to examine whether comparative price advertising was effective, we calculated the simple average effect size estimate (η), the 95% confidence interval (CI) (Hunter and Schmidt 1990; Rosenthal 1984), and the file drawer N, which indicates how robust the results are (Rosenthal 1984). If the 95% CI does not include zero, the relationship under examination is significant.

The file drawer N provides an assessment of how vulnerable our analysis is to future null results. It represents the number of studies that have not been published because of null results that would be needed to bring the significant effect (i.e., the simple average η in Table 1) down to a tar-

[4]The magnitude of the effect size did not vary as a function of whether the study conducted a manipulation check ($\overline{X}_{no\,MC}$ = .19, n = 45 versus $\overline{X}_{MC}$ = .23, n = 40, $t_{(83)}$ = −1.24, $p$ = .22), the nature of advertisement ($\overline{X}_{real}$ = .20, n = 8 versus $\overline{X}_{simulated}$ = .20, n = 77, $t_{(83)}$ = .00, $p$ > .9), or order of price information ($\overline{X}_{RP/SP}$ = .17, n = 6 versus $\overline{X}_{SP/RP}$ = .22, n = 41, $t_{(36,14)}$ = −1.63, $p$ = .11 [unequal variance t-test]).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

geted $\eta$ level (three levels were examined: .05, .10, and .15). For example, to bring the significant effect of ARP on buyers' IRP from an $\eta$ = .26 to $\eta$ = .05 would require that 21 null results be uncovered and added to our analysis. In Table 1, we summarize this information.

## Homogeneity Tests

Following procedures suggested by Rosenthal and Rosnow (1984), for each hypothesis, we tested the various effect sizes for homogeneity.[5] If homogeneous, they were combined, and a 95% CI was calculated to assess support for the hypothesis (see Table 1). The tests disclosed that there was a consistency of results for most of the relationships examined. Thus, the seemingly inconsistent results in terms of the magnitude and direction of the effects reported in the research are misleading. The differences can be attributed to the distribution of effects over the population.

## Substantive Results

We present the substantive results in Table 1; they are fairly self-evident. Cells in which the CI does not include zero demonstrate that the average effect size is significantly different from zero.

### $H_1$

The results support hypotheses $H_{1a}$, $H_{1b}$, and $H_{1e}$; the presence of an ARP in a comparative price advertisement increases consumers' IRP and their perception of value and reduces their intentions to search for a lower price. Only one study examined whether the presence of an ARP affected consumers' believability of the price offer ($H_{1c}$), and thus, this hypothesis is not tested or discussed. Eleven effect sizes were found that examined $H_{1d}$, that is, whether the presence of an ARP enhanced consumers' purchase intentions. The 11 effect sizes were not found to be homogeneous. When we eliminated the effect from Varadarajan's (1986) study, the resulting 10 effect sizes were still homogeneous and do not support the hypothesis (average $\eta$ = –.03, CI = –.01 to .08). A possible reason for Varadarajan's (1986) unusually large effect size ($\eta$ = .31) is that his field study used actual purchase as the dependent variable and not purchase intention (which was used by the other studies). Thus, the differences between purchase intentions and purchases warrant additional research.

### $H_2$

Including a reference price provides the consumer with a point of comparison by which to judge the lower offering price. The meta-analysis results indicate that, as the level of the ARP increases, consumers' IRP, perceptions of value, and purchase intentions also increase, and their search inten-

tions for a lower price decrease (i.e., support for $H_{2a}$, $H_{2b}$, $H_{2d}$, and $H_{2e}$). The expected negative effect on believability, however, was not supported. Although prior research does not make any definitive prediction whether the level of ARP increases or decreases the believability of the price offer, we based $H_{1c}$ and $H_{2c}$ on the notion that, as the ARP moves farther and farther from the SP, it becomes less believable (Biswas 1992; Gupta and Cooper 1992). The results of the meta-analysis of four effect sizes does not support a relationship between the level of the ARP and the believability of the price offer (average $\eta$ = .21, CI = –.24 to .65).

### $H_3$

The results also support $H_{3a–c}$; as the SP decreases, consumers' IRP, believability of price offer, and price search intention decrease, whereas their perception of value and purchase intention increase.

## Discussion

In this review, we summarize and critique the conceptual, methodological, and substantive domains of the comparative price advertising research. We next discuss implications for public policymakers, limitations of the meta-analysis, and avenues for further research.

### Public Policy and Managerial Implications

We believe that the use of meta-analysis is a powerful tool to study public policy issues. It provides a comprehensive integration of the extant research and enables researchers to draw conclusions from seemingly disparate results. In this research study, we focused on whether the ARP provided in a comparative price advertisement enhances buyers' IRP estimates, value perceptions, and purchase intentions and lowers their search intentions. The results largely support the hypotheses.

Examining the results of various studies individually would suggest that many of the studies contradict one another. Thus, marshaling the evidence from this meta-analysis into a courtroom can offer clear and substantial evidence that incorporates the results from all known studies in a research area. Furthermore, the results of such meta-analytical reviews can be used to counter legal tactics, such as muddling an issue with seemingly different results from different studies to support one claim or another, or to introduce confusion or reasonable doubt.

This meta-analysis illustrates that the magnitude and homogeneity in effect sizes leaves little doubt that comparative price advertisements work. That this effect is unaffected by vast differences in methods suggests that it is robust. Overall, the potential for deception seems rife because external reference prices have a strong influence on consumers, even when they are exaggerated (see also Urbany, Bearden, and Weilbaker 1988). The effects on believability are not supported by our meta-analysis in general, and the one significant effect we were able to identify, the effect of SP on believability, was quite small for a mental response variable (.10). These results no doubt are due, in part, to the small number of effect sizes available.

The average sizes for the external reference price effects are smaller than those for the effects of the SP. This suggests

---

[5]We assessed the statistical homogeneity of the effect sizes by first calculating the associated Fisher z appropriate to each of effect sizes (eta, $\eta$), and N – 3, where N is the number of sampling units on which each effect size is based. Then we obtained the statistical significance of the homogeneity of the effect sizes from a chi-square computed with the following formula (see Brown and Stayman 1992; Rosenthal and Rosnow 1984):

$$\Sigma[(N_j - 3)(\bar{z}_j - z)^2] \text{ is distributed as } \chi^2 \text{ with } K - 1 \text{ df,}$$

where $\bar{z}$ is the weighted mean z as follows:

$$\bar{z} = \Sigma(N_j - 3)z_j / \Sigma(N_j - 3).$$

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

that the adverse effects of reference prices may not be as severe as previously suggested (Keiser and Krum 1976). The magnitude of the average effect sizes suggests that consumers are more responsive to reductions in SPs than to increases in ARPs. This effect indicates that consumers place a greater value on reducing the monetary sacrifice represented by the SP (reducing the loss) than on increasing the value of the deal (increasing the gain). Public policymakers can rely on consumers to offer some defense to the widespread use of grossly exaggerated reference prices.

Nonetheless, an inflated and/or false ARP is likely to enhance consumers' IRP estimates and ultimately increase perceptions of value and likelihood of purchases and reduce search. When ARPs are inflated, they are always deceptive. It is difficult, however, to determine the veracity of different types of advertised comparative prices, some being more difficult to judge than others. "Regular price" appears somewhat easier to verify because consumers can examine the historical price offerings and actual sales to judge whether a regular price is bona fide; however, that perception is misleading.

Policymakers encourage retailers and advertisers to provide consumers more information so they can assess the truthfulness of these advertisements better. However, there is something wrong in the legal logic that suggests that disclosing a deceptive practice compensates for the deception. Advertisers that inflate the savings associated with the comparative price claim will be hesitant to disclose the deception openly, truthfully, completely, and in a compelling manner; advertisers that do not inflate the comparative price claim do not need to provide additional information. Moreover, advertisers recently have attempted to protect themselves against deceptive advertising charges by skillfully disclosing the methods used to develop the ARP; however, this tactic is woefully inadequate (*Colorado v. Mays Department Store* 1990). Explaining the deceptive manner in which the inflated ARP was formed does not mean that consumers are not harmed. Much of the time, this disclosure is hidden in small print as a footnote buried in vague and confusing language. Some consumers even may interpret this disclosure as testimony to the veracity of the comparative price claim.

Aggressive legal actions against deceptive ARPs may serve as a deterrent from future abuses (see the review of recent cases in Compeau, Grewal, and Grewal 1994); however, the inconsistencies from state to state in the nature of the regulations and the general lack of vigor in identifying violations and aggressively prosecuting violators suggest that federal enforcement efforts should be stepped up to complement the states' efforts. As consumers who are sensitized to this area because of our research interests, we find inflated comparative price claims in advertisements on a regular basis, with apparently no concern for potential legal prosecution. Although it appears that current laws are adequate, a lack of a highly visible and vigorous enforcement suggests that the federal government should take the lead in educating sellers about the FTC guidelines and then aggressively enforcing them. A push for simple disclosure, though it would require less effort and money, is likely to be ineffective. Moreover, before pursuing such disclosure as a remedy, policymakers must determine what kinds of disclosures reduce the potential for deception, such as retailers informing customers about the duration of the sale, the schedule of sales they plan to run during the year, and so forth. Not all forms of disclosures actually assist the consumer in judging the veracity of the claim.

The findings from the meta-analysis suggest that comparative price advertising can be an effective tool for managers. Simply put, the mere presence of an ARP increases consumers' IRP and, thus, their perceptions of value and intent to purchase. From a managerial perspective, the use of comparative price advertisements conveys to consumers a higher value for a product that currently is selling at a lower price. In one respect then, it is an attempt to "counteract" the possible lowering effect of the SP on consumers' quality judgments, while preserving the lower SP's ability to reduce the perception of the monetary sacrifice. It has been demonstrated that this lower SP also can reduce a consumer's IRP. Ironically, though dropping the SP may increase consumers' perceptions of value, because of the lower sacrifice, it also may reduce value perceptions because of lower quality perceptions and a comparison with a new, reduced IRP. Thus, the net effect of lowering the SP depends on the extent to which consumers allow the SP to influence their quality perceptions and IRP, an issue not addressed by prior research.

Another significant finding is that lowering the SP appears to have a greater impact on consumers' perceptions of value than increasing the external reference price does. That is, there appears to be an offsetting influence that constrains the effect of higher reference prices, but not of lower SPs. This effect is plausible, however, only when consumers have some basic knowledge of price ranges. That is, given some knowledge of general price ranges, a decrease in an SP will produce a greater effect than an identical increase in the ARP. A question remains as to whether a floor exists for this effect.

