**TYCKO & ZAVAREEI LLP**
KRISTEN LAW SAGAFI, California Bar No. 222249
ksagafi@tzlegal.com
ANNICK M. PERSINGER, California Bar No. 272996
apersinger@tzlegal.com
483 Ninth Street, Suite 200
Oakland, CA 94607
Telephone (510) 254-6808
Facsimile (510) 210-0571

*Attorneys for Plaintiffs*
*Additional Counsel Listed on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEANNE and NICOLAS STATHAKOS, on behalf of themselves and all others similarly situated,<br><br>PLAINTIFFS,<br><br>vs.<br><br>COLUMBIA SPORTSWEAR COMPANY, COLUMBIA SPORTSWEAR USA CORPORATION,<br><br>DEFENDANTS. | Case No. 4:15-cv-04543-YGR<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SUMMARY JUDGMENT AND REPLY IN SUPPORT OF CLASS CERTIFICATION**<br><br>Hon. Yvonne Gonzalez Rogers<br><br>Hearing Date: April 25, 2017; 2:00 PM<br>Courtroom: 1, 4th Floor, Oakland Courthouse |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................... 1

II. THE FACTUAL RECORD DEMONSTRATES THAT COLUMBIA'S USE OF
REFERENCE PRICING FOR OUTLET-EXCLUSIVE MERCHANDISE IS DECEPTIVE
AND MISLEADING.............................................................................................. 4

   A. Columbia Sells Products Designed and
     Manufactured Exclusively for Columbia Outlet Stores................................... 4

   B. Columbia's Pricing Scheme for Outlet SMU Builds is Uniform.......................... 4

   C. Columbia's Price Tags ................................................................................... 5

   D. Columbia's Pricing Representations for Outlet SMU Builds
     Are Material to the Reasonable Consumer ..................................................... 7

   E. Plaintiffs Were Deceived into Purchasing Outlet SMU Build Products ............... 8

III. COLUMBIA'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED IN ITS
ENTIRETY ......................................................................................................... 10

   A. Issue No. 1: Columbia's Reference Prices are False and Misleading.................. 11

     1. Columbia's References Prices are Likely to Deceive Reasonable Consumers ......... 11

     2. The Degree of Similarity Between Inline and
       Outlet SMU Build Styles Is a Disputed Question of Fact ............................... 15

   B. Issue No. 2: Plaintiffs Relied on Columbia's False Reference Prices to Their Detriment ... 16

     1. Plaintiffs Suffered Injury in Fact and Therefore Have Standing ..................... 16

     2. The Evidentiary Record Supports Plaintiffs' Theory of
       Deception, Reliance and Materiality.......................................................... 20

   C. Issue No. 3: Plaintiffs Proffer Three Viable Measures of Monetary Relief.......... 24

     1. Price to Value is Not the Only Viable Measure of Monetary Relief ................ 24

     2. Plaintiffs' Proposed Measures of Relief are Proper..................................... 27

     3. Plaintiffs Need Not Prove the Value of the Outlet SMU Builds
       They Purchased to Establish Entitlement to Monetary Relief ......................... 37

IV. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION SHOULD BE GRANTED..... 37

   A. Plaintiffs Have Satisfied the Requirements of Rule 23(a) and 23(b)(3) .............. 38

     1. Class Membership May be Determined Through Objective Criteria ............... 38

     2. Numerosity is Satisfied.......................................................................... 39

     3. Plaintiffs' Claims Are Typical ................................................................. 39

4. Plaintiffs Are Adequate Class Representatives.................................................. 40

5. Fundamental Questions of Law and Fact Predominate and
Can Be Proven with Common Evidence ......................................................... 40

6. A Class Action is Superior to Thousands of Individual Cases ....................... 42

B. Certification Under Rule 23(b)(2) is Proper ...................................................... 43

**V. CONCLUSION**......................................................................................................... 48

# TABLE OF AUTHORITIES

**Cases**

*Aguayo v. U.S. Bank*,
    200 F.Supp.3d 1075 (S.D. Cal. 2016) .................................................................................. 29, 31

*Algarin v. Maybelline, LLC*,
    300 F.R.D. 444 (S.D. Cal. 2014) .......................................................................................... 38

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .............................................................................................................. 10

*Astiana v. Kashi Co.*,
    291 F.R.D. 493 (S.D. Cal. 2013) ..................................................................................... 28, 29

*Belfiore v. Procter & Gamble Co.*,
    311 F.R.D. 29 (E.D.N.Y. 2015) ............................................................................................ 38

*Brazil v. Dell Inc.*,
    2010 WL 5387831 (N.D. Cal. Dec. 21, 2010) ........................................................... 15, 18, 21

Briseno v. ConAgra Foods, Inc.,
    2017 844 F.3d 1121 (9th Cir. Jan. 3, 2017) ......................................................................... 33

*Californians for Disability Rights, Inc.*,
    249 F.R.D. 334 (N.D. Cal. 2008) ...................................................................................... 3, 40

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
    761 F.3d 732 (7th Cir. 2014) ................................................................................................ 23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .............................................................................................................. 10

*Chamberlan v. Ford Motor Co.*,
    369 F.Supp.2d 1138 (N.D. Cal. 2005) .................................................................................. 24

*Chowning v. Kohl's Dep't Stores, Inc.*,
    2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) ................................................................. passim

*Colgan v. Leatherman Tool Grp., Inc.*,
    135 Cal. App. 4th 663 (Cal. Ct. App. 2006) ........................................................................ 23

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) .......................................................................................................... 36

*Cortez v. Purolator Air Filtration Prods. Co.*,
    23 Cal. 4th 163 (2000) ..................................................................................................... 22, 24

*Cota v. Maxwell-Jolly*,
    2010 WL 11485115 (N.D. Cal. Aug. 10, 2010) ................................................................. 3, 40

*Dean v. Colgate-Palmolive Co.*,
    2015 WL 3999313 (C.D. Cal. June 17, 2015) ...................................................................... 38

*Delarosa v. Boiron, Inc.*,
  275 F.R.D. 582 (C.D. Cal. 2011) ................................................................. 37

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ..................................................................... 37

*Evans v. DSW*,
  CV 16-3791-JGB (C.D. Cal. Feb. 2, 2017) .................................................. 11

*FTC v. Figgie Int'l, Inc.*,
  994 F.2d 595 (9th Cir.1993) ...................................................................... 26

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
  42 Cal. 4th 554 (2007) ............................................................................... 13

*Guido v. L'Oreal, USA, Inc.*,
  2013 WL 3353857 (C.D. Cal. July 1, 2013) ................................................ 33

*Hall v. Time Inc.*,
  158 Cal. App. 4th 847 (2008) .................................................................... 16

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) ............................................................. *passim*

*Hofstetter v. Chase Home Finance*, LLC,
  2011 WL 1225900 (N.D.Cal. Mar.31, 2011) .............................................. 40

*Ice v. Hobby Lobby Stores, Inc.*,
  2015 WL 5731290 (N.D. Ohio Sept. 29, 2015) ........................................... 23

*In Campion v. Old Republic Home Protection Co., Inc.*,
  272 F.R.D. 272 (S.D. Cal. Jan. 6, 2011) .................................................... 39

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,
  2012 WL 2428248 (N.D. Cal. June 26, 2012) ............................................. 37

*In re NCAA Student-Athlete Name & Likeness Litig.*,
  2013 U.S. Dist. LEXIS 160739 (N.D. Cal. Nov. 8, 2013) ............................ 32

*In re Tobacco II*,
  240 Cal. App. 4th 779 (2015) .............................................................. *passim*

*Johnson v. Jos. A. Bank Clothiers*,
  2014 WL 4129576 (S.D. Ohio Aug. 19, 2014) ............................................ 23

*Jones v. ConAgra Foods, Inc.*,
  2014 WL 2702726 (C.D. Cal. June 13, 2014) ............................................. 36

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (Cal. 2003) .............................................................. 29, 31

*Kumar v. Salov N. Am. Corp.*,
  2016 WL 3844334 (N.D. Cal. July 15, 2016) ........................................ 32, 34

*Kwikset Corp. v. Superior Court*,
   51 Cal. 4th 310 (2011) ................................................................ 2, 11, 15, 23

*Lanovaz v. Twinnings N. Amer. Inc.*,
   2014 WL 1652338 (N.D. Cal. Apr. 24, 2014). ...................................... 39

*Le v. Kohls Dep't Stores, Inc.*,
   160 F. Supp. 3d 1096 (E.D. Wis. 2016) .............................................. 22

*Mahfood v. QVC, Inc.*,
   2008 WL 5381088 (C.D. Cal. Sept. 22, 2008) ...................................... 39

*Makaeff v. Trump University*, LLC,
   309 F.R.D. 631 (S.D. Cal. 2015) ...................................................... 25, 26

*Massachusetts Mut. Life Ins. Co. v. Superior Court*,
   97 Cal. App. 4th 1282 (2002) .......................................................... 19

*McMillion v. State of Hawaii*,
   261 F.R.D. 536 (D. Haw. 2012) ...................................................... 40

*McVicar v. Global, Inc.*,
   2015 WL 4945730 (C.D. Cal. Aug. 20, 2015 ...................................... 36

*Mollicone v. Universal Handicraft, Inc.*,
   2017 WL 440257 (C.D. Cal. Jan. 20, 2017) ........................................ 38

*Mulder v. Kohl's Dep't Stores, Inc.*
   2016 WL 393215 (D. Mass. Feb. 1, 2016) ........................................ 23

*Mullins v. Premier Nutrition Corp.*,
   178 F.Supp.3d 867 (N.D. Cal. 2016) ................................................ 26

*Nelson v. Pearson Ford*,
   186 Cal.App.4th 983 (2010) ............................................................ 25

*Nilon v. Natural-Immunogenics Corp.*,
   2013 WL 5462288 (N.D. Cal. Sept. 30, 2013) .................................... 38

*Ogden v. Bumble Bee Foods*, LLC,
   2014 WL 27527 (N.D. Cal. Jan. 2, 2014) .......................................... 23

*Ollier v. Sweetwater Union High Sch. Dist.*,
   251 F.R.D. 564 (S.D.Cal.2008) ...................................................... 40

*Park v. Ralph's Grocery Co.*,
   254 F.R.D. 112 (C.D. Cal. 2008) .................................................... 40

*People v. Superior Court (Jayhill)*,
   9 Cal.3d 283 (1973) ...................................................................... 24

*Pickles v. Kate Spade & Co.*,
   2016 WL 3999531 (N.D. Cal. July 26, 2016) ................................ *passim*

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ............................................................................ 18, 19, 22, 23

*Ries v. Arizona Beverages USA LLC*,
    287 F.R.D. 523 (N.D. Cal. 2012) ........................................................................ 38

*Roy v. County of Los Angeles*,
    2016, WL 5219468 (C.D. Cal. Sept. 9, 2016) .................................................... 37, 38

*Shaulis v. Nordstrom Inc.*,
    120 F. Supp. 3d 40 (D. Mass. 2015) .................................................................. 23

*Small v. Lorillard Tobacco Co.*,
    94 N.Y.2d 43 (1999) ........................................................................................... 23

*Spann v. J.C. Penney Corp.*,
    2015 WL 1526559 (C.D. Cal. Mar. 23, 2015) .................................................. *passim*

*Spokeo v. Robins*,
    136 S.Ct. 1540 (2016) ........................................................................................ 16

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003). ............................................................................ 34

*Stitt v. S.F. Mun. Transp. Agency*,
    2014 WL 1760623 (N.D. Cal. May 2, 2014) .................................................... 33

*T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n Eyeglasses*,
    809 F.2d 626 (9th Cir.1999) .............................................................................. 10

*Tait v. BSH Home Appliances Corp.*,
    289 F.R.D. 466 (C.D. Cal. 2012) ...................................................................... 32

*Thurston v. Bear Naked, Inc.*,
    2013 WL 5664985 (S.D. Cal. July 30, 2013) .................................................... 28

*Veera v. Banana Republic, LLC*,
    6 Cal. App. 5th 907 (2016) ................................................................................ 15

*West v. American Telephone & Telegraph Co.*,
    311 U.S. 223 (1940) ........................................................................................... 25

*Williams v. Gerber Products Co.*,
    552 F.3d 934 (9th Cir. 2008) .............................................................................. 10

*Zeisel v. Diamond Foods, Inc.*,
    2011 WL 2211134 (N.D. Cal. June 7, 2011) .................................................... 15, 29

**Other Authorities**

57 Op. Att'y Gen. 126, 129 (1957) ............................................................................ 12, 13

*Manual for Complex Litigation*, Fourth § 32.42 ...................................................... 37

**Rules**

Fed. R. Civ. P. 23(b)(2); ................................................................................................. 40

Fed. R. Civ. P. 56(a) ........................................................................................................ 10

Fed. Rule Civ. P. 23 ......................................................................................................... 37

**Regulations**

Cal. Civil Code § 3343(a), ............................................................................................. 23

# I.  **INTRODUCTION**

Columbia's summary judgment motion and class certification opposition rest on two fundamentally flawed arguments that find no support in the law.[1] Indeed, both of Columbia's primary arguments have already been rejected by this Court and other courts. First, Columbia relies on a single authority—a 1957 AG Opinion related to reference pricing in the furniture and bedding industry—for the argument that the false former price representations on its price tags could not possibly deceive anyone because *similar* products were sold at higher prices in other stores. But the AG Opinion does not buttress that position. Instead, the AG Opinion actually supports Plaintiffs' position that former price representations are only permitted when the *exact* product was actually sold at the higher advertised price. This might explain why no court has ever adopted Columbia's reading of the AG Opinion, despite numerous attempts by various retail defendants in pricing cases similar to this one. As Judge Chhabria recently observed, even if the AG Opinion did stand for the "similar" products proposition Columbia advances here (and he had his doubts), a 60-year old AG Opinion is in no way binding on courts within this District. *Pickles v. Kate Spade & Co.*, Case No. 15-cv-05329-VC, 357-01, 2016 WL 3999531, at *2, n.1 (N.D. Cal. July 26, 2016).

