**EXPERT REBUTTAL REPORT OF HAL PORET IN MATTER OF STATHAKOS V. COLUMBIA SPORTSWEAR COMPANY**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**ANALYSIS OF SURVEY AND OPINIONS OF CAROL A. SCOTT, PH.D.**

REPORT PREPARED ON BEHALF OF:
Tycko & Zavareei LLP
Counsel for Plaintiffs

PREPARED BY:
Hal Poret
Hal Poret LLC
142 Hunter Ave
Sleepy Hollow, NY 10591

March 2017

### *TABLE OF CONTENTS*

**BACKGROUND AND PURPOSE**................................................................................ 1

**AUTHORSHIP AND QUALIFICATIONS**................................................................ 3

**SUMMARY OF OPINIONS** ...................................................................................... 5

**BRIEF OVERVIEW OF SCOTT SURVEY**............................................................ 6

**DETAILED ANALYSIS OF SCOTT SURVEY AND OPINIONS**...................... 10

    **I.Data and Opinions Relating to Whether the Reference Price is Misleading**
.................................................................................................................................. 11

    **II. Data and Opinions Relating to the Influence of the Reference Price on Consumer Behavior** ............................................................................................... 22

        **A.  General observations about the survey design**....................................... 22

        **B.   Specific analysis of survey data** ................................................................ 25

            **1. Questions regarding recent purchase at Columbia outlet** .................. 25

                **a. Questions about factors that influenced the purchase decision**.. 25

                **b. Questions about why respondents felt they got a good deal**....... 30

                **c. Questions about memory of the reference price on the tag.**.......... 31

              **2. Ratings of products shown to respondents in the survey**.................. 36

        **CONCLUSIONS** ........................................................................................... 43

## BACKGROUND AND PURPOSE

1.     Columbia creates and sells a variety of outdoor products, including clothing.  Columbia products are sold through a variety of channels, including: (1) by Columbia through Columbia regular (non-outlet) stores; (2) by Columbia in Columbia outlet stores; and (3) through Columbia wholesale partners (like REI) and distributors.  At Columbia outlet stores, Columbia offers for sale both products that were previously sold elsewhere (Inline Styles) and products offered for sale only at Columbia outlets (Outlet SMU Builds).

2.     In connection with products sold at its Columbia outlet stores, Columbia price tags list two prices: a higher price (reference price) and a lower price, the latter of which is the highest price the consumer pays for the product (subject to the potential for additional discounts).  In the case of Inline Styles, the reference price is the price at which that product was offered for sale through other channels.  In the case of Outlet SMU Builds, the reference price is typically the price at which a different item was offered for sale through other channels.[1]  The exact Outlet SMU Build item was never previously offered for sale at the reference price.

3.     Plaintiffs have filed a class action lawsuit alleging that Columbia's use of the higher reference price on the tags of Outlet SMU Builds is misleading in that it would communicate to consumers that the item was previously offered for sale at the higher reference price.

4.     In connection with the lawsuit, Defendant has submitted the Declaration of Carol A. Scott, Ph.D., concerning a survey that Dr. Scott conducted (Scott

---

[1] Columbia's position is that the different item is the "inline counterpart" of the Outlet SMU Build and is a similar item of similar quality.

Survey and Declaration).  Based on the survey, Dr. Scott states a number of opinions.  While Dr. Scott does not articulate with specificity how her findings or opinions relate to any specific issues in the lawsuit, the gist of her opinions appear to be that prospective class members (Columbia Outlet purchasers) are not consistently misled by or influenced by the higher reference price on the tags of Outlet SMU Builds.

5.      Tycko & Zavareei LLP, counsel for Plaintiffs, retained me to review and analyze and provide my opinions regarding the Scott Survey and Declaration. This report contains such opinions.  As discussed in more detail below, my main opinion is that the data from Dr. Scott's Survey does not support the opinions stated in Dr. Scott's Declaration.  To the contrary, much of the data supports the conclusion that the higher reference price on the tags of Outlet SMU Builds are misleading to consumers and that the higher reference price has a significant influence on consumers' perception of the value of the deal they are getting and their likelihood of purchase.  This is true even accepting the data and Dr. Scott's coding of the answers on its face, as much of the data Dr. Scott collected contradicts her stated opinions.  In addition, flaws in Dr. Scott's coding and presentation of the data obscure the degree to which the data actually supports Plaintiffs' position – in particular, Dr. Scott's practice of breaking up answers that essentially have the same meaning into multiple different coding categories to create the appearance of variation and to minimize the magnitude of various findings, when a proper analysis of the data shows very high rates of consumers sharing perceptions that are consistent with Plaintiffs' allegations.  Certain other flaws, discussed in detail below, also undermine Dr. Scott's opinions.

6.      In the course of preparing this report, I reviewed the following materials: (1) Declaration of Carol A. Scott, Ph.D. with Exhibits and raw data Excel file; (2) Plaintiffs' Memorandum of Points and Authorities in Support of Motion for

Class Certification; (3) Columbia's Notice of Motion and Motion for Summary
Judgment and Opposition to Plaintiffs' Motion for Class Certification; (4)
Columbia Sportswear website; (5) Scott Deposition Transcript.  My work in
connection with this matter will be charged at my ordinary rate of $625 per hour.
My fees are not contingent on the outcome of this litigation or on the opinions set
forth herein.

## AUTHORSHIP AND QUALIFICATIONS

7.      This report was authored by Hal L. Poret, President of Hal Poret LLC
Survey Research and Survey Consulting.

8.      I have personally designed, supervised, and implemented over 1,000
surveys regarding the perceptions and opinions of consumers and professionals.
Well over 100 have involved issues relating to potential false or misleading
advertising.  I have personally designed numerous studies that have been
admitted as evidence in legal proceedings and I have been accepted as an expert
in survey research on numerous occasions by U.S. District Courts, the Trademark
Trial and Appeal Board, the FTC, the FCC, and the National Advertising
Division of the Council of Better Business Bureaus (NAD).

9.      I am a member of the American Association of Public Opinion Research,
publisher of *Public Opinion Quarterly* and the *Journal of Survey Statistics and
Methodology,* the Council of American Survey Research Organizations (CASRO),
the International Trademark Association, and the National Advertising Division
of the Council of Better Business Bureaus (NAD).  I routinely conduct market
research surveys for a variety of small to large corporations and organizations.

10.     I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Association of National Advertisers, Practicing Law Institute, Managing Intellectual Property, Brand Activation Association (formerly Promotions Marketing Association), American Conference Institute, and various bar organizations.

11.     In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School. Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

**SUMMARY OF OPINIONS**

12.     As detailed below, it is my opinion that, to the extent that the Scott Surveys elicited reliable and useful data, the data supports the conclusion that the higher reference price is frequently interpreted as a price that the same product was previously offered for sale and has a significant tendency to influence perception of the value of the deal and purchase decisions.

**BRIEF OVERVIEW OF SCOTT SURVEY**

13.     The following are abbreviated summaries of the Scott Survey and opinions, which are more fully detailed in the Scott Declaration and in the Detailed Analysis section below.

14.     The Scott Survey was a mall-intercept survey conducted in three locations in California – the Northridge Fashion Center in Northridge, CA, The Great Mall in Milpitas, CA, and the Solano Mall in Fairfield, CA.

15.     The key criteria for qualifying for the survey was that respondents answered that they had shopped at a "Columbia Sportswear Outlet" in the past 12 months.

16.     For all respondents, the first portion of the survey consisted of a series of questions asking about their most recent purchase at a Columbia Sportswear Outlet.

17.     The second portion of the survey concerned a hypothetical simulation in which respondents were shown and asked about a product as if they were seeing it while shopping in a Columbia Sportswear Outlet store.

18.     In Version A of the second portion of the survey, the following occurred:

- Half of the respondents were shown a Blue Jacket that had been sold at a Columbia Outlet store.

- Half of the respondents were shown a Black Jacket that was not an Outlet SMU Build, but which Dr. Scott characterizes as a "comparable" jacket that was sold in regular retail stores.

19.     Both jackets displayed a price tag including the higher reference price and the lower price the customer would pay:



20.     All respondents were then asked a series of questions regarding their perceptions of the product and the value of the deal they were getting.

21.     In version B, respondents were shown <u>both</u> the blue jacket (with the same price tag shown above listing the higher reference price and the lower price) and the black jacket with the following tag showing only a higher price:



22.     Respondents were first shown the blue jacket and told that the higher price on the blue jacket was not the regular price of the jacket, but instead that "it actually is the price you would pay for a similar product – but not identical product – in a regular retail sporting goods store like R.E.I. or Big 5." They were then shown the black jacket and told it was the similar product that would normally sell at the higher price in a regular store.

23.     Respondents were then asked the same questions about the blue jacket as in Version A.

24.     There was no version in which respondents were shown the price tag with <u>only</u> the lower price (and not the higher reference price) to test whether there is any difference in consumer response when the allegedly misleading higher reference price is not present.

25.     At the end of the survey, all respondents were then asked a question about which types of products they would expect to find in a Columbia Sportswear Outlet Store, with the following choices:

- The exact same products as those previously sold in a regular sporting goods store, like R.E.I. or Big 5, for example.
- The exact same products sold in a regular sporting goods store except for one or two flaws, that is, what some people would call "irregular" merchandise.
- Products very similar to, but not exactly the same as, those that are sold in a regular sporting goods store.  For example, they could be different colors, or have minor style differences.
- Products that were made specifically for sale at Columbia Sportswear Outlet Stores.  That is, they are sold only at Columbia Sportswear Outlet stores.

26.    No choice offered the option that respondents would expect to find the same products previously sold in a regular Columbia Sportswear store (non-outlet).

27.    Based on the surveys, Dr. Scott states the following opinions (Paragraph 7):

  a.  Columbia store shoppers in California consider a number of factors including the style, size and fit, overall quality, and color of the product as well as price when deciding to purchase a product from Columbia stores.  More consumers rated these factors as important to them than the discount they may or may not have been receiving by buying the product at the Columbia Sportswear Outlet store.

b.  There is no overall consensus among California Columbia store shoppers as to the meaning of the higher price listed on price tags on products in the Columbia stores, nor does the higher price appear to be drive perceptions of the value of the deal when purchasing an outlet store product.

c.  California consumers perceive the quality of the outlet and comparable regular retail products in my study to be the same, and their interest in purchasing the outlet product is not affected by knowledge that the higher price on the price tag does not refer to a "regular" price of the exact same product but instead refers to the price of a similar – but not identical – product sold in regular retail stores.

d.  Most California consumers expect to see different types of merchandise offered for sale in Columbia outlet stores, including products made specifically for sale at the outlet stores and products that are similar, but not identical, to items sold in regular retail stores.

## DETAILED ANALYSIS OF SCOTT SURVEY AND OPINIONS

28.     On a general level, there are two main categories of issues that the Scott data and opinions relate to: (1) the extent to which the higher reference price on Outlet SMU Builds is <u>misleading</u> to consumers – i.e., that the higher price leads consumers to the mistaken belief that the same item was previously offered for sale at a higher price; and (2) the extent to which the higher reference price has a meaningful <u>impact</u> on consumers' perception that they are getting a good deal on the product and <u>influences</u> their behavior.  It is useful to address these issues and how the data relates to them one at a time.

I. **Data and Opinions Relating to Whether the Reference Price is Misleading**

29.     One aspect of Dr. Scott's opinions relates to the issue of whether the higher reference price is misleading to consumers.  In the first portion of the following opinion (Paragraph 7, Scott Declaration), Dr. Scott indicates that there was not an overall consensus on the meaning of the higher reference price:

> b.  There is no overall consensus among California Columbia store shoppers as to the meaning of the higher price listed on price tags on products in the Columbia stores, nor does the higher price appear to be drive perceptions of the value of the deal when purchasing an outlet store product.

30.     The portion of the Scott Survey that most directly addresses this topic is Question 13 of Survey Version A, in which respondents were shown the blue jacket with the higher reference price included on the tag and asked:

> In your own words, what do you think the higher price on the tag represents?

31.     In Exhibit H-16, Dr. Scott presents the data from this question as follows:

**13. In your own words, what do you think the higher price on the tag represents? (VERSION A ONLY)**

|  | Fairfield | | Northridge | | Total | |
|---|---|---|---|---|---|---|
|  | Freq. | % | Freq. | % | Freq. | % |
| Original or first sale price, actual price | 21 | 28.8% | 39 | 52.0% | 60 | 40.5% |
| Retail price | 9 | 12.3% | 5 | 6.7% | 14 | 9.5% |
| Price before it "went on sale", the "sale" price | 8 | 11.0% | 6 | 8.0% | 14 | 9.5% |
| Price in another store | 8 | 11.0% | 4 | 5.3% | 12 | 8.1% |
| Discount/Before discount price | 2 | 2.7% | 7 | 9.3% | 9 | 6.1% |
| Quality/durability | 5 | 6.8% | 3 | 4.0% | 8 | 5.4% |
| Two prices are not real; marketing tool | 5 | 6.8% | 2 | 2.7% | 7 | 4.7% |
| Other (1 or 2 responses) | 4 | 5.5% | 2 | 2.7% | 6 | 4.1% |
| Regular price | 1 | 1.4% | 3 | 4.0% | 4 | 2.7% |
| MSRP or "Manufacturer's"/"Suggested" price | 4 | 5.5% | | | 4 | 2.7% |
| The brand | 4 | 5.5% | | | 4 | 2.7% |
| Don't know | | | 3 | 4.0% | 3 | 2.0% |
| Market price or value | 1 | 1.4% | 2 | 2.7% | 3 | 2.0% |
| Cost, what it cost | | | 2 | 2.7% | 2 | 1.4% |
| Markdown/Marked up price | 2 | 2.7% | | | 2 | 1.4% |
| Outlet vs non-outlet price | 1 | 1.4% | 1 | 1.3% | 2 | 1.4% |
| Too/very expensive, not worth it | 1 | 1.4% | 1 | 1.3% | 2 | 1.4% |
| I like it | | | 1 | 1.3% | 1 | 0.7% |
| Price (without adjective) | 1 | 1.4% | | | 1 | 0.7% |
| Price of other product or other type/size | | | 1 | 1.3% | 1 | 0.7% |
| Pricing error | | | 1 | 1.3% | 1 | 0.7% |
| **Total Obs** | 77 | 105.5% | 83 | 110.7% | 160 | 108.1% |
| Base N | 73 | 100.0% | 75 | 100.0% | 148 | 100.0% |

32.     As shown above, Dr. Scott reports that 40.5% of respondents answered that the higher price is an "original or first sale price, actual price," but attempts to portray the other categories of answers as suggesting significant variation and the lack of any overall consistency in what the reference price represents. Reviewing the above table, however, makes clear that any superficial appearance of variation is merely the product of Dr. Scott having arbitrarily created a number of different coding categories to separately tabulate answers that are essentially equivalent.  Plaintiffs' position is that the higher reference price is misleading because it suggests to the consumer that it is the price that the same item was previously offered for sale.  Accordingly, any answer suggesting that the higher price is a price at which the same item was previously offered for sale would indicate a mistaken belief consistent with Plaintiffs' allegations.  As the above chart shows, in addition to those who answered that the higher price is an "original or first sale price," the following answers were given:

- 9.5% of respondents answered that the higher price was the retail price.  The answer "retail price" contains no indication at all that the respondent thinks the price refers to a different but similar item, and very likely suggests a belief that this was the original "retail" price that the same item was previously sold for.  There is no meaningful difference between the answer "original" price and "retail" price in this context.

