## REBUTTAL EXPERT REPORT OF GABRIELE GOLDAPER

*Jeanne and Nicholas Stathakos vs. Columbia Sportswear Company*

*Case No. 4:15-cv-04543 (YGR)*

### I.        Introduction

1.        I was retained by the law firm of Tycko & Zavareei, LLP, on behalf of their clients, Jeanne and Nicholas Stathakos (hereinafter "Plaintiffs") as an expert consultant in the wholesale and retail industry, in the above-identified lawsuit.

2.        My initial assignment in this case was to compare pricing, costing, and design documents (and physical garments where available) related to each of the seven Outlet SMU Builds purchased by the Plaintiffs and its inline counterpart, and determine whether each Outlet SMU Build was identical to its inline counterpart, and if they were not identical, the extent to which they differed. I was also asked to perform the same comparative analysis with respect to additional SMU-Inline pairs, the information for which was provided to me by Counsel.

3.        On November 16, 2016, I provided an expert report outlining my qualifications, methodology, and findings.

4.        Subsequently, I was asked to prepare this rebuttal report to describe in greater detail: (1) my experience and expertise related to garment construction; (2) the methodology I employed to reach the conclusions stated in my initial report; and (3) apparel industry standards for determining the extent to which garments differ.

5.        The opinions and conclusions stated in my initial report have not changed.

### II.        Summary of Opinions Offered in This Rebuttal Report

6.        It is my opinion that any trained, qualified and experienced apparel production professional with expertise in garment construction and production procedures would employ the methodology I used when performing my assignment; namely, to review the design drawings ("tech pack") for each garment and conduct a

visual inspection of the actual garments to determine whether any two garments were identical, and if not, to determine how and to what degree they differed.

7.   Likewise, it is my opinion that any trained, qualified and experienced apparel production professional with expertise in garment construction and production procedures would conclude, as I did, that none of the SMU garments were identical to their Inline counterparts, and that the differences between the paired garments fell along a spectrum from modest stylistic differences to material differences.

### III.   My Experience and Expertise Related to Garment Construction

8.   Over the course of my career in the apparel industry, which spans more than 45 years, I have developed a particular expertise in garment construction.

9.   Garment construction is the process of working with garment parts that require one or more separate pieces to be assembled as a unit; the basic sections of garments includes top fronts, top backs, bottom fronts, bottom backs, sleeves, collars/neckline treatments, cuffs/sleeve treatments, plackets, pockets, waistline treatments, and hems.

10.   My earliest and best practical training in garment construction came directly from many factory owners and their production personnel, with whom I worked hands-on to oversee the production of garments when I owned my own company and when I subsequently held key executive positions in major apparel companies, where I was responsible for production.  After several years of working with many factory production professionals in the USA, China, Mexico, India, and South and Central America, my experience in construction of garments grew to the point where I became qualified to be the intermediary between the designers of garments and the sewing factories.  In that intermediary role, I referred to the tech packs and CADs to ensure that the factories built the garment in accordance with the design specifications for each garment. As an example: when I was Vice President of

High Tide swimwear, in the early to mid- 1970's, or when I owned my own company, in the late 1970s to early 1980s, I was responsible for production. This meant that I was responsible for working with the technical designers and their specifications for garments, taking these specifications to the factories, explaining and/or demonstrating as needed any specifications to the factories, and then verifying that the factories where adhering to the specifications and that the final products were constructed and sewn properly as specified.

####    IV.    <u>Methodology and Industry Standards</u>

11.    I relied on my expertise in the apparel industry generally and garment construction specifically to reach the opinions and conclusions expressed in my initial report. As outlined therein, my methodology entailed the review of technical design drawings, tech packs, and, where available, actual garments to identify and describe the differences between the garments in each SMU-Inline pair.

12.    As the apparel industry has become more globalized, the need for providing detailed accurate specifications for garment construction has become a standard practice in the apparel industry. Thus, it has become a standard practice to use tech packs, which are detailed technical, descriptive documents, as the vehicle for communicating instructions for the construction of a garment to the manufacturing factories. Apparel professionals establish a firm's product standards and specifications based on predetermined preferences of their target customers, preferred quality characteristics, cost, price levels and capabilities for production. Thus, the use of tech packs for providing written specifications for garment construction, has become a standard practice in the apparel industry; however, each company, sets their own standards and specification for the construction of their particular garments.

13.    Similarly, the use of computer -aided-design, also referred to as CAD, has become a standard practice in the apparel industry. There are many different apparel software programs for this application, but they all are computer integrated

3

systems that aid in the designing and patternmaking processes. The visuals or print-outs of CADs are illustrations of each garment's silhouette and provide some design details which are an additional tool used to assist the factories in constructing garments.

14.     For my work in this case, in addition to reviewing the tech packs and CADs, I examined the actual garments when they were made available to me. Visual inspection of the garment was helpful in two primary ways. First, I compared the actual garment to the tech pack and the technical drawing to confirm whether the design differences reflected in the drawings were incorporated into the finished garment. Second, close visual inspection of the actual garment made it easier for me to determine differences in the fine detail of the garment, such as the "hand" (or physical feel) of the fabric, the type of stitching, and the closeness of stitches to one another, the differences in closures, the differences in the placement of seams and the kinds of seams and the construction of necklines and collars or cuffs.

15.     In deposition, I was asked whether I could name anyone in the apparel industry who could render the opinions I offered in my initial report. I am not personally acquainted with anyone who has my level of expertise in garment construction and production procedures and who also serves as an apparel expert witness.

16.     It is my opinion, however, that any trained, qualified experienced apparel production professional with knowledge of garment construction and production procedures would employ the methodology I used here; namely, review of the technical design drawings and tech packs and visual inspection of the actual garments to determine whether any two garments were identical, and if not, to determine how and to what degree they differed.

17.     Likewise, it is my opinion that any trained, qualified, experienced apparel production professional with expertise in garment construction and production

procedures would conclude, as I did, that none of the SMU garments were identical to their Inline counterparts, and that the differences between the paired garments fell along a spectrum from modest stylistic differences to material differences. While another expert might use a different descriptive word (*i.e.* someone else might substitute "small" or "minor" where I used "modest"; or they might say "major" or "significant" instead of "material"), that expert would however, replicate my methodology and arrive at the same substantive conclusions I reached.

Date: *March 8, 2017*   *Gabriele Goldaper*

Gabriele Goldaper