1

**TYCKO & ZAVAREEI LLP**
KRISTEN LAW SAGAFI, California Bar No. 222249

2

ksagafi@tzlegal.com
ANNICK M. PERSINGER, California Bar No. 272996

3

apersinger@tzlegal.com483 Ninth Street, Suite 200
Oakland, CA 94607

4

Telephone (510) 254-6808
Facsimile (510) 210-0571

5

6

*Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

7

8

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

9

10

11

JEANNE and NICOLAS STATHAKOS,
individually and on behalf of all others similarly
situated,

Case No. 4:15-cv-04543 (YGR)

12

13

Plaintiffs,

**REPLY DECLARATION OF KRISTEN
LAW SAGAFI IN SUPPORT OF
PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION AND IN
OPPOSITION TO COLUMBIA'S
MOTION FOR SUMMARY JUDGMENT**

14

vs.

15

COLUMBIA SPORTSWEAR COMPANY;
COLUMBIA SPORTSWEAR USA
CORPORATION,

16

17

Defendants.

Hon. Yvonne Gonzalez Rogers

18

Hearing Date:    April 25, 2017; 2:00 PM
Courtroom:       1, 4th Floor, Oakland
                 Courthouse

19

20

21

22

23

24

25

26

27

28

1    I, Kristen Law Sagafi, declare as follows:

2    1.    I am an attorney in good standing with the California State Bar, State Bar No.

3    222249. I am a partner in the law firm of Tycko & Zavareei, LLP ("TZ"), and I am counsel for

4    Plaintiffs Jeanne and Nicolas Stathakos in the above-captioned matter.

5    2.    I have personal knowledge of the matters set forth below. If called as a witness I

6    could and would competently testify to the matters included herein.

7    3.    Attached hereto as Exhibit 1 are excerpts from the November 2, 2016 deposition of

8    Jeanne Stathakos in this matter.

9    4.    Attached hereto as Exhibit 2 are excerpts from the November 3, 2016 deposition of

10   Nicolas Stathakos in this matter.

11   5.    Attached hereto as Exhibit 3 are excerpts from the September 27, 2016 deposition of

12   Melissa Olson in this matter.

13   6.    Attached hereto as Exhibit 4 are excerpts from the January 13, 2017 deposition of

14   Larry D. Compeau in this matter.

15   7.    Attached hereto as Exhibit 5 are excerpts from the September 28, 2016 deposition of

16   James Robert "Bobby" Bui in this matter.

17   8.    Attached hereto as Exhibit 6 are true and correct copies of production documents that

18   depict the Outlet SMU Build products the Plaintiffs purchased. The photographs correspond to the

19   following items:

20        Item 1 (XM6093):    STATHAKOS000005

21        Item 2 (XL5077):    STATHAKOS000023

22        Item 3(a) (XL4712):   STATHAKOS000026

23        Item 3(b) (XL4712):   STATHAKOS000027

24        Item 4 (XL6981):    STATHAKOS000030

25        Item 5 (XO5035):    STATHAKOS000039

26        Item 6 (XL5012):    STATHAKOS000040

27        Item 7 (XL6923)     STATHAKOS000045

28   The "Columbia Item Outlet No." appearing directly above each photograph refers to Plaintiffs'

inventory of all Columbia products they own; that information can be disregarded for present

1  purposes.

2        9.      Attached hereto as Exhibit 7 are true and correct copies of production documents

3  Bates stamped STATHAKOS000128-130, which reflect Plaintiffs' purchase from a Columbia

4  outlet store on May 30, 2015.

5        10.     On or about August 18, 2015, Nick Stathakos contacted TZ through a survey portal

6  on www.TopClassActions.com to learn more about the firm's investigation of reference pricing

7  practices at issue in this case. The Top Class Actions website sent an email to TZ paralegal Sydney

8  Teng and TZ partner Jeffrey Kaliel attaching Mr. Stathakos' survey results. Thereafter, I am

9  informed and believe that at the direction of Mr. Kaliel, Ms. Teng corresponded with Mr. and Mrs.

10 Stathakos. Then, also at the direction of Mr. Kaliel, Ms. Teng interviewed Mr. and Mrs. Stathakos.

11 After our firm conducted a background investigation into Mr. and Mrs. Stathakos, and the firm

12 management approved the representation, Ms. Teng finalized the Attorney Representation. Then,

13 attorneys at the firm, together with our co-counsel, prepared their initial complaint. A privilege log

14 detailing the extensive contact between Mr. and Mrs. Stathakos and TZ in advance of filing the

15 initial complaint in this action was submitted as Exhibit 14 to the Ramsey Declaration [Dkt.75-5].

16 Mr. and Mrs. Stathakos signed an attorney representation agreement with TZ on or about September

17 14, 2015. The Stathakos' initial complaint was filed October 2, 2015.

18       11.     I joined TZ in January 2016 to launch an Oakland office for the firm, which is

19 headquartered in Washington, DC. Shortly after I opened TZ's Oakland office, management

20 responsibility for this matter was transferred to me. I entered an appearance in this case on February

21 17, 2016 and was first in touch with Jeanne Stathakos via email on that day. Later in February 2016,

22 I met with Nick and Jeanne Stathakos in person for the first time. I have been in regular contact

23 with them about these proceedings since that time.

24       12.     In or around April 2016, I was asked to assume management responsibility for TZ on

25 two of the outlet pricing cases Columbia mentions in its papers:

26   • *Farwell v Levi Strauss & Co.*, SF Superior Court, Case No. CGC-14-541316

27   • *Barber v. DSW Inc.*, C.D. Cal., Case No. 8:15-cv-02024-JGB; and

28

REPLY DECLARATION OF
KRISTEN L. SAGAFI

13.     I entered an appearance in *Farwell* on April 19, 2016. When I joined the team, I was aware that Farwell had been out of communication with plaintiffs' counsel for several months. It was my understanding then, as it is now, that Mr. Farwell had retained Wayne Kreger to represent him against Levis', and that Mr. Kreger had the only relationship with Mr. Farwell.

14.     I have never had any contact with Mr. Farwell, and I have no knowledge of the circumstances surrounding his decision to engage counsel or serve as a named plaintiff.  By the time I joined the case team, Plaintiff's counsel were already out of touch with Mr. Farwell and coordinating dismissal of his claims. Mr. Kreger represented to attorneys at my firm that he could not locate Mr. Farwell and that he went to Mr. Farwell's home to try to find him. Mr. Kreger told my law partners that Mr. Farwell's neighbors told Mr. Kreger that they believed Mr. Farwell was in a residential rehabilitation center for substance abuse. Mr. Farwell's claims were eventually dismissed with prejudice and two new plaintiffs were substituted into the case. Thereafter, Judge Karnow approved the parties' joint request for dismissal of the new plaintiffs' individual claims with prejudice and dismissal of the class claims without prejudice. The case is now closed.

15.     I entered an appearance in *Barber* on April 21, 2016. Several days later, on May 2, 2016, plaintiffs filed an amended complaint adding Deborah Baumel as a named plaintiff. At the time of filing, I knew that Ms. Baumel was acquainted with Mr. Kreger and was informed that she had joined the case through him. Mr. Kreger provided documents from Ms. Baumel to be used in drafting the amended complaint. To the best of my recollection, I did not have any contact with Ms. Baumel prior to filing the amended complaint adding her as a plaintiff.

16.     DSW filed its motion to dismiss Ms. Baumel's claims on May 16, 2016. [Dkt. 35] I was surprised by DSW's arguments related to Ms. Baumel's standing, which made me concerned about her standing. The next day, I called defense counsel, Stephanie Sheridan, to request a brief extension of plaintiffs' opposition deadline so that I could investigate the standing issues personally and thoroughly.   Thereafter, I spoke with Ms. Baumel directly, and she decided to voluntarily dismiss her claims rather than oppose DSW's motion. The Court granted her request for voluntary dismissal pursuant to Fed. Rule Civ. Proc. 41(A)(1)(a)(i) on May 27, 2016.

17.     On May 31, 2016, Plaintiff Amy Evans, whom I interviewed at length prior to executing an attorney representation agreement with her, filed a new case against DSW: *Evans v. DSW Inc.*, C.D. Cal., Case No. Case 2:16-cv-03791-JGB. DSW's motion to dismiss Ms. Evans' claims was denied in its entirety in an order dated February 3, 2017. A true and correct copy of that order is attached as Exhibit 8.

18.     I have had no direct involvement in *Lucas v. Jos. A. Bank Clothiers, Inc.*, Case No. 3:14-cv-01631-LAB-JLB (S.D. Cal). I am informed by my law partners who worked on the case that attorneys at the law firm of Spangenberg, Shibley & Liber had the primary relationship with the plaintiff in that case. Moreover, after a thorough investigation and evidentiary hearing in which plaintiff's counsel testified under oath, Judge Burns held that the plaintiff—and not his counsel— was responsible for any wrongdoing. A true and correct copy of that order is attached as Exhibit 9.

19.     Mr. Kreger has not any contact with the Plaintiffs in this matter, nor has he done any substantive work on the case since I made my first appearance. He is not included on emails among co-counsel, does not participate in strategy meetings, and does not contribute to briefing or discovery efforts. To the best of my knowledge, he has not been involved in this litigation in any way for more than a year, and we do not seek his appointment as class counsel.

20.     Attached hereto as Exhibit 10 are excerpts from the December 20, 2016 deposition of Gabriele Goldaper in this matter.

21.     Attached hereto as Exhibit 11 is an excerpt from the March 1, 2017 deposition of Carol A. Scott in this matter.

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct and that this declaration was executed on March 13, 2017 in Oakland, California.

REPLY DECLARATION OF
KRISTEN L. SAGAFI

1

2 DATED: March 13, 2017                    By:    */s/ Kristen Law Sagafi*
                                                  Kristen Law Sagafi
3                                                 Attorney for Plaintiffs

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY DECLARATION OF
KRISTEN L. SAGAFI

Exhibit 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JEANNE and NICHOLAS STATHAKOS, individually and on behalf of all others similarly situated,<br><br>                 Plaintiffs,<br><br>      vs.<br><br>COLUMBIA SPORTSWEAR COMPANY; COLUMBIA SPORTSWEAR USA CORPORATION,<br><br>                 Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.<br>) 4:15-cv-04543-YGR<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

VIDEOTAPED DEPOSITION OF JEANNE STATHAKOS, taken at Four Embarcadero Center, 17th Floor, San Francisco, California on November 2, 2016, at 9:42 a.m., before Jay W. Harbidge, Certified Shorthand Reporter in and for the State of California.

JEANNE STATHAKOS

```
 1      Q.      You're in Oakland, okay.

 2              When did you move from Tracy to Oakland?

 3      A.      2000.

 4      Q.      So Columbia Sportswear is the defendant in

 5  this action, as you know.  When, if you remember, was

 6  the first time you went to a Columbia store?

 7      A.      I don't remember the exact date.  It was

 8  quite a number of years ago.  And the first store was an

 9  outlet store, actually.

10      Q.      Have you ever been to a Columbia store that

11  was not an outlet?

12      A.      No.

13      Q.      Do you remember the last time you went

14  shopping in a Columbia outlet?

15      A.      Yes.  February 14th, 2016.

16      Q.      And do you know -- why did you go shopping at

17  Columbia that day?

18      A.      We were planning -- we were getting ready for

19  a trip to Rhode Island and needed some outerwear.

20      Q.      Would you say that you do most of your

21  shopping at an outlet mall versus a regular mall?

22      A.      No.

23      Q.      About the same or more for the regular mall?

24      A.      I wouldn't even say regular mall.  Maybe

25  online shopping.
```

JEANNE STATHAKOS

November 02, 2016

```
 1    secondary price on the bottom that would be anywhere
 2    from maybe 20 percent or more lower than the top price.
 3         Q.    Other than those two prices, have you ever
 4    seen a third price on a price tag?
 5         A.    I have.
 6         Q.    And can you describe for me what that was or
 7    looked like?
 8         A.    Actually, it looked like a grocery store
 9    type.  It was a gun where you change the numbers and
10    then you just slap it on there.
11         Q.    Okay.  So in your example you said there was
12    a top price of, and you gave an example of a hundred
13    dollars.
14         A.    Uh-huh.
15         Q.    What did you understand that price to be?
16         A.    I understood it to be a price, a retail
17    price, something that I would find at perhaps one of
18    their retail stores or any other store that sold this
19    item other than their outlet store.
20         Q.    Did you believe that the hundred dollars --
21    we'll keep using that example, the hundred dollar
22    price -- was the price at which a similar item sold
23    elsewhere?
24         A.    I don't think -- I didn't believe it to be a
25    similar item; I believed it to be the exact same item to
```

JEANNE STATHAKOS

November 02, 2016

1    be sold at perhaps a retail store.

2        Q.      Why did you believe that?

3        A.      There was nothing on the tag to make me

4    believe otherwise.

5        Q.      Have you ever shopped at a different store

6    where the price tags also listed two price tags?

7        A.      Yes.

8        Q.      Which stores?

9        A.      Okay.  I couldn't name them all, but there's

10   quite a few.  I've seen them at Macy's; I've seen them

11   at like Target.

12       Q.      So you remember from those stores that the

13   price tag itself actually listed two prices on it?

14       A.      Yes.

15       Q.      Was the lower price in those scenarios

16   printed on the tag or put on with a sticker like you

17   mentioned before?

18       A.      A lot of times they were put on or even

19   handwritten, crossed out and handwritten in.

20       Q.      In that scenario where they're put on or

21   crossed out and handwritten, what did you believe the

22   higher price on the tag represented?

23       A.      The retail price that that article or item

24   went for.

25       Q.      At which stores?

JEANNE STATHAKOS

November 02, 2016

1    A.    At the Macy's or Target that I've seen them

2  at.  And these were not outlet stores; these were retail

3  stores.

4    Q.    So in that case the higher price would be, in

5  your view, the retail price that it was sold for at that

6  exact store?

7    A.    Right.

8    Q.    When you went to Columbia outlets, the higher

9  price, the hundred dollars in your example, did you ever

10  believe the hundred dollars represented the price that

11  that item was sold at at the same outlet store?

12    A.    I don't understand.  Can you rephrase that a

13  little bit?

14    Q.    Sure.  So the hundred dollars -- the higher

15  price on the price tag -- when you were at Columbia's

16  outlet store, did you believe that that same item had

17  been sold at the same outlet store for the hundred

18  dollars?

19    A.    I believe that to be a price that it was sold

20  at the retail store.

21    Q.    What do you mean by "retail store"?

22    A.    One of those stand-alone retail stores, not

23  an outlet store, or another retail store that sold

24  Columbia products like REI or Any Mountain -- I'm not

25  sure if they sold it -- but other types of retail stores

JEANNE STATHAKOS

November 02, 2016

1    that sold sporting goods, so...

2         Q.      Other than Columbia outlets, have you

3    purchased -- excuse me.  Other than at a Columbia

4    outlet, have you purchased Columbia products anywhere

5    else?

6         A.      No, not directly, no.

7         Q.      What do you mean by "not directly"?

8         A.      Well, I haven't purchased any -- I'm sorry.

9    I have not purchased any Columbia products other than at

10   the outlet stores, no.

11        Q.      Have you ever seen Columbia gear at another

12   store?

13        A.      I have seen other -- I have seen Columbia

14   products, yes.

15        Q.      Which stores?

16        A.      I've seen them at REI.  I have seen them

17   at -- I want to say when I went with my friend to a

18   Mountain Hardware store.

19        Q.      Anywhere else that you can remember?

20        A.      No.  I don't do a lot of store shopping,

21   but --

22        Q.      Okay.  When you saw the Columbia product at

23   the REI -- let's take that --

24        A.      Uh-huh.

25        Q.      -- you said you've never purchased something

JEANNE STATHAKOS

November 02, 2016

```
1   of Columbia's from REI; is that correct?

2        A.      Yes, no.

3        Q.      So correct?

4        A.      That's correct.

5        Q.      Okay.  Why not?

6        A.      I always felt Columbia was an expensive

7   product to purchase, and usually at retail stores I tend

8   not to look at them.

9        Q.      You tend not to look at Columbia products?

10       A.      Correct.

11       Q.      But you do look at other things?

12       A.      I do look at other things, depending on what

13   I'm in there for.

14       Q.      Do you remember any particular items you may

15   have looked at at an REI store that was a Columbia

16   product?

17       A.      I don't remember.

18       Q.      No particular jacket or T-shirt or shorts?

19       A.      No.

20       Q.      Do you have a view at all as to whether the

21   products available at REI that are Columbia's are of

22   equal quality to the products available at the outlet?

23       A.      I'm sorry.  Could you repeat that one more

24   time?

25       Q.      Sure.  So there's products at REI that are
```

JEANNE STATHAKOS

November 02, 2016

1    Columbia's.  I think you said you've seen them but

2    haven't purchased them; is that right?

3        A.      Yes.

4        Q.      And then there's products at the outlet which

5    you've seen and you've purchased some?

6        A.      Right.

7        Q.      Do you have a view that the products at REI

8    are of the same quality as the products at the outlet?

9            MS. SAGAFI:  Objection, calls for expert

10   opinion.

11          THE WITNESS:  Just from my basic

12   understanding, I would think that what's being sold at

13   the outlets are items that came from the retail stores.

14   BY MR. RAMSEY:

15       Q.      So that's not quite what I'm asking.  So in

16   your experience, you've seen some products at REI and

17   you've also seen some products at Columbia that may not

18   be the same thing that you've seen.

19       A.      Uh-huh.

20       Q.      But would you say that a jacket that you

21   maybe have seen at REI is of a similar or same quality

22   as the jacket at the outlet?

23       A.      I wouldn't know.  I haven't looked at

24   Columbia products at REI.

25       Q.      So how would you -- what would you need to

JEANNE STATHAKOS

November 02, 2016

1    see in order to know?

2              MS. SAGAFI:  Objection, calls for

3    speculation, calls for an expert opinion.

4              THE WITNESS:  I really don't know.  I have to

5    maybe look at the same item side by side.

6    BY MR. RAMSEY:

7        Q.    What about pictures of the items; do you

8    think that would give you an opportunity to judge the

9    quality of each product?

10             MS. SAGAFI:  Objection, calls for

11   speculation, expert opinion.

12             THE WITNESS:  No.  I wouldn't believe that's

13   sufficient.

14   BY MR. RAMSEY:

15       Q.    So you'd want to see the actual products?

16       A.    Yes.

17       Q.    When did you first -- let me go back a

18   second.

19             So you mentioned earlier that you believe

20   that what Columbia was doing that was deceptive was

21   having the two price tags without selling that product

22   before at the higher price.  Is that fair

23   representation?

24             MS. SAGAFI:  Objection, misstates testimony.

25   BY MR. RAMSEY:

JEANNE STATHAKOS

```
 1      Q.     Okay.  So can you just briefly describe again
 2  what you think Columbia is doing wrong?
 3           MS. SAGAFI:  Objection, asked and answered.
 4           THE WITNESS:  I believe their price tags are
 5  misrepresenting their product and their pricing
 6  structure.
 7  BY MR. RAMSEY:
 8      Q.     Okay.  Can you tell me when you first came to
 9  believe that?
10      A.     I guess when I was contacted by the law firm.
11      Q.     Who contacted you?
12      A.     Well, my husband was contacted by a legal
13  assistant with Kristen's office.  I'm sorry.  I forget
14  the whole name of the law firm, but he had answered a
15  questionnaire and they contacted him.  And she in turn
16  called me.
17           MS. SAGAFI:  Jeanne, I just want to remind
18  you not to divulge the substance of any of those
19  conversations.  Everything you've said so far is
20  perfectly all right.
21           THE WITNESS:  Okay.
22  BY MR. RAMSEY:
23      Q.     Well, do you remember when that was, like
24  even a month?
25      A.     I don't remember the month, but it was in
```

JEANNE STATHAKOS

November 02, 2016

```
 1    2015.
 2        Q.      Do you remember about how long before this
 3    lawsuit was filed that happened?
 4        A.      I couldn't tell you.
 5        Q.      A month, two months?
 6                MS. SAGAFI:  Objection, calls for
 7    speculation, asked and answered.
 8                THE WITNESS:  Yes, honestly, I couldn't tell
 9    you.
10    BY MR. RAMSEY:
11        Q.      Was it a day?
12        A.      No, it was not a day.
13        Q.      All right.  I'm sorry.  So you said a form
14    was filled out.  Was that by you or your husband?
15        A.      My husband.
16        Q.      So were you involved at all in filling out
17    the form?
18        A.      No.
19        Q.      Did you see the form?
20        A.      No.
21        Q.      Have you seen it since?
22        A.      No.
23        Q.      I'll ask him tomorrow.
24                So you mentioned that the last time you
25    shopped at the Columbia outlet was February of this
```

JEANNE STATHAKOS

November 02, 2016

1    year, correct?

2    A.    Right.

3    Q.    So you would agree, then, that that was after

4    you came to believe that Columbia's pricing was

5    deceptive?

6    A.    Yes, I guess so, yes.

7    Q.    So focusing only on that day, February 2016

8    when you were shopping at the outlet, did you see price

9    tags with the two prices like you've described?

10   A.    Yes.

11   Q.    And when you were there that day, what did

12   you understand the higher price to represent?

13   A.    At that time I still felt it meant something

14   coming -- even though there was no markings on it, that

15   this item could have come from a retail store and that

16   represented a retail price.

17   Q.    By that time, though, hadn't you been told

18   that the higher price was not in fact a price -- the

19   retail price like you describe it?

20   A.    I was told it could possibly be.

21   Q.    So that day you didn't know one way or the

22   other what that higher price represented?

23   A.    I wasn't a hundred percent clear, no.

24   Q.    Do you believe that you've been damaged as a

25   result of Columbia's pricing?

JEANNE STATHAKOS

```
 1              MS. SAGAFI:  Objection, calls for an expert
 2   opinion.
 3              THE WITNESS:  Explain or describe to me what
 4   damaged would be.
 5   BY MR. RAMSEY:
 6       Q.    Sure.  So do you think by buying at a
 7   Columbia outlet where the higher price on the tag was
 8   not the price at which that item had been selling for at
 9   a retail location -- say REI -- that as a result of you
10   buying that item, you should get money from Columbia?
11              MS. SAGAFI:  Same objections.
12              THE WITNESS:  I felt -- I feel actually I was
13   fooled.  I'm not sure I would quite use the term
14   "damaged."
15   BY MR. RAMSEY:
16       Q.    Do you think you were harmed?
17              MS. SAGAFI:  Same objection.
18              THE WITNESS:  Physical harm, no.
19   BY MR. RAMSEY:
20       Q.    Any other type of harm?
21       A.    I guess it goes back to damage.  I don't
22   believe damage, but absolutely fooled.
23       Q.    Do you think you were injured in any way?
24              MS. SAGAFI:  Same objections.  It calls for a
25   legal conclusion and an expert opinion.
```

JEANNE STATHAKOS

1            THE WITNESS:  Injured, I don't believe so

2    either.

3    BY MR. RAMSEY:

4        Q.    Do you think that you lost money as a result

5    of Columbia's pricing at its outlets?

6        A.    I don't know about that.

7        Q.    I'm sorry.  Is that a no or you don't know

8    or --

9        A.    I absolutely don't know whether I've lost

10   money or not.

11       Q.    What would you need to know in order to

12   figure that out?

13             MS. SAGAFI:  Objection, calls for

14   speculation, legal conclusion and expert opinion.

15             THE WITNESS:  Yes, at this time I don't know.

16   I mean, a lot of factors.

17   BY MR. RAMSEY:

18       Q.    What would those factors be?

19       A.    I don't -- I don't know in particular, but --

20   and I don't know at this time what would be my feelings

21   about loss.

22       Q.    So you said you don't know in particular, and

23   because I'm a lawyer I have to keep following up.

24             So do you know in general how you've lost

25   money, if at all?

JEANNE STATHAKOS

November 02, 2016

```
 1   BY MR. RAMSEY:
 2       Q.      Do you know whether that coat that you bought
 3   that day, your husband's coat, was previously sold at a
 4   retail establishment, not the outlet?
 5       A.      I do not know that.
 6       Q.      If I told you to assume that it hadn't been,
 7   hadn't been sold before, would you still have bought the
 8   coat that day?
 9               MS. SAGAFI:   Objection, calls for
10   speculation.
11               THE WITNESS:   Perhaps.
12   BY MR. RAMSEY:
13       Q.      And why is that?
14       A.      We were looking for a bargain, and it must
15   have been a good bargain for us to buy it.
16       Q.      So what was the bargain that you thought you
17   were getting that day?
18       A.      From the price on top, which we thought at
19   that point may have still been a retail price versus
20   whatever the sale price was on the bottom.
21       Q.      So if I told you to assume that that coat had
22   never been sold at the higher price, would you still
23   have bought the coat that day?
24               MS. SAGAFI:   Objection, calls for
25   speculation.
```

JEANNE STATHAKOS

November 02, 2016

```
 1              THE WITNESS:  I don't know.  I really don't
 2      know if I would have.
 3      BY MR. RAMSEY:
 4          Q.      Okay.  Let's go to the coat for yourself.
 5          A.      Okay.
 6          Q.      Do you remember it at all, what it looks
 7      like?
 8          A.      I do.
 9          Q.      Okay.  Do you remember the price you paid for
10      it?
11          A.      That, I do not know.
12          Q.      How about the higher price on the tag?
13          A.      No, I don't remember.
14          Q.      Do you remember the approximate difference
15      between the two?
16          A.      No.
17          Q.      I want you to assume that you were at the
18      store that day with the coat that you ended up buying
19      and you look at the price tag and there is only one
20      price on the thing and it's the price you paid so
21      there's no two prices.  Would you have still bought the
22      coat that day?
23              MS. SAGAFI:  Objection, calls for
24      speculation.
25              THE WITNESS:  No.
```

JEANNE STATHAKOS

November 02, 2016

1    BY MR. RAMSEY:

2        Q.      Why not?

3        A.      I would want a sale, a deal, and that's the

4    whole purpose of going in there.

5        Q.      Would you have bought a different coat that

6    day?

7              MS. SAGAFI:   Objection, calls for

8    speculation.

9              THE WITNESS:   I don't know either.

10   BY MR. RAMSEY:

11       Q.     I'm going to change topics a little bit.

12   Other than your counsel and your husband, have you

13   talked to anyone about this case?

14       A.     No.

15       Q.     Have you ever read anything in newspapers or

16   maybe seen something on TV about pricing at outlets?

17       A.     No.

18              THE VIDEOGRAPHER:   Going off the record, the

19   time is 10:18 a.m.

20              MS. SAGAFI:   Let's go off the record.

21         (Exhibit 41, Exhibit 42 and Exhibit 43)

22              THE VIDEOGRAPHER:   Back on the record, the

23   time is 10:19 a.m.

24   BY MR. RAMSEY:

25       Q.     Okay.  You're welcome to look through these.

JEANNE STATHAKOS

November 02, 2016

1      A.      I guess I would have to say February 2016.

2      Q.      Okay.  So let's just use that as an example,

3  then.  So when you were at the Columbia store, say, in

4  February and you were looking for a specific item, what

5  would cause you to buy, you know, one jacket over

6  another jacket?

7      A.      In that store?

8      Q.      Yes, yes.

9      A.      First of all, the price, and if I feel like I

10  was getting a bargain, and the need that it fills.

11     Q.      What about how it fits; is that important to

12  you?

13     A.      It is important, yes.

14     Q.      How about the color; is that important to

15  you?

16     A.      I would say yes.

17     Q.      If the jacket maybe wasn't a color that you

18  particularly liked, would you buy the jacket?

19     A.      No.

20     Q.      What if the jacket didn't fit quite right;

21  would you buy the jacket?

22     A.      Absolutely not.

23     Q.      Okay.  What about the quality of the product;

24  is that something that's important to you?

25              MS. SAGAFI:  Objection, vague, calls for

JEANNE STATHAKOS

November 02, 2016

```
 1   BY MR. RAMSEY:
 2        Q.      So how do you, when you're browsing for
 3   Columbia products at an outlet, come up with a price
 4   sort of, yeah, that's a good price for me versus no,
 5   that's a bit too expensive for me?  How do you come up
 6   with that price?
 7              MS. SAGAFI:  Objection, calls for
 8   speculation, incomplete hypothetical.
 9              THE WITNESS:  I would look at the price tag
10   and see what I assume is the retail price that it's
11   going for, what the sale price is and see if I feel
12   that's a bargain.
13   BY MR. RAMSEY:
14        Q.      Okay.  So let's say -- let's stick with that
15   hooded sweater dress.  I think you said that you would
16   not have been willing to pay $50 for it.  Let's say the
17   price tag had two prices on it and the higher price was
18   a hundred dollars and the lower price was $50, so you
19   would have paid $50 for the dress had you decided to buy
20   it.  Would you have bought the dress?
21              MS. SAGAFI:  Objection, calls for
22   speculation.
23              THE WITNESS:  Even if the retail price -- or
24   the higher price at a hundred and it was at $50, no, I
25   don't feel that dress was worth it.
```

JEANNE STATHAKOS

 1   lower price.  I know you don't remember what it is --

 2   that's fine -- but would you have bought the dress that

 3   day if that lower price, which was the price you were

 4   actually going to pay for it, was higher than what you

 5   thought the dress was worth to you?

 6          MS. SAGAFI:  Same objections.

 7          **THE WITNESS:  No, I would not have.**

 8   BY MR. RAMSEY:

 9      Q.    Okay.  So now I want to focus on what factors

10   you consider when coming up with the amount you would be

11   willing to pay for a particular item.  We can continue

12   with the hooded sweater dress if that's easier for you.

13          So can you tell me what factors you consider

14   when you're coming up with a price at which you would

15   pay for an item?

16          MS. SAGAFI:  Objection, asked and answered.

17          **THE WITNESS:  We would be looking at the**

18   **price that's marked on there; if it's -- I felt it was a**

19   **good discount; it would have to kind of tug at me that I**

20   **want it; and if I really need it.**

21          MS. SAGAFI:  Jay, when you're at a good

22   stopping point, let's take a break.  We've been going

23   about an hour.

24          MR. RAMSEY:  Sure, I'm happy to stop now.  I

25   have like maybe four more questions on this sort of

JEANNE STATHAKOS

November 02, 2016

```
 1              THE WITNESS:  No, I wouldn't have bought it
 2   at Columbia.
 3   BY MR. RAMSEY:
 4       Q.    When you're browsing, how often would you say
 5   you think about other items that are similar to the item
 6   you're looking at, how much you've paid for those other
 7   items?
 8              MS. SAGAFI:  Objection, calls for
 9   speculation.
10              THE WITNESS:  I couldn't tell.
11   BY MR. RAMSEY:
12       Q.    Would you say that's common or not common?
13              MS. SAGAFI:  Objection, asked and answered.
14              THE WITNESS:  I guess common.
15              MR. RAMSEY:  Okay.  Let's break for a moment.
16              THE VIDEOGRAPHER:  Going off the record, the
17   time is 10:39 a.m.
18              (Brief recess)
19              THE VIDEOGRAPHER:  Back on the record, the
20   time is 10:52 a.m.
21   BY MR. RAMSEY:
22       Q.    Would you consider yourself a bargain hunter?
23       A.    Yes.
24       Q.    Do you ever buy something that is not on
25   sale?
```

JEANNE STATHAKOS

November 02, 2016

```
 1      A.      Could you be a little bit more --
 2      Q.      Sure.  So a piece of clothing that you wear
 3  on a day-to-day basis, would you ever buy something like
 4  that if it were not on sale?
 5      A.      I have, but not typically.
 6      Q.      How often would you say you buy something
 7  that's not on sale?
 8              MS. SAGAFI:  Objection, calls for
 9  speculation.
10              THE WITNESS:  Probably once every couple of
11  years actually.
12  BY MR. RAMSEY:
13      Q.      When you're at a Columbia outlet, have you
14  ever noted that there's an area of the store like a
15  clearance rack?
16      A.      Yes.
17      Q.      Would you say that you buy most of the items
18  from the clearance rack?
19      A.      No.
20      Q.      Half of the items that you've purchased from
21  Columbia from the clearance rack?
22              MS. SAGAFI:  Objection, calls for
23  speculation.
24              THE WITNESS:  I don't know half.
25  BY MR. RAMSEY:
```

JEANNE STATHAKOS

November 02, 2016

```
 1      A.      I didn't pay attention to that, no.

 2      Q.      Do you remember a time where Columbia had

 3   only one price tag on its items, one price on its price

 4   tag?

 5      A.      I couldn't tell you.  I don't remember.

 6      Q.      It may have happened, may not have happened?

 7              MS. SAGAFI:  Objection, asked and answered.

 8              THE WITNESS:  Yes, I don't know.

 9   BY MR. RAMSEY:

10      Q.      Okay.  When you're at an outlet store where

11   there's just one price on a price tag, how do you

12   determine whether you're getting a good bargain?

13              MS. SAGAFI:  Objection, calls for

14   speculation.

15              THE WITNESS:  If there's only one price and

16   it's a printed price on the tag and it looks like an

17   original, I would not think it's a bargain.  I would not

18   even contemplate purchasing it.

19   BY MR. RAMSEY:

20      Q.      What if it were sitting on a rack that said,

21   you know, 20 percent off, 30 percent off?

22              MS. SAGAFI:  Objection, calls for

23   speculation.

24   BY MR. RAMSEY:

25      Q.      Have you ever seen something like that at an
```

1    outlet?

