1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| **JEANNE STATHAKOS, ET AL.,** | CASE NO. 15-cv-04543-YGR |
| Plaintiffs, | **ORDER GRANTING IN PART MOTIONS TO** |
| | **STRIKE EXPERTS; GRANTING IN PART** |
| vs. | **DEFENDANTS' MOTION FOR SUMMARY** |
| | **JUDGMENT; GRANTING IN PART** |
| **COLUMBIA SPORTSWEAR COMPANY, ET AL.,** | **PLAINTIFFS' MOTION FOR CLASS** |
| | **CERTIFICATION** |
| Defendants. | Re: Dkt. No. 61, 75, 76, and 77 |

18    Plaintiffs Jeanne Stathakos and Nicolas Stathakos bring this putative class action against

19 defendants Columbia Sportswear Company and Columbia Sportswear USA Corporation

20 (collectively, "Columbia") for alleged use of deceptive and misleading labeling and marketing of

21 merchandise in its company-owned Columbia outlet stores.  Plaintiffs bring five causes of action:

22 three under each prong of the Unfair Competition Law, California Business & Professions Code

23 §§ 17200, *et seq.* ("UCL") for (i) unlawful, (ii) unfair, and (iii) fraudulent business practices; the

24 fourth for violation of the False Advertising Law, California Business & Professions Code §§

25 17500, *et seq.*, (the "FAL"); and the fifth for violation of the Consumers Legal Remedies Act,

26 California Civil Code §§ 1750, *et seq.* (the "CLRA").

27    Currently before the Court are the following motions:  defendants' motions to exclude

28 plaintiffs' experts, namely Ms. Gabriele Goldaper and Dr. Larry Compeau; defendants' motion for

United States District Court
Northern District of California

summary judgment; and plaintiffs' motion to certify a class under Federal Rule of Civil Procedure 23(b)(2) or 23(b)(3). Specifically, plaintiffs seek to certify the following class under Rule 23(b)(2) or Rule 23(b)(3): "All consumers who have purchased an Outlet SMU Build at a Columbia Outlet store in the State of California since July 1, 2014, through the conclusion of this action."

Having carefully reviewed the papers and evidence submitted on the above motions and oral arguments at the hearing held on April 25, 2017, and for the reasons set forth more fully below, the Court **ORDERS** as follows: The Court **DENIES** defendants' motion to exclude Ms. Goldaper. The Court **GRANTS IN PART** defendants' motion to exclude certain paragraphs of Dr. Compeau's report as set forth herein. The Court **GRANTS IN PART** defendants' motion for summary judgment with regard to plaintiffs' proposed models for monetary relief, but **DENIES** such motion in all other respects. The Court **GRANTS IN PART** plaintiffs' motion for class certification and conditionally certifies a Rule 23(b)(2) class as set forth below.

## I. BACKGROUND

Plaintiffs bring this UCL, FAL, and CLRA putative class action generally alleging that defendants utilize deceptive practices with regard to their use of price tags for certain products at their outlets. Specifically, plaintiffs allege that defendants' use of "reference prices" on merchandise tags at their outlet stores is deceptive because it leads consumers to believe that such merchandise was formerly sold at that price when the truth was to the contrary. Relevant to this action, defendants sold two general categories of garments: (i) "Inline Styles," which were regular products produced for sale at any of defendants' stores, wholesale partners, or online; and (ii) "Outlet Special Makeup ("SMU") Builds," which were designed specifically for, and sold only at, defendants' outlet stores. This case relates only to the sales of defendants' Outlet SMU Builds.

The following background is relevant to the instant motions:

Defendants sell their products primarily through four channels: Columbia's Inline retail stores, website, wholesale partners, and outlet stores. Prior to 2014, Columbia used the outlet stores to sell styles that were previously sold at Inline retail stores, and the price tags reflected both the higher price at which it previously sold Inline and the lower price at which it could be purchased at the outlet. (Dkt. No. 61-22 at 7, Defendants' Interrogatory #3.)

At the beginning of the class period in July 2014, defendants started selling Outlet SMU Builds, which it describes as "styles based off an in-line style, with slight aesthetic modifications." (*Id.*) Importantly, Outlet SMU Builds are sold only at the outlet stores. (*Id.*) Like the Inline Styles sold at the outlet stores, the Outlet SMU Builds also bore a price tag presenting two prices. The higher price tag represented the price at which the "corresponding inline style sold for" whereas the lower price was the "price at which the item could be purchased at the outlet (absent a special sale at the outlet)." (*Id.*) The Outlet SMU Builds, however, were never sold anywhere other than outlet stores, and never sold for the higher reference price. (*See* Bui Dep. Tr. 103:18–20, 123:8–124:12.) The following figures represent the different price tags for inline styles, Outlet SMU Builds, and Inline styles sold at outlets, respectively:




Relevant to this litigation, plaintiffs purchased eight Outlet SMU Builds in seven different styles. Specifically, the following chart summarizes such purchases:[1]

---

[1] The chart is an excerpt of a chart submitted by plaintiffs as Plaintiffs' Appendix at Docket Number 86-1. At oral argument, plaintiff noted that the correct purchase price for Item Number 1 should be "$16.00," not "$27.99."

| Item No. | SMU Style No. | Description[1] | Purchase Date | Ref. Price | Outlet Price | Purchase Price |
|---|---|---|---|---|---|---|
| 1 | XM6093 | Mt. Village Jacket (Gray) | 5/30/15 | $115 | $59.90 | $27.99[2] |
| 2 | XL5077 | Wildflower Woodlands Dress (Fuschia) | 2/14/16 | $60 | $39.90 | $11.98 |
| | | Sunset Hill Shorts | | | | |
| 3(a) | XL4712 | (Beige) | 7/8/15 | $30 | $24.90 | $11.98 |
| 3(b) | XL4712 | (White) | 7/26/15 | $30 | $24.90 | $8.98 |
| 4 | XL6981 | Hopewell Bay Long Sleeve Shirt (Gray) | 2/14/16 | $40 | $29.90 | $7.98 |
| 5 | XO5035 | Cascade Trail Jacket (Green) | 2/14/16 | $120 | $79.90 | $47.94 |
| 6 | XL5012 | Morning Light Hooded Jacket (White) | 2/14/16 | $140 | $99.90 | $39.98 |
| 7 | XL6923 | Cool Camper II Polo (Purple) | 11/22/15 | $35 | $24.90 | $11.95 |

Defendants assert that since the beginning of the class period, they have produced approximately 580 Outlet SMU Builds. Defendants continue to utilize the same price tag practices with regard to the same.

## II. MOTIONS TO EXCLUDE EXPERT REPORTS

### A. Legal Framework

Rule 702 permits opinion testimony by an expert as long as the witness is qualified and their opinion is relevant and reliable. Fed. R. Evid. 702. An expert witness may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The admissibility of an expert opinion requires a three-step analysis:

> The admissibility of expert testimony, Rule 702, requires that the trial court make several preliminary determinations, Rule 104(a). The trial court must decide whether the witness called is properly qualified to give the testimony sought. A witness may be qualified as an expert on the basis of either knowledge, skill, experience, training, or education or a combination thereof, Rule 702. The trial court must further determine that the testimony of the expert witness, in the form of an opinion or otherwise, will assist the trier of fact, i.e., be helpful, to understand the evidence or to determine a fact in issue, Rule 702(a). Finally the trial court must determine that as actually applied in the matter at hand, Rule 702(d), to facts, data, or opinions sufficiently established to exist, Rule 702(b), including facts, data, or opinions reasonably relied upon under Rule 703, sufficient assurances of trustworthiness are present that the expert witness'

4

explanatory theory produced a correct result to warrant jury acceptance, i.e., a product of reliable principles and methods, Rule 702(c).