Managers should maximize the effect of the ARP on the IRP and minimize the impact of the SP on the IRP. One way to accomplish this is to differentiate the SP from the actual value of the item as much as possible, striving to emphasize that the SP is a unique offering, not reflective of "normal" circumstances. Items that appear on sale a good deal of the time are likely to provide a greater impact of the SP on the IRP. That is, a consumer's IRP likely will approximate the sale price after he or she repeatedly sees the item at that sale price, and perceptions of value will not be affected greatly.

### Limitations and Directions for Further Research

In this review, we examine a small group of variables prominent in the literature. Other variables have been investigated (e.g., source credibility, store, brand) and, with additional data points, should be examined in subsequent reviews. The lack of a significant effect for the level of the external reference price on believability also may be due to a limited number of effect sizes or to the alternative operationalizations of the price offer believability construct.

Additional research should explicitly incorporate the simultaneous examination of ARP, SP, and their interactions on the various dependent measures (e.g., $3 \times 3$ with an absent level, two levels of increasing ARP, and two levels of decreasing SP).[6] In addition, research must address the

---

[6]We thank an anonymous reviewer for making this suggestion.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000060

**Appendix A.** An Overview of the Empirical Comparative Price Advertising Research

| Study: Author (cite) | Independent Variable[a] | Dependent Variable[b] | Theory[c] |
|---|---|---|---|
| # 1: Fry and McDougall (1974) | *Discount* (4): 25%, 50%, 11%, 44%; *Store* (2): low, high credibility | *Bel* (1,3) | EX |
| # 2: Barnes (1975) | *Semantic Cues* (3): Special SP, 25% off SP, RP/SP; *Newspaper* (3): high, moderate, low prestige; *Store* (2): high prestige department, low prestige discount | *Bel, PV, PI*, all (7,6) | EX |
| # 3: Keiser and Krum (1976) | *Semantic Cues* (2): RP/SP, SP | *PJ* (1,5); *Willingness to Read Advertisement* (1,5); *Bel* (1,5); *PI* (1,5) | EX |
| # 4: Sewall and Goldstein (1979) | *None* | *Reference Price Interpretation* (open) | EX |
| # 5: Berkowitz and Walton (1980) | *Semantic Cues* (4): RP/SP, Total value/SP, Compare at/our price, % off/now only SP; *Discount* (2): 10%, 40%; *Store* (2): discount, department; *Product* (3): low, medium, high price | *PV* (1,7); *PJ* (1,7); *PI* (1,7) | AL |
| # 6: Blair and Landon (1981) | *Semantic Cue* (3): SP, RP/SP, SP/MSLP | *Normal Price* ($); *Lowest Price* ($); *PV* (1,4) | EX |
| # 7: Della Bitta, Monroe, and McGinnis (1981)   Exp. 1 | *Semantic Cues* (8): SP, RP/SP, RP% off, RP/S off, RP/SP% off, RP/SP% off/S off, RP/SP/% off/% off/S off, RP/SP/% off/$ off; *Amount Off Discount* (5): 10%, 20%, ....50%; *Reference Price* (2): $50, $120 | *PV* (3,7); *SI* (2,7); *Bel* (1,7); *PJ* (3,7)   (all $\alpha > .61$) | AC |
| Exp. 2 | Complete replication of Exp. 1 | Complete replication of Exp. 1, (all $\alpha > .61$) | |
| # 8: Ahmed and Gulas (1982) | *Context* (2): catalog, newspaper advertisement | *PV* ($); *PJ* ($); *Bel* ($) | EX |
| # 9: Friedman et al. (1982) | *Discount* (4): ab, 28%, 50%, 75%; *Sale Price* (1): $49.95; *Reference Price* (4): ab, $200, $100, $75 | *PI* (1,6); *Normal Price* ($); *Maximum Willing to Pay* ($) | AC |
| #10: Raju and Hastak (1983) | *Price Deals* (3): ab, $.40 off, $1.79 off | Cognitive Responses; Attitude: (Bel × Eval) for 6 attributes; Attitude-brand (3,7, $\alpha = .9$); Attitude-act (4,7, $\alpha = .87$); *PI* (1,7) | |
| #11: Oglesby (1984) | *Discount* (4): 10%,30%,50%,70%; *Semantic Cue* (2): RP/% off/SP, RP/SP | *Perceived Price Attitude* (5,5, $\alpha = .8$); *Perceived Quality* (1,7) | EX |
| #12: Bearden, Lichtenstein, and Teel (1984) | *Semantic Cue* (2): RP/SP, SP; *Coupon* (2): ab, present | *PJ* (5,7); *PI* (4,7); Attitude-Purchase and Use (7,7); | AC |

Reproduced with permission of the copyright owner.   Further reproduction prohibited without permission.

COMPEAU000061

| Study | Manipulations | Dependent Variables | Code |
|---|---|---|---|
| Exp. 1<br>Exp. 2<br>Exp. 3<br>Exp. 4 | Brand (3): national, generic, private<br>Complete replication of Exp. 1<br>Complete replication of Exp. 1<br>Complete replication of Exp. 1 | (all α > 85)<br>Complete replication of Exp. 1<br>Complete replication of Exp. 1<br>Complete replication of Exp. 1 | |
| #13: Liefeld and Heslop (1985) | Semantic Cues (5): SP, AP/MSLP, Sale/SP, Sale/RP/SP, Sale/MSLP/SP | *Normal Price ($), Price Accuracy* (normal price − actual price) | EX |
| #14: Varadarajan (1986)[d]<br>Exp. 1 | *Semantic Cues (3):*<br>Get 2 for price of 1, Buy 1 get 1 free, $.01 with a purchase of 1 regular priced; | *Choice* | AC |
| Exp. 2 | 50% off regular price, ½ off regular price, $1.00 off regular price; | *Choice* | AC |
| Exp. 3 | RP/$1.00 off/SP, RP/SP, SP | *Choice* | TU |
| #15: Chapman (1987) | *Promotional Frame (4):* SP, RP/SP, RP/coupon, RP/rebate;<br>*Sale Price (4):* $84.95, $99.95, $114.95, $124.95 | *Perceived Quality (4,7); Monetary Sacrifice (3,7); PI (3,7) Reference Sacrifice (3,7); PI (3,7); Acquisition Value (3,7); Transaction Value (3,7); Redemption Effort (3,7)* (all α = .78–85) | |
| #16: Burton and Lichtenstein (1988) | *Reference Price (3):* $319, $399, $699;<br>*Price (1):* $299;<br>*Consistency (2):* low, high;<br>*Distinctiveness (2):* low, high | *Attitude-Ad-Cognitive (5,9, α = .82); Attitude-Ad-Affective (6,9, α = .92); Attitude-Deal (4,9, α = .92)* | TU |
| #17: Diamond and Campbell (1988) | *Promotion (4):* discount, extra product, premium product, control group | *Average Price ($); Expected Price ($); Frequent Price ($); Fair Price ($); Most Price ($); Expensive (1,7); Quality (1,7)* | TU |
| #18: Kamins and Marks (1988) | *Appeal Sidedness (2):* 1 versus 2;<br>*% Savings (4):* 5,10,14,20 | *PV (1,7); Bel (1,7); Quality (1,7); PI (1,7)* | EX |
| #19: Lichtenstein and Bearden (1988) | *Reference Price (2):* $8215, $7414;<br>*Price (1)* −$7272; *Consistency (2):* low, high; *Distinctiveness (2):* low, high | *Normal Price ($)* | AL, AT |
| #20: Mobley, Bearden, and Teel (1988)<br>Exp. 1 | *Semantic Cue (2):* Save up to %, Save %; *Discount (2):* 25%, 50%; *Product (2):* tennis shoes, sport shirt | *PV (3,7, α = .82); Perceived Informational Value of Advertisement (4,7, α = .79); Bel* (average market price − expected price to pay) | TU |
| Exp. 2 | *Semantic Cues (2):* Save up to %, Save %; *Discount (2):* 25%, 50% | *PV (3,7, α = .85); Perceived Informational Value of Advertisement (4,7, α = .94); Bel* (same) | |
| #21: Urbany, Bearden, and Weilbaker (1988)<br>Exp. 1 | *Reference Price (4):* ab $359, $419, $719; Price (1): $319 | *AP ($); Lowest Market Price ($); Normal Price ($); PV (3,7, α = .79); Choice; Bel (2,7); Search Benefits* (lowest expected price − sale price) | AL, AC, TU |
| Exp. 2 | *Reference Price (3):* ab, $419, $719;<br>Price (2): $279, $319 | Same Variables with α = .86 for PV | |

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

| Study | Manipulations | Measures | Codes |
|---|---|---|---|
| #22: Lichtenstein and Bearden (1989) | Reference Price (3): $319, $399, $699; Consistency (2): low, high; Distinctiveness (2): low, high | PV (4.9, $\alpha$ = .8); Attitude-Deal (4.9, $\alpha$ = .92); Source Credibility (5.9, $\alpha$ = .78); Normal Price ($); Lowest Price ($); Fair Price ($) | AL, AC, AT |
| #23: Grewal (1989) Exp. 1 | Selling Price (2): $75, $135 | Perceived QL (5.7, $\alpha$ = .88); Perceived MS (4.7, $\alpha$ = .76), Perceived Benefits (5.7, $\alpha$ = .88), AV (4.7, $\alpha$ = .82), TV (4.7, $\alpha$ = .87), PV (4.7, $\alpha$ = .87), PI (4.7, $\alpha$ = .84), SI (4.7, $\alpha$ = .6), Bel (4.7, $\alpha$ = .6), Normal Price ($), AP ($) | TU, AL, AC |
| Exp. 2 | Selling Price (2): $99, $180; Reference Price (2): $200, $250 | Perceived QL (4.7, $\alpha$ = .84); Perceived MS (4.7, $\alpha$ = .87), Perceived Benefits (5.7, $\alpha$ = 9), AV (4.7, $\alpha$ = .93), Reference Sacrifice (4.7, $\alpha$ = .86), TV (4.7, $\alpha$ = .89), PV (4.7, $\alpha$ = .88), PI (4.7, $\alpha$ = .92), SI (4.7, $\alpha$ = .79), Bel (4.7, $\alpha$ = .7), Normal Price ($), AP ($) | TU, AL, AC |
| Exp. 3 | Selling Price (3): $100, $140, $180; Reference Price (4): ab, $200, $250, $350; Attributes (3): ab, functional, nonfunctional | Perceived QL (4.7, $\alpha$ = .85); Perceived MS (4.7, $\alpha$ = .87), Perceived Benefits (5.7, $\alpha$ = .89), AV (4.7, $\alpha$ = .83), TV (4.7, $\alpha$ = .86), PV (4.7, $\beta$ = .92), PI (4.7, $\alpha$ = .93), SI (4.7, $\alpha$ = .76), Bel (4.7, $\alpha$ = .83), Normal Price ($), AP ($) | TU, AL, AC |
| #24: Lichtenstein, Burton, and O'Hara (1988) Exp. 1 / Exp. 2 | Reference Price (2): $8215, $7414; Reference Price (3): $319, $399, $699 | PV (4.9, $\alpha$ = .85); Attitude-Deal (5.9, $\alpha$ = .94); PV (4.9, $\alpha$ = .92); Attitude-Deal (5.9, $\alpha$ = .92) | AT / AT |
| #25: Moore and Olshavsky (1989) | Discount (3): 5%, 30%, 70%; Brand (2): low, high familiarity; Store (2): department, discount | Choice | AT |
| #26: Diamond and Sanyal (1990) | Promotional Frame (2): gain, reduced loss | Choice | TU |
| #27: Gotlieb (1990) | Price Saving (2): ab, 30%; Source Credibility (2): low, high | Cognitive Responses; Involvement (16,7, $\alpha$ = .96); Attitude-Product (3,7, $\alpha$ = .93); Technical QL (2,7, $\alpha$ = .83); Functional QL (3,7, $\alpha$ = .75) | ELM |
| #28: Gotlieb and Fitzgerald (1990) | MSLP (2): $289, $429; Involvement (2): low, high; Experience (2): low, high | PI (1,9) | ELM |
| #29: Gotlieb and Swan (1990) | Price Saving (2): ab, 30%; Source Credibility (2): low, high; Experience (2): low, high | Cognitive Responses; Involvement (16,7, $\alpha$ = .96); Attitude-Product (3,7, $\alpha$ = .93); Attitude-ad (2,7, $\alpha$ = .84) | ELM |
| #30: Inman, McAllister, and Hoyer (1990) | Promotion Type (3): real, signal-only, absent; Need for Cognition (2): low, high | Choice | ELM |