Second, Columbia renews its argument that price to value is the only viable measure for monetary relief in this case. In denying Columbia's motion to dismiss, this Court already considered and rejected this argument, recognizing that Plaintiffs were entitled to plead alternate measures of damages and saving for a later day the question of whether Plaintiffs could "prove the amount of monetary restitution." *See* Order Denying Motion to Dismiss, 7-8, Dkt. 41. As detailed below, Plaintiffs have now developed the evidence needed to prove the amount of monetary relief associated with each of their alternate measures of damages and restitution. Columbia suggests that recent developments in the law require this Court to grant summary judgment and/or deny class certification because Plaintiffs have not sought to establish the price differential measure Columbia prefers. Columbia is wrong. Indeed, Columbia's primary authority, *In re Tobacco II*, 240 Cal. App. 4th 779, 792 (2015), expressly recognizes that price to value is not the only viable measure of

---

[1] Defendants Columbia Sportswear Company and Columbia Sportswear USA Corporation are referred to herein collectively as "Columbia."

restitution. Columbia's arguments were also squarely rejected by the Ninth Circuit in *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1101 (9th Cir. 2013), which relied on the California Supreme Court's decision in *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011).

Once Columbia's two faulty pillars crumble, Columbia's basis for summary judgment disappears along with any impediment to class certification. Because its other arguments are wrong on the facts and the law. As a factual matter, Columbia misstates Plaintiffs' testimony; the record demonstrates that Plaintiffs believed the reference prices on Columbia's Outlet SMU Builds reflected true former prices and that they relied heavily on Columbia's false discounts in deciding to purchase Columbia's outlet products. Jeanne Stathakos testified that she would "not even contemplate" buying Columbia items that were not on sale, and testified unequivocally that she and her husband would not have purchased the Cascade Trail Jacket, Style No. XO5035, in February 2016 had they known that it never sold anywhere for the reference price. *See* Deposition of Jeanne Stathakos ("J. Stathakos Dep."), 58:15-18, 76:14-78:23, Ex. 1.[2] Moreover, Columbia simply ignores Plaintiffs' pre-filing purchase of a pair of outlet-exclusive shorts, which Ms. Stathakos says she purchased because of the illusory sale price and probably would not have purchased had she known they had never sold for the reference price. *See* Reply Declaration of Jeanne Stathakos ("J. Stathakos Reply Decl."), ¶¶ 5-7. Both Plaintiffs testified that they based their purchase decisions on Columbia's advertised discounts, which they calculated using the highest price on the price tag as a starting place. *See* J. Stathakos Dep., 30:2-30:20, Ex. 1; *see also* Deposition of Nicolas Stathakos ("N. Stathakos Dep."), 94:3-17, Ex. 2. Moreover, Columbia's own survey evidence confirms that price matters: (1) most consumers surveyed understood Columbia's reference prices to refer to actual former prices of the ticketed item; and (2) the survey showed that consumers' perception of the value of the product goes down in a statistically significant way when they are told the reference price actually refers to a different product. Poret Rebuttal Report, ¶¶ 28-33, 73-81. Under the

---

[2] Unless otherwise stated, all numerical Exhibits cited herein are attached to the Reply Declaration of Kristen Sagafi ("Sagafi Reply Decl.").

applicable authority, these facts are sufficient to confer standing and entitle Plaintiffs to monetary relief.[3]

Plaintiffs also satisfy the requirements for certification under Federal Rules of Civil Procedure 23(b)(2) and (b)(3). Columbia half-heartedly suggests that certification of an injunctive relief class under 23(b)(2) is precluded because Plaintiffs could pursue injunctive relief on an individual basis. That argument is specious. If Columbia were right, Rule 23(b)(2) classes would never be necessary or appropriate. That is not the law, nor should it be. *See, e.g.*, *Cota v. Maxwell-Jolly*, C 09-3798, 2010 WL 11485115, at *5 (S. Armstrong) (N.D. Cal. Aug. 10, 2010) ("Indeed, such a requirement would effectively eviscerate Rule 23(b)(2), which was specifically designed with the benefits of collective action in mind.") (internal quotations omitted); *Californians for Disability Rights, Inc.,* 249 F.R.D. 334, 349 (N.D. Cal. 2008) ("[T]here is no requirement that class certification must be 'necessary.'") (citations omitted).

In addition, Plaintiffs satisfy Rule 23(b)(3). The class definition is objective and definite, and the record indicates that the proposed Class comprises thousands of California consumers. Plaintiffs Jeanne and Nicolas Stathakos are typical and adequate, and the key questions at issue in this case (*e.g.* whether Columbia's uniform pricing practice was likely to deceive reasonable consumers, and if so, what relief is appropriate) are subject to common proof.

Plaintiffs respectfully request that the Court deny Columbia's summary judgment motion in its entirety and certify a class under Rules 23(b)(2) and 23(b)(3).

## II.     THE FACTUAL RECORD DEMONSTRATES THAT COLUMBIA'S USE OF REFERENCE PRICING FOR OUTLET-EXCLUSIVE MERCHANDISE IS DECEPTIVE AND MISLEADING

### A.     Columbia Sells Products Designed and Manufactured Exclusively for Columbia Outlet Stores

Starting in the Fall 2014 season, Columbia began to design and manufacture outlet exclusive products to be sold exclusively at Columbia Outlet stores that were intentionally different from products it sold in its non-outlet stores and through other sales channels. *See* M. Olson Dep., 48:23–

---

[3] An accurate summary of the testimony with regard to each product can be found in Plaintiffs' Appendix, attached hereto as Exhibit A.

49:2; 105:22–106:2, Plaintiffs' Motion for Class Certification ("Motion"), Dkt. 61-18; *see also* Columbia's Responses to Plaintiffs' Interrogatories and Requests for Admission, Motion, Dkt. 61-22 and 61-23 respectively. These outlet-exclusive items are referred to herein as Outlet SMU Builds; Plaintiffs' Statement of Disputed Facts ("PSDF"), Plaintiff Fact ("PF") Nos. 3, 5, 10.

It is undisputed that Columbia offered for sale approximately 580 Outlet SMU Builds through the Fall 2016 season, each of which had a higher reference price and a lower "outlet price" on the price tag. It is further undisputed that Columbia's SMU Outlet Builds are never sold anywhere but Columbia outlet stores and never sold at the higher reference price printed on their tags. Motion, 5:2-8, Dkt. 61; *see also* Bui Dep., 91:22-25, 103:18-20, Motion, Dkt. 61-19; Motion, Dkt. 61-23; PSDF, PF Nos. 3, 5, 10.[4] In other words, the highest price that any consumer actually paid for any SMU Outlet Build is the *lower* of the two prices printed on the tag.

**B. Columbia's Pricing Scheme for Outlet SMU Builds is Uniform**

As detailed in Plaintiffs' opening papers, Columbia uses a "value pricing model," to determine the higher and lower prices appearing on the price tags for its Outlet SMU Builds. *See* Motion, 3-4, Dkt. 61; *see also* Bui Dep. at 82:17–84:6, Dkt. 61-19. Columbia internally refers to the highest price printed on a garment's price tag as the "MSRP" and the lower price as the "outlet price," but Columbia's price tags do not include any explanatory language; the higher and lower prices are simply presented as higher and lower dollar amounts. *Id.*

**C. Columbia's Price Tags**

At its outlet stores, Columbia sells both Outlet SMU Builds and out-of-season Inline products (also called "closeouts"). *See* M. Olson Dep., 48:10-49:2, Motion, Dkt. 61-18; *see also* M. Olson Dep., 36:17-22, Ex. 3. As illustrated below, price tags for the Inline product sold at the outlet look identical to the price tags for the Outlet SMU Builds; the tags for both kinds of products have a higher price printed on them and a lower price appearing on a sticker. The critical difference, however, is that Inline products that end up for sale at a Columbia outlet store were, in fact,

---

[4] Columbia continues to use the reference pricing scheme at issue in its outlet stores to this day; Columbia has not yet supplemented its discovery responses to identify Outlet SMU Builds for the current season, which is Spring 2017.

previously sold elsewhere at the higher price on the price tag. Outlet SMU Builds, by contrast, are never sold anywhere at the higher price. *See* Bui Dep., 83:19-23, Motion, Dkt. 61-19.

As illustrated in Fig. 1 below, Columbia's Inline (non-outlet) price tag has a single price, along with identifying information about the product. This is the price tag used for items sold in retail channels like REI or Macy's. The Outlet SMU Build price tag, Fig. 2 below, looks nearly identical to the Inline price tag, but includes a second sticker bearing the "mark-down" price of $59.90. The fact that $59.90 appears on a second sticker reinforces the idea that the original tag has been altered to reflect a "new" and "discounted" price. The item in Fig. 3 is an Inline product that has been marked down for sale at Columbia's outlet store.

Fig. 1: Inline Tag        Fig. 2: Outlet SMU Build Tag        Fig. 3: Outlet Non-SMU Build Tag

 

The photo on the left (Fig. 1) depicts the actual price tag for an Inline product, the men's Ascender Softshell Jacket, which sells in retail stores for $115. The photo in the center depicts the actual price tag from an Outlet SMU Build called the Mt. Village Softshell jacket.[5] Columbia concedes that the Mt. Village Softshell jacket is only sold at Columbia Outlet stores and is never sold anywhere for $115. In other words, the $115 has nothing whatsoever do with the actual original price of the Mt. Village jacket; the most any consumer would ever pay for the Mt. Village jacket is

---

[5] Columbia has identified the Ascender jacket as the Inline style that served as the inspiration for the Mt. Village jacket. *See* Def., Appendix A, Dkt. 75. The Mt. Village jacket is an Outlet SMU Build that is only sold at Columbia Outlet stores.

$59.90, and the only place anyone can ever buy the Mt. Village jacket (or any Outlet SMU Build) is a Columbia outlet store. The photo on the right (Fig. 3) depicts an actual price tag for the Prism Medallion tee shirt. The Medallion Prism tee shirt is an Inline product that is available for purchase in retail stores (at prices higher than $14.90) and is also available at the outlet for $14.90.[6]

Columbia concedes that it is impossible for Columbia Outlet Store customers to distinguish between Outlet SMU Builds and Inline products that are offered for sale at the outlet. *See* M. Olson Dep., 52:15-24, Ex. 3. The net effect is that the real discounts (on Inline items) are mixed in with the false discounts (on Outlet SMU Builds), and there is no way for consumers to tell which is which – even after they know that *some* of the items were never sold at the higher price. PSDF, PF No. 5. The only plausible reason for including two prices on the tag for the Outlet SMU Build is to make consumers think that Columbia is offering a discount off the original price.

**D. Columbia's Pricing Representations for Outlet SMU Builds Are Material to the Reasonable Consumer**

Plaintiffs are "bargain hunters" whose purchase decisions are driven largely by the presence of a discount. *See* J. Stathakos Dep., 46:22-23, Ex. 1; N. Stathakos Dep., 34:7-35:18; 37:24-38:9, Ex. 2. Indeed, for both Plaintiffs, the prospect of finding "a sale" or "a deal" was "the whole purpose of going" to a Columbia outlet store. *See* J. Stathakos Dep., 30:2-20; 31:17-32:4, Ex. 1; N. Stathakos Dep., 30:24-31:6, Ex. 2. And they measured the depth of the discount on Outlet SMU Builds by comparing "the price on top, which [they] thought at that point may have still been a retail price versus whatever the sale price was on the bottom." J. Stathakos Dep., 30:2-30:20, Ex. 1; N. Stathakos Dep., 94:3-17, Ex. 2; PSDF, PF Nos. 6, 9.

Plaintiffs' experience is typical, and Columbia's Reference pricing scheme is material to other customers' decisions to purchase Outlet SMU Build products. Plaintiffs' expert Dr. Larry Compeau explains that: "external Reference Prices have been consistently shown to have significant impact on consumers' purchasing processes and decisions" by increasing the perceived value of

---

[6] The Prism Medallion tee shirt is not an outlet-exclusive product and, therefore, is not part of this case. The price tag from the Prism Medallion tee shirt is included here to illustrate that is it impossible for consumers to know which outlet products are Inline closeouts (like the Prism Medallion) and which are outlet exclusive Outlet SMU Builds (like the Mt. Village jacket).

items with reference prices affixed. Dr. Compeau Report, 3, Dkt. 61-1. Because the reference prices Columbia uses on its Outlet SMU Builds do not truly reflect former prices, consumers misunderstand them and "are deceived into making purchases that they might not have otherwise made." *Id.* at 8; PSDF, PF No. 9.

Notably, Columbia's own expert survey reinforces Dr. Compeau's analysis by confirming that Columbia's reference pricing scheme is material and deceptive to consumers. In Columbia's own survey, nearly 75% of respondents said they were focused on the price they paid for the outlet exclusive products, and more than 85% of shoppers said they were focused on the "deal" they obtained. *See* Scott Report, Ex. H-7 and H-8, Def., Dkt. 75-13. Moreover, the vast majority of people Columbia surveyed (more than 75%) interpreted the higher prices on Columbia's tags to be former prices. Poret Rebuttal Report, ¶ 33 ("[T]he great majority of responses Dr. Scott tabulated (upwards of 75% to 80%) essentially indicate the same thing – that the higher reference price is a price at which the same item was previously offered for sale."); PSDF, PF No. 9.