- 9.5% of respondents answered similarly that the higher price was the price before it went on sale or the sale price.  These answers strongly suggest a belief that the same product was previously offered for sale at the higher price and now is being sold for a "sale" price.  Nothing about this type of answer suggests a correct belief that a different but similar was sold at the higher price.

- 8.1% of respondents answered that the higher price is the <u>price in another store</u>.  Again, there is no indication that respondents believe it to be the price of a <u>different</u> item.  It is very likely that "price in another store" means that the same item the tag is on was sold in "another store" at the higher price.

- 6.1% of respondents answered that the higher price is the price <u>before</u> a discount.  This also suggests the mistaken belief that the specific item is being sold for a "discount" from its original price, with the higher price being the original price of the same item "before discount."

- 2.7% of respondents answered that the higher price is the <u>regular</u> price, which also suggests that the same item was sold for a higher "regular" price.

- 1.4% of respondents answered that the prices are the <u>markdown/marked up price</u>.  This also suggests a belief that the same item previously had a higher price and has been marked down.

- 1.4% of respondents answered that the prices are the <u>outlet vs. non-outlet price</u>.  This also suggests a belief that the same item was sold at a higher price at the "non-outlet."[2]

33.     As this makes clear, the great majority of responses Dr. Scott tabulated (upwards of 75% to 80%) essentially indicate the same thing – that the higher reference price is a price at which the same item was previously offered for sale. Dr. Scott offers no explanation for how her separate categories of answers could be considered meaningfully different from the 40.5% group of "original or first sale" price answers.  Dr. Scott merely asserts that the other responses are "more general" and that those who were not in the 40.5% group "have different views"

---

[2] Exhibit H-16

without any analysis as to how such answers are meaningfully different.[3]  Dr. Scott's practice of carving up these answers into numerous sub-categories does not change the fact that <u>all</u> of these respondents gave answers that are consistent with Plaintiffs' position that the higher reference price is understood to be the price the same item was previously offered for sale.  Whether respondents articulate the higher price as an "original" or "first sale" or "retail" or "before it went on sale" or "price in other store" or "pre-discount" or "non-outlet" or "pre-markdown" price is irrelevant to whether their impression of what the price represents is mistaken, and these variations in wording do not indicate meaningful variation in the essential understanding of the higher price.  The

---

[3] In her deposition, Dr. Scott testified that her view is that it is unclear what these answers mean.  Scott Depo., Exhibit A attached, 83:1- 120:1.  For instance, Dr. Scott testified that it is unclear whether a "sale price" means "a sale versus what it would have cost at another outlet."  Scott Depo., Exhibit A attached, 88:23-89:12.  Similarly, Dr. Scott testified that "regular price" is "a pretty vague term" and it's unclear whether that means a full price from another store or something else.  Scott Depo., Exhibit A attached, 102:7-21.  Dr. Scott similarly testified that "marked down" is ambiguous, conceding that it means marked down from some original price but she's not sure what the source of the original price is.  Scott Depo., Exhibit A. attached, 110:1 – 6.  Ultimately, Dr. Scott's position on these other categories of answers is that she is not sure what these answers refer to and is "not trying to say it proves something one way or the other" and that this supposed ambiguity is why she classified the other answers separately as "general" answers.  Scott Depo., Exhibit A attached, 118:15-119:7.  Dr. Scott's testimony acknowledges that these other answers <u>might</u> mean that the respondent views the higher reference price as an "original" price at another store, but that she feels there is some ambiguity in the answers that raises uncertainty about this.  It is important to be clear that even if Dr. Scott were correct that these other answers are somewhat ambiguous, her opinion that <u>only</u> 40.5% viewed the higher price as a previous/original price of the same item and that there is meaningful variation in consumers' perceptions is still completely unsupportable.  If the data shows a high rate of answers perceiving the higher price as an original price (40.5%) and a large additional set of answers that <u>might</u> also show the same thing but are somewhat ambiguous, there is no basis for a conclusion that there is variation and lack of consistency in interpretation.  In other words, ambiguity in the data cannot be used to support research conclusions, and certainly cannot be the basis for a conclusion that there is meaningful variation or a failure to perceive the reference price as an original price.  The proper conclusion based on Dr. Scott's view would be that there is a strong pattern of support for the idea that the price is perceived as an original price, along with additional data that may also support this but is uncertain.

overwhelming majority of answers indicate the same mistaken belief that the higher price reflects the price at which the same item was previously offered for sale.

34.     On the other hand, Dr. Scott classified only <u>one</u> respondent as giving an answer suggesting a belief that the higher price reflects the price of an "other product" or "other type/size."   This one respondent represents less than 1% (0.7%) of the survey sample.

35.     The overwhelming rate of answers suggesting a belief that the higher price previously applied to the same item compared to the negligible (0.7%) rate of answering that it applied to an "other" item contradicts Dr. Scott's opinion.

36.     The only other question in the Scott Survey that arguably bears on the <u>meaning</u> of the higher reference price is Question 10.   In Question 10, the respondents who had indicated that they remembered an "other price" on the tag for an item they purchased were asked the following:

> What, if anything, do you remember about this other price?

37.     As an attempt to elicit responses regarding the <u>meaning</u> of the higher price, the wording of this question is highly flawed, because it is extremely vague and fails to direct respondents to comment on their understanding of what the higher price <u>represents</u>.   Merely asking what respondents "remember" about the price was so vague and overly general that the most common responses were to simply state that the other price was "higher" or to actually specify what the price was.   These answers reveal nothing about what the higher price <u>represents</u>. It is curious that Dr. Scott asked such a vaguely worded question about what respondents "remember about this other price" when she used language in the

later question that was far more appropriate to address the meaning of the higher price – "what do you think the higher price on the tag represents?"

38.     Since this question was not worded in a way as to consistently elicit responses as to what the reference price represents, it is not possible to rely on this question for any reliable conclusions.  All we can do is look at the minority of answers that do address the meaning of the reference price.  Of those who were asked the question, 13.1% answered that the "other price" was the "original or regular price" of the item, and 6.6% referred to a "sale price."[4]  Dr. Scott classified <u>no respondents</u> as answering that the other price was a reference to a <u>different</u> but comparable item.  Accordingly, the only answers from this question that reflect on the <u>meaning</u> of the reference price are consistent with the data from Q.13 (discussed above) and further supports the conclusion that the higher reference price is understood to be an "original" or "regular" price at which the item was previously offered for sale, with virtually no instances of the higher price being understood as a reference to a different item.

39.     Dr. Scott also states the following opinion in Paragraph 7 of her Declaration:

> d. Most California consumers expect to see different types of merchandise offered for sale in Columbia outlet stores, including products made specifically for sale at the outlet stores and products that are similar, but not identical, to items sold in regular retail stores.

40.     Elaborating on this opinion, Dr. Scott subsequently states (Paragraph 32) that "a reasonable California consumer would believe that some products offered

---

[4] Exhibit H-11.

at the Columbia outlet stores have never been offered for sale in regular retail channels." This opinion is based on data from the following question:

> 14. Now I will read you a list of some types of products. For each of the following, please tell me whether you think you would, or would not, find that type of products at a Columbia Sportswear Outlet store.

41.     The following answer choices were offered, with the percentage who answered "yes" to each choice shown in bold:

> a. The exact same products as those previously sold in a regular sporting goods store, like R. E. I. or Big 5, for example. **(65.5%)**

> b. The exact same products sold in a regular sporting goods store except for one or two flaws, that is, what some people would call 'irregular' merchandise. **(42.6%)**

> c. Products very similar to, but not exactly the same as, those that are sold in a regular sporting goods store. For example, they could be different colors, or have minor style differences. **(77.7%)**

> d. Products that were made specifically for sale at Columbia Sportswear Outlet Stores. That is, they are sold only at Columbia Sportswear Outlet stores. **(83.8%)**[5]

42.     While Dr. Scott does not specifically opine that this data relates to consumer interpretation of the <u>meaning</u> of the higher reference price, counsel for

---

[5] Exhibit H-17.

Defendants cite the data from this question to support its contention that there is no consistent understanding of what reference prices represent.  Specifically, counsel points to the 83.8% rate of answering that respondents would expect to find products that are made specifically for, and sold only at, the outlet to argue that such respondents could not believe that the reference price refers to a price at which an item was sold elsewhere.[6]  This interpretation of the Scott data is unsupportable for numerous reasons.

43.     First, even if consumers surmise that an outlet store may have <u>some</u> items that are made for sale in the outlet store, this in no way means that those consumers would not be misled upon actually seeing a tag with a higher reference price.  General assumptions about what a store may or may not carry are not dispositive of whether a consumer will be misled upon encountering specific advertising content.  I might generally believe that mainstream supermarkets do not carry all-natural foods, but if I see products inside a supermarket that are labelled in a way so as to suggest they are all-natural, I may conclude that the products are all-natural and be misled if this is not true.

44.     Even more importantly, 70% of respondents who answered that they think Columbia outlets carry made-for-outlet products also answered that they think Columbia outlets carry the exact same products as those previously sold in a regular sporting goods store.[7]  In fact, Columbia does sell both Outlet SMU products and products that are not made-for-outlet in the same stores using the same tags, which means that consumers would be correct to expect that both types of products could be found in stores and may have no way to determine by comparing tags on various products which products are and which are not

---

[6] Defendants' MSJ and Opposition to Class Cert. page 15.
[7] Exhibit 17 and Scott raw data Excel file.

made-for-outlet.[8]  Accordingly, the assumption that <u>some</u> products may be made-for-outlet products in no way rules out the possibility that other products are the same products previously sold in other stores and that a consumer who is actually seeing a higher price on a tag will interpret that to mean that the product is one that was previously sold in another store at a higher price.  Defendants' assertion that a high rate of assuming that outlet stores may carry made-for-outlet products means that consumers cannot be confused by reference prices is meritless.

45.     To the contrary, the only value of the data from Question 14 is that it shows that the <u>potential</u> for confusion is high.  The finding that 65.5% of consumers <u>do</u> think Columbia outlet stores carry products that are the exact same as those previously sold in regular sporting goods stores shows that there is a high potential for confusion.  Since the clear majority of consumers <u>do</u> have an expectation that Columbia outlet stores carry the exact same products previously sold in regular stores, there is a strong foundation for the possibility that the higher reference price will be interpreted as pertaining to the same item previously sold elsewhere.  It is also important to note that this 65.5% result is by no means a <u>cap</u> on the potential for confusion.  It could be that 65.5% of consumers have certain expectations in the abstract, but that upwards of 100% of consumers would mistakenly believe that Columbia outlet stores have products that were previously sold elsewhere once they encounter the tags showing the higher reference price.

46.     The 65.5% result may also be artificially depressed due to a significant

---

[8] It is my understanding that Columbia has admitted that the price tags for Outlet SMU Builds are identical to the price tags for outlet merchandise that actually was previously sold at the reference price and customers have no way to determine which products are Outlet SMUs and which products are not.

flaw in the answer choices to the question.  Again, the following answer choices were offered:

> a. The exact same products as those previously sold in a regular sporting goods store, like R. E. I. or Big 5, for example.

> b. The exact same products sold in a regular sporting goods store except for one or two flaws, that is, what some people would call 'irregular' merchandise.

> c. Products very similar to, but not exactly the same as, those that are sold in a regular sporting goods store. For example, they could be different colors, or have minor style differences.

> d. Products that were made specifically for sale at Columbia Sportswear Outlet Stores. That is, they are sold only at Columbia Sportswear Outlet stores.

47.     Notably missing from this list is any choice indicating that Columbia outlet stores carry the exact same products that were previously sold at <u>regular Columbia Sportswear stores</u> (non-outlet stores).  The only choice that covers the possibility that the exact same products were previously sold at other stores (choice a. above) specifies products previously sold in a "regular sporting goods store, like R. E. I. or Big 5, for example."  As this choice only refers to and explicitly specifies third party sporting goods stores that carry a variety of brands, it does not appear to encompass the exact same products previously sold at non-outlet Columbia stores.  If the survey question had measured the total percentage of respondents who think Columbia outlet stores carry the exact same products that were previously sold at regular sporting goods stores <u>or at non-</u>

outlet Columbia stores, the 65.5% result likely would have been significantly higher.  In sum, the only significance of this data to the question of whether reference prices may be misleading is that it shows a high potential for such confusion, because the large majority of consumers expect that Columbia outlet stores carry the exact same products that were previously sold elsewhere.

II.      **Data and Opinions Relating to the Influence of the Reference Price on Consumer Behavior**

A.  **General observations about the survey design**

48.      The remaining opinions that Dr. Scott states relate to the question of whether the higher reference price on the tag influences consumers' perception and behavior.  As a preliminary matter, it is important to note that Dr. Scott's survey did not directly test whether the higher reference price influences consumers' decisions.  In the first section of the survey, in which the survey asked about the factors that were important to the respondent's past purchase, Dr. Scott did not actually include the reference price as one of the answer choices. Rather, the only relevant answer choice was "the amount of money I saved by buying the product at this store."[9]  Accordingly, there is no data directly measuring the extent to which the reference price was a factor in any decision, only data on whether the belief that respondents were saving money was a factor.  As discussed below, the belief that they were saving money was extremely important to respondents.

49.      In the second section of the survey, in which respondents were posed with a hypothetical scenario and shown jackets with tags, the survey again failed to

---

[9] Exhibit H-12 (Question 11)

directly test for the impact of the higher reference price. The survey showed respondents a jacket with a tag with both the lower sale price and the higher reference price and asked respondents to rate the value of the deal they were getting. The obvious way to test whether the higher reference price impacted consumers' perceptions of the value of the deal and likelihood of purchasing the product would have been to show a separate group of respondents the same tag <u>without</u> the reference price, as follows:

**Test Group Tag**                    **Hypothetical Control Group Tag**

            

50.     By having some respondents see the true tag with both prices and other respondents see the tag with the higher reference price removed, the survey could have directly assessed whether the presence of the higher reference tag impacts consumers' perceptions and decisions. Although Dr. Scott had several versions of the survey in which different jackets were shown with different price tags, Dr. Scott inexplicably never showed a jacket that <u>lacked</u> the higher reference price, thereby ensuring that the survey could not directly assess how respondents' perceptions and decisions change without the reference price.