2        A.        I have.

3        Q.        And in that case, when do you consider you to

4    be getting a good bargain?

5        A.        It still depends on what I think the retail

6    price is and, after the discount, if that price is to me

7    a bargain for that item.

8        Q.        So would you -- focusing on that situation,

9    there's one price on the price tag and it's sitting on a

10   rack that has some percentage off, if it said "20

11   percent off," would you consider you to be getting a

12   good bargain?

13           MS. SAGAFI:  Objection, calls for

14   speculation.

15           THE WITNESS:  I would consider that a

16   bargain.

17   BY MR. RAMSEY:

18       Q.        Would you buy an item that was at 20 percent

19   off only?

20           MS. SAGAFI:  Objection, calls for

21   speculation.

22           THE WITNESS:  Most likely not.

23   BY MR. RAMSEY:

24       Q.        How about 30 percent off; would you consider

25   that to be a good bargain?

JEANNE STATHAKOS

November 02, 2016

```
 1              MS. SAGAFI:  If you know.  And take all the
 2   time you want.
 3              THE WITNESS:  I do believe they belong to us.
 4   BY MR. RAMSEY:
 5       Q.    Okay.  So you'll notice on sort of the lower
 6   right-hand corner there's a marker there that says
 7   "Stathakos" and then there's a number that follows it?
 8       A.    Yes.
 9       Q.    And then if you flip through the numbers, it
10   goes up by one each page?
11       A.    Okay.
12       Q.    So if you could flip to -- it's the
13   STATHAKOS5, that page.
14              So the page says "Columbia Outlet Item No. 1"
15   on top, correct?
16       A.    Yes.
17       Q.    And there's a photograph of a gray jacket of
18   some sort?
19       A.    Okay.
20       Q.    Do you recognize that item?
21       A.    I don't remember it.  It could be our son's.
22       Q.    Do you know, sitting here today, why or what
23   made you purchase it?
24       A.    I couldn't tell you why, no.
25       Q.    Do you remember how much you paid for it?
```

JEANNE STATHAKOS

November 02, 2016

1      A.      No, I do not remember.

2      Q.      Do you consider the product a quality

3  product?

4              MS. SAGAFI:  Objection, calls for

5  speculation, calls for an expert opinion.

6              THE WITNESS:  I believe in the Columbia

7  brand, so I would believe it is a quality product.

8  BY MR. RAMSEY:

9      Q.      Do you remember if you got what you would

10  consider to be a good value for this product?

11             MS. SAGAFI:  Objection, vague, ambiguous,

12  calls for speculation, calls for a legal conclusion and

13  an expert opinion.

14             THE WITNESS:  Probably at the time, yes.

15  BY MR. RAMSEY:

16     Q.      Okay.  So just looking at the photo, what we

17  have, can you tell me what you would consider a good

18  price to be for this jacket?

19             MS. SAGAFI:  Objection, calls for

20  speculation.

21             THE WITNESS:  I couldn't tell you.

22  BY MR. RAMSEY:

23     Q.      If the jacket was $30, would you buy it?

24             MS. SAGAFI:  Objection, calls for

25  speculation, asked and answered.

JEANNE STATHAKOS

November 02, 2016

```
 1              THE WITNESS:  I honestly could not tell you.

 2   BY MR. RAMSEY:

 3       Q.      What would you need to know in order to be

 4   able to tell me?

 5              MS. SAGAFI:  Objection, calls for

 6   speculation.

 7              THE WITNESS:  Again, I would have to see the

 8   price tag and see whether or not I feel like I was

 9   getting a bargain.

10   BY MR. RAMSEY:

11       Q.     If this was priced for sale, what you

12   actually pay, at $25 --

13              MS. SAGAFI:  Objection, calls for

14   speculation, asked and answered.

15              MR. RAMSEY:  I wasn't quite finished with the

16   question.

17              MS. SAGAFI:  Well, I guess it was an

18   incomplete hypothetical also.

19   BY MR. RAMSEY:

20       Q.     So if this were priced at $25, what you'd

21   actually pay, and the higher price on the bag was $50,

22   would you consider yourself to be getting a good

23   bargain?

24              MS. SAGAFI:  Objection, calls for

25   speculation.
```

JEANNE STATHAKOS

November 02, 2016

1         THE WITNESS:  I guess at 50 percent off it

2    would be considered a bargain.

3    BY MR. RAMSEY:

4        Q.    So you would in that instance pay the $25?

5             MS. SAGAFI:  Objection, calls for

6    speculation.

7             THE WITNESS:  I guess I would.

8    BY MR. RAMSEY:

9        Q.    Would you want to touch, feel the garment

10   before buying it?

11       A.    Absolutely, yes.

12       Q.    Do you know if this particular item was sold

13   at a Columbia retail store or REI so somewhere other

14   than an outlet?

15       A.    No, I do not know.

16       Q.    If I told you that it had not been, it only

17   ever sold at the outlet, would you still have purchased

18   it?

19             MS. SAGAFI:  Objection, calls for

20   speculation.

21             THE WITNESS:  I don't know if I would or not.

22   BY MR. RAMSEY:

23       Q.    What would you need to know in order to know?

24             MS. SAGAFI:  Calls for speculation.

25             THE WITNESS:  Now I would have to question

JEANNE STATHAKOS

November 02, 2016

```
 1   why it was never sold at the retail store.
 2   BY MR. RAMSEY:
 3       Q.    What if a jacket that is exactly the same but
 4   a different color sold at the retail store; would you
 5   think that having two prices on the tag at the outlet
 6   was deceptive?
 7             MS. SAGAFI:  Objection, vague, ambiguous
 8   calls for speculation, incomplete hypothetical, calls
 9   for a legal conclusion.
10             THE WITNESS:  It would be deceptive if you're
11   trying to pass off this same jacket as the one at the
12   retail store.
13   BY MR. RAMSEY:
14       Q.    Okay.  So let's do a better example.  Let's
15   say this jacket -- it's gray, appears to be gray from
16   the photo -- is at the outlet store and it has two
17   prices on the price tag like we've been talking about,
18   and the higher price on that tag is -- just pick a
19   number -- eighty bucks.
20             Would you consider that $80 price deceptive
21   if a purple version of this exact jacket was sold at a
22   retail store at $80?
23             MS. SAGAFI:  Same objections as the last
24   question, plus asked and answered.
25             THE WITNESS:  So you told me this jacket was
```

JEANNE STATHAKOS

November 02, 2016

1    never sold at the retail store but you have a similar

2    one selling at the retail store that's purple.  Yes,

3    then I believe it would be deceptive.

4    BY MR. RAMSEY:

5        Q.     Is there any change I could make to this gray

6    jacket so that I have a new jacket that I would sell at

7    the retail store that you think the change is

8    inconsequential enough such that my putting $80 on --

9    the price -- the higher price on the tag at the outlet

10   was not deceptive?

11           MS. SAGAFI:  Objection, vague and ambiguous,

12   calls for speculation, incomplete hypothetical.

13           THE WITNESS:  I don't know how to answer

14   that.

15   BY MR. RAMSEY:

16       Q.     So here's what I'm asking.  I'll try and cut

17   through it.  You seem to believe or what you're saying

18   is that the higher price on the price tag at the

19   outlet -- in this example eighty bucks -- is deceptive

20   unless the exact jacket, same color, same fit, same

21   everything, was sold at a retail store; is that correct?

22       A.     Yes.

23       Q.     And I'm asking, is there any change in your

24   mind that you would allow for where the product sold at

25   the retail store is slightly different than the one at

JEANNE STATHAKOS

November 02, 2016

1    the outlet that would be acceptable to you and make the

2    $80 on the price at the outlet store be not deceptive?

3            MS. SAGAFI:   Same objection, plus asked and

4    answered.

5            THE WITNESS:   I still don't believe that any

6    type of change would make a difference if I knew this

7    was never sold at the retail store.

8    BY MR. RAMSEY:

9        Q.    So do you see -- looking at the photo, do you

10   see there's a pocket there on the front vest?

11       A.    The right-hand side?

12       Q.    Yes, left-hand side of the photo, but if

13   you're wearing the jacket, I guess it would be the

14   right-hand side.

15       A.    Oh, okay.   Yes.

16       Q.    What if the article that was sold at the main

17   retail store, that pocket, instead of being at a slight

18   slant, was directly up and down?

19            MS. SAGAFI:   Objection, calls for

20   speculation, an expert opinion and a legal conclusion.

21   She just told you.

22   BY MR. RAMSEY:

23       Q.    Would you consider the $80 as the higher

24   price on the price tag deceptive?

25       A.    It's not the same jacket that we're talking

```
 1              MS. SAGAFI:  Objection, calls for
 2    speculation.
 3              THE WITNESS:  Yes.
 4    BY MR. RAMSEY:
 5         Q.    Why is that?
 6         A.    At that price I think it was a good value.
 7         Q.    Okay.  Let's go to the next one, number --
 8    well, not the next one, the next one on my list, item
 9    23.  So this is page STATHAKOS27.  Let me know when
10    you're there.
11         A.    Okay.
12         Q.    So you should see a picture of what appears
13    to be a white pair of women's shorts with a little blue
14    hangtag on it.
15         A.    Yes.
16         Q.    Okay.  And you don't have to look, but on
17    page 1, item 23, you paid 8.98 for it.
18         A.    Yes.
19         Q.    Do you consider 8.98 to be a good price for
20    these shorts?
21         A.    Yes, I believe so.
22         Q.    And why is that?
23         A.    Based on the style; I liked it.  I don't
24    remember exactly what the original price -- price was.
25    I felt that it was a substantial bargain.  And so I
```

JEANNE STATHAKOS

November 02, 2016

1    don't have white shorts; I could use them.

2        Q.      Okay.  Do you know whether these white shorts

3    were sold at a Columbia retail store or REI, anywhere

4    other than the outlet?

5        A.      No, I do not.

6        Q.      And if I asked you to assume that they had

7    not been sold anywhere else other than the outlet, would

8    you have still bought them for 8.98?

9            MS. SAGAFI:  Calls for speculation.

10           THE WITNESS:  Yes, I believe so.

11   BY MR. RAMSEY:

12       Q.      Okay.  If we could, flip to item 26.  This

13   should be STATHAKOS30.  You should be looking at a gray

14   blouse of sorts that's hanging on a hanger.

15       A.      Uh-huh.

16       Q.      And if you sort of hold your hand on that

17   page and then also flip to page STATHAKOS71, you should

18   see a price tag there with the higher price being 40 and

19   then a sticker of sorts with 9.97.  Do you see that?

20       A.      Yes.

21       Q.      And then you're welcome to look, but on page

22   2 of the chart at the very beginning it shows that you

23   paid $7.98.

24           Okay.  So maybe back to the photo, do you

25   consider $7.98 to be a good price for this shirt?

JEANNE STATHAKOS

November 02, 2016

```
 1      A.     Yes.

 2      Q.     Do you know whether that shirt has been or

 3  was ever sold at a Columbia retail or REI or somewhere

 4  other than the outlet?

 5      A.     No, I don't.

 6      Q.     If I had told you that it had never been sold

 7  anywhere other than the outlet and it had never been

 8  sold for the $40 listed on the price tag, would you have

 9  still bought it that day for 7.98?

10             MS. SAGAFI:   Objection, calls for

11  speculation.

12             THE WITNESS:   At 7.98, yes.

13  BY MR. RAMSEY:

14      Q.     If you would, flip next to item number 35,

15  which is on page STATHAKOS39.   Let me know when you're

16  there.   Are you there?

17      A.     Yes.

18      Q.     Okay, great.   It's a jacket of sorts with

19  sort of a orange line by the zipper.

20      A.     Uh-huh.

21      Q.     If you can keep your hand there and flip to

22  STATHAKOS77, you'll find another price tag.   And the

23  price tag -- the higher price says 120 and the lower one

24  says 79.90.   Do you see that?

25      A.     Yes.
```

JEANNE STATHAKOS

November 02, 2016

```
 1    Q.      So the front chart doesn't tell me what you
 2  paid, so let's just assume you paid 79.90.
 3    A.      It does.
 4    Q.      Oh, I'm sorry.  I was not looking correctly.
 5  You paid 47.94.  Do you consider 47.94 to be a good
 6  price for this jacket?
 7    A.      Yes.
 8    Q.      Do you know if this jacket was ever sold at
 9  the Columbia retail store, REI or anyplace other than
10  the outlet?
11    A.      I do not know.
12    Q.      If I told you that it had sold only ever at
13  the outlet and had never sold for $120, which is the
14  higher price listed on the price tag, would you have
15  still bought the item for the $47.94 that you paid?
16          MS. SAGAFI:  Calls for speculation.
17          THE WITNESS:  If you told me it was never
18  sold for $120 and was only ever available at the outlet,
19  I would have to think about what it was being offered
20  at.  I don't know whether or not that 47.94 is a
21  bargain.
22  BY MR. RAMSEY:
23    Q.      What would you need to know in order to
24  determine whether the 47.94 was a bargain?
25    A.      What price it would be sold at or offered at
```

JEANNE STATHAKOS

November 02, 2016

```
 1   the outlet.
 2      Q.      Okay.  If I told you that this particular
 3   jacket was sold only ever at the outlet --
 4      A.      Uh-huh.
 5      Q.      -- it had been previously sold at 79.90 at
 6   the outlet, which is the lower price on the tag, would
 7   you have still bought the jacket that day for the $47.94
 8   that you paid?
 9              MS. SAGAFI:  Objection, calls for
10   speculation.
11              THE WITNESS:  Given that information, no.
12   BY MR. RAMSEY:
13      Q.      Okay.  And why is that?
14      A.      I wouldn't feel that that would be enough of
15   a discount.  Again, it's not a need item.
16      Q.      This particular item isn't?
17      A.      Right.
18      Q.      Was this item for you?
19      A.      No.
20      Q.      Well, who was it for?
21      A.      For my husband.
22      Q.      Okay.  Do you remember purchasing this item?
23      A.      I do.
24      Q.      Oh, okay, good memory.
25              Let's flip one page to item number 36, which
```

JEANNE STATHAKOS

November 02, 2016

```
 1   AFTERNOON SESSION                        12:51 P.M.

 2

 3          THE VIDEOGRAPHER:  Back on the record, the

 4   time is 12:51 p.m.

 5

 6                EXAMINATION (RESUMED)

 7          MS. SAGAFI:  Jay, before you get started,

 8   there was one thing from this morning that Jeanne wanted

 9   to clarify, so --

10          THE WITNESS:  So Jay, right?

11   BY MR. RAMSEY:

12      Q.    Yes.

13      A.    I'm sorry.  This morning when you asked if I

14   was damaged or injured or harmed in any way and I asked

15   if it was physically.  But in terms of that, physically,

16   no.  But if I had all the facts about Columbia's

17   products, Columbia's pricing, I may have made other

18   decisions about whether to buy the items at the time,

19   and I guess in that way harm or injury would have been

20   caused if -- I mean, I spent money that I may not have

21   spent.

22      Q.    Okay.  What would you need to know in order

23   to figure that out?

24      A.    I would like to know whether these items

25   priced are from a retail store or somehow otherwise
```

JEANNE STATHAKOS

November 02, 2016

```
 1    labeled.

 2        Q.      Anything else?

 3        A.      I think that would be a step in helping me

 4    make a decision.  The other ones are just whether or not

 5    I needed it and, of course, you know, if I liked it.

 6        Q.      Those are reasons why you may have purchased

 7    something, right?

 8        A.      Right, right.

 9        Q.      Okay.  Is there anything else you would need

10    to know to figure out whether you have been damaged?

11        A.      As I said earlier too, I mean, I feel like

12    I've been fooled by these pricing tags.  They don't

13    specify whether it's for outlet-only, retail or anything

14    like that to allow me to make a decision as to whether I

15    can say it's a value or it's discounted or any of that.

16        Q.      Had the price tags said "Outlet-Only," would

17    you have purchased the items that we looked at earlier

18    today?

19            MS. SAGAFI:  Objection, calls for

20    speculation.

21            THE WITNESS:  I would have probably thought

22    differently or my mindset or thought process might have

23    been a little bit different than what it was.

24    BY MR. RAMSEY:

25        Q.      But would you have purchased the items
```

JEANNE STATHAKOS

November 02, 2016

1   nonetheless?

2              MS. SAGAFI:  Objection, calls for

3   speculation.

4              THE WITNESS:  I wouldn't -- I don't know.  I

5   would have to evaluate it a little bit more.

6   BY MR. RAMSEY:

7       Q.     And what would you be evaluating?  What would

8   you be looking at to make this evaluation?

9       A.     I would look at thinking this item is an

10   outlet item; it's not a retail, so it's not something

11   made for a retail store, perhaps it's not as good

12   quality.  So other factors like that.

13      Q.     Well, so there's the potential for difference

14   of quality.  Any other factors?

15      A.     That's really the one that sticks out.

16      Q.     If it turned out that the outlet item that

17   was outlet-only was of equal quality to an item that was

18   sold at the retail store, would you have still purchased

19   the item at the outlet?

20              MS. SAGAFI:  Objection, calls for

21   speculation, incomplete hypothetical.

22              THE WITNESS:  I guess if that item was not

23   identical to something that was sold in a retail store,

24   I would still have to look at it as it's not something I

25   could go to a retail store and find.

JEANNE STATHAKOS

November 02, 2016

```
 1   BY MR. RAMSEY:

 2       Q.      But you still may purchase the outlet item --

 3   I think that's what you're telling me?

 4               MS. SAGAFI:   Calls for speculation.

 5               THE WITNESS:   I may, I may.  But --

 6   BY MR. RAMSEY:

 7       Q.      So in what circumstances in that situation

 8   where you now know that it's an outlet-only item would

 9   you still purchase the outlet item?

10               MS. SAGAFI:   Calls for speculation.

11               THE WITNESS:   It would still boil down to

12   whether it's a bargain, if it drew me in, and if I

13   needed it.

14   BY MR. RAMSEY:

15       Q.      And in that circumstance, let's say you,

16   after reviewing those things, decide to purchase the

17   outlet-only item.  In that case, would you have been

18   damaged?

19               MS. SAGAFI:   Objection, calls for speculation

20   and a legal conclusion.

21               THE WITNESS:   So if I knew it was an

22   outlet-only item and given the price on the price tag, I

23   might still purchase it.  I would not feel like I was

24   damaged if that was marked "Outlet-Only."

25   BY MR. RAMSEY:
```

JEANNE STATHAKOS

November 02, 2016

```
 1    the higher price on the outlet item to be deceptive?
 2            MS. SAGAFI:  Objection, calls for
 3    speculation, assumes facts not in evidence.
 4            THE WITNESS:  I don't know about that.  It's
 5    how the tag is labeled.
 6    BY MR. RAMSEY:
 7        Q.    What about the tag would make it deceptive or
 8    not deceptive?
 9        A.    It's not saying it's a retail price; it's not
10    saying it's an outlet-only price.  So again, as I said,
11    if I go in, I look at this tag, whether it's in a retail
12    store or outlet store, I'm thinking it's an item that
13    was sold at a retail store originally at this retail
14    price.
15        Q.    Okay.  So you're looking at 47 with the two
16    prices on the tag.
17        A.    Okay.
18        Q.    And you are in the store and you don't know
19    whether it's an item or not -- or whether it's been sold
20    at the outlet or not, and then you later come to find
21    out that it has not been sold anywhere at that higher
22    price but instead this striped shirt in 48 was sold at
23    the higher price.  Would you care?
24            MS. SAGAFI:  Objection, vague, ambiguous
25    calls for speculation.
```

Exhibit 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JEANNE and NICHOLAS STATHAKOS,  )
individually and on behalf of all )
others similarly situated,        )
                                  )
                Plaintiffs,       )
                                  )
        vs.                       )  Case No.
                                  )  4:15-cv-04543-YGR
COLUMBIA SPORTSWEAR COMPANY;      )
COLUMBIA SPORTSWEAR USA           )
CORPORATION,                      )
                                  )
                Defendants.       )
_____ )


            VIDEOTAPED DEPOSITION OF NICHOLAS STATHAKOS,

taken at Four Embarcadero Center, 17th Floor, San

Francisco, California on November 3, 2016, at 9:39

a.m., before Jay W. Harbidge, Certified Shorthand

Reporter in and for the State of California.

NICHOLAS STATHAKOS

November 03, 2016

1    A.    No.

2    Q.    Did you speak to anyone on the phone between

3  those two time periods regarding this case?

4    A.    Yes.

5    Q.    Who did you speak with?

6    A.    Sidney.

7    Q.    I'm sorry.  So was there more than one call

8  with Sidney.

9    A.    Yes, there were a couple of calls.

10   Q.    I see.  How many calls were there with

11  Sidney?

12   A.    I don't remember.

13   Q.    More than five?

14   A.    I couldn't remember.

15   Q.    But definitely more than one?

16   A.    Yes.

17   Q.    Do you remember how far apart the first one

18  and the second one was?

19   A.    No.

20   Q.    Do you remember if you signed the engagement

21  letter prior to the filing of the action?

22   A.    I don't remember.

23   Q.    Was it before or after the first phone call

24  with Sidney?

25   A.    I would imagine it was after.

1    Q.    What did Sidney ask you on that first phone

2  call?

3        MS. SAGAFI:  Objection, calls for a

4  privilege.  I'll instruct the witness not to answer.  No

5  way.

6  BY MR. RAMSEY:

7    Q.    What did you tell Sidney on the first phone

8  call?

9        MS. SAGAFI:  Same objections.  Don't answer

10  that.

11  BY MR. RAMSEY:

12   Q.    When you spoke with Sidney that first time,

13  did you understand that she was representing you?

14   A.    The first time she was not representing me;

15  she was representing her law firm.

16   Q.    When you spoke with Sidney that first time,

17  did you understand that anyone at her law firm was

18  representing you?

19   A.    No.

20   Q.    Well, I'll ask it again.  Do you remember

21  what Sidney -- or what did Sidney tell you in that first

22  phone call?

23        MS. SAGAFI:  Objection, calls for privileged

24  information.  Do not answer.

25  BY MR. RAMSEY:

1    Q.    What did you tell Sidney on that first phone

2  call?

3        MS. SAGAFI:  Same objection.  Do not answer.

4  BY MR. RAMSEY:

5    Q.    Have you paid any money or legal fees to any

6  counsel in this case?

7    A.    I have not.

8    Q.    Have you paid any costs associated with this

9  case?

10   A.    No.

11   Q.    What is your understanding of the claim that

12  you are asserting in this case against Columbia?

13   A.    The claim is that basically Columbia used

14  deceptive pricing in its outlet stores and sold items

15  that were not necessarily sold in their retail stores.

16   Q.    What is your understanding of what you're

17  contending is deceptive about Columbia's -- excuse me --

18  pricing at its outlet stores?

19        MS. SAGAFI:  Objection, calls for a legal

20  conclusion.

21  BY MR. RAMSEY:

22   Q.    You can answer.

23   A.    Sorry.

24   Q.    That's fine.

25   A.    I'm contending that the items that were sold

1  in the outlet store that were marked with a Columbia

2  sticker as showing their retail price were not sold in

3  the retail stores or any retail outlet, but rather, I

4  guess, made specifically for the outlets and not

5  necessarily -- what was on the sticker was not

6  necessarily a retail price.

7    Q.    Excuse me.  Can you describe for me what a

8  typical price tag looks like at a Columbia outlet?

9    A.    From the top of my head, it's basically kind

10  of a rectangular shape, probably rounded corners.  And

11  it has a barcode; it has a description, like I think a

12  line description of what the item is, and the price.

13   Q.    Just one price?

14   A.    Usually just one price, yes, unless you're at

15  the outlet, and then there is a price below it or there

16  is a little sticker when it's been reduced even more.

17   Q.    So focusing just on the outlet price tag --

18   A.    Yes.

19   Q.    -- from your memory, there are two prices on

20  the tag?

21   A.    Usually, yes.

22   Q.    And sometimes a third?

23   A.    Yes.

24   Q.    Is there ever just one price on the tag?

25   A.    Sometimes there's just one price on the tag.

NICHOLAS STATHAKOS

November 03, 2016

Page 22

1    Q.    Do you actually remember seeing a price tag
2  with just one price on the tag?
3    A.    I have in at least -- I mean, I've seen
4  Columbia clothes in other places other than an outlet,
5  like I've seen it at an REI store or Sierra Trading
6  Post, and then it's just the regular retail tag.
7    Q.    Got it.  So focusing again just on the
8  outlet, do you have a memory of seeing at the outlet a
9  price tag where there was only one price listed?
10    A.    At the outlet I think there's usually two
11  prices.
12    Q.    Of those two prices, is there a higher one
13  and a lower one?
14    A.    There is.
15    Q.    Which of those prices, if either, are you
16  claiming is deceptive in this action?
17    A.    The higher one.
18    Q.    And what is your understanding as to why the
19  higher price is -- or why are you claiming it to be
20  deceptive?
21    MS. SAGAFI:  Objection, calls for a legal
22  conclusion, but you can go ahead and answer.
23    THE WITNESS:  The assumption I make when I
24  make -- when I buy something and I see the tag with
25  Columbia is that it is a retail price, and it is a

Page 23

1  retail price of an item that was sold in their store, in
2  their non-outlet stores, the retail stores, and/or a
3  place like REI where it sells nondiscounted items.  And
4  based on the faith I have in the company, I feel that
5  that is something that was sold normally in their
6  stores.
7  BY MR. RAMSEY:
8    Q.    Have you ever shopped at a different store,
9  not Columbia, where you have seen a price tag with two
10  prices on it?
11    A.    Yes.
12    Q.    Can you tell me the stores?
13    A.    I've been to Eddie Bauer; I've been to --
14  Eddie Bauer is what sticks out in my mind right now.
15    Q.    Is that an outlet?
16    A.    I went to the outlet.
17    Q.    And where you've seen the two prices, is it
18  at the outlet or a retail store?
19    A.    At the outlet.
20    Q.    In the cases where you've seen two prices on
21  a tag at the Eddie Bauer outlet, is the lower price also
22  printed on the tag or has it been placed on it with a
23  sticker gun?
24    A.    Well, then that's a third price with a
25  sticker gun.  But otherwise, it is below it.  And I've

Page 24

1  also seen it listed as "Outlet Price."
2    Q.    I understand.  This is at Eddie Bauer?
3    A.    Yes.
4    Q.    Is there anything on the Eddie Bauer outlet
5  price tags -- I take that back.  Let me start over.
6    The higher price on the Eddie Bauer price
7  tag, what do you understand that price to represent?
8    MS. SAGAFI:  Objection, calls for speculation
9  and a legal conclusion.
10    Go ahead.
11    THE WITNESS:  I understand it to mean that
12  that is the price that this garment or whatever I'm
13  looking at was sold normally in the store or online.
14  BY MR. RAMSEY:
15    Q.    Sticking with the Eddie Bauer price tag, do
16  you understand that the higher price on the Eddie Bauer
17  price tag at the outlet could refer to the price at
18  which Eddie Bauer sold a similar item previously?
19    MS. SAGAFI:  Objection, vague and ambiguous,
20  calls for speculation and a legal conclusion.
21    THE WITNESS:  Sorry.  I believe that it is
22  the price of that garment, nothing else, nothing more
23  but that garment that I'm looking at.
24  BY MR. RAMSEY:
25    Q.    So you believe that it's the price that that

Page 25

1  specific garment or perhaps another version -- or not
2  another version but another identical copy of that
3  garment was sold?
4    A.    That specific item.
5    Q.    And so you don't believe that the higher
6  price would refer to the price at which a similar or
7  comparable item sold?
8    A.    No.
9    Q.    And why is that?
10    A.    Because I don't know why that would be.  I
11  mean, I'm -- I'm kind of confused by your question
12  around that.  I take faith in the company, I take faith
13  in Columbia, I have faith in Eddie Bauer that what
14  they're telling me is what's on that tag, and that is
15  that particular item, nothing that was mislabeled,
16  nothing that was changed.  If that tag is attached to
17  that particular item, I have faith that that is what
18  they're telling me that's what they're selling it for,
19  that it's a retail price, not a fictitious price.
20    Q.    I asked the question about Eddie Bauer, so
21  I'm going to ask it specifically about Columbia.
22    I think I know your answer, but is it correct
23  to say that you would not consider the higher price
24  listed on a price tag at a Columbia outlet to be the
25  price at which Columbia sold a similar or comparable

1 item?

2    A.   No.  How could I know that?  That is -- when
3 I see a price -- when I see a price tag attached to an
4 item, that is what I believe it is, nothing more,
5 nothing less.

6    Q.   And so I think you said before that you
7 understand now that some of the items at Columbia's
8 outlet were not previously sold for the higher price on
9 the price tag; is that right?

10    A.   That's correct.

11    Q.   When did you first come that understanding?

12    A.   Probably around the time the suit was filed.

13    Q.   How about in relation to the first phone call
14 with Sidney; was it at that moment in time that you came
15 to that understanding?

16       MS. SAGAFI:  Objection to the extent that the
17 answer would require you to divulge the substance of any
18 conversation, Nick, that you've had with anyone from any
19 of the law firms.

20 BY MR. RAMSEY:

21    Q.   Are you able to answer the question?

22       MS. SAGAFI:  I don't remember what the
23 question was.

24       MR. RAMSEY:  Sure.

25 BY MR. RAMSEY:

1    Q.   So --

2    A.   Sorry.

3    Q.   -- we were talking about when you came to
4 understand that some of Columbia's outlet products were
5 not actually sold for the higher price on the tag, and I
6 asked whether that was -- and you said it was sometime
7 before the suit was filed.  So I'm trying to narrow down
8 more specifically as to when that understanding first
9 came about.

10       And so my question was, was it at the time of
11 your phone call with Sidney, your first phone call with
12 Sidney?

13       MS. SAGAFI:  And I'll state the objection
14 again.  If you can answer that question, Nick, without
15 divulging the substance of your conversations with
16 Sidney, you can answer.

17       THE WITNESS:  I guess I can't.

18 BY MR. RAMSEY:

19    Q.   Okay.  Did you reach your understanding by
20 reading any newspaper articles?

21    A.   No.

22    Q.   Did you reach your understanding by seeing
23 any news report on TV?

24    A.   No.

25    Q.   Did you reach your understanding from any

1 source other than counsel in this matter?

2       MS. SAGAFI:  You can answer that one.

3       THE WITNESS:  No.

4 BY MR. RAMSEY:

5    Q.   I'm just going to show you what was marked
6 yesterday as Exhibits 40, 41, 42 and 43.  All I'm going
7 to ask is whether you've seen them before.  Assuming you
8 say no, that will be all I'll ask.  Just take your time
9 and let me know when you've had a chance to go through
10 them.