Michael H. Graham, 5 Handbook of Fed. Evid. § 702:1 (7th ed.) (footnotes omitted).

Under Rule 703, expert opinion may be based on three possible sources: firsthand knowledge; admitted evidence; and facts or data not otherwise admitted, if they are the kind of information on which experts in the particular field reasonably would rely in forming opinions on the subject. *See* Victor J. Gold, 29 Fed. Prac. & Proc. Evid. § 6274 (2d ed.) At the class certification stage, courts analyze challenges to expert testimony under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). "[A]t this early stage, robust gatekeeping of expert evidence is not required; rather, the court should ask only if expert evidence is useful in evaluating whether class certification requirements have been met." *Culley v. Lincare Inc.*, No. 15-CV-00081-MCE-CMK, 2016 WL 4208567, at *1 (E.D. Cal. Aug. 10, 2016) (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 492–93 (C.D. Cal. 2012). The trial judge has discretion to determine reasonable measures of reliability. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).

Ultimately, the proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702. Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments). An expert should be permitted to testify if the proponent demonstrates that: (i) the expert is qualified; (ii) the evidence is relevant to the suit; and (iii) the evidence is reliable. *See Thompson v. Whirlpool Corp.*, No. C06-1804-JCC, 2008 WL 2063549, at *3 (W.D. Wash. May 13, 2008) (citing *Daubert*, 509 U.S. at 589–90).

**B.      Motion to Exclude Ms. Goldaper**

Plaintiffs have proffered Ms. Goldaper to opine on the similarities between the Outlet SMU Builds and their purported Inline counterparts. Ms. Goldaper reviewed thirty-five distinct garments, and reached the following four conclusions: (i) seven Outlet SMU Builds had major material differences from their Inline counterparts; (ii) nine Outlet SMU Builds had modest differences from their Inline counterparts; (iii) two Outlet SMU Builds were counterparts of each other; and (iv) one of the Outlet SMU Builds had no counterpart whatsoever.

Defendants raise two grounds upon which they argue Ms. Goldaper's expert declaration should be excluded. First, defendants argue that Ms. Goldaper's opinions and methodology are unreliable. Second, defendants argue that, in the alternative, her opinions are irrelevant. Defendants do not persuade:

**Reliability:** Defendants argue that Ms. Goldaper did not employ any particular set standard or methodology in reaching her conclusions about the similarities between different garments at issue in this litigation. (*See* Goldaper Dep. Tr. 56:90–60:14.) Additionally, Goldaper herself stated that she could not identify anyone else in the industry who could have conducted the same analysis. (*Id.* Tr. 56:9–60:14, 68:7–22.) Thus, defendants contend, Goldaper's conclusions are only her personal opinions, and her method results in a high rate of error. Defendants' arguments ignore the actual analysis conducted by Ms. Goldaper, and the expertise that she brings to bear on such analysis.

Ms. Goldaper has been in the fashion industry for forty-five years, taught as a part-time faculty member at the Fashion Institute of Design & Merchandising for approximately thirty years, served as an apparel expert for the United States Agency for International Development, and offered expert opinions comparing garments for purposes of copyright disputes. (Goldaper Rpt. ¶¶ 3–8.) Given her expertise, Ms. Goldaper compared the functional and aesthetic components of the Outlet SMU Builds and their purported Inline counterparts, and on the basis of this comparison, identified whether the differences were "major" or "modest" or whether there were no Inline counterparts. Ms. Goldaper testified that, although the descriptions she ultimately employed—"major" or "modest"—may not be standard throughout the industry, the method she used to compare garments was an "accepted practice." (*Id.* at 58:2–9.) Based on her extensive experience in the fashion industry, the Court finds Ms. Goldaper has sufficient expertise to opine on the degree of similarity between the different garments.

**Relevance:** The standard for relevance is not high. Federal Rule of Evidence 40 defines as relevant evidence which has any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without such evidence. This rule simply requires that the evidence "logically advance a material aspect of the

party's case." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal quotations and citation omitted).

Defendants contend the case centers only on two issues, and that Ms. Goldaper did not opine on either, namely: (i) whether each Outlet SMU Build is similar to an Inline counterpart style and (ii) what the difference is between the value of the garments plaintiffs' purchased and the prices they paid. The Court disagrees. Although Ms. Goldaper admits that she did not opine on the value of any particular Outlet SMU Build relative to its purported Inline counterparts, she did not, as defendants argue, concede that she does not opine on the similarities between Outlet SMU Builds and the Inline styles. The following is the exact colloquy cited by defendants: "Q: Were you asked to render an opinion one way or the other about whether a pair of items were similar? A: Specifically if they were similar or not? I was asked to do exactly what it says in No. 13, and I was limited to answering that." (Goldaper Dep. Tr. 96:7–11.) Paragraph 13 of her opinion reads thus:

> As an apparel expert with over 45 years of experience in the fashion industry, I am of the opinion(s) that: None of the outlet-exclusive styles I reviewed were identical to an inline style. Of the 18 total Outlet SMU Builds I examined, 7 have major material differences from their inline counterparts in design, structure, and/or stylistic detail; 9 have modest stylistic differences compared to their inline counterparts; 1 has no inline counterpart but has modest stylistic differences from another Outlet SMU Build that it is based on; and 1 has no counterpart design at all.

(Dkt. No. 61-4 at 6.) Thus, Ms. Goldaper has performed a comparison describing the degree of differences that exist between the Outlet SMU Builds and their Inline counterparts. Defendants themselves have placed such comparison at issue by arguing that all they need show to escape liability is that the Outline SMU Builds were similar enough to their Inline counterparts such that the reference prices used were accurate and valid. Ms. Goldaper's opinion directly addresses such issue, and is therefore relevant.

Accordingly, the Court **DENIES** defendants' motion to exclude Ms. Goldaper's expert declaration.

**C.      Motion to Exclude Dr. Compeau**

Plaintiffs proffer Dr. Compeau as an expert on consumer behavior.  Specifically, Dr. Compeau provides the following four opinions:  (i) a review of the extant literature demonstrates that consumers are affected and influenced by reference prices; (ii) defendants utilize reference prices extensively; (iii) because the Outlet SMU Builds are never sold anywhere but the outlet stores and never at the reference price, such reference prices are false and suggest to the consumer that they are saving money; and (iv) the reference prices are deceptive and induce consumers to purchase Outlet SMU Builds that they otherwise would not have bought.