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000063

| Study | Independent Variables[a] | Dependent Variables[b] | Theory[c] |
|---|---|---|---|
| #31: Biswas and Blair (1991) | *Reference Price (2): $599, $299; Store (2): discount, department;* | *Normal Price ($); Low Price ($); Average Price ($); High Price ($); PI (1,2);* | AL, AC, TU |
| #32: Gotlieb and Dubinsky (1991) | *Brand (2): familiar, unfamiliar; Selling Price (1): $229; Sale Price (2): $289, $429; Competitors Price (2): $199, $599; Credibility (2): low, high* | PV (normal – selling); Discount (RP – normal); Shop Around Savings (Selling – Low); *Cognitive Responses; Issue Involvement (20,7, α = .95); PI (3,7, α = 91)* | AL |
| #33: Gupta and Cooper (1992) | *Discount (7): 10%, 20%,..... 70%; Brand (2): National, Store; Store (2): high, low image* | Perceived Discount ([Perceived Regular Price – Perceived Discounted Price]/ Perceived Regular Price); Change in PI (1,19) | AL, AC, AT, CI |
| #34: Lichtenstein, Burton and Karson (1991) | *Reference Price/Sale Price Cue (6): $159/$79, $119/$79, $99/$79, $119/107, $119/59, control; Semantic Cues (5): 3 low consistency (was/now a $ value/sale, regular/sale, % off/now only 2 at high distinctiveness (compare at/our price, seen elsewhere/our price)* | *Fair Price (1,7); Normal Price (1,7); Most Price ($); Bel (2,7, r = .50)* PV (4,7, α = .90); Attitude-Deal (3,7, α = .95); Source Credibility (5,7, α = .86) | AL, AC, AT, CI |
| #35: Gotlieb and Sarel (1991a) | *Ad (2): comparative, noncomparative; Source Credibility (2): low, high; Sale Price (2): $289, $429* | PI (3,7, α = .89) | AB |
| #36: Gotlieb and Sarel (1991b) | *Sale Price (2): $289, $429; Competitors Price (2): $199, $599; Credibility (2): low, high* | Perceived Quality (3,7, α = .85); PI (3,7, α = .91) | AL |
| #37: Kalwani and Yim (1992) | *Price Discount Frequency (4): 1,3,5,7 times in 10 weeks; Price Discount (4): 10%, 20%, 30%. 40%* | Expected Brand Price ($); Brand Choice | EX, AL, AC |
| #38: Biswas (1992) | *Brand (2): familiar, unfamiliar; Reference Price (2): plausible ($299), implausible ($599)* | Low Price ($); AP – Market (IRP) ($); PI (1,2); Discount (RP – NP); Shop Around Savings (SP – Low); TV (SP – IRP) | TU, AL, AC |

[a]SP = sales price, RP = reference price, NR = not reported, PR = price, MSLP = manufacturer's suggested list price, ab = absent. Following each independent variable are the number of levels in parentheses and a brief description of each level.

[b]PV = perceived value, Bel = believability, QL = quality, MS = monetary sacrifice, PI = purchase intention, SI = search intention, AP = average price, NP = normal price, TV = transaction value/utility, AV = acquisition value/utility. When available, the number of items, number of points on scale, and reliability of the measure are presented in parentheses after each dependent variable.

[c]EX = exploratory, AL = Adaptation Level Theory, AC = Assimilation-Contrast Theory, TU = Transaction Utility Theory, AT = Attitude Theory, ELM = Elaboration Likelihood Model, AB = Attribution Theory, ory, CI = Correspondence Inference Theory.

[d]Only the abstract was published, but the author provided data. The complete study was published later in Leigh and Varadarajan (1991).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

COMPEAU000064

Appendix B. Methodological Characteristics of Empirical Comparative Price Advertising Research

| | Design[a] | Nature of Advertisement | Price Order | Analysis | Manipulation Check | Sample |
|---|---|---|---|---|---|---|
| # 1: Fry and McDougall (1974) | Field Quasi-Ex | Real | NR | Reg | No | 332 adults |
| # 2: Barnes (1975) | Mail Quasi-Ex 3 × 3 × 2 | Real | NR | MANCOVA | No | 900 adults |
| # 3: Keiser and Krum (1976) | Lab Ex | Simulated | NR | Chi-square | No | 143 students |
| # 4: Sewall and Goldstein (1979) | Field Survey | Catalog | NR | Chi-square | No | 110 adults |
| # 5: Berkowitz and Walton (1980) | Lab Ex 4 × 2 × 2 × 3 | Simulated | RP-SP | MANOVA | No | 568 adults |
| # 6: Blair and Landon (1981) | Field Survey | Simulated | SP-RP | t-test, MANOVA | No | 132 adults |
| # 7: Della Bitta, Monroe, and McGinnis (1981) | E1: Lab Ex 2 × 5 × 8<br>E2: Lab Ex 2 × 5 × 8 | Simulated<br>Simulated | RP-SP<br>PR-SP | MANOVA, MC, CI, C<br>MANOVA, MC, CI, C | No<br>No | 400 students<br>400 students |
| # 8: Ahmed and Gulas (1982) | Mail Survey | Real | NR | t-test | No | 257 adults |
| # 9: Friedman et al. (1982) | Lab Ex | Simulated | NR | ANOVA, t-test | No | 243 adults |
| #10: Raju and Hastak (1983) | Lab Ex 4 × 2 | NR | RP-SP | ANOVA | Yes | 120 students |
| #11: Oglesby (1984) | Lab Ex 4 × 2 | NR | RP-SP | ANOVA | Yes | 120 students |
| #12: Bearden, Lichtenstein, and Teel (1984) | E1: Lab Ex 2 × 2 × 3<br>E2: Lab Ex 2 × 2 × 3<br>E3: Lab Ex 2 × 2 × 3<br>E4: Lab Ex 2 × 2 × 3 | Simulated<br>Simulated<br>Simulated<br>Simulated | NR<br>NR<br>NR<br>NR | MANCOVA<br>MANCOVA<br>MANCOVA<br>MANCOVA | Yes<br>Yes<br>Yes<br>Yes | 292 adults<br>161 adults<br>259 adults<br>144 adults |
| #13: Liefeld and Heslop (1985) | Field Ex | Real | NR | ANOVA, Chi-square | No | 207 adults |
| #14: Varadarajan (1986) | E1: Field Ex<br>E2: Field Ex<br>E3: Field Ex | Real<br>Real<br>Real | NR<br>NR<br>SP-RP | ANOVA<br>ANOVA<br>ANOVA | No<br>No<br>No | NR adults<br>NR adults<br>NR adults |
| #15: Chapman (1987) | Lab Ex 4 × 4 | Text | RP-SP | ANOVA, MC | No | 255 students |
| #16: Burton and Lichtenstein (1988) | Lab Ex 2 × 2 × 3 | Simulated | RP-SP | ANOVA, ANCOVA, Reg | Yes | 278 students |
| #17: Diamond and Campbell (1988) | Lab Ex 1 × 4 | Simulated | SP | ANOVA, MC | No | 103 students |
| #18: Kamins and Marks (1988) | Lab Ex 2 × 4 | Text | SP-RP | ANOVA, MC, Reg | No | 171 students |
| #19: Lichtenstein and Bearden(1988) | Lab Ex 2 × 2 × 2 | Simulated | RP-SP | ANOVA | Yes | 528 students |
| #20: Mobley, Bearden, and Teel (1988) | E1: Lab Ex 2 × 2 × 2<br>E2: Lab Ex 2 × 2 × 2 | Real<br>Real | NR<br>NR | MANCOVA<br>MANCOVA | Yes<br>Yes | 160 students<br>83 students |