Columbia's survey results are entirely consistent with Plaintiffs' testimony about their understanding of what Columbia's price tags mean; Plaintiffs testified that they were "duped" and "fooled" because they mistakenly believed the reference prices on Columbia's price tags to be higher prices at which the exact items they purchased were actually sold. *See* N. Stathakos Dep., 70:20–71:19, Ex. 2; J. Stathakos Dep., 26:6–14, 83:7–21, Ex. 1; PSDF, PF Nos. 9, 12.

Moreover, Columbia's survey confirms that "there is a statistically meaningful <u>reduction</u> in the percentage of consumers who perceive the item to have the highest overall quality when it is revealed to them that the reference price does not refer to the same item." Poret Rebuttal Report, ¶ 75. "[T]here is a statistically meaningful <u>increase</u> in the perception of the quality of the item when the reference price included on the tag is not explained." *Id.*; *see* PSDF, PF No. 15.

### E. <u>Plaintiffs Were Deceived into Purchasing Outlet SMU Build Products</u>

As husband and wife, Plaintiffs typically shop and make their purchasing decisions together. N. Stathakos Reply Decl., ¶ 4; J. Stathakos Reply Decl., ¶ 4. Plaintiffs jointly purchased eight Outlet SMU Build products from Columbia outlet stores. Columbia mischaracterizes Plaintiffs' testimony

to create the impression that they reference prices did not impact their shopping decisions. In truth, the record reflects that Columbia's illusory discounts were critical to all of Plaintiffs' purchase decisions. PSDF, PF Nos. 1, 6, 12-15.

Plaintiffs purchased one of the outlet exclusive styles (a pair of shorts) in two different colors (beige and white) prior to the filing of the complaint in this action. J. Stathakos Reply Decl., ¶¶ 5-7. Plaintiffs first purchased a pair of Sunset Hill shorts (Outlet SMU style number XL4712, identified as Item No. 3 in Columbia's Appendix A) in beige on or about July 8, 2015 from the Columbia outlet store in Tejon, CA. J. Stathakos Reply Decl., ¶ 5. The beige shorts had a price tag that showed two prices: $30 and $24.90. *Id*. at ¶ 6. Plaintiffs understood the highest price on the price tag ($30) was the price at which the shorts were actually sold at retail, either in Columbia's retail store or online or at a different store like REI. *Id.* Plaintiffs thought they were getting a deal because the price they were paying after all discounts ($11.98) was less than half of the *lower* price on the price tag, which was already a discount off the retail price of $30. *Id.* Their understanding of the discount was very important to the decision to buy the beige shorts. *Id.* If Plaintiffs had known that the highest price on the tag was false (*i.e.* that the shorts had never sold anywhere for $30), they probably would not have purchased them. *Id.*

Later that month, on or about July 26, 2015, Plaintiffs purchased the identical outlet-exclusive shorts in white from the Columbia outlet store in Vacaville, CA. *Id*. at ¶ 7. Plaintiffs paid $8.98 for the white shorts. *Id.* Plaintiffs believed that the white shorts were a great deal because the price was lower than what they had paid weeks earlier for the beige shorts. *Id*.

Columbia mischaracterizes Plaintiffs' testimony about their purchase of these shorts. Most notably, Ms. Stathakos did not testify that she would have purchased the white shorts even if she had known they were never sold at the reference price. Indeed, Ms. Stathakos' deposition testimony about the white shorts lacks context because defense counsel never asked about the related, prior purchase of the beige shorts in the same style. J. Stathakos Dep., 74:7-75:1, Ex. 1. Columbia did not even ask Ms. Stathakos whether she would have purchased the white shorts had she known they were never sold at the reference price. Rather, defense counsel only asked her to assume the shorts

had not sold anywhere but the outlet; the question did not address reference price at all. J. Stathakos Dep. at 75:2-10, Ex. 1.

As with the beige and white shorts, Plaintiffs were motivated to make all of their Outlet SMU Build purchases based primarily on the false discount off the advertised original, former retail price. *See* N. Stathakos Dep., 34:9–38:9, Ex. 2; J. Stathakos Dep., 58:10–59:7, Ex. 1; J. Stathakos Reply Decl., ¶¶ 6-7. In fact, Ms. Stathakos testified that getting a deal was the "whole purpose" of shopping at Columbia's outlet stores. J. Stathakos Dep., 31:17-32:4, Ex. 1.

With regard to the other product Plaintiffs purchased prior to filing their complaint, the Mt. Village Jacket, SMU Style No. XM6093, Plaintiffs testified that they did not know whether they would have bought it had they known the reference price was false. J. Stathakos Dep., 63:12-19, 66:12-21, Ex. 1; N. Stathakos Dep., 87:7-89:21, Ex. 2. Ms. Stathakos testified unequivocally, however, that she and her husband would *not* have purchased the Cascade Trail Jacket on Feb. 14, 2016 if they had known the jacket never sold anywhere for the reference price of $120. *See* PSDF, PF Nos. 6, 7; J. Stathakos Dep., 76:14-78:23, Ex. 1; Plaintiffs' Appendix A, filed concurrently. Columbia ignores this testimony, which proves that Columbia's false reference prices were material to Plaintiffs.

Plaintiffs' testimony about their post-complaint shopping further confirms Columbia's pricing scheme remains deceptive even after a consumer knows that some of Columbia's reference prices are false. After filing their Complaint, Plaintiffs continued to be deceived by Columbia's use of false reference prices, because it is impossible for a consumer to tell which products at Columbia outlet stores are Inline styles (previously sold at the higher price on the tag) and which are Outlet SMU Builds (never sold at the higher price). N. Stathakos Dep., 26:6-12; 39:3-41:18, Ex. 2; J. Stathakos Dep., 24:24 - 25: 23, Ex. 1; N. Stathakos Reply Decl., ¶¶ 5-7; J. Stathakos Reply Decl., ¶ 8; *see also* M. Olson Dep., 52:15-24, Dkt. 61-18; PSDF, PF No. 5.

### III. COLUMBIA'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED IN ITS ENTIRETY

Summary judgment is only appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The moving party bears
the initial burden of demonstrating the absence of a genuine issue of material fact. *See id.* A genuine
issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and
which could affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-
56 (1986). The Court must view the evidence in the light most favorable to the nonmoving party and
draw all justifiable inferences in its favor. *See id.* at 255. If evidence produced by the moving party
conflicts with evidence produced by the nonmoving party, a court must assume the truth of the
evidence set forth by the nonmoving party with respect to that fact. *See T.W. Elec. Service, Inc. v.
Pacific Elec. Contractors Ass'n Eyeglasses,* 809 F.2d 626, 630-31 (9th Cir.1999). In deciding a
motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the
drawing of legitimate inferences from the facts are jury functions, not those of a
judge." *Anderson*, 477 U.S. at 255.

Columbia's motion for summary judgment is based on three issues. Columbia claims that it
is entitled to summary judgment because Plaintiffs have not presented evidence that: (1) Columbia's
reference prices are "invalid;" (2) Plaintiffs relied on the reference prices and therefore suffered
injury in fact; and (3) Plaintiffs received something worth less than the price they paid. All three
issues are hotly contested, and the record is replete with disputed facts relating to each.

**A.  Issue No. 1: Columbia's Reference Prices are False and Misleading**

**1.  Columbia's References Prices are Likely to Deceive Reasonable Consumers**

Columbia wrongly argues that it is entitled to summary judgment because Plaintiffs have
failed to establish that the reference prices used on price tags for Outlet SMU Builds are "invalid."
The relevant question is not one of validity—a term Columbia does not define—but whether
Columbia's reference prices are *likely to deceive* a reasonable consumer. *Williams v. Gerber
Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

Here, Plaintiffs' testimony and Columbia's own survey confirm that consumers reasonably
understand Columbia's reference prices to reflect actual former prices at which the ticketed item was
sold. *See* PSDF, PF Nos. 9, 11, 12. And it is undisputed that Columbia's SMU Outlet Builds are

never sold anywhere but Columbia outlet stores and never sold at the higher reference price printed on their tags.[7] The Ninth Circuit has recognized that such practices violate California law:

> Retailers, well aware of consumers' susceptibility to a bargain, [] have an incentive to lie to their customers by falsely claiming that their products have previously sold at a far higher 'original' price in order to induce customers to purchase merchandise at a purportedly marked-down 'sale' price. Because such practices are misleading—and effective—the California legislature has prohibited them.

*Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1101 (9th Cir. 2013); *see also Kwikset*, 51 Cal. 4th at 328 ("The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source.").

Contrary to Columbia's claim, the price at which similar goods sold elsewhere in the marketplace is irrelevant to the question of whether Columbia's reference prices are deceptive. In an analogous case, Judge Bernal of the Central District of California just last month rejected arguments similar to those Columbia makes here, finding that customers reasonably understand reference prices adjacent to the words "Compare At" to refer to former prices at which the exact same item sold. *Evans v. DSW*, CV 16-3791-JGB, at *13 (C.D. Cal. Feb. 2, 2017) ("[R]easonable consumers would believe that the 'Compare At' price refers to either a price for which the same item was formerly sold or a price for which the item is sold by other retailers."); *Pickles*, 2016 WL 3999531, at *2 n.1.

Here, where the price tag offers no explanatory language at all, the only reasonable interpretation of the reference price is that it refers to a price at which the same item was formerly sold. As shown in Fig. 2, *supra*, the higher price on the tag for Outlet SMU Builds is printed directly below the name and UPC code for the ticketed product. Below this official-looking price information, Columbia adds a plain mark-down sticker bearing a lower price. Nothing on the price tag provides the *slightest clue* to a consumer that the higher price is meant to refer to some other product. Indeed, the price tags Columbia uses for its Outlet SMU Builds are *identical* to the tags it

---

[7] Columbia's position that "the reference price on the price tag [for Outlet SMU Builds] was the price at which the item *would have sold* in inline channels" is irrelevant speculation. Def., 6, Dkt. 75. The undisputed fact, and what matters, is that Outlet SMU Builds never *did* sell in Inline channels. Motion, 5, Dkt. 61; *see also* Bui Dep., 91:22-25, 103:18-20, Dkt. 61-19; Dkt. 61-23.

uses to show *real* discounts off Inline items that make their way to the outlet store. *Compare* Fig. 2 and Fig. 3, *supra*. The only reasonable inference is that Columbia *wants* its outlet customers to think the reference prices are real former prices, even when they are not.

Columbia's only authority for the notion that the reference prices are not deceptive as a matter of law because those prices purportedly refer to similar goods is a 1957 California Attorney General (AG) opinion. But, as Judge Chhabria reasoned in *Pickles*, "even if that stale opinion reflected the Attorney General's current view of the law, which is doubtful, a state attorney general opinion is . . . not binding on this Court." *Pickles*, 2016 WL 3999531, at *2 n.1. And, in any event, the AG opinion actually supports Plaintiffs' theory of deception.

In its 1957 opinion, the AG explains that false price comparisons can arise in "two basic variations," for which it provides hypothetical examples. 57 Op. Att'y Gen. 126, 129 (1957). The first is where a dealer represents the "value or worth" of a product, for example, that a mattress is "worth $100," but that he will sell it for $50. *Id*. In that situation, the dealer would violate the FAL unless "similar mattresses" are selling for $100 in the open market. *Id*. The second hypothetical involves a "former price" representation, where the seller claims that a particular couch "was formerly selling for $100 but is now selling for $50." *Id*. In that situation, the former price would be false unless it "actually coincides with the 'prevailing market price' of the couch within the next preceding three months . . ." *Id*. (emphasis added). Thus, the AG draws a distinction between general representations concerning a product's worth in the market and a seller's specific representations concerning the price at which he formerly sold a product.

This case is akin to the AG's second hypothetical. Columbia makes no effort to explain that its reference price supposedly means the "worth" of a similar product available in the marketplace. Instead, its price tags are designed to look like an original price tag with a discount sticker added. The intended (and actual) effect is to create the impression that this very product was previously sold for the reference price. As discussed above, the only plausible interpretation is that the reference prices on Outlet SMU Builds are false former price representations.

Columbia places undue weight on specific language in the AG opinion without examining

the reasoning behind it. Specifically, Columbia makes too much of the AG's statement that the "prevailing market price" "means the predominating price that may be obtained for merchandise *similar* to the article in question on the open market and within the community where the article is sold." *Id*. at 127. Columbia argues that this stands for the general proposition that the market price for every product must necessarily be based on the prices of other "similar" products. But, in the second hypothetical, the AG refers to the prevailing market price for "*the* couch"—not any similar couch. Where, as here, a seller advertises that the original price of a specific product has been reduced, "it makes little sense to compare similar products in other stores." *Pickles*, 2016 WL 3999531, at *1 n.1.

Moreover, the standard Columbia advocates for would render the FAL unenforceable. To require parties to canvass the market for sale prices of "similar" goods, as Columbia suggests, would invite uncertainty as to which other items, if any, are truly "similar," and the additional sales data for such items would only serve to convolute, rather than clarify, the prevailing market price of the products in question. Columbia all but admits that such an analysis would render the FAL unworkable, which would undermine the intent of the California Legislature.