51.     One other critical observation about Dr. Scott's attempt to address the influence of the higher reference price on the tag is that every question is focused on what respondents think about <u>a particular product</u>.  Respondents were asked about the factors that influenced their decision to buy a particular product and were asked to give ratings for a particular product.  However, the potential influence of the higher reference price tag goes well beyond the selection of a particular product.  If the higher reference price is generally present on <u>every item</u> in a Columbia outlet, the potential influence of the tags extends beyond the selection of any particular product to the perception of <u>the store</u> and the decision to shop at <u>the store</u>.  In other words, the impact of the higher reference prices may not only be that purchase of a particular item is influenced by the higher reference price, but that the decision to shop at Columbia outlet stores in the first place is influenced by the presence of higher reference prices on its products.[10] The Scott Survey asked no questions assessing the extent to which the presence of the reference price on the tag influences perceptions of <u>the store</u> or impacts decisions to shop at <u>the store</u>, only questions about the impact on perceptions and decisions with respect to the selection of <u>a particular item</u>.  While, as discussed below, the data shows that the reference price <u>does</u> have a meaningful impact on perceptions/decisions with respect to a particular item, the survey fundamentally fails to capture the larger potential impact on the decision to shop at <u>the store</u> in general.  Accordingly, even the data showing that the reference price has a meaningful impact on consumer perceptions and decisions with respect to a particular purchase understates the potential impact on consumer

---

[10] On this point, it is worth noting that 57.8% of respondents answered that they were just shopping at the Columbia outlet store in general, as opposed to looking for a specific type of product.  Exhibit H-5 (Question 4).  This provides support for the idea that a significant portion of the concern over the reference price relates to influencing consumers to shop at the store in general, not merely influencing the purchase of a particular item.

decisions to shop at Columbia outlet stores in the first place.

**B.  Specific analysis of survey data**

**1.  Questions regarding recent purchase at Columbia outlet**
   **a.  Questions about factors that influenced the purchase decision**

52.   Dr. Scott's first opinion is that consumers consider a variety of factors in deciding to purchase from a Columbia outlet store and that the amount of money they save was cited as being an important factor by less respondents than other factors.  As a preliminary matter, it is important to observe that the question of whether or not the higher reference price has a meaningful impact on perceptions/decisions does not hinge on whether or not there are also a variety of other factors or whether the perception of savings caused by the higher reference price is the most important factor.  It is obvious that other factors such as the appearance, style, size, and fit of clothing will be important to consumers. The real question is whether or not the higher reference price and any perceived implication regarding cost savings is also influential and impactful.

53.   In supporting her opinion on this topic, Dr. Scott points to the data from the following open-ended question and then follow-up closed-ended question about respondents' most recent purchase:

Q.5    What was it about this product that made you decide to purchase it?

Q.11   Please tell me how important the following factors were in deciding to purchase this product:

• I had a coupon I could use for this product

- The amount of money I saved by buying the product at this store
- The color of the product
- The fit or size of the product
- The overall quality of the product
- The price of the product
- The style of the product

54.     Dr. Scott first emphasizes the relatively low rate of answers referring to price or savings in response to the open-ended question 5.[11]  This question, however, was worded in a highly biased manner so as to guide respondents to comment on <u>features or attributes of the clothing itself</u>, as opposed to other considerations that impact decisions such as price or savings.  The question specifically asks what was it <u>about this product</u> that made the consumer purchase it.  This wording is clearly about "the product" – i.e., it directs respondents to comment on features or attributes of <u>the product</u>.  It is not surprising then that the majority of answers pertained to the style or look of the product or other attributes of the product.  "Price" or "Savings" are not attributes or features of the product, they are external reasons or factors that can influence the decision to purchase the product.  Had the question asked respondents what <u>factors</u> influenced their decision to purchase, or what <u>reasons</u> respondents had for purchasing the product, this question would have fairly invited answers that pertained to product attributes/features or external factors such as price/savings, and many more respondents may have mentioned savings.  As worded to focus on what it was "about the product" that made them decide to purchase it, the question does not meaningfully assess the extent to which price and savings were influential.  In fact, Dr. Scott's reported result that the price of products at a Columbia outlet store is only important to a small minority of consumers due to

---

[11] Scott Declaration Paragraph 22.

low rates of mentioning price in this question is simply implausible on its face.

55.     As noted above, the question also only addresses the decision to purchase a particular product and not the decision to shop at a Columbia outlet store in general.  If consumers believe that products sold at the outlet store generally have a good price or involve meaningful savings, it may not only be that price/savings is a factor in the decision to purchase a particular item, but also in the decision to shop at Columbia outlet stores in the first place.  Accordingly, to the extent that the question is only asking what made the respondent decide to purchase a particular product, it is not accounting for the potential that the use of reference prices on all products influences perceptions of the savings on all products and impacts the decision to shop at Columbia outlet stores.

56.     The follow-up closed-ended question (Q.11) more properly asks about "factors" that were important to the consumer decision to purchase the product. It also lists a choice assessing the extent to which "the amount of money I saved by buying the product at this store" was important to respondents.  While, as noted above, this choice does not directly mention the reference price, it at least tests the extent to which consumers believe they are saving money by buying the product at a Columbia outlet store.  The results to this question clearly support the conclusion that the perceived amount of money saved by buying at the Columbia outlet is a very important factor to consumers.  The following shows the percentage of respondents who picked each point on the scale from 1 (Not at all important) to 7 (Very important) for the savings choice:[12]

---

[12] Exhibit H-12 (Question 11)

| Rating | % |
|--------|------|
| **7 (Very Important)** | **52.0%** |
| 6 | 17.0% |
| 5 | 11.2% |
| 4 | 9.9% |
| 3 | 5.4% |
| 2 | 2.4% |
| 1 | 2.0% |

57.    This result overwhelming demonstrates the importance of the perceived amount of saving by buying at the Columbia outlet.  The 52.0% result for the most important point on the scale is the dominant result, far exceeding any other scale point.  Looking at the "top two box" rating that Dr. Scott focuses on yields nearly 70% indicating that this factor is at the most important end of the scale. Looking at the top three points reveals that over 80% of respondents rated this factor as important, in contrast to under 10% who rated it unimportant.  There is no possible interpretation of this data other than that the amount of savings by buying at Columbia outlet store is a very important factor in respondents' decisions.

58.    Dr. Scott attempts to avoid this conclusion by comparing the result for the savings choice to the result for other choices.  Dr. Scott points out that the "top two" box scores for specific attributes of the product (quality/style/fit/color) were higher (in the range of 73.1% to 86.1%) than the top two box score for the savings choice (69.0%).  As noted earlier, the importance of the savings factor is not undermined by the existence of other factors that are also important or even

rated as important by somewhat more consumers.[13]  The 69.0% top two box score result for the savings factor clearly indicates that the factor has substantial importance, and even this number does not tell the whole story given that over 80% rated the factor as important and under 10% rated it as not important.

59.     Dr. Scott also makes the following comment, referring to the fact that 71.4% of respondents gave a top two box important score to "price of the product" as compared to 69.0% for the "amount of money I saved" choice: "There was no indication that consumers thought of the amount of savings more frequently than the absolute price itself."[14]  Again, this observation in no way undermines the importance of the perceived amount of savings, as there is no requirement that this factor be perceived as <u>more important</u> than the absolute price in order for it to be an important factor.  To the contrary, comparing the 69.0% result for the "amount of money I saved" choice to the 71.4% result for the absolute price choice proves the importance of the former.  The 69.0% and 71.4% results are statistically equivalent.  This means the survey found <u>no meaningful difference</u> between the importance of absolute price and the importance of the perceived amount of savings.  Since absolute price is indisputably an important factor in consumer purchase decisions, the equivalence of the result for absolute price and amount of savings strongly supports the conclusion that the perceived amount of savings is also an important factor.  Accordingly, the only data from these questions that is relevant to Plaintiffs' claims about the reference price indicates that – to the extent that Plaintiffs are correct that the reference price implies a significant savings as compared to a price previously offered elsewhere – the reference price's suggestion of savings by buying at the Columbia outlet

---

[13] By way of example, it could be the case that the top factors that influence the decision to purchase an automobile are the price, make/model, color, and other features, but another feature such as miles-per-gallon could still be an important factor if many consumers consider it when making their decision.
[14] Scott Declaration Paragraph 23.

store would be an important factor in purchase decisions.

### b.  Questions about why respondents felt they got a good deal

60.     Dr. Scott also points to data from questions asking respondents why they felt they had gotten a good deal when buying the product that was their most recent purchase at a Columbia outlet store.  As Dr. Scott reports, the large majority of respondents (86.1%) believed they had gotten a good deal when they purchased the product.[15]  These respondents were then asked what made them think it was a good deal.  Dr. Scott reports that only 18.4% gave an answer mentioning a discounted price, and contrasts this result with a higher number that mentioned that the price was good or reasonable.  (The relevant figure should actually be 21.3%, which is the percentage of those who thought they did get a good deal that mentioned a discounted price, whereas the 18.4% includes the answers of those who did not think they got a good deal).  The most glaring error in Dr. Scott's analysis is her assumption that those who answered that the price of the product was good or reasonable were making an absolute, objective judgment and were not influenced by a reference price in forming the judgment that the actual sale price was attractive.  The perception of what is a "good" or "reasonable" price can be relative and subjective.  If Plaintiffs are correct that the higher reference price makes consumers believe the same product was previously offered for sale at a higher price, this could be the cause of respondents' belief that the sale price they paid was good or reasonable.  Accordingly, the distinction Dr. Scott draws between answers mentioning a good/reasonable price and answers mentioning a discounted price has no reliability, as both could be the influence of the higher reference price.

---

[15] Exhibit H-8. Dr. Scott also notes that respondents were asked if they remember what price they paid for the item.  Dr. Scott reports that 73.1% answered affirmatively.  It is

61.     Dr. Scott also fails to count answers indicating that the product was "on sale" as potentially indicating the influence of the reference price.  It is quite possible that the perception that the product was "on sale" stems from the presence of the higher reference price listed above the actual sale price.  It is hard to see how Dr. Scott could justify counting answers that refer to a "mark down" or "discount" in one category but neglect to account for answers indicating the product was "on sale."

62.     In total, there was a 35.6% rate of answering that respondents got a good deal because the price was good/reasonable, a 21.3% rate of mentioning a discount price, and an 11.9% rate of mentioning the product was on sale.[16]  Any of these answers expressing a perception that the price was good/reasonable, a discount, or an on sale price could have been influenced by the higher reference price.  Collectively, these answers reflect a high percentage of consumers and, if anything, confirm the previously discussed data indicating that the perception that respondents were getting a good/discounted price was of significant importance to consumers.[17]

### c.  Questions about memory of the reference price on the tag.

63.     Finally, Dr. Scott points to data from the following questions regarding an "other price" being shown on the price tag of the item purchased:

---

important to point out that Dr. Scott collected no data that could confirm whether or not respondents in fact accurately remembered the price.  The 73.1% figure is fundamentally unreliable without any way to verify the extent to which any perceived memory of a price was accurate.

[16] Exhibit H-9B

[17] Unlike with Dr. Scott's open-ended question asking what about the product made respondents purchase it, Dr. Scott did not include a closed-ended follow-up to clarify the answers to the open-ended question about why respondents felt they had gotten a good deal.

Q.9    Do you remember any other price being shown on the price tag for this item?

IF YES:

Q.10   What, if anything, do you remember about this other price?

64.    Dr. Scott relies on the finding that only 20.7% answered that they remembered an "other price" being shown on the price tag to suggest that the reference price must not be important because many consumers did not remember it.[18]  This conclusion is flawed and indefensible for several reasons.

65.    First, the question's reference to an "other price" shown on the tag is fundamentally ambiguous and confusing.  A reference to "other" does not make any sense without first establishing what baseline price is the point of comparison.  The survey does not do this.  Accordingly, a respondent who is asked whether they remember an "other price" on the tag may reasonably wonder to themselves: "other than <u>what</u>?"  Contrast the vague Scott question to a question that clearly indicates what it is asking about, such as: "Other than the <u>lowest price on the price tag</u>, do you remember a <u>second</u> price shown on the tag?"  In comparison to a clearly worded question such as this one, Dr. Scott's question asking if they remember an "other" price with no starting baseline point to compare this to is unclear and confusing.  If respondents are not clear on what the question means, this would explain why most would fail to answer that they remember an "other price."

66.    Perhaps even more importantly, the question immediately preceding this

---

[18] Exhibit H-10.

question may have caused respondents to believe that "other price" meant a price other than the outlet price (the lower price on the tag) and the reference price.  In Question 8, respondents were asked what made them think they were getting a good deal (or were not getting a good deal), and most mentioned something about the price, including many answers mentioning discounts, markdowns, original or retail prices, or on-sale prices.  These answers explaining why they thought they got a good deal could have been inherently referring to <u>both</u> the outlet price (the lower price on the tag) and the reference price, since the comparison of the lower outlet price and higher reference price could be the basis for the belief that the deal is good.  For instance, if a respondent's reason they believed they got a good deal was that the tag showed an "original" (reference) price and a "discount" (outlet) price, then their answer to Question 8 was necessarily addressing <u>both</u> of these prices.  When Question 9 thereafter asks if they remember any "other price," this could be interpreted as meaning any price other than the ones they had just commented on, the higher reference and lower outlet prices.  Even respondents who recalled the higher reference price would answer "no" when asked in Q.9 if they remember an "other price" when they had just given an answer in Q.8 relating to the reference price.

67.    This problem is clearly illustrated by respondent #5079.  When first asked why they purchased the product, this respondent answered: "i looked  that at the original price and it was on sale so i didnt hesitated **[sic]** to buy it."[19]  This mention of the "original price" strongly suggests that the respondent misperceived the reference price to be an "original price" for the same item.  This respondent then answered that they did get a good deal, and when asked why they thought so (Question 8), mentioned "the sale discounted price," again raising the strong possibility that they were influenced by the belief that the tag

---

[19] <u>See</u> Scott raw data Excel file for specific respondent data.

was showing a discount as compared to an original price.  When asked in Question 9 whether they remember an "other price" on the tag, however, this respondent answered "no," despite having already mentioned an "original price" that strongly suggests they remembered the reference price.

68.     Respondent 5060 also rated their purchase a good deal and answered: "because it said sale and the original price was more."  Despite clearly referring to a sale price and an "original price," this respondent also answered "no" when thereafter asked if they remembered an "other price" on the tag.

69.     Respondent 5014 also rated their purchase a good deal and answered "it was cheaper than the retail price."  The mention of the "retail price" confirms the respondent likely remembered the reference price, but this respondent also answered "no" when thereafter asked if they remembered an "other price" on the tag.