11    A.   I have never seen these documents before.

12    Q.   Okay.  Do you remember the last time you
13 shopped at a Columbia outlet store?

14    A.   I think so.

15    Q.   Do you remember when that was?

16    A.   Well, prior to the trip we took in February
17 of this year, so before that.  I think it was in the
18 same month or the month before.

19    Q.   So earlier this year?

20    A.   Yes.

21    Q.   Around February?

22    A.   Yes.

23    Q.   And you haven't shopped at the Columbia
24 outlet since then?

25    A.   No.

1    Q.   You probably don't remember, but that's fine.
2 Prior to February, the last time you shopped at a
3 Columbia outlet, do you remember the time before that?

4    A.   I did shop at one.  I don't know when.  I
5 think you probably know that better than I do.

6    Q.   Okay.  How many times would you say you've
7 been to a Columbia outlet store?

8    A.   At least five times.  I'm sorry.

9    Q.   No, that's fine.  Have you ever shopped at a
10 Columbia store that was not an outlet store?

11    A.   No.

12    Q.   Have you ever purchased a piece of Columbia
13 clothing at a store that was not a Columbia outlet
14 store?

15    A.   I have.

16    Q.   At which store?

17    A.   It would usually be Sierra Trading Post.

18    Q.   And was that online?

19    A.   Yes.  I've also gone to the store when
20 traveling.

21    Q.   Gone to which store?

22    A.   Sierra Trading Post.

23    Q.   Oh, okay.

24    A.   The brick and mortar, I guess.

25    Q.   Got it.  The Columbia items that you

NICHOLAS STATHAKOS

November 03, 2016

1 purchased from Sierra Trading Post, do you remember
2 whether they were all online or all in the store or some
3 combination?
4    **A.    I couldn't tell you the ratio.**
5    Q.    Okay.  But you've purchased some from Sierra
6 Trading Post online?
7    **A.    Yes.**
8    Q.    And some from the Sierra Trading Post --
9    **A.    Yes.**
10    Q.    -- store?  Okay.  Just let me finish the
11 question before you answer it, even though I know you
12 know what I'm going to ask.
13          Have you ever been to a Columbia outlet store
14 and not purchased something?
15    **A.    Yes.**
16    Q.    Would you say that of your trips to a
17 Columbia outlet store you more often end up purchasing
18 something or more often end up not purchasing something?
19    **A.    I couldn't tell you the ratio of that.  I**
20 **don't know.**
21    Q.    Okay.  Have you ever been to a Columbia
22 outlet store without your wife?
23    **A.    No.**
24    Q.    Why do you shop at Columbia outlet stores?
25    **A.    First of all, I respect the label, as I do**

1 **certain labels in clothing.  I'm kind of embarrassed to**
2 **say this, but with me I have a little bit of a girth, so**
3 **the fit is pretty good.  I can find clothes that fit me**
4 **well.  And I kind of respect the quality of it.  And**
5 **they have -- I guess up until this point I felt that**
6 **their discounts were pretty great.**
7    Q.    Is there any other brand or company, clothing
8 company that you would consider to be similar to
9 Columbia?
10    **A.    I would say North Face is pretty similar.**
11    Q.    Have you shopped at North Face before?
12    **A.    I have.**
13    Q.    How about a North Face outlet?
14    **A.    Yes.**
15    Q.    Do you remember what their price tags look
16 like?
17    **A.    Offhand, no, because I have not been there in**
18 **at least the past year, so...**
19    Q.    Would you say that you shop more often at a
20 Columbia outlet than a North Face outlet?
21    **A.    Probably.**
22    Q.    Do you consider each to have -- Columbia and
23 North Face to have products that are of similar quality?
24          MS. SAGAFI:  Objection, calls for a legal
25 conclusion, calls for speculation.

1          THE WITNESS:  I couldn't say that for sure.
2 BY MR. RAMSEY:
3    Q.    Have you ever shopped at Ross?
4    **A.    I have shopped at Ross.**
5    Q.    Do you remember what their price tags look
6 like?
7    **A.    Vaguely.**
8    Q.    Do you remember if they have one or two
9 prices on them?
10    **A.    They usual have two prices.**
11    Q.    A higher price and a lower price?
12    **A.    Yes.**
13    Q.    And what do you understand the higher price
14 on the Ross price tags to represent?
15    **A.    What this item sold at retail at a**
16 **store wherever that was being sold at.**
17    Q.    And again, you would not, then, believe that
18 the higher price on the Ross price tag referred to the
19 price at which a similar or comparable product sold?
20    **A.    No.**
21    Q.    Okay.  Has there ever been a time where
22 you've been shopping and there have been two prices on
23 the price tag and you have considered the higher price
24 on the price tag to be something other than the price at
25 which that specific item sold?

1    **A.    No.**
2    Q.    Have you ever shopped at TJ Maxx?
3    **A.    I think I have.**
4    Q.    How about Marshall's?
5    **A.    Yes.**
6    Q.    How about Nordstrom Rack?
7    **A.    Yes.**
8    Q.    Of those stores, Nordstrom Rack, TJ Maxx,
9 Marshall's and Ross, would you say you've shopped at
10 those stores more or less than Columbia outlet?
11    **A.    I have no idea.  I don't know that ratio.**
12    Q.    Do you ever shop -- I know you mentioned
13 Sierra Trading Post online, but is shopping online
14 something you do regularly?
15    **A.    Not regularly.**
16    Q.    Do you do most of your clothes shopping out
17 of brick and mortar stores?
18    **A.    Usually.**
19    Q.    When you're shopping online, what is it
20 you're looking for typically?
21    **A.    It might be something very specific that I**
22 **can't find, or it may be something that, using Sierra**
23 **Trading Post as an example, I may get an additional**
24 **savings perk that kind of gets me to go and browse.**
25    Q.    So you may get a coupon or something?

NICHOLAS STATHAKOS

November 03, 2016

Page 34

1    A.    Yes, an online coupon.
2    Q.    Do you receive coupons or other similar
3  promotional opportunities from Columbia?
4    A.    Myself personally, no.
5    Q.    Does your wife?
6    A.    Yes.
7    Q.    When we were talking earlier about what
8  factors go into why you may -- I take that back.
9        If you're looking at a particular item of
10  clothing -- let's say at Columbia, a Columbia outlet --
11  what factors go into your decision to buy that item?
12    A.    Well, myself personally, again, size and fit
13  is important.  So it's first of all finding the -- an
14  item of clothing that fits me appropriately and well,
15  and then how it's priced, how much of a discount I'm
16  getting.
17    Q.    So with price, you said how it's priced and
18  how much of a discount.  Do you view that as the same
19  thing or two things?
20    A.    I'm sorry?
21    Q.    Let me try that again.  So there's the price
22  at which you're going to buy it --
23    A.    Right.
24    Q.    -- at the end of the day.  Is that price,
25  irrespective of any discount you may or may not be

Page 35

1  getting, important to you?
2    A.    The discount is important to me.
3    Q.    Is the actual sales price important to you?
4    A.    Can you rephrase that?  I'm not -- something
5  I'm not -- that's not clicking for me here.
6    Q.    Sure.  So let's take an example.  There's a
7  jacket that you're considering buying.  It has two
8  prices on the price tag.  The higher price is a hundred
9  dollars and the lower price is $20.
10    A.    Okay.
11    Q.    So in that case I guess you have a discount
12  of $80?
13    A.    Eighty percent.
14    Q.    Eighty percent.  So does the $20,
15  irrespective of the fact that you're getting an 80
16  percent discount, matter to you?
17    A.    Not so much.  It's more of the -- personally
18  for me it's how much of a discount I'm getting.
19    Q.    Okay.  What's the most you would spend for a
20  jacket at a Columbia outlet store?
21        MS. SAGAFI:  Objection, calls for
22  speculation.
23        THE WITNESS:  I don't know.
24  BY MR. RAMSEY:
25    Q.    Would you spend $200 on a jacket at a

Page 36

1  Columbia outlet store?
2        MS. SAGAFI:  Objection, calls for
3  speculation.
4        THE WITNESS:  I don't know.
5  BY MR. RAMSEY:
6    Q.    $500?
7        MS. SAGAFI:  Objection, calls for
8  speculation.
9        THE WITNESS:  I don't know.
10  BY MR. RAMSEY:
11    Q.    Let's go back to that jacket that we were
12  talking about.
13    A.    Okay.
14    Q.    This time the higher price is a hundred
15  dollars and the lower price is $50, so you're getting a
16  fifty percent discount, I guess.
17    A.    Okay.
18    Q.    And in that case I think you're telling me
19  that the $50 price, the actual price you're going to
20  pay, doesn't matter to you; it's the fifty percent
21  discount that matters.  Is that true?
22        MS. SAGAFI:  Objection, misstates testimony,
23  calls for speculation.
24        Go ahead.
25        THE WITNESS:  One more time?  I'm sorry.

Page 37

1  BY MR. RAMSEY:
2    Q.    Sure.  So you have the jacket.  There's --
3  the price tag has a hundred dollars as the higher price
4  and $50 as the lower price, so 50 is what you would
5  actually be paying and you're getting a discount of
6  fifty percent in that case.
7    A.    Correct.
8    Q.    And I think what you're telling me is that
9  the amount you're actually going to pay, the $50,
10  doesn't matter to you; it's the discount between --
11  the fifty percent discount that matters; is that right?
12        MS. SAGAFI:  Objection, misstates the
13  testimony.
14        THE WITNESS:  The discount is important to
15  me.
16  BY MR. RAMSEY:
17    Q.    Is the price you're actually paying also
18  important to you?
19    A.    It may be.
20    Q.    Would you say that the discount or the price
21  that you're actually paying is more important to you?
22  Which would you say is more important?
23    A.    The discount is very important to me.
24    Q.    Is there a circumstance in which the actual
25  price would be more important to you than the discount

NICHOLAS STATHAKOS

November 03, 2016

Page 38

1  you were receiving?
2      MS. SAGAFI:  Objection, calls for
3  speculation.
4      THE WITNESS:  A time where the price would be
5  more important to me than the discount?
6  BY MR. RAMSEY:
7      Q.   Yes.
8      A.   The discount is what usually helps me make my
9  decision.
10     Q.   Okay.  When you're at a Columbia outlet
11 store, is there a minimum percentage discount that
12 you're looking for before buying an item?
13     A.   I would say offhand at least 25 percent on
14 the rack.
15     Q.   When you say "on the rack," what does that
16 mean?
17     A.   What it's being sold -- what it's -- you
18 know, the outlet price without any further discounts.
19 And then I know there are further discounts on top of
20 that, so...
21     Q.   Always?  Are there always further discounts
22 on top of that?
23     MS. SAGAFI:  Objection, calls for
24 speculation.
25     THE WITNESS:  I don't know in general for the

Page 39

1  store.  For me, there usually is.
2  BY MR. RAMSEY:
3      Q.   Okay.  Let's go back to that last shopping
4  trip at Columbia outlet --
5      A.   Uh-huh.
6      Q.   -- which you said it was before your trip
7  January or February of 2016.
8      A.   Uh-huh.
9      Q.   Do you remember what you bought during that
10 trip to Columbia?
11     A.   Off the top of my head, I think there was two
12 jackets -- one for myself, one for my wife.
13     Q.   Do you remember -- can you picture in your
14 head the jacket that you bought that day?
15     A.   Yes.
16     Q.   Is it something you wear on a regular basis?
17     A.   When it's cold.
18     Q.   Do you remember the last time you wore it?
19     A.   Well, it was before I turned it over to
20 legal -- to my attorneys here, and it was sitting in a
21 bag in my garage, so, you know, whenever that date was,
22 it was before that.
23     Q.   Okay.  Do you remember what you paid for that
24 jacket?
25     A.   I don't.

Page 40

1      Q.   Do you remember the percentage discount that
2  you received or believe you received that day?
3      A.   I don't.
4      Q.   Do you remember believing that you got a good
5  deal that day on that jacket?
6      A.   I believe I got a good deal.
7      Q.   Do you happen to remember the higher price on
8  the price tag for that jacket?
9      A.   No.
10     Q.   Do you know whether that jacket was sold -- I
11 know you don't know the higher price, but do you know
12 whether that jacket was sold for the higher price on
13 that price tag at a retail store?
14     A.   I assumed it was.
15     Q.   At that time, though, didn't you know that at
16 least some of the Columbia outlet products were not sold
17 for the retail price?
18     A.   I was told, yes.
19     Q.   So then why did you assume this jacket was?
20     A.   I -- well, I didn't end up in Columbia --
21 that was not my first store that I went to that day.  It
22 was -- I went to several others.  And again, it had to
23 do with fit and discount, and I finally found something
24 that fit and the discount seemed good.
25     Q.   Okay.  But you told me that you assumed that

Page 41

1  day that the jacket you bought had previously sold for
2  the higher price on the price tag --
3      A.   Uh-huh.
4      Q.   -- is that right?
5      A.   That's right.
6      Q.   But you also knew on that day or understood
7  that some of the products at the Columbia outlet had not
8  sold for the higher price on the price tag.
9      A.   Right.
10     Q.   Okay.  So why did you assume that this
11 particular jacket had sold for the higher price on the
12 price tag at retail?
13     A.   To be quite honest, I don't know which
14 products would have or have not sold in the store for a
15 higher price for a lower price.  I found something that
16 fit me well.  I found something that I was -- with the
17 discounts seemed like a value, and I bought it, and that
18 it did its job, kept me warm.
19     Q.   If I told you today that that jacket had not
20 actually been sold for the higher price on the price
21 tag, would you still have purchased the jacket that day?
22     MS. SAGAFI:  Objection, calls for
23 speculation.
24     THE WITNESS:  I don't know.
25 BY MR. RAMSEY:

NICHOLAS STATHAKOS

November 03, 2016

Page 70

1        THE WITNESS:  So you're saying -- please
2  repeat the question.  Something got lost in there.
3  BY MR. RAMSEY:
4      Q.    Sure.  We'll just set up the sort of
5  hypothetical for the moment.
6      A.    Yes.
7      Q.    Exhibit 62 is sold at the Columbia retail
8  store.  It has a single price on its tag, a hundred
9  dollars.
10     A.    Okay.
11     Q.    Exhibit 61 is sold at the outlet.  It's only
12  ever at the outlet, has never sold at a retail store.
13     A.    Okay.
14     Q.    Its price tag has two prices on it.  The
15  higher price is a hundred dollars, which is the same
16  price that Exhibit 62 sold for, and the lower price on
17  the tag of Exhibit 61 at the outlet is $70.
18     Are you with me?
19     A.    Right.
20     Q.    All right.  Let's pretend that you bought
21  this jacket, Exhibit 61, at the outlet for the $70.
22  Would you consider yourself injured?
23         MS. SAGAFI:  Objection, calls for speculation
24  and a legal conclusion.
25         THE WITNESS:  I don't know because I'm -- if

Page 71

1  I were to buy that jacket, I'm basing it on the
2  assumption that this sold in the store.  Now, whether
3  this is the same as this, whether this sold in the store
4  or this didn't sell in the store, I'm making the
5  assumption that this sold -- this style, this same
6  jacket, sold in the store and I'm basing my decision
7  based on what you tell me the price of this jacket was,
8  so whatever that is.
9  BY MR. RAMSEY:
10     Q.    Okay.  So now I'm telling you that this
11  jacket, Exhibit 61, had not sold retail and had never
12  sold for a hundred dollars.  And I'm asking you, if you
13  purchased it for $70, whether you would consider
14  yourself injured?
15         MS. SAGAFI:  Objection, asked and answered,
16  calls for speculation, calls for a legal conclusion.
17         THE WITNESS:  Well, I'm not sure what the
18  legal definition is, but I would consider myself duped.
19  I made a decision on I guess false information.
20  BY MR. RAMSEY:
21     Q.    And in this scenario do you consider yourself
22  to have lost money?
23         MS. SAGAFI:  Objection, asked and answered,
24  calls for speculation, calls for a legal conclusion.
25         THE WITNESS:  I don't know.

Page 72

1  BY MR. RAMSEY:
2      Q.    Would you consider yourself damaged?
3         MS. SAGAFI:  Objection, asked and answered,
4  calls for speculation, calls for a legal conclusion.
5         THE WITNESS:  Again, I don't know the -- can
6  you define damages for me a little bit better?
7  BY MR. RAMSEY:
8      Q.    Okay.  Let me try it this way.  If you
9  bought, in the scenario that we're talking about,
10  Exhibit 61, for the $70, do you believe that as a result
11  of your purchase of that jacket for $70 Columbia owes
12  you money?
13         MS. SAGAFI:  Objection, asked and answered,
14  calls for speculation, calls for a legal conclusion.
15         THE WITNESS:  I don't know the answer to
16  that, but what I guess -- I don't know -- would cause me
17  to have an issue is that if I found out that in fact
18  this was not -- this price that I based my decision on,
19  that in fact it was fictitious, that it was false.
20  BY MR. RAMSEY:
21     Q.    Okay.  So let's pretend that you found those
22  things out.  What is it that you contend you are
23  entitled to as a result of this fictitious price?
24         MS. SAGAFI:  Objection, asked and answered,
25  calls for speculation, calls for an expert opinion,

Page 73

1  calls for a legal conclusion.
2         THE WITNESS:  I don't know what that is.  But
3  as a consumer, I think I am entitled to more transparent
4  pricing, that I know that this in fact has been priced or
5  not sold in a store, in fact that is the retail price or
6  it's not the retail price or like it's a second or a
7  return or whatever that is so that I can make an honest
8  and right decision whether to buy this or not, whether
9  it's a deal for me or it's not a deal.
10  BY MR. RAMSEY:
11     Q.    Do you think you should receive money from
12  Columbia?
13         MS. SAGAFI:  Objection, asked and answered,
14  calls for speculation, calls for an expert opinion,
15  calls for a legal conclusion.
16         THE WITNESS:  That part I don't know.  That's
17  between you and Kristen the figure that out.  That's not
18  my realm.
19  BY MR. RAMSEY:
20     Q.    Okay.  We're done with these for now.  Well,
21  not for now.  I think we're done with them.  Sorry, one
22  moment.
23         I'll show you what was marked yesterday as
24  Exhibits 64 and Exhibit 63.
25     A.    Okay.

NICHOLAS STATHAKOS

November 03, 2016

1      Next up I'm going to hand you what was marked
2  yesterday as Exhibit 45.
3      A.   Okay.
4      Q.   Have you sheen this document before?
5      A.   No.
6          MR. RAMSEY:  For the record, it's a document
7  Bates stamped STATHAKOS1 through STATHAKOS113.
8          THE WITNESS:  Okay.
9          MR. RAMSEY:  I'll represent to you that these
10  documents were provided in discovery in this action.  I
11  think if you'll flip through, you'll see photographs of
12  various items.
13     A.   Yes.
14     Q.   And if you continue to flip towards the back,
15  there are additional photographs of price tags or other
16  hangtags.
17     A.   Yes, yes, yes.  You want me to take a look at
18  all of them or --
19     Q.   Sure.  You're welcome to if you want.  I'm
20  only going to ask you about a few of them.
21     A.   Sure.
22     Q.   I'll also represent to you that these are
23  photographs -- or we believe them to be photographs of
24  items that you and your wife bought.
25     A.   Yes, yes.

1      Q.   And just to orient you to the document or the
2  stack, the first three pages are a chart -- or actually,
3  the first four pages.
4      A.   Here's the jacket in question that I bought.
5      Q.   Okay.  We'll circle back to that.
6      A.   Okay.
7      Q.   So the first three -- four pages are a chart
8  of sorts.
9      A.   Okay.
10     Q.   And it lists the various items.
11     A.   All righty.
12     Q.   And in some cases it lists the date and
13  method of purchase and the price paid for the item.  Do
14  you see that?
15     A.   Yes.
16     Q.   I am going to start, if you could flip to
17  item number 1, the photograph of it, which is on page
18  STATHAKOS5 --
19     A.   Okay.
20     Q.   -- you should see a gray jacket.
21     A.   Right.
22     Q.   Are we on the same -- okay, good, we're on
23  the right page.
24         Do you recognize this jacket?
25     A.   I believe I do, yes.

1      Q.   Is it something that you wear?
2      A.   I don't think it's my jacket.  It might be
3  either my son's or wife's.
4      Q.   Do you remember buying it?
5      A.   I mean, I remember all these articles of
6  clothing, but when I got them, I couldn't tell you.
7      Q.   No, that's fine.
8      A.   I can tell you that we bought it, I guess,
9  but that's about --
10     Q.   But you can't remember the day, for
11  example --
12     A.   No, no.
13     Q.   -- at the store, you buying it -- maybe not
14  the date but the experience; is that right?
15     A.   Yes.
16     Q.   Okay.  Do you know if the item depicted in
17  Columbia Outlet Item No. 1 was an item that was -- I
18  take that back.
19         Do you remember the price you paid for the
20  item that is depicted in Columbia Outlet Item No. 1?
21     A.   Not at all.
22     Q.   Do you remember the higher price on the price
23  tag?
24     A.   No.
25     Q.   Okay, that's fine.  I assumed that, but just

1  getting it out there.
2      A.   I wish my memory was that good.
3      Q.   Don't we all.
4          Okay.  Do you know whether the item depicted
5  in Columbia Outlet Item No. 1 was an item that was
6  previously sold at a Columbia outlet retail
7  establishment, REI or someplace other than the outlet?
8      A.   I assumed it was.  I don't know if it was or
9  if it wasn't.
10     Q.   Okay.  But when you bought it, you believe --
11  you believed that at that time you thought it was?
12     A.   Yes.
13     Q.   Okay.  If I told you that this item was not
14  in fact ever sold at a Columbia outlet retail store, REI
15  or someplace other than the outlet and was only ever
16  sold at the outlet, do you believe you would have still
17  purchased the item?
18         MS. SAGAFI:  Objection, calls for
19  speculation.
20         THE WITNESS:  To be quite honest, if I had
21  all the facts, I don't know.
22  BY MR. RAMSEY:
23     Q.   What would all the facts be?
24     A.   That I would know that in fact this was --
25  whether this item was in fact sold at a retail store and

NICHOLAS STATHAKOS

November 03, 2016

Page 90

1 that it wasn't just made for, I guess, the outlets
2 is kind of, I think, fictitious.  I mean, I'm assuming
3 when I saw the price tag that that was the retail price.
4 And the retail price to me means it was sold, unless
5 otherwise stated, at a store, at a regular Columbia
6 store or REI store for the full price and I'm buying it
7 at the cheaper price.  I'm getting a deal, whatever that
8 was.
9      Q.    Okay.  So now I'm asking you to assume that
10 it was not sold ever at the higher price and it was only
11 ever sold at the outlet.  Knowing that, do you think you
12 would have purchased the jacket nonetheless?
13           MS. SAGAFI:  Objection, asked and answered,
14 calls for speculation.
15           THE WITNESS:  That somehow the price tag
16 mentioned that this was outlet-only or what -- what
17 knowledge do I have?  How do I know?  What do I know?
18 BY MR. RAMSEY:
19      Q.    Can you picture in your head what a
20 regular -- what a Columbia price tag looks like?
21      A.    Yes.
22      Q.    Okay.  We don't know what the higher price is
23 on that tag.
24      A.    Okay.
25      Q.    We don't even know what the sales price on

Page 91

1 that tag was.  Okay?  I am asking you whether -- you
2 still don't know those things -- whether knowing now
3 that this was never sold anywhere but the outlet,
4 whether you would have still purchased it for whatever
5 price you paid that day?
6           MS. SAGAFI:  Objection, asked and answered,
7 calls for speculation.
8           THE WITNESS:  I'm not sure.
9 BY MR. RAMSEY:
10      Q.    Okay.  Would you want to see the price tag
11 also?
12      A.    You can show it to me, but right now, I mean,
13 I don't know what the factors were the day I bought it.
14 I don't know what my budget was.  I don't know what I
15 needed that day.  I mean, there's different factors.
16      Q.    So you may have still bought it; you may not
17 have still bought it?
18      A.    Right.  I don't know.
19      Q.    Okay.  Let's go next to item number --
20 Columbia Item No. 35, which is on page STATHAKOS39.
21 This is the jacket I believe you purchased in February.
22      A.    Okay.
23      Q.    Okay.  And if I could get you to hold this
24 page, I'm going to have you flip to another page.
25      A.    Okay.

Page 92

1      Q.    Flip to page STATHAKOS77.  You should see a
2 photograph of a Columbia price tag.
3      A.    Okay.
4      Q.    Okay.  I'm going to represent to you that
5 this is the price tag that is associated with item
6 number 35.
7      A.    Okay.
8      Q.    Okay.  If you could, hold both of those pages
9 for a moment.
10      A.    All righty.
11      Q.    If you go back to the chart at the very
12 beginning --
13      A.    All righty.
14      Q.    -- and you go to item 35 which is on the
15 second page and you scroll all the way to the right,
16 you'll see that the actual price out the door paid that
17 day was $47.94.
18      A.    Okay.
19      Q.    Okay.  And we'll keep all those pages for
20 now.  Do you know, looking at item 35, that jacket --
21      A.    Uh-huh.
22      Q.    -- whether that jacket was ever sold anywhere
23 other than a Columbia outlet?
24      A.    I don't know.  I went by this tag, which is a
25 regular Columbia tag, and it had a retail price on there

Page 93

1 and that made me assume that it was sold at a retail
2 store.
3      Q.    At which price did you believe it sold at the
4 retail store?
5      A.    $120.
6      Q.    And is that because it's the higher price
7 listed on the tag?
8      A.    Yes.  That's the original sticker -- or the
9 original price that's printed on this -- on the tag, on
10 the Columbia tag that's attached to the jacket.
11           MR. RAMSEY:  Just for the record, this is
12 STATHAKOS77 that we're looking at.
13           THE WITNESS:  This -- the $79.90 is what they
14 put at the outlets.
15 BY MR. RAMSEY:
16      Q.    And then you'll remember that day you didn't
17 pay the 120; you didn't pay the 79.90 --
18      A.    Right.
19      Q.    -- but instead paid 47.94.
20      A.    That's correct.
21      Q.    Do you know how that would have happened?
22      A.    The store had a sale, number one; number two,
23 I got an additional discount at the register.
24      Q.    Okay.  So taking a look at the jacket in
25 Columbia item 35, if I told you that this item was never

NICHOLAS STATHAKOS

November 03, 2016

1  sold in a Columbia retail store, was never sold at an
2  REI or anyplace other than the outlet, it was only ever
3  sold at the outlet, and if I also told you that it was
4  never sold at $120, which is the higher price listed on
5  the price tag, would you have still purchased the jacket
6  back in February for the $47.94 that you paid?
7        MS. SAGAFI:  Objection, calls for
8  speculation.
9        THE WITNESS:  I don't know because now you
10  are putting in the question everything I believed that
11  helped me make a decision.  I based it on this item
12  being sold at a retail store for $120.  So you're telling
13  me that that's not correct.  I don't know what my
14  decision would be.  I don't know how much I would need
15  that jacket.  I don't know how much of a deal this is.
16  I don't know what -- it's throwing into question a lot
17  of factors for me.
18  BY MR. RAMSEY:
19     Q.    So you don't know whether you'd buy it or
20  not?
21     A.    No.
22     Q.    Okay.  Similar question:  What if I told you
23  that the jacket depicted in item number 35 was
24  previously sold at the Columbia outlet for $79.90, which
25  is the lower price depicted on the price tag on

1  Stathakos page 77.  Would you still have purchased the
2  jacket back in February for the $47.94 that you paid?
3        MS. SAGAFI:  Objection, vague and ambiguous,
4  incomplete hypothetical, calls for speculation.
5        THE WITNESS:  I really don't know.  I really
6  don't know.
7  BY MR. RAMSEY:
8     Q.    So just roughly -- the lower price on the
9  price tag is 79.90.  Just for rounding purposes, let's
10  pretend it's 80 for a moment.
11     A.    Uh-huh.
12     Q.    And you paid that day 47.94.
13     A.    Okay.
14     Q.    Which is about 50?  So from 80 to 50, what is
15  that?  It's more than a 25 percent discount.
16     A.    Uh-huh.
17     Q.    Knowing that you got more than a 25 percent
18  discount over the price at which this item sold
19  previously at the outlet, would you still have purchased
20  the jacket that day?
21        MS. SAGAFI:  Objection, vague and ambiguous,
22  incomplete hypothetical, calls for speculation.
23        THE WITNESS:  I -- I really don't know.  This
24  right here, the $120 down to what I got it for was what
25  motivated my sale, my buy.

1  BY MR. RAMSEY:
2     Q.    Okay.  But you also --
3     A.    It wasn't -- it wasn't -- it wasn't marked --
4  it wasn't marked to 79.90.  I based my decision on $120.
5     Q.    Okay.
6     A.    And I'm thinking I'm getting a good value, a
7  good deal.  I'm walking away with a good deal, maybe
8  even a steal.  I don't know.
9     Q.    But I believe you previously told me that if
10  you knew that day that it had never sold for $120, you
11  don't know, sitting here, whether you would have still
12  bought it that day for the 47.94 you paid.
13     A.    That's true.
14     Q.    We're done with those pages.  Oh, no, I'm
15  sorry.  Keep that out.
16        Can you flip to item 19, which is on page
17  STATHAKOS23.
18     A.    Okay.
19     Q.    Do you recognize this item?
20     A.    I think that's my wife's.
21     Q.    Not yours?
22     A.    No, no.
23     Q.    If I gave you similar hypotheticals, would it
24  be your decision to buy this item or would it be solely
25  your wife's?