Defendants raise three categories of arguments explaining why the Court should exclude in whole or in part Dr. Compeau's expert report:  first, Dr. Compeau's use of meta-analyses is inadmissible; second, in any event, the scientific literature cited by Dr. Compeau does not support his conclusions; and third, certain paragraphs improperly opine on corporate intent or the ultimate questions regarding causation and deception.[2]

**Inadmissibility of Meta-Analysis:**  Defendants seek to exclude Dr. Compeau's report because it reflects no actual expert analysis but instead merely a summary of prior studies. Defendants fail to provide support for such proposition.  Courts routinely allow experts to utilize their expertise in analyzing and compiling research in their field developed by others.  *See, e.g.*, *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1184 (N.D. Cal. 2007).  Here, Dr. Compeau analyzes the findings developed over thirty years of peer-reviewed research on reference pricing, and explains how the evidence in this case is consistent with that research.  Given Dr. Compeau's experience and qualifications, he is certainly qualified to perform such analysis.  The Court thus rejects defendants' argument on this ground.[3]

---

[2]  Defendants also briefly argue that Dr. Compeau's expert report should be excluded pursuant to Federal Rule of Evidence 403 because its probative value is outweighed by the danger of unfair prejudice and confusion.  A central issue in this case is whether the reference prices are likely to deceive the reasonable consumer.  The consumer behavior analyses performed by Dr. Compeau are relevant and probative with regard to this issue.  Defendants' argument fails.

[3] The Court does not rule here that Dr. Compeau can ultimately testify at trial to the specifics of these studies, only that it is not a basis to exclude his opinions.

**Lack of Support for Opinions:** Defendants next argue that Dr. Compeau's own sources do not support his opinions. First, they contend that many of Dr. Compeau's sources are more than fifteen years old. Second, some of the findings in the articles conflict with Dr. Compeau's opinions. Neither of these arguments, however, addresses the admissibility of Dr. Compeau's opinions, but rather, are pertinent to the weight a fact finder may give to Dr. Compeau's conclusions. That some articles may be outdated or may contradict his opinions does not necessarily render Dr. Compeau's report so unreliable as to militate toward exclusion of his report.

**Improper Opinions:** Finally, defendants argue that some of Dr. Compeau's conclusions are outside the scope of his expertise and are, therefore, improper expert opinions. Specifically, defendants challenge (i) statements expressing opinions on defendants' corporate intent; (ii) conclusions that the reference prices "caused" plaintiffs to purchase the garments at issue; and (iii) opinions that such practices are deceptive as defined under California law. With regard to such issues, the Court agrees that some of Dr. Compeau's opinions are improper.

First, Dr. Compeau cannot opine on a defendants' corporate intent (*see, e.g.*, Compeau Rpt. ¶ 48 ("It is my opinion that Columbia must be fully aware of, and relies on the impact of these reference pricing tactics to sell their products.")), and second, he cannot opine on legal conclusions or matters outside the scope of his expertise (*see, e.g.*, *id.* ¶ 53(6) ("Columbia's Reference Pricing scheme is deceptive to consumers and induces consumers into purchasing Columbia outlet exclusive products that, absent the deceptive [sic], they otherwise would not have bought.")). Although Dr. Compeau can certainly discuss certain corporate practices and may opine on whether certain practices may mislead consumers, he cannot go further. *See Nationwide Transport Finance v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059–60 (9th Cir. 2008) (stating that "evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible" and that deciding questions of law is the exclusive province of the trial judge) (internal quotations and citations omitted); *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (expert opinion that reliance was reasonable and foreseeable were inappropriate subjects for expert testimony).

Accordingly, the Court **GRANTS IN PART** defendants' motion to exclude Dr. Compeau's report to the extent that he opines on corporate intent or reaches legal conclusions outside the scope of his expertise. Specifically, the Court **STRIKES** the following paragraphs from Dr. Compeau's expert report: 6; 29 (last sentence); 42 (last sentence); 43; Heading C; 44; 45 (last sentence); 47 (first sentence); 48; 50 (first sentence); 53(3); 53(4); and 53(6).

## III. MOTION FOR SUMMARY JUDGMENT

### A. Legal Framework

Summary judgment is appropriate when no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings, depositions, discovery responses, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (dispute as to a material fact is "genuine" if sufficient evidence exists for a reasonable jury to return a verdict for the non-moving party) (emphases in original).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the opposing party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that the opposing party lacks evidence to support its case. *Id.* If the moving party meets its initial burden, the opposing party must then set out "specific facts" showing a genuine issue for trial in order to defeat the motion. *Id.* (quoting *Anderson*, 477 U.S. at 250). The opposing party's evidence must be more than "merely colorable" and must be "significantly probative." *Anderson*, 477 U.S. at 249–50. Further, that party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that

shows a genuine issue of material fact exists for trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000); *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute"); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("conclusory allegations unsupported by factual data are insufficient to defeat [defendants'] summary judgment motion").

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). However, in determining whether to grant or deny summary judgment, a court need not "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations and citation omitted). Rather, a court is entitled to "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *See id.* (internal quotations and citation omitted); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving-party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### B.    Discussion

Defendants move for summary judgment on two grounds:  first, the reference prices used are valid and therefore inactionable and, second, plaintiffs have failed to establish reliance, deception, materiality, or a concrete injury.  Alternatively, defendants move for partial summary judgment arguing that plaintiffs have failed to produce evidence supporting a viable method of calculating monetary relief here, either as restitution under the UCL and FAL or damages under the CLRA.  The Court addresses each, in turn.

### 1. *Validity of Reference Prices*

Defendants contend that the "reference price" on the tag was a "valid" reference price according to the statutes under which plaintiffs have brought claims, namely section 17501 of the FAL, which reads: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined . . . ." Cal. Bus. & Prof. Code § 17501 (defining "prevailing market price" as the "worth or value" of the product). Defendants then rely on a 1957 Attorney General Opinion, which states that the "phrase 'prevailing market price' means the predominating price that may be obtained for merchandise similar to the article in question on the open market and within the community where the article is sold." 30 Op. Atty. Gen. 127 (1957). Thus, defendants argue, even though the Outlet SMU Build was never sold for the reference prices advertised, California law explicitly allows them to use it because it represents the price that a similar item (namely, the corresponding Inline Style) was sold for at other stores or online.

California's false advertising laws are not so narrow. "California's [UCL] prohibits any 'unlawful, unfair or fraudulent business act or practice. The [FAL] prohibits any 'unfair, deceptive, untrue, or misleading advertising. . . . [Further, the CLRA] prohibits 'unfair methods of competition and unfair or deceptive acts or practices.'" *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Under each, the relevant inquiry is whether the "reasonable consumer" would be deceived by the challenged practice. *Id.* (holding that under the "reasonable consumer standard, [plaintiffs] must 'show that members of the public are likely to be deceived'"). "In a false advertising case, plaintiffs meet this requirement if they show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'" *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). Importantly, such laws "prohibit 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which a capacity, likelihood or tendency to deceive or confuse the public.'" *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 226 (2013) (citation omitted) (modification in original); *see also Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 507–08 (2003). Thus, even a "perfectly

true statement couched in such a manner that is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under th[is] section[]." *Davis v. HSBC Bank Nevada, N.A.*, 691 F. 3d 1152, 1162 (9th Cir. 2012) (citations omitted) (modifications in original). As applied here, the Ninth Circuit has recognized that such practices may be misleading under the relevant California statutes. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1101 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) ("Retailers, well aware of consumers' susceptibility to a bargain, therefore have an incentive to lie to their customers by falsely claiming that their products have previously sold at a far higher 'original price' in order to induce customers to purchase merchandise at a purportedly marked-down 'sale' price.").