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.
COMPEAU000005

| Study | Design | Setting | Price | Analysis | MC | Sample |
|---|---|---|---|---|---|---|
| #21: Urbany, Bearden, and Weilbaker (1988) | E1: Lab Ex 1 × 4 <br> E2: Lab Ex 2 × 3 | Simulated <br> Simulated | NR <br> NR | MANOVA, LOGIT, C <br> MANOVA, LOGIT, C | Yes <br> Yes | 113 students <br> 168 students |
| #22: Lichtenstein and Bearden (1989) | Lab Ex 2 × 2 × 3 | Simulated | RP-SP | MANOVA, ANOVA | Yes | 278 students |
| #23: Grewal (1989) | E1: Lab Ex 2 × 1 <br> E2: Lab Ex 2 × 2 <br> E3: Lab Ex 3 × 4 × 3 | Text <br> Text <br> Text | RP-SP <br> RP-SP <br> RP-SP | ANOVA <br> ANOVA <br> ANOVA, C | No <br> No <br> No | 29 students <br> 58 students <br> 576 students |
| #24: Lichtenstein, Burton, and O'Hara (1988) | E1: Lab Ex 2 × 2 × 2 × 2 <br> E2: Lab Ex 2 × 2 × 3 | Simulated <br> Simulated | RP-SP <br> RP-SP | FACTOR, Reg <br> ANOVA, Reg | Yes <br> No | 544 students <br> 278 students |
| #25: Moore and Olshavsky (1989) | Lab Ex 3 × 2 × 2 | Simulated | RP-SP | CATMOD, ANOVA | No | 228 students |
| #26: Diamond and Sanyal (1990) | Lab Ex 2 | Simulated | SP | Chi-square | No | 73 adults |
| #27: Gotlieb (1990) | Lab Ex 2 × 2 | Simulated | NR | ANOVA | Yes | 126 students |
| #28: Gotlieb and Fitzgerald (1990) | Lab Ex 2 × 2 × 2 | Simulated | RP | ANOVA | Yes | 97 adults |
| #29: Gotlieb and Swan (1990) | Lab Ex 2 × 2 × 2 | Simulated | NR | ANOVA | Yes | 126 students |
| #30: Inman, McAllister, and Hoyer (1990) | Lab Ex 2 × 3 | Simulated | NR | ANOVA, t-test | No | 155 students |
| #31: Biswas and Blair (1991) | Lab Ex 2 × 2 × 2 | Simulated | RP | ANOVA | Yes | 234 students |
| #32: Gotlieb and Dubinsky (1991) | Lab Ex 2 × 2 × 2 | Simulated | SP-RP | ANOVA | Yes | 118 students |
| #33: Gupta and Cooper (1992) | Lab Ex 2 × 2 × 2 | Text | MIXED | ANOVA | Yes | 290 students |
| #34: Lichtenstein, Burton, and Karson (1991) | Lab Ex 5 × 6 + Control | Real | NR | MANOVA, ANOVA | Yes | 830 students |
| #35: Gotlieb and Sarel (1991a) | Lab Ex 2 × 2 × 2 | Simulated | SP-RP | ANOVA | Yes | 148 students |
| #36: Gotlieb and Sarel (1991b) | Lab Ex 2 × 2 × 2 | Simulated | SP-RP | ANOVA | Yes | 118 students |
| #37: Kalwani and Yim (1992) | Lab Ex 4 × 4 | NR | NR | ANOVA, MC | Yes | 188 students |
| #38: Biswas (1992) | Lab Ex 4 × 4 | NR | NR | ANOVA, MC | Yes | 188 students |

aAll designs were between-subjects designs. Studies #1, #8, #13, and #30 also used at least one within factor.

Note:
Ex = experimental design,     Lab = laboratory setting,
RP = reference price,     SP = sales price,
MC = multiple comparisons,     C = contrasts,
CI = confidence interval,     Reg = regression.
NR = not reported.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

COMPEAU000066

effects of ARP relative to individual subjects' IRPs (e.g., above, at-level, and below) using a pre- and postresearch design.

Although public policy implications can be gleaned from a meta-analysis that examines theory-testing research, there is a need for research that specifically examines some of the issues we raise with regard to potential deception. Studies directly examining and measuring deception would be most useful in determining the conditions in which comparative price advertisements are more likely to deceive consumers. One method that could be used to measure deception is to measure specifically the shift in IRP in response to inflated and fictitious levels of ARP.

Manipulations of involvement, knowledge, time pressure, product type, level of advertising expenditure, and frequency of comparative price advertising could help significantly in understanding these variables' effects on the likelihood of deception. Understanding the effects of comparative advertising in conditions of high versus low involvement would provide a more comprehensive test of our conceptualization.

There is also a need for longitudinal investigation into the longer-term effects of repeated exposure to comparative price advertisements. Although the data hint at diminishing returns, we simply do not know at this point whether consumers become desensitized to ARPs over time. We expect that comparative price advertising would lose its distinctiveness over time if overused.

Prior research has attempted to distinguish between an ARP supplied by a manufacturer (e.g., manufacturer's suggested list price) (Ahmed and Gulas 1989; Blair and Landon 1981; Liefeld and Heslop 1985) and one supplied by a retailer/merchant (Lichtenstein and Bearden 1989). Because these different reference prices evoke different levels of source credibility, there is a need for a conceptual distinction between the source of the reference price claim and its effect on price perceptions. One limitation of our meta-analysis was that, due to a lack of studies, we could not examine the role of different reference prices (or semantic cues).

Other issues in need of further research include the effects of brand and store image. What little research exists indicates that these variables may have key roles in consumers' responses and moderate the effects of reference price. The exact nature and impact of these roles, however, cannot be established currently. Additional research is needed to incorporate the price–quality relationship in predicting and understanding the effects of the reference and selling price. Finally, this research also can be extended by including a review of dissertation abstracts in the database of studies to be examined.

## References

Ahmed, Sadrudin A. and Gary M. Gulas (1982), "Consumers' Perception of Manufacturers' Suggested List Price," *Psychological Reports*, 50 (2), 507–18.

Barnes, James G. (1975), "Factors Influencing Consumer Reaction to Retail Newspaper 'Sale' Advertising," in *Combined Proceedings of the American Marketing Association*, Vol. 37, Edward M. Mazze, ed. Chicago: American Marketing Association, 471–77.

Bearden, William O., Donald R. Lichtenstein, and Jesse E. Teel (1984), "Comparison Price, Coupon, and Brand Effects on Consumer Reactions to Retail Newspaper Advertisements," *Journal of Retailing*, 60 (Summer), 11–34.

Berkowitz, Eric N. and John R. Walton (1980), "Contextual Influences on Consumer Price Responses: An Experimental Analysis," *Journal of Marketing Research*, 17 (August), 349–58.

Biswas, Abhjit (1992), "The Moderating Role of Brand Familiarity in Reference Price Perceptions," *Journal of Business Research*, 25 (3), 251–62.

——— and Edward A. Blair (1991), "Contextual Effects of Reference Prices in Retail Advertisements," *Journal of Marketing*, 55 (July), 1–12.

———, Elizabeth J. Wilson, and Jane W. Licata (1993), "Reference Pricing Studies in Marketing: A Synthesis of Research Results," *Journal of Business Research*, 27 (3), 239–56.

Blair, Edward A. and E. Laird Landon Jr. (1981), "The Effects of Reference Prices in Retail Advertisements," *Journal of Marketing*, 45 (Spring), 61–69.

Brown, Steven P. and Douglas M. Stayman (1992), "Antecedents and Consequences of Attitude Toward the Ad: A Meta-Analysis," *Journal of Consumer Research*, 19 (June), 34–51.

Burton, Scot and Donald R. Lichtenstein (1988), "The Effect of Ad Claims and Ad Context on Attitude Toward the Advertisement," *Journal of Advertising*, 17 (1), 3–11.

Chapman, Joseph D. (1987), "The Impact of Discounts on Subjective Product Evaluations," doctoral dissertation, Virginia Polytechnic Institute and State University.

——— and Kent B. Monroe (1990), "The Framing Effects of Alternative Price Promotions on Buyers' Subjective Product Evaluations," working paper, Department of Marketing, Ball State University.

*Colorado v. May Department Stores Co.* (1990), 1990–2 Trade Cas. (CCH) Par. 69, 163 (Colo. Dist. Ct.).

Compeau, Larry D., Dhruv Grewal, and Diana S. Grewal (1994), "Adjudicating Claims of Deceptive Advertised Reference Prices: The Use of Empirical Evidence," *Journal of Public Policy & Marketing*, 14 (Fall), 52–62.

Cooper, Harris M. (1984), *The Integrative Research Review: A Systematic Approach*. Beverly Hills, CA: Sage Publications.

Della Bitta, Albert J., Kent B. Monroe, and John M. McGinnis (1981), "Consumer Perceptions of Comparative Price Advertisements," *Journal of Marketing Research*, 18 (November), 416–27.

Diamond, William D. and Leland Campbell (1988), "The Framing of Sales Promotions: Effects on Reference Price Change," *Advances in Consumer Research*, Vol. 16, Thomas Srull, ed. Provo, UT: Association for Consumer Research, 241–47.

——— and Abhijit Sanyal (1990), "The Effect of Framing on the Choice of Supermarket Coupons," in *Advances in Consumer Research*, Vol. 7, Marvin E. Goldberg, Gerald Gorn, and Richard W. Pollay, eds. Provo, UT: Association for Consumer Research, 488–93.

Dodds, William and Kent B. Monroe (1985), "The Effect of Brand and Price Information on Subjective Product Evaluations," in *Advances in Consumer Research*, Vol. 2, E.C. Hirschman and M.B. Holbrook, eds. Provo, UT: Association for Consumer Research, 85–90.

COMPEAU000067

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 4:15-cv-04543-YGR   Document 75-12   Filed 01/31/17   Page 61 of 80

————, ————, and Dhruv Grewal (1991), "The Effects of Price, Brand, and Store Information on Buyers' Product Evaluations," *Journal of Marketing Research*, 28 (August), 307–19.

Emery, Fred (1970), "Some Psychological Aspects of Price," in *Pricing Strategy*, Bernard Taylor and Gordon Wills, eds. Princeton, NJ: Brandon/Systems, 98–111.

Friedman, Hershey H., Phillip E. Weingarten, Linda W. Friedman, and Ralph Gallay (1982), "The Effect of Various Price Markdowns on Consumers' Ratings of a New Product," *Journal of the Academy of Marketing Science*, 10 (Fall), 432–37.

Fry, Joseph N. and Gordon H. McDougall (1974), "Consumer Appraisal of Retail Price Advertisements," *Journal of Marketing*, 38 (July), 64–67.

Gabor, Andre and Clive W.J. Granger (1961), "On the Price Consciousness of Consumers," *Applied Statistics*, 10 (November), 170–80.

Gotlieb, Jerry B. (1990), "Communicating Price–Quality Relationships," *Journal of Applied Social Psychology*, 20 (5), 404–23.

———— and Alan J. Dubinsky (1991), "Influence of Price on Aspects of Consumers' Cognitive Processes," *Journal of Applied Psychology*, 76 (4), 541–49.

———— and Cyndy T. Fitzgerald (1990), "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers Are Willing to Pay for the Product," *Journal of Applied Business Research*, 6 (1), 59–69.

———— and Dan Sarel (1991a), "Comparative Advertising Effectiveness: The Role of Involvement and Source Credibility," *Journal of Advertising*, 20 (1), 38–45.

———— and ———— (1991b), "Effects of Price Advertisements on Perceived Quality and Purchase Intentions," *Journal of Business Research*, 22 (3), 195–210.