Here, we know that Columbia outlet stores are the exclusive market for Outlet SMU Builds. PSDF, PF Nos. 3, 5, 10. And we have transaction-level data for every sale in California from 2014 to September 16, 2016 of the seven Outlet SMU Builds that Plaintiffs purchased. Bui Dep., 26:22-27:9, Motion, Dkt. 61-19; *see also* A. Olson Report, Motion, Dkt. 61-13. Those data include the actual purchase price for every sale, and they confirm that no Outlet SMU Build was ever sold at the advertised reference price. *Id.* Where the market is limited to Columbia outlet stores and every sales transaction is known, it would make no sense to invite a needless (and endless) dispute between the parties about similar goods sold somewhere else. Whether some other product—similar or not—was sold elsewhere at a price at or above the advertised reference price is irrelevant. Accordingly, the Court should "apply common sense to the language at hand and interpret the statute to make it workable and reasonable." *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 567, 169 P.3d 889, 897, 67 Cal. Rptr. 3d 468 (2007) (quotation and citation omitted).

### 2. The Degree of Similarity Between Inline and Outlet SMU Build Styles Is a Disputed Question of Fact

Even if Columbia's theory about similar goods were right (it isn't), there remains a genuine issue of fact as to whether any given Outlet SMU Build was sufficiently similar to its Inline counterpart to justify Columbia's reference prices. Columbia relies solely on testimony from one of its employees—Melissa Olson—to argue that differences between its Outlet SMU Builds and their Inline counterparts are limited to "small aesthetic changes." But as another court in this District recently recognized, "in today's brand-obsessed, seasonally dependent fashion market, [] the finest details and distinctions make a world of difference to many consumers." *Pickles* at *1 n.1. Judge Chhabria's observation in *Pickles* is confirmed by Columbia's own consumer survey; as Dr. Scott herself emphasizes, the color of clothing is a very important factor (top two box score) for 73.1% of consumers and is an important factor (top three box) to 86.7%. Poret Rebuttal Report, ¶ 81; PSDF, PF No. 9. Moreover, Plaintiffs' expert, Gabriele Goldaper, examined a sample of 19 pairs of Inline and Outlet SMU Build garments and found that none of the Outlet SMU Build products was identical to its Inline counterpart. Goldaper Report, ¶¶ 11, 17-39, Motion, Dkt. 61-4. Goldaper opined that the differences between the Outlet SMU Builds and their Inline counterparts fell along a spectrum from modest stylistic and construction changes to major design differences, including the lack or presence of a hood, differing placement and style of zippers and trim, differing silhouettes, and differing sleeve and cuff design. *Id*. at ¶¶ 23, 25-28, 31-34.

Goldaper's opinions are based on her 45 years in the apparel industry and her particular expertise with regard to garment production. *Id.* at ¶¶ 8-10. Goldaper has owned her own apparel manufacturing company and has overseen every aspect of garment construction. *Id*. at ¶10. To arrive at the opinions expressed in her opening report, she reviewed technical design drawings that are standard in the apparel industry, and conducted a side-by-side examination of many SMU-Inline garment pairs. *Id*. at ¶¶ 11-14. Other similarly qualified experts could replicate her analysis and arrive at the same conclusions with regard to differences between the Outlet SMU Builds and the corresponding Inline garments. *Id*. at ¶¶ 15-17.

Even if the degree of similarity between Columbia's Inline and Outlet SMU Build products

were relevant here—and Plaintiffs submit that it is not—the question of similarity is very much in dispute. PSDF, PF No. 2. Thus, summary judgment is unwarranted.

**B. Issue No. 2: Plaintiffs Relied on Columbia's False Reference Prices to Their Detriment**

**1. Plaintiffs Suffered Injury in Fact and Therefore Have Standing**

In arguing that Plaintiffs lack standing to pursue their claims because they have failed to demonstrate that they were injured as a result of their reliance on Columbia's illusory discounts, Columbia ignores the great weight of authority. The Ninth Circuit and the California Supreme Court have made clear that a consumer who is a victim of false reference pricing has statutory standing to seek redress "so long as false advertisements induced him to buy a product he would not have purchased or to spend more than he otherwise would have spent." *Hinojos*, 718 F.3d at 1102; *Kwikset*, 51 Cal. 4th at 320-30; *Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907, 918-19 (2016). The pertinent authority, moreover, makes clear that a plaintiff's uncertainty about whether she would have purchased the products if she had known the reference prices were false is sufficient to confer standing, particularly when the plaintiff testifies that "price-comparison advertising influenced [her] purchasing decision[s]." *Chowning v. Kohl's Dep't Stores, Inc.*, No. CV1508673RGKSPX, 2016 WL 1072129, at *4 (C.D. Cal. Mar. 15, 2016); *see also Zeisel v. Diamond Foods, Inc.*, 2011 WL 221113, at *4 (N.D. Cal. June 7, 2011) (finding the plaintiff had satisfied standing when he testified that label misrepresentations influenced his purchasing decision even though he "might have" still purchased the product absent the misrepresentations); *Brazil v. Dell Inc.*, No. C-07-01700 RMW, 2010 WL 5387831, at *3 (N.D. Cal. Dec. 21, 2010) (holding that plaintiffs presented evidence that they relied on false price references when one plaintiff testified he "probably would not have bought the computer when he bought it if not for the false promotion" and other plaintiff testified that "sale price was important").

The California Supreme Court has explained that a plaintiff need only point to "an 'identifiable trifle of economic injury'" in order to have standing under California's consumer protection statutes. *Kwikset*, 51 Cal. 4th 330 n.15. Moreover, the Ninth Circuit has reasoned that "deceived bargain hunters suffer a more obvious economic injury" than results from other types of

false advertising, such as the type of attribute misrepresentation at issue in *Kwikset*, because the "bargain hunter's expectations about the product he just purchased is *precisely* that it has a higher perceived value and therefore a higher resale value." *Hinojos,* 718 F. 3d. at 1105-06.[8]

Here, Plaintiffs' are "bargain hunters" who thought they were receiving deep discounts off actual retail prices. PSDF, PF Nos. 5-6, 11-14; N. Stathakos Dep., 31:5-6, 34:15-38:9, 89:4-90:9, Ex. 2; J. Stathakos Dep., 30:14-15, 39:3-10, 46:22-23, 86:11-13. Ex. 1. Despite Columbia's efforts to mischaracterize the testimony, close scrutiny establishes that Plaintiffs, who typically shop together and make purchase decisions together, placed a great deal of importance on and were influenced by Columbia's false reference prices in making their purchasing decisions. N. Stathakos Reply Decl., ¶¶ 4-7; J. Stathakos Reply Decl., ¶¶ 4-8.

Ms. Stathakos testified that she probably would not have purchased Item No. 3(a), a pair of beige women's shorts that Plaintiffs purchased July 18, 2015 (before filing their initial complaint in this case), had she known the reference price was false. PSDF, PF No. 1; J. Stathakos Reply Decl., ¶ 6. She also testified unequivocally that she and her husband would not have purchased Item. No. 5, a men's jacket purchased February 14, 2016, had they known the truth about the reference price. PSDF, PF No. 6; J. Stathakos Dep., 78:5-15, Ex. 1. As a general matter, Ms. Stathakos testified that she felt like she was "fooled" by Columbia's false reference prices and that if she had "had all the facts about Columbia's products, Columbia's pricing, [she] may have made other decisions about whether to buy the items at the time . . .I mean, I spent money that I may not have spent." PSDF Nos. 9, 11,12,14; J. Stathakos Dep., 26:12-13, 83:16-21, Ex. 1. She further testified that price and the bargain she thought she was receiving (by reference to the higher retail price) was important in her purchasing decision, and that if she isn't able to determine that a garment is a bargain by reference to a retail price, she does not "even contemplate purchasing it." J. Stathakos Dep. at 27:9-

---

[8] Columbia's argument that Plaintiffs have not "suffered a concrete and particularized loss" finds no support in the cases Columbia cites. *See* Def., 14, Dkt. 75. Unlike the plaintiff in *Hall v. Time Inc.*, 158 Cal. App. 4th 847 (2008), *as modified* (Jan. 28, 2008), Plaintiffs testify here that they were actually deceived and acted to their detriment in reliance on Columbia's false advertising. And unlike in *Spokeo v. Robins*, 136 S.Ct. 1540 (2016), Plaintiffs' injury here is not purely statutory. Plaintiffs purchased merchandise in reliance on Columbia's reference prices, which they reasonably but mistakenly believed to reflect actual retail (*i.e.* former) prices.

10, 42:9-12, 58:17-18, 59:5-7, Ex. 1; J. Stathakos Reply Decl., ¶ 6. In other words, price comparisons are critical to her, and often the determining factor, in her purchasing decisions. *Id.*

Similarly, Mr. Stathakos testified that he does not know whether he would have purchased any of the Outlet SMU Builds that he and his wife bought if they had known that the products never sold anywhere at the reference price on the price tags. PSDF, PF No. 5; N. Stathakos Dep., 89:4-96:8, Ex. 2; N. Stathakos Reply Decl., ¶¶ 6-7. During his deposition, Mr. Stathakos expressed uncertainty about whether he would have purchased Outlet SMU Builds had he known that the products were never sold anywhere at the reference price. His testimony makes it clear why uncertainty is enough under the law—because it is difficult for a shopper to know what decisions he would have made if he had not been lied to about a critical factor in the decision analysis:

> Q: …if I also told you that it was never sold at $120, which is the higher price listed on the price tag, would you have still purchased the jacket back in February for the $47.94 that you paid?
>
> A: I don't know because now you are putting in the question everything I believed that helped me make a decision. I based it on this item being sold at a retail store for $120. So you're telling me that that's not correct. I don't know what my decision would be. I don't know how much I would need that jacket. I don't know how much of a deal this is. I don't know what -- it's throwing into question a lot of factors for me.

N. Stathakos Dep., at 94:3-17, Ex. 2.

Since his deposition, Mr. Stathakos has confirmed that he has the same uncertainty about all of the Outlet SMU Builds that he and his wife purchased. For all eight of the products that he and his wife purchased, he believed the "highest price on the tag to reflect the actual retail price at which the item was sold." PSDF, PF No. 9; N. Stathakos Reply Decl., ¶ 5. And he used the higher reference price to calculate the amount of the discount he was receiving, which was "very important" to him. PSDF, PF No. 5; N. Stathakos Reply Decl., ¶ 6. Had he known that the reference price was false, his "understanding of both the retail value of the product and the depth of the advertised discount would have changed," such that he may have decided not to purchase some or all of the items. PSDF, PF No. 6; N. Stathakos Reply Decl., ¶ 7.

Here, Plaintiffs' testimony as a whole demonstrates that the promised discount, which they calculated in reliance on the higher reference price, was critically important to them. In addition,

their testimony reveals that they were deceived by Columbia's deceptive pricing practices, even after they filed their Complaint. J. Stathakos Dep., 25:7-23, Ex. 1; N. Stathakos Dep., 100:4-101:2, Ex. 2.

### 2. The Evidentiary Record Supports Plaintiffs' Theory of Deception, Reliance and Materiality

In addition to its erroneous standing arguments, Columbia argues that Plaintiffs have failed to establish the required causation and reliance to proceed on behalf of a class. Once again, Columbia's position misconstrues the legal standard and ignores the facts.

It is well-settled that while Plaintiffs are required to prove their own reliance, they need not establish causation, deception, or materiality for each individual class member. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985-86 (9th Cir. 2015) ("To state a claim under the UCL or the FAL 'based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived. This inquiry does not require 'individualized proof of deception, reliance and injury.'") (internal quotations omitted); *Brazil v. Dell Inc.*, No. C-07-01700 RMW, 2010 WL 5387831, at *3 (N.D. Cal. Dec. 21, 2010) ("[U]nder California law, plaintiffs need not establish that each and every class member based his or her decision on the represented discounts.").

The Ninth Circuit recognizes that "a representation is 'material' . . . if a reasonable consumer would attach importance to it *or* if the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." *Hinojos*, 718 F.3d at 1107 (internal quotations omitted). Importantly, a misrepresentation need not be the dispositive factor in a consumer's purchasing decision to be material. *See id.*; *see also* Motion, 13 n. 3, Dkt. 61. Moreover, the Ninth Circuit has held that misleading price representations, and particularly false markdowns, are *per se* material under California law, which gives rise to a class-wide inference of reliance. *Hinojos*, 718 F.3d at 1107 ("the legislature's decision to prohibit a particular misleading advertising practice is evidence that the legislature has deemed that the practice constitutes a 'material' misrepresentation, and courts must defer to that determination"); *see also Brazil*, 2010 WL 5387831, at *5 ("There is evidence . . . that external reference prices and semantic clues impact customers' perceptions of value and purchase

decisions."); Motion, 12-15, Dkt. 61. "In effect, California has created what amounts to a conclusive presumption that when a defendant puts out tainted bait and a person sees it and bites, the defendant has caused an injury; restitution is the remedy." *Pulaski*, 802 F.3d at 986; *Massachusetts Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292 (2002), *as modified on denial of reh'g* (May 29, 2002)("plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all").