70.     The following are additional examples of open-ended answers given by respondents to explain why they thought they were getting a good deal among those who thereafter answered "no" when asked if they remembered an "other price" on the tag:

- The discounted price was amazing (#4026)
- It was on sale (#4016)
- They were like $60 off (#3041)
- I believe it was on sale (#3023)
- Because at the time it was on sale (#3022)
- The price was discounted by twenty percent (#5091)
- It was on sale (#6087)

- It was at a discounted price (#6084)
- Good discount (#5039)
- They were on discount (#4017)

71.    <u>All</u> of these responses suggest at least a solid possibility that the respondent saw a higher price that made them believe the lower outlet price was a discount. And yet <u>all</u> of these respondents subsequently answered that they did <u>not</u> remember an "other price" on the tag, despite having already mentioned something about getting a discount or sale price.[20]   These patterns of answers raise a serious concern that significant numbers of respondents answered "no" when asked about an "other price," even if they did remember a higher reference price, very likely because they had already commented on discounted prices and did not interpret "other price" to include something they had already answered about.  There were also many other respondents who gave ambiguous answers about the price being good before answering that they didn't remember any other price, and may have answered negatively for the same reason.  The above-reference data empirically proves that the question about remembering an "other price" was seriously flawed and does not reliably or accurately measure the percentage of respondents who recalled a reference price.

72.    Finally, the figures from Q.9 may also be deflated simply due to basic memory and recall issues.  While I would expect most respondents to remember major features of a product that caused them to purchase it, such as the color or style or fit, I would not necessarily expect them to recall everything they saw on

---

[20] To the extent that it is impossible to tell for sure whether references to discounts reflect memories of the lower outlet price on the tag appearing to be "discounts" from the higher reference price or reflect additional discounts off the lower outlet price, this uncertainty is still a severe problem for the survey.  If answers are ambiguous and one plausible alternative is that many respondents who refer to discounts are thinking about the difference between the two prices shown on the tag, Dr. Scott's opinions that respondents don't recall the reference price on the tag remains unsupportable.

a tag, even if the reference price does have an impact on purchase behavior. Consumers may spend significant time examining a product's appearance and fit, and will have these features reinforced in their memory after the purchase as they wear the clothing going forward.  The price tag may be something they consult for a few seconds and then never see again.  Accordingly, even if the initial glance at the tag does convey an influential impression of a savings as compared to the same item previously sold at a higher price, consumers may not remember this as an influence as easily as they can remember specific attributes of the product that are continually reinforced with product use.

2.  **Ratings of products shown to respondents in the survey**

73.     Dr. Scott's remaining opinions regarding the supposed lack of impact of the higher reference price are based on the second part of the survey, in which respondents were shown jackets and tags and asked to rate a jacket.  As noted above, Dr. Scott failed to include a comparison of ratings of a jacket with a tag including the reference price and tag without the reference price, so there is no direct assessment of the impact of the reference price.  Dr. Scott suggests that the data from this portion of the survey supports an opinion that the higher reference price does not impact consumer perceptions and decisions.  A review of the data, however, reveals otherwise.

74.     In Question 12, respondents were asked to rate the overall quality of a jacket shown to them.  In one group, respondents were shown the blue jacket with the price tag with the higher reference price and were given no explanation. In a second group, respondents were shown the same jacket with the same tag but were given an explanation that the higher reference price is <u>not</u> a previous sale price for the same item but a price relating to a similar item.  The following shows the percentage of respondents in each group who rated the item as having

the <u>highest overall quality</u> (a 7 on the scale):

> **No explanation of reference price**: 57.7%
>
> **Explanation of reference price:**    41.8%[21]

75.     This difference <u>is statistically significant</u> at the 95% confidence level. What this means is clear.  The experiment <u>did</u> detect a statistically meaningful difference in the rating of overall quality depending on whether or not respondents were given an explanation of what the reference price means.  In other words, there is a statistically meaningful <u>reduction</u> in the percentage of consumers who perceive the item to have the highest overall quality when it is revealed to them that the reference price does <u>not</u> refer to the same item.[22]  Or viewed from the other angle, there is a statistically meaningful <u>increase</u> in perception of the quality of the item when the reference price is included on the tag and is <u>not</u> explained.  The change from a 41.8% result when the reference price was explained to a 57.7% rate when the reference price was not explained (a margin of 15.9%) represents a <u>38% increase</u> in the tendency of respondents to rate the jacket as the highest overall quality.

76.     The same thing is seen if using the top two scores that Dr. Scott emphasizes. The following shows the percentage of respondents in each group who gave the blue jacket a top two box score for <u>overall quality</u> (a 6 or 7 on the scale):

> **No explanation of reference price**: 87.2%

---

[21] Exhibit H-13

[22] Dr. Scott confirmed in her deposition that this data does show that having the reference price explained to <u>not</u> be an original price from another store <u>did</u> reduce perception of the quality of the jacket.  Scott Depo., Exhibit A attached, 224:15, 227:1-3.

**Explanation of reference price:**   73.3%

77.     This difference <u>is statistically significant</u> at the 95% confidence level. Again, there is a statistically meaningful <u>increase</u> in perception of the quality of the item when the reference price is included on the tag and is <u>not</u> explained. The change from a 73.3% result when the reference price was explained to an 87.2% rate when the reference price was not explained (a margin of 13.9%) represents a <u>19% increase</u> in the tendency of respondents to rate the jacket as the highest overall quality.  There is no scientific basis for any conclusion other than that the unexplained higher reference price <u>does</u> have a statistically significant impact on perception of the quality of the item as compared to when it is clarified that the price is <u>not</u> a previous price for the same item.

78.     The same conclusion is compelled by the question asking respondents in each group to rate <u>how good a value</u> they think the blue jacket is.  The following shows the percentage of respondents in each group who gave the blue jacket a top two box score for <u>how good a value</u> it is (a 6 or 7 on the scale):

**No explanation of reference price**: 82.1%
**Explanation of reference price:**   65.1%[23]

79.     This difference <u>is statistically significant</u> at the 95% confidence level. Again, this means there is a statistically meaningful <u>increase</u> in perception of how good a value the item is when the reference price is included on the tag and is <u>not</u> explained.  The change from a 65.1% result when the reference price was explained to an 82.1% rate when the reference price was not explained (a margin of 17%) represents a <u>26% increase</u> in the tendency of respondents to rate the

---

[23] Exhibit H-14

jacket as a good value.

80.     To recap, the <u>only difference</u> between the blue jacket/tag shown to the two groups being compared is that the first group did not receive an explanation of the higher reference price and the second group did.  Since this is the only difference in the groups, the statistically significant difference in the results <u>must</u> be caused by the explanation of the reference price and scientifically compels the conclusion that the presence of the reference price with no explanation causes an increased perception of the value of the deal.

81.     This conclusion is so obvious and inescapable that Dr. Scott even felt obligated to acknowledge it, stating it paragraph 29 that "this finding might appear to support the hypothesis that knowing that the higher price referred to a non-identical, but comparable product would reduce perceptions of the goodness of the deal."  To nevertheless attempt to escape this conclusion, Dr. Scott disregards the objective and scientific comparison of the ratings for the same blue jacket with and without the explanation for an unscientific comparison of two jackets that differ both in color and the jacket zipper, the blue and black jacket.  Dr. Scott points out that the ratings of the value of the deal for the blue jacket with the explanation and the value of the black jacket with no explanation are similar, and argues this proves a lack of impact of the reference price.  This is fundamentally unscientific and unsupportable.  The essence of scientific experimentation is that if there is <u>only one variable </u>that changes from one group to the next, the experiment can assess the impact of that variable.  When multiple variables change from one group to the next, the experiment cannot scientifically isolate the impact of any one factor.[24]  The comparison of the results for the

_____

[24] For instance, if a clinical trial sought to measure whether an active ingredient in a medication causes drowsiness, one group would need to be given the medication with

identical jackets (the blue jacket) with and without the explanation of the reference price is a scientifically objective comparison that isolates the impact of the one variable that changes (the explanation) and reliably shows that there is a significant impact.  Dr. Scott attempts to reject this finding in favor of a comparison that is not reliable because there are multiple variables that change – not only the variable of the explanation but also that the jackets themselves are different items, differing at least in color and in the appearance of their zippers. As Dr. Scott herself emphasizes, the <u>color</u> of clothing is a very important factor (top two box score) for 73.1% of consumers and is an important factor (top three box) to 86.7%.[25]  Accordingly, the mere difference in color between the two jackets is a confounding factor that could impact various respondents' perceptions of the attractiveness of the product and deal, and prevents the comparison between the blue and black jackets from reliably assessing the impact of the explanation.  Given data from a comparison of the two blue jackets with only one variable change (the explanation of the reference price) and data from a comparison of the blue and black jackets with multiple variable changes, Dr. Scott's rejection of the former in favor of the latter is unscientific and indefensible.

82.    Dr. Scott also points to the data from the open-ended question asking respondents <u>why</u> they rated the jacket a good deal to suggest that the perception of savings is not driving purchase decisions.  (Paragraph 26).  Dr. Scott points out that more respondents referred to product attributes than the price, as if to suggest that this means that a discounted price was not a reason they rated the jacket a good deal.  This interpretation is baseless.  By definition, perception that

---

the ingredient and the second group the identical pill with the sole variation that the active ingredient is removed.  If the second group gets a pill that has the active ingredient removed and another change (such as the addition of another element such as caffeine), the experiment cannot isolate the impact of the active ingredient.
[25] Exhibit H-12.

something is a "good deal" relates to the price.  The relationship between the perceived value of the product and the price is what determines whether a consumer perceived a "deal" to be good.  The fact that respondents mentioned product attributes in answering why it was a "good deal" clearly does not mean the respondent was not also considering the price relative to the perceived quality of the product.  If the price did not appear low relative to the quality of the product, they would not rate it a good deal.  These open-ended answers do nothing to undermine the closed-ended data showing that the higher reference price impacts the percentage of consumers who perceive the product to be a good deal.

83.     Finally, Dr. Scott points to data showing that respondents' ratings of "how interested" they would be in purchasing the blue jacket were similar when the reference price was explained as when the reference price was not explained. (Paragraph 31).  Dr. Scott interprets this lack of difference to suggest there is no impact of the reference price, again ignoring that a meaningful difference was already established in the previous question asking about the value of the deal. Dr. Scott's interpretation of the data is unsupported, as there is a clear alternative explanation for why the results to the "interest" question did not differ between groups.  Respondents naturally will assume that two survey questions are not asking the same thing.  Respondents had already been asked about how good a deal they thought the blue jacket was, which directly relates to the likelihood that they would purchase the jacket if they were interested in the jacket.  When thereafter asked to rate "how interested" they are in the product, they would be unlikely to interpret this question as again measuring their likelihood of purchasing it.  Rather, they would likely interpret the question about "interest" to be asking how much they like the product – i.e., how much interest they have in the product itself, as opposed to how likely they would be to purchase it because it appears to be a good deal.  If this is how respondents interpreted the

question, respondents in both groups would naturally have the same rating of how much they are interested in the product, regardless of how they perceive the price or how good a deal it is, which they had already answered.

84.     There are numerous examples in the data of respondents who interpreted the question in this manner.  For instance, respondent 6056 rated the jacket a "7" (the highest point on the "very good deal" end of the scale) and answered that the higher reference price shown on the tag was the "original price."  This is the most clear-cut case of a consumer who was misled by the higher reference price and perceived the deal to be a very good value.  This respondent, however, rated their "interest" in purchasing the product as a "1" (the lowest point on the scale indicating "not interested at all.)  Since this respondent had rated the deal the best possible value but answered that they were not at all interested in purchasing the product, their latter answer must mean that they simply don't want the particular jacket shown.  Respondent 6077 fits the same pattern, having rated the jacket a "7" as the best value deal and answered that the higher price is the "normal price of the jacket" but then rated their interest in the jacket as a "1" on the scale, not at all interested.  Respondent 6050 also rated the jacket a "7" as the best value deal and answered that the higher price is the "original retail price" but then rated their interest a "3," a below neutral rating for interest. Other respondents also rated the jacket a 7 or 6 for how good a value it is, but then indicated a lack of interest in the jacket in the next question.  This confirms that after already having been asked to rate the value of the deal, the subsequent question asking "how interested" they would be in the jacket was interpreted as asking whether they would want the particular jacket.  It is not surprising then that both groups gave comparable ratings for interest in the same blue jacket, and this does not reflect on their perceived value of the deal.

85.     In addition, as described earlier, the impact of the reference tags on

consumers' interest in a <u>particular product</u> is not the only issue.  The potential impact of the reference tags extends to the interest in shopping at Columbia outlet stores in general.  Even if it were the case that interest in purchasing one particular product did not vary based on the reference price, use of the reference prices generally across all products could impact the interest in shopping at the store.

## CONCLUSIONS

86.     For the foregoing reasons, it is my opinion that, to the extent that the Scott Surveys elicited reliable and useful data, the data supports the conclusion that the higher reference price is frequently interpreted as a price that the same product was previously offered for sale and has a significant tendency to influence perception of the value of the deal and purchase decisions.

Hal Poret

Dated: March 14, 2017

Exhibit A

**Hal L. Poret** (hal.inc42@gmail.com; 914-772-5087)

*Education*

1998      Harvard Law School, J.D., *cum laude*
- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

1995      S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude*
- Statistics
- Taught calculus/precalculus/statistics

1993      Union College, B.S. in Mathematics with honors, *magna cum laude*
- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

*Employment*

2016 -      President, Hal Poret LLC
- Design, supervise, and analyze consumer surveys, including Trademark, Trade Dress, Advertising Perception, Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Consulting regarding survey design and review of other surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 100 U.S. District Court litigations and proceedings in front of TTAB, NAD, FTC and FCC.

2004  - 2015   Senior Vice President, ORC International
- Designed, supervised, and analyzed consumer surveys in legal and corporate market research areas, and provided expert testimony regarding survey research in legal cases.

2003 – 2004   Internet Sports Advantage
- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003   Attorney, Foley Hoag & Eliot, Boston, MA
- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.