1        MS. SAGAFI:  Objection, similar hypothetical
2  as to what?
3        MR. RAMSEY:  As to the item we just looked
4  at, the item that you actually bought.
5        MS. SAGAFI:  Objection, vague and ambiguous,
6  calls for speculation.
7  BY MR. RAMSEY:
8     Q.    Go ahead.  Do you know what I'm asking?
9     A.    Could you --
10     Q.    Let me try again.
11     A.    Yes.
12     Q.    Did you have any role in deciding to purchase
13  the item depicted in item 19?
14     A.    I think I was with her.  She may have asked
15  me, "Do you like it?"  But I don't have any other role
16  in it.
17     Q.    Okay.  If I told you that this item had been
18  purchased for $10, let's say, and then I asked you
19  whether your wife would have still purchased it had it
20  been $15, would you have any idea?
21        MS. SAGAFI:  Objection, vague and ambiguous,
22  calls for speculation, misstates the information in the
23  document.
24        THE WITNESS:  I don't know if I can speak for
25  my wife, what her -- what she was thinking, but I'm

NICHOLAS STATHAKOS

November 03, 2016

Page 98

1  pretty sure that she sees the same thing I see when we
2  go to the outlet together.
3  BY MR. RAMSEY:
4      Q.    Okay.  That's just one example.  Keeping your
5  hand on this page, item 19, can you also flip to page
6  STATHAKOS73 where you will find a picture of a price
7  tag.
8      A.    Okay.
9      Q.    Where the higher price says 60, there's a
10 lower price that says $39.90, and then a sticker of
11 sorts --
12     A.    Yes.
13     Q.    -- that has 24.98.
14     A.    Yes.
15     Q.    If you could, keep your hands on these pages.
16 And if you would flip back to the chart at the
17 beginning, you'll see that for item 19 on the first page
18 the price paid out the door was $11.98.  Do you see
19 that?
20     A.    Okay, yes.
21     Q.    Okay.
22     A.    That's this (indicating)?
23     Q.    Yes, correct.
24     A.    Okay.
25     Q.    So the price tag that we looked at was also

Page 99

1  the price tag for this pink garment.
2      Okay.  Flipping to the price tag briefly, do
3  you know whether either you or your wife -- I take that
4  back.  If I told you that the item depicted in Columbia
5  Outlet No. 19 on STATHAKOS23 had been sold only ever at
6  the outlet, had never been sold anywhere at a Columbia
7  outlet retail store, REI or elsewhere, had also never
8  sold for $60, which is this higher price on the price
9  tag on Stathakos page 73, would you or your wife, if you
10 know, have purchased this item for the $11.98 paid?
11     MS. SAGAFI:  Objection, vague and ambiguous,
12 incomplete hypothetical, calls for speculation.
13     THE WITNESS:  I don't know about -- I can
14 just speak for myself, and what I can say is that you're
15 putting into question what's on this tag.  I made my
16 decision based on every piece of clothing that I either
17 picked for myself, I picked with my wife based on the
18 total facts here.  I didn't base it on that, hey, it was
19 just -- it wasn't 60 -- well, it was $39.90; it wasn't
20 $24.98.  I see $60.  I made the assumption that is
21 what this item sold at a retail store.  I didn't know
22 that this did not sell at a retail store.  I did not
23 know that this did not sell at Columbia but sold at REI
24 or sold at Sierra Trading or at the outlets only.  I
25 don't know.  I just know that that is the price that a

Page 100

1  company that my wife and I trust put on there and that's
2  what we went by.
3  BY MR. RAMSEY:
4      Q.    Okay.  So if you notice from page 1 the date
5  of purchase for item 19 was February 14, 2016.
6      A.    Uh-huh.
7      Q.    That was earlier this year.
8      A.    Right.
9      Q.    And it was also after the time that you came
10 to understand that at least some items at the Columbia
11 outlet were not sold for -- or had not ever been sold at
12 the higher price on the tag, correct?
13     A.    Correct.
14     Q.    Okay.  So knowing that, do you believe it was
15 reasonable in February 2016 to look at the tag on page
16 STATHAKOS73 and still believe that this item had
17 previously sold at a Columbia outlet retail
18 establishment, REI or somewhere other than the outlet
19 for $60?
20     MS. SAGAFI:  Objection, calls for an expert
21 opinion and a legal conclusion.
22     THE WITNESS:  I don't know, to be quite
23 honest.  To that point and even to now I don't know
24 what's been proven or what has not.  This is just
25 allegations that were made, and there was no reason for

Page 101

1  us to really think otherwise.  I mean, it was a good
2  bargain, 11.98, whatever it was.
3  BY MR. RAMSEY:
4      Q.    Okay.  But you don't know, sitting here,
5  whether you would have still paid the 11.98 to purchase
6  this item had you known at the time that it had never
7  sold for $60?
8      A.    I don't know.
9      Q.    More broadly, do you believe that you would
10 have been involved in that situation -- in that decision
11 given that this item was for your wife?
12     A.    I think more my involvement would be, "How do
13 you like it?"
14     Q.    "It looks nice," or whatever?
15     A.    Yes.
16     Q.    Okay.  Just give me one moment.  We are done
17 with that one.
18     A.    You want this back?
19     Q.    I'm done with it.  You're welcome to look at
20 it if you want.  Just give me a second.
21     Do you know anyone other than your wife or
22 children who has shopped at a Columbia outlet store?
23     A.    No.
24     MS. SAGAFI:  Objection, calls for
25 speculation.

Exhibit 3

Melissa Olson                                    September 27, 2016

Page 1

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4    JEANNE and NICOLAS STATHAKOS,  )

5    individually and on behalf of  )

     all others similarly situated, )

6                                    )

                     Plaintiffs,    )

7                                    )

        vs.                          ) No. 4:15-cv-04543(YGR)

8                                    )

     COLUMBIA SPORTSWEAR COMPANY;    )

9    COLUMBIA SPORTSWEAR USA         )

     CORPORATION,                    )

10                                   )

                     Defendants.    )

11

12

13             C O N F I D E N T I A L

14        VIDEOTAPED DEPOSITION OF MELISSA OLSON

15           Taken on behalf of Plaintiffs

16               September 27th, 2016

17                    * * *

18         BE IT REMEMBERED THAT, pursuant to the

19   Federal Rules of Civil Procedure, the deposition

20   of MELISSA OLSON was taken before KERI M. NIETH, a

21   Certified Shorthand Reporter and Notary Public for

22   Oregon, on Tuesday, September 27th, 2016, commencing

23   at the hour of 9:00 AM, in the law offices of

24   SCHWABE, WILLIAMSON & WYATT, 1211 SW 5th Avenue,

25   Suite 1900, Portland, Oregon.

Melissa Olson                                        September 27, 2016

Page 36

```
 1                    MR. RAMSEY:  Just so you know.  So      10:01:22

 2    we're all on the same.

 3                    THE WITNESS:  Yes.  Sorry.

 4    BY MS. SAGAFI:  (Continuing)

 5        Q.   And this is the line plan for just a          10:01:25

 6    particular season, correct?

 7        A.   That looks like you have fall '14 up

 8    there, yes.

 9        Q.   Very good.

10             And I think this is the point Jay just        10:01:33

11    made, but this line plan includes all outlet

12    products for fall 2014 -- correct? -- not just the

13    SMU outlet exclusives.

14        A.   This would include all outlet product that

15    is getting produced.  It wouldn't be closeouts.        10:01:52

16        Q.   Okay.

17        A.   So outlet has closeouts, also, that they

18    take.  This would be outlet product that is

19    produced.

20        Q.   What do you mean by "closeouts"?              10:02:03

21        A.   Inline product in the season that have

22    excess that outlets take at the end of the season.

23        Q.   Thank you.

24             Do you know who created this document?

25        A.   This -- it's a pull from our PDM system.      10:02:21
```

Melissa Olson                                                        September 27, 2016

                                                                          Page 48

 1    in the "Styles" column whether a particular product     10:17:31

 2    is a new name or a new style request?

 3        A.   No.

 4        Q.   So the "X" doesn't -- at the beginning of

 5    the style number doesn't indicate that it's a new        10:17:42

 6    style request?

 7        A.   No.  It could be a new name.

 8        Q.   Okay.

 9        A.   It could -- yeah.

10        Q.   Okay.  In fall of 2014, do you know the        10:18:13

11    approximate percentage split between new name

12    products and new style request products that were

13    offered for sale in that season?

14        A.   I -- oh, I don't.

15             I know the first season out, most of the        10:18:32

16    products were -- majority was new name.  We did very

17    little new styles.

18        Q.   Has the percentage of new style request

19    products gone up since the first season they were

20    offered?                                                 10:18:52

21        A.   Yes.

22        Q.   Why is that?

23        A.   Our inline product has been carrying over

24    more of their styles, and the request from the

25    wholesale team was to make them look different and       10:19:06

Page 49

1    not just give them the same name, because they were        10:19:12

2    -- they were confusing to the wholesale marketplace.

3        Q.   When you say "inline was carrying over,"

4    what does that mean?

5        A.   So if inline built a style in fall '14 and        10:19:24

6    it sold in well, they decided to carry it over to

7    fall '15 --

8        Q.   In line.

9        A.   Yes, inline, keep the same style.

10           So as they carry over more inline                  10:19:38

11   products, then we would do more new styles.

12           It's easier to take an inline style

13   exactly as it is and just give it a new name if

14   inline is not running that style anymore.

15       Q.   I see.  But if a particular style is still        10:19:58

16   running inline, you're not going to offer the exact

17   same product in the outlet under a new name?

18                   MR. RAMSEY:  I'll object.  That

19   misstates the testimony a little bit.

20   BY MS. SAGAFI:  (Continuing)                               10:20:07

21       Q.   Did I get that wrong?

22       A.   Yes.

23       Q.   Okay.  Will you explain to me, please.

24       A.   We might still -- if inline carries it

25   over, we might still do a new name.                        10:20:15

Melissa Olson                                    September 27, 2016

Page 52

1    shoes, I don't know exactly what they would think.      10:22:52

2            But the complaint is essentially that they

3    are -- the U.S. marketplace, whatever, they have the

4    same product as the outlets, and the outlets have --

5    sell it for a lower price.                              10:23:08

6        Q.   Have you heard the same complaint with

7    regard to the new style request products?

8        A.   Yes, because they're really still the same

9    product, just with design changes.

10           I mean, a very good buyer could go into      10:23:24

11   the outlet and say, "That's the same jacket that I

12   have.  You just put the pockets from the bottom to

13   the top.  There's no other difference.  That's my

14   jacket, and you're selling it for a lower price."

15       Q.   Is there a way for the consumer to         10:23:41

16   identify which products are new name and which

17   products are new style requests just by looking at

18   the way the products are labeled or tagged in the

19   outlet store?

20       A.   No.  Sorry.  Be a little more clear.       10:24:03

21           Is there a way for the consumer to

22   identify if it's a new name or a new style build?

23       Q.   Yes.

24       A.   Not that I know of.

25       Q.   If you walked into a Columbia outlet        10:24:21

Page 90

```
 1              THE WITNESS:  It's -- again, it's the     11:26:09

 2      whole -- it's the retail side of the business that

 3      made the decision to do that.

 4              For me personally, I see it as showing the

 5      deal.  You know, the outlet buyer is getting a     11:26:24

 6      better -- a great deal.

 7      BY MS. SAGAFI:  (Continuing)

 8          Q.   You were about to say "better deal."

 9               What did you mean by that?

10              MR. RAMSEY:  I'll object again.           11:26:39

11      Beyond the scope of the examination for Ms. Olson.

12               Go ahead.

13      BY MS. SAGAFI:  (Continuing)

14          Q.   You can answer.

15          A.   Okay.  I'm building a product for a       11:26:47

16      hundred dollars, and the retail outlet team decides

17      they want to sell it for $70.  Their choice.

18               You're getting, in my mind, a really good

19      product that's built for a hundred dollars, and

20      you're only having to pay 70.  So, seems like a    11:27:03

21      pretty good deal.

22          Q.   And when you say "a product built for a

23      hundred dollars," I know you're speaking about a

24      hypothetical product -- right? -- and not any

25      product -- one product in particular.              11:27:18
```

Melissa Olson                                          September 27, 2016

Page 91

1        A.   Yes.  I just pulled out a hundred dollar      11:27:20

2     price tag.

3        Q.   Okay.  And when you say "I'm building a

4     product for a hundred dollars," you don't mean that

5     it costs a hundred dollars to build it, do you?      11:27:26

6        A.   No.  That I'm building a hundred dollar

7     MSRP product is what I meant.

8        Q.   Yes.  Okay.  I'm with you.

9             So is it fair to say that the use of the

10    MSRP together with the outlet price is meant to      11:27:48

11    communicate a good value to the customer?

12              MR. RAMSEY:  I'll object again.

13    Beyond the scope of the topics.

14              I'd encourage Ms. Olson -- well, it's

15    beyond the scope of the topics and calls for         11:28:08

16    speculation.

17    BY MS. SAGAFI:  (Continuing)

18        Q.   You can answer.

19        A.   Okay.  I don't know what it was intended

20    or meant to show or how each customer could decide   11:28:19

21    what that means.

22              To me, again, it shows that they're

23    getting a good deal.

24        Q.   Do you know whether anyone within the

25    Columbia organization has ever analyzed the effect   11:28:38

Page 93

```
 1    change the price before we go to final price to make    11:30:04

 2    sure that we're still aligning with them?"  Those

 3    kinds of things just to make sure that we're on the

 4    same page.

 5         Q.   Okay.  Would you say that it's common        11:30:13

 6    knowledge within the Columbia Sportswear community

 7    that customers are more likely to buy products that

 8    are on sale?

 9              MR. RAMSEY:  I'll object beyond the

10    scope of topics.  It calls for speculation.          11:30:36

11    BY MS. SAGAFI:  (Continuing)

12         Q.   If you can answer.

13         A.   Okay.  I wouldn't know what customers were

14    more likely to buy or not.  I think that, you know,

15    personally you're either an outlet customer or        11:30:47

16    you're not.  You're looking for a deal or you're

17    not.  I mean, that's my own speculation.

18              If you're an outlet customer, you probably

19    are looking for a sale price, in my opinion.

20         Q.   Do you think that opinion is generally      11:31:03

21    held by Columbia?

22         A.   I don't know.

23              MR. RAMSEY:  Object again for beyond

24    the scope and calls for speculation.

25              THE WITNESS:  I couldn't answer that.       11:31:14
```

Melissa Olson                                      September 27, 2016

                                                        Page 94

1        I don't know.                              11:31:16

2    BY MS. SAGAFI:  (Continuing)

3        Q.    Okay.  You said you're either an outlet

4    customer or you're not.

5              What's the difference between somebody    11:31:20

6    who's an outlet customer and somebody's who's not?

7                   MR. RAMSEY:  Same objections.

8                   THE WITNESS:  In my opinion, there

9    are consumers who are looking for the best deal they

10   can find.  Generally you can find those at outlet    11:31:32

11   stores.  And that's why I said that.

12   BY MS. SAGAFI:  (Continuing)

13       Q.    Okay.  Let me show you Columbia 001055.

14   And we'll treat this one as Exhibit 7.

15                   (Excel Spreadsheet Columbia        11:32:53

16                   001055, EXB. 7, referred to.)

17   BY MS. SAGAFI:  (Continuing)

18       Q.    Do I have it up there?  Yes.

19             Are you familiar with this document --

20       A.    Yes.                                 11:33:10

21       Q.    -- Columbia 1055?

22       A.    Yes.

23       Q.    What do you understand this document to

24   be?

25       A.    It's like the fall '16 outlet line.    11:33:15

Page 105

| | | |
|---|---|---|
| 1 | get developed? | 11:46:30 |

2          The style level can include a Pan-Asian

3     fit, so we might offer -- you know, and this is

4     really inline where I'm jumping out of outlet and

5     into inline.                                              11:46:43

6          There might be inline styles that China

7     decides they want, and so they'll add a Pan-Asian

8     fit, and then it would be China developed at the

9     style level.

10         Q.   That sounds very confusing.               11:46:57

11         A.   (Laughing.)

12         Q.   Is the information in Columns S and T

13     here, is that data available on the apparel side

14     such that we could, if you needed to, pull a new

15     line plan report for fall of '16 that includes those    11:47:20

16     two data fields?

17         A.   I'm not sure that drops in there yet or

18     not for fall in the apparel side.  All of the outlet

19     styles are corporate developed.

20         Q.   Well, that makes it easy.  Thank you.     11:47:40

21              Okay.  That's all for this document.

22              Do you know when Columbia started

23     producing new style request products for sale at its

24     outlet stores in California?

25         A.   I believe it was the 2014.                11:48:15

Melissa Olson                                    September 27, 2016

Page 106

```
 1      Q.   Spring or fall?                        11:48:19

 2      A.   I'm pretty sure it's fall.

 3      Q.   What would you need to look at to be sure?

 4      A.   It would take some -- it would take some

 5   research.                                      11:48:34

 6           I think I already did this, and that's

 7   where we're at.  So I'm pretty confident that it was

 8   twenty -- the fall 2014 season.

 9      Q.   Okay.  And do you have an understanding of

10   the reasons why Columbia started producing new style  11:48:49

11   request products for sale in the outlets at that

12   time?

13      A.   My understanding is there were -- our

14   wholesale customers were complaining that the same

15   exact styles were in the outlet stores that they   11:49:04

16   were also selling, and the outlet stores had them at

17   a lower price.

18      Q.   Prior to the fall 2014 season, did

19   Columbia produce new name styles for sale in their

20   outlet stores?                                 11:49:28

21      A.   I would have to go back and double check.

22   I'm not sure if that started the same season or not

23   or if it was 2013.  I -- might have been the same

24   season that we started doing new names.

25      Q.   Okay.  So it sounds like it's not that  11:49:51
```

Exhibit 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JEANNE AND NICHOLAS STATHAKOS, )
Individually and on Behalf of  )
All Others Similarly Situated, )
                               )
            Plaintiffs,        )
vs.                            ) Case No. 4:15-cv-
                               )         04543YGR
COLUMBIA SPORTSWEAR COMPANY;   )
COLUMBIA SPORTSWEAR USA        )
CORPORATION,                   )
            Defendants.        )
_____ )


VIDEOTAPED DEPOSITION OF

LARRY D. COMPEAU, Ph.D.

Potsdam, New York

Friday, January 13, 2017


Reported by:  Kristin Ashley Hicks, RPR

LARRY COMPEAU

January 13, 2017

```
 1         Government enforcement action.
 2    BY MR. CARDON:
 3         Q    What is that -- what is the sense that you
 4         have?
 5         A    Just that I think -- I do not know what
 6         they are, but I believe that the standards may
 7         be different in civil versus a Government
 8         enforcement regulation, but I don't know what
 9         they are.
10         Q    Is the question of harm something that
11         plays into the differences there?
12                        MS. GOLD:  Object to the form.
13         A    Does harm have a legal definition?
14    BY MR. CARDON:
15         Q    I'm using it in the colloquial sense.
16         A    Colloquial.
17         Q    Does -- For a Government to pursue a false
18         or deceptive advertising action, does there
19         have to be someone who is actually harmed?
20                        MS. GOLD:  Object to the form.
21              You're just asking him as a layperson?
22         A    I -- you know, again, as a layperson, my
23         understanding is there has to be harm in any of
24         these actions.  Consumers, you know, had to
25         feel some disadvantage in order to bring any of
```

LARRY COMPEAU

January 13, 2017

```
 1        offered advice to retailers, sellers on how
 2        they can avoid deceiving consumers through the
 3        use of reference prices.  So I'm interpreting
 4        those regulations, interpreting those guides
 5        and providing advice, managerial prescription,
 6        prescriptions to sellers.
 7        Q    Got it.  But you would not expect a judge
 8        to rely upon you to tell them what the legal
 9        standard is?
10        A    No.
11        Q    Okay.  How --
12        A    I would expect a judge to rely on me to
13        determine whether a practice would be deceptive
14        in my view.
15        Q    So you believe that a judge should rely
16        upon you to determine whether a practice falls
17        above or below a legal standard?
18                        MS. GOLD:  Object to the form.
19        A    Not a legal standard.  Simply a standard
20        that's borne out in the research.
21   BY MR. CARDON:
22        Q    Okay.  And that standard may be different
23        from what the operative legal standard is in
24        any particular jurisdiction at any particular
25        time?
```

LARRY COMPEAU

January 13, 2017

```
 1        at this one type of deception that could occur?
 2        A    Correct.
 3        Q    And if the quality is exactly what the
 4        consumer inferred from the reference price,
 5        then that type of deception does not exist?
 6                    MS. GOLD:  Objection, asked and
 7             answered.
 8        A    Let me think for a second.
 9             Yeah, I --
10             See, again, I have problems with this
11        because you have to take it in context with the
12        next sentence.  Finally, if the reference price
13        is exaggerated, and even if the consumer infers
14        quality based on the final sale price, the
15        legal definition of deception has been met.
16    BY MR. CARDON:
17        Q    Well, we just established you're not
18        discussing whether a legal definition has been
19        met or not, right?  That's not within your
20        capability?
21        A    My -- what I'm saying is in any given
22        specific case my charge is not to determine
23        whether or not that specific violation measures
24        up to, you know, the Court definition.  That's
25        up to the Court to decide.  But I can certainly
```

LARRY COMPEAU

January 13, 2017

```
 1          make inferences and draw conclusions based on
 2          the guides and the empirical evidence that
 3          exists.
 4          Q    And in this sentence here that we're
 5          referring to --
 6                        MS. GOLD:  Which sentence now
 7                because there's been more than one?
 8   BY MR. CARDON:
 9          Q    If the reference price is exaggerated and
10          the consumer infers product quality based on
11          this reference price, then there has been
12          deception; i.e., the consumer has been
13          materially misled by the exaggerated reference
14          price.  And the misled that you're referring
15          there to is to the quality, right?  That's what
16          that sentence is about?
17                        MS. GOLD:  Object to the form.
18          A    Yes.  Yes, but it's just that one aspect
19          of it that we're bringing quality into the
20          equation here.
21   BY MR. CARDON:
22          Q    Is --
23          A    You could -- if you read in the rest of
24          it, you can see that there can be deception
25          without consumer's inferring quality.
```

LARRY COMPEAU

January 13, 2017

```
 1                    MS. GOLD:  Object to the form.
 2        A    I don't know what the Court uses,
 3        honestly.  I don't know what factors the Court
 4        would deem important in that scenario.
 5   BY MR. CARDON:
 6        Q    Okay.  But you would think so, right?  If
 7        you were trying to decide whether a -- some
 8        deception or some -- some misinformation was
 9        material, you'd want to know more than just the
10        bare fact that there was misinformation?
11        A    I have never, nor do I try to make the
12        legal judgment of materiality.  It's just not
13        what I -- I'm supposed to do.
14        Q    Okay.  So that's beyond the scope of any
15        opinion you have here?
16        A    Correct.
17        Q    Okay.  But let me ask you, the concept of
18        materiality on some level goes to whether there
19        is actually deception.  Isn't that right?  So
20        if there is a price, a reference price, and I
21        never look at the reference price, then with
22        respect to me it is so immaterial that I
23        haven't even been deceived because I didn't
24        even look at it?  Would you conceptually agree
25        with that?
```

LARRY COMPEAU

January 13, 2017

```
 1   A     No.

 2   Q     Okay. why have I been deceived about

 3   something I didn't look at?

 4   A     Several reasons.  Number one, you're

 5   asking me, again, to refer to and opine on

 6   materiality which I cannot do.  It's a legal --

 7   as far as I'm concerned, that's a legal

 8   construct and it's determined by the Court.

 9   You then go ahead and position materiality on

10   an individual basis where one consumer doesn't

11   look at the reference price, so it's not

12   material.  And to me that -- we don't look at

13   that as materiality because, again,

14   materiality's a legal word.

15        What we would do is we would look at how

16   the consumers respond to that price

17   information.  To date there is no research to

18   support the notion that consumers are -- do not

19   respond in some way to a reference price

20   scenario.  Even when they don't believe it, it

21   still has a positive impact on their

22   perceptions of the value of the deal, their

23   willingness to purchase and a negative impact

24   on their willingness to continue to search.

25   Q     And it also can have a negative impact on
```

LARRY COMPEAU

1    which that is one?

2    **A    Correct.**

3    Q    So you're not saying there is a causation

4    effect, that because there is a reference price

5    that impacts this perception of value;

6    therefore, consumers always buy the product?

7         MS. GOLD:  Object to the form.

8    **A    The way you have stated it specifically in**

9    **that way, it is correct.  You are correct.**

10   BY MR. CARDON:

11   Q    Okay.  And I'm not trying to play games

12   here.  It's just one of those factors that you

13   described, and it makes that factor tend

14   towards purchase?

15        MS. GOLD:  Object to the form.

16   **A    Correct.  As I've stated, that the mere**

17   **presence of a reference price -- and it's**

18   **causal, the mere presence of a reference price**

19   **causes consumers to increase their perceptions**

20   **of value, and therefore, increase their**

21   **likelihood of purchase.  The higher that**

22   **reference price is relative to the selling**

23   **price may even increase more the perception of**

24   **value and increases more their likelihood of**

25   **purchase.**

LARRY COMPEAU

January 13, 2017

1    Q     That sounds about right.

**2    A     Yeah.**

3    Q     That seemed to me to be about the latest

4    that I saw any -- any actual research, although

5    I wasn't clear whether there was an actual

6    consumer survey or consumer research conducted

7    in connection with that.

**8    A     Right, and I don't recall right now.**

9    Q     Okay.  So this says you take the first

10   part, consumers rely on Columbia's reference

11   prices, you go to the and portion would read

12   that in their purchase decision processes.  So

13   they're not saying that that -- you're not

14   saying that that is the exclusive basis on

15   which they reach a purchase decision?

**16   A     No.  I'm saying that they rely on that**

**17   information as part of their decision process.**

18   Q     Okay.  And for any particular consumer,

19   you can't determine whether they would have or

20   wouldn't have made that purchase but for that

21   alleged misrepresentation?

22                  MS. GOLD:  Object to the form.

**23   A     So the research shows that we have been**

**24   unable to find instances where the presence and**

**25   use of a reference price doesn't influence**

LARRY COMPEAU

January 13, 2017

```
 1        their decision processes.  So maybe I missed
 2        your question.
 3   BY MR. CARDON:
 4        Q     There is a difference -- I'm getting at
 5        the difference between the distinction between
 6        influence and determine.  And I don't think
 7        you've gone out so for on a limb to say that
 8        they determine the purchase decision.  They
 9        influence it, and in certain circumstances that
10        may be enough to push one over the edge or to
11        pass the point where a purchase is made, and in
12        other cases that may be just one of the factors
13        involved in the decision?
14                   MS. GOLD:  Object to the form.
15        A     That's a good question, but the research
16        has been very specific in that we look at the
17        likelihood of purchase.  And what I can say
18        based on that empirical research is that the
19        likelihood of consumers purchasing when a
20        reference price is used is significantly higher
21        than --
22   BY MR. CARDON:
23        Q     Understood.
24        A     -- when one isn't present.
25        Q     Understood.  You said that quite a few
```

LARRY COMPEAU

January 13, 2017

```
1   about, right?

2   A      Long, long time ago.

3   Q      Yeah, that impact is going to push that

4   marble forward towards that line.  In some

5   instance the impact is enough in combination

6   with the distance from the line to push it

7   over.  And in some instances the impact is not

8   enough to push it over, or in some instances

9   maybe a high impact but the marble was pretty

10  far back from the line.  And that's the concept

11  I'm trying to understand and see if we agree on

12  with the idea of impact, that when something

13  impacts a decision, it goes into that basket of

14  factors that a person makes -- uses to make a

15  decision.  It doesn't necessarily say in every

16  instance the marble will cross the line.

17               MS. GOLD:  Object to the form.

18  A      All I can do is go back to the research

19  and show that consumers rely on reference

20  prices, they hold dear to their hearts the

21  notion of getting a deal when they purchase

22  something.  And so it always has a

23  statistically significant impact on their

24  decision processes.  I'm -- I can't sit here

25  though and controvert the evidence to say that
```

Exhibit 5

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3

4    JEANNE and NICOLAS STATHAKOS,      )

     individually and on behalf of      )

5    all others similarly situated,     )

                                        )

6                    Plaintiffs,        )

                                        )

7         v.                            ) No. 4:15-cv-04543 (YGR)

                                        )

8    COLUMBIA SPORTSWEAR COMPANY;       )

     COLUMBIA SPORTSWEAR USA            )

9    CORPORATION,                       )

                                        )

10                   Defendants.        )

11

12

13              C O N F I D E N T I A L

14        VIDEOTAPED DEPOSITION OF JAMES ROBERT BUI

15             Taken on behalf of Plaintiffs

16                 September 28th, 2016

17                      * * *

18          BE IT REMEMBERED THAT, pursuant to the Federal

19   Rules of Civil Procedure, the deposition of JAMES ROBERT

20   BUI was taken before Robin L. Nodland, an Oregon Certified

21   Shorthand Reporter, a Registered Diplomate Reporter, and a

22   Certified Realtime Reporter, on Wednesday, September 28,

23   2016, commencing at the hour of 9:10 a.m., in the law

24   offices of SCHWABE WILLIAMSON & WYATT PC, 1211 SW Fifth

25   Avenue, Suite 1900, Portland, Oregon.

1   Q.   Okay.

2           So as we go through the questions today,

3   just for ease of reference, I'm going to refer to

4   the seven new designs that are in your criteria here

5   in sheet 1 of 1054 as the seven new designs.  Okay?

6   A.   Great.

7   Q.   Does that make sense?

8   A.   Yes.

9   Q.   If I say that, you know what I mean?

10  A.   Yes.

11  Q.   Okay.  That's going to save us a lot of time.

12  A.   Absolutely.

13  Q.   All right.

14           All right.  So you've told me that you are

15  the person that created the sheet 1 tab of this

16  document; right?

17  A.   Yes.

18  Q.   What source or sources did you use to pull the

19  information in columns G, H, and I in this tab?

20  A.   So the -- in column I, which are -- I'll refer

21  to as our JDE style numbers, which is an old -- old

22  enterprise system that we used, those were the ones

23  that were given to me by Jay.

24  Q.   Okay.

25  A.   And I had to then cross-reference them to the

James Robert Buf                     September 28, 2016

Page 22

1  new material style numbers, which is our existing

2  system, platform, in order to go into my own system,

3  the retail system, which we call ideas, to find the

4  associated SKUs.

5  Q.   Okay.   And the SKUs that we see here represent

6  every iteration of the seven new design products,

7  regardless of what season they were offered in; is

8  that right?

9  A.   Yes.

10  Q.   Okay.   Let's look at the codes tab, which is

11  the second tab of this document.   Did you compile

12  the information in this tab?

13  A.   I did not.   It was Danielle, from loss

14  prevention.

15  Q.   Okay.   Do you have an understanding of what

16  these codes mean?

17  A.   A vague understanding, yes.

18  Q.   Okay.   Do you know where these codes came from?

19  What is the source for these codes?

20  A.   So loss prevention works with a system called

21  Aspect, and Aspect is a transactional system.   So

22  it's really intended to look for anomalies, but in

23  order to do that, they have to -- they have to

24  record every single transaction.   And so she took

25  the data that I gave to her, and she ran all of the

1    transactions that had those particular SKUs in those

2    particular stores.   And then there were some

3    additional codes, which is this page, in her

4    reporting that she listed so that we could

5    understand what the codes meant.

6    Q.   All right.   And is it fair to say that the

7    Aspect system captures every transaction completed

8    at California outlet stores in real time?

9    A.   I don't know if it does it in real time.   That

10   I can't answer with certainty, but I can say that it

11   does capture every single transaction.

12   Q.   And when -- let me ask it this way:   Does the

13   Aspect system contain every transaction from

14   California outlet stores dating back to July 1st of

15   2014?

16   A.   Yes.   It captures all the transactions for all

17   of our stores, even outside of California.

18   Q.   Great.

19   A.   Yes.

20   Q.   Are you able to give me any information about

21   the platform that the Aspect system uses to house

22   all of that data?   And let me explain the question.

23        You know, this document, 1054, is in

24   Excel.   So I assume that your colleague pulled these

25   data from the Aspect system and just downloaded it

James Robert Bub                                    September 28, 2016

Page 26

```
 1        BY MS. SAGAFI:  (Continuing)
 2   Q.    Okay.
 3           Did you provide, as one of your criteria,
 4   a date range for which you wanted your colleague to
 5   pull Aspect transaction data?
 6   A.    Yes.  I asked her to go back as far as she
 7   could, ideally 2010 or up to the present, and that's
 8   what she did.
 9   Q.    So am I correct in understanding that she
10   looked for any transaction at these 11 stores
11   involving any of the SKUs listed in sheet 1 going
12   back to 2010?
13   A.    Yes.
14   Q.    Great.  That's very helpful.  Thank you.
15           Sorry.
16   A.    That's okay.
17   Q.    There's just a whole lot of questions that I
18   don't need to ask now.
19               MR. RAMSEY:  That's a good sign when
20   they cross things off.
21   BY MS. SAGAFI:  (Continuing)
22   Q.    In looking at the data collected in the data
23   tab of document 1054, it looks to me like the most
24   recent transaction occurred September 16th, 2016.
25   Was that an end date that you provided to your
```

1    colleague who pulled this data?

2    A.    I didn't give her a specific end date.  I just

3    said to the present.  So I believe she -- this

4    reflects the date she pulled it.

5    Q.    And if she were to pull the data again, today,

6    would it include transactions, if any, for these

7    SKUs that had taken place between September 16th and

8    today?

9    A.    It should, yes.

10   Q.    Do you have a sense of how often the Aspect

11   database updates itself or is updated?  Another way

12   of asking that question is, how long is the delay

13   between when a transaction happens and when it would

14   show up in Aspect?

15   A.    Unfortunately, I don't know that.  I don't know

16   if it's real time or if it's overnight or -- I don't

17   know that answer.

18   Q.    It must be pretty quick, though, because this

19   includes data up to September 16th, and we're only a

20   couple weeks past that now.

21            That wasn't a question; that's just me

22   thinking out loud.

23            All right.  Let's look at the codes tab.

24   And let's just take these in order by row.  And I'd

25   just like you to explain to me in your own words

1    that manages the marketing and the loyalty program.