Even if the reference prices here satisfied the definition of "former price" for the same or a similar item, such would not negate the alleged deception. Plaintiffs' proffered evidence (*see supra*) demonstrates that consumers could not distinguish based on the price tags between garments which were Outlet SMU Builds that were never sold for the advertised reference price and Inline styles sold at the outlets which were at some point sold for the advertised reference price. Thus, defendants' claim that their practice is inactionable fails. *See Davis*, 691 F. 3d at 1162.[4]

Accordingly, the Court **DENIES** defendants' motion for summary judgment on this ground.

### 2. Reliance, Deception, Materiality, or Injury

Under the UCL and the FAL in a case based on a fraud theory involving false advertising and misrepresentation to consumers, plaintiffs must "demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the

---

[4] The 1957 Attorney General's opinion lends no further support. First, a state attorney general opinion is only persuasive authority and is not binding on this Court. *See Pickles v. Kate Spade & Co.*, No. 15-CV-5329-VC, 2016 WL 3999531, at *1 n.1 (N.D. Cal. July 26, 2016). Second, even so, the opinion does not address this situation where plaintiffs' theory is that the price tags are deceptive because they suggest that the Outlet SMU Builds were *actually* sold at the reference price. Furthermore, even if the Court adopted defendants' theory of the case, genuine issues of fact would remain regarding the degree of similarity between the Outlet SMU Build and their Inline counterparts to support defendants' theory that the reference price advertised was the true "prevailing market price."

United States District Court
Northern District of California

element of reliance in ordinary fraud actions." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326–27 (2011) (internal quotations and citation omitted). Similarly, under the CLRA, plaintiffs must show that the consumer was injured "as a result" of the allegedly deceptive practice. Cal. Civ. Code § 1780(a).

Defendants argue that here, the evidence demonstrates that plaintiffs did not rely on the reference prices in making their purchasing decisions. Specifically, five of the eight items at issue were purchased by plaintiffs *after* the original complaint had been filed at which time plaintiffs would have had notice of the allegedly deceptive practice. (*See* Plaintiffs' Appendix A Items 2, 4, 5, 6, and 7.) For this set of garments, defendants argue that plaintiffs could not have reasonably relied on the reference prices on the tags. For arguably four of the items, plaintiff Jeanne Stathakos indicated the she would still have purchased the items even if she had known that the reference prices were false, but Nicholas Stathakos testified that he was unsure as to whether they would have purchased the same. (*Id.* Items 2, 3(b), 4, and 6.)[5] As to the remaining items, both plaintiffs testified that they were unsure as to whether they would have still purchased the garments had they known of the deceptive nature of the price tags. (*See generally id.*)

The Court finds that with regard to the five items purchased by plaintiffs after the original complaint was filed, summary judgment in favor of defendants is appropriate. Plaintiffs argue that their post-complaint purchases are still actionable because they continued to be misled by the price tags given that it was impossible to distinguish between Outlet SMU Builds and the Inline styles sold at the outlet stores. Although that may be the case, plaintiffs knew after filing their complaint of the practices which they now allege are misleading. Therefore, they could not have actually

---

[5] With regard to Item 3(b), the parties dispute the nature of plaintiff Jeanne Stathakos' response, which is as follows: "Q: Do you consider 8.98 to be a good price for these shorts? A: Yes, I believe so. Q: And why is that? A: Based on the style; I liked it. I don't remember exactly what the original price—price was. I felt that it was a substantial bargain. And so I don't have white shorts; I could use them. Q: Okay. Do you know whether these white shorts were sold at a Columbia retail store or REI, anywhere other than the outlet? A: No, I do not. Q: And if I asked you to assume that they had not been sold anywhere else other than the outlet, would you have still bought them for 8.98? A: Yes, I believe so." (J. Stathakos Dep. Tr. 74:19–75:10.) Defendants argue that such was a concession that she would have purchased the same item had she known the reference price was misleading, while plaintiffs contend that the question and response are ambiguous as to that issue. Such dispute is an issue of fact to be reserved for trial.

14

relied on the reference prices on the price tags on any of the garments at defendants' outlet stores. *See Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 807–08 (2007) (dismissing claims and finding that plaintiff cannot satisfy the "actual reliance" requirement where she purchased items knowing that "defendant may have made false or materially incomplete representations about its product"), *disapproved of on other grounds by Kwikset*, 155 Cal. App. 4th at 338. Accordingly, the Court **GRANTS** defendants' motion for summary judgment with regard to the five items purchased by plaintiffs after the original complaint in this action was filed.[6]

However, with regard to the other products at issue, the Court finds that plaintiffs have at least raised triable issues of fact as to whether they relied on the reference prices in making their purchases. As to such purchases, plaintiffs' depositions were either ambiguous or indicate uncertainty as to whether they would have purchased the garments at issue had they known of the misleading nature of the reference prices. *See Chowning v. Kohl's Dep't Stores, Inc.*, No. 15-CV-8673-RGK, 2016 WL 1072129, at *4 (C.D. Cal. Mar. 15, 2016). Additionally, both filed reply declarations averring that they understood the reference prices to be true former prices, that the amount of the discount is an important factor they use in purchasing decisions, and that had they known the truth, their "understanding of the discount would have been different" and thus, they may "have decided not to purchase some or all of the items." (Dkt. No. 86-7 at 2 (N. Stathakos Declaration); Dkt. No. 86-8 at 3 (J. Stathakos Declaration).) Thus, with regard to the items described as Items 1, 3(a), and (3)(b) in Plaintiffs' Appendix (Dkt. No. 86-1), the Court **DENIES** defendants' motion for summary judgment.

### 3. *Monetary Relief*

"The [FAL], the [UCL], and the CLRA authorize a trial court to grant restitution to private litigants asserting claims under those statutes." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 694 (2006); *see also* Cal. Bus. & Prof. Code § 17203 (authorizing court to "restore to any person . . . any money or property . . . which may have been acquired by means of such

---

[6] The Court notes, however, that given that this litigation is proceeding as a class action incorporating all Outlet SMU Builds for the class period, the effect of summary judgment as to these garments for the named plaintiffs is merely technical. Defendants conceded as much at oral argument.

unfair competition"); *id.* § 17535 (same with regard to the FAL). "Under the [FAL] and [UCL], the remedy of restitution serves two purposes—returning to the plaintiff monies in which he or she has an interest and deterring the offender from future violations." *Colgan*, 135 Cal. App. 4th at 695–96. In addition, the CLRA allows plaintiffs to recover actual and punitive damages. Cal. Civil Code § 1780(a)(1)–(5); *see also* Cal. Civ. Code § 3343(a) (defrauded party is entitled to recover as damages the "difference between the actual value of that which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction").[7] With regard to restitution under the CLRA, there is "nothing to suggest that [such remedy] should be treated differently than the restitution remedies provided under the [FAL] or [UCL]." *Colgan*, 135 Cal. App. 4th at 694.