———— and John E. Swan (1990), "An Application of the Elaboration Likelihood Model," *Journal of the Academy of Marketing Science*, 18 (Summer), 221–28.

Grewal, Dhruv (1989), "The Effects of Intrinsic, Extrinsic Cues and Reference Prices on Buyers' Perceptions of Quality and Value," doctoral dissertation, Department of Marketing, Virginia Polytechnic Institute and State University.

———— and Larry D. Compeau (1992), "Comparative Price Advertising: Informative or Deceptive?" *Journal of Public Policy & Marketing*, 11 (Spring), 52–62.

————, Kent B. Monroe, and R. Krishnan (1998), "The Effects of Price Comparison Advertising on Buyers' Perceptions of Acquisition Value and Transaction Value," *Journal of Marketing*, 62 (April), 46–59.

Gupta, Sunil and Lee G. Cooper (1992), "The Discounting of Discounts and Promotion Thresholds," *Journal of Consumer Research*, 19 (December), 401–11.

Hedges, Larry V. and Ingram Olkin (1985), *Statistical Methods for Meta-Analysis*. Orlando, FL: Academic Press.

Helson, Harry (1964), *Adaptation Level Theory*. New York: Harper and Row.

Hunter, John E. and Frank L. Schmidt (1990), *Methods of Meta-Analysis: Correcting Error and Bias in Research Findings*. Newbury Park, CA: Sage Publications.

————. and Gregg B. Jackson (1982), *Meta-Analysis: Cumulating Research Findings Across Studies*. Beverly Hills, CA: Sage Publications.

Inman, J. Jeffrey, Leigh McAllister, and Wayne Hoyer (1990), "Promotion Signal: Proxy for a Price Cut?" *Journal of Consumer Research*, 17 (June), 74–81.

Jacobson, Robert and Carl Obermiller (1990), "The Formation of Expected Future Price: A Reference Price for Forward-Looking Consumers," *Journal of Consumer Research*, 16 (March), 420–32.

Jones, Edward E. and Keith E. Davis (1965), "From Acts to Dispositions: The Attribution Process in Person Perception," in *Advances in Experimental Social Psychology*, Vol. 2, Leonard Berkowitz, ed. New York: Academic Press, 219–66.

Kahneman, Daniel and Amos Tversky (1979), "Prospect Theory: An Analysis of Decision Under Risk," *Econometrica*, 47 (March), 263–91.

Kalwani, Mahohar U. and Chi Kin Yim (1992), "Consumer Price and Promotion Expectations: An Experimental Study" *Journal of Marketing Research*, 29 (February), 90–100.

Kamins, Michael A. and Lawrence J. Marks (1988), "An Examination into the Effectiveness of Two-Sided Comparative Price Appeals," *Journal of the Academy of Marketing Science*, 16 (Summer), 64–71.

Kaufmann, Patrick J., N. Craig Smith, and Gwen Ortmeyer (1994), "Deception in Retailer High-Low Pricing: A Rule of Reason Approach," *Journal of Retailing*, 70 (Summer), 115–38.

Keiser, Stephen E. and James R. Krum (1976), "Consumer Perceptions of Retail Advertising with Overstated Savings," *Journal of Retailing*, 52 (Fall), 27–37.

Kelley, Harold H. (1967), "Attribution Theory in Social Psychology," in *Nebraska Symposium on Motivation*, David Levine, ed. Lincoln, NE: University of Nebraska Press, 192–238.

Klein, Noreen M. and Janet E. Oglethorpe (1987), "Cognitive Reference Points in Consumer Decision Making," in *Advances in Consumer Research*, Vol. 14, Melanie Wallendorf and Paul Anderson, eds. Provo, UT: Association for Consumer Research, 183–87.

*Kraft Inc.* (1991), Docket No. 9208 (Jan. 30), 1991 FTC Lexis 38.

Leigh, James H. and P. Rajan Varadarajan (1991), "Consumers' Behavioral Responses to Alternative Coupon Price Promotions: A Field Study in a Fast Food Retailing Context," in *Proceedings of the 1991 Symposium on Patronage Behavior and Retail Strategy: The Cutting Edge II*, William R. Darden, Robert F. Lusch and J. Barry Mason, eds. Baton Rouge: Louisiana State University, 133–45.

Lichtenstein, Donald R. and William O. Bearden (1988), "An Investigation of Consumer Evaluations of Reference Price Discount Claims," *Journal of Business Research*, 16 (2), 1–12.

———— and ———— (1989), "Contextual Influences on Perceptions of Merchant-Supplied Reference Prices," *Journal of Consumer Research*, 16 (June), 55–66.

————, Peter H. Bloch, and William C. Black (1988), "Correlates of Price Acceptability," *Journal of Consumer Research*, 15 (September), 243–52.

————, Scot Burton, and Eric J. Karson (1991), "The Effect of Semantic Cues on Consumer Perceptions of Reference Price Ads," *Journal of Consumer Research*, 18 (December), 380–91.

————, ————, and Bradley S. O'Hara (1988), "Marketplace Attributions and Consumer Evaluations of Discount Claims," *Psychology and Marketing*, 6 (Fall), 163–80.

COMPEAU000068

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Liefield, John and Louise Heslop (1985), "Reference Prices and Deception in Newspaper Advertising," *Journal of Consumer Research*, 11 (March), 868–76.

*May Department Stores Co. v. Colorado* (1993), 863 P.2d 967 (Colo. S. Ct.).

Mobley, Mary F., William O. Bearden, and Jesse E. Teel (1988), "An Investigation of Individual Responses to Tensile Price Claims," *Journal of Consumer Research*, 15 (September), 273–79.

Monroe, Kent B. (1971), "Psychophysics of Price: A Reappraisal," *Journal of Marketing Research*, 8 (May), 248–51.

——— (1984), "Theoretical and Methodological Developments in Pricing," in *Advances in Consumer Research*, Vol. 11, Thomas C. Kinnear, ed. Provo, UT: Association for Consumer Research, 636–37.

——— (1990), *Pricing: Making Profitable Decisions*, 2d ed. New York: McGraw-Hill.

——— and Joseph D. Chapman (1987), "Framing Effects on Buyer's Subjective Product Evaluations," in *Advances in Consumer Research*, Vol. 14, Melanie Wallendorf and Paul Anderson, eds. Provo, UT: Association for Consumer Research, 193–97.

———, Dhruv Grewal, and Larry D. Compeau (1991), "The Concept of Reference Prices: Theoretical Justifications and Research Issues," working paper, Department of Marketing, University of Illinois.

——— and R. Krishnan (1985), "The Effects of Price on Subjective Product Evaluations," in *Perceived Quality: How Consumers View Stores and Merchandise*, Jacob Jacoby and Jerry C. Olson, eds. Lexington, MA: Lexington Books, 209–32.

Moore, David J. and Richard W. Olshavsky (1989), "Brand Choice and Deep Price Discounts," *Psychology and Marketing*, 6 (Fall), 181–96.

Oglesby, Bobbie D. (1984), "Price and Semantic Cues' Effect on Perceived Quality and Attitude," in *Marketing Comes of Age*, David M. Klein and Allen E. Smith, eds. Boca Raton, FL: Southern Marketing Association, 308–12.

Ozanne, Julie L., Merrie Brucks, and Dhruv Grewal (1992), "A Study of Information Search Behavior During the Categorization of New Products," *Journal of Consumer Research*, 18 (March), 452–63.

Petty, Richard E. and John T. Cacioppo (1981), *Attitudes and Persuasion: Classic and Contemporary Approaches*. Dubuque, IA: Wm. C. Brown Company Publishers.

Preston, Ivan L. (1992), "The Scandalous Record of Avoidable Errors in Expert Evidence Offered in FTC and Lanham Act Deceptiveness Cases," *Journal of Public Policy & Marketing*, 11 (Fall), 57–67.

Rajendran, K.N. and Gerard J. Tellis (1994), "Contextual and Temporal Components of Reference Price," *Journal of Marketing*, 58 (January), 22–34.

Raju, P.S. and Manoj Hastak (1983), "Consumer Response to Deals: A Discussion of Theoretical Perspectives," in *Advances in Consumer Research*, Vol. 7, J. Olson, ed. Ann Arbor, MI: Association for Consumer Research, 296–301.

Rao, Akshay and Kent B. Monroe (1989), "The Effect of Price, Brand Name, and Store Name on Buyers' Perceptions of Product Quality: An Integrative Review," *Journal of Marketing Research*, 26 (August), 351–57.

Rosenthal, Robert (1984), *Meta-Analytic Procedures for Social Research*. Beverly Hills, CA: Sage Publications.

——— and Ralph L. Rosnow (1984), *Essentials of Behavioral Research*. New York: McGraw-Hill.

Sewall, Murphy A. and Michael H. Goldstein (1979), "The Comparative Price Advertising Controversy: Consumer Perceptions of Catalog Showroom Reference Prices," *Journal of Marketing*, 43 (Summer), 82–92.

Sherif, Muzafer, Carolyn Sherif, and Carl I. Hovland (1961), *Social Judgment: Assimilation and Contrast Effects in Communication and Attitude Change*. New Haven, CT: Yale University Press.

Stigler, George J. (1961), "The Economics of Information," *Journal of Political Economy*, 69 (June), 213–25.

Szymanski, David M., Sundar G. Bharadwaj, and P. Rajan Varadarajan (1993), "An Analysis of the Market Share–Profitability Relationship," *Journal of Marketing*, 57 (July), 1–18.

Thaler, Richard (1985), "Mental Accounting and Consumer Choice," *Marketing Science*, 4 (Summer), 199–214.

Tversky, Amos and Daniel Kahneman (1981), "The Framing of Decisions and the Psychology of Choice," *Science*, 211 (September), 453–58.

Urbany, Joel E., William O. Bearden, and Dan C. Weilbaker (1988), "The Effect of Plausible and Exaggerated Reference Prices on Consumer Perceptions and Price Search," *Journal of Consumer Research*, 14 (June), 95–110.

——— and Peter R. Dickson (1991), "Consumer Normal Price Estimation," *Journal of Consumer Research*, 18 (June), 45–51.

Varadarajan, P. Rajan (1986), "Consumers' Behavioral Responses to Coupon Price Promotions: An Empirical Inquiry," in *AMA Educators' Proceedings*, Vol. 52, Terence A. Shimp et al., eds. Chicago: American Marketing Association, 211.