Here, Plaintiffs have testified that they were "duped" and "fooled" because they mistakenly believed that the reference prices on Columbia's Outlet SMU Builds reflected actual prices at which the items they purchased were offered for sale previously or elsewhere. PSDF, PF No. 12; N. Stathakos Dep., 21:7-26:5, 70:20-71:19, 89:4-96:8, 99:20-100:2, Ex. 2; J. Stathakos Dep., 16:16-17:4, 18:19-19:1, 21:11-13; 23:4-6, 24:24-25:16; 26:12-14, 42:2-12, 67:3-69:7, 84:11-15, 98:7-14, Ex. 1. Plaintiffs further testified that they purchased the Outlet SMU Builds in reliance on Columbia's representation of a discount off the retail price. *Id.*; *see also* N. Stathakos Dep., 34:15-38:9, Ex. 2; J. Stathakos Dep., 39:3-10, 44:17-20, Ex. 1. The promised discount was a key factor in their purchase decisions, and they may have decided against purchasing Columbia's Outlet SMU Builds had they known the promised discounts were illusory. PSDF, PF No. 6; N. Stathakos Dep., 22:23-26:5, 34:15-38:9, 70:5-71:19, 89:4-96:8, 99:20-100:2, Ex. 2; N. Stathakos Reply Decl., ¶¶ 5-7; J. Stathakos Dep., 20:6-23:6, 26:12-14, 30:2-32:9, 39:3-10, 42:2-12, 44:17-20, 46:22-47:11, 58:15-59:7, 64:23-65:9, 83:16-86:13, Ex. 1; J. Stathakos Reply Decl., ¶¶ 4-8.[9]

Significantly, Columbia knows that its outlet shoppers are looking for bargains. As Columbia's Director of the Global Strategic Response Team and Product Creation OPS, Melissa Olson, testified, bargain hunting is the whole point of shopping at a Columbia outlet store:

---

[9] Plaintiffs continued to rely on Columbia's false reference prices even after the filing of their Complaint. As Columbia concedes, it is impossible for its outlet shoppers to distinguish between Outlet SMU Builds, which are priced with false reference prices, and true overstock items, which were actually previously sold at the reference price appearing on the price tag. M. Olson Dep., 52:10-24, Plaintiffs' Motion, Dkt. 61-18; Plaintiffs' Motion, 5-6, Dkt. 61-22; PSDF, PF 5. Consequently, even after filing their complaint, Plaintiffs did not and could not know which reference prices were false and which were true former prices; thus, they continued to rely on the false reference prices in making their purchase decisions. PSDF, PF 5; J. Stathakos Dep., 24:24-25:23, Ex. 1; N. Stathakos Dep, 39:3-41:18, 93:24-96:8, 100:22-101:8, Ex. 2.

> [Y]ou're either an outlet customer or you're not. You're looking for a deal or you're not. . . . If you're an outlet customer, you probably are looking for a sale price, in my opinion. . . . [T]here are consumers who are looking for the best deal they can find. Generally you can find those at outlet stores.

M. Olson Dep., 93:15-94:11, Plaintiffs' Mot, Dkt. 61-18; *see also* J. Stathakos Dep., 32:3-4, Ex. 1 ("I would want a sale, a deal, and that's the whole purpose of going in there."). For this reason, and because the leases for its outlet stores require most merchandise to be offered at a "discount," Columbia uses false reference prices to show customers that they are "getting a better – a great deal." M. Olson Dep., 90:1-91:23, Motion, Dkt. 61-18; *see also* Bui Dep., 91:5-11, Motion, Dkt. 61-19; PSDF, PF No. 14.

In light of Plaintiffs' experience and Ms. Olson's testimony, Columbia's argument that its reference prices are immaterial borders on senseless. First, Columbia attempts to discredit Plaintiffs' expert, Dr. Larry Compeau, the leading academic in the field of consumer behavior as it relates to reference pricing, by arguing that the body of research supporting Plaintiffs' position is inapplicable because it does not focus specifically on outlet shoppers. Def., 14-15, Dkt. 75. But Columbia's argument is refuted by its own survey, which was limited to Columbia outlet customers and supports Plaintiffs' theory of deception and materiality. As explained by Plaintiffs' survey expert, Hal Poret, Columbia's survey results support Plaintiffs' theory of the case—not Columbia's. For example, the survey results indicate that upwards of 75% to 80% of respondents understood Columbia's reference prices to mean actual former or retail prices for the ticketed item.[10] Scott Report, Ex. H-16, Def., Dkt. 75-13; Poret Rebuttal Report, ¶ 33; PSDF, PF No. 9. In addition, nearly 70% of respondents indicated that the perceived amount of savings was one of the most important factors in their purchasing decision, and over 80% of respondents rated the amount of savings as an important factor. Poret Rebuttal Report, ¶ 57. Nearly 70% of respondents' answers confirmed "previously discussed data indicating that the perception respondents were getting a good/discounted price was of significant importance to consumers." *Id.* at ¶ 62. Finally, Dr. Scott's survey revealed a statistically significant difference between respondents' perceptions of the value of the deal when the

---

[10] Notably, "Dr. Scott classified only <u>one</u> respondent as giving an answer suggesting a belief that the higher price of an 'other product' or 'other type/size.' This one respondent represents less than 1% (0.7%) of the survey sample." Poret Rebuttal Report, ¶ 34.

reference price was explained compared to when the reference price was not explained. *Id.* at ¶ 75 ("[T]here is a statistically meaningful <u>reduction</u> in the percentage of consumers who perceive the item to have the highest overall quality when it is revealed to them that the reference price does not refer to the same item."); *id.* ("[T]here is a statistically meaningful <u>increase</u> in the perception of the quality of the item when the reference price included on the tag is not explained.").

These results are consistent with more than 40 years of academic research, the collective conclusion of which is that reference prices *always* have a statistically significant effect on consumer purchasing behavior; the mere presence of a reference price increases consumers' perception that they are getting a good deal, which in turn increases their willingness to buy. Compeau Report, ¶ 5, 15, 18-20, 25-29, 47, 49, Dkt 61-1; Compeau Rebuttal Report, ¶¶ 11-12, 15; Deposition of Larry D. Compeau ("Compeau Dep."), 148:17-20,159:16-25, 253:23-254:24, 275:18-24, Ex. 4; PSDF, PF No. 15. As Dr. Compeau testified, the research indicates that all consumers rely on reference prices "as part of their decision process," and that the likelihood of consumers purchasing an item when a reference price is used is significantly higher than when one isn't present. *Id.* at 275:18-24. Conversely, there is no academic research—not a single study—that suggests consumers do not respond in some way to reference prices. *Id.* at 148:17-20, 253:23-254:24.

Nevertheless, Columbia argues that "[r]arely is a perceived discount, based on a reference price, ever a factor in purchasing decisions," which Columbia instead asserts are "driven by actual attributes of a garment." Def., 17, Dkt. 75. Columbia's only support for this proposition, however, is its own survey, which, as discussed above, demonstrates the opposite; namely, that consumers' perceptions of the value of the product went *down* in a statistically significant way when they were told the product was never actually sold at the reference price. Poret Rebuttal Report, ¶ 75.

Here, as in *Brazil*, "there is no dispute that the [false reference prices] were communicated to all class members, because the representations were made at the point of sale as part of a standardized [] purchasing process." *Brazil*, 2010 WL 5387831, at *5. And there is no question that Columbia's price representations were material to the Plaintiffs. Moreover, Columbia's own survey strongly suggests that proposed Class members were deceived by Columbia's use of reference prices

on Outlet SMU Builds, and acted to their detriment in reliance on Columbia's false price

representations. *See generally* Poret Rebuttal Report. On the record presented, Plaintiffs have more

than demonstrated their reliance on Columbia's material representations sufficient to give rise to a

presumption of class-wide reliance and to defeat summary judgement. PSDF, PF Nos. 4-8, 14-15.

**C. Issue No. 3: Plaintiffs Proffer Three Viable Measures of Monetary Relief**

**1. Price to Value is Not the Only Viable Measure of Monetary Relief**

With respect to restitution, Columbia errs in arguing that the difference between the price

paid and value received is the only proper measure of compensation in false advertising cases. Def's

Br., 18, Dkt. 75. As this Court correctly held in denying Columbia's motion to dismiss, California

law recognizes alternative measures of restitution. Order denying Columbia's Motion to Dismiss, 7,

Dkt. 41. Indeed, as the Court previously observed, Columbia's primary authority for the notion that

price to value is the only viable measure of relief in a false advertising case actually holds the

opposite. *In re Tobacco II*, 240 Cal. App. 4th at 792, *review denied* (Dec. 9, 2015) (explaining that

"Vioxx ['s] [price-to-value method] does not purport to set forth the exclusive measure of restitution

potentially available" in a consumer fraud case); *see also Pulaski & Middleman, LLC v. Google,*

*Inc.*, 802 F.3d 979, 983 (9th Cir. 2015) (recognizing alternate measures of restitution); *Spann v. J.C.*

*Penney Corp.*, No. SA CV 12-0215 FMO, 2015 WL 1526559, at *4 (C.D. Cal. Mar. 23, 2015)

("…defendant has not cited, nor has the court found, any authority indicating that [price to value

differential] is the only way restitution can be calculated."); *Chowning*, 2016 WL 1072129, at *5

("Of course, the price/value differential is not the exclusive measure of restitution, as [*In re Tobacco*

*II Cases*] and [*Pulaski*], have ruled."); *Le v. Kohls Dep't Stores, Inc.*, 160 F. Supp. 3d 1096, 1105

(E.D. Wis. 2016) (holding that "California case law has not cabined restitution under the UCL and/or

CLRA to the price-to-value method"). And none of Columbia's other authorities actually hold that

price to value is the *only* viable measure of restitution.[11, 12]

---

[11] *Cortez*, for example, merely notes that a price differential analysis would "include[] an element of
restitution," and cites with approval several cases authorizing various measures of restitution,
including rescission and refund. *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 174,
177 (2000) (citing *People v. Superior Ct. ("Jayhill")*, 9 Cal. 3d 283, 286 (1973); *see also Pulaski*,
802 F.3d at 989; *Kwikset*, 51 Cal. 4th at 334 (noting that a "deceived party can seek rescission");
*Ogden v. Bumble Bee Foods*, LLC, 2014 WL 27527, at *13 (N.D. Cal. Jan. 2, 2014) (holding that

With respect to damages, Columbia argues, without any authority, that price to value is also the only appropriate measure of damages under the CLRA. Def., 18, Dkt. 75. Columbia is mistaken, as California law expressly recognizes that "[d]amages under the CLRA . . . and restitution under the False Advertising and Unfair Competition Laws . . . are different remedies." *Colgan*, 135 Cal. App. at 695, *as modified on denial of reh'g* (Cal. Ct. App. Jan. 31, 2006). In fact, under Cal. Civil Code § 3343(a), which sets forth an appropriate measure of damages for CLRA claims, an award of actual damages can permissibly exceed the delta between what the plaintiff paid and the market value of what she received; the CLRA allows for recovery of "the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, *together with any additional damage arising from the particular transaction, including . . . amounts actually and reasonably expended in reliance upon the fraud.*" *See Colgan* 135 Cal. App. 4th at 675 (emphasis added). Under this standard, putative class members are entitled to receive a full refund of the price they actually paid for Outlet SMU Builds purchased in reliance on Columbia's false reference prices as a measure of damages, separate and apart from any determination about the proper measure and amount of restitution. *See, e.g., Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1146-47 (N.D. Cal. 2005) (explaining that under the CLRA a consumer can recover "actual damages" to

the plaintiffs failed to present sufficient evidence to support rescission and a full refund where the mislabeling was about a particular attribute of the tuna at issue); *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663 (2006) (rejecting "market value" approach after finding that the record contained "*no evidence concerning the amount of restitution necessary to restore purchasers to the status quo ante.*").

[12] The authorities collected at footnote 9 of Columbia's brief are from foreign jurisdictions applying the consumer protection laws of states other than California. In *Shaulis v. Nordstrom Inc.*, 120 F. Supp. 3d 40 (D. Mass. 2015), and *Mulder v. Kohl's Dep't Stores, Inc.* No. 15-11377-FDS, 2016 WL 393215 (D. Mass. Feb. 1, 2016), for example, the courts were applying Massachusetts' unfair competition law, which differs materially from the California statutes Plaintiffs invoke here. Similarly, in *Johnson v. Jos. A. Bank Clothiers*, No. 13-756, 2014 WL 4129576, at *5 (S.D. Ohio Aug. 19, 2014), the court expressly acknowledged that it was "declining to import the Ninth Circuit's theory of loss of subjective expectancy into [Ohio's consumer protection statute]." Columbia's remaining cases are similarly unavailing. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739-40 (7th Cir. 2014) (invoking "benefit of their bargain" rationale in analyzing Illinois Consumer Fraud and Deceptive Business Practices Act claim); *Ice v. Hobby Lobby Stores, Inc.*, No. 14-744, 2015 WL 5731290, at *7 (N.D. Ohio Sept. 29, 2015) (involving claim under Ohio Consumer Sales Practices Act); *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 (1999) (involving consumable product characteristic claim under New York consumer protection statute).

"compensate someone for the harm which he or she has been proven to suffer" and that "[p]revailing consumers under the CLRA *may also* obtain an injunction, restitution, [and] punitive damages") (italics added; citations omitted).

**2.  Plaintiffs' Proposed Measures of Relief are Proper**

Plaintiffs proffer three measures of monetary relief: (1) refund; (2) promised percentage discount; and (3) disgorgement of profit. Each of Plaintiffs' proposed models of relief supports Plaintiffs' theory of liability and can be calculated with precision by reference to Columbia's sales data. PSDF, PF Nos. 8, 16. Moreover, at least one district court in California has approved each of the three models Plaintiffs propose at the summary judgement stage. *See Spann v. J.C. Penney Corp.*, No. SA CV 12-0215 FMO, 2015 WL 1526559, at *5-8 (C.D. Cal. Mar. 23, 2015).[13] As in *Spann*, the law and facts support the viability of each model. And the California Court of Appeals' decision in *Tobacco II* does not require a different result.