*Testimony at Trial or by Deposition Past 4 Years*

(Party who retained me shown in bold)

2017    Network-1 Technologies v. **Alcatel-Lucent et al.**
        (Desposition)                          USDC Eastern District of TX

2017    Health Partner Plans v. **Reading Health Partners**
        (Deposition and Injunction hearing)    USDC Eastern District of PA

2017    In Re **Biogen** '755 Patent Litigation
        (Deposition)                           USDC District of NJ

2017    **Cava Mezze** v. Mezze Mediterranean Grill
        (Trial)                                USDC District of MD

2017    Mastrandrea v. **Vizio**
        (Deposition)                           USDC Central District of CA

2017    **Adidas** v. Skechers                 USDC District of OR
        (Deposition and Injunction hearing)

2016    **Triumph International, Inc.** v. Gourmetgiftbaskets.com, Inc.
        (Deposition)                           USDC Central District of CA

2016    Phelan Holdings v. **Rare Hospitality Management**
        (Deposition)                           USDC Middle District of FL

2016    **Intellectual Ventures II** v. AT&T Mobility
        (Deposition)                           USDC District of DE

2016    **One World Foods** v. Stubbs Austin Restaurant Company
        (Deposition)                           USDC Western District of TX

2016    **Booking.com B.V.** v. Michelle Lee
        (Deposition)                           USDC Eastern District of VA

2016    Variety Stores v. **Walmart Stores, Inc.**
        (Trial)                                USDC Eastern District of NC

2016    **American Cruise Lines** v. American Queen Steamboat Company
        (Deposition)                           USDC District of DE

2016   **Ducks Unlimited** v. Boondux LLC and Caleb Sutton
       (Deposition)                              USDC Western District of TN

2016   **Deere & Company** v. Fimco dba Schaben
       (Deposition)                              USDC Western District of KY

2016   Universal Church v. **Univ. Life Church**  USDC Southern District of NY
       (Deposition)

2016   **U. of Houston** v. Houston Col. of Law   USDC Southern District of TX
       (Deposition)

2016   Navajo Nation v. **Urban Outfitters**      USDC District of NM
       (Daubert Hearing)

2016   Beaulieu v. **Mohawk Carpet Dist.**        USDC Northern District of GA
       (Deposition)

2016   Efficient Frontiers v. **Reserve Media**   USDC Central District of CA
       (Deposition)

2016   **McAirlaids** v. Medline Industries       USDC Eastern District of VA
       (Deposition)

2016   **Under Armour** v. Ass Armor             USDC Southern District of FL
       (Deposition)

2016   **C5 & CoorsTek** v. CeramTec             USDC District of Colorado
       (Deposition and trial)

2016   **BBC** v. Stander                        USDC Central District of CA
       (Deposition)

2016   **Caterpillar** v. Tigercat               USPTO Opposition
       (Deposition)

2016   Premier v. **Dish Network**               USPTO Opposition
       (Deposition)

2016   **Omaha Steaks** v. Greater Omaha         USPTO Opposition
       (Rebuttal Testimony)

2016   **EMC** v. Pure Storage                   USDC District of MA

(Deposition)

| | | |
|---|---|---|
| 2016 | **Top Tobacco** v. North Atlantic (Deposition) | USPTO Opposition |
| 2016 | Ascension Health v. **Ascension Ins.** (Deposition) | USDC Eastern District of MO |
| 2016 | **Quoc Viet** v. VV Foods (Deposition and trial) | USDC Central District of CA |
| 2016 | Joules v. **Macy's Merchandising Group** (Deposition and trial) | USDC Southern District of NY |
| 2015 | MMG v. **Heimerl & Lammers** (Deposition and trial) | USDC District of MN |
| 2015 | **PRL USA** v. Rolex (Deposition) | USDC Southern District of NY |
| 2015 | Bison Designs v. **Lejon** (Deposition) | USDC District of CO |
| 2015 | Barrera v. **Pharmavite** (Deposition) | USDC Central District of CA |
| 2015 | **Flowers** v. Bimbo Bakeries (Deposition) | USDC Middle District of GA |
| 2015 | Razor USA v. **Vizio** (Deposition) | USDC Central District of CA |
| 2015 | Allen v. **Simalasan** (Deposition) | USDC Southern District of CA |
| 2015 | **Church & Dwight** v. SPD (Deposition and trial) | USDC Southern District of NY |
| 2015 | BMG Rights Mgmt. v. **Cox Enterprises** (Deposition and trial) | USDC Eastern District of VA |
| 2015 | Verisign v. **XYZ.COM LLC** (Deposition) | USDC Eastern District of VA |

| | | |
|---|---|---|
| 2015 | **Select Comfort v.** Personal Comfort (Deposition) | USDC District of Minn |
| 2015 | Farmer Boys v. **Farm Burger** (Deposition) | USDC Central District of CA |
| 2015 | Ono v. **Head Racquet Sports** (Deposition) | USDC Central District of CA |
| 2015 | **Select Comfort v.** Tempur Sealy (Deposition) | USDC District of Minn |
| 2015 | ExxonMobil v. **FX Networks** (Deposition) | USDC Southern District of TX |
| 2015 | Mullins v. **Premier Nutrition** (Deposition) | USDC Northern District of CA |
| 2015 | **Delta** v. Network Associates (Deposition) | USDC Middle District of FL |
| 2015 | Brady v. **Grendene** (Deposition) | USDC Central District of CA |
| 2015 | **Zippo** v. LOEC (Deposition) | USDC Central District of CA |
| 2015 | Maier v. **ASOS** (Deposition) | USDC District of Maryland |
| 2015 | **Converse** In re: Certain Footwear (Deposition and trial) | International Trade Commission |
| 2014 | Scholz v. **Goudreau** (Deposition) | USDC District of Mass |
| 2014 | **Economy Rent-A-Car** v. Economy Car Rentals (TTAB Testimony) | USPTO |
| 2014 | Weber v. **Sears** (Deposition) | USDC Northern District of IL |

2014   Native American Arts v. **Stone**          USDC Northern District of IL
(Deposition)

2014   Gravity Defyer v. **Under Armour**          USDC Central District of CA
(Trial)

2014   **Adams** v. Target Corporation          USDC Central District of CA
(Deposition)

2014   PODS v. **UHAUL**          USDC Middle District of FL
**(**Deposition and trial**)**

2014   Flushing v. **Green Dot Bank**          USDC Southern District of NY
(Deposition)

2014   Amy's Ice Creams v. **Amy's Kitchen**          USDC Western District of TX
(Deposition)

2014   **Unity Health** v. UnityPoint          USDC Western District of WI
(Deposition)

2014   In re: NCAA Student-athlete litigation          USDC    Northern District of CA
(Deposition and Trial)

2014   Spiraledge v. **SeaWorld**          USDC Southern District of CA
(Deposition)

2014   **Diageo N.A. v.** Mexcor          USDC Southern District of TX
(Deposition and trial)

2014   **Pam Lab** v. Virtus Pharmaceutical          USDC    Southern District of FL
(Deposition and trial)

2014   **US Soccer Federation** v. Players Ass'n   Arbitration
(Arbitration Testimony)

2014   **Estate of Marilyn Monroe** v. AVELA          USDC Southern District of NY
(Deposition)

2014   Kelly-Brown v. **Winfrey, et al.**          USDC Southern District of NY
(Deposition)

2014   Virco Mfg **v. Hertz & Academia**          USDC Central District of CA

(Deposition)

| | | |
|---|---|---|
| 2014 | In re: Hulu Privacy Litigation **(Deposition)** | USDC Northern District of CA |
| 2013 | **Jackson Family Wines** v. Diageo (Deposition) | USDC Northern District of CA |
| 2013 | Bubbles, Inc. v. **Sibu, LLC.** (Deposition) | USDC Eastern District of VA |
| 2013 | Clorox v. **Industrias Dalen** (Deposition) | USDC Northern District of CA |
| 2013 | Globefill v. **Elements Spirits** (Deposition and trial) | USDC Central District of CA |
| 2013 | Active Ride Shop v. **Old Navy** (Deposition and trial) | USDC Central District of CA |
| 2013 | **Macy's Inc**. v. Strategic Marks LLC. (Deposition) | Northern District of CA |
| 2013 | Karoun Dairies, Inc. v. **Karoun Dairies, Inc.** (Deposition) | Southern District of CA |
| 2013 | **Kraft Foods** v. Cracker Barrel Old Country (Deposition and Trial) | Northern District of IL |
| 2013 | **Bayer Healthcare** v. Sergeants Pet Care USDC (Deposition and Trial) | Southern District of NY |
| 2013 | JJI International v. **The Bazar Group, Inc.** (Deposition) | USDC District of RI |
| 2013 | **Fage Dairy USA** v. General Mills (Deposition) | Northern District of NY |
| 2013 | Gameshow Network v. **Cablevision** (Deposition and trial) | F.C.C. |
| 2013 | Telebrands v. **Meyer Marketing** (Deposition) | USDC Eastern District of CA |

| | | |
|---|---|---|
| 2012 | Marketquest v. **BIC**<br>(Deposition) | USDC Southern District of CA |
| 2012 | **Hornady** v. DoubleTap<br>(Deposition) | USDC District of Utah |
| 2012 | **Briggs/Kohler** Opposition to Honda<br>(Deposition) | TTAB |
| 2012 | **Apple** v. Samsung<br>(Deposition and Trial) | USDC Northern District of CA |
| 2012 | Forest River v. **Heartland**<br>(Deposition) | USDC Northern District of IN |
| 2012 | SPD v. **Church & Dwight**<br>(Deposition) | USDC District of NJ |
| 2012 | Brighton Collectibles v. **Texas Leather**<br>(Deposition) | USDC Southern District of CA |
| 2012 | **Cytosport** v. Vital Pharmaceuticals<br>(Deposition) | USDC Eastern District of CA |
| 2012 | Authors Guild v. **Google**<br>(Deposition) | USDC Southern District of NY |
| 2012 | Clear Choice v. **Real Choice**<br>(Opposition testimony) | TTAB |
| 2011 | **Borghese** v. Perlier et al.<br>(Deposition) | USDC Southern District of NY |
| 2011 | My Favorite Company v. **Wal-Mart**<br>(Deposition) | USDC Central District of CA |
| 2011 | **PepsiCo** v. Pirincci<br>(Opposition testimony) | TTAB |
| 2011 | **GAP Inc.** v. G.A.P. Adventures<br>(Trial) | USDC Southern District of NY |

| 2011 | **Merck Eprova** v. Brookstone<br>(Deposition and trial) | USDC Southern District of NY |
| 2011 | Wella, Inc. v. **Willagirl LLC**<br>(Deposition) | USDC Southern District of NY |
| 2011 | Bauer Bros. v. **Nike**<br>(Deposition) | USDC Southern District of CA |
| 2011 | **Aviva Sports** v. Manley<br>(Deposition) | USDC District of Minnesota |
| 2011 | **American Express** v. Black Card LLC<br>(Deposition) | USDC Southern District of NY |
| 2011 | Gosmile v. **Dr. Levine**<br>(Preliminary Injunction Trial) | USDC Southern District of NY |

*Presentations*

What's New in Advertising Law, Claim Support and Self-Regulation?
(ABA Seminar, November 17, 2015)

How Reliable is Your Online Survey
(2015 ASRC Annual Conference, September 29, 2015)

What Do Consumers Think?  Using Online Surveys to Demonstrate Implied Claims
(ANA Advertising Law and Public Policy Conference, April 1, 2015)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual
Property & Technology Institute, May 30, 2013)

Using Survey Experts in Trademark Litigation (DRI Intellectual Property Seminar, May
9, 2013)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference,
Snowmass Colorado, January 2013)

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

<u>Measuring Consumer Confusion Through Online Surveys</u> (2011 Midwest IP Institute) (September, 2011)

<u>Online Surveys as Evidence in Trademark Disputes</u> (International Trademark Association Annual Conference, May 2011)

<u>Managing Intellectual Property Trademark Roundtable</u> (April 7, 2010)

<u>Recent Trends in Trademark Surveys</u> (Virginia State Bar Intellectual Property Conference, October 2009)

<u>Trademark Surveys in US Litigation</u> (presentation for International Trademark Association Annual Conference) (May 2009)

<u>How to Conduct Surveys for use in Trademark Disputes</u> (Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

<u>Trademark and Advertising Perception Studies for Legal Disputes</u> (Opinion Research Corporation Seminar, June 2008)

<u>Understanding Advertising Perception Surveys</u> (Promotions Marketing Association Annual Law Conference) (November 2007)

<u>Designing and Implementing Studies to Substantiate Advertising Claims</u> (American Conference Institute Claims Substantiation Conference, October 2007)

<u>Surveys in Trademark and False Advertising Disputes</u> (InfoUSA Webinar, June 2007)

<u>Measuring Consumer Perception in False Advertising and Trademark Cases</u>, (multiple presentations) (2007)

<u>Potential Errors to Avoid In Designing a Trademark Dilution Survey</u> (American Intellectual Property Association paper, April 2007)

<u>Consumer Surveys in Trademark and Advertising Cases</u> (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

<u>Use of Survey Research and Expert Testimony in Trademark Litigation</u>, (International Trademark Association Annual Conference, May 2006)

<u>Survey Research as Evidence in Trademark/Trade Dress Disputes</u> (multiple presentations) (2006)

<u>Using Surveys to Measure Secondary Meaning of Trade Dress</u>, Legal Education Seminar, Boston, April 2006

*Publications/Papers*

<u>Cutting Edge Developments in Trademark Surveys</u> (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

<u>Hot Topics and Recent Developments in Trademark Surveys</u> (paper for May 2013 DRI Intellectual Property Conference)

<u>Surveys in Trademark and Advertising Litigation</u>  (2013 National CLE Conference, Snowmass Colorado, January 2013)

<u>Trademark Litigation Online Consumer Surveys</u> (Practical Law Company Intellectual Property and Technology, May 2012)

<u>Hot Topics in Advertising Law 2012</u> (Contributor to Practising Law Institute publication)

<u>A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys</u>, 100 TMR 756 (May-June 2010)

<u>Recent Trends in Trademark Surveys</u> (paper for Virginia State Bar Intellectual Property conference, October 2009)

<u>Trademark Dilution Revision Act breathes new life into dilution surveys</u> (In Brief PLI website, June 2009)

<u>The Mark</u> (Survey Newsletter; three editions 2009)

<u>Hot Topics in Trademark Surveys</u> (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

<u>The Mark</u> (Survey Newsletter, 2008)

<u>Trademark and Advertising Survey Report</u> (Summer 2007)

<u>Avoiding Pitfalls in Dilution Surveys under TDRA</u> (AIPLA Spring Conference, Boston, May 2007)

*Commentary*

Comment on Hotels.com case (on TTABLOG.COM, July 24, 2009)

Comment on Nextel v. Motorola (on TTABLOG.COM, June 19, 2009)

PLI All-Star Briefing Newsletter, "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

*Professional Memberships/Affiliations*

American Association of Public Opinion Research

Council of American Survey Research Organizations

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

Exhibit B

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                    ---o0o---

4

5   JEANNE AND NICOLAS STATHAKOS, )

6   et al,                        )

7          Plaintiffs,            )

8     vs.                         )   No. 4:15-cv-04543-YGR

9   COLUMBIA SPORTSWEAR COMPANY;  )

10  COLUMBIA SPORTSWEAR USA       )

11  CORPORATION,                  )

12          Defendants.           )

13  _____)

14

15

16

17      VIDEOTAPED DEPOSITION OF CAROL A. SCOTT, PH.D.

18              WEDNESDAY, MARCH 1, 2017

19

20

21

22

23

24  PAGES 1 - 260

25

Carol A. Scott                                                      March 1, 2017

Page 83

```
 1                  9.5 percent of respondents answered that
 2     the reference price was a retail price, which you've
 3     contended was a general response; is that right?
 4          A     General response?
 5          Q     Yes.
 6          A     Meaning what?
 7          Q     You used that term -- and we can go back
 8     and look at paragraph 27 of your report, but I
 9     believe in paragraph 27, you -- you stated that
10     retail price was a general -- a general observation.
11     So if you look at paragraph 27, which is on page 16
12     of your report at the bottom, so page 17 of 92, you
13     say:  "A few" -- and I'm reading from the bottom of
14     that paragraph:
15                     "A few respondents mentioned
16                 it was an MSRP or manufacturer's
17                 suggested price, which I understand
18                 is not incorrect, and a few
19                 respondents indicated that the two
20                 prices are not real/marketing
21                 tools.  Other more general
22                 responses include retail price,
23                 9.5 percent, the price before it
24                 went on sale, 9.5 percent, or the
25                 price in another store,
```

Carol A. Scott                                    March 1, 2017

Page 84

```
 1                8.1 percent, which are more

 2                general."

 3                Do you see that?

 4      A         Yes.

 5      Q         Okay.

 6                So you've called the -- the answer

 7      indicating that the reference price was a retail

 8      price to be more general; is that fair?

 9      A         That's correct.

10      Q         Okay.

11                And you didn't include this data, meaning

12      the 9.5 percent of respondents who answered that the

13      reference price was a retail price, as being

14      consistent with Plaintiffs' contention in this case

15      that consumers believe that the reference price is a

16      prior price of the same product, correct?

17      A         Correct.

18      Q         The only responses that you considered as

19      being consistent with Plaintiffs' theory were the

20      40.5 percent that were associated with the original

21      or first sale price; is that right?

22                MR. CARDON:   Well, that misstates -- that

23      misstates the witness's testimony.   Vague and

24      ambiguous as to "consistent with Plaintiffs'

25      theory."
```

Carol A. Scott                                    March 1, 2017

Page 85

1    BY MS. GOLD:

2         Q      You can answer.

3         A      So now -- so I believe that Plaintiffs'

4    theory has to do with same item, same store.  This

5    is the price it was sold in the store and now it's

6    not sold at the store.  And they are claiming, and

7    the Plaintiff is claiming, that because it was a

8    similar item sold in different stores, then that's

9    somehow not good.  Okay?