2    Q.   And what specific person would you go to?

3    A.   I don't know a specific person.  I'd have to

4    ask around.

5    Q.   Okay.

6              All right.  Let's look now at what was

7    previously marked as Exhibit 13 yesterday.

8                   MR. RAMSEY:  Are we done with the

9    sheet?

10                  MS. SAGAFI:  For a while, yeah.

11                  MR. RAMSEY:  We should probably turn

12   off the projector, then.

13                  MS. SAGAFI:  Yeah.  That's a good

14   idea.  I won't need the projector for a little

15   while.

16   BY MS. SAGAFI:  (Continuing)

17   Q.   Okay.  Bobby, so you have in front of you what

18   was marked yesterday as Exhibit 13.  Do you

19   recognize this document?

20   A.   I do, yes.

21   Q.   What is it?

22   A.   It's what we call our value pricing model.

23   Q.   Do you know who created this document?

24   A.   Yes, I do.

25   Q.   Who created it?

James Robert Bur                    September 28, 2016

Page 83

1   A.   I did.

2   Q.   When?

3   A.   I think it was 2010.   Somewhere around then.

4   Q.   And have the price values reflected on this

5   document -- well, I'll ask it a different way.

6            Has the value pricing model changed at all

7   since you created it in 2010 to the present?

8   A.   It has gone through some minor changes between

9   2010 and 2012, but then we locked it in in 2012.

10  Q.   I see.

11           So looking at this document, describe to

12  me what is meant by inline price as that appears at

13  the top left.

14  A.   Inline price refers to the MSRP.

15  Q.   Okay.   And what does MSU [sic] price mean?

16  A.   SMU?

17  Q.   What does SMU price mean?

18  A.   That is our outlet price.

19  Q.   Okay.   And if we were to look at an outlet

20  product on the first day that it's available for

21  sale at the outlet store, would we typically see

22  these two prices on the price tag?

23  A.   Yes.

24  Q.   And do the prices on the price tags for outlet

25  products sometimes vary from the values that we see

1    here on the value pricing model?

2    A.    This is -- these are -- these system -- these

3    prices are in the system.   So if a product comes

4    across with this MSRP, it's assigned this SMU price.

5    So if there is a vary -- variance from that, then

6    it's done at the item level by the buyer.

7    Q.    Okay.

8    A.    Individual -- individually.

9    Q.    And what is the process by which a buyer might

10   make a price change from the SMU price that is in

11   the system?

12   A.    The process?

13   Q.    M-hm.

14   A.    What do you mean by the process?

15   Q.    What considerations go into the decision to

16   vary the price from the value that exists in the

17   system?

18   A.    It could be history, the performance of the

19   product.   So if we -- if we feel like the SMU price

20   is -- can be higher or can be lower, that might be

21   changed based on previous performance.   It can be to

22   correlate with other products within its family so

23   that they're similar prices.   It can be -- those are

24   generally the reasons.

25   Q.    Anything else?   Any other reasons you can think

1   Q.   And associates do that permanent markdown

2   typically by stickering?

3   A.   Yes.  Restickering, yes.

4   Q.   Okay.

5   A.   Also a consideration was the fact that in

6   outlet stores we need to have a certain percentage

7   of our product on sale every day.

8   Q.   To comply with the lease?

9   A.   To comply, yes, exactly.  So I don't -- I think

10  it's somewhere around 80 or 85 percent of the

11  product has to be at least 20 percent off.  So when

12  we put this together, our goal was to be around 25

13  percent off.  But the caveat was that we wanted to

14  be -- I wanted to be in a -- I'll call it a rounded

15  number.

16          So if you see the 4.90, which to me is a

17  5, or a 9.90, which means to me a 00.  You see what

18  I mean?  So it rounds out to the five or ten dollar

19  increments.

20  Q.   Say that part again, about the rounding.  I

21  didn't follow that.

22  A.   Our target is to be about 25 percent off of the

23  MSRP.

24  Q.   For?

25  A.   For our value, value pricing.

COMMENT

1   speculation.  Beyond the scope of the topics.

2   A.   I don't -- I don't know the answer to that

3   question.

4   BY MS. SAGAFI:  (Continuing)

5   Q.   Really?

6               MR. RAMSEY:  Object.  Argumentative.

7   There's no question pending.

8   BY MS. SAGAFI:  (Continuing)

9   Q.   Why does Columbia include two prices on the

10   price tag?

11              MR. RAMSEY:  Same objection.  It's

12   beyond the scope of the topic.  Calls for

13   speculation.

14          If you can answer.

15   A.   Why do we include two?

16   BY MS. SAGAFI:  (Continuing)

17   Q.   Yes.

18   A.   The MSRP comes on the tag, and the outlet price

19   is what we intend to sell it for as our first price.

20   MSRP comes on every tag.

21   Q.   Has anyone at Columbia ever done anything to

22   assess what the presence of two prices on the price

23   tag means to its customers?

24   A.   No.

25   Q.   No focus groups on that issue?

1    through the present?

2    A.    I can't say if it was exactly fall '14, but it

3    is presently done.

4    Q.    Okay.  So at what point in the process are the

5    price stickers placed on the price tag for outlet

6    products?

7    A.    It would be done at factory.

8    Q.    Okay.  And is that true across the board for

9    all outlet products?

10   A.    No, it isn't.

11   Q.    Is it true across the board for all new design

12   outlet products?

13   A.    Yes.  That's the intent.

14   Q.    Okay.  Let's look at point number seven here,

15   which says, "Outlets will still be asked to take

16   prior-season excess and in-season products which may

17   include some sensitive styles or technologies."

18         What did you mean by sensitive styles or

19   technologies?

20   A.    Sensitive meaning that the name may still exist

21   in the marketplace with our wholesale accounts, or

22   the technology may be a little bit newer, and we, in

23   general, would like to delay outlets having that

24   product, but maybe because of the number of units in

25   closeouts, that we would need outlet assistance to

1    help sell through that product.

2    Q.   Okay.  You can set this one aside.

3              And look now at what's been marked

4    Exhibit 26.  This is a one-page document Bates

5    stamped Columbia 01034.  Are you familiar with this

6    document, Bobby?

7    A.   I'm familiar.

8    Q.   Okay.

9    A.   Yes.

10   Q.   How would you describe this document?

11   A.   It looks like a schematic of what the Columbia

12   tag would look like.

13   Q.   And is this what the current tags on Columbia

14   outlet products look like?

15   A.   Generally speaking, yes.

16   Q.   And has this been the appearance of the price

17   tag since the fall '14 season?

18   A.   Yes, I think so.

19   Q.   I am looking at the lower right-hand portion of

20   this document that says, "Revised address layout

21   5/20/13."  Does that indicate the date on which a

22   portion or this whole tag was revised?

23   A.   That's what it would seem to indicate, but I

24   don't know for sure.

25   Q.   Okay.  But to the best of your recollection,

1    Q.   So do you conclude, looking again at the price

2    tag pictured in Exhibit 28, since this is not a Z

3    sticker, do you conclude that the sticker that bears

4    the price 24.90 was already affixed when this

5    product arrived at the outlet store in which it was

6    sold?

7    A.   Yes.

8    Q.   Okay.   And looking at the UPC sticker pictured

9    in Exhibit 28, is it accurate to refer to the $35

10   price as the MSRP?

11   A.   Yes.

12   Q.   To the best of your knowledge, does the MSRP

13   appearing on UPC stickers for outlet products ever

14   say the letters MSRP?

15   A.   This is -- the way it's represented here is the

16   way I'm used to seeing it.

17   Q.   Are you aware of any reason why the sticker

18   does not say MSRP in front of the MSRP price?

19   A.   I am not aware, no.

20   Q.   Let's look now at the additional sticker that

21   appears below the UPC sticker on the price tag in

22   Exhibit 28.   And the price appearing there is 24.90.

23   Is it fair to refer to that price as the outlet

24   price?

25   A.   Yes.

James Robert Bui                                September 28, 2016

Page 124

1    Q.   Is it also correct to refer to that 24.90 price

2    as the original price?

3                    MR. RAMSEY:   I'll object as vague and

4    ambiguous as to "original."

5    A.   Original price of what?

6    BY MS. SAGAFI:   (Continuing)

7    Q.   Of the product pictured in Exhibit 28.

8    A.   That's our outlet price.

9    Q.   And so is 24.90 the highest price that this

10   product would ever be sold at the outlet?

11   A.   It's our starting price, yes.   It's our first

12   price.

13   Q.   Okay.

14           All right.   Please take a look now at what

15   has been marked as Exhibit 29.   Jay already has

16   that.

17           And during the break your counsel had the

18   opportunity to compare the photograph that we have

19   marked as Exhibit 29 to the original paper receipt

20   that is pictured in Exhibit 29, and so I guess I'll

21   direct this question to counsel.

22                    MR. RAMSEY:   I'll confirm that it's

23   the same.

24                    MS. SAGAFI:   Okay.   Thanks.

25                    MR. RAMSEY:   I'll confirm that it's

Exhibit 6

Item 1

Columbia Outlet Item No.1



STATHAKOS000005

Item 2

Columbia Outlet Item No. 19



STATHAKOS000023

Item 3(a)

Columbia Outlet Item No. 22



STATHAKOS000026

Item 3(b)

Columbia Outlet Item No. 23



Item 4

Columbia Outlet Item No. 26



STATHAKOS000030

Item 5

Columbia Outlet Item No. 35



STATHAKOS000039

Item 6

Columbia Outlet Item No. 36



Item 7

Columbia Outlet Item No. 41



STATHAKOS000045

Exhibit 7

**Subject: Fwd: Columbia Support - Re: (#800007) - Recent Purchases**

Sent from AOL Mobile Mail

On Wednesday, September 2, 2015, Customer
Care <support@customercare.zendesk.com> wrote:

##- Please type your reply above this line -##

Your request has been solved. To reopen this request, simply reply to this email
with additional information.

 **Giovanni Pena (Customer Care)**
Sep 2, 13:22

Hello Jeanne,

Thanks for calling in!

Here are all the purchases from in-store I have on my end:

7/26/2015

Vacaville Premium Outlets

$53.84

```
7/8/2015
Tejon Outlet
```

STATHAKOS000128

$53.95

> 6/11/2015
> Las Vegas Premium Outlets

$22.46

6/11/2015
Las Vegas Premium Outlets

$34.99

5/30/2015
Gilroy Outlet

$27.99

> 5/9/2015
> Vacaville Premium Outlets
> $34.38
>
> 11/24/2014

Tejon Outlet

$38.48

11/8/2014

Gilroy Outlet

$51.47

> 6/15/2014
> Las Vegas Premium Outlets
> $13.99

11/27/2013
Cabazon Outlets
$22.43

If you need anything else, I'll be here to help.

Have a great rest of your day!

STATHAKOS000129

Best Regards,
Gio
Customer Care

---

 Jeanne Stathakos
Sep 2, 13:14

Initial contact handled by agent 411136. Skill Name –
Columbia

This email is a service from Customer Care. Delivered by **Zendesk**.

Exhibit 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 16-3791-JGB (SPx)** | | Date | February 2, 2017 |
|---|---|---|---|---|
| Title | ***Amy Evans v. DSW, Inc.*** | | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

|   Attorney(s) Present for Plaintiff:   |   Attorney(s) Present for Defendant:   |
|---|---|
| None Present | None Present |

Proceedings:     **Order DENYING Defendant DSW, Inc.'s Motion to Dismiss Plaintiff's
First Amended Complaint (Dkt. No. 14) (IN CHAMBERS)**

　　　　Before the Court is a Motion to Dismiss ("Motion") filed by defendant DSW, Inc.
("Defendant") (Dkt. No. 14).  After considering all papers timely filed in support of and in
opposition to the Motion, the Court DENIES Defendant's Motion to Dismiss.  The February 13,
2017 hearing on this matter is VACATED.

# I. BACKGROUND

**A. Procedural History**

　　On May 31, 2016, Plaintiff Amy Evans ("Plaintiff") filed a putative class action Complaint
against DSW, Inc. and Does 1 through 100. (Dkt. No. 1.)  The Complaint alleged DSW, Inc.
("DSW" or "Defendant), engaged in deceptive advertising practices when selling products at its
stores.  (Id.) On July 11, 2016, Plaintiff filed a First Amended Complaint against DSW, ("FAC,"
Dkt. No. 13), attaching Exhibits A, B, C, and D in support. (Dkt. Nos. 13-1 through 13-4.) The
FAC arises from similar allegations, but omits the fictitious defendants. (Id.) In the FAC,
Plaintiff purports to represent a class of California residents who purchased a DSW Exclusive
Product advertised with a "Compare At" price and a lower actual selling price during the
applicable statute of limitations period. (Id. ¶ 53.)

On August 1, 2016, DSW filed its Motion to Dismiss the FAC pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), 8, and 9(b).[1] ("Motion" or "MTD," Dkt. No. 14.) In support, DSW filed the following documents:

- Declaration of Stephanie Sheridan and two accompanying exhibits (Dkt. No. 14-1);
- Declaration of Kim Chacon (Dkt. No. 14-2); and
- Request for Judicial Notice of twelve exhibits. ("RJN1," Dkt. Nos. 15-1 through 15-12, Ex. A-L.)

On August 15, 2016, Plaintiff filed an Opposition to the Motion. ("Opp.," Dkt. No. 17.) In support, Plaintiff filed the following documents:

- Declaration of Plaintiff and four accompanying exhibits (Evans Decl., "Ex. A," Dkt. No. 17-1); and
- Four judicial decisions ("Ex. B-E," Dkt. Nos. 17-2 through 17-5.)

On August 22, 2016, Plaintiff filed a Request for Judicial Notice. ("RJN2," Dkt. Nos. 18 & 18-1 at Ex. A.) On August 29, 2016, DSW filed a Reply, ("Reply," Dkt. No. 19), and five accompanying exhibits. ("Ex. A-E," Dkt. Nos. 19-1 through 19-5.) On September 9, 2016, Plaintiff, in Opposition to Defendant's Motion, filed a Request for Judicial Notice of the following documents: (1) Order of the San Francisco County Superior Court overruling demurrers to a complaint alleging analogous claims in "a similar apparel pricing case," ("RJN3," Dkt. No. 22, Ex. A), and (2) a Transcript of a motion hearing for <u>Lucas v. Jos A. Bank Clothiers, Inc.</u> (Case No. 14-1631), in the Southern District of California. (RJN3 at Ex. B.)[2] DSW filed three Notices of Recent Authority in support of its Motion to Dismiss: the first was filed on October 7,

---

[1] Unless otherwise indicated, any mention of "Rule" refers to the Federal Rules of Civil Procedure.

[2] Pursuant to Federal Rule of Evidence 201, "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). An adjudicative fact may be judicially noticed if it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court may take notice of federal and state judicial decisions. <u>See</u> <u>United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.</u>, 971 F.2d 244, 248 (9th Cir. 1992) (courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (internal citation omitted).

In their Requests for Judicial Notice, the Parties ask the Court to take notice of various judicial decisions, court filings, and sources of law supporting their contentions. These materials are proper subjects of judicial notice. <u>See</u> <u>id.</u> Accordingly, the Court GRANTS the Requests for Judicial Notice. (RJN1, 2 & 3.)

---

**CIVIL MINUTES—GENERAL**

2016, ("N1," Dkt. No. 24), the second on December 22, 2016, ("N2," Dkt. No. 32), and the last on January 3, 2017. ("N3," Dkt. No. 33.)

### B. Allegations in the FAC

The following facts are drawn from Plaintiff's FAC and are taken as true for purposes of this Motion.

#### 1. General Allegations

DSW is an Ohio corporation that sells shoes, handbags, and accessories for women, men, and children. ("10-K," Dkt. No. 13-1, 8.) DSW has 468 stores nationwide, (Id.), and operates forty-five DSW locations in California. (FAC at 11.) DSW describes itself as "appeal[ing] to consumers from a broad range of socioeconomic and demographic backgrounds." (10-K at 8.) DSW also states that it "sells a large assortment of brand name, designer and private brand merchandise," by purchasing "primarily in-season footwear found in specialty and department stores and branded make-up," directly "from over 400 domestic and foreign vendors." (Id. at 8-9.) DSW characterizes offering "high quality, in-season fashion styles at attractive prices compared to the sale prices found at specialty retailers and department stores" as the primary value it provides to its customers. (Id. at 10.) DSW attributes its attractive pricing to historically employing "a consistent pricing strategy that provides customers with the same price on [its] merchandise from the day it arrives in store until it enters our planned clearance rotation." (Id.)

According to Plaintiff, DSW increases its sales by creating the "illusion of traditional outlet and warehouse discounts and bargains," in "offering made-for-outlet goods at prices reduced from fabricated, arbitrary, and false 'Compare At' prices." (FAC at 13.) Whereas retail outlet stores in the past provided consumers with an opportunity to purchase excess merchandise at a steep discount, retailers today increasingly use outlet or warehouse stores to sell made-for-outlet goods never intended for sale at non-outlet stores. (Id. at 12.) Plaintiff alleges that DSW is doing just that: intentionally using false price comparisons designed to deceive consumers into believing they are purchasing brand-name shoes at a discount, when they are actually buying shoes made exclusively for DSW. (Id. at 13.) Plaintiff maintains that DSW designed this deceptive advertising to make customers feel like they are saving money by shopping at DSW rather than other retail stores, even though the pair of shoes they purchased could never be offered at a different price or sold by a different retailer. (Id.)

DSW creates and trademarks the DSW Exclusive Products' brands—including, among others, Kelly & Katie, Lulu Townsend, Poppie Jones, Audrey Brooke, and One Wink. (Id. at 4-5.) Yet, DSW advertises its exclusive products with the "Compare At" price references. (Id. at 4-5.) Plaintiff alleges that this practice constitutes false, fraudulent, and deceptive advertising because the "Compare At" prices on product tags list substantially higher prices than those offered at DSW. (Id. at 2.) Plaintiff further alleges that every DSW customer's receipt contains a "YOU SAVE" amount in large, capitalized letters, that reflects the difference between the actual price paid and the "Compare At" price advertised on the product price tag. (Id.) Plaintiff alleges this is also true for online purchases, where DSW advertises its Exclusive Products with "Compare At" price references, and DSW tells customers how much they saved when they complete their

orders. (Dkt. No. 17-1, 10.) Plaintiff maintains, therefore, that DSW "sets the prices for its DSW Exclusive Products knowing full well that the products will never be sold anywhere at the Compare At price," in order to "facilitate sham markdowns," thereby deceiving its customers into believing they are getting a deal to increase its sales. (FAC at 5-6.)

### 2. Allegations Specific to Plaintiff

Plaintiff alleges she purchased five pairs of DSW shoes— either at the DSW store in Sherman Oaks, California or on DSW's website—in March and April of 2016. (Id. at 7.) She alleges DSW advertised all of the shoes she purchased with a "Compare At" price and a lower actual price. (Id.) Specifically, Plaintiff alleges that on March 11, 2016, she purchased a pair of Kelly & Katie Chris Textured Sandals with a "Compare At" price of $59.00 and a lower actual price of $29.95 at the DSW location in Sherman Oaks, California. (Id. at 14.) On that same day she tried on a pair of Katie & Kelly Louise Wedge Pumps, and then ordered them in her preferred style and color in-store. (Id.) The Louise Wedge Pumps were advertised with a "Compare At" price of $60.00 and a lower actual price of $39.95. (Id.) On March 27, 2016, Plaintiff purchased a pair of black Kelly & Katie Nadia Sandals and a pair of blush Katie & Kelly Talia Flat Sandals on DSW's website. (Id.) The Nadia Sandals had a "Compare At" price of $75.00 and a lower actual price of $39.95. (Id.) The Talia Flat Sandals were advertised with a "Compare At" price of $55.00 and a lower actual price of $39.95. (Id.) On April 6, 2016, Plaintiff purchased another pair of Kelly & Katie Talia Flat Sandals online, but in black. (Id.) The black Talia Flats were advertised with a "Compare At" price of $55.00 and a lower actual price of $39.95. (Id.)

Plaintiff alleges that DSW never sold or intended to sell the items she purchased at the represented "Compare At" price because all five pairs were DSW Exclusive Products. (Id.) She was never informed that she was purchasing shoes exclusively sold at DSW. (Id.) Plaintiff asserts that had she known of the falsity of the "Compare At," price references—i.e., that she did not purchase the shoes at a discount—she would have not paid the price she did. (Id.) Plaintiff further alleges that she will not purchase DSW Exclusive Products in the future unless or until DSW discontinues advertising these false and misleading reference prices. (Id. at 15.)

### 3. Causes of Action

Based on the foregoing factual allegations, the FAC asserts the following six claims arising out of Defendant's allegedly false advertising practices: (1) unfair business practices, in violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq. (FAC at 18); (2) fraudulent business practices, in violation of the UCL (Id. at 19-21); (3) unlawful business practices, in violation of the UCL (Id. at 21-24); (4) false advertising, in violation of the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq. (Id. at 24-25); (5) violation of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq. (Id. at 25-27); and (6) a claim for unjust enrichment. (Id. at 27-28.) The FAC also alleges Defendant has violated 15 U.S.C. sections 52(a) and 45(a)(1) of the Federal Trade Commission Act, (Id. at ¶¶ 32, 81, 86), various regulations promulgated by the Federal Trade Commission, (Id. at ¶ ¶ 23, 25, 43), and California's law prohibiting false former pricing schemes. Cal. Bus. & Profs. Code § 17501. (Id. at ¶ ¶ 22, 82, 84.) The FAC does not assert a

separate claim based on these violations, but merely predicates the UCL claim on them. (See id. at 21.)

Plaintiffs assert the foregoing claims on behalf of a "Proposed Class" consisting of "[a]ll California residents who, within the applicable statute of limitations preceding the filing of this action and going forward from the date of the Complaint, purchased a DSW Exclusive Product advertised with a Compare At price and a lower actual selling price from DSW." (Id. at 16.) The FAC requests an order certifying that this action be maintained as a class action, that Plaintiff be appointed Class Representative, and Plaintiff's counsel be appointed Class Counsel. (Id. at 28.) Plaintiff seeks actual and punitive damages on behalf of herself and the Class, as well as "restitution and all other equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class as a result of its unlawful, unfair and fraudulent business practices," attorney's fees and costs, and injunctive relief. (Id. at 28.)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

A party may seek dismissal of an action for lack of subject matter jurisdiction under Rule 12(b)(1) "either on the face of the pleadings or by presenting evidence." Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003); See also White v. Lee, 227 F.3d 1217, 1242 (9th Cir. 2000). Where the party asserts a facial challenge, the court limits its inquiry to the allegations set forth in the complaint. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).

"In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." Id. The court "need not presume the truthfulness of the plaintiff's allegations," Lee, 227 F.3d at 1242, and may generally "resolve factual disputes concerning the existence of jurisdiction." McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988). "Where jurisdiction is intertwined with the merits," the Court must "[a]ssume the truth of the allegations in a complaint. . . unless controverted by undisputed facts in the record." Warren, 328 F.3d 1136, 1139 (9th Cir. 2003).

### B. Rule 12(b)(6)

Rule 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 47 (1957) (holding that the Federal Rules require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests") (quoting Fed. R. Civ. P. 8(a)(2)); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any

reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

Surviving a motion to dismiss requires a plaintiff to allege "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).  The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Rule 9(b) presents heightened pleading requirements for plaintiffs alleging fraud or mistake.[3] In alleging fraud or mistake, the plaintiff must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Failure to satisfy this heightened pleading requirement can result in dismissal of the claim.  Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1107 (9th Cir. 2003).  In general, the plaintiff's allegations of fraud or mistake must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong."  Id. at 1106.  This heightened pleading standard requires the plaintiff to allege fraud or mistake by detailing "the who, what, when, where, and how" of the misconduct charged.  Id. at 1106-07.  In other words, the plaintiff must specify the time, place, and content of the alleged fraudulent or mistaken misconduct.  See Id.

### III. DISCUSSION

Defendant argues the FAC must be dismissed under Rule 12(b)(1) and Rule 12(b)(6) because Plaintiff: (a) lacks standing, (MTD at 9, 16), (b) cannot state a claim under the UCL and FAL because she fails to adequately allege that reasonable consumers would be deceived by DSW's

---

[3] Neither party disputes that Rule 9(b)'s heightened pleading requirements apply to the FAC's FAL, UCL, and CLRA claims.

pricing scheme, (Id. at 9, 19-23), (c) cannot state a claim under the CLRA because the FAC does not allege that Defendant committed any of the specific prohibited acts under that provision, (Id. at 10, 24-27), and (d) cannot sustain her claim for restitution because she does not allege she paid more for the shoes than the value she received. (Id. at 10, 28.) The Court addresses the parties' contentions below.

## A. Standing

Article III, Section 2, of the United States Constitution restricts the federal "judicial power" to the resolution of "Cases" and "Controversies," which is satisfied where the plaintiff has standing to bring his or her suit. Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992); see also Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004). To satisfy Article III standing, a plaintiff must show that: (1) she has suffered "an injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged actions of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Bernhardt v. Cnty. of Los Angeles, 279 F.3d 862, 868-69 (9th Cir. 2002). (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81 (2000)). The plaintiff bears the burden of establishing these elements, and standing must be present at the time the action is brought. Lujan, 504 U.S. at 561, 570 n.5.

The UCL, FAL, and CLRA have additional statutory requirements beyond what the Constitution requires. "Under California's UCL and FAL, a private person has standing only if he or she 'has suffered injury in fact and has lost money or property as a result of the unfair competiton.'" Cal. Bus. & Prof. Code § 17204. To establish standing under the UCL, FAL, and CLRA, a plaintiff must: "(1) establish a loss or deprivation of money or property sufficient to qualify as an injury in fact, i.e., *economic injury*, and (2) show that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." Kwikset Corp. v. Super. Ct., 51 Cal. 4th 310, 322 (2011) (emphasis in original). Under the CLRA, the plaintiff "must not only be exposed to an unlawful practice but also have suffered some kind of damage." Bower v. AT&T Mobility, LLC, 196 Cal. App. 4th 1545, 1556 (2011) (internal quotation marks omitted). In short, to have standing under the FAL, UCL or CLRA, Plaintiff must sufficiently allege (1) that she suffered an economic injury, and (b) that she actually relied on the purported material misrepresentation. See In re Ferrero Litig., 794 F. Supp. 2d 1107, 1111-12 (S.D. Cal. 2011) (citing Kwikset, 51 Cal. 4th at 326-27).

## B. California's FAL, UCL, and CLRA

California's FAL prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17500. "This statute makes it unlawful for a business to disseminate any statement 'which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]'" Arevalo v. Bank of Am. Corp., 850 F. Supp. 2d 1008, 1023-24 (N.D. Cal. 2011) (internal citation omitted). "The statute has been interpreted broadly to encompass not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency

to deceive or confuse the public. . . . Consequently, even a perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under this section." Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1162 (9th Cir. 2012) (internal citations, quotations, and alterations omitted).

California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The UCL provides a separate theory of liability under the "unlawful," "unfair," or "fraudulent" prongs. Stanwood v. Mary Kay, Inc., 941 F. Supp. 2d 1212, 1222 (C.D. Cal. 2012) (citing Lozano v. AT&T Wireless Servs., Inc., 504 F.3d 718, 731 (9th Cir. 2007)). "The UCL expressly incorporates the FAL's prohibition on unfair advertising as one form of unfair competition." Hinojos, 718 F.3d at 1103. Accordingly, any violation of the FAL also violates the UCL. Williams v. Gerber Products Co., 552 F.3d 934, 938 (9th Cir. 2008) (citing Kasky v. Nike, Inc., 27 Cal. 4th 939, 950 (2002)).

Finally, California's CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770. Specifically, the CLRA prohibits, among other things, "[a]dvertising goods or services with intent not to sell them as advertised" and "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code § 1770(a)(9), (13).

### 1. Reasonable Consumer Test

To state a claim under the FAL, UCL, or the CLRA, a plaintiff must allege the defendant's purported misrepresentations are likely to deceive a reasonable consumer. Williams, 552 F.3d at 938; see also Reid v. Johnson & Johnson, 780 F.3d 952, 958 (9th Cir. 2015) ("It is true that violations of the UCL, FAL, and CLRA are evaluated from the vantage point of a 'reasonable consumer.'"). "A reasonable consumer is 'the ordinary consumer acting reasonably under the circumstances.'" Davis, 691 F.3d at 1161-62 (quoting Colgan v. Leatherman Tool Group, Inc., 135 Cal. App. 4th 663 (2006)). "Likely to deceive implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather the phrase indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." In re Sony Gaming Networks & Customer Data Sec. Breach Litig., 903 F. Supp. 2d 942, 967 (S.D. Cal. 2012) (quoting Lavie v. Procter & Gamble Co., 105 Cal. App. 4th 496, 508 (2003)).

## C. Analysis

### 1. Standing

DSW asserts that Plaintiff lacks standing because any damages she suffered in reliance on the "Compare At" representations were motivated by her desire to be a class representative in this litigation. (MTD at 16.) On that basis, DSW argues that the damages alleged are a "self-inflicted injury," which cannot satisfy Article III. (Id.) Plaintiff has alleged that she would not have

purchased the five pairs of shoes if she knew that the discounts were false. (FAC at 15.) Plaintiff attaches her receipts for her purchases as Exhibits to her Opposition. (Opp. at Ex. A.) The receipts establish that she lost money or property—i.e., suffered an economic injury—and her Declaration confirms her belief that this loss is one she would not have suffered absent DSW's false advertising. (Evans Decl.) This is sufficient to establish standing under Article III and the UCL, FAL, and CLRA.

The Ninth Circuit has explained that, in the context of false advertising claims under California law, consumers suffer an "injury-in-fact" for Article III purposes when, as a result of false advertising, they purchase a product "when they otherwise would not have done so." Hinojos, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013); see also Mazza v. Am. Honda Motor Co., 666 F.3d 581, 595 (9th Cir. 2012) ("To the extent that class members were relieved of their money by [defendant's] deceptive conduct—as Plaintiffs allege—they have suffered an 'injury in fact.'" (quoting Stearns v. Ticketmaster Corp., 655 F.3d 1103, 1021 (9th Cir. 2011)).

At any rate, whether Plaintiff relied on DSW's alleged misrepresentation to her detriment or what motivated her desire to purchase the shoes depends on the resolution of factual issues going to the merits of this case. Taking Plaintiff's allegations as true, as the Court is obligated to do, she has adequately plead that she suffered an injury-in-fact because she purchased the shoes in reliance on DSW's allegedly fraudulent misrepresentations. Further, Plaintiff has adequately alleged that she personally relied on DSW's "Compare At" prices, which is all that is required at the pleading stage.

With respect to Plaintiff's claim for injunctive relief, DSW argues that there is no risk of future harm because now that Plaintiff knows the "Compare At" price is the value of a comparable item, and not an identical one, she faces no risk of being deceived by DSW's pricing in the future. (MTD at 17.) Plaintiff satisfies the constitutional standing requirements to pursue injunctive relief. She alleges that she would likely shop at DSW stores again "if product labels accurately reflect discounts and bargains." (FAC at ¶52.) She also alleges that DSW continues to use this deceptive pricing scheme, which puts Plaintiff and California consumers alike at a continuing risk of future deception. This is particularly true because Plaintiff and California consumers have no way of determining whether a price reduction advertised by DSW is true or fraudulent. (Opp. at 17.)

The Court also agrees with Plaintiff that Luman v. Theismann, No. 14-15385, 2016 WL 139342, at *2 (9th Cir. Apr. 8, 2016), and Lucas v. Jos. A. Bank Clothiers, Inc., No. 14-CV-1631-LAB JLB, 2015 WL 2213169, at *4 (S.D. Cal. May 11, 2015), are factually distinguishable, and therefore, do not support DSW's arguments for dismissal. In Luman, the Ninth Circuit upheld the district court's dismissal of plaintiffs' claims on standing grounds because plaintiffs failed to allege that they intended to purchase defendant's products in the future. Luman, 2016 WL 139342, at *2. Here, Plaintiff specifically alleges that she would shop at DSW in the future absent the risk of being deceived by DSW's fraudulent advertising. (FAC at 15.) As Plaintiff argues in her Opposition, unlike in Lucas, the products at issue here are exclusively manufactured and sold by DSW so there would be "no way of knowing whether the 'Compare At' price printed on an item's tag corresponds to its true value, or a false and misleading amount manufactured by

DSW." (Opp. at 17.) And so, Plaintiff and consumers cannot just "shop around" to determine whether they are being deceived by DSW's "Compare At" value estimate, like they could in <u>Lucas</u>.