As an initial matter, the Court rejects defendants' argument that the only possible measure of monetary relief here is the difference between the actual value of the garments and the price paid. California courts have recognized that the price-to-value method is not the exclusive measure of restitution potentially available in a false advertising case. *See In re Tobacco Cases II*,

_____

[7] Under the CLRA, plaintiffs may seek restitution and actual damages in addition to other forms of monetary relief, including punitive damages and attorneys' fees. *See* Cal. Civ. Code § 1780(a)(4), (e); *see also Chowning*, 2016 WL 1072129, at *13. Plaintiffs briefly assert in their motion for class certification that their models apply both to restitution under the UCL and the FAL and to damages under the CLRA. However, the parties' arguments focused primarily on the appropriateness of each model as a measure of restitution, and none of plaintiffs' models appears to calculate any "actual damages" incurred by plaintiffs, apart from restitution. *See Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 174 (2000) ("In a fraud action the court may award as damages money fraudulently taken from the plaintiff. Civil Code section 3343, subdivision (a), provides: 'One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction. . . .' Thus, while the award of damages may be greater than the sum fraudulently acquired from the plaintiff, the award includes an element of restitution—the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.").

Thus, the Court's discussion below is limited to restitution under the UCL, FAL, and CLRA. Plaintiffs may attempt to pursue other measures of restitution not discussed below, or damages calculations under the CLRA. However, the Court notes that claims for actual damages under the CLRA may not be susceptible to class resolution here given the more demanding requirements under the same. *See Wilens v. TD Waterhouse Grp., Inc.*, 120 Cal. App. 4th 746, 754 (2003) ("Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof."); *see also Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069–70 (9th Cir. 2014) ("Unlike the UCL, the CLRA demands that each potential class member have both an actual injury and show that the injury was caused by the challenged practice.").

16

240 Cal. App. 4th 779, 893 (2015); *see also People v. Superior Court*, 9 Cal. 3d 283, 286 (1973)

(holding that a court "may exercise the full range of its inherent powers in order to accomplish

complete justice between the parties").  However, courts have also recognized that there are

limitations on the measures of restitution to which plaintiffs may be entitled.  *See Day v. AT&T*,

63 Cal. App. 4th 325, 338–39 (1998) ("Taken in the context of the statutory scheme, the definition

suggests that section 17203 operates only to return to a person those *measurable amounts* which

are *wrongfully taken* by means of an unfair business practice." (emphases in original)); *In re

Tobacco Cases II*, 240 Cal. App. 4th at 893–94 (rejecting certain measures of restitution as

inappropriate).  Specifically, courts have identified the following principles in fashioning

restitution remedies under California's consumer protection laws:

> First, restitution cannot be ordered exclusively for the purposes of deterrence. . . .
> Second, even though plaintiffs may pursue alternative forms of restitution [from
> the price-to-value method], any proposed method must account for the benefits or
> value that a plaintiff received at the time of purchase.  Finally, the amount of
> restitution must represent a measurable loss supported by the evidence.

*Chowning*, 2016 WL 1072129, at *6 (citations omitted).

Against this backdrop, the Court turns to an analysis of plaintiffs' proffered methods for

calculating monetary relief here, namely:  (i) full refund; (ii) promised discount; and (iii)

disgorgement of profits.  Defendants oppose each method, arguing that each is barred by

applicable case law.

### a.    *Full Refund*

Plaintiffs proffer that they are entitled to receive as restitution a full refund for every dollar

spent purchasing the garments at issue.  Plaintiffs argue that a return of the full price of each

garment is appropriate here because plaintiffs would not have spent any money on the garments

absent the alleged misrepresentation on the price tags.

Plaintiffs do not persuade.  Under California law, a full refund may be available as a means

for restitution only when "plaintiffs prove the product had *no* value to them."  *In re Tobacco

Cases II*, 240 Cal. App. 4th at 895 (emphasis in original); *see also Allen v. Hyland's Inc.*, 300

F.R.D. 643, 671 (C.D. Cal. 2014) ("Plaintiffs' contention that they are entitled to full restitution is

linked to their theory that the products they paid for are worthless because they did not provide

any of the advertised benefits and had no ancillary value."); *Allen v. Similasan Corp.*, 306 F.R.D. 635, 649 (S.D. Cal. 2015) ("Here, restitution is the equivalent of out-of-pocket expenses because, under Plaintiffs' theory, the purchased Products are ineffective and therefore worthless."); *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 639 (S.D. Cal. Sept. 18, 2015) (allowing full refund model where plaintiffs' theory of liability was that the students "received none of the advertised benefits of [Trump University]"); *cf. Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 898–99 (N.D. Cal. 2016) (allowing full refund model where product was advertised to "treat joint health problems or to keep joints healthy" but did not do so).

Here, plaintiffs undeniably obtained some value from the garments they purchased, separate and apart from the allegedly deceptive advertising practices. Both plaintiffs testified that they considered several aspects of the products before making purchasing decisions, including the price of the product and perceived discount, the fit and look of the product, and its function. (*See* J. Stathakos Dep. Tr. 70:25–71:12 ("Q: Do you remember why or what about this item made you purchase it? A: Well, first of all, I liked the color and also that it was a sweater dress that kind of fitted a need, I guess, for where we were traveling to because it was one of those easy-to-wear articles. And then the price, as I mentioned before, with AAA you get a slightly better discount too. So based on that, it was . . . So based on that, that's what drew me in and made me purchase it."); N. Stathakos Dep. Tr. 34:9–16 ("Q: If you're looking at a particular item of clothing—let's say at Columbia, a Columbia outlet—what factors go into your decision to buy that item? A: Well, myself personally, again, size and fit is important. So it's first of all finding the—an item of clothing that fits me appropriately and well, and then how it's priced, how much of a discount I'm getting."). Thus, while the value of the discount is an important factor for plaintiffs, they also placed intrinsic value in the garment itself. Plaintiffs presented no evidence suggesting that the garments themselves were deficient. In such cases, courts have rejected the full refund model of restitution. *See Chowning*, 2016 WL 1072129, at *7 ("This model fails to account for the value Plaintiff received and, therefore, runs afoul of the limiting principle discussed above."); *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 2466559, at *15 (N.D. Cal. May

30, 2014) ("[Plaintiff's] full refund model is deficient because it is based on the assumption that consumers receive no benefit whatsoever from purchasing the identified products.").[8]

Accordingly, the Court **GRANTS** summary judgment in favor of defendants and finds that plaintiffs are not entitled to a full refund given the facts and circumstances present here.

### b. *Promised Discount*

Plaintiffs' second proposed model seeks to recover as restitution the value of the "promised discount." For instance, for an object with a reference price of $30, an outlet price of $24.90, and an actual purchase price of $11.98, such as Item 3(a) (SMU Style No. XL4712) (*see* Plaintiffs' Appendix), the model would operate thus: The promised discount in such case would be 17%, which is the discount between the outlet price and the reference price. Such percentage would then be applied to the actual purchase price, in this case, $11.98, to arrive at a figure of approximately $2.04. (*See* Olsen Report ¶ 17(c)(vi).) Plaintiffs argue that such a method isolates the exact benefit promised to plaintiffs by the allegedly deceptive price tags and compensates plaintiffs only for that specific benefit.