Zeithaml, Valarie A. (1988), "Consumers' Perceptions of Price, Quality, and Value: A Means-End Model and Synthesis of Evidence," *Journal of Marketing*, 52 (July), 2–22.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

COMPEAU000069

**EXHIBIT 17**

Consumers' Interpretations of the Semantic Phrases Found in Reference Price Advertisements
Compeau, Larry D;Lindsey-Mullikin, Joan;Grewal, Dhruv;Petty, Ross D
The Journal of Consumer Affairs; Summer 2004; 38, 1; ProQuest Central
pg. 178

178                                   THE JOURNAL OF CONSUMER AFFAIRS

LARRY D. COMPEAU, JOAN LINDSEY-MULLIKIN,
DHRUV GREWAL, AND ROSS D. PETTY

# Consumers' Interpretations of the Semantic Phrases Found in Reference Price Advertisements

Consumers are frequently presented with a higher reference price to compare with a lower advertised selling price. The research on reference prices has traditionally been conducted based on the implicit assumption that consumers' interpretations of a given semantic phrase, e.g., "Regular Price / Sale Price," are consistent across all consumers, but this fundamental assumption has never been tested. Guidelines issued by the Federal Trade Commission and the Council of Better Business Bureaus, as well as regulations enacted by approximately half of all states, appear to be based on a similar assumption. However, given the variability among consumers' perceptions found in other areas of consumer research, it is reasonable to expect that consumer interpretations of semantic phrases may vary. Given the potential variability, a pricing claim may be deemed informative or deceptive depending on the meaning the particular consumer attaches to the claim. This article presents a discussion of the vagueness in pricing claims as a step toward evaluating deception.

Advertisers often present consumers with commonly used semantic phrases such as "Regular Price," Manufacturer's Suggested List Price," and "Compare At" to label price offerings (Biswas and Blair 1991; Compeau and Grewal 1998; Lichtenstein, Burton, and Karson 1991). These reference price ads attempt to provide consumers with a higher price as a point of reference to enhance consumers' perceptions of value (Grewal, Monroe, and Krishnan 1998).

An advertiser uses a semantic phrase to provide additional information by which the consumer can judge the price offer. For example, an advertisement with a "Regular Price /Sale Price" semantic phrase provides more information than an advertisement that presents just "Sale Price." Ideally,

Larry D. Compeau is an Associate Professor, Clarkson University School of Business, Potsdam, NY (compeau@clarkson.edu). Joan Lindsey-Mullikin is an Assistant Professor at Babson College, Babson Park, MA. Dhruv Grewal holds the Toyota Chair of Commerce and Electronic Business at Babson College. Ross D. Petty is a Professor of Marketing and Technology Law at Babson College.

Larry Compeau thanks the Clarkson University School of Business for a grant in support of this research.

The Journal of Consumer Affairs, Vol. 38, No. 1, 2004
ISSN 0022-0078

Copyright 2004 by The American Council on Consumer Interests

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.



SUMMER 2004          VOLUME 38, NUMBER 1                    179

the consumer is better informed and makes a better purchase decision. However, there is also the possibility of *misinformation* from the added information. If the added information is vague in nature it may mislead the consumer. Vagueness can allow so many interpretations that it creates an inaccurate understanding in the mind of some consumers. Preston and Richards (1986, 605) talk about this in terms of "miscomprehension" which results in deceptiveness. Thus, it is unlikely that all consumers evaluate or interpret price comparisons the same. First, different semantic phrases may invoke different meanings resulting in between-phrase differences. For example, "Compare At" may not have the same meaning for consumers as "Manufacturer's Suggested Price." Secondly, within-phrase differences may occur between two consumers interpreting the same semantic phrase. Given the variability among consumers' perceptions found in other areas of consumer research, we would not expect consumers' interpretations of semantic phrases to be any different.

This manuscript presents a discussion of the vagueness in pricing claims as a step toward evaluating deception. In the following section a discussion of the current state of the regulation of reference price advertising is provided. It is argued that variation among consumers' interpretations is an important issue for public policy makers to consider in developing guidelines for consumer fairness. An examination of consumers' interpretations of semantic cues tests the assumption that consumer's interpretations do not vary. We demonstrate that semantic cues do indeed hold different meanings for different consumers.

## PUBLIC POLICY BACKGROUND

Semantic cues may inform or deceive the consumer depending on how consumers interpret them. The "courts have determined that if a statement in an ad lends itself to more than one interpretation by the ordinary recipient of the ad, and one of those interpretations is deceptive, the representation will be construed to be deceptive" (*Thompson Medical Co. v. FTC* 1986). The FTC over the years has increasingly examined consumer studies, like those presented here, to interpret implied claims (Petty 1992; Petty and Kopp 1995). While some price comparisons may appear explicit, the meaning and subsequent impact can only be understood with evidence on how consumers interpret the phrase. Reference price advertising claims were challenged on a regular basis by the FTC during the 1950s and 1960s, but less so in the 1970s. The FTC promulgated Guides (advice, not law) against Deceptive Pricing in 1958 and revised them in 1964. According to

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Pitofsky (1977), exaggerating a reference price may deny consumers the
benefits of the bargain they thought they were getting; however, he main-
tains that as long as consumers are accurately informed of the selling price,
they can make good decisions and the purchase may still be at a price lower
than at most other stores in the area.

Marketing researchers have long recognized that some miscompre-
hension of advertising is inevitable. How many consumers must be misled
by advertising before it is legally actionable? Beginning in 1984, the FTC
determined that if around 20–25% of the audience is misled by an ad, then
the ad may be declared illegally misleading. Later in 1984, the FTC
changed this standard to whether the hypothetical reasonable consumer is
misled. This approach now forced the FTC to empirically substantiate
when a "reasonable consumer" would interpret an ad in a misleading way,
and thus, evidence of actual consumer interpretations, such as those found
in this study, is important in making these determinations (Petty 1992;
Petty and Kopp 1995).

Another important issue is how likely is it that a particular claim will
influence consumers' purchasing behavior. Legal analysis generally refers
to this as materiality, i.e., whether the claim is material to consumer choice
(Richards and Preston 1992). If a claim is an obvious exaggeration, or is
too vague for consumers to rely upon, it is referred to as "puffing" (Rich-
ards 1990; Preston 2003). That is, if consumers do not believe a claim and
disregard it, then no deception has occurred. Thus, in order for a semantic
phrase to be materially deceptive, it must be believed as well as mislead-
ing in some way.

Assuming consumers believe the semantic phrase (i.e., that the seman-
tic phrase accurately describes the reference price), it follows that if a se-
mantic phrase is vague and open to multiple interpretations by consumers,
then one or more of the interpretations may be misleading and deceptive.
Vagueness, alone, however, is not inherently misleading; it is when that
vagueness allows so many interpretations that it creates an inaccurate un-
derstanding in the mind of some consumers such that it becomes mislead-
ing and deceptive. This "miscomprehension" can be either accidentally or
intentionally induced, consequently resulting in deceptiveness (Preston
and Richards 1986, 605).

To date, however, no research has explicitly examined the vagueness of
the interpretations consumers assign to semantic phrases. If we find that
consumers arrive at widely diverging meanings for a given semantic
phrase, then this vagueness may result in deception. Given the potential
public policy relevance and importance of research examining consumers'

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

interpretations of semantic phrases in the context of pricing claims for de-
termining whether such claims are illegally vague, and thus deceptive, we
present two studies that examine this issue.

## YIN AND YANG: EMPIRICAL AND QUALITATIVE
## EXAMINATIONS OF SEMANTIC PHRASE MEANINGS

A first study was designed to test our hypothesis that consumers assign
different meanings to the same semantic phrase. If this hypothesis is dem-
onstrated, we move toward the argument that semantic phrases are vague
in nature leading to multiple interpretations and thus towards deception.
Subjects ($N = 299$), undergraduate and graduate students at two universi-
ties, were asked what a particular semantic phrase meant to them via a
multiple-choice question. An advertisement (clipped from a newspaper ad
and presented on a stand-alone basis) for a Sony Walkman digital AM/FM
Stereo Cassette was presented with a reference price of $59.99, a sale price
of $42.00, and the notation, "Save $17.99." Three common semantic
phrases were superimposed: "Regular Price," "Manufacturer's Suggested
List Price (MSLP)," and "Compare At." All else remained constant.

Subjects were instructed to select the meaning of the reference price se-
mantic cue that most closely matched their personal understanding from
one of the following choices: (1) "The price at which the item usually or
normally sells—an everyday price," (2) "The price I would have to pay for
the Walkman at most other stores," (3) "A fictitious price that has been
inflated to show you that they are giving you a discount." The first option
is based on the definition provided by the FTC for a regular price. The sec-
ond option is also based on the FTC's delineation for a price comparison,
but modified to make it simpler and more direct. We were deliberately bold
in phrasing the third choice to be quite blatant in its meaning. Subjects
needed to be presented a choice where they could elect a response that was
clearly pointed at vagueness and possible deception. In other words, we
needed to provide at least one choice that would allow subjects the oppor-
tunity to express a response that indicated that the advertiser was using a
vague reference price based on the use of a particular semantic phrase.
This approach would allow some insight into whether any of the three se-
mantic phrases might be viewed as more vague, and possibly more decep-
tive, than others. Each subject was asked the above questions regarding
only one of the three semantic cues in a $1 \times 3$ between-subjects experi-
mental design.

Chi-square analysis (Table) shows a significant relationship ($p < .001$)

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

THE JOURNAL OF CONSUMER AFFAIRS

TABLE
*Results of Study 1: Number/Percentage of Respondents*
*Selecting a Definition for Each Semantic Phrase*

|  | Price it usually sells at | Price at most other stores | Inflated price |
|---|---|---|---|
| Regular Price | 69/.70 | 2/.02 | 28/.28 |
| MSLP | 52/.48 | 30/.28 | 26/.24 |
| Compare At | 46/.50 | 15/.16 | 31/.34 |
|  | 167/.56 | 47/.16 | 85/.28 |

Note: Chi-square = 33.60, $df = 4$; $p < .001$.

between the semantic phrases and the three possible multiple-choice responses. An analysis of the counts shows that "Regular Price" has the largest consensus regarding its meaning. Sixty-nine of the respondents stated that the phrase "Regular Price" means "the price at which the item usually or normally sells—an everyday price." Note that little consensus was found for the meaning of MSLP and still less regarding the meaning of the "Compare At" phrase. Somewhat confusing is the result that MSLP fared better than "Compare At" in terms of subjects selecting it as potentially more vague and deceptive. Although subjects did not appear to differentiate "Compare At" and MSLP in terms of whether they meant that these were prices usually charged (about half for each), fewer subjects did interpret "Compare At" as a price charged at other stores and more subjects did consider "Compare At" as an inflated price compared to MSLP. Thus, "Compare At" was actually more likely to be thought of as vague compared to MSLP. These results suggest that the subjects vary widely in their interpretations of these semantic cues, and that contrary to Grewal and Compeau (1992), while MSLP may be inherently vague in many contexts, at least these subjects find "Compare At" more vague. Interestingly, across all semantic cues, 28% of all respondents felt that the semantic phrase represented "a fictitious price that has been inflated to show you that they are giving you a discount." The second study now follows up on these results and examines consumers' meanings attached to semantic phrases through the use of a qualitative method.