Full Refund Model:

The California Supreme Court has recognized that "the opportunity to rescind [a] contract, return the products, and obtain a refund" would be an "appropriate" remedy. *People v. Superior Court (Jayhill)*, 9 Cal.3d 283, 286 (1973). More recently, the California Supreme Court cited *Jayhill* with approval in *Cortez*, explaining that "a court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved." *See Cortez*, 23 Cal.4th at 177 (stating that the court has equitable power to approve "the return of money acquired from an individual to that individual[,]" as in *Jayhill*, where "the Attorney General sought an order that customers who were victims of a fraudulent sales presentation be afforded the opportunity to rescind an ensuing contract and obtain a refund").

Columbia relies on the California Court of Appeal's decision in *Nelson v. Pearson Ford*, 186 Cal. App. 4th 983, 1013 (2010) for the proposition that there is "no authority supporting the remedy

---

[13] Columbia relies heavily on Judge Klausner's opinion granting summary judgment and denying class certification in *Chowning v. Kohl's Dep't Stores, Inc.*, No. CV1508673RGKSPX, 2016 WL 1072129, at *4 (C.D. Cal. Mar. 15, 2016). Plaintiffs respectfully submit that *Chowning* was wrongly decided and will likely be overturned on appeal, which is currently pending.

of rescission in a UCL case." Def., 19, Dkt. 75. Even if this Court were bound by the decision in *Nelson*, the holding is not nearly as sweeping as Columbia suggests. In *Nelson*, the defendant's unfair practice of adding an insurance premium to the price of purchased vehicles increased the cost of cars sold by approximately $30. *See Nelson* 186 Cal.App.4th at 1018. The trial court's restitution order, however, awarded the members of the class all the money they had paid for their vehicles. *Id.*[14]

The *Nelson* court's finding that complete rescission was inappropriate in that case, where a refund resulted in a windfall, does not mean that rescission is inappropriate here, where Plaintiffs could return the falsely advertised clothing in exchange for a refund.[15] In this case, the contemplated relief satisfies the statutory objective of "restor[ing] to the victims sums acquired through [defendant's] unfair practices." *Id.* at 1018.[16]

Indeed, courts have approved full refunds for consumers even where the products they purchased had some value. For example, like Columbia in this case, in *Makaeff v. Trump University, LLC*, 309 F.R.D. 631, 637 (S.D. Cal. 2015), the defendants argued that the only proper measure of restitution is the difference between what the plaintiff paid for Trump University and the value of what was received. The court concluded, however, that a full refund model was workable because

---

[14] *See West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 237 (1940) (a federal court may disregard a state appellate court interpretation of state law if it is "convinced by other persuasive data that the highest court of the court of the state would decide otherwise")

[15] Similarly, the Court of Appeal in *Tobacco II* held that rescission was inappropriate on the specific record before it, which included, *inter alia*, plaintiffs' concession that the proper measure of damages was difference in value. *In re Tobacco II*, 240 Cal.App.4th at 793-94 (2015).

[16] Columbia relies on *Chowning* for the notion that consumers alleging mislabeling or deceptive advertising are not entitled to a full refund where the challenged product has conferred a benefit. Def., 19, Dkt. 75. In so holding, *Chowning* relied on several mislabeling cases involving food products. *Chowning*, 2016 WL 1072129, at *7. Columbia cites these and other food labeling cases. Def., fn.12, Dkt. 75. But the food cases are of little use here. In a food case, where the product is consumable and provides nourishment even if it does not deliver on its "all natural" (or other) claims, monetary relief is best measured by the premium consumers paid for the promised (but absent) characteristic. As the Ninth Circuit observed in *Hinojos*, however, deceived bargain hunters suffer a more obvious economic injury than consumers in other types of mislabeling cases. *Hinojos*, 718 F. 3d. at 1105-06. It follows, therefore, that bargain hunters duped into purchasing durable items in reliance on an illusory discount should be entitled to different (and more fulsome) relief than the price premium measure available to consumers who purchase—and then consume—mislabeled juice or other foods.

consumers had been induced to pay for Trump University, *which could have some value*, based on

defendants' fraudulent practices. *Id.* at 638-40. The court distinguished cases involving consumable

products, like food, because "while the food products may have been missing a particular premium

quality" like being "all natural," the plaintiffs contended that Trump University was missing its

reason for existing—Donald Trump. Here too, the products at issue are not just missing a premium

quality like being "Made in U.S.A." [17] Rather, the entire transaction would never have taken place if

Plaintiffs had not been lured into the transaction by Columbia's fraudulent pricing scheme.

Columbia attempts to distinguish *Makaeff*, 309 F.R.D.at 638-40 by claiming that "it

involved allegations that the product received was entirely worthless." Def. at 19. But that is

misleading. While the plaintiffs attempted to argue that Trump University was worthless, the Court

did not agree. The court explained that "[a] number of class members have testified to being satisfied

with their TU investment and to having obtained some value from their education, despite the

alleged absence of the promised Trump benefits." *Id.* at 640. Thus, the court concluded that the cases

addressing worthless placebo pills advertised as medication "provided little support" for the

plaintiffs' refund theory. Instead, the court found the fraudulent sales tactics of Trump University

more akin to *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir.1993) where the "trial court

awarded [] consumers a full-refund for redress even though the FTC had previously found that the

heat detectors had some value." *Id.* at 638; *see also id.* ("Defendants argue that *Figgie* is

distinguishable because the consumers were eligible for a full refund only if they returned their heat

detectors. ….However, in approving full-refunds, the *Figgie* court did not condition it upon a return

---

[17] Notably, as one court explained, in *Mullins v. Premier Nutrition Corp.*, 178 F.Supp.3d 867, 898-99 (N.D. Cal. 2016), a full refund model is inapplicable in cases involving beverages and cigarettes because the plaintiffs in those cases "did not contend that consumers never would have purchased the product absent the claims on the label. How could they? The products at issue were expressly for consumption, flavor, and hydration." *Id.* at 899. The court, however, concluded that those cases were distinguishable because the plaintiff claimed "that she and other putative class members would not have purchased Joint Juice absent its claim to treat joint health problems or to keep joints healthy." *Id.* Likewise, here, Plaintiffs testified that they would not have purchased Outlet SMU Builds if they hadn't been marketed at a discount. As a result, they should be compensated for the amount they paid based on Defendant's dishonest and fraudulent practices.

of the heat detectors. Instead, the court focused on the fraud in the selling, not the value of the product, in upholding full refunds.").

Here, as in *Spann*, both Plaintiffs testified that Columbia's illusory discounts were the key driver in their purchase making decisions. PSDF, PF No. 6. Indeed, Ms. Stathakos testified that she does not "even contemplate" purchasing items that are not on sale. J. Stathakos Dep., 27:9-10, 42:9-12, 58:17-18, 59:5-7, Ex. 1. And Nick Stathakos testified that the advertised discount off the higher references price motivated his purchase decisions. N. Stathakos Dep., 94:3-95:25, Ex. 2. Contrary to Columbia's contention, Ms. Stathakos testified unequivocally that she and her husband would not have purchased Columbia's Cascade Trail Jacket (XO5035) if they had known that the jacket had never sold anywhere at any time for the reference price of $120. *See* J. Stathakos Dep., 76:14-78:23, Ex. 1; PSDF, PF Nos. 6-7. Likewise, Ms. Stathakos testified that she and her husband probably would not have purchased Columbia's Sunset Hill shorts (XL4712) in beige had they known they had never sold at the reference price of $30. J. Stathakos Reply Decl., ¶¶ 5-6; *see also* PSDF, PF No. 6. Both Plaintiffs expressed uncertainty about whether they would have purchased other outlet-exclusive products from Columbia if they had known the advertised discounts were illusory. *See* PSDF, PF No. 6; Plaintiffs' Appendix A.[18]

Using the transaction-level sales data Columbia produced in this case, Plaintiffs' expert, Arthur Olsen, determined that the Full Refund amount for the seven Outlet SMU Builds Plaintiffs purchased is $1,404,449.50. A. Olsen Rebuttal Report, ¶ 7.[19] Columbia does not challenge Mr. Olsen's methodology or results with regard to any of Plaintiffs' proffered measures. In light of the

---

[18] Any ambiguity with regard to whether Plaintiffs would have purchased any of the Outlet SMU Builds had they known the reference prices were false only highlights that the factual question of whether Columbia's illusory discounts were material is in dispute.

[19] The amount reported for all three measures of relief has increased from Plaintiffs' opening motion because Columbia on March 2, 2017 provided replacement sales data for SMU Style no. XM6093. Mr. Olsen recalculated the amounts for all three models using the same methodology he used in his initial report. The new totals, which reflect only the seven products Plaintiffs purchased, are correctly reported in this brief and the Olsen Rebuttal Report, filed concurrently. If a class is certified, Plaintiffs will seek sales transaction data for the entire population of Outlet SMU Builds, which Mr. Olsen will use to calculate classwide totals for each of Plaintiffs' proffered measures.

evidentiary record before the Court, Plaintiffs should be permitted to present the Full Refund measure to the finder of fact.

<u>Promised Percentage Discount</u>:

The heart of this case is that Plaintiffs and Class members were fraudulently induced to purchase Columbia's outlet-exclusive products by Columbia's use of illusory discounts. Plaintiffs' testimony is clear that the promised discount, which they calculated using the reference price as a starting point, is what drove their purchase decisions. PSDF, PF Nos. 6-7, 12-14; N. Stathakos Dep., 31:5-6, 34:15-38:9, 89:4-90:9, Ex. 2; J. Stathakos Dep., 30:14-15, 39:3-10, 46:22-23, 86:11-13, Ex. 1; N. Stathakos Reply Decl., ¶¶ 4-7; J. Stathakos Reply Decl., ¶¶ 4-8.

California courts have held that plaintiffs may "seek some [damages or restitution] amount representing the disparity between their expected and received value," which in this case can be measured by the "expected" discount as reflected as the percentage difference between the reference price and the lower "outlet price" appearing on the price tag. *See Astiana v. Kashi Co.*, 291 F.R.D. 493, 506 (S.D. Cal. 2013) (granting class certification where plaintiffs proposed partial refund model for restitution and damages based on allegedly false representations that food products were "All Natural"); *Thurston v. Bear Naked, Inc.*, No. 11-CV-2985-H BGS, 2013 WL 5664985, at *10 (S.D. Cal. July 30, 2013) (same).

Under the Promised Percentage Discount model, Plaintiffs and members of the class recover the percentage discount they were promised, measured against the amount they actually spent. To determine the promised discount, Mr. Olsen compared the higher reference price for each Outlet SMU Build to the lower outlet price to determine the amount of "discount" represented by the price tag. *See* A. Olsen Report, 7, Dkt. 61-13; PSDF, PF No. 16. For example, if an Outlet SMU Build's price tag bore a higher price of $100 and an outlet price of $80, the promised percentage discount is 20%. Mr. Olsen then applied the promised percentage discount to the amount *actually paid* by the consumer in each transaction to calculate the amount attributable to the misrepresented discount in each transaction. *Id.* Applying this Promised Percentage Discount analysis to each individual transaction using Columbia's updated data, Mr. Olsen calculated class-wide monetary recovery of

$486,873.31 for the seven-item sample he examined. A. Olsen Rebuttal Report, ¶ 7. As the court held in *Spann*, "this [promised percentage discount] method of restitution does not fail as a matter of law," such that "Plaintiff[s] [are] entitled to argue that payment of the [promised percentage discount], if measurable and supported by evidence, would restore sums acquired through defendant's allegedly unfair pricing practices." *Spann*, 2015 WL 1526559, at *7.[20]

<u>Disgorgement of Profit:</u>

As Plaintiffs explained in their opening motion, Dkt. 61 at p. 22, restitutionary disgorgement of profit is a well-accepted method for calculating restitution and damages under California's consumer protection laws where, as here, the recovery will "replace . . . money or property that defendants took directly from [the] plaintiff." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (Cal. 2003); *see also Zeisel v. Diamond Foods, Inc.*, No. C 10-01192 JSW, 2011 WL 2221113, at *10 (N.D. Cal. June 7, 2011) (finding that plaintiff had presented a likely method for determining class damages where plaintiff proposed proving restitutionary disgorgement by relying on documents produced by Diamond relating to net sales, profits, and costs, as well as retail prices of its Shelled Walnut Products."); *Astiana*, 291 F.R.D. at 506 (determining that restitution based upon "sales, profits and prices" was a "viable theory of how to calculate [restitution]."); *Aguayo v. U.S. Bank*, 200 F.Supp.3d 1075 (S.D. Cal. 2016) (finding that a class of borrowers were entitled to recover a bank's profits as restitution). Columbia does not address these authorities, focusing instead on *Tobacco II*, which itself confirms the rule that restitutionary disgorgement is a permissible form of recovery in a false advertising case:

> There are two types of disgorgement: restitutionary disgorgement, which focuses on the plaintiff's loss, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment. Typically, the defendant's benefit and the plaintiff's loss are the same, and restitution requires the defendant to restore the plaintiff to his or her original position … The California Supreme Court has held that, while restitutionary disgorgement may be an available remedy under the UCL, nonrestitutionary disgorgement is not available in a UCL individual action or in a UCL representative action...

---

[20] Columbia's only authority in opposition to the Promised Percentage Discount model is *Chowning*, 2016 WL 1072129, at *10. Def., 20, Dkt. 75. Columbia erroneously argues that *Chowning* relied on *In re Tobacco II* in reaching in concluding that plaintiffs' promised discount measure of relief was inappropriate. The *Chowning* court did not rely on *Tobacco II* in this regard, however; rather, the court simply noted that while *Spann* viewed promised percentage discount as an acceptable form of restitution, *Chowning* found the measure too closely akin to expectation damages. *Id.*

*Tobacco II*, 240 Cal.App.4th at 800 (internal quotations and citations omitted).