10              So my interpretation is that if someone

11   says this is the original price, it was sold at this

12   price, that that's what is most consistent with the

13   Plaintiffs' theory.

14              Some people said retail price; that's all

15   they said.  And a retail price could mean it was the

16   intended retail price, it was the price that it may

17   have been offered at a retail store.  It's the price

18   it would have been if it was offered at a retail

19   store.  There was some language like that.  So

20   that's why, in my mind, a retail price is broken out

21   separately.

22        Q      So that is -- that -- that represents your

23   view of -- well, let me just strike that.

24              In your view, what's the difference

25   between an answer of an original price, which you

Carol A. Scott                                    March 1, 2017

Page 86

1   coded as being consistent with the Plaintiffs'

2   theory of the reference price being a former price

3   of the same item, and the answer of a retail price

4   that was given?

5        A      Well, in my mind --

6               MR. CARDON:   Asked -- asked and answered.

7               Go ahead.

8               THE WITNESS:   In my mind, when people walk

9   into an outlet store, they know they are in an

10  outlet store, right?   There's no -- no mistaking

11  that they are in an outlet store.   And they don't

12  expect to pay, quote, retail prices, right?   They

13  are in an outlet store for a reason.   They think

14  that there is something different; I'm going to get

15  a nice bargain or something.   That's, kind of, the

16  definition of an outlet store.

17              So when they say "retail," what do they

18  mean by "retail price"?   Do they mean that this

19  specific item was sold at retail?   Do they mean --

20  and there is some -- you know, some of the responses

21  are pretty clear, that's what it was going to cost

22  at retail.   Or if I bought this at Macy's, this is

23  what it would cost.   If I bought it at the retail

24  price, if I was going to buy it at a high-end

25  specialty store.   Well, if that product was offered

Carol A. Scott                                         March 1, 2017

Page 87

1    at those stores, that could well be the price,

2    right?

3    BY MS. GOLD:

4         Q    Right.

5              A former -- a former price of the same

6    product at another store, correct?

7              MR. CARDON:  Objection; argumentative.

8              THE WITNESS:  No, I don't think that's

9    what it says.  I don't know that they are assuming

10   that it was formerly sold at that.  It's just, if it

11   were offered -- if it were offered in an retail

12   outlet, this is -- in a regular retail store, this

13   is what that number would be.

14             But many of those times, they don't

15   specify whether they thought it actually was there

16   or whether it might have been or whether it would

17   be, if it was.  That's why I categorize it as

18   somewhat separately.

19   BY MS. GOLD:

20        Q    Are you offering an expert opinion in this

21   case that a response of retail price, in this

22   context, cannot refer to a former price of the same

23   item?

24        A    I'm offering an opinion that that's a

25   vague response whose meaning is not entirely clear.

1      That's why I call it a more general response.

2          Q      Okay.

3                 Moving on to the next item, which is

4      responses categorized as, "Price before it 'went on

5      sale,' the 'sale price.'"

6                 Do you see that, the next line down?

7          A      Yes.

8          Q      Okay.

9                 Another 9.5 percent of respondents

10     answered that the reference price was a price before

11     it went on sale -- or it was categorized as a "Price

12     before it 'went on sale, sale price,'" which you

13     also contended was general, which we just -- we just

14     saw in paragraph 27.

15         A      Yes.

16         Q      Do you see that?

17         A      Yes.

18         Q      Okay.

19                Again, you didn't include this data as

20     being consistent with Plaintiffs' contention that

21     consumers believed the reference price to be a prior

22     price of the same item, correct?

23         A      Well, what I agreed is that I thought this

24     was a more general one and it was not as specific.

25     And that if you read the verbatims, I think you can

1    say some of them might respond to that, and some of

2    them might not.

3              But a sale -- this is a sale price.  Well,

4    what does that mean?  Is it on sale versus what it

5    used to be?  Is it on sale versus what it would have

6    cost at another outlet?

7              I think that's why we list it, it's

8    clearly here, where nobody is trying to, you know,

9    put that under the rug.  It's clearly out in the

10   table and people can make of it what they wish.  I

11   don't think it is as directly related to the

12   Plaintiffs' theory as some other people might.

13   Q      So let's talk about the first part of the

14   coding, which is "Price before it 'went on sale.'"

15             Do you see that?

16   A      Yes.

17   Q      So what -- what, in your view, is the

18   difference between an answer of "Original price" and

19   "Price before it 'went on sale,'" in the context of

20   how the prices are presented on the tags in this

21   study?

22       A      Well, for me -- and again, everybody is

23   free to look at those responses and see what they

24   think, but it was the price before Columbia decided

25   to put it in the outlet store.  Right?  That was

1    their manufacturer's suggested retail price.  They

2    decided to put it in the outlet store and now they

3    have another price, sale price.  Lower price or

4    sales price.

5            So those responses, to me, don't have any

6    specification, overt specification, as to whether

7    that product sold there for a long period of time or

8    they sold that many -- that they sold units at that

9    price.  I mean, I think that's all bound up in the

10   Plaintiffs' theory, is that the -- that higher price

11   needs to be something that a significant number of

12   the goods were sold at before.  And that doesn't say

13   that.

14        Q    Well, you testified, I think, that the

15   price before sale referred to -- was the price

16   before Columbia decided to put it in the outlet

17   store.

18            And we know, though, don't we -- and

19   you're not contesting here that the outlet SMU

20   builds were never sold at the higher reference price

21   on any of the tags, correct?

22        A    That's my assumption.

23        Q    Okay.

24            So -- so what do you mean when you say it

25   was the price that Columbia decided to put it in the

Carol A. Scott                                    March 1, 2017

Page 91

1    outlet store at?  I believe that was your testimony.

2        A      Well, from my point of view, if you put a

3    manufacturer's suggested retail price on something,

4    then at any point in time Columbia decided, they

5    could have put it somewhere else if they chose to.

6        Q      But there is no evidence in this case that

7    Columbia ever did that, is there?

8        A      Well, I don't know of any.

9        Q      Okay.

10              Now, the answer of "Price before it 'went

11   on sale,'" that answer doesn't suggest that

12   consumers who responded thought that the higher

13   price was the price of a different but similar item,

14   does it?

15       A      Not necessarily, no.

16       Q      Okay.

17              And, again, are you offering an expert

18   opinion in this case that the "Price before it 'went

19   on sale'" response cannot refer to a former price of

20   the same item?

21       A      Well, it might, but it doesn't say that

22   clearly.  That's why I classified it as more

23   general.

24       Q      Okay.

25              Moving down to the next line, "Price in

1       another store."

2                       Do you see that?

3           A       Yes.

4           Q       Okay.

5                       So another 8.1 percent of respondents

6       answered that the reference price was a "Price in

7       another store," which you also contended was

8       general.

9                       And, again, you didn't include this data,

10      did you, as being consistent with Plaintiffs'

11      contention that consumers believe the reference

12      price is a former price of the same item, did you?

13                      THE WITNESS:   Would you read that for me?

14                              (Record read as follows:

15                              "Q   So another 8.1 percent of

16                              respondents answered that the

17                              reference price was a 'Price in

18                              another store,' which you also

19                              contended was general.   And

20                              again, you didn't include this

21                              data, did you, as being

22                              consistent with Plaintiffs'

23                              contention that consumers

24                              believe the reference price is a

25                              former price of the same item,

 1                      did you?")

 2            THE WITNESS:  Lordy.  I did not include

 3    this item in the text in the report as being most

 4    consistent with the Plaintiffs' theory.

 5    BY MS. GOLD:

 6        Q    Why not?

 7        A    Because -- well, again, some of them say,

 8    If I were going -- if I bought this in Macy's,

 9    that's what it would cost.

10            And my understanding is, if it was sold in

11    Macy's, that was going to be what it would cost, or

12    what the price would be.  So it's a way of parsing

13    this out.  If somebody believes, Oh, if I bought

14    this in a high-end sporting goods store, yeah, I'd

15    probably be paying that price.  That could be true,

16    couldn't it?  I mean -- and I think Plaintiffs would

17    say -- they might argue that that has some negative

18    effect.  But, in fact, it could potentially be true.

19    So I think it's useful to split those out so we can

20    see which one is which.

21        Q    But if some respondents said, if it -- I

22    think what you just said was that some respondents

23    could have said, If it was sold in Macy's, that what

24    it would cost -- that's what it would cost, or

25    that's what the price would be.

```
 1          But that's consistent with a former price
 2   of the same item sold somewhere else; is it not?
 3          MR. CARDON:  Objection; argumentative,
 4   asked and answered.  You're just -- you're just
 5   arguing with her now.  She told you her answer and
 6   you're saying no.
 7          THE WITNESS:  It's okay.
 8   BY MS. GOLD:
 9       Q    You can answer.
10       A    I'll give the same answer.
11            If somebody says to me -- if somebody said
12   to me, You know, if I bought that item at a high-end
13   sporting goods store, yes, that's the price I would
14   expect to pay.  Do they mean that they think it was
15   offered there at that price?  Do they think it might
16   at some point be offered there at that price?  Do
17   they know when it was offered?  Is it at the same
18   time?  Was it last season?  Do they think that there
19   were substantial sales made of that product in that
20   other store?
21            I don't know that.  So that's why it's a
22   general, okay, for me.  And, again, you know, people
23   can look at this and make their own decisions about
24   it but, to me, that's a little bit different
25   meaning.
```

Carol A. Scott                                    March 1, 2017

Page 95

 1        Q      Now, this answer of "Price in another
 2   store" does not suggest that the reference price is
 3   a higher price of a similar but different item, does
 4   it?
 5        A      Well, I don't think it says that either.
 6   I think it's a general response.
 7        Q      Okay.
 8               Moving down, another 6.1 percent of
 9   respondents' responses were categorized as
10   "Discount/Before discount price."
11               Do you see that?
12        A      Yes.
13        Q      Okay.
14        A      Okay.  And I need to caution you about one
15   thing before you go on, because you said it twice
16   now, and I meant to correct you and I didn't.  You
17   said an additional 6.1, okay?  Be very careful when
18   you do that.  It's most of the time going to be
19   right, but not always, because if you see at the
20   bottom --
21        Q      Okay.
22        A      -- there were 148 respondents and there
23   were 160 mentions.  So some people gave more than
24   one reason.
25        Q      Okay.  I see.

Carol A. Scott                                    March 1, 2017

Page 96

1      A      So you can't automatically -- you won't be
2   too far off, but you can't automatically add these.
3      Q      Okay.
4             And is there a way to figure that out, in
5   terms of they were coded twice, from the raw data
6   that were -- that was provided?
7      A      You can figure out if one Respondent gave
8   two -- gave answers that would have been given two
9   codes.
10     Q      You -- okay.
11     A      Yes, you could figure that out.
12     Q      So you could figure that out from the raw
13  data?
14     A      Yes, you could.
15     Q      Thank you.  I appreciate that.
16            So, again, we were looking at
17  "Discount/Before discount price."
18     A      Right.
19     Q      Okay.
20            And, again, you did not include the
21  6.1 percent of respondents as being consistent with
22  the Plaintiffs' -- most consistent with the
23  Plaintiffs' theory that the reference -- that
24  consumers believe the reference price is a price of
25  the same item, former price of the same item; is

Carol A. Scott                    March 1, 2017

Page 97

1    that correct?

2        A    I don't believe that response is called

3    out specifically in that paragraph, but I would

4    not -- it is not part of the 40 percent original

5    sale price.

6        Q    Right.

7             The only -- the only part or the only

8    responses that you considered in reaching your

9    opinion about the meaning -- consumers' view of the

10   meaning of the reference price was the 40.5

11   associated with "Original or first sale price,

12   actual price," correct?

13       A    That's correct.

14       Q    Okay.

15            So why, in your view, was the response

16   coded as "Discount or Before discount price" not

17   consistent with Plaintiffs' contention that

18   consumers believe the higher reference price to be a

19   former price of the same item?

20       A    Okay.  We don't know that, because as I

21   understand it, the higher price is an MSRP, that's

22   what that is, and then a discount factor is used.

23   You represented that it's 20 to 30 percent.  A

24   discount factor is applied to it and that's how you

25   get a sale price in the store.

1          So that doesn't imply to me that the

2    consumer necessarily believes that the product was

3    sold at that higher price.

4        Q    I just want to make sure I follow you.

5             Just -- and are you saying that because,

6    in your view, the before discount price doesn't

7    necessarily mean a price it was actually sold at?

8        A    Correct.

9        Q    And what are you basing that opinion on?

10       A    Well, I think, you know, we can look at

11   your former questions, which says, there is this

12   higher price, there is manufacturer's suggested,

13   retail price, and it is the same for these different

14   variations in the goods.  And then for these set of

15   goods, there is a discount factor that's applied.

16   Okay?

17            So, in fact, it is a discount from that.

18   You know, Columbia has established a price, and then

19   they have applied a discount.

20            Okay.  Now, if consumers say, Oh, okay,

21   this is the price before a discount.  Well, that's

22   actually kind of true.  Right?