Taking Plaintiff's allegations as true, Plaintiff would shop at DSW in the future absent DSW's alleged misrepresentations, which allows the Court to reasonably infer that she is threatened by a repetition of harm. Accordingly, Plaintiff has adequately alleged standing to pursue injunctive relief.

### 2. Sufficiency of Allegations

#### a. Reasonable Consumer Test

DSW contends that Plaintiff does not plead sufficient facts indicating that DSW's "Compare At" prices are misleading or false. (MTD at 20-22.) Specifically, DSW maintains that Reasonable consumers are most likely to interpret "Compare At" to mean a comparable value comparison of similar, not identical items. (<u>Id.</u> at 22.) DSW points out that it disclosed the meaning of "Compare At" at both the POS and online at the time of Plaintiff's purchase. (<u>Id.</u>) Such disclosures, in DSW's view, show that Plaintiff's purported deception was not reasonable. (<u>Id.</u>)

Plaintiff adequately alleges she was deceived by DSW's purportedly false reference pricing advertisements. She also plausibly alleges such advertisements are likely to deceive reasonable consumers. Plaintiff pleads with particularity how and why she was deceived by the "Compare At" tags. And it is reasonable to infer that most customers would interpret the "Compare At" price to mean the price charged for the same item—either formerly or at a different store—rather than an estimate price of what a retailer could charge for a hypothetical "comparable" shoe.

DSW, however, persists that the "Compare At" reference price is not likely to deceive a reasonable consumer because most reasonable consumers would have shopped around enough to know that DSW's shoes are not sold anywhere else. (MTD at 22-23.) In so doing, DSW compares the choice between different pairs of shoes to comparing "apples with apples." <u>Id.</u> The Court does not find this argument persuasive. There is simply nothing to support, at this point, DSW's assertion that reasonable consumers looking to purchase shoes would have looked at other retailers and determined that DSW's shoes were not sold elsewhere.

Furthermore, DSW's inclusion of a "YOU SAVED" amount on every receipt bolsters the reasonableness of the belief that the "Compare At" amount refers to the price at which the same item was formerly sold or the price at which the same item is currently sold by other retailers. The belief that "Compare At" refers to two prices for identical items appears even more reasonable because the "YOU SAVED" amount equals the difference between the "Compare At" price and the lower actual price for each item. (FAC at 7, 10.) Of course, one "saves" money when they purchase a cheaper, but qualitatively different product, but it is hard to imagine how one could "save" the difference between the "Compare At" price and the lower actual price when the product at issue was never sold at the higher price. Plaintiff has sufficiently alleged that reasonable consumers are likely to be deceived by the "Compare At" price references on the

price tags in conjunction with the "YOU SAVED" amounts included on every receipt.

Moreover, whether reasonable consumers would be deceived is a question of fact, usually inappropriate for the Court's determination at the motion to dismiss stage. Williams, 552 F.3d at 938 ("California courts, however, have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer."). Accordingly, the Court will not delve into the issues of fact going to the heart of the dispute on a motion to dismiss—namely, whether reasonable consumers would find DSW's reference prices to be misleading or deceptive. At any rate, the FAC's claims regarding the inaccuracy of the products' comparative reference prices are factually supported because "the products at issue here were never sold anywhere at the Compare At price." (FAC at 7.)

The Court finds Plaintiff sufficiently alleges her claim that the tags are deceptive, and would likely deceive a reasonable consumer. This is all that is required at the pleading stage to state a claim under the FAL, UCL, and CLRA. "[A] plaintiff must set forth what is false or misleading about a statement, and why it is false." In re GlenFed, Imc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994).

### b. Rule 9(b)

Claims made under the UCL, FAL, and CLRA must also meet the heightened pleading standards required by Rule 9. See Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009). Hence, litigants bringing deceptive practice claims must allege "the who, what, when, where, and how" of the supposedly fraudulent conduct. Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997). Plaintiff has adequately alleged she, and reasonable consumers, are likely to be deceived by DSW's misleading advertisements, she was actually deceived in that she relied on DSW's material misrepresentations to her detriment, she provided the dates she purchased the five pairs of DSW Exclusive shoes, and the location at which they were purchased. (FAC at 12-14.) As such, Plaintiff has alleged "the who, what, when, where, and how" of the alleged fraud and has therefore satisfied the heightened pleading requirement under Rule 9(b). Besides, any remaining factual deficiencies DSW ascribes to the Complaint speak to knowledge that is particularly within DSW's knowledge. Branca v. Nordstrom, Inc., No. 14CV2062-MMA (JMA), 2015 WL 10436858, at *8 (S.D. Cal. Oct. 9, 2015)("[T]he Rule 9(b) heightened pleading standard is relaxed as to facts supporting allegations of fraud that are exclusively within the defendant's possession and of which a plaintiff cannot be expected to have personal knowledge prior to discovery."). As such, Plaintiff's inability to allege that she paid more than the actual value of the shoes does not defeat her claim under Rule 9's heightened standard.

DSW maintains, however, that Plaintiff has failed to adequately allege the materiality of the purported misrepresentations, her reliance on those misrepresentations, or DSW's awareness that the purported misrepresentations would induce such reliance. (MTD at 20-22.) For instance, DSW argues that the precise meaning of "Compare At" could not have been material to Plaintiff because if it were, she would have looked it up in the disclosures specifying the precise meaning of "Compare At." (Id.)

The allegations are sufficient for the Court to find that Plaintiff relied on these false

representations. (FAC at 14) (stating she "would not have purchased the products, or would not have paid the price she did, if she had known that the represented discounts were false.") Further, the Court is persuaded that Plaintiff sufficiently alleges that DSW not only made material misrepresentations, but also likely intended for its customers to rely on those misrepresentations.

The fact that DSW disclosed the meaning of "Compare At" does not preclude finding that DSW intended to deceive consumers. The Ninth Circuit in <u>Williams v. Gerber Prods. Co.</u>, 552 F.3d 934, 937-38 (9th Cir. 2008) reversed the district court's dismissal of a consumer action for misleading labeling. 552 F.3d 934. In <u>Williams</u>, the district court dismissed a consumer action for misleading labeling because it concluded that the "all-natural" label could not have misled plaintiffs since the ingredients list was also displayed on the packaging. The Ninth Circuit reversed the district court. <u>See</u> <u>id.</u> at 939 ("We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception."). Besides, if DSW did not want customers to believe that DSW was offering them a price that could not be had anywhere else, it would not affix "YOU SAVED" to every receipt.

Moreover, materiality is also typically a question of fact, which cannot form the basis of dismissal on a 12(b)(6) motion. In any event, the Court can easily appreciate that discounts are material to the average shopper. The impression one is getting a deal is precisely why reference pricing is a popular way to attract customers, and DSW's Form 10-K acknowledges as such. In fact, DSW acknowledges that the value of its brand to its customers inheres in the "attractive prices" it offers "compared to the sale prices found at specialty retailers and department stores." (10-K, 10.) Here, Evans specifically and plausibly alleges that DSW falsely markets its products as discounted precisely because consumers such as herself reasonably regard price reductions as material information when making purchasing decisions. As such, Plaintiff also adequately pleads that DSW intended to deceive consumers for purposes of stating a claim under UCL's fraud prong under Rule 9(b)'s heightened pleading requirement.

### c. Unlawful Prong of UCL

Under Count III of the FAC, Plaintiff alleges DSW's misconduct violates three statutes: (1) California Business & Professions Code § 17500, <u>et seq.</u>; (2) the Consumers Legal Remedies Act, Cal. Civil Code § 1750, <u>et seq</u> and (3) the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) and 15 U.S.C. § 52(a). (FAC at 21.) DSW argues that Plaintiff cannot rely on violations of California's former price law, the CLRA or the FTC Act to state a claim under the UCL's "unlawful" prong. (MTD at 29.)

According to DSW, Plaintiff cannot state a claim under California former price law because nothing in the FAC suggests that the "Compare At" price was a former price. (MTD at 23.) The FAL prohibits advertisers from advertising former prices unless the former price was the prevailing market price within the preceding three months or unless the date of the former price was the prevailing market price is clearly and obviously stated on the advertisement. Cal. Bus. & Prof Code § 17501. The Court has already determined that the allegations, taken as true, make it

plausible that reasonable consumers would believe that the "Compare At" price refers to either a price for which the same item was formerly sold or a price for which the item is sold by other retailers. See supra Part III.C.2.a. The FAC alleges that the DSW products at issue are only sold at the lower actual value price, and are only sold by DSW.  (FAC ¶ 48.) The "Compare At" price, therefore, can neither reflect a "former price" nor a prevailing market price on the evidence presented. As such, Plaintiff has stated a claim under California's former price law for purposes of satisfying the "unlawful prong" of the UCL.

With respect to Plaintiff's ability to rely on the FTC Act to state her UCL claim, DSW argues that the FTC expressly permits such "comparable value comparisons," so its "Compare At" price references are not unlawful. (MTD at 21.) DSW, however, eludes a vital qualifier, which is that comparison prices cannot "appreciably exceed the price at which substantial sales of the article are being made in the area." 16 C.F.R. § 2332(a). Hence, the FTC Guidelines DSW champions in support of its Motion make clear that advertised comparison prices must be based on actual, not estimated, prices of comparable items sold in different retail stores or channels. Id. The FTC guidelines expressly condition the use of comparison prices to actual prices by similar retailers, not estimates of what a hypothetical retailer may charge for a fictitious, but similar, item. 16 C.F.R. § 233.2(c). The FTC Guidelines's requirement that retailers who use reference pricing make "clear to the consumer that a comparison is being made with other merchandise" further limits DSW's use of comparable price representations. Id. Plaintiff, therefore, states a claim under the UCL's unlawful prong under either the former price law or the FTC Act. And the Court is also satisfied that the allegations are sufficient to state a claim under the CLRA, which will be discussed in more detail below.

### d. CLRA

DSW moves to dismiss Plaintiff's CLRA claim on the basis that the Complaint fails to allege that DSW committed any one of the twenty-five specific activities deemed "unlawful" under that provision (MTD at 25): (a)(9) fails because Plaintiff does not allege DSW falsely advertised any goods she purchased, only that DSW's prices for those goods is deceptive (as "Compare At" does not speak to quality) and (a)(13) fails because the FAC does not identify any representations by DSW regarding "price reductions." (Id. at 25-26.)

Plaintiff has adequately plead her CLRA claim. She alleges she is a consumer, who purchased DSW's products for her own personal use, (FAC at ¶¶46-48), and that DSW's advertised products are misleading because the "Compare At" prices falsely give the impression the products have been marked down, when they were never sold at the "Compare At" price. (See FAC at 14-16.); (Opp. at 24.) The allegations are sufficient for the Court to reasonably infer that DSW "[a]dvertis[ed] goods or services with intent not to sell them as advertised," Cal. Civ. Code § 1770, subd. (a)(9), or "[m]a[de] false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Id. at subd. (a)(13). Contrary to DSW's assertion, that is all that must be alleged at the pleading stage.

DSW further alleges that Plaintiff cannot allege harm because Plaintiff does not allege the items she purchased are somehow worth less than the amounts she agreed to pay. (MTD at 26.)

---

Since Plaintiff did not allege that what she paid for the shoes exceeded what they were actually worth, and economic injury is based on actual, not subjective value, DSW maintains that Plaintiff cannot allege requisite harm under the CLRA. (Id. at 28.)

Plaintiff is not required to show that she paid more than the "actual value" of the shoes to state claims under the FAL, UCL, and CLRA. Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 330 (2011)( rejecting defendant's argument that plaintiffs must prove that they did not receive the benefit of the bargain to establish standing under the UCL, FAL, and CLRA). Misleading reference prices effect an economic injury "because the bargain hunter's expectations about the product he just purchased is precisely that it has a higher perceived value and therefore has a higher resale value." Hinojos, 718 F.3d at 1106. Accordingly, the Court DENIES Defendant's Motion to Dismiss as to Plaintiff's claims under the FAL, UCL, and CLRA.

### 3. Unjust Enrichment Claim

DSW argues that the "FAC does not reveal any basis for awarding Plaintiff restitution or actual damages—Plaintiff alleges *no facts to show how much she paid*, let alone that she paid more than her items were actually worth." (MTD at 27.) As to Plaintiff's unjust enrichment claim, DSW argues that there is no stand-alone cause of action for restitution, so plaintiff cannot allege an entitlement to both restitution and unjust enrichment. (Id. at 27-28.) The Court finds this argument premature on a motion to dismiss as its resolution turns on a factual dispute going to the merits of the case. In any event, Plaintiff's allegations that DSW is reaping more profits by deceiving consumers through its "Compare At" pricing scheme would be sufficient to award restitution. Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 988 (9th Cir. 2015), cert. denied, 136 S. Ct. 2410 (2016) ("Restitution has two purposes: 'to restore the defrauded party to the position he would have had absent the fraud,' and 'to deny the fraudulent party any benefits, whether or not for[e]seeable, which derive from his wrongful act.'").Thus, any claim for unjust enrichment or restitution is adequately alleged.

### IV. CONCLUSION

For the reasons set forth above, the Court DENIES Defendant's Motion to Dismiss.

**IT IS SO ORDERED.**

Exhibit 9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DAVID M. LUCAS, et al.,

                                    Plaintiffs,

        vs.

JOS. A. BANK CLOTHIERS, INC.,

                                    Defendant.

CASE NO. 14cv1631-LAB (JLB)

**ORDER RE: SANCTIONS**

      David Lucas sued Joseph A. Bank for allegedly inflating suit prices before offering supposed "buy one, get one free" sales.  Hassan Zavareei of Tycko & Zavareei and Stuart Scott of Spangenberg Shibley & Liber represented David M. Lucas in this putative class action.  Without rehearsing the entire procedural history of the case, suffice it to say that the allegations against Joseph A. Bank fell apart when it became clear to all that Lucas, who had been designated lead plaintiff, had lied about ever buying suits from Joseph A. Bank. Plaintiffs eventually moved to dismiss the case with prejudice, and Joseph A. Bank filed a motion to sanction Lucas and his attorneys for not dismissing the case sooner.

      The Court agrees that Lucas's attorneys should have been more diligent and skeptical of Lucas's story much earlier in the litigation.  But they didn't act recklessly.  And the Court won't stain their reputations for dishonest acts committed by their client .  With that said, the Court recognizes that significant time, effort, and money was spent by everyone involved because Lucas attempted to perpetrate a fraud on Joseph A. Bank, this Court, and the public.  The Court has determined that Lucas's conduct is sanctionable.

# I. Background

## A.   Lucas becomes the class representative.

Lucas learned of the proposed lawsuit against Joseph A. Bank through an online advertisement.  He responded to the ad and eventually spoke with an employee at the Spangenberg law firm.  The conversation was memorialized in a May 2014 memo.  Lucas told a firm representative with whom he first spoke that he remembered buying three suits for about $1,000.  He went on to relate that the suits "incurred wear" "within a year."  When the Spangenberg associate asked Lucas if he'd be interested in serving as a class representative in a contemplated class action suit against Joseph A. Bank, he enthusiastically responded "YES!" (Ex. A, Tab 1.)

About a month later, Lucas sent Spangenberg an email containing a different account. He now claimed that he had purchased a total of 12 suits from Joseph A. Bank—three suits on four separate occasions.  Spangenberg asked for proof, and Lucas emailed them back a document that he described as "the bank statements for the four purchases made with my debit card."  What Lucas provided looked like an online banking print-out that had been redacted with black marker.  The document showed four debit transactions at Joseph A. Bank occurring in December 2012, June 2013, December 2013, and a fourth transaction with the date redacted.  (Ex. A, Tab 2.)

A Spangenberg paralegal followed up with Lucas asking him for the date of the redacted purchase.  Lucas told her it was July 1, 2012.  The paralegal annotated the alleged bank statement with that date and attempted to otherwise "clean[] up the document" by removing the black marker redactions.  Attorney Scott later produced this cleaned-up document to Joseph A. Bank in July 2015, but didn't provide the original that Lucas had sent until August 2016.  (Ex. A, Tab 34.)

Scott testified that in his opinion, Lucas seemed like a good fit to be a class representative. Lucas held a Master's degree in accounting, worked for Qualcomm, and was married to a service member in the U.S. Navy.  Scott had no reason to suspect that Lucas was lying about buying suits.  Scott and Zavareei decided to move forward with Lucas as

their class representative.  They filed the lawsuit in July 2014.

**B.   Problems with Lucas's story emerge.**

The parties litigated the action over the next year.  In January 2016, Joseph A. Bank deposed Lucas.  Lucas testified that he purchased the first three suits in July 2012 from a Joseph A. Bank store in San Diego.  He said the suits frayed after he wore them once or twice.  Rather than return them to Joseph A. Bank, he donated them to Goodwill.  Yet, he testified that a few months later he bought three more suits from Joseph A. Bank.  When these suits also frayed after a single wearing, he donated them too.  He testified that the next summer (2013), he bought three more suits from Joseph A. Bank.  And a few months later, he bought the final three suits.  According to Lucas, all of the suits frayed after he wore them once or twice.  He testified that he didn't complain or return the suits because returning things made him anxious.  He maintained that he purchased all of the suits with his Navy Federal Credit Union debit card.  (Dkt. 151-1, Ex. B.)

On May 24, 2016, pursuant to a subpoena, Navy Federal Credit Union produced Lucas's original bank statements.   The records established that Lucas had made no purchases from any Joseph A. Bank store.  Faced with the glaring inconsistency between Lucas's testimony and what the records revealed, plaintiffs' counsel told Joseph A. Bank's lawyers that they were "conferring with Mr. Lucas to figure this out," and surmised that Lucas may have "misremembered the debit card he used."  (Ex. A, Tab 16.)

A week later, Daniel Frech, a Spangenberg attorney who had most of the communication with Lucas, alerted Scott and Zavareei to another issue: If the prices Lucas supplied on his alleged bank statement were correct, then he was taxed at 8.75%, which "should mean that he bought [the suits] in the Bay area."  (Ex. A, Tab 21.)  Frech emailed Lucas: "The tax rate looks like it was 8.75%, which suggest[s] that it was in San Francisco or Santa Clara county.  Maybe Marin.  Not a lot of places around San Diego have a sales tax rate that high."  (Ex. A, Tab 20.)

**C.   The parties file summary judgment motions.**

On June 22, 2016, Lucas and Joseph A. Bank filed motions for summary judgment.

(Dkt. 103 and 106.)  Joseph A. Bank argued that Lucas wasn't entitled to restitution, and also maintained that his story was so implausible that no reasonable juror could believe it. Joseph A. Bank identified five problems with Lucas's story: (i) His claim to have purchased twelve-suits didn't make sense; (ii) his Navy Federal records showed no suit purchases; (iii) the Navy Federal records showed that Lucas made purchases in Virginia at the same times in 2012 that he claimed he bought suits in San Diego; (iv) Lucas said he had alterations performed at the stores, but the prices on the statement Lucas produced didn't reflect those additional costs; and (v) the suit prices on the statement Lucas produced reflected an 8.75% sales tax, yet no Joseph A. Bank store in San Diego had a tax rate that high in 2012 or 2013. (Dkt. 106-1.)

Zavareei testified that when he read Joseph A. Bank's summary judgment motion "alarm bells went off."  A few days later, Tycko attorneys spoke with Lucas by telephone and although they "still kind of believe[d]" Lucas, stated they didn't feel comfortable going forward with him as class representative.  (Ex. A, Tab 28.)  Plaintiffs' counsel withdrew their motion for summary judgment, asked for a continuance on Joseph A. Bank's pending summary judgment motion, and moved to substitute a new class representative "to protect the putative class" and because of the "vagaries around the specifics of [Lucas's] purchases."  (Dkt. 108-1.)  Discovery was closed by then, and the Court denied the request.  (Dkt. 113.)

Three days later, plaintiffs' counsel moved to voluntarily dismiss their claims with prejudice and to withdraw from representing Lucas owing to ethical concerns.  (Dkt. 116, 117.)  At this point, Joseph A. Bank moved for sanctions against Lucas and his attorneys. (Dkt. 132.)  They also obtained an order from the magistrate judge compelling plaintiffs' counsel to produce their communications with Lucas. (Dkt. 147.)  The Court granted the motion to withdraw and ordered Lucas to: (i) answer some key questions about the alleged bank statement; and (ii) appear at a hearing on October 18, 2016.  (Dkt. 123, 128, 150.)

**D.    The sanctions hearing.**

A few days before the hearing, Lucas sent the Court an email explaining that the bank statement he produced had been "faxed" to him.  He didn't offer any information about when,

where, how, or from whom he obtained this document. He also tried to blame his former counsel for any misunderstanding that may have arisen.

The Court held the hearing on October 18, 2016. Lucas appeared telephonically from Japan, and advised the Court that he was proceeding without an attorney. The Court placed Lucas under oath and attorneys from both sides, as well as the Court, questioned him. Lucas maintained that the bank statement he provided was legitimate and that his twelve-suit story was true. He admitted that he must have mistakenly purchased the 2012 suits in Virginia, but insisted that he bought the suits in 2013 in California.

While questioning Lucas, Zavareei submitted into evidence an email that he sent to Lucas on July 12, 2016. The letter stated: "We have been doing research on how to proceed based on our conclusion that you have not been honest with us and have been dishonest in your deposition. Despite our numerous calls and requests for clarification, you have not been able to provide any sort of explanation for the facts that indicate you were being untruthful." (Ex. 1.)

Joseph A. Bank called attorneys Scott and Zavareei as witnesses. Scott testified that after May 24, when he became aware of the real Navy Federal records, lawyers with his firm spoke with Lucas and emailed him 13 times. Zavareei said he didn't realize how serious the problem was until he read Joseph A. Bank's summary judgment motion. Both Scott and Zavareei admitted they knew about the tax rate issue before the summary judgment motion. Zavareei also acknowledged that he didn't read Lucas's deposition until months after it was taken.

## II. Standard of Review

### A. Burden of proof.

The Ninth Circuit hasn't addressed the standard of proof for sanctions. *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010). But most courts that have considered the issue apply the clear and convincing evidence standard. *See, e.g.*, *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995). The clear and convincing standard is a way to protect against "the consequences of grave

- 5 -

decisions too lightly reached." *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1252 n.5 (9th Cir. 1997). Sanctioning an attorney is a grave decision with serious consequences for his or her reputation. A sanctions motion alone is an accusation with the power to stigmatize. For these reasons, the Court finds that when a lawyer's good name and professional honor are on the line, the party moving for sanctions must provide clear and convincing evidence.

**B.    Section 1927 sanctions.**

Under section 1927, "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The law of the Ninth Circuit isn't quite clear if "recklessness suffices for § 1927 sanctions," *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001), or if sanctions under "section 1927 must be supported by a finding of subjective bad faith." *Blixseth v. Yellowstone Mountain Club*, *LLC*, 796 F.3d 1004, 1007 (9th Cir. 2015) (bad faith includes when an attorney "recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent"). The Court need not resolve the issue because even under the lesser standard of recklessness, there is not clear and convincing evidence that Lucas's former attorneys acted recklessly.

**C.    Inherent power sanctions.**

The Court may also sanction parties or counsel under its' inherent powers when they act in bad faith. *Fink*, 239 F.3d at 994. Here, the Court finds by clear and convincing evidence that Lucas acted in bad faith, and also that he acted intentionally and willfully.

## III.  Findings of Fact

**A.    Lucas's counsel didn't act recklessly.**

Recklessness is "a departure from ordinary standards of care that disregards a known or obvious risk of material misrepresentation." *In re Girardi*, 611 F.3d 1027, 1038 n.4 (9th Cir. 2010). Attorneys Scott and Zavareei testified that they weren't aware of Lucas's obvious lack of credibility until they read Joseph A. Bank's motion for summary judgment. The Court

14cv1631

credits their testimony, and finds that they acted promptly and reasonably after that point. Within three weeks of determining that Lucas lacked credibility, they moved to substitute a new class representative. When the Court denied that motion, they moved to dismiss Lucas's claims with prejudice, and withdraw from representing him.

**1. Counsel filed suit in good faith and didn't alter the statement to deceive.**

Having considered all of the evidence, the Court finds that plaintiff's counsel initially had no reason to suspect that Lucas – a professional accountant with advanced degrees, a job at Qualcomm, and a wife serving in the U.S. Navy – was lying to them about buying suits. This finding is buttressed by evidence that Lucas produced a phony document to his lawyers to corroborate his account of the purchases. Lucas's counsel were entitled to rely on his representations and the corroborating record he produced.

Although counsel weren't reckless, the Court believes that they should have done more to vet Lucas before selecting him as their class representative. For example, it was sloppy not to nail down Lucas's complete story early on. Basic questions about where Lucas bought the suits and what he did with them should have been asked long before Joseph A. Bank deposed him a year after the case was filed. Plaintiffs' counsel were also somewhat careless in ignoring Lucas's changing story (*e.g.*, first three suits, then twelve), even though they didn't disregard an obvious risk that their client was deceiving them before filing suit.

Joseph A. Bank argues alternatively that counsel should be sanctioned for altering the bank statement and failing to disclose the changes. At the hearing, Scott acknowledged that was a mistake. And it was. But the changes to the phony record were cosmetic, not substantive. The paralegal supplied a missing date by typing it into the document in a noticeably different font. The Court agrees that counsel should have notified Joseph A. Bank about the alteration, but the conduct is not cause for sanctions.

**2. Counsel acted carelessly, but not recklessly, after Lucas's deposition.**

Lucas told a far-fetched story at his deposition. The Court finds that former counsel acted negligently, but not recklessly, in failing to follow-up with their client immediately after his deposition. That's especially true for attorney Zavareei, who admitted that he was

embarrassed that he may not have read the deposition testimony until as late as June 2016. Because an attorney is entitled to rely on his client's sworn testimony, as outlandish as the twelve-suit story sounded, plaintiffs' counsel still had no hard evidence that their client was lying to them and that he had forged the corroborating bank statement until the true and correct bank records were obtained.

But the revelation of the official Navy Federal records four months later should have alerted plaintiffs' counsel that Lucas's account was either mistaken or false. The Court finds it troubling that former counsel filed their summary judgment motion on June 22, 2016—a month after discovering the problems with the bank records that were the linchpin for Lucas's standing.

The Court acknowledges that the missing purchases, standing alone, didn't necessarily mean that Lucas was lying or that he created a false document. The more likely explanation was that he misremembered which account he used. And that's what plaintiffs' counsel initially thought. Frech wrote Scott and Zavareei: "Meaning, unless Lucas is a pathological liar with a penchant for forgery, that he misremembered which account he used to purchase the suits. Or something else is amiss." (Ex. A, Tab 12.)

But Lucas's counsel had also discovered other problems. For example, Frech emailed Lucas on May 31, 2016, that the 8.75% tax rate didn't look right. A month later, counsel told the Court in their substitution motion that, "Plaintiff did not know prior to the filing of" Joseph A. Bank's summary judgment motion on June 22, 2016, "that JAB has no stores in metropolitan San Diego with an 8.75% sales tax rate." (Dkt. 108-1.)

At the hearing, Scott admitted he was aware of the tax issue by June 1, 2016, but said he didn't know exactly where the Joseph A. Bank stores in San Diego County were located during the relevant time frame. He acknowledged on cross examination that he should have taken the time to research the store locations but didn't. Zavareei testified that he probably had some knowledge about the tax issue. Plaintiffs' counsel knew that the City of La Mesa had an 8.75% tax rate during the relevant time, but acknowledged that they didn't follow up to find out if Joseph A. Bank had a store in La Mesa in 2012 or 2013.

1   These weren't great explanations—particularly after Frech emailed lawyers at Tycko
2   and Spangenberg on June 28 relating, "I looked again just now and can't find any plausible
3   8.75% taxing jurisdictions in which Lucas could have bought all four of his suits." (Ex. A, Tab
4   28.)  But what that email does suggest is that when counsel filed their substitution motion
5   two days later – claiming they didn't know about the tax problem before June 22 – they made
6   the motion in good faith.  Briefs often pass through many word processors.  Based on the
7   internal email, and Zavareei and Scott's credible testimony at the hearing, the Court finds
8   the tax rate problem was something that got missed rather than something that was
9   intentionally concealed to mislead.  Still, Lucas's counsel should have alerted the Court to
10  the problems with the bank statement.

11  The Court credits Zavareei and Scott's testimony, which is supported by confidential
12  internal emails, that tends to establish the lawyers didn't appreciate how serious the
13  problems with Lucas's account were until Joseph A. Bank pointed them out.  Lucas's counsel
14  didn't act recklessly.

15  **B.    Lucas should be sanctioned $40,000.**

16  In contrast to his counsel, the Court finds that Lucas did act recklessly and with the
17  intent to deceive by making up a story that he had purchased suits from Joseph A. Bank,
18  and creating a phony document purporting to prove the purchases that he never made.  He
19  compounded these deceitful actions by lying under oath at deposition and during the
20  sanctions hearing before this Court.  Lucas defrauded Joseph A. Bank, his own counsel, and
21  the Court from the inception of this lawsuit.

22  **1.    Lucas wasn't credible.**

23  The Court finds Lucas's account of the background facts to be incredible.  First, his
24  story that he successively purchased defective suits doesn't ring true.  The chances of one
25  suit falling apart after a single wearing is slim; to have it happen eleven more times is
26  fantastic.  Lucas's story also doesn't match the account he provided during his initial intake
27  conversation, namely, that he bought three suits that incurred wear after a *year*.  Ask
28  yourself, after buying three suits from a store and determining they were poorly made, would

- 9 -

anyone return to the same clothing store three more times and spend thousands of dollars to purchase nine more disintegrating suits? At the hearing, Lucas testified that he couldn't recall where he bought these suits in San Diego. He couldn't remember, in particular, if he purchased the suits at the same location all four times, if it was in a shopping center, or if the store was located somewhere along his commuting route between Escondido and his job in San Diego at Qualcomm. The Court finds that Lucas's testimony was false. He didn't buy suits at any Joseph A. Bank store in San Diego at any time.

Lucas also couldn't answer basic questions about the alleged bank statement. For example, he couldn't explain why the prices reflected an 8.75% tax rate, or why his record didn't reflect the alteration costs he said he incurred. At the hearing, he testified that he couldn't recall how he obtained the bank statement. Yet, in the email he sent the Court just three days before the hearing, he stated that someone had "faxed" it to him. He also said other things that weren't true. For example, he testified that when he emailed the alleged bank statement to his attorneys, he included a cover page identifying the financial institution it was from. The lawyers denied that, and the Court finds that Lucas's testimony that he identified the name of the bank isn't true. (*See* Ex. 3.)

Nor did Lucas provide any credible explanation for his failure to figure out where the alleged bank statement came from. The Court questioned Lucas – an experienced accountant – about whether he had taken the basic step of ordering a credit report to identify all possible financial institutions where he may have had accounts. He initially said no, then yes, before finally settling on a story that he discovered three extra cards (Amazon, Best Buy, and Synchronicity). He said that although he tried to obtain records of those accounts, the companies wouldn't produce them for reasons amounting to the dog-ate-my-homework. Lucas's answers at the hearing were hesitant and punctuated with deep sighs. Like his former counsel, the Court concludes his account is dishonest.