The Court is aware of only two opinions addressing this theory of damages, and each resulted in a different conclusion. Plaintiffs rely on the court's decision in *Spann*. There, the court held that because the defendant "accepted plaintiff's money in exchange for clothing items," plaintiff's "interest in the money is not merely an expectation interest," and the model appropriately compensated for the alleged damage. *Spann*, 2015 WL 1526559, at *7. Defendants, on the other hand, rely on the court's decision in *Chowning*. There, the court disagreed with *Spann* explaining that, although plaintiffs did indeed have more than a mere expectation interest in the money, the promised discount model "seeks to award Plaintiff the bargain she expected to receive without any focus on the amount of money she lost in the process." *Chowning*, 2016 WL

---

[8] Plaintiffs' primarily rely on *Spann v. J.C. Penney Corp.*, No. 12-CV-215-FMO, 2015 WL 1526559 (C.D. Cal. Mar. 23, 2015) in support of their position that a full refund model may be available here. This Court respectfully disagrees with the finding in *Spann*. The court in *Spann* relied on general principles indicating that the opportunity to rescind a "contract, return the products, and obtain a refund" could be an appropriate remedy. *Id.* at *6. However, the court did not address specifically the separate issue of whether restitution in a false advertising case is appropriate if plaintiffs received value from the transaction at issue.

1072129, at *10.

The Court finds *Chowning* more persuasive. In the conventional mislabeling or false advertising case, plaintiffs generally allege that absent the alleged misrepresentation, "demand for [the product] would have been less and the [product's] market price would have been lower." *See In re POM Wonderful LLC*, No. 10-ML-2199-DDP, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) (allegations that advertisements concerning health benefits of certain juice products were misleading). In such cases, courts have found that a proper measure for restitution could be the difference between the actual price paid and the price of the product "but for" the alleged misrepresentation, i.e., the price premium caused by the misrepresentation. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 983, 989 (9th Cir. 2015) ("The calculation need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase. Instead, in calculating restitution under the UCL and FAL, the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information.") (citing *Kwikset*, 51 Cal. 4th at 329).

The case at bar presents analogous issues. In essence, by proffering this restitution model, plaintiffs are claiming that "but for" the reference price, plaintiffs would have been willing to pay only a price lower than what they actually paid for each product. Thus, a proper measure of restitution could be the delta between the price plaintiffs actually paid and the price a reasonable consumer would have paid absent the reference price. However, the promised discount model does not purport to measure that difference, but assumes that plaintiffs would have purchased such products only if the "promised discount" were applied to the actual purchase price. As the court in *Chowning* found, such would be the equivalent of awarding plaintiffs expectation damages, without accounting for the amount of money plaintiffs actually lost in the process. Such would be outside the scope of the restitution remedies allowed under California law. Accordingly, the Court **GRANTS** summary judgment in favor of defendants and finds that the promised discount method is not a proper measure of restitution here.

c.       ***Disgorgement of Profits***

Plaintiffs also propose the disgorgement of profits as a viable measure of damages. Essentially, plaintiffs' model calculates profits by subtracting the total landed cost for each product from the actual purchase price. (Dkt. No. 59-9 at 11–12.) In cases where the total landed cost was greater than the purchase price, plaintiffs valued such transaction at "$0." (*Id.*)

California law recognizes two distinct types of disgorgement, namely "restitutionary disgorgement, which *focuses on the plaintiff's loss*, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment." *In re Tobacco Cases II*, 240 Cal. App. 4th at 800 (citation omitted) (emphases in original). In cases claiming restitution under California's consumer protection laws, the California Supreme Court has held that only restitutionary disgorgement may be available. *Id.*; *see also Trazo v. Nestle USA, Inc.*, 113 F. Supp. 3d 1047, 1052 (N.D. Cal. 2015) ("The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received, not the full purchase price or all profits. There is no reason to go beyond the price premium, and doing so would result in a windfall to plaintiff." (citation omitted)).[9]

Plaintiffs' model for disgorgement of profits focuses on defendants' gain in the transaction, but again fails to take into account any benefits or value gained by plaintiffs. Plaintiffs attempt to circumvent this issue by arguing that plaintiffs' loss is equal to the full purchase price because the purchase would not have occurred absent the allegedly misleading statement on the price tags. Relying again on the court's decision in *Spann*, plaintiffs argue that their model of disgorgement can properly be described as restitutionary in nature because "the money plaintiff seeks was

---

[9] For instance, in *In re Tobacco Cases II*, plaintiffs sought disgorgement of profits gained from defendants' sale of cigarettes advertised as "light" or "lowered tar and nicotine." Plaintiffs argued that "disgorgement of all the money they spent on Marlboro Lights, or its profits thereon, would be restitutionary" because the rule "against nonrestitutionary disgorgement merely 'prohibits a plaintiff from seeking return of money in which he *never* had an ownership interest.'" *In re Tobacco Cases II*, 240 Cal. 4th at 801 (citation omitted) (emphasis in original). The appellate court rejected plaintiffs' argument, explaining that "restitution without proof of any loss to any plaintiff cannot be characterized as *restitutionary*." *Id.* (emphasis in original) (citing *Red v. Kraft Foods, Inc.*, No. 10-CV-1028-GW, 2012 WL 8019257, at *11 (C.D. Cal. Apr. 12, 2012) (finding that disgorgement of full profits would "constitute nonrestitutionary disgorgement" where plaintiffs received some benefit from the products); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148 (2003) ("Under the UCL, an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant in which the plaintiff has an ownership interest.").

obtained by the defendant from the plaintiff in the first place." *Spann*, 2015 WL 1526559, at \*8 (citation omitted).[10]

Here, the evidence demonstrates that plaintiffs undeniably obtained some benefit or value from the products they purchased from defendants, separate and apart from the value they thought they were receiving based on the allegedly deceptive price tags. The proposed measure of restitution fails to account for that benefit, and is, therefore, impermissible under California law. Accordingly, the Court **GRANTS** summary judgment in favor of defendants with regard to plaintiffs' claim for disgorgement of profits.

## IV. MOTION FOR CLASS CERTIFICATION

### A. Legal Framework

Under Federal Rule of Civil Procedure 23(a), the Court may certify a class only where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Courts refer to these four requirements as "numerosity, commonality, typicality[,] and adequacy of representation." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

Once the threshold requirements of Rule 23(a) are met, plaintiffs must then show "through evidentiary proof" that a class is appropriate for certification under one of the provisions in Rule 23(b). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Here, plaintiffs seek certification under Rule 23(b)(2) and Rule 23(b)(3).

Rule 23(b)(2) requires plaintiffs to establish that the "party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

---

[10] Plaintiffs further rely on *Aguayo v. U.S. Bank*, 200 F. Supp. 3d 1075 (S.D. Cal. 2016). However, such case is inapposite, and actually contradicts plaintiffs' position. *Aguayo* involves profits "earned from [] deficiency payments," which plaintiffs claimed were unlawfully collected. *Id.* at 1077. In finding that plaintiffs could recover such profits as restitution, the court noted that such was appropriate to "the extent [plaintiffs] can produce evidence 'permitting a reasonable approximation of the amount of the wrongful gain.'" *Id.* (citation omitted). Thus, even *Aguayo* required an additional showing of how much of such profits was "wrongful gain."

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Ellis*, 657 F.3d at 986 (citation omitted). In a class action "predominantly for money damages . . . th[e] absence of notice and opt-out violates due process" and renders certification of a Rule 23(b)(2) class inappropriate. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011).