To establish the everyday meanings that consumers assign to the commonly seen semantic phrases used in reference price advertisements, fourteen individual in-depth interviews were conducted over a three-month period, resulting in 167 responses to the presentation of various semantic cues and phrases. Ten combinations of semantic phrases were presented including "Regular Price," "Manufacturer's Suggested List Price," and

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

"Compare At" alone, then each paired with "Sale Price," and finally four different combinations in the context of real advertisements taken from newspapers and circulars. The participants, all women, were the primary shoppers for their families. Women were chosen since they still have primary shopping responsibility within most households (Bielby and Bielby 1988; Crosby 1991; Hochschild 1989; Inman and Winer 1999). The women ranged in age from 26 to 55, and household incomes stretched from approximately $25,000 to over $100,000 per year. The women also cut across marital status, including being currently married, single, and divorced. Participants were encouraged to verbalize any and all responses and experiences that came to mind after seeing the presentation of a particular semantic phrase.

A complete list of all definitions proffered by the participants in response to associated semantic phrases was compiled from the verbatim transcripts. From this complete list of responses, the authors, via an iterative negotiation process, attempted to converge on common definitions that appeared to best capture the essence of the expressed everyday meaning of the semantic phrases. In addition, these definitions were compared to participants' responses to the same semantic phrases as they occurred in real print advertisements. Consistency and conflict in the participants' definitions were noted. Although these meanings come from only 14 participants, and thus we cannot draw conclusions regarding broad-based meanings across consumers in general, given the significant homogeneity of the participants, it is more difficult for differences to emerge. Consumer confusion and differences in meaning are more likely to be found in a broader based and more diverse set of participants, so this set of participants should be viewed as offering a more rigorous test. Moreover, the complexity and richness of the responses are revealing. Nonetheless, this discussion is intended to serve more as a foray into the complexity of the meanings of semantic phrases rather than an exhaustive compilation.

*Regular Price.*   Overall, these participants seem to have a common grasp of what a regular price is, namely, the price at which the product usually sells for at that same store. This meaning appears to dramatically change however when "Regular Price" is shown along with "Sale Price." Participants' responses to the "Regular Price/Sale Price" phrase convey significant skepticism regarding the "Regular Price." Consequently, it appears that, alone, regular price is the price at which the product usually sells, but when paired with a sale price the consumer becomes somewhat suspicious of the veracity of the regular price.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

In the context of an advertisement, the regular price seems to gain additional credibility. That is, although the participants judge the actual savings to be small, they do not question the validity of the regular price. Possibly the removal of the phrase from the typical advertising context changed its meaning. That is, in the context of an advertisement "Regular Price" has greater credibility than when it is presented on a stand-alone basis as a phrase used to label a price. Thus, one methodological implication is that semantic phrases should be studied in a ecologically valid context. Moreover, when "Regular Price" was paired with "Sale Price" but not in the context of an advertisement, the responses were more doubtful and cynical.

Thus, the regular price appears to be best defined as the usual price for a product, sold in the same store, on a regular basis that the participants acknowledge may be exaggerated in the context of a sale to convey a deal.

*Manufacturer's Suggested List Price (MSLP).*   The results of studies examining the effect of MSLP on consumers' perceptions are mixed (see reviews by Grewal and Compeau 1992). In this study, the term "Manufacturer's Suggested List Price" proved to be a very confusing phrase for the participants. Most disturbing was the large breadth of interpretations. In general, participants had many different definitions, but most were highly skeptical of the phrase whether presented alone, with a "Sale Price," or in the context of an advertisement. For some participants, MSLP was equated to the original price. Others said it was a wholesale price, not to mention that wholesale price was also named as the interpretation for a number of other semantic phrases. One participant who believed that the MSLP was a wholesale price thought that she was getting a product for less than what the store paid for it in the context of the advertisement. In sum, while there was no consensus as to the meaning of MSLP, there existed a high level of suspicion and disbelief.

*Compare At.*   In practice, "Compare At" is probably the most frequently used semantic cue. The two largest off-price retailers in the U.S., TJ Maxx and Marshalls, both use this phrase as part of their pricing strategy. Kopalle and Lindsey-Mullikin (2001) found that both consumers and retail employees reported that the "Compare At" phrase refers to prices found in a "regular price" department store. Berkowitz and Walton (1980) found positive consumer value evaluations for "Compare At," compared to other terms, however they conclude that consumer responses to comparison cues seem to be product dependent and are probably more complex than ini-

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

tially realized. The "compare at" cue has been found to result in higher per-
ceptions of value by subjects viewing the phrase at home compared to in-
store (Grewal et al. 1998).

In the present study, "Compare At" appears to have the fairly consen-
sual meaning of the price one would pay for a comparable product at an-
other store, or for an alternative brand at the same store when not on sale.
The participants were also somewhat skeptical of this phrase regardless of
whether it was presented alone, with a sale price, or in the context of an ad-
vertisement. When probed as to how a store might obtain these "Compare
At" prices, however, only one participant believed that a store would actu-
ally check the prices at other stores. The notion that the "Compare At"
price actually represents a MSLP was mentioned by four participants, who
also suggested significant skepticism. Thus, no consensus regarding the
meaning of "Compare At" was discernible.

## DISCUSSION

The use of semantic phrases can be informative or deceptive. To be in-
formative, the phrase must provide the consumer with accurate informa-
tion that the consumer does not already have available and it must also
be understandable. To be deceptive, the semantic phrase must communi-
cate to a reasonable consumer at least one materially misleading interpre-
tation that influences purchasing behavior. In order to measure deceptive-
ness it would be necessary to measure the consumers' perceptions of a
pricing claim, as well as substantiate the retailer's claim made by checking
competitor pricing. The current paper demonstrates the role of vagueness
toward understanding and avoiding deceptiveness by demonstrating the
multiple meanings assigned by consumers to commonly used semantic
phrases. These results provide tentative support for the potential for de-
ceptiveness through the use of semantic phrases.

The level of variance in the participants' meanings associated with these
semantic phrases is cause for concern. In all cases, with the possible ex-
ceptions of regular price and sale price, consumers are simply not provided
with enough information to arrive at common interpretations of these
phrases. The phrase "Manufacturer's Suggested List Price" (MSLP) is
problematic. First, Grewal and Compeau (1992) illustrate the paradox of
using MSLP. If MSLP is valid, that is, regularly sold at that price, then
there is no incentive for the seller to use MSLP rather than "regular price"
in a reference price format. Only when the product does not regularly sell
at MSLP is there an advantage in using MSLP, but in that case it is subject

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

to misinterpretation by consumers. Secondly, these participants don't understand what a MSLP is. Paradoxically, if the consumer is highly skeptical of MSLP, or recognizes that the seller may be trying to deceive, then the consumer isn't likely to be deceived. If they don't believe it, they won't be fooled. So, in a way, the MSLP language might actually be less deceptive than other semantic phrases.[1] Nonetheless, this research found no evidence that consumers globally rejected MSLP as unbelievable. Thus, sellers should consider abandoning the practice of using MSLP as a semantic phrase to convey a "deal" to the consumer. The FTC Guides, the Council of Better Business Bureau Code of Advertising, and several states require that for MSLP to be used, the advertiser must substantiate that substantial sales at MSLP are made in the advertiser's trade area.

"Compare At" is another semantic phrase that, in order to be informative, requires more specific information. Interestingly, some participants indicate that this price is the price you would pay at other stores, yet none of the participants, contrary to regulatory authorities that require substantial sales in the market area, believe that the seller would actually check prices at other stores. One possible explanation conveyed to us during the interviews is that some of the participants believed that "Compare At" is the price that the manufacturer suggests (without it being labeled a MSLP) and thus, the logical connection is made that this "Compare At" price would be the price other stores would charge, since this same suggested price would be communicated to all stores. It seems that to be informative, the seller should provide an explanation as to how these "Compare At" prices were determined.

In sum, the use of "MSLP" appears to have considerable potential for deception, and little hope to be informative. "Compare At" requires that additional information be provided to the consumer in order to be more informative. Our finding that 34% of consumers in our study thought the "Compare At" price was an inflated price further suggests that this claim may be perceived as puffing by many consumers and, therefore, may be less effective for the advertiser than other types of price comparisons. This result also suggests that about two-thirds of our participants may be deceived by the "Compare At" phrase if specific information regarding the comparison is not provided. The bottom line is that claims like MSLP and "Compare At" appear to be subject to multiple interpretations, and thus may be deceptive.

Future research may want to consider a survey methodology to tap a much broader spectrum of consumers. Identifying meanings is always difficult since we are inherently limited by the words that are at our disposal.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Moreover, some study of the intended meanings from the perspective of the advertisers could be informative. Finally, research that explores just the believability of the various semantic phrases would also be informative.

## ENDNOTE

1. Thanks to an anonymous reviewer for making this point.

## REFERENCES

Berkowitz, Eric N. and John R. Walton. 1980. Contextual Influences on Consumer Price Response: An Experimental Analysis. *Journal of Marketing Research*, 17: 349–358.

Biswas, Abhijit and Edward A. Blair. 1991. Contextual Effects of Reference Prices in Retail Advertisements. *Journal of Marketing*, 55: 1–12.

Compeau, Larry D. and Dhruv Grewal. 1998. Comparative Price Advertising: An Integrative Review. *Journal of Public Policy & Marketing*, 17: 257–273.

Grewal, Dhruv and Larry D. Compeau. 1992. Comparative Price Advertising: Informative or Deceptive? *Journal of Public Policy & Marketing*, 11: 52–62.

Grewal, Dhruv, Kent B. Monroe, and R. Krishnan. 1998. The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions. *Journal of Marketing*, 62: 46–59.

Kopalle, Praveen and Joan Lindsey-Mullikin. 2003. The Impact of External Reference Price on Consumer Price Expectations. *Journal of Retailing*, 79: 225–236.

Lichtenstein, Donald R., Scot Burton, and Eric J. Karson. 1991. The Effect of Semantic Cues on Consumer Perceptions of Reference Price Advertisements. *Journal of Consumer Research*, 18: 380–91.

McCracken, Grant David. 1988. *The Long Interview*. Newbury Park, CA: Sage.