Where, as here, the disgorgement measure will return money *spent by Plaintiffs*, it is focused on the losses of the Plaintiffs, not the gains of the defendant. As such, it is restitutionary in nature. In addition, Plaintiffs offer proof of their losses through testimony indicating that they would not have purchased Columbia's mislabeled Outlet SMU Builds but for Columbia's illusory discounts. PDSF, PF Nos. 5-7, 12-13. Moreover, the delta between Columbia's landed cost and what Class members actually paid for Columbia's Outlet SMU Builds can be calculated with precision by reference to Columbia's detailed sales data. *See* A. Olsen Report, ¶17, Dkt. 61-13; PSDF, PF No. 16. By subtracting the landed cost of each garment in each season from the *actual amount a consumer paid* for each item using Columbia's updated data, Mr. Olsen calculated a total disgorgement figure of $637,478.88 for the sample of seven Outlet SMU Builds Plaintiffs purchased. A. Olsen Rebuttal Report, ¶ 7. On these facts, Plaintiffs are entitled to argue that disgorgement is a proper measure of recovery.

In support of its effort to defeat the disgorgement remedy, Columbia points to Judge Klausner's lament, in *Chowning*, that "a gap in statutory coverage" allowed defendant Kohl's to get away with its misleading pricing scheme. *See* Def., 21, Dkt. 75. In other words, Columbia seems to argue that it should get away with its misleading pricing because of a gap in consumer protection law. But Judge Klausner grudgingly read in a legislative gap where there isn't one. Judge Klausner worried that "a retailer [could] sell an item for $35 dollars between January and March, then advertise in April that the item has an 'original price' of $80 but is now on sale for $30. Even though the item never sold for $80, the retailer [could] evade restitution under the price/value differential measure simply by arguing that, despite the misrepresentation, the value of the item ($35) exceeded the price consumers paid ($30)." *Chowning*, 2016 WL 1072129, at *12. That scenario, however, fails to account for restitutionary recovery of defendant's ill-gotten profits from a transaction where a plaintiff paid money based on a falsely advertised original price of $80.

As the court in *Korea Supply Co.* reaffirmed, "an order for restitution is one compelling a UCL defendant to return money obtained through an unfair business practice to those persons in

interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply Co.*, 29 Cal. 4th at 1144-45, 1149 (citations omitted). Here, the unlawful business practice is Columbia's practice of including a misleading reference price on price tags. Plaintiffs have an ownership interest in the money they paid for the Outlet SMU Build they purchased as a result of Columbia's deceptive pricing scheme. As a result, Columbia may not keep its ill-gotten gains from a sale that stemmed from its unfair practice.

In his analysis of restitutionary disgorgement, Judge Klausner discussed *Korea Supply Co.* and emphasized that profits may be recovered "to the extent that these profits represent monies given to defendant" and then concluded that "the amount of restitutionary disgorgement cannot simply be the profit that a defendant earns by defrauding a plaintiff, instead it must represent the amount the plaintiff lost as a result of the defendant's deceptive practices." *Chowning*, 2016 WL 1072129, at *8. The court in *Korea Supply Co.*, however, did not hold that the amount had to be what plaintiff *lost*. To the contrary, the court merely held that a plaintiff must have some ownership interest in money or property given to a defendant. The plaintiff in *Korea Supply Co.* had simply never given any money to the defendant.[21] The court's decision in *Aguoyo* is apposite. *Aguoyo*, 200 F.Supp.3d at 1075. In *Aguoyo*, a bank had earned profits on unlawfully collected deficiency payments. *Id.* The court concluded that restitutionary disgorgement was appropriate and that the plaintiffs had shown an ownership interest because the profits plaintiffs sought to disgorge "were earned on money U.S. Bank unlawfully took from class members." *Id.* Stated otherwise, even though the bank's profits exceeded the amount that plaintiffs in *Aguoyo* lost, the court concluded that the plaintiffs were "entitled to U.S. Bank's profits earned from the deficiency payments to the extent that Plaintiffs can produce evidence permitting at least a reasonable approximation of the amount of the wrongful gain." *Id.* Since Plaintiff's expert Arthur Olsen has shown that Columbia's profits on the Outlet

---

[21] *Korea Supply Co.*, 29 Cal. 4th at 1149 ("The remedy sought by plaintiff in this case is not restitutionary because plaintiff does not have an ownership interest in the money it seeks to recover from defendants. First, it is clear that plaintiff is not seeking the return of money or property that was once in its possession. KSC has not given any money to Lockheed Martin; instead, it was from the Republic of Korea that Lockheed Martin received its profits. Any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff.").

SMU Builds can be ascertained, Plaintiffs and the class members they seek to represent are entitled to those profits that Columbia wrongfully gained.

### 3. Plaintiffs Need Not Prove the Value of the Outlet SMU Builds They Purchased to Establish Entitlement to Monetary Relief

Columbia's suggestion that a "market value" determination is required to measure monetary relief rests on the flawed premise that price to value differential is the only viable measure of relief. As discussed in Plaintiffs' opening motion, alternate measures of recovery are permitted. *See also supra* §§ III.C(1)-(2). Plaintiffs' proposed measures of damages can be calculated by reference to the detailed transactional sales data Columbia has produced in this case without a separate analysis of the "market value" of Columbia's deceptively priced products. *See generally* A. Olsen Report, Dkt. 61-13; A. Olsen Rebuttal Report. Because Plaintiffs do not rely on a price to value measure, Plaintiffs have not attempted to present evidence of market value. If the Court is persuaded that price to value differential is the only appropriate measure of relief, Plaintiffs would respectfully request 90 days in which to develop the evidence in support of such a measure. PSDF, PF No. 8.

## IV. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION SHOULD BE GRANTED

Courts have "broad discretion" in determining whether to certify a class. *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *2 (N.D. Cal. July 15, 2016) (certifying statewide class in false labeling action). In exercising that discretion, "[d]istrict courts in California routinely certify consumer class actions arising from alleged violations of the CLRA, FAL, and UCL," which do not require class wide proof of causation, injury, or reliance. *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012). This case is well suited for certification under Rules 23(b)(3) and (b)(2) because the evidentiary record demonstrates that Columbia's company-wide pricing practices for Outlet SMU Builds sold during the class period uniformly violated the FAL, the CLRA, and the UCL. As addressed below, Plaintiffs satisfy the requirements for certification under Rule 23(b)(2) and 23(b)(3), and certification should be granted under both sections. *In re NCAA Student-Athlete Name & Likeness Litig.*, No. C 09-1967 CW, 2013 U.S. Dist. LEXIS 160739, at *30-31 (N.D. Cal. Nov. 8, 2013) ("Plaintiffs seek to certify one class under Rule 23(b)(2) to pursue declaratory and injunctive relief and another class under Rule 23(b)(3) to pursue

monetary relief. Nothing in the federal rules or existing case law prevents them from seeking certification under both provisions.").

### A. Plaintiffs Have Satisfied the Requirements of Rule 23(a) and 23(b)(3)

#### 1. Class Membership May be Determined Through Objective Criteria

The Ninth Circuit recently held that there is no ascertainability requirement under Rule 23, and that there is no requirement that the determination of membership in the class must be administratively feasible. *Briseno v. ConAgra Foods, Inc.*, 2017 844 F.3d 1121, 1130-31, 1133 (9th Cir. Jan. 3, 2017). The appropriate inquiry regarding the class definition is merely whether membership can be determined through objective criteria. *Id.* at 1124, fn. 4, 6; *see also Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *18 (C.D. Cal. July 1, 2013). Here, Plaintiffs' class definition is objective. The Class comprises all Consumers who have purchased an Outlet SMU Build at a Columbia outlet store in California since July 1, 2014, through the conclusion of this action. As such, any California resident who purchased an Outlet SMU Build will be able to objectively determine whether he or she is a member of the class.

#### 2. Numerosity is Satisfied

It cannot be disputed that the proposed classes are "so numerous that joinder of all members is impracticable." *See* Motion, Dkt. 61, at 8 (listing evidence showing, for example, that tens of thousands of people bought the seven products during the relevant time period, and that Columbia sells an additional 573 Outlet SMU Build products); *see also Stitt v. S.F. Mun. Transp. Agency*, No. 13-CV-3704 YGR, 2014 WL 1760623, at *3 (N.D. Cal. May 2, 2014). Columbia claims that numerosity has not been satisfied because there is no evidence the reference prices were invalid, or that anyone relied on the reference prices. Def. at 28. But those issues are common questions affecting a group of numerous purchasers who purchased one of the 580 Outlet SMU Build products. Therefore the proposed class meets the numerosity requirement.

#### 3. Plaintiffs' Claims Are Typical

Without a single citation to the factual record, Columbia argues that Plaintiffs are atypical because "they did not rely on the reference prices at all and also did not receive any items worth less than what they paid." Def., 34, Dkt. 75. Contrary to Columbia's sweeping argument, the record

reflects that Plaintiffs are bargain-hunters who have purchased numerous items at Columbia Outlet stores since 2009. J. Stathakos Dep., 14:4–12, Ex. 1. Like the class members they seek to represent, Plaintiffs based their purchasing decisions on their reasonable but mistaken understanding that the higher reference prices printed on Outlet SMU Build price tags were true former prices. *Id.* at 30:2-30:20; N. Stathakos Dep., 89:3-90:8, Ex. 2. Because the outlet SMU Builds Plaintiffs purchased were never sold at the higher price, Plaintiffs were "duped" and "fooled," because they "made a decision on . . . false information." *See* N. Stathakos Dep., 70:20–71:19, Ex. 2; J. Stathakos Dep., 26:6–14, 83:7–21, Ex. 1 ("But if I had all the facts about Columbia's products, Columbia's pricing, I may have made other decisions about whether to buy the items at the time . . . I spent money that I may not have spent."). Thus, the evidence demonstrates that Plaintiffs relied on the reference prices to their detriment, which is consistent with the claims and interests of the unnamed class members. *See Kumar*, 2016 WL 3844334, at *4.

As discussed above, Plaintiffs amply demonstrate their standing. *See supra* § III.B(1). Moreover, as Columbia's insistence that the difference between price paid and valued received is the only viable measure of relief in this case is wrong. *See supra* § III.C(1)-(3). But even if Columbia was correct (and it is not) that defense would apply equally to Plaintiffs and all class members.

### 4. Plaintiffs Are Adequate Class Representatives

In analyzing Rule 23(a)(4), a court must determine "(1) [whether] the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Columbia does not challenge that the Plaintiffs' interests are aligned with the interests of the class. Moreover, the factual record demonstrates that Plaintiffs are willing, able, and eager to prosecute the action vigorously on behalf of the class. *See* N. Stathakos Decl., ¶¶ 5-13, Dkt. 61-10; J. Stathakos Decl., ¶¶ 5-13, Dkt. 61-9. Likewise, Plaintiffs' counsel is fully prepared to prosecute this action. The law firms of Tycko & Zavareei LLP and Kopelowitz Ostrow Ferguson Weiselberg Gilbert, which seek appointment as

class counsel here, have a proven track record of excellence and success in consumer class actions.[22] Plaintiffs and their counsel are adequate to represent the proposed Class.

## 5. Fundamental Questions of Law and Fact Predominate and Can Be Proven with Common Evidence

As detailed in Plaintiffs' Motion, common questions exist and predominate in this litigation. None of Columbia's argument counsel to the contrary. Motion, 8-15, 17-23, Dkt. 61. In its discussion of commonality, Columbia again advances the unsupported theory that its reference prices cannot be misleading if some other product sold for that price. Def., 28-29, Dkt. 75. Again, Columbia's novel construction of the law finds no support in California's robust consumer protection statutes or the cases interpreting them. *See supra* § III.A(1). Next, Columbia mistakenly argues that Plaintiffs have failed to present evidence that Columbia's reference prices are misleading or material to themselves or the class. Def., 29, Dkt. 75. Columbia overlooks the undisputed fact that its pricing scheme is common to all Outlet SMU Builds within the proposed class definition, both as to the use of higher reference prices, and the look of the price tags used to display them. *See supra* §§ II.A-B. Moreover, the record is rife with evidence that Plaintiffs were bargain hunters who cared about price and carefully considered discounts, which they calculated using Columbia's false reference prices. *See*, *e.g.*, *supra* §§ II.D, III.B(1). Both Plaintiffs were repeatedly deceived by Columbia's pricing scheme and acted to their detriment in reliance on it, before and after they filed their complaint. *See*, *e.g.*, *supra* § II.E.

Columbia's argument that its survey evidence can defeat class certification ignores what its own survey actually showed. As discussed above, Columbia's survey provides very strong evidence that (1) a vast majority of consumers understand Columbia's reference prices to be former prices; and (2) consumers perceive the value of an Outlet SMU Build to be lower when they are told that the reference price actually refers to some other product. *See supra* §§ II.D, III.A(2), III.B(2); *see also generally* Poret Rebuttal Report. More importantly, however, the Ninth Circuit has held that

---

[22] While Columbia indulges in some mud-slinging aimed at Plaintiffs' counsel, it refrains from actually arguing that counsel is inadequate. *See* Def., 8-9, Dkt. 75. Wayne Kreger, who is the target of Columbia's most pointed criticism, has had no contact with Nick or Jeanne Stathakos and does not seek appointment as class counsel in this matter. *See* Sagafi Reply Decl., ¶¶ 10-19.

misleading price representations, and particularly false markdowns, are *per se* material under California law, which gives rise to a class-wide inference of reliance. *Hinojos*, 718 F.3d at 1107. None of Columbia's cases holds otherwise.[23]

Finally, as fully addressed in Plaintiffs' Motion and above, Plaintiffs' proffered measures of monetary relief are properly tied to Plaintiffs' theory of liability; namely, that Columbia's price tags advertise a false discount, which induces consumers to purchased products they otherwise would not buy. *See* Motion, 20-23, Dkt. 61; *supra* § III.C. Further, monetary relief is calculable based on data within Columbia's possession and control, and has been approved in similar cases within this Circuit. *See Spann*, 307 F.R.D. at 530. None of the models would compensate class members for damages except those attributable to Columbia's precise misrepresentations on their price tags, and money consumers actually spent based on those representations. Plaintiffs' proposed damages and restitution models are therefore consistent with *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013), and Ninth Circuit authority interpreting it, and predominate over individual issues.