23       Q    If it was ever actually sold at that

24   price, though, right?

25            MR. CARDON:  Again, argumentative.

1    BY MS. GOLD:

2         Q     If it was never sold at that price --

3               MR. CARDON:   The -- the witness is

4    testifying.   She's giving you her answers and you're

5    telling her she's wrong, according to you.

6               MS. GOLD:   No.   Okay.

7    BY MS. GOLD:

8         Q     You can answer.

9         A     Well, I'm just saying it could be, but

10   nobody has established that.   Everybody knows, going

11   into an outlet store, that you're going to have some

12   discounts.

13              I think the Plaintiffs' theory is that

14   there is an expectation that the product has been --

15   that exact product has been sold -- and hopefully,

16   and according to them -- in that same store at that

17   price for some period of time.   And I'm just saying,

18   when somebody says it's a discount off of a price,

19   maybe they have those assumptions and maybe they

20   don't.

21   BY MS. GOLD:

22        Q     What's your basis for your view that the

23   Plaintiffs' theory is that the item had to be sold

24   at the exact same store?

25        A     Well, I think if you read the complaint

1    and if you read Dr. Compeau, I think he would say

2    that that's the closest one.  They might accept in

3    another store, but then you get into all of these

4    complications, right?  Is it a store in your area?

5    Is it a store not in your area?  Is it available at

6    the same time?  Is it not at the same time?

7             There is all kinds of complications about

8    what qualifies, in somebody's mind, as to what's a

9    legitimate externally-provided reference price.

10            And I'm just saying that here, when

11   somebody says it's a discount off of some price, I

12   don't know what all they're thinking about behind

13   that.

14       Q    But you've made the determination to

15   categorize it in a way that's inconsistent with the

16   Plaintiffs' theory?

17       A    No, I said it's --

18            MR. CARDON:  Objection; vague and

19   ambiguous.  That's your characterization.

20            THE WITNESS:  I said it's a more general

21   response that is not as clearly consistent.

22   BY MS. GOLD:

23       Q    Okay.

24            So then, is it your expert opinion in this

25   case that a response of "Discount" -- I'm sorry,

Page 101

1   "Before discount price" cannot refer to the former

2   price of the same item?

3        A      Well, it might.  Well, and it may be.  But

4   what kind of former price?  Is it a former price

5   that was used in the store, or was it a

6   manufacturer's sales price?  Or was it something

7   else?

8                That's why it shows that we don't know

9   what that refers to.

10       Q      Okay.

11               Going down a few lines to "Regular price."

12  Do you see that?  It's about three or four more

13  lines down.

14       A      Yes.

15       Q      And 2.7 percent of respondents' answer

16  were categorized as "Regular price," correct?

17       A      That's correct.

18       Q      Okay.

19       A      You skipped my favorite, which is "Two

20  prices are not real," but yes, that's somewhere

21  down.  And it does say, reference price -- "Regular

22  price," and that's four people, 2.7 percent.

23       Q      Okay.

24               And again, you do not include this data,

25  responses of "Regular price," as being consistent

Page 102

1  with Plaintiffs' contention that consumers believe

2  the reference price is the former -- is a former

3  price of the same item, correct?

4       A    That's correct.

5       Q    Okay.

6            Why not, for "Regular price"?

7       A    Okay.  Because, again, this is a more

8  general notion.  What do you mean by "Regular

9  price"?  Is that it's full price if there had

10 been -- if it wasn't sold in an outlet store?  What

11 does the regular price mean?  That's a pretty vague

12 term.  Does it mean -- "regular" must mean, Oh, they

13 sold it for a year, they sold it for the season,

14 they sold it for a day.  One person in here, I can't

15 remember which category, they said, Oh, that's the

16 price when it barely came out.  It's like they

17 expected that you might have sold it for a day and

18 it was discounted.

19            Well, so what counts as a "regular price"?

20 Since I don't know that, I am going to put it down

21 as a general response.

22      Q    But if it's -- if it's still a former

23 price -- if they're -- in that response that you

24 just mentioned, it's the -- it's the -- I want to

25 use the right term that you used.  It's "the price

Carol A. Scott                                                    March 1, 2017

                                                         Page 103

1        when it barely came out" --

2            A       Right.

3            Q       -- I think that's what you said.  That's

4        still a response that indicates a former price of

5        the same item, isn't it?

6            A       Well, if it -- if we -- and I think we

7        probably would have put that in "Original or first

8        sale price," even though it would not be consistent

9        with Plaintiffs' theory, right?  Because Plaintiffs'

10       theory is that you're confused; that you're thinking

11       that the product must have sold for some period of

12       time in some quantity at that price.  And if

13       somebody knows that it might have been sold there --

14       you might not have sold anything because only on at

15       that price for 30 minutes, then they're not really

16       confused.

17           Q       Okay.

18                   Moving on to -- we're talking again about

19       "Regular price."  The response of "Regular price"

20       doesn't suggest that consumers think that the higher

21       price is a price of a different but similar item,

22       does it?

23           A       It doesn't necessarily, no.

24           Q       Okay.

25                   So when you --

Carol A. Scott                                                    March 1, 2017

Page 104

```
 1        A      Although, I could say for that one -- I
 2   should just mention that this term is so general.
 3   When you say, Oh, that's the regular price, does
 4   that mean regular price of this item?  Regular price
 5   of this category of goods?  You know, that's when I
 6   say "regular" is kind of general.  I don't know
 7   exactly what they thought about that.
 8        Q      Okay.
 9               So I'm still -- I'm just trying to
10   understand what the difference, in your view, is
11   between the answers of original -- between the term
12   "original," "actual," and "regular."
13        A      Okay.
14        Q      So can you just clarify that for me?
15        A      Well --
16               MR. CARDON:  Asked and answered.
17               But you can go ahead and do it again.
18               THE WITNESS:  When it says, "This is the
19   original price," that, to me, means that's the price
20   it originally was, okay?  That's the price it
21   originally was sold at.  Or "first sales price,"
22   that's the first price it was on sale for.  The
23   "actual price," it was an actual price of that good.
24   And so those -- some of them are a little vaguer,
25   still, but we kind of erred on the side of caution
```

1   and put most anything in that category.

2              Other things that are not as clear as to

3   what they refer to, we put in these other categories

4   which, again, are listed.  And that's my

5   interpretation of them and why we did it that way.

6   BY MS. GOLD:

7        Q    Okay.

8             Can you look at the last sentence in

9   paragraph 27 of your report, which is on page 18 of

10  92.

11       A    So it's the last sentence of paragraph 27?

12       Q    Yeah.  So it's on the top of page 17 of

13  your report, which is page 18 of 92.  I'll just read

14  it.  It says:

15                  "Thus, while some consumers do

16                  perceive it to be related to an

17                  original or regular retail price,

18                  others have different views, with

19                  no one view held by more than

20                  50 percent of the respondents."

21                  Do you see that?

22       A    Yes.

23       Q    So in this sentence, you use the terms

24  "original" or "regular" interchangeably, do you not?

25       A    Well, I sort of made a -- yeah -- a very

Carol A. Scott                                                              March 1, 2017

Page 106

1    vague statement there.  But I think what I would say

2    is, some do perceive it to be original; some people

3    perceive it to be a regular retail price; and others

4    have different views, which I think is represented

5    in the table.  And I don't count up more than

6    50 percent of the respondents for any of those

7    individual categories.

8         Q     But in this sentence, at least, you group

9    people who respond as orig- -- relate -- as it being

10   perceived as either original or regular together,

11   but yet in the data, you didn't add in the responses

12   related to regular price as being similar to and

13   consistent with Plaintiffs' theory like you did

14   original price.

15             So I'm just wondering what the -- let me

16   just ask you that.

17             MR. CARDON:  Objection; misstates the

18   document.  In the sentence you're referring to,

19   those words are not in quotes.  And where they are

20   used to define categories, they are in quotes with

21   the entire category name.

22             THE WITNESS:  I think what I would say is

23   that they're not -- they're not combined.  They are

24   still separate.  Right?  It's an "or," right?  Some

25   people said it's original or some people said

Carol A. Scott                                    March 1, 2017

Page 107

 1    something about a retail price and others have

 2    different views.  So I think it's consistent with

 3    the table.

 4            You might -- it's not -- I agree, it's not

 5    the clearest statement in the world, and somebody

 6    could maybe misunderstand it, but that's my intent.

 7    BY MS. GOLD:

 8        Q    It just seemed to me, in this sentence,

 9    that you were grouping respondents, some who gave

10    the response of "original" or "regular" in -- sort

11    of in the same group in terms of their perception.

12    But yet, in the -- in the data, you didn't do that

13    in terms of how you -- how you categorized it and

14    how you have made -- drawn conclusions from that.

15    So I'm trying to understand what distinction you

16    drew.

17            MR. CARDON:  Asked and answered.  And now

18    you're being argumentative.

19            THE WITNESS:  And I -- yeah.  I would say

20    that your interpretation of that sentence is

21    inconsistent with my intent.

22            MS. GOLD:  Okay.

23            MR. CARDON:  So what do you want to do in

24    terms of timing?  It's just -- it's about ten to

25    12:00.  Do you want to -- it's been about an hour

Carol A. Scott                                    March 1, 2017

Page 108

1    since we've taken a break.  Do you -- what do you

2    want to do in terms of lunch?  Should we go off

3    record and discuss the planning of the day?

4              MS. GOLD:  I mean, I'd rather keep going,

5    at least until 12:30, unless the witness, obviously,

6    or anyone needs to stop.  I'm not going to, you

7    know, force anyone to stay.

8              MR. CARDON:  I'd like to take a break

9    about, if not more often, at least about once an

10   hour.  So let's take a break now, then.

11             MS. GOLD:  Okay.  Sure.

12             THE VIDEOGRAPHER:  This marks the end --

13   we're going off the record at 11:53 a.m.

14                  (Recess taken.)

15             THE VIDEOGRAPHER:  We're back on the

16   record at 12:01 p.m. and we're continuing media

17   number 2.

18   BY MS. GOLD:

19        Q    Okay.  Dr. Scott, so let's go back to

20   Exhibit H-16.

21        A    Sure.

22        Q    Which is, just to help you out, it's on 84

23   of 92 if you look at the top of the document.

24        A    So glad somebody put those page numbers on

25   there.

Carol A. Scott                                        March 1, 2017

                                                  Page 109

1        Q      The Court filing --

2               MR. CARDON:  The Court did that, yeah.

3               THE WITNESS:  Thank goodness.  Okay.

4     BY MS. GOLD:

5        Q      Okay.

6               So we left off at "Regular price" and I

7     want to move down to "Markdown/Marked up price."

8               Do you see that?

9        A      Yes.

10       Q      Okay.

11              So another -- or -- well, you -- I won't

12    say another.

13              1.4 percent of respondents' responses were

14    categorized as believing that the higher price on

15    the tag represented "Markdown/Marked up price."

16              Do you see that?

17       A      Yes.

18       Q      Okay.

19              You didn't include this data related to

20    "Markdown/Marked up price" as consistent with

21    Plaintiffs' theory that the reference price --

22    consumers believe the reference price to be the

23    higher former price of the same item, correct?

24       A      That's correct.

25       Q      And why not?

Page 110

1        A        Okay.   I didn't because if you say this is

2   a marked down price, well, it is.   But marked down

3   from what?   I mean, that's why it's a general thing.

4   I don't know what it's marked down from.   It does --

5   it was originally being sold for blah blah blah, and

6   then it was marked down.

7            You know, all of these will -- in some

8   ways, it's conservative to break these out this way.

9   Because later, when I test the impact of giving

10  people disclosures, it will actually give me a

11  stronger test of the Plaintiffs' hypothesis.   So

12  that's a good thing for me.

13       Q        But this, the data related to exhibit --

14  the data in Exhibit H-16 and question 13, I believe,

15  is what it's flowing from, that's only data that you

16  used to reach your opinion in this case about the

17  meaning of the reference price; is it not?

18       A        That's correct.   But it will also come

19  into play when we do the later -- another opinion,

20  it will -- it will lend credence to the later result

21  and conclusion on a different opinion.

22       Q        Okay.

23            But the only data related to your opinions

24  on what consumers believe the meaning of the

25  reference price to be flows from this data in H-16,

1    correct?

2         A      That's correct.

3         Q      Okay.

4                MR. CARDON:  And -- and I'll object that

5    that misstates the witness's testimony and the

6    documents as to what opinion B is.  It leaves out

7    the second half of it.

8    BY MS. GOLD:

9         Q      Okay.

10               Going back to the "Markdown/Marked up

11   price" response, you would agree, would you not,

12   that the response "Markdown/Marked up price" doesn't

13   indicate the consumers think the higher price is a

14   price of a different but similar item, does it?

15        A      That's a general response.

16        Q      So is that a "yes" or a "no"?

17        A      It doesn't indicate that.  No, it does

18   not.

19        Q      Okay.

20               And doesn't the answer "Markdown/Marked up

21   price" indicate the respondent thought that the item

22   previously sold at the marked up price?

23        A      Maybe yes, maybe no.

24        Q      Why do you think that might not be true?

25        A      Well, in fact, it is a marked down price.

Carol A. Scott                                    March 1, 2017

Page 112

1    There is a manufacturer's suggested retail price and

2    then it's been marked down.

3              So when somebody says it's a marked down

4    price or it's a mark up, from what?  It doesn't give

5    me any reference to that.  So whatever their

6    reference is.

7        Q    So in your view, "Markdown/Marked up

8    price" doesn't have to be a price that ever was --

9    an item was ever actually sold at in a consumer's

10   mind.

11       A    Doesn't need to be.

12       Q    So are you offering an expert opinion in

13   this case that marked up price cannot refer to a

14   former price of the same item?

15       A    No.

16       Q    Okay.

17       A    But I don't have any evidence that that's

18   the case.  I mean, I think that's -- that's the

19   reason why I provided these responses in the detail

20   that I have.

21       Q    Okay.

22       A    Right?

23       Q    Okay.  That's fair.

24              Okay.  One more.  I'm moving down one more

25   to the next line of "Outlet versus non-outlet

Page 113

1    price."

2              Do you see that?

3    A    Yes.

4    Q    And, again, we've got 1.4 percent of

5    respondents' responses being categorized as "Outlet

6    versus non-outlet price."

7              And, again, you didn't include this data

8    as being consistent with the Plaintiffs' contention

9    that consumers believe the reference price to be a

10   prior price of the same item, correct?

11   A    Let me just check something.

12             Oh, okay.  I should have corrected this

13   before.  If you look at page -- my report,

14   paragraph 27, 16, it says, "Approximately 40 percent

15   of respondents" --

16   Q    Can you hold on one moment just so I can

17   get to where you are --

18   A    Sure.

19   Q    -- because I want to make sure I

20   understand your point.