The Court finds that the likely motivation for Lucas's false account was money. As the intake memorandum reveals, Lucas seemed extremely interested in becoming a class representative ("YES!") in the lawsuit against Joseph A. Bank. To assure his selection, he

multiplied the number of suits he allegedly purchased, saying initially that he bought three suits for $1,000, then changing the story to claim that he bought twelve suits for $5,000.  At one point, he even suggested that he had purchased more than twelve suits – using a credit card that he was "unable to get credit card statements for" because he no longer had access to "that credit card account."  (Ex. A, Tab. 2.)   Lucas must have assumed that claiming he purchased more suits meant he would receive more money if he prevailed in the lawsuit.

The Court finds by clear and convincing evidence that Lucas acted in bad faith by intentionally deceiving his lawyers and – initially – opposing counsel about the suit purchases.  He also acted in bad faith and with the intent to deceive when he created a fake bank record, and lied under oath at his deposition and during the sanctions hearing.  The effect of his deceitful conduct was to sabotage two years of expensive litigation to the detriment of all involved.

**2. Sanctioning Lucas $40,000 is appropriate.**

Faced with the kind of litigation misconduct established here, a court is duty bound to take action to redress it, and to try to deter future misconduct.  To do nothing, or to simply dismiss a case under aggravated circumstances like these, creates a risk that courts will be viewed by unscrupulous litigants as an organ for committing fraud.  With that said, the Court is also aware that when it exercises its "inherent sanctioning power" it must do so in a way that "tailor[s] the sanction to the particular wrong." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 56 (1991).  "Hence, a court can properly consider plaintiff's ability to pay monetary sanctions as one factor in assessing sanctions. It cannot, however, decline to impose any sanction, where a violation has arguably occurred, simply because plaintiff is proceeding *pro se*." *Warren v. Guelker*, 29 F.3d 1386, 1390 (9th Cir. 1994).

At the hearing, Lucas testified that he didn't know his net worth.  He said he earned income from a home he owned in Virginia, and that he had about $25,000 equity in the house.  He also testified that he owns a car and he has about $30,000 in savings.  Based on this accounting, incomplete as it may be, the Court finds that Lucas can afford a monetary sanction of $40,000.  That's a fraction of what Joseph A. Bank spent, but it's an amount that

14cv1631

is proportionate to what Lucas can pay and to the reprehensibleness of his conduct.

### IV.  Conclusion

Ben Franklin said it takes many good deeds to acquire a good reputation and only one bad deed to lose it.  That's especially true in the legal profession.  The Court is reluctant to sanction attorneys who were intentionally deceived by their client—although, as recounted here, that doesn't absolve them completely.  As experienced class action litigators, counsel should have more thoroughly vetted Lucas's account, and should have promptly investigated his changing stories.  But ultimately, the Court finds there isn't clear and convincing evidence that the attorneys multiplied the proceedings "unreasonably and vexatiously."  In other words, plaintiffs' counsel didn't act in bad faith or recklessly by failing to dismiss the case sooner.  Lawyers must give their clients the benefit of the doubt and act circumspectly before abandoning them or their cases.  That's especially true in situations like this one, where the interests of a putative class were also at stake.

David Lucas caused Joseph A. Bank to needlessly expend a substantial amount of money.  He's done a disservice to many other citizens who faithfully and with good intentions turn to the Court to help them reliably and honestly resolve their disputes.  His conduct is sanctionable.  The Court orders Lucas to pay Joseph A. Bank $40,000.

**IT IS SO ORDERED**.

DATED:  November 15, 2016

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

- 12 -

14cv1631

Exhibit 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JEANNE AND NICOLAS STATHAKOS,        )
et al.,                              )
                                     )
          Plaintiffs,                )
                                     )
vs.                                  ) Case No. 4:15-cv-
                                     )         04543-YGR
COLUMBIA SPORTSWEAR COMPANY;         )
COLUMBIA SPORTSWEAR USA              )
CORPORATION,                         )
                                     )
          Defendants.                )
_____)



DEPOSITION OF GABRIELE GOLDAPER

VOLUME I

Los Angeles, California

Tuesday, December 20, 2016




Reported by:  Susan Van Booven
              CSR No. 3956

 1    consumer would be able to spot design differences

 2    between two products?

 3              MS. SAGAFI:  Objection; calls for speculation.

 4              **THE WITNESS:  I can't answer that.  I can't**

 5    **speak for the -- what the consumer can do; I can speak**

 6    **for what I can do.**

 7    BY MR. RAMSEY:

 8       Q    And so you also, then, wouldn't have any

 9    knowledge or expertise on whether a typical consumer

10    could identify the differences that you have identified

11    for the garments in this case?

12              MS. SAGAFI:  Objection; calls for speculation,

13    and beyond the scope.

14              **THE WITNESS:  Can you rephrase the question?**

15    **Or repeat it?**

16    BY MR. RAMSEY:

17       Q    Sure.  So, you reviewed a number of garments in

18    this case, correct?

19       **A    I did.**

20       Q    And you spotted, I believe it was either

21    material or modest differences between pairs of

22    garments; is that correct?

23       **A    Yes.**

24       Q    And that is what you identified based on your

25    experience in the industry?

1        A     That's correct.

2        Q     But you're not rendering an opinion at all

3   about whether a consumer, a typical Columbia consumer,

4   for example, would be able to also spot those

5   differences?

6        A     I'm not rendering an opinion on that.

7        Q     Okay.  And you aren't even qualified to render

8   that type of opinion, right?

9        A     That's why I'm not rendering an opinion on

10  that.

11       Q     That's fine.  All right.  Flipping to 39,

12  Cameron Industries versus B.I.Y.A.Y.C.D.A.?

13       A     B.I.Y.A.Y.C.D.A.

14       Q     B.I.Y.A.Y.C.D.A.; that seems easier.  Tell me,

15  if you can, the issue in that case?

16       A     It was similar; it was also a print.  It was

17  more of a geometric print.  But I was able to trace the

18  fabric to the China fabric market, because the company

19  produced everything in China; therefore, didn't buy

20  domestic goods, only bought -- and so I was able to show

21  that they were not infringing because they hadn't bought

22  domestic goods.

23       Q     So in that case were you comparing and

24  contrasting the two prints, or just focused on showing

25  that the defendant's print was sourced from the Chinese

GABRIELE GOLDAPER

December 20, 2016

```
 1      A      Yes.

 2      Q      Okay.  What's in paragraphs 18 and 19, is that

 3   a methodology that you created?

 4      A      It's an accepted practice in our industry in

 5   terms of comparing or trying to find the differences

 6   between two garments.  The same thing with quality

 7   issues, they're either minor -- they're either moderate

 8   or major.  And so we use those terms to describe

 9   differences.

10      Q      Is that -- those words, "moderate" or "major,"

11   or "material," I think is actually what you used --

12      A      Right.

13      Q      -- in the report, are those terms that have

14   been developed in research?

15           MS. SAGAFI:  Objection; calls for speculation.

16           THE WITNESS:  I can't answer that because I

17   don't know the background.  I can only tell you that the

18   apparel industry has its own idioms and idiomatic

19   wording, and those would be -- I would put them in that

20   category.

21   BY MR. RAMSEY:

22      Q      Okay.  But in using these words as you have in

23   this case, you haven't consulted any literature?

24      A      No, I have not.

25      Q      Consulted any research of any type?
```

GABRIELE GOLDAPER

December 20, 2016

```
 1      A     No.
 2      Q     It's just purely your experience in the
 3   industry?
 4      A     Yeah.  I would say, after 45-plus -- almost 48
 5   years of working with garments, it is based on my
 6   experience and, kind of, the accepted practices, what I
 7   hear other people in the apparel industry -- when we
 8   talk, using similar terms.
 9      Q     So are those accepted practices, as you've
10   described them, listed somewhere?  Could I go grab them
11   off the Internet?
12      A     There's very little that's listed in the
13   apparel industry when it comes to standard practices.
14   It's been a development.  So I'm not -- I do not believe
15   that there's anyplace you could find them listed.
16      Q     Okay.  Or generically described as opposed to
17   listed; is there anyplace I could find that?
18      A     If it is, I'm not aware.
19      Q     Are there any other individuals that you
20   believe would have the requisite experience or expertise
21   that would be able to identify the same -- or, excuse
22   me -- the differences that you've identified in your
23   report?
24      A     I couldn't answer that.
25      Q     Not a single person that you think could do
```

1    that?

2        A    I can't answer that.  I don't know everybody

3    that works in the garment industry and/or what they can

4    do.

5        Q    Do you know anyone that you believe could do

6    that?

7            MS. SAGAFI:  Asked and answered.

8            THE WITNESS:  At the moment, I can't come up.

9    BY MR. RAMSEY:

10       Q    Okay.  So if I'm looking for an expert to do

11   the same thing you did, you couldn't list me a name?

12           MS. SAGAFI:  Objection; argumentative, asked

13   and answered.

14           THE WITNESS:  You're correct.

15   BY MR. RAMSEY:

16       Q    If I found an expert, let's call him John Doe,

17   that I asked to do the same analysis, is it fair to say

18   that he might have different opinions about what is a

19   modest or material difference?

20           MS. SAGAFI:  Objection; calls for speculation.

21           THE WITNESS:  I have to know his background and

22   his involvement in the apparel industry; specifically,

23   production, garments.  Without knowing that, I couldn't

24   answer your question.

25   BY MR. RAMSEY:

 1  regard?

 2      A    Yes.

 3      Q    Okay.  Can you name me one?

 4      A    No.

 5      Q    Why not?

 6      A    That's not proper.  This goes on the record,

 7  and that's not right.

 8      Q    Okay.  Let's call that person John Doe; you

 9  don't have to tell me his or her name.  If I asked that

10  person to do the same analysis that you did in this

11  case, would you expect them to reach the same opinions?

12          MS. SAGAFI:  Objection; calls for speculation,

13  incomplete hypothetical.

14          THE WITNESS:  I would have no way of knowing.

15          MR. RAMSEY:  Let's take a quick break.

16          MS. SAGAFI:  Okay.

17          (Recess.)

18  BY MR. RAMSEY:

19      Q    You said you wanted to add something?

20      A    Yeah, I wanted to clarify something, you know,

21  for the record.  This com- -- you know, checking these

22  garments and finding similarities or not similarities,

23  the reason I have the expertise and the reason I'm able

24  to do it, I need to explain that to you, is, everything

25  that I found was production-related.

GABRIELE GOLDAPER

December 20, 2016

1          In other words, the way the pocket was put on

2    or the way the zippers were sewn, the kind of stitching,

3    you know, the way the garment was constructed, those are

4    all issues related to production.  And I have many,

5    many, many years, of course, of production experience.

6          I mean, you know, I owned my own company for

7    many years.  And Speedo -- I mean, no matter what the

8    product was, I was always involved in production, as you

9    saw from my resume.  And when you work in production,

10   you begin to understand how to construct a garment, and

11   you -- that knowledge just grows with the years of

12   working with those garments.

13          So when I had this assignment, it was not too

14   difficult for me, because I'm very familiar with the

15   differences in constructing a garment, in sewing a

16   garment, in putting pockets in and putting zippers in

17   and closures on the sleeves, and what it meant.

18          So I needed to have that cleared up for the

19   record so that you could understand that that's where I

20   came from with my expertise.

21       Q    Okay.  And based on that expertise, there are

22   either, I think you said earlier, moderate or material

23   or major differences between garments in how they're

24   constructed and all the things you just described,

25   right?

GABRIELE GOLDAPER

December 20, 2016

```
 1      A    Yes.

 2      Q    -- in your opinion?  And yet you're the only

 3   person who could render the opinion in this case?

 4           MS. SAGAFI:  Objection; misstates the

 5   testimony, argumentative.

 6           THE WITNESS:  I don't think I said I'm the only

 7   person.  I merely said that I didn't know -- couldn't

 8   give you a name of someone else.  That doesn't mean that

 9   out in the universe there aren't other people who could

10   do it.

11   BY MR. RAMSEY:

12      Q    How many years have you been in the fashion

13   industry, apparel industry?

14      A    About 48.

15      Q    And in all that time, you've met probably

16   hundreds of people, right?

17      A    Yes.

18      Q    And of all those people, you're not aware of

19   any one of them who would be qualified, in your opinion,

20   to render an opinion in this case along the lines that

21   you rendered?

22           MS. SAGAFI:  Objection; misstates the

23   testimony; asked and answered, argumentative.

24           THE WITNESS:  First of all, you used the word

25   "in this case."  I don't know of people who have done
```

GABRIELE GOLDAPER

December 20, 2016

```
 1    expert witness work.  Okay.
 2              I know a lot of production managers, but I'm
 3    not in a position to vouch for their work.  A lot of
 4    them are very good at production, but would not be able
 5    to do expert witness work.
 6    BY MR. RAMSEY:
 7        Q    Setting aside whether they'd be able to do
 8    expert witness work, do you think these individuals in
 9    production would be able to spot the same differences
10    that you spotted in this case?
11        A    They're strictly production people?
12        Q    Correct.
13        A    They would be able to spot -- some of them
14    would be able to.
15        Q    And would they also refer to the changes as
16    moderate or material?
17        A    That, I couldn't answer.  They might, but I
18    couldn't answer for sure.
19        Q    Is there anything else they might refer to the
20    changes as, differences as?
21        A    Instead of material, they might have said
22    "major."
23        Q    Okay.  You mentioned earlier, when talking, I
24    think, about a sleeve, that a sleeve on a ski jacket and
25    a sleeve on a blouse are effectively the same as far as
```

GABRIELE GOLDAPER

1    Q    Do you remember any discussion in those

2    deposition transcripts about why Columbia makes product

3    for the outlet, that is exclusive to the outlet?

4    **A    Do I remember why they do it?  It's a very**

5    **profitable part of their business.  I don't remember**

6    **reading exactly a statement that said why they do it,**

7    **except that it's very profitable for them.**

8    Q    Are you aware that many brands will sell one

9    version of a product inline and then also sell different

10   products at the outlet?

11        MS. SAGAFI:  Objection; vague, ambiguous, calls

12   for speculation.

13        **THE WITNESS:  You'll have to be more specific.**

14   BY MR. RAMSEY:

15        Q    Are you aware of any companies that create

16   product for exclusive sale at their outlet?

17        **A    I'm aware of companies that create merchandise**

18   **exclusively for their outlet stores.  I did it myself**

19   **and sold to outlet stores when I was in business.**

20        Q    Which company was that at?

21        **A    I owned a company called Prisma Corp.  That was**

22   **the corporation name.  But the division was Sunbow, Moon**

23   **Glow and Prisma.**

24        Q    And in that case, you created product that was

25   specifically designed for sale at an outlet?

GABRIELE GOLDAPER

December 20, 2016

1          A      Yes.

2          Q      And why did you do that?

3          A      Because if I had leftover fabric and couldn't

4     use it for my inline business, I would have to take a

5     loss on the fabric.  But if I could find a low labor

6     garment style that performed well, and use this leftover

7     fabric, I would have a win-win situation.

8                 I wouldn't have to take a beating on my fabric;

9     I wouldn't have to take a beating on the garment.  I

10    could sell it at a really low price to the discounters,

11    and they could mark it up at a reasonable -- that was up

12    to them, but it was low enough, coming in, that they

13    could mark it up and do okay with it.

14         Q      Okay.

15         A      And remember, I ran Speedo.

16         Q      Yes.

17         A      Speedo had outlet stores.  If we had order

18    cancellations, they were shipped to the outlet stores.

19    And we, similarly, would do that with excess piece

20    goods.

21         Q      At Speedo?

22         A      Yes.

23         Q      Did Speedo make any items for the outlet

24    exclusively?

25         A      Yes, they did also make for the outlet store.

1      Q    Were you told to not render an opinion about
2   that?
3      A    I was not specifically asked to -- I was not
4   told not to do that, or --
5      Q    Okay.
6      A    -- no reference to that.
7      Q    Were you asked to render an opinion one way or
8   the other about whether a pair of items were similar?
9      A    Specifically if they were similar or not?  I
10  was asked to do exactly what it says in No. 13, and I
11  was limited to answering that.
12     Q    So you describe, in paragraph 18 and 19, some
13  general categories, I guess, of what may be either a
14  major material difference or a modest difference.  Do
15  you see that?
16     A    Yes, I do.
17     Q    We'll get into some specific products in a
18  moment.  But as a general matter, if there is a material
19  difference between one garment and another garment, does
20  that, in your opinion, necessarily make the garments not
21  comparable?
22     A    If they're not similar, they're not -- they're
23  not comparable; is that what you're asking me?
24     Q    Yeah.  They're not comparable if ...?  What
25  would you say?

GABRIELE GOLDAPER

December 20, 2016

```
 1        A    If they're identical, they could be; but if
 2   they're not identical, if they're not similar, or even
 3   if they're similar with these material or minor, then
 4   they're not comparable.
 5        Q    Okay.  And what are you basing that opinion on
 6   with respect to what would be comparable or not?
 7        A    Well, again, my production experience and my
 8   experience in working with products, whether I'm selling
 9   products, whether I'm involved with the product
10   development people in developing product.
11             You know, because I had such a multiplicity of
12   functions and was responsible for the bottom line, I
13   really got involved in everything.  So that's how I get
14   my experience in.
15        Q    Okay.  Would it be your opinion that two
16   garments would be comparable only if they were
17   identical?
18        A    Correct.
19        Q    So if there were even the most modest of
20   changes, they would not be comparable?
21        A    Correct.
22        Q    In paragraph 18, I believe it's the second
23   sentence, it says, "It is accepted in my industry that a
24   major difference exists between garments where they have
25   different functional features."  Do you see that?
```

GABRIELE GOLDAPER

December 20, 2016

```
 1   handwriting on the first page.  It looks to me to be
 2   time records, but I don't --
 3       A    That's exactly what it is.
 4       Q    And the first page of Mr. Bui's deposition
 5   also?
 6       A    Same thing.
 7       Q    Also time records?
 8       A    Right.
 9       Q    It doesn't mean anything, right?
10       A    Nothing else.
11       Q    Okay.
12       A    But it is the honest way for me to keep my
13   time.
14       Q    Okay.  I just wanted to make sure.
15            Now we'll go to the garments.  So the first one
16   we are going to look at is -- it's paragraph 22 of your
17   report, and it is --
18       A    Okay, so I have to go to my report -- right? --
19   to see what I said.  So this is -- goes here.
20            MS. SAGAFI:  Right.  So if you would like to
21   refer to your report, it is Exhibit 72.
22            THE WITNESS:  Thank you.  So we're going to
23   find --
24            MS. SAGAFI:  Paragraph 22.
25            THE WITNESS:  Sorry, but it's easier to have
```

GABRIELE GOLDAPER

December 20, 2016

```
 1   the report.  3190 and 6612.  Is that what I'm looking

 2   at?  6612 and 3190.

 3   BY MR. RAMSEY:

 4       Q    Okay.  So I put in front of you two garments.

 5   The black one, which is to your right, is the inline

 6   style version; WG, I believe, is the first two codes.

 7   And the one on your left is light gray, and that's the

 8   outlet version --

 9       A    Okay.

10       Q    -- so we're oriented.  I'm just going to have

11   you walk me through some of the differences, and then I

12   will --

13       A    Be happy to do it.

14       Q    -- ask questions as we go.

15       A    In no particular order, though --

16       Q    Sure.

17       A    -- okay?  The zippers, the pockets.  Okay.

18   These are straight pockets; at an angle, but straight,

19   with zippers.

20           These are angled pockets with a --

21           MS. SAGAFI:  Snap.

22           THE WITNESS:  -- snap.  Thank you.

23   BY MR. RAMSEY:

24       Q    Can I stop you right there?

25       A    Yes.
```

GABRIELE GOLDAPER

December 20, 2016

1        Q     So, just for the record, the zippers were on

2    the inline version, and the snaps were on the outlet

3    version.  Viewing those alone, that difference, is that,

4    standing alone, a material difference or a modest

5    difference?

6        A     No, you know, when you come up with a material

7    difference, it's not -- remember, I said that it's not

8    one particular thing; it's the combination.  Okay.  But

9    if you -- forcing me to say so, then I would say yes.

10              These are nice.  You know, these are blind

11    zippers because you can't see the zipper.  And these are

12    totally different pockets; they're totally different

13    constructed.  This is, you know, sewn -- attached on the

14    top.

15        Q     The outlet version has a pocket that's attached

16    on the top of the garment?

17        A     And these --

18        Q     The inline version has pockets inside?

19        A     -- inside.  Okay.  That's a material

20    difference.  But when I make garment material, as

21    opposed to moderate, for this exercise I took everything

22    into consideration.  So if they had one thing that was

23    material and everything else was so minor.  Okay.

24              This, to me, is a material difference, both in

25    the way it was sewn and in the way it was constructed.

GABRIELE GOLDAPER

December 20, 2016

1   Okay?  Right here.  To me, these two, there's nothing

2   similar about them.  This has a -- like, we call this an

3   empire waist.  It's above the natural line of the waist.

4       Q    So the inline version has an empire waist,

5   which is --

6       A    It's above the natural point of a waist.  If

7   it's got kind of like an oval.

8       Q    It sits about the chest --

9       A    Yeah.

10      Q    -- as opposed to the belt?

11      A    Yes.

12      Q    Okay.

13      A    Whereas, this one is at waist length or

14  thereabouts.  And if you see the way they are sewn,

15  totally different.  Just so you can see, look at how --

16  I call this clean.  You know why?  You can't see any

17  stitching here.  You see that?

18      Q    Yes.

19      A    Clean.  Now, this isn't dirty, but this has the

20  stitching on the outside.  This is much cleaner, okay?

21  This has the stitching on the outside, which makes it

22  totally different.  The waist is different, the

23  stitching is different, the construction is different,

24  you see?  This is almost a double layer.

25           What happened is when they got cut, this --

GABRIELE GOLDAPER

December 20, 2016

1   this is sewn, attached to this.  It's not one piece.

2   This -- this, too, this is attached right here, but it's

3   a much cleaner look.  Okay.

4           Now, the other differences that I saw.  Look at

5   how this sleeve is inset.  You don't see any stitching;

6   it's beautifully done.  It's on the inside.  This is

7   also beautifully done, by the way.  I don't think it's

8   not beautifully done, but it's very different.  There's

9   your top stitching.

10      Q    So, just to be clear.  So the inline version

11  has stitches on the sleeve that you --

12      A    You can't see them.

13      Q    -- can't see, and the outlet version has

14  stitches attaching the sleeve that you can see?

15      A    And -- okay.  Yeah, this is a much cleaner

16  version, and that's because all of it is sewn inside and

17  then turned around, you know, and you don't see it.

18  Okay.  This is not done the same way.  This one, in the

19  sleeve, has an extra piece.  This one does not.

20      Q    So the inline version has an extra piece on the

21  sleeve, and the outlet version does not.

22      A    The collar on this inline, if we look closely,

23  is, once again, sewn and attached totally different.

24  Here again, this is sewn from the inside so you don't

25  see the stitches.  This is sewn from the outside.

GABRIELE GOLDAPER

December 20, 2016

1           This has an extra line of flat stitching around

2     the collar because it is not a collar that is -- you

3     know, this is a collar that was turned inside out, when

4     they sewed it, so that it's all one piece.  You see, you

5     have collar inside, collar outside; fabric inside,

6     fabric outside.

7           Okay?  Does that make sense?

8     Q     So the inline version has collar on the inside

9     and outside that is of the same fabric?

10    A     Yeah.  It's sewn as one piece, which is turned

11    inside out.

12    Q     Whereas the outlet version does not have that?

13    A     The outlet version is quite different.  The

14    outline [sic] portion merely has a cover around the neck

15    edge, you know, around the edge.  It's very different.

16    And the collar on this one uses the fabric from the

17    inside to finish off the neck, the collar.  This one

18    does not.  See, the fabrics are different.

19    Q     So, again, the outlet version, the fabric from

20    the inside is used to finish the collar, whereas the

21    inline version does not have that.

22    A     Because of the construction, the differences in

23    construction of the collars, you find that this collar

24    is attached -- this is called sew overlock stitch.  What

25    it does is it sews and it overlocks.  See?

GABRIELE GOLDAPER

December 20, 2016

1      Q    The outlet version has the sew overlock stitch?

2      A    Around the neck.  This one does not.

3      Q    This one is -- the inline version does not have
4   it?

5      A    Right.  And the same thing is, of course,
6   visible throughout the garment.  This is also overlock,
7   and this is a better way.  This is sew overlock.  But
8   look closely.  There's two lines of stitching, okay?
9   That's -- holds it.  That means this won't fray.  This
10  thread won't get loose and -- which is usually a
11  problem.  And this has got a double line of stitching
12  here.  Okay.

13            This does not.  This is just a plain sew
14  overlock, as opposed to having that extra line, because
15  if this ever comes out, it will just unravel the whole
16  thing.  This does not.

17      Q    On the outlet version, you described this type
18  of stitch on the inside of the garment as what?

19      A    That's a sew overlock.

20      Q    And the same stitch on the inline version?

21      A    This has got -- it's a cover stitch, but it's
22  covered with double needle.  This is one needle; two
23  needles.  And that's -- holds it.  It won't fray.  It's
24  cleaner.  Okay.

25      Q    So --

GABRIELE GOLDAPER

December 20, 2016

1        A    Much nicer.  Now, we're not done.

2        Q    Can I -- so on the -- sticking with the

3    stitches that we were just talking about, you said that

4    the stitch on the outlet version may fray?

5        A    Well, it could.  It doesn't have to.  But if

6    it's going -- if you pull one of those threads

7    accidentally, it kind of -- the whole thing pull- -- you

8    know, comes out.  And this, it won't happen here because

9    it's got that extra two lines of stitching that holds it

10   down.

11       Q    Okay.

12       A    You ready?  All right.  Let's look at the

13   inside of the garment.  And by the way, there's nothing

14   wrong with the insides or the outsides.  It's just that

15   they're not the same; they're very different.  This

16   labor, this is called gathering.  And in order --

17       Q    On the inline version, there is, at the -- on

18   the back, but the inside of the garment, an area where

19   the fabric is pinched.

20       A    To create the skirt effect on the back.  You

21   have to do it on the inside, and it creates it on the

22   outside, okay?  Nothing here.  Plain black -- I mean

23   plain back.

24       Q    On the outlet version?

25       A    Right.  Now, if we turn it over, both

GABRIELE GOLDAPER

December 20, 2016

```
 1    garments --

 2        Q    Now we're looking at the outside --

 3        A    Of both.

 4        Q    -- back.

 5        A    And once again, the outside of the back of this

 6    one has this pleated little skirt as an effect.  This

 7    one, as you can see, has absolutely nothing.  Okay?

 8             And again, both sleeves -- you see? -- this has

 9    nothing, and -- oh, that's interesting.  One of them had

10    a piece on the sleeve.  This one did, didn't it?  There

11    it is.  This has a piece on the sleeve.  I don't know

12    why.  Here, too; both sleeves.

13        Q    On -- the inline version has the extra portion

14    on the sleeve?

15        A    Okay.  Now we're not done.  The finishing on

16    the sleeve edge, they're both clean, but they're

17    different.  This is -- the material's folded over and

18    sewn.

19        Q    On the inline version?

20        A    Right.  This one has half elastic.  Half of the

21    sleeve has elastic right here; the other half does not.

22    And this one, that's double-needle stitching.  This

23    doesn't have double-needle stitching.  This is single

24    needle.  See?  One needle.  This is double needles.

25             Different sleeves.  All right?
```

GABRIELE GOLDAPER

December 20, 2016

```
 1      Q     Go ahead.  I just want to make sure you get a
 2   chance to review paragraph 22 to make sure that there
 3   isn't anything else you want to point out.
 4      A     And yeah, they're different -- finishing at the
 5   bottom of both garments is different.  As you can see
 6   here, the bottom of this, it's folded over and it's sewn
 7   very nicely.  This is also sewn very nicely, but it's a
 8   different finish, different stitches.
 9             Okay.  I got -- I got it.
10      Q     Okay.
11      A     So I took all of those elements and said it was
12   materially different.
13      Q     Okay.  Just to circle back to a concept
14   earlier.  Are there any examples on either of these of a
15   yoke?
16      A     A yoke.  I don't think so.  No.  No.  It would
17   have been nice if it had neck facing here.  But it
18   doesn't.  No, there's no example of a yoke that I could
19   find.
20      Q     Okay.  Actually, my next question was going to
21   be is there an example of neck facing that --
22      A     No.
23      Q     On either jacket?  Just for my own --
24      A     That's okay.
25      Q     -- understanding, I'm looking at the inline
```

GABRIELE GOLDAPER

December 20, 2016

1    jacket --

2        A    Uh-huh.

3        Q    -- the inside of it.  Where would the neck

4    facing piece be?

5        A    Well, see, they finished this neck very nicely.

6        Q    The collar?

7        A    The collar.  And this is why -- remember, I

8    said it would be nice if they had neck facing here.  The

9    neck facing, if it had been here, would have protected

10   the wearer from feeling this line of stitches.  Okay.

11            There you don't need it because it's -- if

12   there's -- there's no need to protect this.  This is

13   flat, and it's finished with its self-fabric.

14       Q    So on the outlet version, an example, if it had

15   neck facing, would be essentially an extra piece of

16   fabric that covers the stitches?

17       A    Yeah.  And it doesn't have to do the whole

18   neck.  It could just be this particular area right here

19   because that's, you know, the area you feel it.  But the

20   fact that it doesn't have it is not a major problem, but

21   that's where it would be if you had it.

22       Q    And does either garment have an example of

23   darting?

24       A    Well, indirectly, this is a form of darting,

25   because what it has done is, by taking this and

GABRIELE GOLDAPER

December 20, 2016

```
 1    gathering this here, it has put those two pieces
 2    together and created a nicer fit, as opposed to looking
 3    at this.  It's just a straight piece of fabric.  Okay.
 4             Now, if they had put a dart in here -- because
 5    of the way it's made you don't really need it because --
 6    you don't really need it.  And because of the way they
 7    made this waistline, you could consider -- a dart
 8    doesn't have to be a straight line; a dart could be a
 9    half-moon circle like this.  And they use this to raise
10    the waistline.  And it was a clever way to do it.  It's
11    a form of a dart.
12        Q    So --
13        A    See?  It's an angle.
14        Q    So the inline version, what I think was
15    previously described as the empire waist?
16        A    Yeah, this is an empire waist.
17        Q    That construction in this garment might be an
18    example of a dart?
19        A    Yes.  It's not the best example of a dart,
20    because darts usually end a little bit before they
21    finish --
22        Q    I think --
23        A    And they graduate, you see.
24        Q    -- on the back of suits are --
25        A    Yeah.
```

GABRIELE GOLDAPER

December 20, 2016

```
 1      Q    -- usually --
 2      A    Right.  And this one went all the way.  But you
 3   could call it a form of a dart.
 4      Q    In paragraph 22 of your report, the last
 5   sentence --
 6      A    Oh, excuse me.  There's one more difference.
 7   Look at the brand.  Put your finger on it.
 8      Q    On the outlet version, the logo?
 9      A    Go ahead, put your finger on it.
10      Q    On the left breast pocket is what we're
11   feeling.
12      A    It's embroidered.
13      Q    So the inline version is embroidered, whereas
14   the outlet version is --
15      A    That's just probably heat transferred.  That's
16   probably just stamped on one way or the other.  It's
17   screen -- there's many ways to do it.  But this is
18   embroidered.  And this is also done by a machine.
19      Q    So the last sentence of paragraph 22 of your
20   report, and paragraph 22 refers to these two items,
21   says, "The major differences described above are
22   apparent from visual inspection of the garments,
23   although they may be less perceptible viewing the tech
24   pack schematics alone."
25      A    That's correct.
```

GABRIELE GOLDAPER

December 20, 2016

```
 1      Q    When you were reviewing these, if you remember,
 2   were there items that you were able to see by reviewing
 3   the actual garments that you were not able to see as a
 4   result of viewing the tech packs and CADs?
 5      A    Well, if you look at a tech pack, you don't
 6   know what it is that you're not able to see because, you
 7   know, it's not there, probably.  Bottom line, it's
 8   easier to look at the visuals, especially since we
 9   already decided I'm so used to looking at garments from
10   a production point of view, that visually, it's much
11   easier.
12           On the tech pack, you have to be very careful,
13   and you really have to study, you know, all the
14   different lines, and then match it to the tech pack of
15   the other one.  It's quite a bit more difficult.
16      Q    Are you able to determine the type of stitching
17   that was used by looking at the tech pack?
18      A    Let's see.  Well, from the drawing, you get a
19   pretty good impression, but it's not as accurate as
20   looking here.
21      Q    Looking at the actual garment.
22      A    But you get a pretty good impression of it.
23   But, for example, I can tell you stitches per inch
24   easier by measuring this.  You know, I just take a ruler
25   and count the stitches.  A little harder here, when you
```

GABRIELE GOLDAPER

1    look at the tech pack.