Rule 23(b)(3) requires plaintiffs to establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Wal-Mart*, 564 U.S. at 351); *see also Mazza*, 666 F.3d at 588. The Court considers the merits to the extent they overlap with the Rule 23 requirements. *Ellis*, 657 F.3d at 983. The Court must resolve factual disputes as "necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*." *Id.* (emphasis in original). "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.'" *Aburto v. Verizon Cal.*, Inc., No. 11-CV-03683-ODW, 2012 WL 10381, at *2 (C.D. Cal. Jan. 3, 2012) (quoting *Ellis*, 657 F.3d at 982), *abrogated on other grounds as recognized by Shiferaw v. Sunrise Sen. Living Mgmt., Inc.*, No. 13-CV-2171-JAK, 2014 WL 12585796, at *24 n. 16 (C.D. Cal. June 11, 2014). "A party seeking class certification must affirmatively demonstrate [its] compliance with the Rule." *Wal-Mart*, 564 U.S. at 350. Ultimately, the Court exercises its discretion to determine whether a class should be certified. *Califano v. Yamasaki*, 442 U.S. 682, 703 (1979).

**B.      Discussion**

Plaintiffs contend that they have established all requirements for certification of the class under both Rule 23(b)(2) and Rule 23(b)(3).  Given the Court's grant of summary judgment in favor of defendants on plaintiffs' proffered methods for calculating monetary relief in this case, the Court finds that plaintiffs have not presented common evidence to support a Rule 23(b)(3) damages class.  Accordingly, the Court **DENIES** without prejudice plaintiffs' motion to certify the same.

Thus, the Court addresses only the requirements for certification of a Rule 23(b)(2) class below.  The Court first addresses the threshold requirements under Rule 23(a)—numerosity, commonality, typicality, and adequacy—and then addresses whether certification is appropriate under Rule 23(b)(2).

*1.      Numerosity*

Rule 23(a)(1) requires that each proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiffs need not state an exact number to meet the threshold requirements of Rule 23.  Rather, the rule "requires examination of the specific facts of each case and imposes no absolute limitations."  *Gen. Tel. Co. of the Nw. Inc. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 330 (1980); *see also Gold v. Midland Credit Mgmt., Inc.*, 306 F.R.D. 623, 630 (N.D. Cal. 2014); *see, e.g.*, *Patrick v. Marshall*, 460 F. Supp. 23, 29 (N.D. Cal. 1978) (certifying class with at least thirty-nine potential members).

Defendants argue a lack of numerosity on the theory that plaintiffs have failed to demonstrate that the prices were invalid, that anyone relied on such prices or found the reference prices to be material, or that the value of the garment exceeded the price paid.  Such arguments, however, relate to the merits of plaintiffs' claims, not whether the class as defined meets the numerosity requirement under Rule 23(a).  For the purposes of class certification, plaintiffs have sufficiently proffered evidence demonstrating that there are potentially tens of thousands, if not hundreds of thousands of members in the proposed class.  (*See* Bui Dep. Tr. 26:22–27:9 (testifying that for the seven Outlet SMU Builds purchased by plaintiffs, there were tens of thousands of transactions between July 1, 2014 through September 16, 2016); Olson Dep. Tr. 144:15–145:16

(testifying that defendants have approximately 580 distinct Outlet SMU Builds and that the typical

minimum purchase order for any one Outlet SMU Build is 3,000 units).)  Accordingly, the Court

finds that plaintiffs have satisfied their burden with regard to demonstrating numerosity.

### 2. *Commonality*

Rule 23(a)(2) requires that the party seeking certification show that "there are questions of

law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, a common

question "must be of such a nature that it is capable of classwide resolution—which means that the

determination of its truth or falsity will resolve an issue that is central to the validity of each one of

the claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.  The existence of common questions itself

will not satisfy the commonality requirement, and instead, "[w]hat matters to class certification

. . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the

resolution of the litigation."  *Id*. (citation omitted) (emphasis in original).

Plaintiffs proffer the following common questions:  (i) defendants' use of reference prices

on its Outlet SMU Builds was uniform across all outlet stores; (ii) the reference prices were

misleading to reasonable consumers; and (iii) such representations were material and consumers

relied upon the same.  With regard to the first question, no dispute exists that defendants' pricing

scheme was uniform throughout its outlet stores for all Outlet SMU Builds.  With regard to the

second question, defendants claim that the reference prices were valid and therefore not

misleading.  The Court has already rejected this argument in the context of summary judgment

above, and rejects it again here.

The only question that remains is whether plaintiffs have common evidence to demonstrate

classwide reliance and materiality.  The Court finds that they have.  Under the UCL or the FAL

"based on false advertising or promotional practices, it is necessary only to show that members of

the public are likely to be deceived."  *Pulaski*, 802 F.3d at 985.  "[A] court need not make

individual determinations regarding entitlement to restitution.  Instead, restitution is available on a

classwide basis once the class representative makes the threshold showing of liability under the

UCL and FAL."  *Id.*  Here, plaintiffs have proffered the actual price tags, which they argue is

common evidence that such misrepresentations are likely to mislead reasonable consumers.

Additionally, plaintiffs' expert, Dr. Compeau, has submitted an expert declaration indicating that such practices are likely to mislead reasonable consumers into believing that the price listed refers to an actual, true former price for the object.

Defendants' main argument centers on their own expert's declaration, which includes a survey rebutting plaintiffs' theory of reliance. Specifically, defendants' expert opines that (i) consumers were driven, in large part, by the garment's attributes rather than price (*see* Scott Report ¶¶ 22–26); (ii) only a few consumers rated the perceived discount as a very important factor (*id.* ¶24); (iii) many consumers would have still purchased the item knowing that the reference price only concerned a price at which a similar item sold (*id.* ¶¶ 26–31); and (iv) there was no uniform understanding of what the reference prices represented (*id.* at ¶¶ 24, 27). On this proffer, defendants challenge certification. *See Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 457 (S.D. Cal. May 12, 2014) (finding class certification inappropriate where defendants' persuasive and objective evidence demonstrated that a substantial number of potential class members were not misled by claims that the product would last for twenty-four hours); *see also Jones v. ConAgra Foods, Inc.*, No. 12-CV-1633-CRB, 2014 WL 2702726, at *14 (N.D. Cal. June 13, 2014) (finding class certification not appropriate where consumers' understanding of the phrase "All Natural" was not uniform).

The Court does not find defendants' expert's opinions sufficiently persuasive to rebut the presumption of reliance and materiality afforded to plaintiffs at this stage. Plaintiffs' rebuttal expert, Dr. Poret, identifies several flaws in Dr. Scott's analysis. (Dkt. No. 86-4.) For instance, Dr. Scott concludes that only 40% of consumers understood the reference price to be "former prices." However, that percentage depends on the manner in which Dr. Scott categorized the responses to her question. Although only 40% specifically described the reference price as the "original or first sale price, actual price," others described it as the "retail price," "price before it 'went on sale,' the 'sale' price," "price in another store," or "discount/before discount price." (*Id.* at 14.) Such descriptions arguably fall into plaintiffs' theory as to why defendants' use of the reference prices here are misleading. Additionally, using Dr. Scott's own survey results, Dr. Poret identifies that over 80% of respondents rated the savings they received as a five or higher (on a

United States District Court
Northern District of California

1  scale of one to seven with seven being the most important) when asked about the importance of

2  the same in making purchasing decisions.  (*Id.* at 30.)  Rather than rebut plaintiffs' claims, such

3  survey results could, in fact, support plaintiffs' theories of reliance and materiality.