Petty, Ross D. 1992. *The Impact of Advertising Law on Business and Public Policy*. Westport, CT: Quorum Books.

Petty, Ross D. and Robert J. Kopp. 1995. Advertising Challenges: A Strategic Framework and Current Review. *Journal of Advertising Research*, 35: 41–55.

Pitofsky, Robert. 1977. Beyond Nader: Consumer Protection and the Regulation of Advertising. *Harvard Law Review*, 90: 661–701.

Preston, Ivan L. 2002. A Problem Ignored: Dilution and Negation of Consumer Information by Antifactual Content. *Journal of Consumer Affairs*, 36: 263–283.

Preston, Ivan L. and Jef I. Richards. 1986. Consumer Miscomprehension as a Challenge to FTC Prosecutions of Deceptive Advertising. *John Marshall Law Review*, 19: 605.

Richards, Jef I. 1990. A New and Improved View of Puffery. *Journal of Public Policy & Marketing*, 9: 73–84.

Richards, Jef I. and Ivan L. Preston. 1992. Proving and Disproving Materiality of Deceptive Advertising Claims. *Journal of Public Policy & Marketing*, 11: 45–56.

*Thompson Medical Co. v. FTC*, 1986, 791 F.2d 189, cert. denied, 479 U.S. 1086 (1987).

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

# EXHIBIT 18



CLARKSON STUDENTS          FACULTY & STAFF          ALUMNI & FRIENDS          SUPPORT CU          PARENTS & FAMILY          K-12 PROGRAMS

DEPOSIT NOW     APPLY NOW     REQUEST INFO     DIRECTORY



**MEET CLARKSON**

## Larry Compeau

### One of Clarkson's most popular professors

Larry Compeau doesn't just defy convention—he challenges all accepted wisdom.

In his marketing courses at Clarkson University's School of Business, he asks students to give presentations, then proceeds to "grill them relentlessly" until he's satisfied with their arguments.

The Professor of Consumer and Organizational Studies admits that he comes across as aggressive, and even annoying, in his questioning.

"Talk to any of my students, and they'll tell you I'm absolutely brutal. I just don't accept crap. I won't accept it," Dr. Compeau said. "I push them because I firmly believe in the intrinsic satisfaction of doing something you thought couldn't do, and doing it well."

Despite that tough reputation in the classroom, Dr. Compeau has a special place on his office wall where his most prized recognition hangs—the 2007 Clarkson University Distinguished Teaching Award. The honor goes each year to the faculty member who alumni say has had the most impact on their lives after graduation.

"My classroom philosophy is simple: If you're not challenging yourself, intellectually and professionally, why are you bothering?" he said. "Our students are very in tune and intuitive. You can be obnoxious, but if they know you're doing it for them, they will thrive."

It also helps that despite his Socratic method, Dr. Compeau is extremely affable. He's also very good at explaining complex market behaviors in an understandable way.

For that reason, the professor has been contacted for interviews by journalists from major publications like The New York Times, The Washington Post, National Public Radio, Newsweek, TIME and Crain's New York Business. He sheds light on issues related to his main research interests of pricing, consumer behavior

Clarkson University: Larry Compeau

and psychology and marketing strategy.

PAGE 1 2

## SCHOOLS AT CLARKSON

School of Arts & Sciences

School of Business

Wallace H. Coulter School of Engineering

Institute for a Sustainable Environment

Early College Program: The Clarkson School

Graduate School

## HIGHLIGHTS OF EXCELLENCE

Adirondack Semester

Career Center

Honors Program

ROTC

Student Success Center

Sustainability

## RESEARCH & INNOVATION

Division of Research

The Center for Advanced Materials Processing (CAMP)

The Center for Air Resources Engineering & Science (CARES)

The Center for Rehabilitation Engineering & Science & Technology (CREST)

The Center for Sustainable Energy Systems (CSES)

The Shipley Center for Innovation

Reh Center for Entrepreneurship

## CLARKSON UNIVERSITY

8 Clarkson Ave.
Potsdam, New York 13699
315-268-6400

Contact the Webmaster
©2016 Clarkson University

## CONNECT WITH CLARKSON

    

• Human Resources  • Giving  • Site Index
• Consumer Information Disclosures (HEOA)
• Act on Legal & Moral Concerns

**EXHIBIT 19**



newsise

Login

Home  Sections  Channels  Wires  Experts  Newsrooms  About  Blog

Subscribe Now

< PREVIOUS ARTICLE                RETURN TO ARTICLE LIST                NEXT ARTICLE >



# Clarkson UNIVERSITY
## defy convention

## B-School Prof is Consumer Pricing Expert in the Courtroom

Article ID: 622646
Released: 29-Aug-2014 9:30 AM EDT
Source Newsroom: Clarkson University

⭐ Add to Favorites

more news from this source

SHARE

Since almost everyone has access to the Internet today, it should be easy to find a fair price when shopping. But that's not necessarily the case -- as evidenced by the hundreds of cases and investigations for deceptive price advertising brought before courts, each year.

And when attorneys and private litigators are up against big companies with high-powered lawyers, they turn to Clarkson University's Larry Compeau. The business school professor has been an expert witness and consultant in a number of cases for nearly a quarter of a century.

Credit: Clarkson University

Clarkson University School of Business Professor Larry Compeau

MEDIA CONTACT
*Available for logged-in reporters only*

CHANNELS
Marketing

KEYWORDS
Pricing, deceptive price advertising, Advertising, consumer pricing, Consumer Protection,
+ Show More

Chat now!

Compeau's expertise has been a critical component as an expert witness in several precedent setting legal cases on pricing practices. His research focuses on what is known as reference price advertising, which often involves a "regular" price and a "sale" price, and how that affects consumers' perceptions of a "deal." Usually, the concern is whether the deal is being communicated in a bona fide way so the consumer is informed, not deceived. Compeau is the expert litigators rely on for this determination.

In a recent case in which Compeau was on the witness stand for two days, his expert testimony won seven California district attorneys a $7 million settlement against a prominent online retailer.

In a class action suit against a large personal computer manufacturer, his testimony prompted an out-of-court settlement of $20 million.

And in another case, last year, Compeau's research was cited in an opinion by the United States Court of Appeals.

Compeau considers himself a consumer advocate in that his long stream of research repeatedly shows the deceptive effects certain price advertising can have on consumers. As a consultant he's always looking for ways for firms to convey deals to consumers that are not misleading or deceptive -- in other words legal -- but also compelling in conveying the real merits of the deal.

A few years ago, in Queen v. Hudson Bay Company (one of the largest retailers in Canada), the Canadian government brought hundreds of charges against Hudson Bay for advertising products on sale, comparing the sale price with a "regular" price; when, in fact, the retailer had not sold at least half of the items at that "regular" price.

The prosecution claimed that in order for a price to be labeled "regular," it must be sold at that price at least half of the time -- referred to as a volume test.

Compeau wrote that what the government was doing wasn't fair to the company because it assumed that the seller had control over the customers' behavior. Rather than this "volume test," Compeau  asserted that if the product was offered at least 50 percent of the time at the regular price -- a time test -- then this was a fair sale presentation. Eventually the suit was settled out of court. The Crown dropped most of its charges and Hudson agreed to pay a small fine.

In a case against Overstock.com, the judge commented that "Dr. Compeau is a very credible witness." Compeau says that this is because his long stream of research is focused in this area, he knows what facts are, and he knows what the entire body of research shows. That's why judges put so much stock in his testimony and depositions.

Compeau believes that firms should not be overly restricted from conveying deals to consumers and that consumers should be able to depend on those deals as being bona fide.

His next cases of potentially deceptive price advertising involve a class action suit against an international hotel chain and another against one of the nation's largest banks.

Compeau received his bachelor and master of science degrees from Clarkson and his Ph.D. from Virginia Tech. He serves on the editorial boards of two journals, the Journal of Public Policy & Marketing and the Journal of Product and Brand Management.

Clarkson University launches leaders into the global economy. One in five alumni already leads as a CEO, VP or equivalent senior executive of a company. Located just outside the Adirondack Park in Potsdam, N.Y., Clarkson is a nationally recognized research university for undergraduates with select graduate programs in signature areas of academic excellence directed toward the world's pressing issues. Through 50 rigorous programs of study in engineering, business, arts, sciences and health sciences, the entire learning-living community spans boundaries across disciplines, nations and cultures to build powers of observation, challenge the status quo, and connect discovery and engineering innovation with enterprise.



COMMENTS | COMMENTING POLICY

## View All Latest News

Science News



Sharks Show Novel Changes in Their Immune Cancer-Related Genes

Isotopic Similarities Seen in Materials That Formed Earth, Moon

Medical News



'Mini-Guts' Offer Clues to Pediatric GI Illness

Clue to How Cancer Cells Spread

Life News



Video Game Ratings Work, if You Use Them

Can the Comorbidity of Depression and Psychopathy ...

New Study Reveals That Insects Also Migrate

Heat From Earth's Core Could Be Underlying Force in Plate ...

Tracking Antarctic Adaptations in Diatoms

This Is LSD Attached to a Brain Cell Serotonin Receptor

In Alzheimer's, Excess Tau Protein Damages Brain's GPS

Too Much Sitting, Too Little Exercise May Accelerate Biological Aging

One in Five Adults Secretly Access Their ...

Gun Violence in PG-13 Movies Continues to Climb ...

Moralistic Thinking on Political Left, Right Not ...

View all Science News

View all Medical News

View all Life News

## Business News



Don't Smile Too Big to Be Effective in Online Marketing Ads, Study ...

Telecommuting Extends the Work Week, at Little Extra Pay

Air Polluters More Likely to Locate Near Downwind State Borders

Home Delinquency Rates Lower Among ACA Households

Study: While Painful, Surge Pricing Is Still a Good Deal

View all Business News

## Marketplace News



GeoVax to Collaborate with Georgia State on Development of Hepatitis ...

Case Western Reserve University Showcases Student and Alumni Startups ...

New Treatment for Erectile Dysfunction Uses Soundwaves

New Genome Browser Product Gives Freedom to Collaborate in the Cloud

View all Marketplace News

## Expert Pitch



Expert with New Poll Data Available for Comment on Immigration ...

West Virginia University Experts Offer Unique Perspectives on Issues ...

Full Impact of Airport Protests and Other Demonstrations Will Be ...

U-M Experts Can Comment on Trump's Visa Ban

U-Michigan Experts Available to Comment on Trump's Visa Ban

View all Expert Pitch

©2017 Newswise, Inc   |   215 5th St. SW, Suite 100, Charlottesville VA 22903   |   434-296-9417

Privacy Notice   |   Terms of Service   |   Contact Us

0.3662 seconds