### 6. A Class Action is Superior to Thousands of Individual Cases

Columbia's sole argument with respect to superiority is that a class action will be unmanageable because "deception, reliance, materiality, and damages raise individual issues." Def., 36, Dkt. 75. As outlined above, Columbia implemented a uniform deceptive pricing scheme that applies equally to all members of the Class. *See supra* § II. Moreover, the Ninth Circuit has held that misleading price representations, and particularly false markdowns, are *per se* material under California law, which gives rise to a class-wide inference of reliance. *Hinojos*, 718 F.3d at 1107. As addressed in Plaintiffs' Motion, Columbia has produced complete sales and design records for all

---

[23] Columbia's reliance on *McVicar v. Global, Inc.*, No. C 12–01633, 2015 WL 4945730 (C.D. Cal. Aug. 20, 2015) is misplaced. In *McVicar*, the proposed class consisted of air conditioner owners – most of whom were never exposed to any statements or advertising from the defendants because the defendants marketed exclusively to contractors not to consumers. *Id.* at *12. Thus, it's unsurprising that consumer survey results showed that a disclosure related to a copper evaporator coil meant little to consumers who (i) were not sophisticated contractors, and (ii) were not making the decision to purchase the air conditioner in the first place. *Id.* Here, on the other hand, every purchaser is exposed to the pricing scheme at issue during their *own* decision to purchase. *Jones v. ConAgra Foods, Inc.*, SA CV 13-1223, 2014 WL 2702726 (C.D. Cal. June 13, 2014) is also distinguishable. While there may be no common understanding of the term "All Natural" during a purchasing decision, every consumer evaluates price when he or she decides whether or not to pay for a product.

seven of the Outlet SMU Builds Plaintiffs purchased, and have confirmed that the same information exists as to all 580 total Outlet SMU Builds. *See supra* § II.A; Bui Dep., 21:14–23:19, Ex. 5. Based on those data, Plaintiffs' expert has already computed classwide restitution and damages figures, none of which Columbia disputes. *See* A. Olsen Report, Dkt. 61-13; A. Olsen Rebuttal Report. Likewise, virtually every question of liability and damages will be proven by common proof, and class notice and trial will be manageable. *See* Motion, 23-34, Dkt. 61. Nothing further is required to demonstrate manageability.

## B. Certification Under Rule 23(b)(2) is Proper

Columbia argues that certification of a Rule 23(b)(2) class is inappropriate because Plaintiffs also seek certification under Rule 23(b)(3). *See* Def., 36-38, Dkt. 75. But nothing in the Rule itself or the interpretative case law supports the notion that Rule 23(b)(2) and Rule 23(b)(3) provide mutually exclusive remedies. *See* Fed. Rule Civ. P. 23; *see also*, *e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 987-88, n.10 (9th Cir. 2011) (recognizing that the district court could certify a damages class under Rule 23(b)(3) separate from, or in addition to, an injunctive relief class under Rule 23(b)(2)); *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, Case No. C-10-02553, 2012 WL 2428248, at *8 (N.D. Cal. June 26, 2012); *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 591 (C.D. Cal. 2011) (certifying a Rule 23(b)(2) class in addition to a Rule 23(b)(3) class); *Manual for Complex Litigation*, Fourth § 32.42. Columbia's attempt to import an exclusivity provision into Rule 23 should be rejected.

Ignoring the plain language of Rule 23, Columbia misleadingly claims that "[w]here, as here, the complaint seeks on behalf of a putative class both injunctive relief and monetary relief, Rule 23(b)(2) certification is not appropriate where the monetary relief sought is superior [in] strength, influence, or authority to injunctive [] relief." *See* Def. at 37 (internal quotations omitted). Columbia, however, conflates the relief that Plaintiffs seek under Rule 23(b)(3) – damages – with the relief Plaintiffs seek under Rule 23(b)(2) – injunctive relief. The Court's decision in *Roy v. County of Los Angeles*, Nos. CV-12-090122016, CV 13-04416 2016, WL 5219468, at *16-17 (C.D. Cal. Sept. 9, 2016) is instructive. Like Columbia does in this case, in *Roy*, the defendants argued that

certification of the plaintiffs' claims under Rule 23(b)(2) would be inappropriate because the plaintiffs' claims for damages under Rule 23(b)(3) predominated over their injunctive claims under Rule 23(b)(2). *Id.* The court was not persuaded, explaining that:

> [T]here is a difference between seeking damages for a class certified under Rule 23(b)(2) and seeking to certify separate classes in the same action in which injunctive relief is sought for classes certified under Rule 23(b)(2) and damages are sought for classes certified under Rule 23(b)(3).

*Id.* Accordingly, the *Roy* court certified a Rule 23(b)(2) class and held that the question of "whether the damages claims are incidental to the injunctive relief the [] plaintiffs [sought] is irrelevant, because the [] [p]laintiffs [were] not seeking to recover damages for the proposed Rule 23(b)(2) classes." *Id.* at 16-17. And so it is here. Because Plaintiffs seek damages under Rule 23(b)(3), and not under Rule 23(b)(2), the question of whether the damages Plaintiffs seek are incidental to the injunctive relief Plaintiffs seek is irrelevant. *See id.*

None of Columbia's cases support the proposition that a plaintiff seeking monetary relief on behalf of a class under Rule 23(b)(3) cannot also seek injunctive relief on behalf of a class under Rule 23(b)(3). In *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 458-59 (S.D. Cal. 2014), the court concluded injunctive relief was not appropriate because purchasers could readily discern whether or not the claim that the makeup would last 24 hours was true such that purchasers of the products were unlikely to be deceived in the future. *See also Nilon v. Natural-Immunogenics Corp.*, 2013 WL 5462288, at *1, n.2 (N.D. Cal. Sept. 30, 2013) (injunctive relief inapplicable where plaintiff alleged a supplement was worthless and that he would not buy it again).[24]

Here, Plaintiffs and the class remain at risk for future deception and harm arising from Columbia's misleading prices. Columbia concedes that consumers cannot distinguish Outlet SMU

---

[24] *But see Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533-34 (N.D. Cal. 2012) (finding standing for injunctive relief and explaining that "Defendants argue further that plaintiffs are not threatened by future harm because they are now aware of the contents of AriZona beverages, and can no longer be deceived; …. should plaintiffs encounter the denomination "All Natural" on an AriZona beverage at the grocery store today, they could not rely on that representation with any confidence."); *Dean v. Colgate-Palmolive Co.*, No. EDCV 15–0107, 2015 WL 3999313, at *7-8 (C.D. Cal. June 17, 2015); *Mollicone v. Universal Handicraft, Inc.*, No. 16-cv-07322-, 2017 WL 440257, at *7-8 (C.D. Cal. Jan. 20, 2017) (same); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 67-68 (E.D.N.Y. 2015).

Builds, which are never sold at the higher price on the price tag, from true overstock items, which were at some point sold at the higher reference price. *See supra* § IIE. In fact, as discussed above, even after discovering Columbia's reference pricing scheme, Plaintiffs continued to be deceived by it, because they remained uncertain about which discounts were real and which were illusory. *Id.* As a result, there is no question that, absent an injunction, Plaintiffs and the class will continue to be deceived by Columbia's pricing scheme.

*Mahfood v. QVC, Inc.*, No. SACV 06-0659, 2008 WL 5381088, at *3-5 (C.D. Cal. Sept. 22, 2008) is also inapposite. In *Mahfood*, QVC sold products on television by listing a retail price along with the lower price that QVC offered. *Id.* at *1. The court concluded that there was no single practice or policy affecting the class members because the products QVC offered for sale may have been sold in other retail channels at the higher advertised prices. *Id.* at *5. Thus, individual inquiries would be required to determine whether QVC's advertised retail value for any particular product was an accurate reflection of the product's actual selling price in a vast and undefined marketplace. *Id.* *4-5. As a result, it could not be shown that QVC had refused to act on grounds generally applicable to the class. *Id.* at *3.[25] Here, however, it is undisputed that Outlet SMU Builds are never sold anywhere but Columbia Outlet stores and never offered for sale at the higher price printed on the tag. *See supra* § II.A. Thus, there is no need to look beyond Columbia's Outlet stores to determine whether the reference prices for Outlet SMU Builds reflect actual former prices. They don't. Ever.

Moreover, Columbia's argument that "a class representative, realizing that a Rule 23(b)(3) class is not appropriate workable because a monetary award cannot be proven classwide, cannot ditch his and the putative class's claims for damages in favor of an injunction only" is meritless. *See* Def. 36. To the contrary, a Rule 23(b)(2) class can be certified where the court finds no workable method of calculating classwide damages under Rule 23(b)(3). *See*, *e.g.*, *Lanovaz v. Twinnings N. Amer. Inc.*, No. C-12-02646, 2014 WL 1652338, at *4-7 (N.D. Cal. Apr. 24, 2014).

---

[25] Similarly, in *In Campion v. Old Republic Home Protection Co., Inc.*, 272 F.R.D. 272 (S.D. Cal. Jan. 6, 2011), individualized hearings would have been required to determine each class member's entitlement to injunctive relief, a cumbersome process that would have run afoul of Rule 23(b)(2)'s requirement that the relief must be applicable to the class as a whole

Further, contrary to Columbia's contention that monetary relief automatically predominates over injunctive relief, it is well established that restitutionary relief under the UCL and FAL is "ancillary" to injunctive relief. *Compare* Def. at 37 *with In re Tobacco Cases,* 46 Cal.4th 298, 319 (2009). Thus, if the Court finds that injunctive relief is appropriate with respect to the class as a whole, Plaintiff may also seek restitutionary relief. *See Hofstetter v. Chase Home Finance*, LLC, 2011 WL 1225900, at *15 (N.D.Cal. Mar.31, 2011).

In a last effort to shield themselves from a Rule 23(b)(2) class, Columbia argues that a class action is not necessary to achieve injunctive relief. *See* Def., 38, n2, Dkt. 75. Specifically, Columbia contends that granting relief to Plaintiffs individually would provide sufficient benefit to other potential class members to render the class mechanism unnecessary. That argument fails. Courts in the Ninth Circuit consistently hold that there is no "necessity" requirement to certify a class pursuant to Rule 23(b)(2). *See, e.g.*, *McMillion v. State of Hawaii*, 261 F.R.D. 536, 547-548 (D. Haw. 2012) ([D]istrict court cases in this circuit have repeatedly refuted the existence of a [necessity] requirement as a component of Rule 23(b)(2)"); *Park v. Ralph's Grocery Co.,* 254 F.R.D. 112, 123 (C.D. Cal. 2008) (same); *Ollier v. Sweetwater Union High Sch. Dist.*, 251 F.R.D. 564, 566 (S.D.Cal.2008) (same); *Californians for Disability Rights, Inc.,* 249 F.R.D. at 349 (same). If accepted, Columbia's argument would obliterate Rule 23(b)(2), which specifically provides that a class may be certified for injunctive relief where a defendant has refused to act on grounds that generally apply to the class. *See, e.g.*, *Cota v. Maxwell-Jolly*, C 09-3798, 2010 WL 11485115, at *5. Since none of Columbia's arguments counsel a different result, a Rule 23(b)(2) class should be certified because Columbia has refused to change its deceptive pricing scheme such that "injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2); *see also* Motion, 24-25, Dkt. 61.

## V.   **CONCLUSION**

As set forth above, there are questions of fact with respect to each of Columbia's three purported bases for summary judgment. Plaintiffs have also demonstrated that a class should be certified. Plaintiffs request that the Court DENY summary judgment and GRANT class certification.

Dated: March 13, 2017

Respectfully submitted,

By: _/s/ Kristen L. Sagafi_
Kristen Law Sagafi

**TYCKO & ZAVAREEI LLP**
KRISTEN LAW SAGAFI, Cal. Bar No. 222249
ksagafi@tzlegal.com
ANNICK M. PERSINGER, Cal. Bar No. 272996
apersinger@tzlegal.com
483 Ninth Street, Suite 200
Oakland, CA 94607
Telephone (510) 254-6808
Facsimile (510) 210-0571

**TYCKO & ZAVAREEI LLP**
HASSAN A. ZAVAREEI, Cal. Bar No. 181547
hzavareei@tzlegal.com
ANDREA R. GOLD, D.C. Bar. No. 502607,
admitted *pro hac vice*
agold@tzlegal.com
JEFFREY D. KALIEL, Cal. Bar No. 238293
jkaliel@tzlegal.com
1828 L Street, NW, Suite 1000
Washington, DC 20036
Telephone (202) 973-0900
Facsimile (202) 973-0950

**KOPELOWITZ OSTROW P.A.**
JEFFREY M. OSTROW, Florida Bar No. 121452
ostrow@kolawyers.com
SCOTT A. EDELSBERG, Florida Bar No. 0100537
edelsberg@kolawyers.com
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
(pro hac vice to be filed)