21   A    Sure.

22   Q    Thank you.  I appreciate that.  Go ahead.

23   A    Okay.  So the sentence starts:

24             "Approximately 40 percent of

25             respondents mentioned something

Carol A. Scott                                        March 1, 2017

Page 114

```
 1              related to an original price, the
 2              first sale price, or the actual
 3              price, which is similar to
 4              Plaintiffs' contention that
 5              consumers believe it to be a
 6              price," and so on.
 7              So you keep saying it's consistent with
 8     their hypothesis, and I think that's something that
 9     we've used in conversation here in the -- in the
10     deposition, but it's not -- that language isn't used
11     here.  So I think it's a little softer than that,
12     which is -- it's my view that this is similar --
13     this is similar to your theory because it implies
14     that it actually was sold at that price.  And that
15     the others are more general, that it may or may not
16     imply that.
17        Q    And dissimilar, then?  Would that be fair
18     to say?  Dissimilar?
19        A    Similar.  The --
20        Q    Right.
21        A    The first category is similar.  In my
22     view, is similar to what the Plaintiff has
23     contended.
24              These other responses are more general and
25     are not necessarily similar to that.
```

Carol A. Scott                                    March 1, 2017

Page 115

```
 1        Q        So are you saying that they are dissimilar
 2   or you're not?
 3        A        Well, I'm saying that they are -- that
 4   they are more general and the reference is unclear.
 5   The first one, to me, clearly indicates that people
 6   believe that it was sold at that price.  These
 7   others, maybe yes, maybe no.  They are more general
 8   in focus.
 9        Q        But -- but you're not saying that they are
10   dissimilar, necessarily, correct?
11             MR. CARDON:  Argumentative, and asked and
12   answered.  This is the third time you -- you've
13   tried to get her to use the word "dissimilar" when
14   she's using the word "general."
15             THE WITNESS:  Okay.  I think that we
16   should leave it at that.  That I think these are
17   more general responses for which the reference is
18   not clear or is not specified.
19   BY MS. GOLD:
20        Q        Okay.
21                 So let me go back, because I don't
22   remember where we left off.  Okay.
23                 So I think where I left off was -- was
24   just on this "Outlet versus non-outlet price" and
25   asking you whether or not you included those
```

Carol A. Scott                                    March 1, 2017

                                                    Page 116

1    responses as being similar to, we'll use that --

2         A    Right.

3         Q    -- Plaintiffs' theory in this case.

4         A    Right.

5         Q    So is that -- you did or you did not

6    include them?

7         A    I did not, obviously.

8         Q    Okay.

9              And -- and can you explain to me why not,

10   for "Outlet versus non-outlet price"?

11        A    Okay.  Because, you know, again, according

12   to Defendants, if that product had sold at a non- --

13   at a non-outlet store, that would, in fact, be the

14   price.  Right?

15             So here, if somebody says, Oh, that's what

16   I would pay for it at a Macy's or a high-end

17   sporting goods store, then we don't know for sure if

18   they expect that it was for some period of time, or

19   it wasn't, or if it was going to be.  So that's why

20   I put it into a general category.  But they do

21   expect that there is a difference between outlet and

22   non-outlet prices.

23        Q    But nothing about the "Outlet versus

24   non-outlet price" indicates that respondents think

25   it's a different but similar item at another store,

Carol A. Scott                                                    March 1, 2017

Page 117

 1      does it?

 2           A      Well, that's not what I'm saying at all.

 3      I'm not making a claim about that.

 4           Q      Okay.

 5                  But can I get an answer to that question,

 6      then?

 7                  Does -- in your view, does anything about

 8      an answer of "Outlet versus non-outlet price"

 9      indicate that the consumer believed it was a

10      different but similar item at another store?

11           A      Okay.  And what I would say is there is

12      nothing in that item that suggests that is true, or

13      that there was an expectation that it actually sold

14      in that -- in that non-outlet store.  There is

15      nothing to suggest either way.

16           Q      Okay.

17                  So are you offering an expert opinion in

18      this case that -- that the -- an answer of

19      non-outlet price cannot refer to a former price of

20      the same item?

21           A      Cannot refer to it?

22           Q      (Nods head.)

23           A      I mean, I guess what I've said is it could

24      refer to a number of things.  But it's a general

25      response about an expectation of different prices in

Page 118

1    different stores.

2         Q      But it could be considered to be referring

3    to a former price of the same item?

4              MR. CARDON:  Now -- now, are you asking

5    her -- just asking her that question or are you

6    asking her if that's an expert opinion of hers in

7    this case?

8              MS. GOLD:  That's what I am asking her.

9              MR. CARDON:  Which?

10             MS. GOLD:  Whether it could be.

11             MR. CARDON:  It could be --

12             MS. GOLD:  That's what I asked.

13             MR. CARDON:  -- just generally, not

14   whether that's part of one of her opinions?

15             THE WITNESS:  I think what I've said, and

16   I should probably stay there, is that this is a

17   general response, and I do not know what the

18   referent is.

19             I don't know that it's a same item.  I

20   don't know that it's a same item sold for some

21   period of time.  I don't know that the consumer

22   would say -- well, actually I do know that.  But I

23   don't know if they are intending, at that moment in

24   time, of thinking about the general category of

25   goods; that's what -- what products like this would

Carol A. Scott                                      March 1, 2017

                                                        Page 119

 1    cost at a non-outlet.  I don't know what the

 2    referent is.  That's why I listed it as general.

 3    BY MS. GOLD:

 4          Q      Okay.

 5          A      So I'm not trying to say that it proves

 6    something one way or the other.  I'm saying it's

 7    general.

 8          Q      Okay.

 9                 And so I'm asking you, then:  In this

10    case, is it your expert opinion that "non-outlet

11    price" cannot refer to a former price of the same

12    item?

13                 MR. CARDON:  She's simply asking you if

14    you have that expert opinion in this case.

15                 THE WITNESS:  I'd say, you know, no, I

16    don't.  Because I told you three times, this is a

17    general price.  I can't tell you what the reference

18    is.  I can't tell you that it is, and I can't tell

19    you that it isn't.

20                 So the fact that it couldn't be, that's in

21    the theory of, is anything possible?  Since I don't

22    know the referent, I can't tell you that.

23    BY MS. GOLD:

24          Q      Okay.

25          A      But it doesn't mean anything, really, one

Page 120

1      way or the other.

2          Q    Okay.

3               Now, you -- in this classification that

4      was done -- and I understand that you supervised it

5      and approved it so --

6          A    Yes.

7          Q    -- I'll say you classified, but you

8      approved the classification -- only one respondent

9      as giving an answer that indicated a belief that the

10     higher price was the price of an other product or

11     other type in size.

12              Do you see that?  It's the second from the

13     bottom, correct?

14         A    Yes.

15         Q    Okay.

16              And that represented less than 1 percent

17     of the survey sample, correct?

18         A    That's correct.

19         Q    Okay.

20              And question 10 of the survey, so let's go

21     there.  And this is, I believe, on page 45 of 92.

22     If you think I've gotten that wrong, tell me, but I

23     think that's the right one.

24         A    That's on survey A, yes?

25         Q    Yes.  Okay.

1    That's why I call it a more general response.

2         Q    Okay.

3              Moving on to the next item, which is

4    responses categorized as, "Price before it 'went on

5    sale,' the 'sale price.'"

6              Do you see that, the next line down?

7         A    Yes.

8         Q    Okay.

9              Another 9.5 percent of respondents

10   answered that the reference price was a price before

11   it went on sale -- or it was categorized as a "Price

12   before it 'went on sale, sale price,'" which you

13   also contended was general, which we just -- we just

14   saw in paragraph 27.

15        A    Yes.

16        Q    Do you see that?

17        A    Yes.

18        Q    Okay.

19             Again, you didn't include this data as

20   being consistent with Plaintiffs' contention that

21   consumers believed the reference price to be a prior

22   price of the same item, correct?

23        A    Well, what I agreed is that I thought this

24   was a more general one and it was not as specific.

25   And that if you read the verbatims, I think you can

1    say some of them might respond to that, and some of

2    them might not.

3              But a sale -- this is a sale price.  Well,

4    what does that mean?  Is it on sale versus what it

5    used to be?  Is it on sale versus what it would have

6    cost at another outlet?

7              I think that's why we list it, it's

8    clearly here, where nobody is trying to, you know,

9    put that under the rug.  It's clearly out in the

10   table and people can make of it what they wish.  I

11   don't think it is as directly related to the

12   Plaintiffs' theory as some other people might.

13        Q    So let's talk about the first part of the

14   coding, which is "Price before it 'went on sale.'"

15             Do you see that?

16        A    Yes.

17        Q    So what -- what, in your view, is the

18   difference between an answer of "Original price" and

19   "Price before it 'went on sale,'" in the context of

20   how the prices are presented on the tags in this

21   study?

22        A    Well, for me -- and again, everybody is

23   free to look at those responses and see what they

24   think, but it was the price before Columbia decided

25   to put it in the outlet store.  Right?  That was

Carol A. Scott                                March 1, 2017

                                                Page 102

1    with Plaintiffs' contention that consumers believe

2    the reference price is the former -- is a former

3    price of the same item, correct?

4            A    That's correct.

5            Q    Okay.

6                 Why not, for "Regular price"?

7            A    Okay.  Because, again, this is a more

8    general notion.  What do you mean by "Regular

9    price"?  Is that it's full price if there had

10   been -- if it wasn't sold in an outlet store?  What

11   does the regular price mean?  That's a pretty vague

12   term.  Does it mean -- "regular" must mean, Oh, they

13   sold it for a year, they sold it for the season,

14   they sold it for a day.  One person in here, I can't

15   remember which category, they said, Oh, that's the

16   price when it barely came out.  It's like they

17   expected that you might have sold it for a day and

18   it was discounted.

19                Well, so what counts as a "regular price"?

20   Since I don't know that, I am going to put it down

21   as a general response.

22           Q    But if it's -- if it's still a former

23   price -- if they're -- in that response that you

24   just mentioned, it's the -- it's the -- I want to

25   use the right term that you used.  It's "the price

Carol A. Scott                                    March 1, 2017

                                                    Page 110

 1      A    Okay.  I didn't because if you say this is

 2   a marked down price, well, it is.  But marked down

 3   from what?  I mean, that's why it's a general thing.

 4   I don't know what it's marked down from.  It does --

 5   it was originally being sold for blah blah blah, and

 6   then it was marked down.

 7           You know, all of these will -- in some

 8   ways, it's conservative to break these out this way.

 9   Because later, when I test the impact of giving

10   people disclosures, it will actually give me a

11   stronger test of the Plaintiffs' hypothesis.  So

12   that's a good thing for me.

13      Q    But this, the data related to exhibit --

14   the data in Exhibit H-16 and question 13, I believe,

15   is what it's flowing from, that's only data that you

16   used to reach your opinion in this case about the

17   meaning of the reference price; is it not?

18      A    That's correct.  But it will also come

19   into play when we do the later -- another opinion,

20   it will -- it will lend credence to the later result

21   and conclusion on a different opinion.

22      Q    Okay.

23           But the only data related to your opinions

24   on what consumers believe the meaning of the

25   reference price to be flows from this data in H-16,

1    different stores.

2         Q    But it could be considered to be referring

3    to a former price of the same item?

4              MR. CARDON:  Now -- now, are you asking

5    her -- just asking her that question or are you

6    asking her if that's an expert opinion of hers in

7    this case?

8              MS. GOLD:  That's what I am asking her.

9              MR. CARDON:  Which?

10             MS. GOLD:  Whether it could be.

11             MR. CARDON:  It could be --

12             MS. GOLD:  That's what I asked.

13             MR. CARDON:  -- just generally, not

14   whether that's part of one of her opinions?

15             THE WITNESS:  I think what I've said, and

16   I should probably stay there, is that this is a

17   general response, and I do not know what the

18   referent is.

19             I don't know that it's a same item.  I

20   don't know that it's a same item sold for some

21   period of time.  I don't know that the consumer

22   would say -- well, actually I do know that.  But I

23   don't know if they are intending, at that moment in

24   time, of thinking about the general category of

25   goods; that's what -- what products like this would

Carol A. Scott                                    March 1, 2017

Page 119

1    cost at a non-outlet.  I don't know what the
2    referent is.  That's why I listed it as general.
3    BY MS. GOLD:
4         Q    Okay.
5         A    So I'm not trying to say that it proves
6    something one way or the other.  I'm saying it's
7    general.
8         Q    Okay.
9              And so I'm asking you, then:  In this
10   case, is it your expert opinion that "non-outlet
11   price" cannot refer to a former price of the same
12   item?
13             MR. CARDON:  She's simply asking you if
14   you have that expert opinion in this case.
15             THE WITNESS:  I'd say, you know, no, I
16   don't.  Because I told you three times, this is a
17   general price.  I can't tell you what the reference
18   is.  I can't tell you that it is, and I can't tell
19   you that it isn't.
20             So the fact that it couldn't be, that's in
21   the theory of, is anything possible?  Since I don't
22   know the referent, I can't tell you that.
23   BY MS. GOLD:
24        Q    Okay.
25        A    But it doesn't mean anything, really, one

Page 224

1   between the 57.7 percent who rated it highest

2   overall quality when they were only shown the blue

3   jacket versus the 41.8 percent who rated it highest

4   overall quality when they were shown both jackets

5   and given an explanation, that that difference is

6   statistically significant at the 95 percent

7   confidence level?

8        A    If you want to take one point of the data,

9   sure.

10       Q    Okay.

11            And so would you agree with me that

12  knowing what the higher reference price meant,

13  comparing these two, reduced the perception of the

14  quality of the jacket?

15       A    Yes.

16       Q    Okay.

17       A    It's still high, but it's reduced it.  And

18  I, personally, would not do that kind of analysis

19  because taking a single point out of that

20  distribution doesn't make a whole lot of sense.

21            But if you look at the top two, you still

22  see a significant difference, but it's now -- giving

23  a top-two-box, you still have almost three-fourths

24  of the people giving the blue jacket the

25  top-two-box, which is a pretty high number, versus

 1        A      That's correct.   Or reduced the frequency
 2   of people thinking it's the high- -- it's a -- the
 3   highest number, the highest level of value, yes.
 4        Q      Okay.
 5               MR. CARDON:   I don't -- can I just ask, I
 6   don't see where -- we're on H-14?
 7               MS. GOLD:   Yes.
 8               MR. CARDON:   I don't see -- I see 62.9,
 9   not 65.1.
10               THE WITNESS:   She's asking me about black
11   and blue, 65.  And this is the black only.
12               MR. CARDON:   Got it.
13   BY MS. GOLD:
14        Q      Okay.
15               MR. CARDON:   Thank you.
16               THE WITNESS:   Which it -- I mean, it's --
17   you know, it's interesting that the -- never mind.
18               MS. GOLD:   I don't think there is a
19   question pending.  Okay.
20   BY MS. GOLD:
21        Q      Would you agree with me that the essence
22   of scientific experimentation is that if there is
23   only one variable that changes from one test group
24   to the next, the experiment, then, can assess the
25   impact of that variable?