2        Q    Did --

3        A    You know, these are the instructions for the

4    factory, and that's -- the factory is trained to look at

5    these type of pictures.  They're not necessarily looking

6    at this.  They're look- -- this is the factory; this is

7    how you communicate with the factory.

8            That's the function of the tech pack.  These

9    are the instructions to the factory.

10       Q    And they take those and --

11       A    Yes.

12       Q    -- know what to do?

13       A    And they -- based on this, they make that first

14   sample, which they now send back to you and you approve

15   it or you say, "No, it needs this," or "It needs that."

16       Q    Okay.  We're going to move to the next sample,

17   which is paragraph 23 of your report.  And it's style

18   No. WL6010 --

19       A    Okay.

20       Q    -- and style No. XL6115.

21       A    Did I have a physical?  Yes, I have a physical.

22            MS. SAGAFI:  He'll get them for you.

23            THE WITNESS:  Sure.

24            MS. SAGAFI:  And these are the tech documents

25   for those.

GABRIELE GOLDAPER

December 20, 2016

```
 1              THE WITNESS:  Okay, thank you.  Yeah, 6010.

 2              MS. SAGAFI:  Yeah, and then this is 6115.  So

 3   you can take these out, and I'll put them back in order

 4   if you want.

 5              THE WITNESS:  Okay.  Well, I'll first do the

 6   visual and then --

 7              MS. SAGAFI:  Okay.

 8   BY MR. RAMSEY:

 9       Q    I've put in front of you -- to your right is

10   the inline version, with style number starting with WL,

11   and on your left is the outlet version, with number

12   starting XL.  The inline version is a bluish purple, and

13   the outlet version is a pink.

14       A    Okay.

15       Q    Okay.

16       A    And you would like for me to proceed and show

17   you --

18       Q    Yes.  And I think, each time, after you

19   describe one difference, I will pause and say it for the

20   record.

21       A    Okay.

22              MS. SAGAFI:  Or if I may interject, as you're

23   describing the differences, if you say, "On the inline,

24   I observe," whatever, then we'll know you're talking

25   about this inline version over here.
```

GABRIELE GOLDAPER

December 20, 2016

```
 1       A      Okay.

 2              MS. SAGAFI:  "And on the outlet product, I

 3   observe" --

 4              THE WITNESS:  Okay.

 5              MS. SAGAFI:  -- whatever.

 6   BY MR. RAMSEY:

 7       Q      You tend to say "this one" and "this one."

 8       A      Yeah -- no, thank you.  That's a good

 9   suggestion.  Thank you.

10       Q      No problem.

11       A      Okay.  So, on the inline --

12              MS. SAGAFI:  Let's hang on a second.

13              What's the question pending right now?

14              MR. RAMSEY:  Oh, I'm sorry.

15       Q      Can you, like you did with the last sample, go

16   ahead and describe the differences.

17       A      The inline jacket, first of all, is a hooded

18   jacket, whereas the outline -- outlet jacket is not a

19   hooded jacket.

20              Okay.  Do I stop now?

21       Q      No, go ahead.

22       A      The inline jacket has side pockets with

23   zippers, and a line -- a sewn line running almost

24   A-shaped -- you see? -- at an angle.  The outlet one has

25   two different places.  It does have an angled line;
```

GABRIELE GOLDAPER

December 20, 2016

```
 1   however, it is not as angled as the inline one.
 2            This is more of almost 45-degrees; this is
 3   straight, and then a slight bend.  So this is a
 4   different looking -- it creates a different look, this
 5   outlet here.  In addition to which, the outlet style,
 6   when it comes to the zipper, it again has double panels.
 7            By that I mean it has this panel and then this
 8   panel.  That's the second panel.
 9       Q    So on the outlet version, there is a panel that
10   covers the pocket and then a separate panel between the
11   pocket and the zipper?
12       A    Correct.
13       Q    Okay.
14       A    Whereas in the inlet [sic] jacket, we have no
15   such panels at all.  It's truly just a flat front.
16   Okay.  And the inline has, in the shoulder area, no
17   division at all.  This one, the outlet style, has the
18   logo and this separate piece.
19            Now, when we created this garment --
20       Q    The outlet?
21       A    The outlet garment, you have to make a separate
22   pattern piece for this, a separate pattern piece for
23   this; you have to make a separate cut for this and a
24   separate cut for this -- it's quite a bit more extensive
25   work and labor -- though this one has a separation
```

GABRIELE GOLDAPER

December 20, 2016

1   between the front and the shoulder area, and the logo is

2   visible in that place.

3            If you look at the inline style, there is no

4   separation whatsoever between the front and the

5   shoulder, and I'm not able to find the brand name.  The

6   location of the brand is quite different than the

7   location of the brand on the outlet.

8       Q    So the outlet version has the brand, meaning

9   the Columbia logo, on the left breast pocket, and the

10  inline has it on the left sleeve shoulder?

11           MS. SAGAFI:  Well, there is no left breast

12  pocket on the outlet version, but that's generally where

13  the logo appears.

14           MR. RAMSEY:  I'm sorry, no pocket.  Left breast

15  area.

16           THE WITNESS:  The construction of the sleeve in

17  the inline garment is different than the construction of

18  the sleeve of the outlet garment.  This is a straight

19  line.

20           MS. SAGAFI:  The outlet?

21           THE WITNESS:  Outlet.  What did I say?  The

22  outlet has a straight line running up and down the

23  sleeve.  The inline garment has a more -- again, it's a

24  slanted, a curved line.

25           And the way it is sewn is different than the

GABRIELE GOLDAPER

December 20, 2016

```
 1   way this is sewn.  Okay.  That's significantly
 2   different.  Similarly, again, this is double needle.
 3   That means it's two needles sewing the sleeve, in the
 4   outlet style.  In the inlet -- inline style, it's truly
 5   a single needle, one line.
 6            Okay.  Now, let's turn them around.
 7   BY MR. RAMSEY:
 8      Q    Looking at the outside back of each?
 9      A    Yes.  Again, if you look at the outside back,
10   this outlet style is a more tailored look than this one,
11   I mean it is a more fitted look.  That's another word
12   for it.  This is a more fitted look.
13            If I were to measure this across, I believe I'd
14   have more room here than I do here.  This is more
15   fitted.  Okay?  And again, the way the shoulder is
16   connected to the back, the way it is sewn, again, is
17   different.  The inline one is different from the
18   outline -- outlet store, if you can see.
19            The outlet store sleeve and back shoulder area
20   are sewn differently than the one here, the inline.  And
21   I said that there's no hood on the outlet; there is a
22   hood here.  So I can't compare how the hood was made
23   because it's not there.
24            But I can tell you that -- because of the shape
25   and the bell bottom of the inline style, that I said
```

GABRIELE GOLDAPER

December 20, 2016

```
 1    this appears to me more like a rain jacket, and this
 2    appears to me more like a motorcycle jacket because it's
 3    a more fitted.
 4              These lines, the way they're curved here make
 5    it more fitted.  And the front, with all these extra
 6    panels, make it more fitted.  Okay.  We did go over the
 7    sleeves; the sleeves are different.
 8              All right.  Let's make sure I covered
 9    everything.
10              Now, this piece right here, we could call
11    that -- in the outlet store, we could call that a yoke.
12         Q    The top piece --
13         A    Yeah.
14         Q    -- on the back?
15         A    Yeah.  Similarly in the front.  Okay.  This
16    outlet -- inline style only has it in the back; it does
17    not have it in the front.  So this has -- okay.
18              There's a fiber content difference.  The inside
19    back of the inline garment is a hundred percent
20    polyester, and the outlet style is 94 percent polyester
21    and 6 percent elastin.  The manner in which the garments
22    are sewn together is different.  As I said, the shaping
23    of the pockets are different, and the sleeve details are
24    different.
25              I think, if you look at the way the pockets
```

GABRIELE GOLDAPER

December 20, 2016

```
 1   are, you can see the inline style is sewn -- it's sewn
 2   differently than -- this has an overlap, you see.  It's
 3   still a blind zipper, but it -- they have an overlap
 4   that they -- this is bar tacking.  That's bar tacking.
 5   Tacks this to cover it.  That does not exist here.
 6       Q     On the inline version?
 7       A     On the inline.  And I said, you know, this has
 8   a flare at the bottom; this is straight.  This is more
 9   fitted; this is more loose.  This is hooded; this is
10   not.
11       Q     And taken together that made the two jackets
12   materially different?
13       A     Yes.
14       Q   I'm going to step back for just a second.  And
15   you mentioned that the inside backs of the garments have
16   slightly different fabric percentages?
17       A     Lining fabric, yes.  According -- and this came
18   off the tech pack.  It's got to be in the tech pack.
19   And we'll look at the tech pack, but --
20       Q     Do you know why -- what's the difference
21   between a hundred percent polyester and 94 percent
22   polyester with 6 percent elastin?
23       A     Elastin makes it fit a little bit better.
24   Elastin has a little bit of rubber in it, so, you know,
25   it has give; it makes for a nicer fit.  And because this
```

GABRIELE GOLDAPER

December 20, 2016

```
 1   was a tighter-fitting jacket, that may be why they had

 2   it.

 3       Q     The two different fabric percentages, would

 4   they provide a different functionality at all, other

 5   than the fit?

 6       A     It's a slight functionality difference because

 7   fit is, you know, what -- if something makes it fit

 8   better or less better, it's a functional item.  By

 9   itself, it's a moderate, but combined with everything

10   else, we're looking at major lack of similarity, okay,

11   or major differences.

12       Q     Looping back to what we talked about earlier

13   but now we have a sample in front of us, you're

14   commenting on the differences between the garments, but

15   not the value or price at which Columbia could sell the

16   two garments, correct?

17       A     That is correct.

18       Q     And you couldn't tell me that because they used

19   one type of stitch on the inline and one type of stitch

20   on the outlet, that they would garner a different price

21   at the store?

22       A     I would not be able to tell you that.

23       Q     I think you'll notice, on both, there is a

24   round hang tag.  And I believe both say "Water

25   Resistant"?
```

GABRIELE GOLDAPER

December 20, 2016

```
 1       A     Yes.

 2       Q     Do you know whether both are equally water

 3   resistant?

 4       A     I don't know that.

 5       Q     Okay.  And you didn't test for that, for

 6   instance?

 7       A     No, I did not.

 8       Q     In any of the garments that you've looked at

 9   where it indicated that it was water resistant, wind

10   resistant or heat resistant, did you check those

11   qualities of the garments?

12       A     No.

13             MS. SAGAFI:  Objection; vague and ambiguous.

14   Just -- I don't object to that question, but I just

15   don't think you phrased it well.

16             MR. RAMSEY:  Okay.

17       Q     So where the inline version and the outlet

18   version both said that they were wind resistant, you

19   didn't compare how well either resisted the wind,

20   correct?

21       A     That's correct.

22       Q     Okay.  And where either said that they were

23   waterproof or water resistant, you didn't compare the

24   relative ability of the jackets to dispel water?

25       A     That's correct.
```

GABRIELE GOLDAPER

December 20, 2016

```
 1       Q     And the same would be true for heat resistant?
 2   So if they both said they were heat resistant, you
 3   didn't judge whether one was better at resisting heat
 4   versus the other?
 5       A     That's correct.
 6       Q     And you weren't asked to do that?
 7       A     No, that's correct as well.
 8       Q     Let's do another sample.  This one is going to
 9   be -- sorry, one moment.
10           MS. SAGAFI:  We've been going about an hour.
11   Let's take a break while you set up the next one.
12           MR. RAMSEY:  Perfect; let's do that.
13           MS. SAGAFI:  Okay.
14           (Recess.)
15   BY MR. RAMSEY:
16       Q     So we're going to move to our next example,
17   which is paragraph 37 of your report.
18       A     Okay.
19       Q     I'm going to put on your left what I believe
20   is -- yes -- the outlet style, with style number
21   starting with XM.  And then on your right will be --
22       A     This is outlet?
23           MS. SAGAFI:  This is outlet.
24   BY MR. RAMSEY:
25       Q     -- will be the inline, which is style number
```

GABRIELE GOLDAPER

December 20, 2016

```
 1   starting WM6044.  And I think I said it's paragraph 37
 2   of your report.  And so when you're ready, I'd like you
 3   to walk me through the various differences.
 4       A    Okay.  This is the inline style, which has a
 5   pocket front, almost center, and the outlet style, which
 6   does not have the same pocket.  It's a zipper pocket.
 7       Q    So the inline style has a pocket sort of in the
 8   left breast area, whereas the outlet style does not.
 9       A    The zippers on the inline style are not blind
10   zippers, meaning we can see the zipper and we can see
11   the stitching around the zipper on both pockets, whereas
12   the outlet style has a zipper that's covered.  So we
13   call that blind, because we can't see it; it's covered
14   on both sides.
15            And the outlet style zipper is at somewhat of
16   an angle, or at least it looks to me like it's somewhat
17   of an angle, whereas the inline is just straight up and
18   down.  Okay.  The inline men's jacket has a matching
19   zipper.  It's a black jacket with a black zipper, and
20   everything surrounding that black zipper is, in fact, in
21   black.
22            The outline style -- outlet style does not have
23   a matching zipper, but has a rather pronounced, glaring
24   blue zipper, which, in my mind, is not as attractive as
25   the inline style.
```

GABRIELE GOLDAPER

December 20, 2016

1        Q     Unless you like blue, right?

2        A     The inline style, at the area of the breast,

3    has a single line of stitching which connects the top to

4    the bottom part of the jacket, whereas the outlet style,

5    it similarly has a connection between the shoulder and

6    the bottom part, but it is much higher on the jacket

7    front than the inline.  And not only is it much higher,

8    the overlap of the fabric is about a quarter of an inch

9    wider, if not more, than the construction and the sewing

10   of the inline.

11             The inline just has flat stitching connecting

12   the top and the bottom of the front; the outlet one has

13   much more in their connections.  First of all, it's much

14   higher; it's nearer to the shoulder area.  And it's

15   got -- technically, what they've done is they've taken

16   this fabric and doubled it over and then sewn on both

17   sides.  It just creates a very nice effect, and it

18   separates the shoulder from the lower half of the

19   garment.

20             This one does not have that visual effect.

21        Q     The inline does not --

22        A     The inline, it just connects the top and the

23   bottom.  This is, in my opinion, a nicer looking front

24   visually, is more -- has more eye appeal.

25        Q     The outlet one?

GABRIELE GOLDAPER

December 20, 2016

```
 1        A     The outlet one.

 2              The inline garment, at the sleeve, has Velcro

 3   to close the sleeve, whereas the outlet garment does not

 4   have Velcro but has a half-elastic sleeve, which is

 5   quite different because this sleeve is adjustable,

 6   whereas this sleeve is not.  There is no provision for

 7   tightening or loosening this elastic.

 8        Q     The inline sleeve is adjustable because --

 9        A     The inline is -- thank you for correcting me --

10   is adjustable.  Okay.

11              The inline garment has a drawstring at the

12   bottom.  The -- this one has it as well, but if I

13   remember right, the construction of the way it's done is

14   a little different.  I don't know if it's a function of

15   the fabric -- okay, I have to go to my notes for this

16   one because I know there's a difference, but I don't

17   remember what it is.

18              Do we have the tech pack for this?

19              MS. SAGAFI:  Yes.  So this is a tech pack for

20   the inline.

21              THE WITNESS:  On one of the pages makes a

22   note --

23              MR. RAMSEY:  If you could call out the Bates

24   number, that would be great.

25              MS. SAGAFI:  Sure.  The tech pack for the --
```

GABRIELE GOLDAPER

December 20, 2016

1          THE WITNESS:  Inline.

2          MS. SAGAFI:  -- inline garment, WM6044, begins

3    on Bates Columbia 00983.

4          THE WITNESS:  Okay.  And take a look at the --

5          MS. SAGAFI:  The tech pack for the outlet

6    garment, which is style No. XM6094, begins on

7    Columbia 00982.

8          THE WITNESS:  Okay.  The difference in the

9    inline was not the drawstring -- I need to correct

10   that -- but it was the finishing on the inside of the

11   garment, of the zipper.  Okay.

12          The outlet zipper is attached to the garment

13   somewhat differently than the inline.  The inline is

14   attached to the garment and then covered on the inside

15   with another piece of fabric.  We do not see that in the

16   outlet.

17          And that's what it was.  I knew there was a

18   difference, but I couldn't remember what it was.  It is

19   in the way the inside of the garment is finished.

20          And lastly, the collars had a difference, if I

21   remember.  I think, this one, finishing on the collar

22   was different.  The finishing on the collar is

23   different, but -- something else.  I have to find it.

24          MS. SAGAFI:  These are at paragraph 37 of your

25   report.

GABRIELE GOLDAPER

December 20, 2016

```
 1              THE WITNESS:  Oh, thank you.
 2              Okay.  This has -- oh, there it is.  There it
 3    is.  Okay.  I was looking for it.  Okay.  The inline
 4    garment has -- at the neck line, it has a soft fabric
 5    that is lining the zipper area so that it can't scratch
 6    or touch the body, especially at the neck area here.
 7              The outlet garment doesn't have that at all.
 8    See, there's nothing in the area of the neck; because of
 9    the way it's closed, it hits the neck.  This makes it
10    feel softer at the neck.  There's no abrasion or there's
11    no feeling of the fabric or any of -- stitching.  We
12    don't have that here.
13    BY MR. RAMSEY:
14         Q    So on the inline version, on the left side,
15    inside of the jacket, there is a fabric that is
16    different than --
17         A    It's almost like a lining fabric.  I mean,
18    that's -- it is a lining fabric, but it's there so that
19    you don't feel, around your neck area, any abrasion from
20    the zipper.  Okay.  See?  This way, they don't feel the
21    zipper at all.  It protects the wearer.
22              Whereas here, they have this -- they could
23    conceivably feel this in this area around the neck or
24    even around here.  That's not the case here.  You're not
25    going to feel it.
```

GABRIELE GOLDAPER

December 20, 2016

```
 1      Q    Can I stop you for a second?

 2           So the inline jacket, on the front left breast

 3   area, has a pocket --

 4      A    Uh-huh.

 5      Q    -- whereas the outlet version doesn't?

 6      A    That's correct.

 7      Q    And you'll notice that the fabric that we're

 8   discussing is behind that left front pocket.

 9      A    Yes.

10      Q    So are you saying that the fabric behind the

11   left breast pocket is such that you don't feel the

12   zipper of the pocket?

13      A    No, you don't feel -- see, that only goes here.

14   This piece right here?  That's so that when the zipper

15   closes -- and this part, where the pocket is, is the

16   same fabric, that's so when the zipper closes, there's

17   no abrasion at all.  You can't feel the zipper.

18           Whereas, potentially, you could feel it here.

19   We don't have the lining from the pocket and we don't

20   have this lining fabric to soften this area.

21      Q    But there's also not the lining fabric on the

22   right inside portion --

23      A    Right.

24      Q    -- of the inline version.

25      A    The thongs of the zipper here, because they're
```

GABRIELE GOLDAPER

December 20, 2016

1    on the outside, you wouldn't feel them.  But these are

2    going to be on the inside, you know, against your body.

3    These are not going to be against your body, because

4    it's got this piece right here.  You see, this is

5    against your body.

6         Q    It's got the piece beneath the zipper --

7         A    Right --

8         Q    -- on the right --

9         A    -- so you don't feel it against your body.

10   This has absolutely -- this has some protection here,

11   but nothing here at all.

12             Basically, this area is so that if you are

13   wearing either very light -- a shirt like that or

14   something, or nothing, that you don't feel the zipper.

15        Q    Okay.  Let me know after you've had a chance to

16   review paragraph 37, or any other documents you want to,

17   whether you think you've checked off all of the

18   differences that you identify.

19        A    We did the cuffs, right?  Yes.

20             MS. SAGAFI:  Yes.

21             I think, Gabriele, your report discusses this

22   bit of fabric on the inline.

23             THE WITNESS:  Yeah.  That's partly also what we

24   don't have here.  Here, this closes the zipper at the

25   neck.  That's to protect you at the neck.

GABRIELE GOLDAPER

December 20, 2016

```
1    BY MR. RAMSEY:

2         Q    So on the inline version, at the top of the

3    zipper --

4         A    Right.

5         Q    -- there's a little piece of fabric that covers

6    the zipper?

7         A    Thank you.  That's the other part; that's in

8    addition to this part.  This part should, nevertheless,

9    be here to protect you from feeling this against your

10   skin.  But this part is at the chin; this will avoid

11   that you feel it at the chin.  It doesn't exist here.

12             And it's -- this part here in No. 37, it says

13   the model for the outlet store has an exposed zipper and

14   does not have a chest pocket -- the exposed zipper at

15   the chin.  It doesn't have the chin protection.  Okay.

16        Q    And so based on these differences, why did you

17   determine that these are moderate differences as opposed

18   to material?

19        A    These are moderate because, basically, I felt

20   that it -- they were not really material differences.

21   You know, it still had the waist at the same -- I mean,

22   it still had the pockets.

23             It still had zippered pockets, it just had them

24   in different -- at a slightly -- angle, but it still had

25   the pockets.  And it still had the overall feel of the
```

GABRIELE GOLDAPER

December 20, 2016

```
 1    garment.  And although some of these are very

 2    valuable -- this is really important, the fact that the

 3    Velcro can adjust the sleeve and that this was with

 4    elastic -- I still didn't feel that they were material.

 5    I felt that this could get away as moderate.

 6              And, you know, the same thing I said.  The

 7    color of the zipper, I don't think that that's that

 8    critical to make it material, but it is moderate.  It

 9    makes it dissimilar; it makes it different.

10        Q    Are there features on the outlet jacket that

11    you believe are preferable to any of the corresponding

12    features on the inline jacket?

13              MS. SAGAFI:  Objection; calls for speculation,

14    a lay opinion, and exceeds the scope.

15              THE WITNESS:  To answer that question, I'd have

16    to go back and examine each and every one of the outlet

17    ones.

18    BY MR. RAMSEY:

19        Q    No, I'm sorry, just of the two that are in

20    front of us.  Is there anything on this outlet jacket

21    that is, in your opinion or view, more preferable than

22    the inline jacket?

23              MS. SAGAFI:  Are you asking for her personal

24    opinion or her expert opinion?

25              MR. RAMSEY:  I'm asking for her opinion.
```

GABRIELE GOLDAPER

December 20, 2016

```
 1           MS. SAGAFI:  All right.  Well, see, since
 2   you're asking for an expert opinion, it exceeds the
 3   scope of her engagement here.  But if you want her
 4   personal lay opinion, I would object to relevance.
 5           But you can answer.
 6           THE WITNESS:  I'll give you my personal
 7   opinion.
 8   BY MR. RAMSEY:
 9       Q    Okay.
10       A    And my personal opinion is no, there's nothing
11   in this jacket that would make this more preferable than
12   this, for me, personally.
13       Q    For you, personally?
14       A    Yes.
15       Q    How about for a 30-year-old male?
16           MS. SAGAFI:  Objection; calls for a lot of
17   speculation.
18           MR. RAMSEY:  Sure.
19       Q    So you described earlier, on the outlet jacket,
20   that the construction of the upper chest area, which --
21   the line is higher than on the inline version --
22       A    Right, yes.
23       Q    -- and also the stitching used on the outlet
24   version and the way, I guess, it doubles over --
25       A    Yes.
```

GABRIELE GOLDAPER

December 20, 2016

1      Q      -- is different than the inline version.  And

2    you indicated earlier that the way that portion of the

3    outlet jacket is constructed is better; is that true?

4            MS. SAGAFI:  Objection; misstates the

5    testimony.

6            THE WITNESS:  I said it's different.

7    BY MR. RAMSEY:

8      Q     You don't think the way the outlet version is

9    constructed --

10     A    It's different.  It's different.

11     Q     And you didn't say earlier that it was better

12   or made it look better?

13            MS. SAGAFI:  Objection; argumentative, asked

14   and answered.

15            THE WITNESS:  I don't remember, but it is

16   different.

17   BY MR. RAMSEY:

18     Q     Okay.  Can we look at paragraph 37?  You'll see

19   there that after the underlined portion which indicates

20   the style numbers, it says, "Both of these styles are

21   men's jackets."  And then it goes on to say that, "The

22   inline style has several features that are not present

23   on the outlet model."

24            When you were drafting the report, were you

25   looking for items that the inline style had that the

GABRIELE GOLDAPER

December 20, 2016

```
 1   outlet did not?

 2      A    No, I was looking for areas that the garments

 3   were not similar, were not the same.  I was looking for

 4   the areas that they were different.

 5      Q    Was there ever an item that existed or feature

 6   that existed on the outlet version that was not on the

 7   inline version that you excluded from the report?

 8      A    I can tell you that I didn't exclude any

 9   differences from my report.  So if there were any

10   differences in one versus the other, it's in my report.

11      Q    When you were reviewing the items and drafting

12   your report, did you attempt to describe differences in

13   a way that would suggest that the inline version was

14   somehow better than the outlet version?

15      A    That was not my intent.

16      Q    Do you think you did that?

17      A    Do I think I did what?

18      Q    Do you think, in reviewing the items and

19   drafting your report, you noted differences in a manner

20   that suggested that the inline version is somehow better

21   than the outlet version?

22      A    I think I gave both inline and outlet garments

23   their fair due and stated exactly what they were and

24   what the differences between the two garments were.

25      Q    Okay.  We're going to look at one more sample.
```

GABRIELE GOLDAPER

December 20, 2016

```
 1    It's going to be paragraph 39 of your report.  Go ahead
 2    and get those.
 3        A    That's the little shorts.
 4        Q    That's the shorts.
 5             (Discussion off the record.)
 6             MS. SAGAFI:  So, 4720 and 4712, that's what
 7    we're looking at, right?
 8             THE WITNESS:  Uh-huh.
 9    BY MR. RAMSEY:
10        Q    I'm going to put on your right the inline
11    version, which starts with style No. AL, and on your
12    left will be the outlet version, which is -- starts with
13    style No. XL.
14             And once you've had an opportunity to look at
15    each of them and your report, which, again, is paragraph
16    39 of your report, please go ahead and walk me through
17    the various differences.
18        A    Okay.  The outlet -- I'm sorry.  The inline
19    style, if we look at the back, it has a V cut in the
20    center of the back.  If we look at the outlet style, it
21    does not.  It has a continuous patching of the back; it
22    has a continuous stream of fabric.
23             If we look at the inline shorts, we see the
24    pockets of the inline shorts have an extra line of
25    sewing above the pocket, immediately above the pocket,
```

GABRIELE GOLDAPER

December 20, 2016

1   on both back pockets.  The outlet style, however, does

2   not have that extra line of sewing immediately above the

3   pocket.

4           And it appears that the pocket in the outlet

5   style has been moved higher up, which accounts for why

6   they don't have that extra line of stitching.  So the

7   placement of the pocket on the inline style is a little

8   bit lower than for the outlet style.  Okay.

9           For the inline style, the shape of the pocket,

10  because of the double lines of sewing, create almost

11  like a boxlike look.  This is not true for the outlet

12  style.  We don't have that same boxlike look in the

13  pocket.

14          Those are primarily the most significant

15  differences between the inline shorts and the outlet

16  shorts.

17      Q    Just make sure you've reviewed 39.  I think you

18  got everything, but just to make sure.

19      A    Yeah, I think I do.

20          Yeah, it's mostly the pockets in the back.

21      Q    Speaking of the back, so you noted, on the

22  inline version, there's a V cutout --

23      A    Yes.

24      Q    -- on the waist?  What does that -- does that

25  serve a particular purpose?

GABRIELE GOLDAPER

December 20, 2016

```
 1        A     Well, it -- it could serve as a decorative
 2    function, because you can still get the belt loops
 3    through.  And it could also serve as a fit.
 4              I would have to try it on to see the
 5    difference, if, in fact, the fact that this is open
 6    gives it a better fit.  But without trying it on, I
 7    couldn't say for sure.
 8        Q     Okay.  And so just to confirm, you didn't try
 9    on any of the --
10        A     I did not.
11        Q     Any of the garments?
12        A     Nothing, no.
13        Q     And you didn't have anyone try them on?
14        A     No, I didn't.
15        Q     And you classified the differences as moderate,
16    correct?
17        A     Yes.
18              MS. SAGAFI:  I believe the word she uses is
19    "modest," but --
20              MR. RAMSEY:  Modest, I'm sorry.
21        Q     Had one of the pair of shorts been a different
22    color, would you classify it still as moderate or
23    material?
24        A     No, modest.
25        Q     Still modest?
```

GABRIELE GOLDAPER

December 20, 2016

1       A       Yeah.

2       Q       In that case, the color wouldn't matter -- or

3   it wouldn't be material?

4       A       No, it would be modest --

5       Q       All right.

6       A       -- in this case because we've got modest

7   differences.  And color is -- by itself, wouldn't be the

8   major -- wouldn't take it into the territory of major.

9       Q       Okay.  Okay.  I'm going to take these away.

10           If I could get you to turn to the last page of

11  your report, page 16 -- or, actually, probably 15 and

12  16.  That's the Conclusion section, paragraphs 42 to --

13  I think there was a typo -- to 42.  But the Conclusion

14  section.

15      A       Okay.

16      Q       And specifically in paragraph 41, you say that

17  "In conclusion, it is my opinion" --

18           THE WITNESS:  Oh, he has a different copy than

19  mine.

20           MS. SAGAFI:  No, it is a typo.  So, just so

21  that the record is clear, there is a paragraph numbered

22  41 appearing on page 15 of your report.  There's another

23  paragraph --

24           THE WITNESS:  Oh.

25           MS. SAGAFI:  -- numbered 41 appearing on

Exhibit 11

Page 1

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                        ---o0o---

4

5    JEANNE AND NICOLAS STATHAKOS, )

6    et al,                        )

7           Plaintiffs,            )

8      vs.                         )   No. 4:15-cv-04543-YGR

9    COLUMBIA SPORTSWEAR COMPANY;  )

10   COLUMBIA SPORTSWEAR USA       )

11   CORPORATION,                  )

12          Defendants.            )

13   _____)

14

15

16

17       VIDEOTAPED DEPOSITION OF CAROL A. SCOTT, PH.D.

18              WEDNESDAY, MARCH 1, 2017

19

20

21

22

23

24   PAGES 1 - 260

25

 1      A    I don't agree with his -- obviously, I

 2  don't agree with his opinions in this case.  He

 3  has -- he obviously has some history of research in

 4  this area.  I don't have a question about whether he

 5  is -- I don't have an opinion about whether he is or

 6  isn't an expert.  I really haven't considered that.

 7            I just look at what he has written in this

 8  case, and I don't really agree with it, no.  I mean,

 9  it's not -- let's say I don't agree with it.  I

10  just -- I don't think it -- I don't think that he

11  can draw some conclusions from it that he wants to

12  draw in this particular case.

13      Q    But you don't question his expertise,

14  generally, in reference pricing and consumer

15  behavior; is that right?

16            MR. CARDON:  Misstates the witness's

17  testimony, argumentative.

18            THE WITNESS:  As I say, I'm not going to

19  question his expertise, in general.  I'm going to

20  look at what he's done in this case and see if it's

21  valid or not.

22  BY MS. GOLD:

23      Q    Okay.

24            So you know that Dr. Compeau submitted an

25  expert report in this case, right?