4       Accordingly, the Court finds that plaintiffs have satisfied the commonality requirement for

5  class certification under Rule 23(a).

6                 **3.    Typicality**

7       To satisfy typicality, plaintiffs must establish that the "claims or defenses of the

8  representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

9  "The purpose of the typicality requirement is to assure that the interest of the named representative

10  aligns with the interests of the class."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168,

11  1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

12  "The test of typicality is whether other members have the same or similar injury, whether the

13  action is based on conduct which is not unique to the named plaintiffs, and whether other class

14  members have been injured by the same course of conduct."  *Id.* (citation omitted).

15       With regard to this requirement, defendants argue that plaintiffs are atypical because

16  plaintiffs' purchases in this case confirm that they did not rely on the reference prices at all and

17  there is no evidence that they received any items that are worth less than what they paid.

18  Defendants' arguments with respect to typicality essentially mirror their arguments for summary

19  judgment as to plaintiffs' reliance.  For the same reasons that the Court rejected such arguments in

20  the context of summary judgment, the Court rejects defendants' arguments here.  The record

21  demonstrates that, at least with respect to the items purchased prior to the filing of the complaint,

22  plaintiffs relied on the representations on the price tags to make their purchasing decisions.

23       Accordingly, the Court finds that plaintiffs have satisfied their burden with regard to Rule

24  23(a)'s typicality requirement.

25                 **4.    Adequacy**

26       Rule 23(a)'s adequacy requirement considers "(1) [whether] the representative plaintiffs

27  and their counsel have any conflicts of interest with other class members, and (2) [if] the

28

representative plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class." *Staton v. Boeing*, 327 F.3d 938, 957 (9th Cir. 2003).

Defendants argue here that plaintiffs are inadequate because they have essentially ceded control over the litigation to counsel. The record, however, does not raise concerns. Both plaintiffs have filed declarations in support of the instant motions, have been deposed, and have testified that they have reviewed the complaints in this action. Absent convincing evidence to the contrary, such are sufficient to demonstrate that the representative plaintiffs will prosecute this action vigorously on behalf of the class.[11] Thus, the Court finds that the named plaintiffs here satisfy the adequacy requirement under Rule 23(a).

Defendants' concerns regarding the actions of plaintiffs' counsels' firm in other contexts, does not extend to counsel here, or render them inadequate. Accordingly, the Court also finds that plaintiffs' counsel, namely Tycko & Zavareei, LLP and Kopelowitz Ostrow Ferguson Weiselberg Gilbert, are adequate for the prosecution of this class action.

### 5. Rule 23(b)(2) Injunctive Relief Class

Finally, a Rule 23(b)(2) class requires plaintiffs to establish that the "party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Class certification under Rule 23(b)(2) is appropriate only where the primary relief is declaratory or injunctive." *Ellis*, 657 F.3d at 986 (citation omitted). In a class action "predominantly for money damages . . . th[e] absence of notice and opt-out violates due process" and renders certification of a Rule 23(b)(2) class inappropriate. *Wal-Mart*, 564 U.S. at 363.

Here, there is no dispute that the final injunctive relief sought by plaintiffs—namely, the discontinuation of defendants' current use of reference prices—would apply generally to the entire class. Defendants' argue, instead, that certification of a Rule 23(b)(2) class is inappropriate here

---

[11] Defendants also argue that plaintiffs are inadequate for the same reasons they contend that plaintiffs are atypical. For the same reasons that the Court rejected such arguments in the context of typicality, it does so again with regard to adequacy.

because the primary relief requested by plaintiffs is, in fact, damages.  *See Algarin*, 300 F.R.D. at

459 ("Certification is improper where, as here, the request for injunctive and/or declaratory relief

is merely a foundational step towards a damages award which requires follow-on individual

inquiries to determine each class member's entitlement to damages.").  Plaintiffs concede that they

seek damages only under Rule 23(b)(3) and not under Rule 23(b)(2).  (Dkt. No. 86 at 46.)  Thus,

"whether the damages claims are incidental to the injunctive relief the [plaintiffs] seek is

irrelevant, because the [plaintiffs] are not seeking to recover damages for the proposed Rule

23(b)(2) class[]."  *Roy v. Los Angeles*, Nos. 12-CV-9012-BRO, 13-CV-4416-BRO, 2016 WL

5219468, at *16–17 (C.D. Cal. Sept. 9, 2016).[12]

Because plaintiffs have satisfied all the requirements for class certification under Rule

23(a) and Rule 23(b)(2), the Court finds that certification of plaintiffs' proposed class as a Rule

23(b)(2) class is appropriate.  At oral argument, plaintiffs requested another opportunity to present

a damages calculation acceptable to the Court and preferred the certification of a Rule 23(b)(3)

class over a Rule 23(b)(2) injunctive relief class.

Accordingly, and in the interest of judicial efficiency, the Court **CONDITIONALLY**

**CERTIFIES** a Rule 23(b)(2) class as set forth below.

## V.  CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows:  The Court **DENIES** defendants'

motion to exclude Dr. Goldaper.  The Court **GRANTS IN PART** defendants' motion to exclude Dr.

Compeau and **STRIKES** the following paragraphs from his expert report:  6; 29 (last sentence); 42

(last sentence); 43; Heading C; 44; 45 (last sentence); 47 (first sentence); 48; 50 (first sentence);

53(3); 53(4); and 53(6).  The Court **GRANTS** summary judgment in favor of defendants with

respect to plaintiffs' methods for calculating monetary relief, but **DENIES** summary judgment in all

other respects.  The Court **GRANTS IN PART** plaintiffs' motion for class certification, and

---

[12]  Defendants also argue that a Rule 23(b)(2) class is not necessary because the same injunctive relief could be obtained by plaintiffs on an individual basis.  However, no such necessity requirement exists under such rule, as several district court cases in this circuit have found.  *See McMillon v. Hawai'i*, 261 F.R.D. 536, 547–48 (D. Hawai'i 2009) ("This court agrees with the recent district court cases in this circuit that have repeatedly refuted the existence of a needs requirement as a component of Rule 23(b)(2).") (citing cases).

**CONDITIONALLY CERTIFIES** the following Rule 23(b)(2) class: "All consumers who have purchased an Outlet SMU Build at a Columbia Outlet store in the State of California since July 1, 2014, through the conclusion of this action."

Within fourteen (14) days of this Order, plaintiffs must file a notice indicating their intent to pursue a Rule 23(b)(3) class. If plaintiffs no longer intend to pursue the same, the Court's conditional certification of the Rule 23(b)(2) class shall become final. Otherwise, the parties must file a joint statement within seven (7) days of plaintiffs' notice setting forth a proposed briefing schedule for plaintiffs' motion to certify a Rule 23(b)(3) class. The Court will permit defendants to move for summary judgment only as to any new methods for calculating restitution and damages proffered by plaintiffs in their amended motion for class certification.

This Order terminates Docket Numbers 61, 75, 76, and 77.

**IT IS SO ORDERED.**

Dated: May 11, 2017

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**